**TOGUT, SEGAL & SEGAL LLP**
Albert Togut
Kyle J. Ortiz
Brian F. Moore
One Penn Plaza, Suite 3335
New York, NY 10119
Phone: (212) 594-5000
Email: altogut@teamtogut.com
　　　 kortiz@teamtogut.com
　　　 bmoore@teamtogut.com

*Proposed Counsel to the Debtors and
Debtors in Possession*

**SHEARMAN & STERLING LLP**
Fredric Sosnick
William S. Holste
Jacob S. Mezei
599 Lexington Avenue
New York, NY 10022
Phone: (212) 848-4000
Email: fsosnick@shearman.com
　　　 william.holste@shearman.com
　　　 jacob.mezei@shearman.com

**SHEARMAN & STERLING LLP**
Ian E. Roberts (*pro hac vice* pending)
2601 Olive Street, 17th Floor
Dallas, TX 75201
Phone: (214) 271-5777
Email: ian.roberts@shearman.com

*Proposed Special Counsel to the Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| VICE GROUP HOLDING INC., *et al.* | Case No. 23-10738 (__) |
| Debtors.[1] | (Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL
ORDERS (I) AUTHORIZING THE DEBTORS TO PAY PREPETITION
CLAIMS OF CERTAIN (A) FREELANCERS, (B) CRITICAL VENDORS,
AND (C) FOREIGN VENDORS; AND (II) GRANTING RELATED RELIEF**

---

[1]　The last four digits of Debtor Vice Group Holding Inc.'s tax identification number are 4250. Due to the large number of debtors in these chapter 11 cases, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://https://cases.stretto.com/vice/. The location of the Debtors' service address for purposes of these chapter 11 cases is: 49 South 2nd Street, Brooklyn, NY 11249.

Vice Group Holding Inc. and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), respectfully represent in support of this motion (the "Motion") as follows:

## Relief Requested

1.     The Debtors request entry of an interim order in the form attached hereto as **Exhibit A** (the "Proposed Interim Order") and a final order in the form attached hereto as **Exhibit B** (the "Proposed Final Order" and, together with the Proposed Interim Order, the "Proposed Orders") (i) authorizing, but not directing, the Debtors to pay or otherwise honor certain prepetition claims and obligations, in the ordinary course of business, owing to:  (a) Freelancers; (b) Critical Vendors; and (c) Foreign Vendors (each as defined below, and collectively, the "Key Suppliers", and the obligations relating thereto, the "Key Supplier Claims"), and (ii) setting the date of a final hearing and granting related relief.  The Debtors request that the Court schedule a final hearing within approximately 21 days to consider approval of this Motion on a final basis.

## Jurisdiction and Venue

2.     The United States Bankruptcy Court for the Southern District of New York (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the Southern District of New York, dated January 31, 2012 (Preska, C.J.) (the "Amended Standing Order").

3.     Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409. The bases for relief are sections 105(a) and 363(b) of title 11 of the United States Code (the "Bankruptcy Code"), Rules 6003 and 6004 of the Federal Rules of Bankruptcy

Procedure (the "<u>Bankruptcy Rules</u>"), and Rule 9013-1 of the Local Bankruptcy Rules for the Southern District of New York (the "<u>Local Rules</u>").

4.      This Motion is a core proceeding pursuant to 28 U.S.C. § 157(b).  The Debtors confirm their consent to the Court's entry of a final order in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

<u>Background</u>

5.      On the date hereof (the "<u>Petition Date</u>"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code with this Court and contemporaneously herewith have requested joint administration of the Chapter 11 Cases for procedural purposes only, pursuant to Bankruptcy Rule 1015(b).  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases, and no official committees have been appointed or designated.

6.      From their humble beginnings as an alternative magazine, the Debtors and their non-Debtor affiliates (collectively, "*VICE*") have grown into the largest independent youth-targeted media company in the world.  Today, *VICE* is a global, multiplatform media company that has a powerful brand, diversified financial profile, premium content, and rich audience engagement with its youth targeted audience. With production hubs around the world, *VICE* creates thousands of pieces of content a week in 25 languages, including news, award-winning original video and film content and advertising.  Additional facts relating to the Debtors' businesses and capital structure, and the commencement of these Chapter 11 Cases, are set forth in the

*Declaration of Frank A. Pometti in Support of the Debtors' Chapter 11 Petitions and First Day Relief* (the "First Day Declaration"), which was filed contemporaneously with this Motion and is incorporated herein by reference.[2]

### The Debtors' Key Suppliers

7.    As a multiplatform media company, *VICE* relies on continuing access to, and relationships with, its Key Suppliers, which include irreplaceable freelancers who are essential for the Debtors' production activities, vendors who are critical to the development and production of content and advertising, and other crucial vendors and service providers.

8.    Additionally, many of the Debtors' obligations to Key Suppliers arise out of the Debtors' agreements with their customers and are essential to allow the Debtors to fulfill such agreements.  Often, when the Debtors enter into an agreement with a customer, such customer may require the Company to use certain vendors in connection with that agreement.  In such cases, the use of the Key Supplier's services is critical for the Debtors' ability to continue the existing relationship with the customer. Any interruption of such Key Suppliers' services as a consequence of a failure to pay them might cause significant harm to the Debtors' customer relationships, and might even result in the termination of the Debtors' current projects, leading to a loss of revenue that the Debtors can ill afford.

9.    Any disruption in the Debtors' ability to produce content and advertising on a timely basis would have far-reaching and adverse economic consequences for the Debtors and their business.  Accordingly, the Debtors request authority to pay certain Key Supplier Claims, subject to the limitations set forth in the Proposed Orders.

---

[2]    Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the First Day Declaration.

10.     The following table summarizes the categories of Key Supplier Claims that the Debtors request authority to pay, pursuant to this Motion, and the estimated prepetition amounts outstanding within each such category:

| Category | Description of Services Provided | Estimated Amount Due or Due to be Paid Within 21 Days (Interim Order) | Estimated Amount Outstanding as of Petition Date (Final Order) |
|---|---|---|---|
| Freelancers and Staffing Agencies | Writers, freelancers, influencers, producers, and other creative talent who are essential to the Debtors' production of journalism, advertising, television, films, podcasts, digital content, and other content, as well as staffing agencies that coordinate the hiring of such independent contractors. | $2.0 million | $3.0 million |
| Critical Vendors | Specialized suppliers of goods and services that are critical to maintain the Debtors' day-to-day operations, or which are sole or limited-source providers of the goods and services necessary for the uninterrupted operations of the Debtors' business. | $6.0 million | $8.0 million |
| Foreign Vendors | Suppliers of goods or services that are based outside of the United States. | $1.5 million | $2.0 million |
| **Total amount of Key Supplier Claims:** | | $9.5 million | $13.0 million |

The Debtors intend to apply their business judgment and discretion on a case-by-case basis and pay only those Key Suppliers who both are (i) critical to maintaining the uninterrupted flow of goods and services needed for the Debtors' business operations and (ii) willing to provide the Debtors with favorable postpetition terms.

I.    **Freelancers**

11.    Due to the industries in which the Debtors operate, in the ordinary course of business, they have historically utilized the services of more than 1,800 freelancers and other independent contractors (the "Freelancers"). The Freelancers, who either are engaged directly by the Debtors as independent contractors or through staffing agencies (the "Staffing Agencies"), include writers, influencers, producers, and other creative talent, and are essential to the Debtors' production of journalism, advertising, television, films, podcasts, digital content, and other content.

12.    The Freelancers play a central role in the Debtors' operations. They possess specific qualifications, skills, and expertise, without which the Debtors would not be able to produce the high-quality content for which they are known around the world. The Freelancers are critical to the Debtors' ongoing viability, and their importance cannot be overstated.

13.    The Debtors compete actively for the services of Freelancers with their competitors. Accordingly, if individuals and Staffing Agencies are not paid timely, it is expected they will pivot to other opportunities and projects. Moreover, many of the Freelancers are artists or personalities who are not fungible in the way other goods or services may be, and in some cases, they are party to personal services contracts that may be subject to section 365(e)(2) of the Bankruptcy Code.

14.    If the Debtors were unable to obtain the services of their Freelancers, their ability to fulfill obligations to their customers that have relied on the Debtors to live up to their contractual commitments would be hindered. Without the services of the Freelancers, the Debtors' productions would be delayed, and in some cases, it would not be possible for the Debtors to secure adequate replacements for the Freelancers in a

timely fashion, with potentially devastating effects on the Debtors' capacity to generate revenue.

15.     Even for the Freelancers that are engaged through Staffing Agencies, it is critical that the Staffing Agencies be paid on an uninterrupted basis.  If the Staffing Agencies do not receive payment, it is foreseeable that they no longer would provide Freelancers to the Debtors, and in some instances, the Staffing Agencies themselves may be unable to pay the Freelancers they make available to the Debtors.

16.     Accordingly, by this Motion, the Debtors seek authority, but not direction, to pay prepetition claims of Freelancers and Staffing Agencies ("Freelancer Claims") in an aggregate amount not to exceed $2.0 million on an interim basis and $3.0 million on a final basis (inclusive of the interim amount), in each case, as the Debtors, in the exercise of their reasonable business judgment, believe are essential to avoid costly disruptions to their operations.

**II.     Critical Vendors**

17.     The Debtors' ability to continue to generate revenue on an uninterrupted basis and operate their businesses—and, therefore, the success of these Chapter 11 Cases—depends on the services and goods provided by a variety of critical vendor business counterparties (the "Critical Vendors").  As a general matter, the Critical Vendors include vendors and suppliers who provide the Debtors with various goods and services, including, but not limited to, production equipment and services, content, licensing, information technology services, telecommunications equipment and services, and advertising and marketing-related services.  The Debtors' trade relationships with their Critical Vendors generally are not governed by long-term contracts, and the Debtors believe that those trade relationships may materially deteriorate if the Debtors are unable to pay the prepetition claims of Critical Vendors (the "Critical Vendor

Claims"), causing interruptions and delays in the Debtors' operations, with potentially devastating effects on the value of the Debtors' estates.[3]

18.    The Debtors, with the assistance of their advisors, have spent significant time reviewing and analyzing their books and records, consulting line of business managers, reviewing contracts and supply agreements, and analyzing applicable law, regulations, and historical practices to identify the Critical Vendors who supply the products and services most vital to the Debtors' go-forward operations.  The Debtors identified the Critical Vendors pursuant to the following criteria:  (i) which suppliers were sole-source or limited-source suppliers, without whom the Debtors could not continue operations without disruption; (ii) the Debtors' ability to find timely alternative sources of supply that can provide requisite services on equal (or better) terms and in a reasonable time; (iii) whether a vendor provides services that are essential to maintaining employee health and safety; (iv) the Debtors' ability to continue operating while transitioning business to an alternative supplier, if available, and how long such a transition would take; (v) the degree to which replacement costs (including pricing, transition expenses, professional fees, and lost sales or future revenue) exceed the amount of a vendor's prepetition claim; (vi) which suppliers would be prohibitively expensive or practically difficult to replace; (vii) whether a supplier's nonperformance would present an unacceptable risk to the Debtors' operations given the uniqueness  of services that such supplier provides; (viii) whether a particular vendor currently is

---

[3]    In several cases, the Debtors' contracts with certain of the Critical Vendors provide only a framework for the issuance of purchase orders that are limited in scope to particular projects or orders.  Thus, the Debtors' postpetition ability to use the contracts to compel the Critical Vendors to continue to provide goods and services may be limited.  In addition, certain Critical Vendors who are party to long-term written supply contracts may cease performance under such contracts after the Petition Date, notwithstanding the application of the automatic stay, causing irreversible harm to the Debtors' business.  The Debtors seek authority, in their business judgment, to pay such Critical Vendors as necessary to ensure continued performance.

refusing to supply the Debtors with goods or services or is refusing to do so without

cash up front; and (ix) whether a vendor meeting the foregoing criteria is able or likely

to refuse to provide products or services to the Debtors after the Petition Date if its

prepetition balances are not paid.

19.     Applying the foregoing criteria, the Debtors believe that the Critical

Vendors provide mission-critical goods and services that support the Debtors'

production of content and advertising.  Any attempt to replace these Critical Vendors

would be highly disruptive to the Debtors' businesses and operations, particularly

during the Debtors' transition into chapter 11.

20.     The Debtors believe that payment of the Critical Vendor Claims is

essential to avoid costly disturbances to the Debtors' businesses during these Chapter 11

Cases at this critical juncture.  Accordingly, by this Motion, the Debtors seek authority,

but not direction, to pay prepetition Critical Vendor Claims in an aggregate amount not

to exceed $6.0 million on an interim basis and $8.0 million on a final basis (inclusive of

the interim amount), that, in the exercise of the Debtors' business judgment the Debtors

believe are essential to avoiding costly disruptions to the Debtors' operations.

21.     For the avoidance of doubt, the Debtors seek authority to pay only such

Critical Vendor Claims as they determine, in their sole discretion, to be necessary or

appropriate to induce the Critical Vendors to continue supplying or otherwise

supporting the Debtors' operations on a postpetition basis.  Subject to the Court's

approval, the Debtors intend to pay the Critical Vendor Claims only to the extent

necessary to preserve the value of their estates.  To that end, in return for paying a

portion of the Critical Vendor Claims, the Debtors propose that they be authorized to

require such Critical Vendors, as a condition of payment, to provide favorable trade

terms for the postpetition procurement of their goods and services and, if appropriate, to enter into Trade Agreements (as defined below).

**III.    Foreign Vendors**

22.    Due to the international scope of the Debtors' businesses, a critical component of the Debtors' operations involves transacting with counterparties and vendors outside of the United States (the "Foreign Vendors").  The Foreign Vendors supply goods and services to the Debtors that are crucial to the Debtors' ongoing international operations and for the continuation of their businesses in the ordinary course during these Chapter 11 Cases, including production equipment and services, content, licensing, information technology services, and advertising and marketing-related services.  Maintaining existing relationships with the Foreign Vendors is essential for the Debtors to continue to operate in the ordinary course.  Replacing these Foreign Vendors would be time-consuming, impracticable, and cost-prohibitive.

23.    Foreign Vendors often have skeptical reactions to the United States bankruptcy process, due to their unfamiliarity with chapter 11.  Short of severing their contractual relations with the Debtors, nonpayment of the Foreign Vendors' prepetition claims (the "Foreign Vendor Claims") may cause Foreign Vendors to take other precipitous actions, including delaying shipments or initiating a lawsuit in a foreign court to obtain a judgment against the Debtors in respect of Foreign Vendor Claims in courts outside of the United States.  Although the automatic stay set forth in section 362 of the Bankruptcy Code applies to protect the Debtors' assets wherever they are located in the world, the Foreign Vendors may believe erroneously that they are not subject to the automatic stay.  Moreover, attempting to enforce the Bankruptcy Code in foreign countries would be uneconomical and, in instances where personal jurisdiction over a Foreign Vendor may be difficult to obtain, could be futile.

24.    In light of the foregoing, by this Motion, the Debtors seek authority, but not direction, to pay prepetition Foreign Vendors in an aggregate amount not to exceed $1.5 million on an interim basis and $2.0 million on a final basis (inclusive of the interim amount), that, in the exercise of the Debtors' business judgment the Debtors believe are essential to avoiding costly disruptions to the Debtors' operations, as and when they come due.  For the avoidance of doubt, the Debtors seek authority to pay only such Foreign Vendor Claims as the Debtors determine, in their sole discretion, to be necessary or appropriate to induce the Foreign Vendors to continue supplying or otherwise supporting the Debtors' operations on a postpetition basis.

25.    In connection with the proposed payments, the Debtors shall maintain a matrix/schedule (the "Key Supplier Matrix"), which will include the following information: (i) the category of amount paid, applied, offset or setoff as further described and classified herein; (ii) the aggregate amount of the payment, application, offset, or setoff by category; (iii) the Debtor or Debtors that made the payment, application, offset, or setoff; (iv) the identity of the recipient of the payment, application, offset, or setoff; and (v) timing of the payment, application, offset, or setoff.

## Continuation of Customary Trade Terms

26.    Subject to the Court's approval, the Debtors intend to pay Key Supplier Claims only to the extent necessary to preserve their businesses.  The Debtors have designated a core group of executives (including the Debtors' Chief Restructuring Officer), advisors, and employees who have experience in the Debtors' businesses and in the Debtors' value-preserving process, which will review, assess, and, as appropriate, recommend payment on account of trade claims to determine whether they should be treated as Key Supplier Claims.  In return for paying Key Supplier Claims, the Debtors will use commercially reasonable efforts to condition payment of such claims upon each

such Key Supplier's agreement to continue supplying goods and services to the Debtors

in accordance with trade terms that are consistent with historical practice

(the "Customary Trade Terms").

27.    In particular, the Debtors will have each Critical Vendor, with the

exception of Critical Vendors with a prepetition balance of less than $50,000, execute an

agreement substantially in the form attached as **Exhibit C** (each, a "Trade Agreement").

Each such Trade Agreement, once agreed to and accepted by a party, shall be a legally

binding contractual arrangement between the parties governing the commercial trade

relationship as provided herein.  In addition, the Debtors request that if any party

accepts payment pursuant to the relief requested by this Motion and thereafter does not

continue to provide goods or services on Customary Trade Terms, as applicable, then:

(a) such payment may be deemed to be an improper postpetition transfer on account of

a prepetition claim, and therefore, immediately recoverable by the Debtors in cash upon

written request; (b) upon recovery by the Debtors, any prepetition claim of such party

shall be reinstated as if the payment had not been made; and (c) if there exists an

outstanding postpetition balance due from the Debtors to such party, the Debtors may

elect to recharacterize and apply any payment made pursuant to the relief requested by

this Motion to such outstanding postpetition balance, and such supplier or vendor will

be required to repay to the Debtors such paid amounts to the extent that they exceed the

postpetition obligations then outstanding, without the right of any setoffs, claims,

provisions for payment of any claims, or otherwise.

## Basis for Relief

**I.    The Court Should Authorize the Debtors to Pay the Key Supplier Claims in Their Sole Discretion.**

28.    Courts have recognized that it is proper to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including an operating business's going-concern value. *See Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 468 (2017) (noting that bankruptcy courts have authorized the payment of prepetition claims where "the distributions at issue would enable a successful reorganization and make even the disfavored creditors better off" (internal quotation omitted)); s*ee also In re Windstream Holdings Inc.*, 614 B.R. 441, 460 (S.D.N.Y. 2020) (affirming order where "the Bankruptcy Court utilized its 'broad equitable power' to ensure the rehabilitation of Debtors and viability of the estate for all creditors, by 'enabl[ing Debtors] to . . . pay [their] creditors'") (alterations in original) (quoting *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 177 (Bankr. S.D.N.Y. 1989)); *Armstrong World Indus., Inc. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.)*, 29 B.R. 391, 398 (Bankr. S.D.N.Y. 1983) (authorizing the payment of prepetition claims to suppliers).  Allowing a debtor to honor a prepetition obligation is especially appropriate where, as here, doing so is consistent with the "two recognized policies" of chapter 11 of the Bankruptcy Code—preserving going-concern value and maximizing property available to satisfy creditors. *See Bank of Am. Nat'l Trust & Savs. Assoc. v. 203 N. LaSalle St. P'Ship*, 526 U.S. 434, 453 (1999).  In authorizing the payment of prepetition claims, "[b]ankruptcy courts recognize that section 363 is a source for authority to make critical vendor payments, and section 105 is used to fill in the blanks."  *In re Tropical Sportswear Int'l Corp.*, 320 B.R. 15, 20 (Bankr. M.D. Fla. 2005).

29.    Section 363(b) of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). It is well settled that, pursuant to section 363(b) of the Bankruptcy Code, courts may authorize payment of prepetition obligations where a sound business purpose exists for doing so. *See In re Ionosphere Clubs*, 98 B.R. at 175 (noting that section 363(b) provides "broad flexibility" to authorize a debtor to honor prepetition claims where supported by an appropriate business justification). *See also In re James A. Phillips*, 29 B.R. at 397 (relying upon section 363 as a basis to allow a contractor to pay the prepetition claims of suppliers who were potential lien claimants); *In re Murray Metallurgic Coal Holdings, LLC*, 613 B.R. 442, 450 (Bankr. S.D. Ohio 2020) (finding that Section 363 of the Bankruptcy Code "provides a mechanism for debtors to obtain court authority to pay prepetition claims before confirmation if a sound business purpose supports the payment"). Sound business purpose exists where "the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)); *see also F.D.I.C. v. Castetter*, 184 F.3d 1040, 1043 (9th Cir. 1999) (the business judgment rule "requires directors to perform their duties in good faith and as an ordinarily prudent person in a like circumstance would").

30.    It is a sound exercise of the Debtors' business judgment to pay the Key Supplier Claims as they become due in the ordinary course, because doing so will avoid value-destructive business interruptions. The goods and services provided by the Key Suppliers are necessary for the continued, uninterrupted operation of the Debtors'

business.  The Debtors anticipate that a failure to pay the Key Supplier Claims as they become due likely would result in the refusal by Key Suppliers to continue to provide, among other things, essential goods and services, or in Key Suppliers conditioning the delivery of such goods and services on onerous or commercially unreasonable terms. The Debtors' production of content is predicated on timeliness, efficiency, and synchronization, and they rely on the Key Suppliers in order to timely deliver high-quality and polished content to their customers.  Any disruption in the continuity of the Debtors' relationships with the Key Suppliers could hinder the Debtors' operations and restructuring efforts.

31.     In addition, the Court has the authority, pursuant to its equitable powers under section 105(a) of the Bankruptcy Code, to authorize the relief requested herein, because such relief is necessary for the Debtors to carry out their fiduciary duties under section 1107(a) of the Bankruptcy Code.  Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  It is long established that courts may use the doctrine of necessity to allow the debtor in possession to make payments to key suppliers on account of prepetition claims in order to preserve its business.  *See, e.g., In re C.A.F. Bindery, Inc.*, 199 B.R. 828, 835 (Bankr. S.D.N.Y. 1996); *In re Fin. News Network Inc.*, 134 B.R. 732, 735–36 (Bankr. S.D.N.Y. 1991) (holding that the "doctrine of necessity" stands for the principle that a bankruptcy court may allow preplan payments of prepetition obligations where such payments are critical to the debtor's reorganization).

32.     Moreover, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, debtors in possession are fiduciaries "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity

owners." *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002). Implicit in the fiduciary duties of any debtor in possession is the obligation to "protect and preserve the estate, including an operating business's going-concern value." *Id.* Some courts have noted that there are instances in which a debtor can fulfill this fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim." *Id.* The court in *CoServ* specifically noted the pre-plan satisfaction of prepetition claims would be a valid exercise of the debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate . . . ." *Id.*

33.     The relief requested herein is appropriate and warranted under the circumstances. The authority to satisfy the Key Supplier Claims during the initial days of these Chapter 11 Cases will allow the Debtors to maintain their operations, including the integrity of the Debtors' production efforts, and to smoothly transition into and efficiently administer these Chapter 11 Cases. Failure to pay the Key Supplier Claims could potentially destroy value that would otherwise inure to the benefit of the Debtors' estates.

34.     The resulting harm to the Debtors' estates of the potential loss of goods and services from Key Suppliers far outweighs the costs associated with paying the Key Supplier Claims. The Debtors believe that the relief sought in this Motion will not burden the Debtors, but rather will help maximize the value of their estates, particularly if the Debtors are empowered to negotiate such payments with potential Key Suppliers. Accordingly, for the reasons set forth herein, it is appropriate for the Court to authorize the Debtors to satisfy the Key Supplier Claims.

35.     Where, as here, debtors have shown that the payment of prepetition claims is critical to maximize the value of their estates, courts in this district and other jurisdictions have routinely authorized payments to critical vendors and similar

vendors on account of prepetition claims.  *See, e.g.*, *In re GTT Communications, Inc.*, No. 21-11880 (MEW) (Bankr. S.D.N.Y. Nov. 30, 2021) (authorizing the payment of prepetition trade claims of suppliers, foreign vendors, lien claimants, and other operational partners); *In re Frontier Communications Corp.*, No. 20-22476 (RDD) (Bankr. S.D.N.Y. June 19, 2020) (authorizing the payment of prepetition claims of critical vendors on the basis that they could cease to provide specialized goods and services necessary to maintain the smooth operation of the debtors' business otherwise); *In re Barneys New York, Inc.*, No. 19-36300 (CGM) (Bankr. S.D.N.Y. Sept. 5, 2019) (authorizing the payment of prepetition claims of critical vendors and foreign vendors on the basis that they could cease to provide specialized goods and services necessary to maintain the smooth operation of the debtors' business otherwise); *In re Hollander Sleep Products, LLC*, No. 19-11068 (MEW) (Bankr. S.D.N.Y. July 2, 2019) (same); *In re Windstream Holdings, Inc.*, No. 19-22312 (RDD) (Bankr. S.D.N.Y. Apr. 22, 2019) (authorizing the payment of prepetition claims of critical vendors on the same basis); *In re Aegean Marine Petrol. Network Inc.*, No. 18-13374 (MEW) (Bankr. S.D.N.Y. Dec. 6, 2018) (authorizing the payment of prepetition claims of foreign claimants and HSE and other claimants on the same basis); *In re Sears Holding Corporation*, No. 18-23538 (RDD) (Bankr. S.D.N.Y. Nov. 16, 2018) (authorizing the payment of prepetition claims of critical vendors on the same basis); *In re Cumulus Media, Inc.*, Case No. 17-13381 (SCC) (D.I. 152) (Bankr S.D.N.Y. Dec. 21, 2017) (granting relief to pay approximately $14.3 million in prepetition obligations owing to talent); *In re AOG Entertainment, Inc.*, Case No. 16- 11090 (SMB) (D.I. 118) (Bankr S.D.N.Y. June 3, 2016) (granting relief to pay prepetition obligations owing to talent).[4]

---

[4]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion.  Copies of these orders are available upon request to the Debtors' proposed counsel.

**A. The Court Should Authorize Payment of the Freelancer Claims.**

36.     The Freelancers are critical to the Debtors' ability to continue their production efforts, both under existing projects and in future.  Without their services, the Debtors could be forced to delay or halt productions, causing their estates to forfeit essential revenue.  Furthermore, nonpayment of Freelancers would damage the Debtors' longstanding relationships with Freelancers and Staffing Agencies and inflict significant reputational harm on the Debtors' brand.  This disruption could limit the Debtors' ability to staff their production projects going forward, decreasing the value of the Debtors' business, which could impair stakeholder value at the outset of these Chapter 11 Cases.  In light of these business realities, the Debtors submit that the payment of the Freelancer Claims represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, and, therefore, is justified under sections 105(a) and 363(b) of the Bankruptcy Code.

**B. The Court Should Authorize Payment of the Critical Vendor Claims.**

37.     The Debtors require a steady flow of the products and services provided by the Critical Vendors to maintain operational stability.  Without those products and services, the Debtors could be forced to halt operations unexpectedly while they search for substitute vendors and service providers and may have to forgo existing favorable trade terms as a result, in their haste to find new vendors, thereby preventing the Debtors from capturing revenue.  Importantly, any disruption to the Debtors' supply chain could result in a significant loss of operational efficiency, decreasing the value of the Debtors' business, which could impair stakeholder value at the outset of these Chapter 11 Cases.  Based on these circumstances, the Debtors submit that the payment of the Critical Vendor Claims represents a sound exercise of the Debtors' business

judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, and, therefore, is justified under sections 105(a) and 363(b) of the Bankruptcy Code.

### C. The Court Should Authorize Payment of the Foreign Vendor Claims.

38.     If the Debtors were not to pay certain of the Foreign Vendor Claims, they anticipate that certain Foreign Vendors simply would refuse to do business with the Debtors unless and until they receive payment on account of their prepetition claims. As a result, the Debtors would be unable to procure essential products and services, potentially causing the Debtors to fail or delay in providing content to their customers.

39.     The Foreign Vendors also may take other precipitous actions against the Debtors based on the incorrect belief that they are not bound by the automatic stay.  The Court's jurisdiction over the Foreign Vendors may be limited, or not easily enforceable, notwithstanding that section 362 of the Bankruptcy Code provides that the filing of a chapter 11 petition "operates as a stay, applicable to all entities," with respect to creditor remedies.  For example, if a Foreign Vendor lacks assets within the United States that would otherwise be available to satisfy a judgment entered by the Court to enforce the automatic stay, the Court as a practical matter may be unable to prevent such Foreign Vendors from violating the automatic stay by pursuing remedies against the Debtors' assets located outside of the United States, if they are not timely paid.  *See, e.g., In re Aerovias Nacionales de Columbia S.A. Avianca*, 303 B.R. 1, 6 (Bankr. S.D.N.Y. 2003) (finding that the rationale for foreign vendor motions is the uncertain extraterritorial reach of the automatic stay).  As a result, the Debtors may have few alternatives, if the Foreign Vendors decline to provide necessary services to the Debtors, potentially causing serious disruption to the Debtors' operations.

40.     Based on these circumstances, the Debtors submit that the payment of the Foreign Vendor Claims represents a sound exercise of the Debtors' business judgment

and is necessary to avoid immediate and irreparable harm to the Debtors' estates.

Courts in this jurisdiction routinely grant authorization for debtors to pay claims owing

to foreign entities against which the automatic stay cannot be enforced readily in the

United States and as to which it would be unduly time-consuming and expensive to

seek enforcement of an order of the bankruptcy court in the creditor's home country.

*See*, *e.g.*, *In re Philippine Airlines, Inc.*, No. 21-11569 (SCC) (Bankr. S.D.N.Y. Sept. 30, 2021)

(authorizing the payment of prepetition obligations owed to foreign critical vendors); *In*

*re Avianca Holdings S.A.*, No. 20-11133 (MG) (Bankr. S.D.N.Y. Jan. 27, 2021) (same); *In re*

*LATAM Airlines Group S.A.*, No. 20-11254 (JLG) (Bankr. S.D.N.Y. July 7, 2020) (same); *In*

*re Frontier Communications Corp.*, No. 20-22476 (RDD) (Bankr. S.D.N.Y. June 19, 2020)

(same); *In re Barneys New York, Inc.*, No. 19-36300 (CGM) (Bankr. S.D.N.Y. Sept. 5, 2019)

(authorizing the payment of prepetition claims of foreign vendors).[5]    Accordingly,

approval of the payment of Foreign Vendor Claims is justified under sections 105(a) and

363(b) of the Bankruptcy Code.

## II.    The Court Should Authorize the Banks to Honor and Process the Debtors' Payments on Account of the Key Supplier Claims.

41.    As a result of the commencement of these Chapter 11 Cases, and absent an

order of the Court providing otherwise, the Debtors' checks and electronic fund

transfers on account of the Key Supplier Claims may be dishonored or rejected by

financial institutions.  Under the Debtors' cash management system, the Debtors readily

are able to identify checks or transfers as relating directly to payment of Key Supplier

Claims.  Accordingly, the Debtors believe that prepetition checks and transfers other

than those for Key Supplier Claims will not be honored inadvertently.  The Debtors

---

[5]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

submit that any financial institution should be authorized to rely on the representations of the Debtors with respect to whether any check drawn or transfer request issued by the Debtors prior to the Petition Date should be honored pursuant to this Motion.

### Reservation of Rights

42.     Nothing contained herein is or should be construed as: (i) an admission as to the validity of any claim against the Debtors; (ii) a waiver of the Debtors' rights to dispute any claim on any grounds; (iii) a promise or requirement to pay any claim; (iv) an admission that any particular claim is of a type specified or defined hereunder; (v) a request to assume any executory contract or unexpired lease; or (vi) a waiver of the Debtors' rights under the Bankruptcy Code or any other applicable law. The authorization to pay amounts on account of the Key Supplier Claims should not affect the Debtors' rights to contest the amount or validity of such obligations.

### The Requirements of Bankruptcy Rule 6003(b) Are Satisfied

43.     Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003. As set forth in this Motion, the Debtors believe that an immediate and orderly transition into chapter 11 is critical to the viability of their operations and any delay in granting the relief requested could hinder the Debtors' operations and cause irreparable harm. Furthermore, the failure to receive the requested relief during the first 21 days of these Chapter 11 Cases would severely disrupt the Debtors' operations at this critical juncture and imperil the Debtors' chapter 11 process. Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support the relief requested herein.

## Request for Waiver of Bankruptcy Rules 6004(a) and 6004(h)

44.     Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale,
or lease of property other than cash collateral is stayed until the expiration of 14 days
after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).
As set forth throughout this Motion, any delay in paying the Key Supplier Claims
would be detrimental to the Debtors, their estates, and creditors, as the Debtors' ability
to manage and run their businesses without any unexpected or inopportune
interruptions requires, in part, that the Debtors remain current with such obligations.
For this reason and those set forth above, the Debtors submit that ample cause exists to
justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent
applicable to the Proposed Orders.

45.     To implement the foregoing relief requested in this Motion immediately,
the Debtors also respectfully request a waiver of the notice requirements of Bankruptcy
Rule 6004(a), to the extent that they are deemed applicable to the Proposed Orders.

## Motion Practice

46.     This Motion includes citations to the applicable rules and statutory
authorities upon which the relief requested herein is predicated and a discussion of
their application to this Motion. Accordingly, the Debtors submit that this Motion
satisfies Local Rule 9013-1(a).

## Notice

47.     Notice of this Motion will be provided to:  (i) the Office of the United
States Trustee for Region 2, U.S. Federal Office Building, 201 Varick Street, Suite 1006,
New York, NY 10014 (Attn:  Andrea B. Schwartz); (ii) the parties identified on the
Debtors' consolidated list of 30 largest unsecured creditors; (iii) Gibson, Dunn &
Crutcher LLP, 200 Park Avenue, New York, NY 10166 (Attn: David M. Feldman,

Michael S. Neumeister, and Tommy Scheffer), counsel to the DIP/First Lien Group; (iv) Wachtell, Lipton, Rosen & Katz, 51 West 52nd Street, New York, NY 10019 (Attn: Scott K. Charles and Neil M. Snyder), counsel to TPG Virat Holdings 1, L.P., and Sixth Street Virat Holdings 3, LLC; (v) Shipman & Goodwin LLP (Attn: Marie C. Pollio), counsel to Wilmington Trust, National Association; (vi) the Internal Revenue Service; (vii) the Office of the United States Attorney for the Southern District of New York; (viii) the offices of the attorneys general in the states in which the Debtors operate; and (ix) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties"). The Debtors respectfully submit that, in light of the nature of the relief requested, no other or further notice need be given.

### No Previous Request

48.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter the Proposed

Orders granting the relief requested herein and such other and further relief as the

Court deems just and appropriate.

Dated:  May 15, 2023
        New York, New York

VICE GROUP HOLDING INC., *et al.*
*Debtors and Debtors in Possession*
*By Their Proposed Counsel*
TOGUT, SEGAL & SEGAL LLP,
By:

*/s/ Kyle J. Ortiz*
ALBERT TOGUT
KYLE J. ORTIZ
BRIAN F. MOORE
One Penn Plaza, Suite 3335
New York, New York 10119
Telephone: (212) 594-5000
altogut@teamtogut.com
kortiz@teamtogut.com
bmoore@teamtogut.com

## EXHIBIT A

## Proposed Interim Order

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| VICE GROUP HOLDING INC., *et al.* | Case No. 23-10738 (__) |
| Debtors.[1] | (Joint Administration Requested) |

## INTERIM ORDER (I) AUTHORIZING
## THE DEBTORS TO PAY PREPETITION CLAIMS
## OF CERTAIN (A) FREELANCERS, (B) CRITICAL VENDORS,
## AND (C) FOREIGN VENDORS; AND (II) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the Debtors for entry of an interim order (this "Interim Order"), pursuant to sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004, (i) authorizing, but not directing, the Debtors to pay or otherwise honor certain prepetition claims and obligations in the ordinary course of business owing in respect of: (a) Freelancers; (b) Critical Vendors and (c) Foreign Vendors, and (ii) setting the date of a final hearing and granting related relief, all as more fully set forth in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order* and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that this Court may

---

[1] The last four digits of Debtor Vice Group Holding Inc.'s tax identification number are 4250. Due to the large number of debtors in these chapter 11 cases, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.stretto.com/vice. The location of the Debtors' service address for purposes of these chapter 11 cases is: 49 South 2nd Street, Brooklyn, NY 11249.

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion.

enter a final order consistent with Article III of the United States Constitution; and due and proper notice of the Motion having been provided to the Notice Parties, and such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and this Court having held a hearing to consider the relief requested in the Motion; and upon the First Day Declaration; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, creditors, and all parties in interest; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor;

IT IS HEREBY ORDERED THAT:

1.      The Motion is GRANTED on an interim basis as set forth herein.

2.      The Debtors are authorized, but not directed, in the reasonable exercise of their business judgment and subject to the limitations described herein, to honor, pay, or otherwise satisfy prepetition Freelancer Claims (or a portion thereof) in an amount not to exceed $2.0 million, pending entry of the Final Order.

3.      The Debtors are authorized, but not directed, in the reasonable exercise of their business judgment and subject to the limitations described herein, to honor, pay, or otherwise satisfy prepetition Critical Vendor Claims (or a portion thereof) in an amount not to exceed $6.0 million, pending entry of the Final Order; *provided* that, as a prerequisite to making a payment pursuant to this Interim Order to a Critical Vendor with prepetition claims exceeding $50,000, the Debtors must receive written acknowledgement (email being sufficient) that such Critical Vendor will continue providing services to the Debtors on Customary Trade Terms.

4.      The Debtors shall condition payment of the Critical Vendor Claims, with the exception of (i) Freelancer Claims and (ii) any Critical Vendor with a balance of less than $50,000, upon entry into a corresponding Trade Agreement, substantially in the form annexed to the Motion as Exhibit C, in the exercise of their reasonable business judgment.   The Debtors are authorized to negotiate, modify, or amend the form of a Trade Agreement and to settle all or some of the Critical Vendor Claims for less than the face amount of such claims without further notice or hearing, each in their reasonable business judgment with the consent of the DIP/First Lien Group.

5.      The Debtors are authorized, but not directed, in the reasonable exercise of their business judgment and subject to the limitations described herein, to honor, pay, or otherwise satisfy prepetition Foreign Vendor Claims (or a portion thereof) in an amount not to exceed $1.5 million, pending entry of the Final Order; *provided* that, in connection with making a payment pursuant to this Interim Order to a Foreign Vendor with prepetition claims exceeding $50,000, the Debtors will seek an acknowledgement (email being sufficient) that such Foreign Vendor will continue providing services to the Debtors on Customary Trade Terms.

6.      Any party that accepts payments from the Debtors on account of a Key Supplier Obligation shall be deemed to have agreed to the terms and provisions of this Interim Order.  Notwithstanding anything to the contrary herein, prior to making any payment pursuant to this Interim Order, the Debtors shall provide such Key Supplier with a copy of this Interim Order (unless previously provided to such Key Supplier).

7.      If any party accepts payment pursuant to the relief requested by the Motion and thereafter does not continue to provide goods or services to the Debtors on Customary Trade Terms, as applicable:  (i) such payment may be deemed by the Debtors to be an improper postpetition transfer on account of a prepetition claim and,

therefore, will be immediately recoverable by the Debtors in cash upon written request; (ii) upon recovery by the Debtors, any prepetition claim of such party shall be reinstated as if the payment by the Debtors had not been made in the first instance; and (iii) if there exists an outstanding postpetition balance due from the Debtors to such party, then the Debtors may elect to recharacterize and apply any payment made pursuant to the relief requested by the Motion to such outstanding postpetition balance, and such supplier or vendor will be required to repay to the Debtors such paid amounts to the extent that they exceed the postpetition obligations then outstanding, without the right of any setoffs, claims, provisions for payment of any claims, or otherwise.

8.      Further, nothing herein shall prejudice the Debtors' ability, upon notice and a hearing and with the consent of the DIP/First Lien Group, to seek a further order from this Court authorizing the Debtors to exceed the aggregate amounts of any Key Supplier Claim category as set forth herein.

9.      The Debtors shall maintain a matrix/schedule of amounts paid under the terms and conditions of this Interim Order (the "Key Supplier Matrix"), including the following information: (i) the category of amount paid, applied, offset or setoff as further described and classified in the Motion; (ii) the aggregate amount of the payment, application, offset, or setoff by category; (iii) the Debtor or Debtors that made the payment, application, offset, or setoff; (iv) the identity of the recipient of the payment, application, offset, or setoff; and (v) timing of the payment, application, offset, or setoff. The Debtors shall provide a copy of such Key Supplier Matrix on a confidential and professionals' eyes-only basis to the United States Trustee and counsel to the DIP/First Lien Group and any statutory committee appointed in these Chapter 11 Cases by the third business day of each week, beginning with the week following entry of this Interim Order (or on such other delivery schedule as may mutually be agreed to by the

United States Trustee, the DIP/First Lien Group, and any statutory committee
appointed in these Chapter 11 Cases).

10.    Nothing in the Motion or this Interim Order, nor the Debtors' payment of
claims pursuant to this Interim Order, shall be deemed or construed as: (i) an
admission as to the validity of any claim against the Debtors; (ii) a waiver of the
Debtors' rights to dispute any claim on any grounds; (iii) a promise to pay any claim;
(iv) an implication or admission that any particular claim is a Key Supplier Obligation;
(v) a waiver of the Debtors' rights to contest the extent, perfection, priority, validity, or
amount of any lien; or (vi) an approval, assumption, adoption, or rejection of any
agreement, contract, lease, program, or policy under section 365 of the Bankruptcy
Code.

11.    All banks and other financial institutions are authorized to receive,
process, honor, and pay all checks presented for payment of, and to honor all fund
transfer requests made by the Debtors related to, the Key Supplier Claims, regardless of
whether the checks were presented or fund transfer requests were submitted before or
after the Petition Date, *provided* that funds are available in the Debtors' accounts to cover
the checks and fund transfers. Banks and other financial institutions may rely on the
representations of the Debtors with respect to whether any check, item or other
payment order drawn or issued by the Debtors prior to the Petition Date should be
honored pursuant to this or any other order of this Court and such bank or financial
institution shall not have any liability to any party for relying on such representations
by the Debtors as provided for herein.

12.    The Debtors are authorized to issue postpetition checks or to effect
postpetition fund transfer requests in replacement of any checks or fund transfer
requests in respect of the Key Supplier Claims that are or have been dishonored or

rejected as a consequence of the commencement of the Chapter 11 Cases, and to take all other steps reasonably necessary to implement and effectuate the relief sought in the Motion.

13.    The final hearing (the "<u>Final Hearing</u>") on the Motion shall be held on _____, 2023, at__:__ _.m. (prevailing Eastern Time).  Any party in interest objecting to the relief sought at the Final Hearing or in the Final Order shall file and serve a written objection, which objection shall be served upon:  (i) proposed counsel for the Debtors, Togut, Segal & Segal LLP, One Penn Plaza, Suite 3335, New York, NY 10119 (Attn:  Kyle J. Ortiz and Brian F. Moore); (ii) proposed special counsel for the Debtors, Shearman & Sterling LLP, 599 Lexington Avenue, New York, NY 10022 (Attn.:  Fredric Sosnick) and Shearman & Sterling LLP, 2601 Olive Street, 17th Floor, Dallas, TX 75201 (Attn.:  Ian E. Roberts); (iii) the Office of the United States Trustee for Region 2, U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, NY 10014 (Attn: Andrea B. Schwartz); (iv) Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, NY 10166 (Attn:  David M. Feldman, Michael S. Neumeister, and Tommy Scheffer), counsel to the DIP/First Lien Group; (v) Wachtell, Lipton, Rosen & Katz, 51 West 52nd Street, New York, NY 10019 (Attn:  Scott K. Charles and Neil M. Snyder), counsel to TPG Virat Holdings 1, L.P., and Sixth Street Virat Holdings 3, LLC; (vi) Shipman & Goodwin LLP (Attn:  Marie C. Pollio), counsel to Wilmington Trust, National Association; and (vi) counsel to any statutory committee appointed in these Chapter 11 Cases, in each case so as to be received no later than _____, 2023, at 11:59 p.m. (prevailing Eastern Time).  If no objections to the entry of the Final Order are timely filed, this Court may enter the Final Order without further notice or a hearing.

14.    The requirements set forth in Bankruptcy Rule 6003(b) are satisfied by the contents of the Motion.

15.     Notice of the Motion, as provided therein, is deemed good and sufficient under the circumstances, and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

16.     Notwithstanding Bankruptcy Rule 6004(h), the terms and provisions of this Interim Order shall be immediately effective and enforceable upon its entry.

17.     Notwithstanding any provision in the Federal Rules of Bankruptcy Procedure to the contrary, the Debtors are not subject to any stay in the implementation, enforcement or realization of the relief granted in this Interim Order, and the Debtors may, in their discretion and without further delay, take any action and perform any act necessary to implement the relief granted in this Interim Order.

18.     Notwithstanding anything to the contrary contained in the Motion or this Interim Order, any payment to be made and any relief or authorization granted hereunder shall be limited by, and shall be subject to, the requirements imposed on the Debtors in any orders entered by this Court authorizing the Debtors to obtain debtor-in-possession financing and authorizing the use of cash collateral (any such order, a "DIP Order"), including, for the avoidance of doubt, the debtor-in-possession financing and cash collateral budget. To the extent of any conflict (but solely to the extent of such conflict) between the terms of this Interim Order and the terms of any DIP Order, the terms of the DIP Order will govern.

19.     This Court shall retain jurisdiction over any and all matters arising from or related to the interpretation or implementation of this Interim Order.

Dated:_____                    _____
                                                              UNITED STATES BANKRUPTCY JUDGE

7

**<u>EXHIBIT B</u>**

**Proposed Final Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| VICE GROUP HOLDING INC., *et al.* | Case No. 23-10738 (__) |
| Debtors.[1] | (Joint Administration Requested) |

## FINAL ORDER (I) AUTHORIZING
## THE DEBTORS TO PAY PREPETITION CLAIMS
## OF CERTAIN (A) FREELANCERS, (B) CRITICAL VENDORS, AND
## (C) FOREIGN VENDORS; AND (II) GRANTING RELATED RELIEF

Upon the motion (the "<u>Motion</u>")[2] of the Debtors for entry of an order (this "<u>Final Order</u>"), pursuant to sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004, (i) authorizing, but not directing, the Debtors to pay or otherwise honor certain prepetition claims and obligations in the ordinary course of business owing in respect of:  (a) Freelancers; (b) Critical Vendors and (c) Foreign Vendors, and (ii) granting related relief, all as more fully set forth in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order; and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that this Court may enter a final order consistent with Article III of the

---

[1]   The last four digits of Debtor Vice Group Holding Inc.'s tax identification number are 4250.  Due to the large number of debtors in these chapter 11 cases, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.stretto.com/vice.  The location of the Debtors' service address for purposes of these chapter 11 cases is:  49 South 2nd Street, Brooklyn, NY 11249.

[2]   Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion.

United States Constitution; and due and proper notice of the Motion having been provided to the Notice Parties, and such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and this Court having held a hearing to consider the relief requested in the Motion; and upon the First Day Declaration; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, creditors, and all parties in interest; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor;

IT IS HEREBY ORDERED THAT:

1.    The Motion is GRANTED as set forth herein.

2.    The Debtors are authorized, but not directed, in the reasonable exercise of their business judgment and subject to the limitations described herein, to honor, pay, or otherwise satisfy prepetition Freelancer Claims (or a portion thereof) in an amount not to exceed $3.0 million, inclusive of any amounts previously paid under the Interim Order.

3.    The Debtors are authorized, but not directed, in the reasonable exercise of their business judgment and subject to the limitations described herein, to honor, pay, or otherwise satisfy prepetition Critical Vendor Claims (or a portion thereof) in an amount not to exceed $8.0 million, inclusive of any amounts previously paid under the Interim Order; *provided* that, as a prerequisite to making a payment pursuant to this Final Order to a Critical Vendor with prepetition claims exceeding $50,000, the Debtors must receive written acknowledgement (email being sufficient) that such Critical Vendor will continue providing services to the Debtors on Customary Trade Terms.

4.      The Debtors shall condition payment of the Critical Vendor Claims, with the exception of (i) Freelancer Claims and (ii) any Critical Vendor with a prepetition balance of less than $50,000, upon entry into a corresponding Trade Agreement, substantially in the form annexed to the Motion as Exhibit C, in the exercise of their reasonable business judgment.   The Debtors are authorized to negotiate, modify, or amend the form of a Trade Agreement and to settle all or some of the Critical Vendor Claims for less than the face amount of such claims without further notice or hearing, each in their reasonable business judgment with the consent of the DIP/First Lien Group.

5.      The Debtors are authorized, but not directed, in the reasonable exercise of their business judgment and subject to the limitations described herein, to honor, pay, or otherwise satisfy prepetition Foreign Vendor Claims (or a portion thereof) in an amount not to exceed $2.0 million, inclusive of any amounts previously paid under the Interim Order; *provided* that, in connection with making a payment pursuant to this Final Order to a Foreign Vendor with prepetition claims exceeding $50,000, the Debtors will seek an acknowledgement (email being sufficient) that such Foreign Vendor will continue providing services to the Debtors on Customary Trade Terms.

6.      Any party that accepts payments from the Debtors on account of a Key Supplier Claims shall be deemed to have agreed to the terms and provisions of this Final Order.  Notwithstanding anything to the contrary herein, prior to making any payment pursuant to this Final Order, the Debtors shall provide such Key Supplier with a copy of this Final Order (unless previously provided to such Key Supplier).

7.      If any party accepts payment pursuant to the relief requested by the Motion and thereafter does not continue to provide goods or services to the Debtors on Customary Trade Terms, as applicable:  (i) such payment may be deemed by the

3

Debtors to be an improper postpetition transfer on account of a prepetition claim and, therefore, will be immediately recoverable by the Debtors in cash upon written request; (ii) upon recovery by the Debtors, any prepetition claim of such party shall be reinstated as if the payment by the Debtors had not been made in the first instance; and (iii) if there exists an outstanding postpetition balance due from the Debtors to such party, then the Debtors may elect to recharacterize and apply any payment made pursuant to the relief requested by the Motion to such outstanding postpetition balance, and such supplier or vendor will be required to repay to the Debtors such paid amounts to the extent that they exceed the postpetition obligations then outstanding, without the right of any setoffs, claims, provisions for payment of any claims, or otherwise.

8.      Further, nothing herein shall prejudice the Debtors' ability, upon notice and a hearing and with the consent of the DIP/First Lien Group, to seek a further order from this Court authorizing the Debtors to exceed the aggregate amounts of any Key Supplier Obligation category as set forth herein.

9.      The Debtors shall maintain a matrix/schedule of amounts paid under the terms and conditions of this Final Order (the "Key Supplier Matrix"), including the following information: (i) the category of amount paid, applied, offset or setoff as further described and classified in the Motion; (ii) the aggregate amount of the payment, application, offset or setoff by category; (iii) the Debtor or Debtors that made the payment, application, offset or setoff; (iv) the recipient of the payment, application, offset or setoff; and (v) timing of the payment, application, offset or setoff.  The Debtors shall provide a copy of such Key Supplier Matrix on a confidential and professionals' eyes-only basis to the United States Trustee and counsel to the DIP/First Lien Group and any statutory committee appointed in these Chapter 11 Cases by the third business day of each week beginning upon entry of this Final Order (or on such other delivery

schedule as mutually agreed to by the United States Trustee, the DIP/First Lien Group, and any statutory committee appointed in these Chapter 11 Cases).

10.    Nothing in the Motion or this Final Order, nor the Debtors' payment of claims pursuant to this Final Order, shall be deemed or construed as:  (i) an admission as to the validity of any claim against the Debtors; (ii) a waiver of the Debtors' rights to dispute any claim on any grounds; (iii) a promise to pay any claim; (iv) an implication or admission that any particular claim is a Key Supplier Obligation; (v) a waiver of the Debtors' rights to contest the extent, perfection, priority, validity, or amount of any lien; or (vi) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy under section 365 of the Bankruptcy Code.

11.    All banks and other financial institutions are authorized to receive, process, honor, and pay all checks presented for payment of, and to honor all fund transfer requests made by the Debtors related to, the Key Supplier Claims, regardless of whether the checks were presented or fund transfer requests were submitted before or after the Petition Date, *provided* that funds are available in the Debtors' accounts to cover the checks and fund transfers.  Banks and other financial institutions may rely on the representations of the Debtors with respect to whether any check, item or other payment order drawn or issued by the Debtors prior to the Petition Date should be honored pursuant to this or any other order of this Court and such bank or financial institution shall not have any liability to any party for relying on such representations by the Debtors as provided for herein.

12.    The Debtors are authorized to issue postpetition checks or to effect postpetition fund transfer requests in replacement of any checks or fund transfer requests in respect of the Key Supplier Claims that are or have been dishonored or rejected as a consequence of the commencement of the Chapter 11 Cases, and to take all

other steps reasonably necessary to implement and effectuate the relief sought in the Motion.

13.    Notwithstanding Bankruptcy Rule 6004(h), the terms and provisions of this Final Order shall be immediately effective and enforceable upon its entry.

14.    Notwithstanding any provision in the Federal Rules of Bankruptcy Procedure to the contrary, the Debtors are not subject to any stay in the implementation, enforcement or realization of the relief granted in this Final Order, and the Debtors may, in their discretion and without further delay, take any action and perform any act necessary to implement the relief granted in this Final Order.

15.    Notwithstanding anything to the contrary contained in the Motion or this Final Order, any payment to be made and any relief or authorization granted hereunder shall be limited by, and shall be subject to, the requirements imposed on the Debtors in any orders entered by this Court authorizing the Debtors to obtain debtor-in-possession financing and authorizing the use of cash collateral (any such order, a "DIP Order"), including, for the avoidance of doubt, the debtor-in-possession financing and cash collateral budget. To the extent of any conflict (but solely to the extent of such conflict) between the terms of this Final Order and the terms of any DIP Order, the terms of the DIP Order will govern.

16.    This Court shall retain jurisdiction over any and all matters arising from or related to the interpretation or implementation of this Final Order.

Dated:_____                    _____
                                             UNITED STATES BANKRUPTCY JUDGE

## EXHIBIT C

**Trade Agreement**

[Name of Applicable Debtor]

_____, 2023

TO: [Key Supplier]
[Name]
[Address]

Dear Valued Supplier:

As you are aware, [_____] and certain of its affiliates (collectively, the "<u>Company</u>") each filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code (the "<u>Chapter 11 Cases</u>") in the United States Bankruptcy Court for the Southern District of New York (the "<u>Court</u>") on [__], 2023 (the "<u>Petition Date</u>").

On the Petition Date, the Company requested authority from the Court to pay certain suppliers and service providers (collectively, the "<u>Key Suppliers</u>"). On _____, 2023, the Bankruptcy Court entered an [interim/final] order (the "<u>Order</u>") authorizing the Company, under certain conditions, to pay prepetition claims of certain Key Suppliers that agree to the terms below as well as agree to be bound by the terms of the Order. A copy of the Order is annexed hereto (collectively with this letter, the "<u>Trade Agreement</u>").

To receive payment on prepetition claims pursuant to the Order, each selected Key Supplier must agree to continue to supply goods or services to the Company based on "Customary Trade Terms." As used herein and in the Order, "<u>Customary Trade Terms</u>" are the normal and customary trade terms, practices, and programs (including credit limits, pricing rebates, cash discounts, timing of payments, coupon reconciliation, and other applicable terms and programs), that were most favorable to the Company and in effect between the Key Supplier and the Company at any time within the 24-month period before the Petition Date, or, if applicable, the trade terms of the agreement between the parties in effect on the Petition Date, or such other trade terms as agreed by the Company and the Key Supplier.

For purposes of administration of this program, you and the Company agree as follows:

1.      The estimated balance of your aggregate prepetition claim(s) against the Debtors is $[____] (the "<u>Agreed Vendor Obligation</u>").

2.      Following execution of this Trade Agreement, the Company shall pay you $_____ (the "<u>Payment</u>") on account of its prepetition claim in full and final satisfaction of the Agreed Vendor Obligation (net of any setoffs, credits, or discounts). Such payment will satisfy ___% of the total amount of the Agreed Vendor Obligation.

3.      Timing of Payments: The Company shall make the Supplier Payment in accordance with the following schedule: [TBD]

4.      Nothing herein waives the Company's or your rights under section 365 of the Bankruptcy Code.

5.      The Customary Trade Terms may not be modified, adjusted, or reduced in a manner adverse to the Company except as agreed-to in writing by the Parties.  For the avoidance of doubt, such Customary Trade Terms include, but are not limited to:

_____

_____

_____

6.      You will hereafter extend to the Company all Customary Trade Terms and agree to abide by any purchase order terms and conditions between you and the Company as in effect before the Petition Date (the "Current PO(s)").

7.      You shall continue to honor any existing allowances, credits, contractual obligations, or balances that accrued as of the Petition Date and shall apply all such allowances, credits, or balances towards future orders in the ordinary course of business.

8.      You agree that you shall not require a lump-sum payment upon the confirmation or consummation of a plan of reorganization in these cases on account of any administrative expense claim that you may assert, but instead agree that such claims will be paid in the ordinary course of business after confirmation of a plan under applicable Customary Trade Terms, if the plan provides for the ongoing operations of the Company.

Payment of your Agreed Vendor Obligation in the manner set forth in the Order may only occur upon execution of this Trade Agreement by a duly authorized representative of your company and the return of this letter to the Company.  Your execution and return of this Trade Agreement constitutes an agreement between you and the Company:

i.      to the Customary Trade Terms and, subject to the reservations contained in the Order, to the amount of the Payment set forth above;

ii.      that, for a period lasting until the later of two years from the Petition Date, or, in the case of purchase orders, the date upon which the term of your Current PO(s) expire, you will continue to supply the Company with goods or services pursuant to Customary Trade Terms and that the Company will pay for those goods or services in accordance with Customary Trade Terms;

iii.      that you have reviewed the terms and provisions of the Order and consent to be bound by the same;

iv.      that you will not separately seek payment on account of any prepetition claim (including, without limitation, for reclamation or claims pursuant to section 503(b)(9) of the Bankruptcy Code), or

2

other similar claims outside of the terms of the Order or a plan confirmed in the Company's chapter 11 cases unless your participation in the vendor payment program authorized by the Order (the "<u>Vendor Payment Program</u>") is terminated;

     v.    that, in consideration for the Payment, you agree not to file or otherwise assert against the Company, its estate, or any other person or entity, or any of their respective assets or property (real or personal) any lien (regardless of the statute or other legal authority upon which the lien is asserted) on account of any prepetition amounts allegedly owed to you by the Company. Furthermore, if you have taken steps to file or assert a lien before entering into this Letter Agreement, you agree to take all necessary steps to remove the lien as soon as possible at your sole cost and expense;

    vi.    that if you fail to comply with the terms and provisions of this Trade Agreement, (a) the Company may demand repayment in cash and otherwise take all action to have such payment be deemed to be an improper postpetition transfer on account of a prepetition claim and (b) upon recovery by the Company, your prepetition claim will be reinstated as if the payment had not been made, and you must file a reinstated claim by the later of (1) the general bar date established by order of this Court or (2) 30 days after the Debtors have provided written notice to the party of the reinstatement of its claim; and

    vii.   that you will keep the existence and the terms of this Trade Agreement confidential and will not disclose it to any person or entity without the prior written consent of the Company, other than as required by law.

The Company and you also hereby agree that any dispute concerning this Trade Agreement, the Order, or your participation in the Vendor Payment Program shall be determined by the Court and that all litigation arising out of or relating to this Trade Agreement, the Order, or your participation in the Vendor Payment Program or its subject matter must be commenced in the Court. If you have any questions about this Trade Agreement or our financial restructuring, do not hesitate to contact us.

Sincerely,

[Name of Applicable Debtor]
By: _____
Title: _____
Dated: _____

Agreed and accepted by:

[Vendor]
By: _____
Title: _____
Dated: _____