**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| VICE GROUP HOLDING INC., *et al.* | Case No. 23-10738 (___) |
| Debtors.[1] | (Joint Administration Requested) |

**DECLARATION OF BRENT HERLIHY IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING AND (B) USE CASH COLLATERAL, (II) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, (IV) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF**

I, Brent Herlihy, hereby declare under penalty of perjury:

1. I am a Partner in the Restructuring and Special Situations Group at PJT Partners LP ("PJT"), a global investment banking firm listed on the New York Stock Exchange with its principal offices at 280 Park Avenue, New York, New York 10017. PJT is the proposed investment banker to Vice Group Holding Inc. ("Vice Parent") and its debtor affiliates, the debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases").

2. I submit this declaration (this "Declaration") in support of the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Superpriority Claims, (III) Modifying the Automatic Stay, (IV) Granting Adequate Protection to Prepetition Secured*

---

[1] The last four digits of Debtor Vice Group Holding Inc.'s tax identification number are 4250. Due to the large number of debtors in these chapter 11 cases, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.stretto.com/vice. The location of the Debtors' service address for purposes of these chapter 11 cases is: 49 South 2nd Street, Brooklyn, NY 11249.

*Parties, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "DIP Motion"), filed contemporaneously with this Declaration, and approval of the proposed debtor-in-possession financing described therein (the "DIP Facility").[2]

3. I believe that: (i) under the circumstances, the Debtors are currently unable to borrow funds on an unsecured or junior basis, or solely secured by the Debtors' unencumbered assets, in sufficient amounts to fund their business and these Chapter 11 Cases; (ii) the DIP Facility (a) is the product of an arm's-length, good faith negotiation process and (b) is currently the only available postpetition financing option for the Debtors; and (iii) the terms and conditions of the DIP Facility, when taken as a whole, are reasonable under the circumstances.

4. The statements in this Declaration, except where specifically noted, are based on my personal knowledge or opinion, on information that I have received from the Debtors' employees or advisors, or employees of PJT working directly with me or under my supervision, direction, or control, or from the Debtors' records maintained in the ordinary course of their businesses. I am not being compensated for this testimony other than through payments received by PJT as a professional proposed to be retained by the Debtors in these Chapter 11 Cases. If I were called upon to testify, I could and would testify competently to the facts set forth in this Declaration. I am over the age of 18 years and am authorized to submit this Declaration on behalf of the Debtors.

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the DIP Motion or the DIP Credit Agreement. as applicable. The material terms of the proposed DIP Facility are set forth in detail in the DIP Motion. For the avoidance of doubt, any description of the proposed terms of the DIP Facility herein or in the DIP Motion is qualified in its entirety by the terms of the DIP Credit Agreement and the other DIP Loan Documents. To the extent anything in this Declaration is inconsistent with such documents, the terms of the applicable documents are intended to control.

**Background and Qualifications**

5. PJT is a leading global financial advisory firm with more than 900 employees in eleven offices in the U.S., Europe, and Asia. The firm offers integrated advisory services for mergers and acquisitions, restructuring and special situations, and fund placement. PJT is an industry leader in advising companies and creditors in all aspects of complex restructurings and bankruptcies. The firm has extensive experience providing financial advisory and investment banking services to financially distressed companies, including representing both debtors and lenders in the procurement and provision of postpetition financing. PJT is a registered broker-dealer with the United States Securities and Exchange Commission and is a member of the Securities Investor Protection Corporation and is regulated by the Financial Industry Regulatory Authority

6. As stated above, I am a Partner in the Restructuring and Special Situations Group at PJT. Prior to joining PJT in 2015, I worked in the Restructuring and Reorganization Group at The Blackstone Group L.P. from 2013 to 2015. Prior to that, I received a J.D. from Harvard Law School and an M.B.A. from Harvard Business School. I also worked in the mergers and acquisitions group of Lazard Frères & Co. LLC from 2007 to 2009, after obtaining a B.A. in politics from Princeton University. I have 10 years of restructuring experience, advising companies, creditors, and sponsors in restructurings and special situations, and have worked across numerous industries, including power, media and telecommunications, retail, automotive, industrials, aerospace, and oil and gas. Over the course of my career, I have advised senior management and boards of directors in a wide variety of industries in connection with restructurings, mergers and acquisitions, and financing transactions.

7. I have been involved in numerous restructurings, including, among others, Aegean Marine Petroleum, Covia, Danaos, Desarrolladora Homex, ExGen Texas Power, Frontera

Holdings, Fusion Connect, GenOn Mid-Atlantic, Key Energy Services, LATAM Airlines Group, Preferred Sands, Quicksilver Resources, Sandy Creek Energy Station, SAS Scandinavian Airlines, and Talen Energy Supply.

### PJT's Retention

8. PJT began to serve as an investment banker to the Debtors and their non-Debtor affiliates (collectively, the "Company" or "VICE") in the summer of 2022, to assist the Company with the restructuring negotiations that led to the development of the proposed DIP Facility and the filing of these Chapter 11 Cases.

9. Since the beginning of PJT's current engagement, I, along with a number of other PJT professionals, have worked closely with the Debtors' management team, financial staff, creditors, and other professionals to evaluate the need for financing and otherwise assist in the Debtors' restructuring efforts. PJT's work in that regard has included, among other things: (i) analyzing the Debtors' liquidity and projected cash flows; (ii) understanding the Debtors' businesses, operations, properties, and finances; (iii) reviewing and analyzing the Debtors' balance sheet and capital structure alternatives; (iv) providing strategic advice to the Debtors' board of directors and management; (v) participating and assisting in structuring a process to sell the Debtors' business; (vi) participating in negotiations with the Debtors' existing lenders and other parties in interest in connection with the Debtors' restructuring and sale processes; (vii) negotiating and analyzing debtor-in-possession financing proposals; and (viii) assisting the Debtors in connection with preparations for commencement of these Chapter 11 Cases. As a result of this work and engagement with the professionals retained by the Debtors with respect to this restructuring, I am familiar with the Debtors' capital structure, business operations, and current liquidity needs.

10. Among the matters as to which I am generally familiar, are the cash-flow forecasts prepared by the Debtors' financial advisor, AlixPartners, LLP. I understand that these forecasts calculate anticipated cash receipts and disbursements during the projected period and consider a number of factors, including, but not limited to, the effect of the chapter 11 filing on business operations, fees and expenses associated with postpetition financing, professional fees, vendor relationships, and various required payments.

### The Debtors' Need for the DIP Facility and Access to Cash Collateral

11. The Debtors require access to the DIP Facility and the immediate ability to use cash collateral to ensure they have sufficient liquidity to operate their business in the ordinary course and administer these Chapter 11 Cases. The Debtors are entering chapter 11 without sufficient liquidity to fund these Chapter 11 Cases while they market and ultimately sell their assets. It is my understanding, based on information provided by the Debtors' other advisors, that all cash is the collateral of the Prepetition Secured Parties and the Cash Management Bank. Any delay in the Debtors' ability to access Cash Collateral will create a substantial risk to the Debtors' ability to continue operations.

12. Based upon my discussions with AlixPartners, my experience in restructuring, and my familiarity with the Debtors, and as discussed further in the First Day Declaration, I believe that the Debtors require access to borrowings under the DIP Facility to fund the costs of administering these Chapter 11 Cases, near-term working capital needs and ongoing business operations. Indeed, as illustrated in the DIP budget attached as Schedule 1 to the Interim Order (the "DIP Budget"), absent the DIP Facility, the Debtors' current cash balance, along with their operating cash flow, as currently projected, would be insufficient to fund ongoing operations and expenses, including costs associated with these Chapter 11 Cases.

13. Moreover, it is important for the Debtors to demonstrate they have the liquidity to fund these Chapter 11 Cases in order provide the greatest chance of avoiding negative impacts to their business, by helping to assure vendors and other third parties that the Debtors will be able to continue operating business-as-usual. Demonstrating that the Debtors have sufficient liquidity to operate through the sale process in which the Debtors are engaging will also help to facilitate efforts to obtain the highest or otherwise best bid. Based on discussions with the Debtors' other advisors, I understand that the liquidity provided by the DIP Facility will be needed to immediately provide assurance to the Debtors' vendors, and other counterparties. Based on my familiarity with the Debtors' operations and my experience as a restructuring professional, I do not believe that the Debtors are currently able to achieve these goals or prudently operate solely on a cash-collateral basis.

### The Debtors' Efforts to Secure Financing

14. As described in the *Declaration of Frank A. Pometti in Support of the Debtors' Chapter 11 Petitions and First Day Relief* ("First Day Declaration"), a significant transformation and expansion of the Company in 2019 left *VICE* with a highly leveraged capital structure that constrained its ability to fund operations and growth through the generation of free cashflow. This situation worsened late last year with the maturity of the Prepetition Senior Secured Term Loans and the Senior Subordinated Unsecured Notes (each as defined in the DIP Motion). The already-significant strain created by the Company's debt burden was then exacerbated further by the loss of the Vice World News ("VWN") contract in February of 2023.

15. Since PJT's retention, the Company and its advisors have evaluated various potential paths forward, including both in-court and out-of-court restructuring and sale options. The Company commenced a sale process in February of 2023. As the Debtors and their advisors weighed the various paths forward, it eventually became clear that chapter 11 proceedings would

ultimately be required in order to secure the new financing necessary to bring the Company's sale process to a conclusion. In connection with chapter 11 planning, the Debtors and their advisors began to identify potential sources of postpetition financing and evaluate the required size of any such financing.

16. As discussed further in the First Day Declaration, the Debtors and their advisors undertook an analysis to determine how much postpetition financing would be required to operate the Debtors' business, pay administrative costs during the chapter 11 process, and otherwise implement a restructuring. Based on this analysis, and after extensive negotiations with the Prepetition Term Lenders, the Debtors determined to proceed with $10 million in postpetition financing to accomplish such objectives.

**The DIP Facility Was Negotiated in Good Faith and At Arm's-Length**

17. My team and I, along with the Debtors' other advisors, actively negotiated the terms of the DIP Facility over the last several months. The parties engaged in hard-fought, arm's-length negotiations in an effort to reach the best available material terms under the circumstances. Ultimately, the Debtors were unable to secure any actionable proposals for DIP financing other than on the terms offered by the Prepetition Term Lenders.

**The DIP Facility is the Best Available Financing, Taken as a Whole, under the Circumstances**

18. Based upon the knowledge gained through the efforts of the Debtors and their advisors to obtain postpetition financing, my experience in raising DIP financing, current market conditions, the Debtors' circumstances, and my participation in, and supervision of, the negotiations around the proposed DIP Facility, I believe that there are currently no alternative sources of financing available on both better and more executable terms, taken as a whole, than the DIP Facility. The terms of the DIP Facility are, taken as a whole, reasonable under the

circumstances. I believe, therefore, that the DIP Facility represents the best option currently available to address the Debtors' liquidity needs and fund these Chapter 11 Cases.

19. As part of the financing process that I oversaw, PJT discussed a potential DIP financing with multiple third parties outside of the Company's capital structure, including banks, direct lenders and opportunistic funds. Although PJT engaged in preliminary discussions with such parties, none of these resulted in any proposals, in part because, based upon my understanding, the Debtors do not have unencumbered assets that would support sufficient postpetition financing from a new lender. I understand that the Prepetition Term Lenders have liens on substantially all assets of the Debtors and were clear that they would not consent to being primed. The lack of unencumbered assets means there is no material source of adequate protection necessary to develop a priming DIP. No third party that PJT engaged with as part of the DIP financing process was interested in providing a holistic package of postpetition financing to the Debtors in an amount sufficient to fund these Chapter 11 Cases on a junior or unsecured basis.

20. It is my understanding that the Cash Management Bank has consented to the priming of its security interest by the DIP Facility and the use of Cash Collateral contemplated by the DIP Motion. This is part of a Consent and Forbearance Agreement with the Cash Management Bank agreed to prepetition, under which the Cash Management Bank will continue to provide cash management services and refrain from exercising remedies against or terminating cash management agreements with the Debtors and their non-Debtor affiliates while the Forbearance is in effect. The forbearance agreements are part of the adequate protection of the interest of the Cash Management Bank, and also protect the Debtors' businesses from potentially costly interference should the Cash Management Bank exercise remedies against the Debtors' non-Debtor affiliates.

21. It is my understanding that the DIP Lenders, as Prepetition Term Lenders, uniquely do not require any further consent to prime the Pulse Notes, pursuant to the Pulse Notes Subordination Agreement. The proposed DIP Facility, therefore, would avoid the need for a potentially costly priming battle with either the holders of the Pulse Notes or the Cash Management Bank.

22. Based upon my involvement in the process of negotiating the DIP Facility, I believe that the Roll-Up contemplated by the DIP Facility is reasonable under the circumstances. As described above, we were unable to identify sources for postpetition financing other than from the Prepetition Term Lenders. The Prepetition Term Lenders have been clear, however, that they would not be willing to provide postpetition financing without the inclusion of the Roll-Up, especially given the funds advanced by the Prepetition Term Lenders in the lead-up to these Chapter 11 Cases. In negotiations in which I participated, the Debtors fought to limit the size of the Roll-Up, but under the circumstances, I believe that the Roll-Up is reasonable.

**The Terms and Fees of the DIP Facility, Taken as a Whole, Are Reasonable, Under the Circumstances**

23. Based on my knowledge of the Debtors' financial position and the market for DIP financings, I believe that the economic terms of the proposed DIP Facility, taken as a whole, are reasonable under the circumstances and reflect the market's lack of interest in providing the Debtors with postpetition financing. The key economic terms of the DIP Facility are set forth below:

| *Key Economic Terms of the DIP Facility* | |
|---|---|
| Facility Size | Up to $60 million in multi-draw term loans, inclusive of $10 million of new money advances that will be available to the Debtors ("New Money DIP Loans"), and the roll-up of $50 million at a ratio of 5:1 (the "Roll-Up"). Upon entry of the Interim Order, the Debtors may draw $5 million in New Money DIP Loans, and there will be a |

9

| Key Economic Terms of the DIP Facility | |
|---|---|
| | Roll-Up of $25 million in Prepetition Senior Secured Term Loans. Upon entry of the Final Order, an additional $5 million of New Money DIP Loans will be available, and there will be a Roll-Up of an additional $25 million in Prepetition Senior Secured Term Loans. |
| Interest Rate | SOFR plus 12.0%, subject to a SOFR floor of 3.0% (or Base Rate + 11.0% in the case of Base Rate Loans) shall be paid on funded amounts only, including prepetition funded amounts rolled up into DIP Loans; no interest on unused commitment amount. In the case of New Money DIP Loans, SOFR interest will be cash pay and the 12.0% margin will be PIK, and in the case of Roll-Up DIP Loans, all interest will be PIK. |
| Commitment Fee | A PIK fee of 10.0% on New Money DIP Loans, earned upon entry of the Interim Order. |
| Exit Fee | A 6.0% PIK fee on funded amount of New Money DIP Loans unless the Lenders acquire the assets of the Debtors pursuant to a credit bid. |

The fees and rates to be paid under the proposed DIP Facility (i) were the subject of arm's-length negotiation between the Debtors and the DIP Lenders, (ii) are an integral component of the overall terms of the proposed DIP Facility, and (iii) were required by the DIP Lenders as consideration for the extension of postpetition financing. The process for negotiating the DIP financing economics was rigorous and marked by hard bargaining. The parties exchanged numerous term sheets and mark-ups, each with significant changes to the material terms of the proposed DIP Facility.

24. The DIP Facility provides for a challenge period ("Challenge Period") for the filing of adversary proceedings to contest the Prepetition Senior Secured Term Loans and the liens granted thereunder that I understand to be shorter than the time period provided in the Local Bankruptcy Rules for the Southern District of New York. The shortened Challenge Period is

necessary to allow for the completion of the sale in accordance with the milestones agreed to between the Debtors and the Prepetition Term Lenders.

25. During those negotiations, my team and I evaluated the economic terms of the DIP Facility, including the amounts of fees provided thereunder, in comparison to other postpetition financings provided to similarly situated debtors in the current market. Under the current circumstances, I believe that the fees, rates, and other economics provided for in the DIP Facility, taken as a whole, are reasonable and in the Debtors' best interests, given the circumstances, particularly in light of the absence of any more favorable alternatives. In addition, as stated above, the Debtors were unable to obtain other DIP financing on similar or more favorable terms. In particular, the DIP Lenders insisted upon the Roll-Up as a necessary condition for their providing the DIP Facility, and there are currently no better terms available on the market.

## The Need for Interim Relief

26. Based upon my discussions with the Debtors and their other advisors, and my analysis of the Debtors' projected cash flows, I believe that, due to their current limited liquidity, the Debtors require access to postpetition financing and use of cash collateral to operate their businesses, preserve value in the interim period, and avoid irreparable harm pending a final hearing. As set forth in the DIP Budget attached as Schedule 1 to the Interim Order, the Debtors anticipate drawing on the DIP Facility prior to the final hearing and will need immediate access to Cash Collateral in order to continue operations. The interim liquidity available under the DIP Facility is needed to immediately assure customers, vendors, counterparties, employees, potential buyers, and other constituents that the Debtors will be able to operate in the ordinary course. Absent the liquidity available from the DIP Facility and use of Cash Collateral pursuant to the Interim Order, the Debtors will likely be forced to curtail operations, which would threaten their ability to implement the sale process contemplated by these Chapter 11 Cases. Accordingly, for

the reasons set forth herein and in the First Day Declaration, I believe it is appropriate and necessary for the Court to approve the DIP Facility on an interim basis pursuant to the terms of the Interim Order.

## Conclusion

27. In sum, it is my opinion that, absent the interim relief requested by the DIP Motion, the Debtors will suffer significant, and potentially permanent, impairment to their business operations to the material detriment of their stakeholders, and the relief requested in the DIP Motion is in the best interests of the Debtors and their estates.

*[Remainder of page intentionally left blank.]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:  May 15, 2023

*/s/ Brent Herlihy*
Name: Brent Herlihy
Title: Partner, PJT Partners LP