**TOGUT, SEGAL & SEGAL LLP**
Albert Togut
Kyle J. Ortiz
Brian F. Moore
One Penn Plaza, Suite 3335
New York, NY  10119
Phone:  (212) 594-5000
Email:    altogut@teamtogut.com
              kortiz@teamtogut.com
              bmoore@teamtogut.com

*Proposed Counsel to the Debtors and Debtors
in Possession*

**SHEARMAN & STERLING LLP**
Fredric Sosnick
William S. Holste
Jacob S. Mezei
599 Lexington Avenue
New York, NY  10022
Phone:  (212) 848-4000
Email:    fsosnick@shearman.com
              william.holste@shearman.com
              jacob.mezei@shearman.com

-and-

Ian E. Roberts (*pro hac vice* pending)
2601 Olive Street, 17th Floor
Dallas, TX  75201
Phone:  (214) 271-5777
Email:    ian.roberts@shearman.com

*Proposed Special Counsel to the Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| VICE GROUP HOLDING INC., *et al.* | Case No. 23-10738 (__) |
| Debtors.[1] | (Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY
OF AN ORDER (I) ESTABLISHING BIDDING,
NOTICING, AND ASSUMPTION AND
ASSIGNMENT PROCEDURES, (II) AUTHORIZING
AND APPROVING THE DEBTORS' ENTRY INTO THE STALKING HORSE
AGREEMENT, (III) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE
DEBTORS' ASSETS AND (IV) GRANTING RELATED RELIEF**

---

[1]    The last four digits of Debtor Vice Group Holding Inc.'s tax identification number are 4250.  Due to the large number of debtors in these chapter 11 cases, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://https://cases.stretto.com/vice/.  The location of the Debtors' service address for purposes of these chapter 11 cases is:  49 South 2nd Street, Brooklyn, NY 11249.

Vice Group Holding Inc. and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), respectfully represent in support of this motion (the "Motion") as follows:

**Preliminary Statement**

1.      In order to maximize the value of these estates, the Debtors are pursuing a process to sell substantially all of their assets including the Debtors' interests in certain non-Debtor subsidiaries (collectively, the "Assets").  To that end, the Debtors have negotiated the terms of a stalking horse asset purchase agreement with Vice Acquisition HoldCo, LLC (the "Stalking Horse Bidder"). A substantially final version of the stalking horse asset purchase agreement is annexed hereto as **Exhibit B** (the "Stalking Horse Agreement").[2]

2.      Vice Acquisition HoldCo, LLC is a limited liability company formed under the laws of the state of Delaware by Fortress Credit Corp., in its capacity as administrative agent under that certain Amended and Restated Credit and Guaranty Agreement, dated November 4, 2019 (as amended, restated, or supplemented, the "Prepetition Senior Secured Credit Agreement"), and that certain Senior Secured Super-Priority Term Loan Debtor-in-Possession Credit and Guaranty Agreement (as amended, restated, or supplemented, the "DIP Credit Agreement").  The stalking horse bid embodied in the Stalking Horse Agreement (the "Stalking Horse Bid") is a "credit bid" under section 363(k) of the Bankruptcy Code against certain obligations (i) owed, or to be owed, by the Debtors under the DIP Credit Agreement as of the date of closing of the Stalking Horse Agreement (the "Closing") and (ii) owed by the Debtors under the Pre-Petition Credit Agreement

---

[2]     It is anticipated that a final executed Stalking Horse Agreement will be filed with the Court within three days hereof.

to the Stalking Horse Bidder and the other lenders under the Prepetition Senior Secured Credit Agreement (the "Prepetition Term Lenders").   The Stalking Horse Bid will be allocated *first*, to payment of any such obligations under the DIP Credit Agreement until paid in full, and *second*, to payment of any such obligations under the Pre-Petition Credit Agreement.  The Stalking Horse Bid is for an aggregate purchase price of approximately $225 million (the "Stalking Horse Purchase Price"), which may be adjusted from time to time pursuant to the terms of the Stalking Horse Agreement, in addition to the assumption of significant liabilities of the Debtors.

3.      The entry into the Stalking Horse Agreement is a critical step in the Debtors' efforts to preserve their collective businesses as a going concern and is essential to the sale process that the Debtors have been actively pursuing for the past several months (which itself followed on a process that was commenced in the summer of 2022).  The decision by the Debtors to pursue the transaction contemplated by the Stalking Horse Agreement, however, is not the culmination of that process.  Although, upon the entry into the Stalking Horse Agreement, the Stalking Horse Bidder will be fully committed to purchase the Assets under the terms of the Stalking Horse Agreement, the credit bid at the Stalking Horse Purchase Price will provide a baseline of value in the Debtors' on-going marketing process and facilitate the Debtors' on-going negotiations with other active bidders.

4.      Given the Debtors' current and projected liquidity, and the milestones under the DIP Credit Agreement, the sale process outlined in this Motion is the best way to preserve and maximize going concern value and is essential to allow the Debtors to preserve the jobs of as many of its employees as possible.  The decision to enter into the Stalking Horse Agreement follows on several months of an organized marketing effort to obtain bids for all or portions of the Debtors' assets and is supported by the Debtors' independent special committee (the "Special Committee")

that has been overseeing the Debtors' prepetition marketing process, and that will continue to oversee the sale process through these Chapter 11 Cases.  Having extensively marketed the Assets prior to the Petition Date, the Debtors believe that a sale on the timetable described herein is necessary and appropriate to sell the Debtors' assets in a value-maximizing transaction.

5.      The Stalking Horse Agreement is the result of extensive prepetition negotiations with the administrative agents and lenders under the Prepetition Senior Secured Credit Agreement and DIP Credit Agreement (collectively, the "Senior Secured Parties"). In connection therewith, and in consultation with the Senior Secured Parties, the Debtors have developed bidding and auction procedures to govern the sale of the Assets (the "Bidding Procedures"). The Bidding Procedures, attached as **Exhibit 1** to the Bidding Procedures Order (as defined herein), allow interested bidders to submit bids for either (a) all or a combination of the Assets or (b) one or more of the Debtors' primary business segments (the "Business Segments").

6.      The Bidding Procedures were designed to generate the greatest level of interest and best value for the Assets while affording the Debtors flexibility to execute asset sales as quickly and efficiently as possible, within the milestones imposed under the DIP Credit Agreement.  The Debtors are confident the Bidding Procedures and other relief requested herein will facilitate the sale of the Assets for the highest or otherwise best value, preserve as many jobs as possible for employees, and maximize recoveries for their stakeholders.

### Relief Requested

7.      By this Motion, the Debtors request entry of:

a.      an order, substantially in the form attached hereto as **Exhibit A** (the "Bidding Procedures Order"), among other things:

i.      authorizing and approving the Bidding Procedures, in connection with the sale or sales of the Assets pursuant to section 363 of the Bankruptcy Code

4

(the "Sale"), including certain dates and deadlines thereunder for the Sale process;

ii.      authorizing and approving the Debtors entry into the Stalking Horse Agreement;

iii.      authorizing and approving the form and manner of notice of the sale of the Assets, the Auction, and the Sale Hearing, substantially in the form attached to the Bidding Procedures Order as **Exhibit 2** (the "Sale Notice");

iv.      approving the Expense Reimbursement (defined below);

v.      approving procedures set forth in the Bidding Procedures Order (the "Assumption and Assignment Procedures") for the assumption, assumption and assignment, and rejection of certain executory contracts (the "Contracts") or unexpired leases (the "Leases"), and approving the form and manner of service of the notice regarding such assumption, assumption and assignment, or rejection of the Contracts and Leases to counterparties (each, a "Counterparty"), substantially in the form attached to the Bidding Procedures Order as **Exhibit 3** (the "Assumption and Assignment Notice");

vi.      granting related relief; and

b.      one or more orders (each, a "Sale Order")[3] authorizing and approving the following:

i.      the Sale of the Assets free and clear of all liens, claims, interests, and encumbrances to the Successful Bidder or Successful Bidders (as defined below);

ii.      the assumption and assignment of the proposed assumed Contracts and Leases (collectively, the "Assigned Contracts") in connection with the Sale; and

iii.      granting related relief.

## **Jurisdiction and Venue**

8.      On May 15, 2023 (the "Petition Date"), the Debtors filed voluntary petitions for

relief under chapter 11 of the Bankruptcy Code with this Court and requested joint administration

of the Chapter 11 Cases for procedural purposes only, pursuant to Bankruptcy Rule 1015(b).  The

---

[3]    The proposed form of the Sale Order for a sale to the Stalking Horse Bidder will be filed with the Court prior to the Sale Objection Deadline (as defined in the Bidding Procedures).

Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases, and no official committees have been appointed.

9.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the Southern District of New York, dated January 31, 2012 (Preska, C.J.). Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409. The bases for relief are sections 105, 363, 365, and 503 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9007, and 9008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Rules 6006-1 and 9006-1(b) of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules"), and the and the *Guidelines for the Conduct of Assets Sales* promulgated by General Order M-383 of the Court (the "Sale Guidelines").

10.     This Motion is a core proceeding pursuant to 28 U.S.C. § 157(b). The Debtors confirm their consent to the Court's entry of a final order in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

## **Background**

11.     From their humble beginnings as a niche magazine, the Debtors and their non-Debtor affiliates (collectively, "*VICE*" or the "Company") have grown into a global media company that focuses on content centered around news and culture, serving a largely global youth audience. Today, *VICE* is a global, multiplatform media company that has a powerful brand,

diversified financial profile, premium content, and rich engagement with its youth-targeted audience. With production hubs around the world, *VICE* creates thousands of pieces of content a week globally, including editorial, digital and social video, experiential events, commercials, music videos, scripted and unscripted television, feature documentaries, and movies. Additional facts relating to the Debtors' businesses and capital structure, and the commencement of these Chapter 11 Cases, are set forth in the *Declaration of Frank A. Pometti in Support of the Debtors' Chapter 11 Petitions and First Day Relief* (the "First Day Declaration") and the *Declaration of Brent Herlihy in Support of the Debtors' Motion for Entry of an Order (I) Establishing Bidding, Noticing, and Assumption and Assignment Procedures, (II) Authorizing and Approving the Debtors' Entry into the Stalking Horse Agreement (III) Approving the Sale of Substantially all of the Debtors' Assets and (IV) Granting Related Relief* (the "Herlihy Declaration").[4]

## I.    Prepetition Marketing and Sale Process[5]

12.    The sale process contemplated by this Motion is the continuation of an effort spanning approximately 12 months. As described in the First Day Declaration, over the last two years, the Company continued to face tightening liquidity, industry headwinds, and a looming maturity of the Prepetition Senior Secured Term Loans and its Senior Subordinated Notes. To confront those issues, the Company began to consider and develop wider strategic alternatives, including pursuing a transaction that would involve the entirety of the Company and its assets. First Day Decl. ¶¶ 64–80.

---

[4]    Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the First Day Declaration.

[5]    A more detailed description of the Debtors' prepetition marketing and sale efforts is set forth in the Herlihy Declaration.

13.    In the spring of 2022, *VICE* management began working with PJT Partners LP ("PJT") and LionTree LLC ("LionTree") to assist *VICE* in exploring a sale that would maximize value for the benefit of creditors and other stakeholders. Herlihy Decl. ¶ 7. With the support of PJT and LionTree, *VICE* launched a marketing process (the "2022 Marketing Process") for a potential sale of the whole Company ("WholeCo"), while also considering individual sales of *VICE* Studios, and VIRTUE. *Id.* PJT and LionTree reached out to 15 parties in connection with the WholeCo process, 28 parties for the *VICE* Studios process, and 21 parties for the VIRTUE process. *Id.*

14.    Through the 2022 Marketing Process, three non-binding indications of interest were received for *VICE* Studios and VIRTUE (the "2022 Partial Bids").   *Id.* at ¶ 8. The Board of Directors of Vice Parent decided not to transact on the 2022 Partial Bids and, in the summer of 2022, halted the *VICE* Studios and VIRTUE processes to focus on a WholeCo sale process (the "2022 WholeCo Process"). *Id.* The 2022 WholeCo Process lasted through Fall 2022 and resulted in the Company receiving indications of interest from two prospective bidders. *Id.* The Company reached advanced stages of negotiation and documentation with one of the two WholeCo bidders. *Id.* Ultimately, however, by late 2022, the Company and such bidder were unable to reach an agreement to transact. *Id.*

15.    As described in the First Day Declaration, the Special Committee was constituted in January 2023, which included two new directors designated by the Prepetition Term Lenders. First Day Decl. ¶ 10. Following the appointment of the Special Committee, the Debtors' renewed their sale process, which has remained underway since that time (the "2023 Marketing Process"). Herlihy Decl ¶ 9.

16.     As part of the 2023 Marketing Process, prior to the selection of the proposed Stalking Horse Bidder, PJT and LionTree solicited interest from 133 counterparties for WholeCo and/or certain of its business segments. Out of the 133 counterparties, 88 executed non-disclosure agreements ("NDAs"). *Id.* at ¶ 10. Initially, the 2023 Marketing Process yielded three indications of interest for WholeCo, two indications of interest for *VICE* Studios, one indication of interest for VIRTUE, and four indications of interest for Publishing and/or its sub-brands. *Id.* at ¶ 10.

17.     As further described in the First Day Declaration, in February 2023, GMN Cayman Ltd ("GMNC") terminated its agreements with the Debtors relating to the production of *VICE* World News content. First Day Decl. ¶ 12. The *VICE* World News content and related agreements were material for the businesses in terms of revenue, and the termination had consequences that rippled through the business. Herlihy Decl. ¶ 11. With the assistance of its advisors, the Debtors determined that they needed to implement a number of structural changes to the Company to mitigate the impact of the loss of the *VICE* World News contract.  *Id.* These changes included focusing resources on the Company's remaining digital businesses as well as certain key third party relationships and implementing significant cost reductions resulting in a leaner news organization.  *Id.* The Debtors, PJT and LionTree informed counterparties that were more active in the sales process of these developments and provided them with updated diligence and other information reflecting the loss of the *VICE* World News contract and the actions that the Debtors plan to undertake to mitigate the loss of that contract. *Id.*

18.     Although the Debtors have received no binding bids from any third parties to date (other than the Stalking Horse Bid), there are discussions continuing with select bidders that submitted indications of interest in the prepetition marketing process or have otherwise performed significant diligence with respect to a potential purchase of the Company. *Id.* at ¶ 12. The Debtors,

PJT and LionTree expect that some of these discussions will continue in chapter 11 and may result in a binding bid. *Id.* At this time, however, the Stalking Horse Agreement is the only binding bid available to the Company. *Id.*

19.    As described above, the Debtors' assets have been marketed extensively through a sale and marketing process that has lasted approximately one year. In total, since March 2022, PJT and LionTree engaged with over 155 potential buyers; over 95 of those parties executed NDAs. *Id.* at ¶ 13. The proposed Bidding Procedures are intended to conclude this process with an additional, transparent marketing process and committed Stalking Horse Bid. *Id.*

**II.    Need for a Timely Sale Process**

20.    Appreciating their challenging financial condition and the need to complete a sale and exit bankruptcy as soon as possible, the Debtors accomplished as much as possible prior to the commencement of these cases. With the Stalking Horse Agreement in place, the Debtors are poised to execute the last leg of their sale process, which will include a postpetition marketing campaign, consistent with the terms of the Bidding Procedures.

21.    The ongoing operations of the Debtors' businesses come with considerable expenses, which in the periods leading up to the Petition Date have largely been funded by additional advances from the Senior Secured Parties. Although the Debtors anticipate that the loans provided under the DIP Credit Agreement (the "DIP Facility"), coupled with the use of cash collateral, will give them enough time to complete a sale that will maximize the value of the assets, it is crucial to stress that time is of the essence given the Debtors' current financial situation. Herlihy Decl. ¶ 17.

22.     It is against that backdrop that the Debtors, in connection with entering into the DIP Credit Agreement agreed to the following milestones (the "Milestones"):

| Date | Milestone |
|---|---|
| **On the Petition Date** | The Debtors shall file the Motion |
| **No later than three days after the Petition Date** | File an executed Stalking Horse Agreement |
| **No later than 15 days after the Petition Date** | Obtain entry of the Bidding Procedures Order |
| **No later than 35 days after the Petition Date** | The Debtors shall have conducted the Auctions with respect to the Sale, if necessary. |
| **No later than 40 days after the Petition Date** | Conduct Sale Hearings or obtain entry of final Sale Order |
| **No later than 55 days after the Petition Date** | The Sale shall close. |

Due to the exigencies of the situation, and to comply with the Milestones, contemporaneously with the filing of this Motion, the Debtors have filed a motion (the "Motion to Shorten") pursuant to Bankruptcy Rule 2002 and 9006(c) seeking to have this Motion heard on shortened notice.

23.     As set forth in the Motion to Shorten, the Debtors request the Court consider entry of the Bidding Procedures Order within 12 days of filing of this Motion.[6]   As described in greater detail in the Motion to Shorten, the Debtors believe that sufficient cause exists to shorten the notice period for a hearing on this Motion. The shortened notice period requested is reasonable and appropriate because it allows the Debtors to continue pursuing a sale and DIP financing that are key to preserving and maximizing value.

---

[6]   The Milestone for the entry of the Bid Procedures Order is 15 days after the Petition Date.  That deadline falls on Memorial Day, a federal holiday.  As a result, the Debtors respectfully seek to have this Motion heard on May 26, 2023, in order to comply with the Milestones. As described in the Motion to Shorten, the Debtors believe that, under the circumstances of these Chapter 11 Cases, there is sufficient cause to shorten the notice period to 12 days.

### III.   <u>The Stalking Horse Agreement</u>

24.      The terms of the Stalking Horse Agreement were negotiated and agreed to by the
Debtors and the Stalking Horse Bidder without collusion, in good faith, and from arm's-length
bargaining positions, with each side represented by sophisticated advisors. Herlihy Decl. ¶¶ 14–
15.  The Debtors submit that the terms of the Stalking Horse Agreement are reasonable under the
circumstances. *Id.* By establishing a minimum acceptable bid, the Stalking Horse Agreement,
together with the Bidding Procedures, provides certainty in an auction process and sets a baseline
for other bidders to compete against. *Id.*

25.      There have been extensive arms-length negotiations between the Debtors and the
Prepetition Term Lenders, through their respective advisors, regarding the terms of the Stalking
Horse Agreement. *Id.* The negotiations occurred over the course of several weeks, with both parties
represented by sophisticated counsel and advisors.  *Id.* The Special Committee frequently, and the
entire Board of Directors on a more limited basis, was updated during this process and provided
feedback and direction to the Company's management and advisors. *Id.* An example of a positive
outcome of such negotiations is the Stalking Horse Bidder's agreement to forgo any break-up fee
under the Stalking Horse Agreement.  The terms of the Stalking Horse Agreement were negotiated
and agreed to without collusion, in good faith, and from arm's-length bargaining positions. *Id.*

26.      The key terms of the Stalking Horse Agreement are as follows:[7]

---

[7]   This summary description and any further descriptions in this Motion of the provisions of the Stalking Horse
Agreement are for summary purposes only, do not restate the terms of the Stalking Horse Agreement in their
entirety, and in the event of any inconsistency with the Stalking Horse Agreement, the Stalking Horse Agreement
will govern. Capitalized terms used but not defined in this section shall have the meanings ascribed to them in the
Stalking Horse Agreement.

| Provision | Summary |
|---|---|
| **Parties**<br>*Preamble* | Vice Acquisition Holdco, LLC, a Delaware limited liability company ("<u>Buyer</u>"), Vice Group Holding Inc., a Delaware corporation (the "<u>Company</u>"), and those certain Subsidiaries of the Company signatory hereto (collectively with the Company, "<u>Sellers</u>" and each entity individually, a "<u>Seller</u>"). |
| **Purchase Price**<br>*Section 2.06* | On the terms and subject to the conditions contained herein, the aggregate consideration for the Purchased Assets (the "<u>Purchase Price</u>") shall consist of (i) a credit bid of $225,000,000 pursuant to Section 363(k) of the Bankruptcy Code against certain obligations owed by Sellers under the Pre-Petition Credit Agreement and the DIP Credit Agreement as of the Closing (the "<u>Credit Bid</u>"), with the Credit Bid allocated *first*, to payment of any such obligations under the DIP Credit Agreement until paid in full, and *second*, to payment of any such obligations under the Pre-Petition Credit Agreement, (ii) the assumption of the Assumed Liabilities, and (iii) the payment of the Cure Costs; <u>provided</u>, <u>however</u>, that Buyer reserves the right, in its sole discretion, to increase the Purchase Price (including any component thereof), subject to the Bid Procedures Order and applicable Law. |
| **Purchased Assets**<br>*Section 2.01* | "Purchased Assets" are set forth in Section 2.01 of the Stalking Horse Agreement and, in sum, include all right, title and interest of the Company in, to or under the properties and assets of the Company, except the Excluded Assets. |
| **Excluded Assets**<br>*Section 2.03* | "Excluded Assets" are set forth in Section 2.03 of the Stalking Horse Agreement and include all right, title and interest to, in and under the following assets, properties, interests and rights of Sellers and their Affiliates (whether owned, licensed, leased or otherwise):<br>(a) the organizational documents, corporate records and minute books, in each case, to the extent solely pertaining to the organization, existence or capitalization of Sellers (and not involving or related in any way to the Purchased Assets or the Assumed Liabilities);<br>(b) subject to Section 2.05, any Contract that is not a Purchased Contract (collectively, the "<u>Excluded Contracts</u>");<br>(c) any Excluded Cash;<br>(d) all rights that accrue or will accrue to any Seller or any of their Subsidiaries pursuant to this Agreement or any of the other Transaction Documents;<br>(e) other than the Purchased Shares, all shares of capital stock or other equity interests of any Seller or any Subsidiary of any Seller;<br>(f) other than the Assumed Plans and the Purchased Entities' Plans, all Seller Plans, together with all funding arrangements related thereto (including all assets, trusts, insurance policies and administrative service Contracts related thereto), and all rights and obligations thereunder; |

(g) all current and prior director and officer insurance policies of the Sellers and all rights of any nature with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries;

(h) all attorney-client privilege and attorney work-product protection of Sellers or associated with their businesses solely to the extent arising with respect to legal counsel representation of Sellers or its Affiliates or their businesses in connection with the transactions contemplated by this Agreement or any of the Transaction Documents; and

(i) all rights to any Tax refunds, or credits (in lieu of refunds) against Tax liabilities, of Sellers that relate to Taxes that are paid by Sellers after the Closing, but solely to the extent that such Tax refunds are not attributable to a loss, credit or other tax attribute of Buyer or any of its Affiliates including, without limitation, any tax attributes of any Seller or Group Companies that would otherwise be transferred to Buyer or any of its Affiliates (including any Purchased Entity or JV Entity) pursuant to the transactions contemplated by this Agreement; provided, that if Buyer or any of its Affiliates incurs any reasonable, out-of-pocket costs or expenses (including Taxes) as a direct result of the receipt any such Tax refund or credit (in lieu of a refund), Buyer shall be entitled to retain the portion of such Tax refund or credit (in lieu of a refund) equal to the amount of such reasonable, out-of-pocket costs or expenses.

| | |
|---|---|
| **Assumed Liabilities**<br>*Section 2.02* | "Assumed Liabilities" are set forth in Section 2.02 of the Stalking Horse Agreement, pursuant to which the Buyer agrees, effective as of the Closing, to assume the following Liabilities:<br><br>(a) all Liabilities relating to or arising out of the ownership or operation of the Purchased Assets (including, for the avoidance of doubt, any Liabilities for Taxes arising from the ownership or operation of the Purchased Assets in a Post-Closing Tax Period (including, with respect to any Taxes arising in a Straddle Period, the portion of such Taxes that are allocable to Buyer under Section 7.06(d))) by Buyer solely for and in respect of periods following the Closing and excluding any Excluded Liabilities;<br><br>(b) all Liabilities with respect to the Assumed Plans and the Purchased Entities' Plans, if any;<br><br>(c) Liabilities associated with Transferred Employees relating to (i) payroll (including salary, wages and commissions), vacation, sick leave, parental leave, long service leave, workers' compensation claims and unemployment benefits and (ii) severance, retention and termination agreements to the |

extent such agreements are Assumed Plans or Purchased Entities' Plans;[8]

(d) all Liabilities of each Seller and Purchased Entity relating to or arising out of the Purchased Contracts solely in respect of periods following the Closing and not to the extent relating to or arising out of any breach or default thereof or other activities on or prior to the Closing and excluding any Excluded Liabilities;

(e) all Ordinary Course current Liabilities of the Sellers attributable to the ownership or operation of the Purchased Assets in respect of the period following the Petition Date to the extent consistent with and provided for in the DIP Budget (as defined in the DIP Order) or the backup or supporting material for the DIP Budget as provided to and approved by the Required DIP Lenders (as defined in the DIP Order) and not to exceed $[__] in the aggregate (which shall, for the avoidance of doubt, exclude any Excluded Liabilities);

(f) any and all Liabilities for Transfer Taxes;

(g) Cure Costs required to be paid pursuant to Section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Purchased Contracts; and

(h) any other Liability expressly to be assumed by the Buyer pursuant to the Sale Order.

| | |
|---|---|
| **Excluded Liabilities**<br>*Section 2.04* | "Excluded Liabilities" are set forth in Section 2.04 of the Stalking Horse Agreement, pursuant to which the Buyer is not assuming any Liability that is not an Assumed Liability, including, among other things:<br><br>(a) all Liabilities for any Taxes (i) arising from or with respect to the Purchased Assets, the Assumed Liabilities or the operation of the Business that are attributable to any Pre-Closing Tax Period (including, with respect to any Taxes arising in a Straddle Period, the portion of such Taxes that are allocable to the Seller under Section 7.06(d)), (ii) imposed on or with respect to the Excluded Assets or Excluded Liabilities, (iii) of any Seller or any Affiliate (other than a Purchased Entity or a JV Entity) or predecessor of Seller for any period, including Taxes of Seller or any Affiliate (other than a Purchased Entity or a JV Entity) or predecessor of Seller that could become a liability of, or be assessed or collected against, Buyer or any of |

---

[8]    In February 2023, amidst industry-wide challenges and increasing pressure on the viability of the Company, the Debtors adopted (i) a key employee retention program (the "KERP") for 27 Employees and (ii) a key employee incentive plan (the "KEIP"). In light of the Debtors' KERP and KEIP being assumed pursuant to the Stalking Horse Agreement, the Debtors do not currently anticipate seeking relief with respect to such plans in these Chapter 11 Cases. However, if, for any reason, the Debtors seek to pay any amounts pursuant to the KERP or KEIP during these Chapter 11 Cases, the Debtors will seek the appropriate relief with the Court.

its Affiliates (including the Purchased Entities and JV Entities), or that could become an Encumbrance on the Purchased Assets, (iv) for which Seller or any of its Affiliates, the Purchased Entities and the JV Entities would be liable as a result of being a member of an affiliated, consolidated, combined or unitary group on or prior to the Closing Date, pursuant to Treasury Regulations Section 1.1502-6 or any analogous or similar Law, and (v) arising in connection with the transactions contemplated by this Agreement (other than Transfer Taxes for which the Buyer is liable pursuant to this Agreement) (for the avoidance of doubt and without limitation, for purposes of this Section 2.04(a), Taxes shall include Taxes imposed as a result of transferee Liability, of being a member of an affiliated, consolidated, combined or unitary group for any period or otherwise through operation of law);

(b) all Liabilities arising under any (i) Excluded Contract or (ii) Purchased Contract, to the extent relating to periods prior to the Closing or any actions taken or not taken by Sellers or any Purchased Entity thereunder prior to the Closing;

(c) all Liabilities of Sellers for Indebtedness, including any intercompany Indebtedness among Sellers or due from a Purchased Entity to a Seller;

(d) all Liabilities and other obligations of Sellers relating to or arising from any Collective Bargaining Agreement (except as required by applicable Law);

(e) all Liabilities associated with current or former employees of the Seller or its Affiliates (other than (i) payroll (including salary, wages and commissions), vacation, sick leave, parental leave, long-service leave, workers' compensation claims and unemployment benefits of any Transferred Employees and (ii) any Liabilities arising under Assumed Plans or Purchased Entities' Plans, including severance, retention and termination agreements);

(f) all Liabilities arising out of, relating to, or with respect to any notice pay or benefits and claims under the WARN Act with respect to any current and/or former employee arising prior to the Closing Date;

(g) all Seller Plans (other than the Assumed Plans and the Purchased Entities' Plans), and Liabilities arising out of, relating to or with respect to any Seller Plan (other than the Assumed Plans and the Purchased Entities' Plans);

(h) all Liabilities arising in connection with any violation of any applicable Law relating to the period prior to the Closing;

(i) all Liabilities of Sellers arising under or pursuant to any Environmental Health and Safety Requirements, including with respect to any real property owned, operated, leased or

16

|  | otherwise used by Sellers, whether or not used in the Ordinary Course, including any Liabilities for noncompliance with any Environmental Health and Safety Requirements (including the Release of Hazardous Materials), in each case to the extent arising as a result of any act, omission, or circumstances taking place on or prior to the Closing, whether known or unknown as of the Closing; |
|  | (j) all Liabilities arising out of, relating to or with respect to any Order or Proceeding involving, against or affecting any Purchased Asset, the Business, any Seller or any assets or properties of any Seller (i) commenced, filed, initiated or threatened as of the Closing or (ii) relating to facts, events or circumstances arising or occurring prior to the Closing; |
|  | (k) any obligation of any Seller to indemnify any Person by reason of, or in connection with, the fact that such Person was a director, officer, manager, employee or agent of such Seller or any Purchased Entity or any other Person; |
|  | (l) any Cure Costs not otherwise assumed under Section 2.02(g); |
|  | (m) all Liabilities for: (i) all costs and expenses incurred or owed in connection with the administration of the Chapter 11 Cases by Sellers (including all Estimated Wind-Down Expenses and all Seller Retained Professional Fees); and (ii) all costs and expenses incurred in connection with the negotiation, execution and consummation of the transactions contemplated under this Agreement by Sellers; |
|  | (n) all Liabilities arising from any Proceedings whether in existence prior to, at the Closing Date or arising thereafter; and |
|  | (o) all other Liabilities of Sellers that are not expressly included as Assumed Liabilities or that relate to an Excluded Asset, whether arising prior to or after the Closing. |
| **Conditions to Closing**<br>*Section 8.01* | (a) (i) all waiting periods (including any extension thereof) applicable to the purchase and sale of the Purchased Assets under the HSR Act shall have expired or been terminated and (ii) all other filings, certificates, (non-jurisdiction) notices, approvals and clearances under any other Antitrust Law as identified in <u>Section 8.01(a)</u> of the Disclosure Schedules shall have been obtained, deemed obtained or shall have occurred, *provided* that <u>Section 8.01(a)</u> of the Disclosure Schedules shall be updated to include such additional filings, certificates, (non-jurisdiction) notices, approvals and clearances as identified by the Buyer within ten (10) Business Days following the date of this Agreement; |
|  | (b) no provision of any applicable Law and no judgment, injunction or Order shall then be in effect prohibiting or making illegal the consummation of the Closing; and |

| | (c)  (c)      the Bankruptcy Court shall have entered the Sale Order and the Bidding Procedures Order, and the Sale Order and the Bidding Procedures Order shall each be a Final Order. |
|---|---|
| ***Expense Reimbursement*** *Section 5.04 and 10.02* | The Stalking Horse Agreement provides for the payment of an Expense Reimbursement of up to $1.5 million for reimbursement of reasonable and documented out-of-pocket third-party expenses (including costs of government filings, attorneys' fees and expenses) incurred by Buyer in connection with the consideration, evaluation and negotiation of the Stalking Horse Agreement and the transactions contemplated thereby. If the Stalking Horse Agreement is terminated by (A) either Party pursuant to Section 10.01(d), (B) the Company pursuant to Section 10.01(o) or (C) Buyer pursuant to Section 10.01(b), Section 10.01(g) or Section 10.01(k), then Sellers, on a joint and several basis, shall pay to Buyer (by wire transfer of immediately available funds), an amount equal to the Expense Reimbursement no later than the date that is one (1) Business Day following the date of such termination; and (ii) if this Agreement is terminated pursuant to Section 10.01(c) or Section 10.01(e), then Sellers, on a joint and several basis, shall pay to Buyer (by wire transfer of immediately available funds), an amount equal to the Expense Reimbursement upon the closing of the "Successful Bid" or "Next-Highest Bid" (each as defined in the Bid Procedures Order) or an Alternative Transaction. |

## IV.    **Bidding Procedures**

### A.    **Overview**

27.    The purpose of the Bidding Procedures is to facilitate an ongoing competitive process.  The Bidding Procedures provide for access to due diligence, the criteria for qualifying bidders and bids, the process for receiving and negotiating offers, the conduct of an Auction (if any), the selection and approval of successful bidders, and deadlines pertaining to the Bidding Procedures.  If approved, these procedures will enable the Debtors to obtain bids from potential buyers in a manner that aligns with the Milestones and the Debtors' chapter 11 strategy.

28.    As the Bidding Procedures are attached to the Bidding Procedures Order, they are not herein restated in their entirety.  The Debtors will have the ability to alter the Bidding Procedures based on the exigencies of a given situation if the Debtors determine, in their business

judgment, in a manner consistent with their fiduciary duties and applicable law, and in consultation

with the Consultation Parties (as defined in the Bidding Procedures), that it is reasonable to do so.

29.    For convenience, certain key terms of the Bidding Procedures are summarized

below:[9]

a.    <u>Bid Deadline</u>. A Potential Bidder that desires to make a bid shall deliver electronic copies of its bid so as to be received no later than June 13, 2023 at 4:00 p.m. (prevailing Eastern Time); <u>provided</u>, that the Debtors may, in consultation with the Consultation Parties and with the consent of the Stalking Horse Bidder, extend the Bid Deadline without further order of the Court subject to providing notice to all Potential Bidders and the Stalking Horse Bidder.

b.    <u>Description of Assets</u>. The Debtors will consider bids that are made for either (i) all or a combination of the Debtors' Assets; or (ii) one or more of the Debtors' Business Segments.

c.    <u>Potential Bidders' Access to Diligence</u>. To participate in the diligence process and receive access to due diligence information with respect to any of the Assets, an interested party must submit to the Debtors or their advisors: an executed confidentiality agreement in form and substance reasonably satisfactory to the Debtors, which for interested parties that have signed a confidentiality agreement previously with the Debtors, may in the Debtors' discretion be the previously executed agreement

d.    <u>Qualified Bids</u>. To qualify as a Qualified Bidder, Potential Bidders must deliver a Bid by the Bid Deadline that meets all of the criteria set forth in the Bidding Procedures. These criteria include the provision of: certain information regarding the identity of the bidder, a description of the assets being bid upon, the proposed purchase price, the proposed sources and uses, the proposed liabilities to be assumed, evidence of financial ability to close, certain representations and warranties and details regarding outstanding authorizations and approvals. The complete list of required contents of a Qualified Bid is set forth in detail in the Bidding Procedures.

e.    <u>Sale Hearing Acceleration</u>. The Debtors are authorized (but not required) to elect to terminate the sale and marketing process, and, upon notice to parties, accelerate the Sale Hearing, if: (i) the Debtors do not receive a

---

[9]  This summary description and any further descriptions in this Motion of the provisions of the Bidding Procedures are for summary purposes only, do not restate the terms of the Bidding Procedures in their entirety, and in the event of any inconsistency with the Bidding Procedures, the Bidding Procedures will govern. Capitalized terms used but not defined in this section shall have the meanings ascribed to them in the Bidding Procedures.

Qualified Bid (other than the Stalking Horse Bid) prior to the Bid Deadline; or (ii) the Qualified Bids received (whether individually or in the aggregate) fail to exceed the amount of the Stalking Horse Bid. In the event that the Debtors elect to accelerate the Sale pursuant to this section (a "<u>Sale Acceleration Election</u>"), the Debtors will file and serve a notice, among other things, naming the Stalking Horse Bidder as the sole Successful Bidder.

f.    <u>Auction</u>. Assuming the Debtors do not make a Sale Acceleration Election and more than one Qualified Bid is timely received, an Auction will be conducted. The Bidding Procedures set forth the details for participation in the Auction and other procedures with respect to the Auction.

g.    <u>Successful Bids and Back-Up Bids</u>.

i.    In consultation with the Consultation Parties, and subject to approval by the Court, the Debtors will determine which Qualified Bid or combination of Qualified Bids constitutes the highest or otherwise best offer for the purchase of the Assets, considering all factors, including certain factors described in the Bidding Procedures.

ii.    In consultation with the Consultation Parties, and subject to approval by the Court, the Debtors will determine which Qualified Bid or combination of Qualified Bids constitute the next highest or next best offer after the Successful Bid(s), and such bid(s) shall remain open and irrevocable until the Back-Up Bid Outside Date. If the Sale with a Successful Bidder is terminated prior to the Back-Up Bid Outside Date, the Back-Up Bidder(s) shall be deemed the new Successful Bidder(s) and shall be obligated to consummate each Back-Up Bid as if it were a Successful Bid at the Auction.

**B.    Key Dates and Deadlines**

30.    The Debtors' need to consummate a sale of their Assets as quickly and efficiently as possible. Accordingly, consistent with the Milestones, the Debtors propose the following key dates for the sale process:

| Date | Deadline |
|---|---|
| **Wednesday, May 17, 2023** | File Final Stalking Horse Agreement |
| **Friday, May 26, 2023, at 10:00 a.m. (Eastern Time)** | Hearing to consider entry of the Bidding Procedures Order |
| **Friday, May 26, 2023** | File Sale Notice and Assumption and Assignment Notice |
| **Monday, June 12, 2023, at 4:00 p.m. (Eastern Time)** | Deadline to object to the assumption and assignment of an executory contract or unexpired lease, as to the proposed cure amount. |
| **Tuesday, June 13, 2023, at 4:00 p.m. (Eastern Time)** | Bid Deadline |
| **Wednesday, June 14, 2023, at 4:00 p.m. (Eastern Time)** | Qualified Bid Designation Date |
| **Friday, June 16, 2023, at 10:00 a.m. (Eastern Time)** | Auction to be held at the New York offices of Shearman & Sterling LLP |
| **Friday, June 16, 2023, at 4:00 p.m. (Eastern Time)** | Deadline to object to the proposed Sale ("Sale Objection Deadline"), including any objection to the sale of the Assets free and clear of liens, claims, interests, and encumbrances pursuant to section 363(f) of the Bankruptcy Code and entry of a Sale Order. |
| **Friday, June 23, 2023, at 10:00 a.m. (Eastern Time)** | Sale Hearing (unless accelerated in the event no Qualified Bids are received)[10] |
| **On or before Friday, July 7, 2023** | Closing |

---

[10]    Subject to the availability and convenience of the Court.

31.     The Debtors respectfully request that the Court approve this timeline.  The Debtors have been actively marketing their assets for approximately 12 months in total.  As a result, although the timeline is relatively short, the Debtors believe that in light of the extensive marketing to date, it is appropriate under the circumstances.

32.     Further, the timeline contemplated by the Bidding Procedures, while expeditious, is consistent with the milestones in the DIP Milestones and otherwise is reasonable under the circumstances.  Herlihy Decl. ¶ 17. Without the DIP Financing—which currently is the only postpetition financing available to the Debtors— and access to cash collateral, the Debtors will suffer significant impairment to their business operations and cannot continue as a going concern. *Id.* It is vitally important that the Debtors be afforded the opportunity to proceed with an efficient sale process within the DIP Milestones to preserve value for all stakeholders.  *Id.* Further, as described above, there already has been a thorough and extensive marketing process for the Debtors.  Many of the potential buyers most likely to make Qualified Bids on the Assets have already engaged with the Company, completed extensive diligence, had the opportunity to make proposals prepetition, are aware of the Company's situation, and, if interested, should be capable of submitting meaningful bids by the Bid Deadline. *Id.* In addition, potential bidders who have not previously conducted diligence on the Debtors' businesses will have immediate access to, subject to the execution of an appropriate confidentiality agreement, a significant amount of information regarding the Assets, including, but not limited to, a confidential information memorandum (the "CIM"). *Id.*

### C.     Noticing Procedures

33.     The Sale Notice, substantially in the form attached as Exhibit 2 to Exhibit A, will: (a) include a general description of the Assets for sale; (b) prominently display the date, time, and

place (as applicable) of the (i) Accelerated Sale Hearing, (ii) Bid Deadline, (iii) Auction and (iv) Sale Hearing; and (c) prominently display the deadlines and procedures for filing a Sale Objection. It is contemplated that on or before May 26, 2023, the Debtors shall file the Sale Notice with the Court, serve the Sale Notice on the Sale Notice Parties (as defined in the Bidding Procedures) by first class U.S. mail, and cause the Sale Notice to be published on the dedicated restructuring website hosted at https://cases.stretto.com/vice/.

34.    The Noticing Procedures constitute adequate and reasonable notice of the key dates and deadlines for the sale process, including, among other things, the Sale Objection Deadlines, the Bid Deadline, and the time and location of the Auction (if any) and the Sale Hearing. Accordingly, the Debtors request that the Court find that the Noticing Procedures are adequate and appropriate under the circumstances and comply with the requirements of Bankruptcy Rule 2002.

### D.    Assumption and Assignment Procedures

35.    In addition to the Bidding Procedures, the Debtors also seek approval of the Assumption and Assignment Procedures to facilitate the fair and orderly assumption, assumption and assignment, or rejection of certain of the Contracts and Leases as may be designated in any other Successful Bid.  The proposed Assumption and Assignment Procedures are set forth in the Bidding Procedures and the Assumption and Assignment Notice attached as Exhibit 3 to Exhibit A.  Specifically, the Assumption and Assignment Procedures are as follows:

a.    Assumption and Assignment Notice. As soon as practicable following entry of the Bidding Procedures Order, the Debtors will file with the Court and serve on the Sale Notice Parties, including each Counterparty, the Assumption and Assignment Notice and will cause the same to be published on the Case Website. The Assumption and Assignment Notice will (a) identify the Assigned Contracts initially designated by the Stalking Horse Bidder for potential assumption and assignment to the Stalking Horse Bidder (the "Initial Assumed Contracts"); (b) list the Debtors' good faith calculation of the Cure Costs with respect to each Initial Assumed Contract; (c) expressly state that assumption or assignment of any Assigned Contract

23

is not guaranteed and is subject to Court approval; (d) direct the non-Debtor Counterparty to relevant publicly available financial information regarding the Stalking Horse Bidder for purposes of demonstrating adequate assurance of future performance by the Stalking Horse Bidder; (e) prominently display the deadline to file a Cure Objection and an Adequate Assurance Objection (each as hereinafter defined); and (f) prominently display the dates, times, and location of the Sale Hearings.

b.     <u>Designation of Contracts and Leases</u>. Pursuant to the terms of the Stalking Horse Agreement, the Stalking Horse Bidder shall have the right, at any time prior to one (1) business day prior to Closing to designate additional Assigned Contracts for proposed assumption and assignment to the Stalking Horse Bidder (each, a "<u>Supplemental Contract</u>") or to remove Contracts from the list of Assigned Contracts from proposed assumption and assignment (each, a "<u>Removed Contract</u>"). The Debtors shall, as soon as reasonably practicable after the Buyer's designation of any Supplemental Contracts or any Removed Contracts file with the Court, serve by overnight delivery on all applicable Counterparties, and cause to be published on the Case Website, a notice of proposed assumption and assignment of the Supplemental Contracts (a <u>Supplemental Assumption and Assignment Notice</u>") and/or removal of the Removed Contracts, which shall (A) expressly state that assumption or assignment of the Supplemental Contracts is not guaranteed and subject to Court approval and removal of the Removed Contracts does not constitute a rejection by the Debtors of such Contract, and (B) direct the non-Debtor Counterparty to a Supplemental Contract to relevant publicly available financial information regarding the Stalking Horse Bidder for purposes of demonstrating adequate assurance of future performance by the Stalking Horse Bidder; and (C) prominently display the deadline to file an Adequate Assurance Objection with respect to a Supplemental Contract.

c.     <u>Auction Results</u>. The Debtors will, within one (1) calendar day after the conclusion of the Auction, or as soon as practicable thereafter, file with the Court, serve on the Sale Notice Parties (including each Counterparty to an Assigned Contract in a Successful Bid), a Notice of Auction Results, which shall (1) identify the Successful Bidders and Back-Up Bidders; (2) list all Assigned Contracts in the Successful Bids and Back-Up Bids; (3) identify any known proposed assignee(s) of Assigned Contracts (if different from the applicable Successful Bidder); and (4) set forth the deadlines and procedures for filing Adequate Assurance Objections in response to the Notice of Auction Results.

d.     <u>Cure Objections</u>.

     i.     <u>Cure Objection Deadlines</u>. Any Counterparty who wishes to object to the proposed assumption, assignment, or potential designation of

their Contract or Lease, the subject of which objection is the Debtors' proposed Cure Costs to cure any outstanding defaults then existing under such Contract or Lease (a "Cure Objection"), which must (1) be in writing; (2) comply with the Bankruptcy Code, Bankruptcy Rules, and Local Rules; (3) state, with specificity, the legal and factual bases thereof, including the cure amount the Counterparty believes is required to cure defaults under the relevant Contract or Lease; and (4) include any appropriate documentation in support thereof, by no later than the applicable Sale Objection Deadline, which shall be at least seven (7) calendar days after service of such notice, or less in the case of a Supplemental Assumption and Assignment Notice to the extent necessary.

ii.        Resolution of Cure Objections. If a timely Cure Objection cannot otherwise be resolved by the parties prior to the commencement of the applicable Sale Hearing, such objection and all issues of adequate assurance of future performance shall be determined by the Court at the Sale Hearing or at a later hearing on a date to be scheduled.

iii.       Adjourned Cure Objections. If a timely Cure Objection is received and such objection cannot otherwise be resolved by the parties, such objection shall be heard at the applicable Sale Hearing; provided that a Cure Objection may, at the Debtors' discretion (with the consent of the Stalking Horse Bidder, or, if an Auction is held, the Successful Bidder), be adjourned to a subsequent hearing if, pending resolution of such Cure Objection (an "Adjourned Cure Objection"), the Debtors maintain a cash reserve (a "Cure Cost Reserve") equal to the lesser of (1) the amount the objecting Counterparty has asserted to be required to cure the asserted defaults under the applicable Assigned Contract and (2) such other cash reserve amount as may be ordered by the Court, until a Cure Cost amount is agreed to by the parties or determined by the Court; provided that if the Debtors maintain a letter of credit or similar security deposit for the Debtors' obligations under an Assigned Contract to a Counterparty asserting a Cure Objection, the Debtors shall not be required to fund a Cure Cost Reserve to the extent of the existing amounts available under such letter of credit or other security deposit maintained by such Counterparty. Notwithstanding the existence of an Adjourned Cure Objection, the Assigned Contract may be deemed assumed and assigned to the Stalking Horse Bidder, or, if an Auction is held, the Successful Bidder, as of the applicable Closing Date if the Debtors maintain a Cure Cost Reserve.

iv.       Failure to File Timely Cure Objection. If a Counterparty fails to file with the Court and serve on the Objection Recipients a timely Cure

Objection, the Counterparty shall be forever barred from asserting any objection with regard to the cost to cure any defaults under the applicable Contract or Lease. The Cure Costs set forth in each Assumption and Assignment Notice shall be controlling and will be the only amount necessary to cure outstanding defaults under the applicable Contract or Lease under Bankruptcy Code section 365(b), notwithstanding anything to the contrary in the Contract or Lease, or any other document, and the Counterparty shall be forever barred from asserting any additional cure or other amounts with respect to such Contract or Lease against the Debtors, the Successful Bidder, or the property of any of them.

e.    <u>Adequate Assurance Information</u>. Each Bid (other than the Stalking Horse Bid) must contain such financial and other information that allows the Debtors, after consultation with the Consultation Parties, to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate the applicable Sale, including, without limitation, such financial and other information setting forth adequate assurance of future performance under section 365(f)(2)(B) of the Bankruptcy Code, and the Potential Bidder's willingness to perform under any contracts that are assumed and assigned to the Potential Bidder (the "<u>Adequate Assurance Information</u>").

f.    <u>Adequate Assurance Objections</u>.

    i.    <u>Adequate Assurance Objection Deadline</u>. Any Counterparty who wishes to object to the proposed assumption, assignment, or potential designation of their Contract or Lease, the subject of which objection is a Successful Bidder's (including the Stalking Horse Bidder's) and/or any of their known proposed assignees' (if different from the Successful Bidder) proposed form of adequate assurance of future performance with respect to such Contract or Lease (an "<u>Adequate Assurance Objection</u>"), shall file with the Court and serve on the Objection Recipients, including the applicable Successful Bidder and any known proposed assignee of such contract or lease (if different from the Successful Bidder), its Adequate Assurance Objection, which must (1) be in writing; (2) comply with the Bankruptcy Code, Bankruptcy Rules, and Local Rules; (3) state, with specificity, the legal and factual bases thereof; (4) include any appropriate documentation in support thereof, by no later than the applicable deadline set forth in the applicable notice, which shall be at least seven (7) calendar days after the filing of such notice, or less in the case of a Supplemental Assumption and Assignment Notice to the extent necessary.

ii.  <u>Resolution of Adequate Assurance Objections</u>. If a timely Adequate Assurance Objection cannot otherwise be resolved by the parties prior to the commencement of the applicable Sale Hearing, such objection and all issues of adequate assurance of future performance shall be determined by the Court at the Sale Hearing or at a later hearing on a date to be scheduled.

iii.  <u>Failure to Timely File Adequate Assurance Objection</u>. If a Counterparty fails to file with the Court and serve on the Objection Recipients, including the applicable Successful Bidder and any known proposed assignee of the Contract or Lease (if different from the Successful Bidder), a timely Adequate Assurance Objection, the Counterparty shall be forever barred from asserting any such objection with regard to the relevant Contract or Lease. The Successful Bidder and/or its known proposed assignee of the Contract or Lease shall be deemed to have provided adequate assurance of future performance with respect to the applicable Contract or Lease in accordance with Bankruptcy Code section 365(f)(2)(B) and, if applicable, Bankruptcy Code section 365(b)(3), notwithstanding anything to the contrary in the Contract or Lease or any other document.

g.  <u>Reservation of Rights</u>. The inclusion of a Contract or Lease or Cure Costs with respect thereto on an Assumption and Assignment Notice or the Notice of Auction Results shall not constitute or be deemed a determination or admission by the Debtors, the Successful Bidders, or any other party in interest that such Contract or Lease is an executory contract or unexpired lease within the meaning of the Bankruptcy Code. The Debtors and the Stalking Horse Bidder reserve all of their rights, claims, and causes of action with respect to each Contract and Lease listed on an Assumption and Assignment Notice and Notice of Auction Results. The Debtors' inclusion of any Contract or Lease on the Assumption and Assignment Notice or the Notice of Auction Results shall not be a guarantee that such Contract or Lease ultimately will be assumed or assumed and assigned.

### E.    Extraordinary Provisions Under the Sale Guidelines

36.    Collectively, the Bidding Procedures and the Stalking Horse Agreement and the proposed Sale Order are contemplated to contain, the following provisions, which the Sale Guidelines require to be separately disclosed:[11]

(a)    <u>No Good Faith Deposit</u>. Pursuant to the Bidding Procedures, the Stalking Horse Bidder shall not be required to post a Good Faith Deposit. Additionally, the Debtors reserve their rights to waive the requirement to provide a Good Faith Deposit with respect to any bidder.

(b)    <u>Record Retention</u>. The Stalking Horse Agreement provides that for a period of three (3) years following the Closing Date, Buyer shall provide to Sellers and their respective Affiliates and representatives (after reasonable advance notice and during regular business hours) reasonable access to, including the right to make copies of, all books and records included in and otherwise related to the Purchased Assets, to the extent necessary to permit Sellers to determine any matter relating to their respective rights and obligations hereunder or to any Pre-Closing Tax Period (for example, for purposes of any Tax or accounting audit or any claim or litigation matter) or otherwise related to the Excluded Assets, for periods prior to the Closing and shall preserve such books and records until the latest of (a) such period as shall be consistent with Buyer's records retention policy in effect from time to time, (b) the retention period required by applicable Law, (c) the conclusion of all bankruptcy proceedings relating to the Chapter 11 Cases and (d) in the case of books and records relating to Taxes, three (3) years following the Closing Date.  Such access shall include access to any information in electronic form to the extent reasonably available.

(c)    <u>Sale of Avoidance Actions</u>. All of the Debtors' claims or causes of action arising under sections 544, 547, 548, 549 and 550 of the Bankruptcy Code and any similar state Law.

(d)    <u>Requested Findings as to Successor Liability</u>. Under the Stalking Horse Agreement, the Parties intend that, to the fullest extent permitted by applicable Law (including under Section 363 of the Bankruptcy Code), upon the Closing, Buyer shall not be deemed to: (a) be the successor of any Seller, (b) have, de facto, or otherwise, merged with or into Sellers, (c) be a

---

[11]    The following list of possible Extraordinary Provisions, as such term is defined in the Sale Guidelines, is not intended to be an admission that any of these items are unusual relief in a sale of significant assets of a large chapter 11 debtor pursuant to section 363 of the Bankruptcy Code. Extraordinary Provisions that are not applicable here have not been included in the following list.

mere continuation or substantial continuation of Sellers or the enterprise(s) of Sellers or (d) be liable or have any Liability for any acts or omissions of Sellers in the conduct of their businesses or arising under or related to the Purchased Assets other than as expressly set forth and agreed in the Stalking Horse Agreement.

## **Basis for Relief**

### I.    **The Bidding Procedures Are Fair and Are Designed to Maximize the Value Received for the Assets.**

37.    The Bidding Procedures are appropriate under sections 105 and 363 of the Bankruptcy Code because they provide for an orderly, uniform, and competitive bidding process through which interested parties may submit offers to purchase the Assets.  Potential bidders will have sufficient notice and an opportunity to conduct diligence and finalize their bids, particularly due to the fact that it is expected that the majority of potential bidders already engaged with PJT, LionTree and *VICE's* management in the months leading to the Petition Date.  Indeed, the Bidding Procedures are designed to promote what courts have deemed to be the paramount goal of a chapter 11 sale:  maximizing the value of sale proceeds received by the estate.  *In re Celsius Network LLC*, No. 22-10964 (MG), 2022 WL 14193879, at *6, 7 (Bankr. S.D.N.Y. Oct. 24, 2022) ("[G]enerally, the Court will entertain a motion for approval . . . of proposed bidding procedures if such procedures are, as a matter of reasonable business judgment, likely to maximize the sale price," and finding bidding procedures there "work[ed] to ensure a fair bidding process and to maximize the sale price of the property in the auction" (second alteration in original) (quoting the Sale Guidelines and Bankruptcy Code section 363(b))); *In re Dura Auto.  Sys., Inc.*, No. 06-11202 (KJC), 2007 WL 7728109, at *90 (Bankr. D.  Del. Aug.  15, 2007) (citing cases and noting that "courts recognize that procedures intended to enhance competitive bidding are consistent with the

goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales").

38.     The Debtors, with the assistance of their advisors, have structured the Bidding Procedures to promote active bidding by interested parties and to reach the highest or otherwise best offer reasonably available for the Debtors' businesses.  The Bidding Procedures will allow the Debtors to conduct the Auction, if necessary, in a fair and transparent manner that will encourage participation by financially capable bidders with demonstrated ability to timely consummate a Sale.  The Bidding Procedures also provide the Debtors with an adequate opportunity to consider competing bids and to select the highest or otherwise best offers for the potential completion of a Sale.

39.     Importantly, the Debtors have tailored their process to facilitate bids that are superior to the Stalking Horse Bid.  The Bidding Procedures guide potential acquirers to bid on the Company as a whole, specific Business Segments, or any combination of Assets.

40.     As described above, the sale timeline and post-petition marketing period thereunder is reasonable.  The Milestones were heavily negotiated at arm's length, and separately provided for this Debtors' DIP financing, and failure to adhere to such timeline could jeopardize the process that has been agreed to and funded by the Debtors' Senior Secured Lenders.  As noted above, the Debtors' Assets have been marketed extensively prior to the Petition Date. Through that process, parties that have expressed an interest in bidding are already familiar with the Assets for purposes of formulating and finalizing their bids.

41.     Courts in this district and other districts have approved procedures containing similar timelines (if not shorter) than the sale timeline proposed herein.  *See, e.g.*, *In re Purdue Pharma L.P.*, No. 19-23649 (SHL) (Bankr. S.D.N.Y. Apr. 28, 2023), ECF No. 5570 (approving

48-day sale timeline); *In re Pareteum Corporation*, No. 22-10615 (LGB) (Bankr. S.D.N.Y. May

31, 2022), ECF No. 76 (approving 38-day sale timeline); *In re Garrett Motion Inc.*, No. 20-12212

(MEW), ECF No. 282 (approving approximately 55-day sale timeline); *In re Ditech Holding*

*Corp.*, No. 19-10412 (JLG) (Bankr. S.D.N.Y. Apr. 23, 2019), ECF No. 456 (approving 58-day

sale timeline); *In re Synergy Pharm., Inc.*, No. 18-14010 (JLG) (Bankr. S.D.N.Y. Jan. 17, 2019),

ECF No. 181 (approving 53-day sale timeline).

42.    Accordingly, the Bidding Procedures should be approved, because, under the

circumstances, they are reasonable, appropriate, and in the best interests of the Debtors, their

estates, and all parties in interest.

## II.    The Proposed Sale Should Be Approved.

43.    Ample authority exists for approval of the Sale.  Section 363 of the Bankruptcy

Code provides, in relevant part, "[t]he trustee, after notice and a hearing, may use, sell, or lease,

other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Courts

in the Second Circuit and others, in applying this section, have required that the sale of a debtor's

assets be based upon the sound business judgment of the debtor. *See In re Chateaugay Corp.*, 973

F.2d 141 (2d Cir. 1992) (holding that a judge reviewing a section 363(b) application must find

from the evidence presented a good business reason to grant such application); *Committee of*

*Equity Security Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1071 (2d Cir. 1983)

(same); *In re Gen. Motors Corp.*, 407 B.R. 463, 493-94 (Bankr. S.D.N.Y. 2009).

44.    Once a court is satisfied that there is a sound business justification for the proposed

sale, the court must then determine whether (a) the debtor has provided the interested parties with

adequate and reasonable notice, (b) the sale price is fair and reasonable, and (c) the purchaser is

proceeding in good faith. *Gen. Motors*, 407 B.R. at 493–94; *In re Betty Owens Sch.*, 1997 U.S.

Dist. Lexis 5877 (S.D.N.Y. 1997); *accord In re Delaware and Hudson Ry. Co.*, 124 B.R. at 166;

*In re Decora Indus., Inc.*, Case No. 00-4459, 2002 WL 32332749 at *3 (Bankr. D. Del. May 20,

2002).   Where a debtor demonstrates a valid business justification for a decision, it is presumed

that "in making a business decision the directors of a corporation acted on an informed basis, in

good faith and in the honest belief that the action taken was in the best interests of the company."

*Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*,

147 B.R. at 656 (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

> **A.    The Debtors Have Demonstrated a Sound Business Justification for the Proposed Sale.**

45.    A sound business purpose for the sale of a debtor's assets outside the ordinary

course of business exists where such sale is necessary to preserve the value of the estate for the

benefit of creditors and interest holders. *See, e.g., In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143

(3d Cir. 1986); *In re Lionel Corp.*, 722 F.2d at 1063; *see also In re Food Barn Stores, Inc.*, 107

F.3d 558, 564–65 (8th Cir. 1997) (recognizing that paramount goal of any proposed sale of

property of estate is to maximize value).

46.    Pursuing entry into and performance under the Stalking Horse Agreement

represents a reasonable exercise of the Debtors' business judgment and is in the best interests of

all parties.   An orderly but expeditious sale of the Acquired Assets is critical to preserving and

realizing their going concern value and, in turn, to maximizing recoveries for the Debtors'

economic stakeholders and preserving jobs. A prompt sale is also required by the DIP Credit

Agreement and the Stalking Horse Agreement.

> **B.    The Noticing Procedures Are Reasonable and Appropriate.**

47.    The notice to third parties that the Debtors propose to provide, as set forth in the

Bidding Procedures Order and Bidding Procedures, is more than adequate and reasonable.   Such

notice will ensure that actual notice of the Auction, Sale Hearing, and Sale will be provided to all known creditors of the Debtors, in addition to notice by publication. Moreover, such notice, together with the authority pursuant to sections 363 and 365 of the Bankruptcy Code, will enable the Court to make findings at the Sale Hearing and in the Sale Order that the ultimate purchaser of the Acquired Assets, whether it be the Stalking Horse Bidder or, if an Auction is held, the Successful Bidder, shall not be liable under theories of successor liability in connection with such Acquired Assets.

### C.      The Proposed Sale Process Will Produce a Fair and Reasonable Purchase Price for the Assets.

48.      The Stalking Horse Bid was extensively negotiated and will serve as a floor for Qualified Bids for the Assets. Herlihy Decl. ¶ 14. As a result, the Debtors are confident that the sale process will culminate in the Debtors obtaining the highest or otherwise best value for the applicable Assets which will inure to the benefit of all parties in interest in these Chapter 11 Cases. *Id.* at 18.

### D.      A Sale Free and Clear of Liens, Claims, Encumbrances, and Interests Is Appropriate.

49.      In the interest of attracting the best offers, the Assets should be sold free and clear of any and all liens, claims, interests, and other encumbrances, in accordance with section 363(f) of the Bankruptcy Code, with any such liens, claims, interests, and encumbrances to attach to the proceeds of the applicable sale. Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests, and encumbrances if any one of the following conditions is satisfied:

(a)      applicable non-bankruptcy law permits sale of such property free and clear of such interest;

(b)      such entity consents;

(c)     such interest is a lien and the price at which property is to be sold is greater than the value of all liens on such property;

(d)     such interest is in bona fide dispute; or

(e)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); *see also In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("Section 363(f) is written in the disjunctive, not the conjunctive, and if any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens."); *Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (same).

50.     With respect to any party asserting a lien, claim, encumbrance or other interest against the Purchased Assets (as defined in the Stalking Horse Agreement), the Debtors will be able to satisfy one or more of the conditions set forth in section 363(f).

### III.     Credit Bidding Should Be Authorized Under Section 363(k) of the Bankruptcy Code.

51.     A secured creditor is allowed to "credit bid" the amount of its claim in a sale. Section 363(k) of the Bankruptcy Code provides, in relevant part, that unless the court for cause orders otherwise, the holder of a claim secured by property that is the subject of the sale may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property. 11 U.S.C. § 363(k).  Thus, credit bidding is a statutory right of secured creditors that cannot be restricted absent cause shown.  Presently, the Credit Bid is with respect to obligations that are expected to be incurred under the DIP Facility, which may be supplemented by amounts due under the Prepetition Senior Secured Credit

Agreement.  Accordingly, the Credit Bid contemplated by the Stalking Horse Agreement and the ability to credit bid pursuant to the Bidding Procedures should be authorized.

## IV.    The Expense Reimbursement Amount Is Reasonable and Appropriate and Should Be Approved.

52.    The Debtors also are seeking approval of an expense reimbursement payment up to a maximum of $1.5 million, which amount will constitute an allowed super-priority administrative expense claim of the Debtors pursuant to sections 364(c)(1), 503, and 507 of the Bankruptcy Code (the "Expense Reimbursement") to the Stalking Horse Bidder for reasonable, documented, out-of-pocket expenses. The Expense Reimbursement shall constitute an allowed super-priority administrative expense claim under sections 364(c)(1), 503, and 507 of the Bankruptcy Code and shall be senior to all other administrative expense claims that may be approved in the Chapter 11 Cases and (ii) be payable under the terms and conditions set forth in the Stalking Horse Agreement.

53.    Courts in this District analyze the appropriateness of bidding incentives under the "business judgment rule" standard, with well-established law that bid protections similar to the Expense Reimbursement Amount should be approved as long as (a) the relationship between the parties is not tainted by self-dealing, (b) the fee does not hamper bidding, and (c) the amount of the fee is reasonable in relation to the size of the transaction. *See Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 658 (S.D.N.Y. 1992). All three of these requirements are met here.

54.    The Debtors, the Senior Secured Parties, and the Stalking Horse Bidder, each represented by sophisticated advisors, negotiated the terms of the Expense Reimbursement Amount at arms'-length. Herlihy Decl. ¶ 14–17. Capped at $1.5 million in a sale transaction requiring extensive costs and efforts by the Senior Secured Parties and Stalking Horse Bidder, the Expense Reimbursement Amount is reasonable and appropriate under the circumstances. *Id.*

Notably, there is no break-up fee sought.  Moreover, the Expense Reimbursement is only payable

where the Stalking Horse Bidder is not ultimately the Successful Bidder. Herlihy Decl. ¶ 16.  The

Stalking Horse Bidder has committed substantial time and resources and incurred associated

opportunity cost.  The Stalking Horse Agreement will provide a floor of value and facilitate the

Debtors' efforts to obtain a higher or better value for their assets.  For these reasons, the Expense

Reimbursement should be approved.

**V.      Assumption and Assignment of Assigned Contracts Should Be Approved.**

**A.      The Assumption and Assignment Procedures Reflect the Debtors' Reasonable Business Judgment.**

55.      Section 365(a) of the Bankruptcy Code provides that a debtor in possession "subject

to the court's approval, may assume or reject any executory contract or unexpired lease of the

debtor." 11 U.S.C. § 365(a).  Upon finding that a debtor has exercised its sound business judgment

in determining to assume an executory contract or unexpired lease, courts will approve the

assumption under section 365(a) of the Bankruptcy Code if the transaction is in the best interests

of the estate.  *See In re Penn Traffic Co.*, 524 F.3d 373, 383 (2d Cir. 2008) ("That the debtor's

interests are paramount in the balance of control is underscored by the business judgment standard

employed by courts in determining whether to permit the debtor to assume or reject the contract.");

*In re Klein Sleep Prods.*, *Inc.*, 78 F.3d 18, 25 (2d Cir. 1996) ("Th[e] decision [to allow a debtor to

assume an unexpired lease] required a judicial finding—up-front—that it was in the best interests

of the estate (and the unsecured creditors) for the debtor to assume the lease.").

56.      The assumption of the Assigned Contracts in connection with a Sale is an exercise

of the Debtors' sound business judgment because the Assigned Contracts are necessary to operate

the Debtors' businesses and, as such, are essential to obtaining the highest or otherwise best offer

for the Debtors' businesses.  Moreover, the Assigned Contracts will have been selected by the

successful bidder at the Auction, and thus part of the bid that is selected as the highest or best. They will be assumed and assigned in accordance with the Assumption and Assignment Procedures approved by the Court. Accordingly, the Debtors' assumption of the Assigned Contracts is an exercise of sound business judgment and should be approved.

**B.      Defaults Will Be Cured in Connection with the Sale Process.**

57.      The consummation of a Sale, which will involve the assignment of the Assigned Contracts, will be contingent upon the Debtors' compliance with the applicable requirements of section 365 of the Bankruptcy Code. Section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under the Assigned Contracts must be cured or that adequate assurance be provided that such defaults will be promptly cured. As set forth above, the Debtors propose to file with the Court and serve on each Counterparty, the Assumption and Assignment Notice indicating the Debtors' calculation of the amounts necessary to cure any prepetition monetary defaults (the "Cure Costs") for each assumed or assumed and assigned contract. The Counterparties will have the opportunity to file objections to the proposed assumption and assignment of the Assigned Contracts to the Successful Bidder, including the proposed Cure Costs. Accordingly, the Debtors are confident that any such cure of defaults under the Assigned Contracts will be achieved fairly, efficiently, and properly, consistent with the Bankruptcy Code.

**C.      Adequate Assurance of Future Performance Will Be Provided to Counterparties.**

58.      Pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor may assign an executory contract or unexpired lease of nonresidential real property if "adequate assurance of future performance by the assignee of such contract or lease is provided." 11 U.S.C. § 365(f)(2)(B). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle*

*Homes, Inc. v. Azzari* (*In re Carlisle Homes, Inc.*), 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (citation omitted); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("[a]lthough no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance."). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease has financial resources and expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding).

59.     As set forth in the Bidding Procedures, for a bid to qualify as a "Qualified Bid," a Potential Bidder must include with its bid such financial and other information setting forth adequate assurance of future performance under section 365(f)(2)(B) of the Bankruptcy Code and the bidder's willingness to perform under any Assigned Contracts (the "Adequate Assurance Information"). The Stalking Horse Agreement separately contemplates the buyer supporting the Debtors' showing of adequate assurance. The Debtors will provide Adequate Assurance Information to all Counterparties to the Assigned Contracts and Counterparties will have an opportunity to file an objection in advance of the Sale Hearing. Based on the foregoing, the

Debtors' assumption and assignment of the Assigned Contracts satisfy the requirements under section 365 of the Bankruptcy Code and should be approved.

## **Reservation of Rights**

60.     Nothing contained herein is or should be construed as:  (i) an admission as to the validity of any claim against the Debtors; (ii) a waiver of the Debtors' rights to dispute any claim on any grounds; (iii) a promise or requirement to pay any claim; (iv) an admission that any particular claim is of a type specified or defined hereunder; (v) a request to assume any executory contract or unexpired lease; or (vi) a waiver of the Debtors' rights under the Bankruptcy Code or any other applicable law.

## **Request for Waiver of Bankruptcy Rules 6004(h) and 6004(d)**

61.     Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  Bankruptcy Rule 6006(d) further provides that an "order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of fourteen (14) days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6006(d).

62.     In light of the current circumstances and financial condition of the Debtors, the Debtors believe that in order to maximize value and preserve jobs, the sale of the Assets pursuant to the Sale process must be consummated as soon as practicable.  Accordingly, the Debtors request that the Bidding Procedures Order and the Sale Order be effective immediately upon entry of each

such order and that the 14-day stay periods under Bankruptcy Rules 6004(h) and 6006(d) be waived.

### Notice

63.     Notice of this Motion will be provided to:  (i) the Office of the United States Trustee for Region 2, U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, NY 10014 (Attn:  Andrea B. Schwartz); (ii) the parties identified on the Debtors' consolidated list of 30 largest unsecured creditors; (iii) Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, NY 10166 (Attn:  David M. Feldman, Michael S. Neumeister, and Tommy Scheffer), counsel to the Senior Secured Parties; (iv) Wachtell, Lipton, Rosen & Katz, 51 West 52nd Street, New York, NY 10019 (Attn:  Scott K. Charles and Neil M. Snyder), counsel to TPG Virat Holdings 1, L.P., and Sixth Street Virat Holdings 3, LLC; (v) Shipman & Goodwin LLP (Attn:  Marie C. Pollio), counsel to Wilmington Trust, National Association; (vi) the Internal Revenue Service; (vii) the Office of the United States Attorney for the Southern District of New York; (viii) the offices of the attorneys general in the states in which the Debtors operate; and (ix) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties").  The Debtors respectfully submit that, in light of the nature of the relief requested, no other or further notice need be given.

### No Previous Request

64.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter the Proposed Order

granting the relief requested herein and such other and further relief as the Court deems just and

appropriate.

Dated: May 15, 2023
      New York, New York

**SHEARMAN & STERLING LLP**

*/s/ Fredric Sosnick*
Fredric Sosnick
William S. Holste
Jacob S. Mezei
599 Lexington Avenue
New York, NY  10022
Phone:  (212) 848-4000
Email:  fsosnick@shearman.com
       william.holste@shearman.com
       jacob.mezei@shearman.com

-and-

Ian E. Roberts (*pro hac vice* pending)
2601 Olive Street, 17th Floor
Dallas, TX  75201
Phone:  (214) 271-5777
Email:  ian.roberts@shearman.com

*Proposed Special Counsel to the Debtors and Debtors in
Possession*

## **EXHIBIT A**

**Bidding Procedures Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Chapter 11 |
| VICE GROUP HOLDING INC., *et al.* | Case No. 23-10738 (__) |
| Debtors.[1] | (Joint Administration Requested) |

**ORDER (I) ESTABLISHING BIDDING, NOTICING,**
**AND ASSUMPTION AND ASSIGNMENT PROCEDURES,**
**(II) AUTHORIZING AND APPROVING THE DEBTORS' ENTRY INTO THE**
**STALKING HORSE AGREEMENT, AND (III) GRANTING RELATED RELIEF**

Upon the motion, dated May 15, 2023 (ECF No. [__]) (the "<u>Motion</u>")[2] of the debtors in

possession (collectively, the "<u>Debtors</u>") in the above-captioned cases for entry of an order (this

"<u>Order</u>"), among other things:

i.      authorizing and approving the Bidding Procedures, in connection with the sale or
sales of the Assets pursuant to section 363 of the Bankruptcy Code (the "<u>Sale</u>"),
including certain dates and deadlines thereunder for the Sale process;

ii.     authorizing and approving the Debtors entry into the Stalking Horse Agreement;

iii.    approving the Expense Reimbursement;

iv.     authorizing and approving the form and manner of notice of the sale of the Assets,
the Auction, and the Sale Hearing, substantially in the form attached to the Bidding
Procedures Order as **<u>Exhibit 2</u>** (the "<u>Sale Notice</u>");

v.      approving procedures set forth in the Bidding Procedures Order (the "<u>Assumption</u>
<u>and Assignment Procedures</u>") for the assumption, assumption and assignment, and
rejection of certain executory contracts (the "<u>Contracts</u>") or unexpired leases (the

---

[1]    The last four digits of Debtor Vice Group Holding Inc.'s tax identification number are 4250.  Due to the large
number of debtors in these chapter 11 cases, a complete list of the debtor entities and the last four digits of their
federal tax identification numbers is not provided herein.  A complete list of such information may be obtained
on the website of the Debtors' claims and noticing agent at https://https://cases.stretto.com/vice/.  The location of
the Debtors' service address for purposes of these chapter 11 cases is:  49 South 2nd Street, Brooklyn, NY 11249.

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion or the
Bidding Procedures, as applicable.

"Leases"), and approving the form and manner of service of the notice regarding such assumption, assumption and assignment, or rejection of the Contracts and Leases to counterparties (each, a "Counterparty"), substantially in the form attached to the Bidding Procedures Order as **Exhibit 3** (the "Assumption and Assignment Notice"); and

vi.       granting related relief;

all as more fully set forth in the Motion; and the Court having jurisdiction to consider the Motion

and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing*

*Order of Reference* M-431, dated January 31, 2012 (Preska, C.J.); and consideration of the Motion

and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being

proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the

Motion having been provided to the parties listed therein as set forth in the affidavit of service

filed with respect thereto (ECF No. ___); and such notice having been adequate and appropriate

under the circumstances, and it appearing that no other or further notice need be provided; and the

Court having reviewed the Motion, the First Day Declaration, and the Herlihy Declaration filed

contemporaneously therewith; and the Court having held a hearing to consider the relief requested

in the Motion (the "Hearing"); and upon the record of the Hearing; and the Court having

determined that the legal and factual bases set forth in the Motion establish just cause for the relief

granted herein; and it appearing that the relief requested in the Motion is in the best interests of the

Debtors, their estates, creditors, and all parties in interest; and upon all of the proceedings had

before the Court and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT**:

A.       Jurisdiction and Venue. Consideration of the Motion and the relief requested

therein is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court

pursuant to 28 U.S.C. §§ 1408 and 1409. The Court has jurisdiction to consider the Motion and

2

the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334, and the Amended

Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.).

B.    <u>Statutory and Legal Predicates</u>. The statutory and legal predicates for the relief

requested in the Motion are sections 105, 363, and 365 of the Bankruptcy Code, Bankruptcy Rules

2002, 6004, and 6006, Local Rules 6004-1, 6005-1, and 6006-1, and the Sale Guidelines.

C.    <u>Bidding Procedures</u>. The Debtors have articulated good and sufficient business

reasons for the Court to approve the Bidding Procedures. The Bidding Procedures are fair,

reasonable, and appropriate. The Bidding Procedures are reasonably designed to promote a

competitive and robust bidding process to generate the greatest level of interest in the Debtors'

business resulting in the highest or otherwise best offer. The Bidding Procedures comply with the

requirements of Local Rule 6004-1 and the Sale Guidelines.

D.    <u>Designation of Stalking Horse Bid</u>. The approval of the Stalking Horse Bidder as a

"stalking-horse" bidder and the Stalking Horse Agreement as a "stalking-horse" sale agreement is

in the best interests of the Debtors and the Debtors' estates and creditors, and the Debtors have

demonstrated compelling and sound justifications for the relief sought hereunder. The Stalking

Horse Agreement will enable the Debtors to secure a fair baseline price for the Assets at the

Auction and, accordingly, will provide a clear benefit to the Debtors' estates, their creditors, and

all other parties in interest.

E.    The Debtors and the Stalking Horse Bidder negotiated the Stalking Horse

Agreement without collusion, in good faith, and from arm's-length bargaining positions. Neither

party has engaged in any conduct that would cause or permit the agreement to be avoided under

section 363(n) of the Bankruptcy Code.

3

F.      The Stalking Horse Bidder is not an "insider" or "affiliate" of any of the Debtors, as those terms are defined in section 101 of the Bankruptcy Code, and no common identity of incorporators, directors, or controlling stakeholders exist between the Stalking Horse Bidder and the Debtors.

G.      The Expense Reimbursement is necessary and appropriate.

H.      <u>Sale Notice</u>. The Sale Notice attached hereto as **Exhibit 2** and the procedures with respect to such Sale Notice contain the type of information required under Bankruptcy Rule 2002 and Local Rule 6004-1 and comply in all respects with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

I.      <u>Assumption and Assignment Procedures</u>. The Debtors have articulated good and sufficient business reasons for the Court to approve the Assumption and Assignment Procedures. The Assumption and Assignment Procedures, including the Assumption and Assignment Notice attached hereto as **Exhibit 3**, are fair, reasonable, and appropriate. The Assumption and Assignment Procedures provide an adequate opportunity for all Counterparties to raise any objections to the proposed assumption and assignment or to the proposed Cure Costs. The Assumption and Assignment Procedures comply with the provisions of section 365 of the Bankruptcy Code and Bankruptcy Rule 6006.

J.      <u>Notice</u>. All other notices to be provided pursuant to the procedures set forth in the Motion are good and sufficient notice to all parties in interest of all matters pertinent hereto. No further notice is required.

K.      <u>Relief is Warranted</u>. The legal and factual bases set forth in the Motion establish just and sufficient cause to grant the relief requested therein.

4

L.        Other Findings.  The findings and conclusions set forth herein constitute the Court's

findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this

proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of

fact constitute conclusions of law, they are adopted as such.  To the extent any of the following

conclusions of law constitute findings of fact, they are adopted as such.

**NOW, AND THEREFORE, IT IS HEREBY ORDERED THAT**

1.        The Motion is GRANTED to the extent set forth herein.

## I.        The Bidding Procedures

2.        The Bidding Procedures, substantially in the form attached to this Order as **Exhibit**

**1**, are approved and incorporated into this Order by reference, as though fully set forth herein.

Accordingly, the failure to recite or reference any particular provision of the Bidding Procedures

shall not diminish the effectiveness of such provision, it being the intent of the Court that the

Bidding Procedures be authorized and approved in their entirety.  The Debtors are authorized to

take all actions necessary or appropriate to implement the Bidding Procedures.

## II.        Important Dates and Deadlines

3.        The Sale Hearing will commence on [**June 23], 2023**, at [**10:00 a.m.] (prevailing**

**Eastern Time)**, before the Honorable [_____] of the United States Bankruptcy Court for the

Southern District of New York, One Bowling Green, New York, New York 10004-1408. The Sale

Hearing may be accelerated if the Debtors make a Sale Acceleration Election in accordance with

the Bidding Procedures (such accelerated hearing, the "Accelerated Sale Hearing"). Subject to the

terms of the Bidding Procedures, the Debtors may, in their reasonable business judgment, (and

subject to the terms of the Stalking Horse Agreement, to the extent such agreement remains in full

force and effect), in consultation with the Consultation Parties and with the consent of the

5

Successful Bidder(s), adjourn or reschedule any Sale Hearing or Accelerated Sale Hearing, as applicable, with notice to the Sale Notice Parties.

4.  Sale Objection Deadline. Any objections to the Sale (a "Sale Objection") by a Sale Notice Party must be made by **June 16, 2023, at 4:00 p.m. (prevailing Eastern Time)** (the "Sale Objection Deadline"). The Sale Objection Deadline may be extended by the Debtors with the consent of the Stalking Horse Bidder, the Senior Secured Parties, to the extent the Stalking Horse Agreement remains in full force and effect, and the Court.

5.  Competitive Bidding. The following dates and deadlines regarding competitive bidding are hereby established, in each case subject to extension in accordance with the Bidding Procedures and subject to the terms of the Stalking Horse Agreement, to the extent that such agreement remains in full force and effect:

(a)  Bid Deadline: **June 13, 2023, at 4:00 p.m. (prevailing Eastern Time)**, the deadline by which all Qualified Bids must be actually received in writing by the Bid Notice Parties (the "Bid Deadline"); and

(b)  Auction: **June 16, 2023, at 10:00 a.m. (prevailing Eastern Time)**, is the date and time the Auction, if one is needed, will be held at the offices of Shearman & Sterling LLP, 599 Lexington Avenue, Lexington Ave, New York, NY 10022, or at such other time and location (including via remote video) as designated by the Debtors, in consultation with the Consultation Parties and providing notice to the Sale Notice Parties, and subject to the terms of the Bidding Procedures.

**III.    Stalking Horse Agreement**

6.  The Stalking Horse Bidder is a Qualified Bidder and the Stalking Horse Bid is a Qualified Bid, in each case, pursuant to the Bidding Procedures for all purposes.

7.  The Debtors are authorized to enter into the Stalking Horse Agreement as executed in the form attached to the Bidding Procedures Motion (or an amended form as may be agreed to

6

between the Debtors and the Stalking Horse Bidder and filed with the Court prior to the entry of the Bidding Procedures Order).

8.      The Debtors are authorized to pay the Expense Reimbursement in cash or by wire transfer of immediately available funds in accordance with the terms of the Stalking Horse Agreement without further action or order by the Court.

9.      Notwithstanding anything to the contrary in this Order or any other order of this Court, the Stalking Horse Bidder shall not be required to file or serve a proof of claim with respect to claims arising under or in connection with the Stalking Horse Agreement, and no bar date shall be imposed with respect to such claims.

## IV.    <u>Sale Notice Procedures</u>

10.     The Sale Notice Procedures, substantially in the form set forth in the Sale Notice attached to this Order as **<u>Exhibit 2</u>**, are approved. The Debtors are authorized to implement the Sale Notice Procedures as set forth in the Bidding Procedures Motion, the Bidding Procedures, and the Sale Notice.

## V.     <u>Assumption and Assignment Procedures</u>

11.     The (a) Assumption and Assignment Procedures, as set forth in the Bidding Procedures, and (b) the Assumption and Assignment Notice in the form attached to this Order as **<u>Exhibit 3</u>**, are approved.

12.     The Assumption and Assignment Procedures shall govern the assumption or assumption and assignment of all of the Debtors' Contracts and Leases to be assumed or assumed

and assigned in connection with the Sale, subject to the payment of any amounts necessary to cure any defaults arising under any such Contract or Lease (the "Cure Costs").

**VI.    Related Relief**

13.     The Debtors are authorized to make non-substantive changes to the Bidding Procedures, the Assumption and Assignment Procedures, and any related documents without further order of the Court, including, without limitation, changes to correct typographical and grammatical errors.

14.     All persons and entities (whether or not selected as a Qualified Bidder) that submit a bid for any of the Debtors' Assets during the sale process, including at the Auctions, shall be deemed to have knowingly and voluntarily (a) submitted to the exclusive jurisdiction of this Court with respect to all matters related to the terms and conditions of the transfer of Assets, the Auctions, and any Sale; (b) consented to the entry of a final order by the Court in connection with the Motion or this Order (including any disputes relating to the Bidding and Auction Process, the Auctions, and/or any Sale) to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution; and (c) waived any right to jury trial in connection with any disputes relating to the any of the foregoing matters.

15.     Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 6006(d), 7062, or 9014, or any applicable provisions of the Bankruptcy Rules or the Local Rules or otherwise stating the contrary, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry, and any applicable stay of the effectiveness and enforceability of this Order is hereby waived.

8

16.     Prior to mailing and publishing the Sale Notice and the Assumption and Assignment Notice, as applicable, the Debtors may fill in any missing dates and other information, conform the provisions thereof to the provisions of this Order, and make such other, non-material changes as the Debtors deem necessary or appropriate.

17.     To the extent the provisions of this Order are inconsistent with the provisions of any exhibits referenced herein or with the Motion, the provisions of this Order shall control.

18.     The Debtors are authorized to take all actions reasonably necessary or appropriate to effectuate the relief granted in this Order.

19.     The Court shall retain exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

Dated: _____, 2023
       New York, New York


_____
UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit 1</u>**

**Bidding Procedures**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| VICE GROUP HOLDING INC., *et al.* | Case No. 23-10738 (__) |
| Debtors.[1] | (Joint Administration Requested) |

## BIDDING PROCEDURES

On May 15, 2023, Vice Group Holding Inc. and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

On [__], 2023, the Unites States Bankruptcy Court for the Southern District of New York (the "Court") entered an order (ECF No. [__]) (the "Bidding Procedures Order")[2] which, among other things, authorized (a) the Debtors to solicit bids for a sale in accordance with the Bidding Procedures outlined herein and (b) the Debtors' entry into a purchase and sale agreement (as may be amended, supplemented, or otherwise modified from time to time, the "Stalking Horse Agreement") with one or more entities (or their designees) formed in a manner acceptable to the Senior Secured Parties in their sole discretion (the "Stalking Horse Bidder") for the sale of the Assets, free and clear of any and all liens, encumbrances, claims, and other interests, pursuant to which the Stalking Horse Bidder has committed to provide aggregate consideration consisting of (collectively, the "Stalking Horse Bid"): (i) a credit bid of $225 million pursuant to Section 363(k) of title 11 of the United States Code (the "Bankruptcy Code") against certain obligations owed by the Debtors under the Pre-Petition Senior Secured Credit Agreement and the DIP Credit Agreement as of the Closing (the "Credit Bid"), with the Credit Bid allocated *first*, to payment of any such obligations under the DIP Credit Agreement until paid in full, and *second*, to payment of any such obligations under the Pre-Petition Senior Secured Credit Agreement as of the closing of the Sale process (the "Closing") and (ii) the assumption of the Assumed Liabilities in full

---

[1]    The last four digits of Debtor Vice Group Holding Inc.'s tax identification number are 4250.  Due to the large number of debtors in these chapter 11 cases, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.stretto.com/vice/.  The location of the Debtors' service address for purposes of these chapter 11 cases is:  49 South 2nd Street, Brooklyn, NY 11249.

[2]    Capitalized terms used but not otherwise defined shall have the respective meanings ascribed to such terms in the Bidding Procedures Order or the Motion requesting the relief granted therein, as applicable.

satisfaction of the obligations under the Prepetition Senior Secured Credit Agreement. Pursuant to the Bidding Procedures Order and these Bidding Procedures, the Stalking Horse Bid is subject to higher or better offers, the outcome of the Auction and the approval of the Court.

## <u>Description of the Assets</u>

The Debtors seek to sell substantially all of their assets (including the Debtors' intellectual property, certain customer and vendor contracts, accounts receivable and goodwill) and assign certain contracts material to the operation of the Debtors' businesses (collectively, the "<u>Assets</u>").

The Debtors will consider bids (including bids from multiple bidders and multiple bids submitted by the same bidder) that are made for either:

(a)     *VICE* Media Group – a diversified content powerhouse comprised of all of the *VICE* business segments and all *VICE* Assets;

(b)     one or more of the following business segments:

- *VICE* Publishing – an award-winning global digital content business, which publishes content through its portfolio of brands;

- Refinery29, Inc. – a digital media and entertainment company focused on a female audience; or

(c)     Any combination of Assets or business segments (the "<u>Business Segments</u>") that comprise *VICE* Media Group.

Any party interested in submitting a bid for any of the Debtors' Assets should contact the Debtors' investment bankers, PJT Partners LP, 280 Park Avenue, New York, New York  (Attn: Robert Murphy (murphy@pjtpartners.com), Emanuele Antonio Pascale (emanuele.antonio.pascale@pjtpartners.com)); and LionTree LLC, 745 5th Ave, New York, NY 10151 (Attn: Ben Braun (bbraun@liontree.com), Faris Chehabi (fchehabi@liontree.com)).

**Important Dates and Deadlines**

| Date | Deadline |
|---|---|
| **Wednesday, May 17, 2023** | File Final Stalking Horse Agreement |
| **Friday, May 26, 2023, at 10:00 a.m. (Eastern Time)** | Hearing to consider entry of the Bidding Procedures Order |
| **Friday, May 26, 2023** | File Sale Notice and Assumption and Assignment Notice |
| **Monday, June 12, 2023, at 4:00 p.m. (Eastern Time)** | Deadline to object to the assumption and assignment of an executory contract or unexpired lease, as to the proposed cure amount. |
| **Tuesday, June 13, 2023, at 4:00 p.m. (Eastern Time)** | Bid Deadline |
| **Wednesday, June 14, 2023, at 4:00 p.m. (Eastern Time)** | Qualified Bid Designation Date |
| **Friday, June 16, 2023, at 10:00 a.m. (Eastern Time)** | Auction to be held at the New York offices of Shearman & Sterling LLP |
| **Friday, June 16, 2023, at 4:00 p.m. (Eastern Time)** | Deadline to object to the proposed Sale ("Sale Objection Deadline"), including any objection to the sale of the Assets free and clear of liens, claims, interests, and encumbrances pursuant to section 363(f) of the Bankruptcy Code and entry of a Sale Order. |
| **Friday, [June 23, 2023], at [10:00 a.m.] (Eastern Time)[3]** | Sale Hearing (unless accelerated in the event no Qualified Bids are received) |
| **Friday, July 7, 2023** | Closing |

---

[3]    Subject to the convenience and availability of the Court.

3

**Noticing**

<u>Consultation Parties</u>

Subject to terms of these Bidding Procedures, the Debtors shall consult in good faith with counsel to (each of the following parties to the extent applicable, including such party's advisors, a "<u>Consultation Party</u>"):

(a)    any Official Committee of Unsecured Creditors appointed in these Chapter 11 Cases (the "<u>Creditors' Committee</u>"); and

(b)    the Senior Secured Parties, Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, NY 10166 (Attn:  David M. Feldman, Michael S. Neumeister, and Tommy Scheffer).

Notwithstanding the forgoing, the consultation rights afforded herein: (i) shall not limit the Debtors' discretion in any way in the evaluation of bids, compliance with these procedures, and other matters at the Auction; (ii) shall not include the right to veto any decision made by the Debtors in the exercise of their reasonable business judgment; and (iii) otherwise limit the Debtors' reservation of rights in respect of their fiduciary obligations including as described herein.

If a member of the Creditors' Committee submits a Qualified Bid, the Creditors' Committee will continue to have Consultation Rights; provided that the Creditors' Committee shall exclude such member from any discussions or deliberations regarding the sale of the Assets and shall not provide any confidential information regarding the sale of the Assets to such member.

<u>Bid Notice Parties</u>

All bids must be submitted in writing to the following parties (collectively, the "<u>Bid Notice Parties</u>"):

(a)    the Debtors, c/o *VICE*, 49 S 2nd St, Brooklyn, NY 11249 (Attn: Maria Harris (maria.harris@vice.com));

(b)    the Debtors' counsel, Togut, Segal & Segal LLP, One Penn Plaza, Suite 3335, New York, NY 10119 (Attn:  Kyle J. Ortiz (kortiz@teamtogut.com) and Brian F. Moore (bmoore@teamtogut.com)) and special counsel for the Debtors, Shearman & Sterling LLP 599, Lexington Avenue, Lexington Ave, New York, NY 10022 (Attn: Fredric    Sosnick    (fsosnick@shearman.com),    Christopher    Forrester (chris.forrester@shearman.com) and Ian E. Roberts (ian.roberts@shearman.com);

(c)    the Debtors' investment bankers, PJT Partners, LP 280 Park Avenue, New York, New York 10017 (Attn: Robert Murphy (murphy@pjtpartners.com), Emanuele Antonio Pascale (emanuele.antonio.pascale@pjtpartners.com)); and  LionTree

4

LLC, 745 5th Ave, New York, NY 10151 (Attn: Ben Braun (bbraun@liontree.com), Faris Chehabi (fchehabi@liontree.com)).

Sale Notice Parties

Information that must be provided to the "Sale Notice Parties" under these Bidding Procedures must be provided to the following parties:

(a)     the Consultation Parties (as applicable);

(b)     all persons and entities, known by the Debtors and their advisors, to have expressed an interest in a transaction with respect to any of the Debtors' Assets during the past twelve (12) months (for whom identifying information and addresses are available to the Debtors);

(c)     all persons and entities known by the Debtors to have asserted any lien, claim, encumbrance, or other interest in any Asset (for whom identifying information and addresses are available to the Debtors), including all known holders of claims and all creditors prior to the date of entry of the Bidding Procedures Order;

(d)     all parties to litigation with the Debtors that are known as of the date of entry of the Bidding Procedures Order, and/or their counsel;

(e)     all Counterparties to Assigned Contracts and Leases under the applicable proposed Sale;

(f)     any Governmental Authority known to have a claim in these Chapter 11 Cases;

(g)     the United States Attorney for the Southern District of New York;

(h)     the Office of the Attorney General in each state which the Debtors operate;

(i)     the Office of the Secretary of State in each state in which the Debtors operate or are organized;

(j)     all of the multiemployer pension plans to which any of the Debtors is a contributing employer and all of the single employer defined benefit plans to which any Debtor is a contributor;

(k)     the Federal Trade Commission;

(l)     the United States Attorney General/Antitrust Division of Department of Justice;

5

(m)     all of the Debtors' known creditors (for whom identifying information and addresses are available to the Debtors); and

(n)     all other Persons directed by the Court (for whom identifying information and addresses are available to the Debtors).

Objection Recipients

All Sale Objections, Cure Objections, and Auction Result Objections (each as defined below), each as further discussed in the Bidding Procedures Order, shall be filed with the Court by the applicable objection deadline and served on the following parties (collectively, the "Objection Recipients"):

(a)     the Bid Notice Parties;

(b)     entities on the Master Service List (which may be obtained at the Debtors' case management website at https://cases.stretto.com/vice/); and

(c)     counsel to the Stalking Horse Bidder.

## Notice Procedures

## Sale Notice Procedures

The Debtors will provide actual notice of the Sale to known parties in interest (*i.e.*, the Sale Notice Parties) as well as publication and other notice to unknown parties (together, the "Sale Notice Procedures"). The Sale Notice Procedures provide for the following:

(a)     Sale Notice**.** On or before the date that is three business days after entry of the Bidding Procedures Order, the Debtors shall file with the Court, serve on the Sale Notice Parties by first class U.S. mail, postage prepaid, or electronic mail, and cause to be published on the dedicated website hosted and maintained by Stretto, Inc., the Debtors' claims and noticing agent in the Chapter 11 Cases (the "Noticing Agent"), located at https://cases.stretto.com/vice/ (such website, the "Case Website"), the notice of the Sale, substantially in the form attached to the Bidding Procedures Order as **Exhibit 2** (the "Sale Notice").

(b)     The Sale Notice will (a) include a general description of the Assets for sale and Business Segments or Assets for which Bids will be considered; (b) prominently display the date, time, and place (as applicable) of the (i) Accelerated Sale Hearing, (ii) Bid Deadline, (iii) Auction and (iv) Sale Hearing; and (c) prominently display the deadlines and procedures for filing a Sale Objection.

## Assumption and Assignment Notice Procedures

The Debtors developed procedures (such procedures, the "Assumption and Assignment Procedures") to facilitate the fair and orderly assumption, assumption and assignment, and rejection of certain executory contracts (the "Contracts") or unexpired leases (the "Leases") as may be designated in the Stalking Horse Agreement or any other Successful Bid(s) (as defined below).

The Assumption and Assignment Procedures provide for notice regarding such assumption, assumption and assignment, or rejection of the Contracts and Leases to Counterparties, and the Debtors' calculation of potential cure costs that would arise in connection with any proposed assumption and assignment (such notice, substantially in the form attached to the Bidding Procedures Order as **Exhibit 3**, the "Assumption and Assignment Notice"). The Debtors shall provide the Assumption and Assignment Notice in accordance with these Bidding Procedures and the Bidding Procedures Order.

Assumption and Assignment Notice. As soon as practicable following entry of the Bidding Procedures Order, but in no event later than May 26, 2023, the Debtors will file with the Court and serve on the Sale Notice Parties, including each Counterparty, the Assumption and Assignment Notice and will cause the same to be published on the Case Website. The Assumption and Assignment Notice will (a) identify the Assigned Contracts initially designated by the Stalking Horse Bidder for potential assumption and assignment to the Stalking Horse Bidder (the "Initial Assumed Contracts"); (b) list the Debtors' good faith calculation of the Cure Costs with respect to each Initial Assumed Contract; (c) expressly state that assumption or assignment of any Assigned Contract is not guaranteed and is subject to Court approval; (d) direct the non-Debtor Counterparty to relevant publicly available financial information regarding the Stalking Horse Bidder for purposes of demonstrating adequate assurance of future performance by the Stalking Horse Bidder; (e) prominently display the deadline to file a Cure Objection and an Adequate Assurance Objection (each as hereinafter defined); and (f) prominently display the dates, times, and location of the Sale Hearings.

Designation of Contracts and Leases. Pursuant to the terms of the Stalking Horse Agreement, the Stalking Horse Bidder shall have the right, at any time prior to one (1) business day prior to Closing to designate additional Assigned Contracts for proposed assumption and assignment to the Stalking Horse Bidder (each, a "Supplemental Contract") or to remove Contracts from the list of Assigned Contracts from proposed assumption and assignment (each, a "Removed Contract"). The Debtors shall, as soon as reasonably practicable after the Buyer's designation of any Supplemental Contracts or any Removed Contracts file with the Court, serve by overnight delivery on all applicable Counterparties, and cause to be published on the Case Website, a notice of proposed assumption and assignment of the Supplemental Contracts (a Supplemental Assumption and Assignment Notice") and/or removal of the Removed Contracts, which shall (A) expressly state that assumption or assignment of the Supplemental Contracts is not guaranteed and subject to Court approval and removal of the Removed Contracts does not constitute a rejection by the Debtors of such Contract, and (B) direct the non-Debtor Counterparty to a Supplemental Contract to relevant publicly available financial information regarding the Stalking Horse Bidder

7

for purposes of demonstrating adequate assurance of future performance by the Stalking Horse Bidder; and (C) prominently display the deadline to file an Adequate Assurance Objection with respect to a Supplemental Contract.

Auction Results. The Debtors will, within one (1) calendar day after the conclusion of the Auction, or as soon as practicable thereafter, file with the Court, serve on the Sale Notice Parties (including each Counterparty to an Assigned Contract in a Successful Bid), a Notice of Auction Results, which shall (1) identify the Successful Bidders and Back-Up Bidders; (2) list all Assigned Contracts in the Successful Bids and Back-Up Bids; (3) identify any known proposed assignee(s) of Assigned Contracts (if different from the applicable Successful Bidder); and (4) set forth the deadlines and procedures for filing Adequate Assurance Objections in response ot the Notice of Auction Results.

Cure Objections.

    i.    Cure Objection Deadlines. Any Counterparty who wishes to object to the proposed assumption, assignment, or potential designation of their Contract or Lease, the subject of which objection is the Debtors' proposed Cure Costs to cure any outstanding defaults then existing under such Contract or Lease (a "Cure Objection"), which must (1) be in writing; (2) comply with the Bankruptcy Code, Bankruptcy Rules, and Local Rules; (3) state, with specificity, the legal and factual bases thereof, including the cure amount the Counterparty believes is required to cure defaults under the relevant Contract or Lease; and (4) include any appropriate documentation in support thereof, by no later than the applicable Sale Objection Deadline, which shall be at least seven (7) calendar days after service of such notice, or less in the case of a Supplemental Assumption and Assignment Notice to the extent necessary.

    ii.    Resolution of Cure Objections. If a timely Cure Objection cannot otherwise be resolved by the parties prior to the commencement of the applicable Sale Hearing, such objection and all issues of adequate assurance of future performance shall be determined by the Court at the Sale Hearing or at a later hearing on a date to be scheduled.

    iii.    Adjourned Cure Objections. If a timely Cure Objection is received and such objection cannot otherwise be resolved by the parties, such objection shall be heard at the applicable Sale Hearing; provided that a Cure Objection may, at the Debtors' discretion (with the consent of the Stalking Horse Bidder, or, if an Auction is held, the Successful Bidder), be adjourned to a subsequent hearing if, pending resolution of such Cure Objection (an "Adjourned Cure Objection"), the Debtors maintain a cash reserve (a "Cure Cost Reserve") equal to the lesser of (1) the amount the objecting Counterparty has asserted to be required to cure the asserted defaults under the applicable Assigned Contract and (2) such other cash reserve amount as

8

may be ordered by the Court, until a Cure Cost amount is agreed to by the parties or determined by the Court; provided that if the Debtors maintain a letter of credit or similar security deposit for the Debtors' obligations under an Assigned Contract to a Counterparty asserting a Cure Objection, the Debtors shall not be required to fund a Cure Cost Reserve to the extent of the existing amounts available under such letter of credit or other security deposit maintained by such Counterparty. Notwithstanding the existence of an Adjourned Cure Objection, the Assigned Contract may be deemed assumed and assigned to the Stalking Horse Bidder, or, if an Auction is held, the Successful Bidder, as of the applicable Closing Date if the Debtors maintain a Cure Cost Reserve.

iv.    <u>Failure to File Timely Cure Objection</u>. If a Counterparty fails to file with the Court and serve on the Objection Recipients a timely Cure Objection, the Counterparty shall be forever barred from asserting any objection with regard to the cost to cure any defaults under the applicable Contract or Lease. The Cure Costs set forth in each Assumption and Assignment Notice shall be controlling and will be the only amount necessary to cure outstanding defaults under the applicable Contract or Lease under Bankruptcy Code section 365(b), notwithstanding anything to the contrary in the Contract or Lease, or any other document, and the Counterparty shall be forever barred from asserting any additional cure or other amounts with respect to such Contract or Lease against the Debtors, the Successful Bidder, or the property of any of them.

    <u>Adequate Assurance Information</u>. Each Bid (other than the Stalking Horse Bid) must contain such financial and other information that allows the Debtors, after consultation with the Consultation Parties, to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate the applicable Sale, including, without limitation, such financial and other information setting forth adequate assurance of future performance under section 365(f)(2)(B) of the Bankruptcy Code, and the Potential Bidder's willingness to perform under any contracts that are assumed and assigned to the Potential Bidder (the "<u>Adequate Assurance Information</u>").

<u>Adequate Assurance Objections</u>.

i.    <u>Adequate Assurance Objection Deadline</u>. Any Counterparty who wishes to object to the proposed assumption, assignment, or potential designation of their Contract or Lease, the subject of which objection is a Successful Bidder's (including the Stalking Horse Bidder's) and/or any of their known proposed assignees' (if different from the Successful Bidder) proposed form of adequate assurance of future performance with respect to such Contract or Lease (an "<u>Adequate Assurance Objection</u>"), shall file with the Court and serve on the Objection Recipients, including the applicable Successful Bidder and any known proposed assignee of such contract or lease (if

9

different from the Successful Bidder), its Adequate Assurance Objection, which must (1) be in writing; (2) comply with the Bankruptcy Code, Bankruptcy Rules, and Local Rules; (3) state, with specificity, the legal and factual bases thereof; (4) include any appropriate documentation in support thereof, by no later than the applicable deadline set forth in the applicable notice, which shall be at least seven (7) calendar days after the filing of such notice, or less in the case of a Supplemental Assumption and Assignment Notice to the extent necessary.

ii.    <u>Resolution of Adequate Assurance Objections</u>. If a timely Adequate Assurance Objection cannot otherwise be resolved by the parties prior to the commencement of the applicable Sale Hearing, such objection and all issues of adequate assurance of future performance shall be determined by the Court at the Sale Hearing or at a later hearing on a date to be scheduled.

iii.    <u>Failure to Timely File Adequate Assurance Objection</u>. If a Counterparty fails to file with the Court and serve on the Objection Recipients, including the applicable Successful Bidder and any known proposed assignee of the Contract or Lease (if different from the Successful Bidder), a timely Adequate Assurance Objection, the Counterparty shall be forever barred from asserting any such objection with regard to the relevant Contract or Lease. The Successful Bidder and/or its known proposed assignee of the Contract or Lease shall be deemed to have provided adequate assurance of future performance with respect to the applicable Contract or Lease in accordance with Bankruptcy Code section 365(f)(2)(B) and, if applicable, Bankruptcy Code section 365(b)(3), notwithstanding anything to the contrary in the Contract or Lease or any other document.

<u>Reservation of Rights</u>. The inclusion of a Contract or Lease or Cure Costs with respect thereto on an Assumption and Assignment Notice or the Notice of Auction Results shall not constitute or be deemed a determination or admission by the Debtors, the Successful Bidders, or any other party in interest that such Contract or Lease is an executory contract or unexpired lease within the meaning of the Bankruptcy Code. The Debtors and the Stalking Horse Bidder reserve all of their rights, claims, and causes of action with respect to each Contract and Lease listed on an Assumption and Assignment Notice and Notice of Auction Results. The Debtors' inclusion of any Contract or Lease on the Assumption and Assignment Notice or the Notice of Auction Results shall not be a guarantee that such Contract or Lease ultimately will be assumed or assumed and assigned.

**Marketing Process**

<u>Access to Diligence</u>

To participate in the diligence process and receive access to the Debtors' electronic data room (the "<u>Data Room</u>") and the confidential information memorandum relating to the Sale (the "<u>CIM</u>"), a party must submit to the Debtors or their advisors:

(a)     an executed confidentiality agreement in form and substance reasonably satisfactory to the Debtors; and

An interested party shall be a "<u>Potential Bidder</u>" if the Debtors determine in their reasonable discretion, after consultation with the Consultation Parties, that an interested party has satisfied the above requirements. As soon as practicable, the Debtors will deliver to such Potential Bidder (i) an information package containing information and financial data with respect to the Assets in which such Potential Bidder has expressed an interest and (ii) access to the Data Room.

Once an interested party is deemed a Potential Bidder, its identity may, in the Debtors' discretion, be disclosed to the Stalking Horse Bidder. Each Potential Bidder shall comply with all reasonable requests for information and due diligence access by the Debtors or their advisors regarding the ability of such Potential Bidder, as applicable, to consummate its contemplated transaction.

Until the Bid Deadline (as defined below), the Debtors will provide any Potential Bidder with reasonable access to the Data Room and any other additional information that the Debtors believe to be reasonable and appropriate under the circumstances. The Debtors will work to accommodate all reasonable requests for additional information and due diligence access from Potential Bidders. All due diligence requests shall be directed to Debtors' investment bankers, PJT Partners LP and LionTree LLC.

Unless otherwise determined by the Debtors, the availability of additional due diligence to a Potential Bidder will cease if (i) the Potential Bidder does not become a Qualified Bidder or (ii) these Bidding Procedures are terminated.

Neither the Debtors nor any of their representatives shall be obligated to furnish any information of any kind whatsoever relating to the Business Segments or Assets to any person or entity who is not a Potential Bidder or a Consultation Party or who does not comply with the participation requirements set forth above.

**Auction Qualification Procedures**

<u>Bid Deadline</u>

A Potential Bidder that desires to make a bid on one or more of the Business Segments or Assets shall deliver electronic copies of its bid in both PDF and MS-WORD format so as to be

received no later than **June 13, 2023 at 4:00 p.m. (Eastern Time)** (the "Bid Deadline"); provided that the Debtors may, in consultation with the Consultation Parties, extend the Bid Deadline for any reason whatsoever, in their reasonable business judgment, for all or certain Potential Bidders, without further order of the Court, subject to providing notice to the Stalking Horse Bidder, all Potential Bidders, and the Consultation Parties.

Bids should be submitted by email to the Bid Notice Parties.

**Any party that does not submit a bid by the Bid Deadline will not be allowed to (i) submit any offer after the Bid Deadline or (ii) participate in any Auction**.

Communications with Potential Bidders

There must be no communications between and amongst Potential Bidders unless the Debtors have previously authorized such communication in writing. The Debtors reserve the right, in their reasonable business judgment, in consultation with the Consultation Parties, to disqualify any Potential Bidder(s) that have communications between and amongst themselves.

Form and Content of Qualified Bids

A "Bid" as used herein is a signed document from a Potential Bidder received by the Bid Deadline that identifies the purchaser by its legal name (including any equity holders or other financial backers, if the Potential Bidder is an entity formed for the purpose of submitting bids or consummating a Sale), and any other party that will be participating in connection with the bid or the Sale, and includes, at a minimum, the following information:

(a) Proposed Business Segments or Assets and Valuation. Each Bid must clearly identify and list the Assets and liabilities that the Potential Bidder seeks to acquire, whether individually or in combination. If a Bid is for one or more Business Segments, such Bid must identify, on a per Business Segment basis, the valuations, in U.S. dollars, that the Potential Bidder associates with each of those Business Segments, and a description of any significant assumptions on which such valuations are based (including a separate identification of the cash and non-cash components of the valuation). To the extent the Bid proposes to purchase particular Assets, such as intellectual property, the Bid shall clearly identify the value, in U.S. dollars, associated with such Assets.

(b) Purchase Price. Each Bid must specify the purchase price for the Assets proposed to be acquired. In addition, each Bid must include a sources and uses table for the proposed Sale that shows the portion of the purchase price to be funded with cash on hand, the portion to be funded with cash from committed financing sources, and the portion to be funded with non-cash consideration.

(c) Proposed APA. Each Bid must include a copy of an asset purchase agreement reflecting the terms and conditions of the Bid, which agreement must be marked to

12

show any proposed amendments and modifications to the form of purchase agreement posted by the Debtors in the Data Room (the "Proposed APA").

(d)  Unconditional Offer; No Financial Contingency. A statement that the Bid is formal, binding, and unconditional (except for those conditions expressly set forth in the applicable Proposed APA), is not subject to any due diligence or financing contingency and is irrevocable until the first business day following the closing of the proposed Sale, except as otherwise provided in these Bidding Procedures. To the extent that a Bid is not accompanied by evidence of the Potential Bidder's capacity to consummate the Sale set forth in its Bid, each Bid must include committed financing documented to the Debtors' satisfaction, in consultation with the Consultation Parties, that demonstrates that the Potential Bidder has received sufficient debt and/or equity funding commitments to satisfy the Potential Bidder's purchase price and other obligations under its Bid.

(e)  Cash Offer or Non-Cash Consideration. A statement confirming that the Bid is based on an cash offer, and, in the case of a bid for all of the Assets included in the Stalking Horse Agreement, meets the Minimum Overbid Amount (as defined herein). In the case of Bids that do not constitute all-cash offers, a detailed description of the amount of non-cash consideration offered.

(f)  Employee and Labor Terms. A statement of proposed terms for unionized and nonunionized employees, which shall include, alternatively: (i) a statement that the Potential Bidder will assume the Debtors' affected collective bargaining agreements (the "Affected Labor Agreements") without modification; (ii) if the Potential Bidder will not assume the Affected Labor Agreements without modification, a statement that the Potential Bidder will enter into good faith negotiations with each affected labor union (the "Affected Unions") to enter into modified labor agreements (each, a "Modified Labor Agreement"), including a term sheet, which shall be attached to the Potential Bidder's Proposed APA, proposing post-closing work rules and conditions to be offered to unionized employees; or (iii) a statement that the Potential Bidder does not intend to assume any Affected Labor Agreements; provided that such statement shall include whether or not the Potential Bidder intends to offer employment to any of the Debtors' employees following a closing of an applicable Sale. Such statement shall also include an acknowledgment of the requirements of sections 1113 and 1114 of the Bankruptcy Code and an agreement to use good faith reasonable best efforts to cooperate with the Debtors in ensuring compliance with any applicable provisions thereof in the event that mutually satisfactory Modified Labor Agreements have not been entered into between the Potential Bidder and the Affected Unions prior to the closing of a sale contemplated by these Bidding Procedures.

(g)  Pension Plans. Each Bid must state whether or not the Potential Bidder intends to assume (i) sponsorship of all or any part of or (ii) any of the potential liabilities associated with the Debtors' multi-employer pension plan (the "Pension Plan"). If

13

the Potential Bidder does not intend to assume sponsorship or liabilities of the Pension Plan in full, each Bid must state whether the Potential Bidder intends to assume the assets and liabilities of the Pension Plan relating to plan participants associated with the Business Segments in the Bid.

(h)     Required Approvals. A statement or evidence (i) that the Potential Bidder has made or will make in a timely manner all necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, if applicable ("HSR Filings"), and any other Antitrust Law (as defined in the Stalking Horse Agreement), and pay the fees associated with such filings and (ii) of the Potential Bidder's plan and ability to obtain all governmental and regulatory approvals to operate the business and the Business Segments included in its Bid from and after closing the applicable Sale and the proposed timing for the Potential Bidder to undertake the actions required to obtain such approvals. A Potential Bidder further agrees that its legal counsel will coordinate in good faith with Debtor's legal counsel to discuss and explain Potential Bidder's regulatory analysis, strategy, and timeline for securing all such approvals as soon as reasonably practicable, and in no event later than the time period contemplated in the Proposed APA.

(i)     No Entitlement to Expense Reimbursement or Other Amounts. A statement that the Bid does not entitle the Potential Bidder to any breakup fee, termination fee, expense reimbursement, or similar type of payment or reimbursement and a waiver of any substantial contribution administrative expense claim under section 503(b) of the Bankruptcy Code related to bidding for the Assets.

(j)     Adequate Assurance Information. Each Bid must contain such financial and other information that allows the Debtors, after consultation with the Consultation Parties, to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate the applicable Sale, including, without limitation, such financial and other information setting forth adequate assurance of future performance under section 365(f)(2)(B) of the Bankruptcy Code, and the Potential Bidder's willingness to perform under any contracts that are assumed and assigned to the Potential Bidder (the "Adequate Assurance Information").

(k)     Designation of Contracts and Leases. Each Bid must identify with particularity each and every executory contract and unexpired lease, the assumption and, as applicable, assignment of which is a condition to closing the applicable Sale.

(l)     Representations and Warranties. Each Bid must include the following representations and warranties:

    (i)     a statement that the Potential Bidder has had an opportunity to conduct any and all due diligence regarding the applicable Assets prior to submitting its Bid;

14

(ii)     a statement that the Potential Bidder has relied solely upon its own independent review, investigation, and/or inspection of any relevant documents and the assets in making its Bid and did not rely on any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding the Business Segments and/or Assets or the completeness of any information provided in connection therewith, except as expressly stated in the representations and warranties contained in the Potential Bidder's Proposed APA ultimately accepted and executed by the Debtors;

(iii)    a statement that the Potential Bidder agrees to serve as Back-Up Bidder (as defined herein), if its Bid is selected as the next highest or next best bid after the Successful Bid with respect to the applicable Assets, until the Back-Up Termination Date (as defined herein);

(iv)    a statement that the Potential Bidder has not engaged in any collusion with respect to the submission of its Bid;

(v)     a statement that all proof of financial ability to consummate a Sale in a timely manner and all information provided to support adequate assurance of future performance is true and correct; and

(vi)    A statement that the Potential Bidder agrees to be bound by the terms of these Bidding Procedures.

(m)    <u>Other Requirements</u>. A Potential Bidder must also accompany its Bid with:

(i)     a Deposit (as defined herein);

(ii)    the contact information of the specific person(s) whom the Debtors or their advisors should contact in the event that the Debtors have any questions or wish to discuss the bid submitted by the Potential Bidder;

(iii)    written evidence of available cash, a commitment for financing (not subject to any conditions), or such other evidence of ability to consummate the transaction contemplated by the applicable Proposed APA, as acceptable in the Debtors' business judgment and following consultation with the Consultation Parties, including a description of each investor and any additional party or parties investing in the transaction included in the applicable bid and such party's financial position;

(iv)    a copy of a board resolution or similar document demonstrating the authority of the Potential Bidder to make a binding and irrevocable bid on the terms proposed and to consummate the transaction contemplated by the Proposed APA;

(v)     a covenant to cooperate with the Debtors to provide pertinent factual information regarding the Potential Bidder's operations reasonably required to analyze issues arising with respect to any applicable Antitrust Laws and other applicable regulatory requirements; and

(vi)    if the Bid includes an asset purchase agreement that is not executed, a signed statement that such Bid is irrevocable until the first business day following the closing or closings of the applicable Sale, and to serve as a Back-Up Bidder.

The submission of a Bid by the Bid Deadline shall constitute a binding and irrevocable offer to acquire the Assets reflected in such Bid.

For the avoidance of doubt, the Stalking Horse Bid as of the hearing on these Bidding Procedures shall be deemed to be a Qualified Bid.

Deposit

To qualify as a Qualified Bid (as defined herein), each Bid (other than the Stalking Horse Bid) must be accompanied by a good faith cash deposit in the amount of ten percent (10%) of the proposed purchase price (the "Deposit"), to be deposited, prior to the Bid Deadline, with an escrow agent selected by the Debtors (the "Escrow Agent") pursuant to the escrow agreement to be provided by the Debtors to the Potential Bidders (the "Escrow Agreement").

To the extent the Business Segments or Assets included in a Qualified Bid are modified at or prior to the Auction, the Qualified Bidder must adjust its Deposit so that it equals ten percent (10%) of the purchase price proposed to be paid for each Business Segment or Asset.

Review of Bids and Designation of Qualified Bidders

The Debtors will deliver, within one (1) business day after receipt thereof, copies of all Bids to the Consultation Parties. A bid received for the Assets that is determined by the Debtors, in consultation with the Consultation Parties, to meet the requirements set forth in the preceding section will be considered a "Qualified Bid," and the Stalking Horse Bidder, and any bidder that submits a Qualified Bid (including the Stalking Horse Bid) will be considered a "Qualified Bidder."

The Debtors may, after consulting with the Consultation Parties, amend or waive the conditions precedent to being a Qualified Bidder at any time, in their reasonable business judgment, in a manner consistent with their fiduciary duties and applicable law, and may engage in negotiations with Potential Bidders who submitted Bids complying with the preceding section

16

as the Debtors deem appropriate in the exercise of their business judgment, based upon the Debtors' evaluation of the content of each Bid.

The Debtors will evaluate timely submitted bids, in consultation with the Consultation Parties, and may take into consideration the following non-binding factors:

(a)     the amount of the purchase price set forth in the Bid;

(b)     the Assets included in or excluded from the Bid;

(c)     the value to be provided to the Debtors under the Bid for the Business Segments and/or Assets included therein (individually and in the aggregate), including the net economic effect upon the Debtors' estates after the payment of any applicable Termination Payment;

(d)     any benefit to the Debtors' bankruptcy estates from any assumption or waiver of liabilities, including any liabilities under the Pension Plans and the assumption of the sponsorship of all, any, or a portion of the Pension Plans;

(e)     the transaction structure and execution risk, including conditions to, timing of, and certainty of closing, termination provisions, availability of financing and financial wherewithal to meet all commitments, cost to the Debtors' bankruptcy estates to pursue such transaction, and required governmental or other approvals;

(f)     the impact on employees, employee claims against the Debtors, Affected Labor Agreements, and whether the Potential Bidder has reached an agreement with the Affected Unions; and

(g)     any other factors the Debtors may reasonably deem relevant, in consultation with the Consultation Parties.

The Debtors, in consultation with the Consultation Parties, will make a determination regarding which bids qualify as Qualified Bids, and will notify Potential Bidders whether they have been selected as Qualified Bidders by no later than **June 14, 2023**, **at 4:00 p.m. (Eastern Time**) with respect to each bid or combination of bids (the "Qualified Bid Designation Date").

The Debtors reserve the right to work with any Bidder in advance of the Auction to cure any deficiencies in a Bid that is not initially deemed a Qualified Bid. If a Bid is received and, in the Debtors' judgment, after consultation with the Consultation Parties, it is not clear whether the Bid is a Qualified Bid, the Debtors may consult with the Potential Bidder and seek additional information in an effort to establish whether or not the Bid is a Qualified Bid.

The Debtors, after consultation with the Consultation Parties, will have the right to determine that a Bid is not a Qualified Bid if any of the following conditions are satisfied:

17

(a)     a Potential Bidder has failed to comply with reasonable requests for additional information from the Debtors; or

(b)     the terms of the Bid are burdensome or conditional in view of the proposed purchase price or, in the case of a Bid or combination of Bids for the Assets in the Stalking Horse Agreement, are materially more burdensome or conditional than the terms of the applicable Stalking Horse Agreement and are not offset by a material increase in purchase price, which determination (as made by the Debtors in consultation with the Consultation Parties).

The Stalking Horse Bidder is a Qualified Bidder and the Stalking Horse Bid is a Qualified Bid.

## Pre-Auction Procedures

Determination and Announcement of Baseline Bids

The Debtors shall make a determination regarding:

(a)     the Assets and/or Business Segments to be auctioned by the Debtors (each, an "Auction Package");

(b)     the highest or best Qualified Bid (or collection of Qualified Bids) determined for each Auction Package (each, a "Baseline Bid," and such bidder or group of bidders, a "Baseline Bidder") to serve as the starting point at the Auction for such Auction Package;

(c)     which Bids have been determined to be Qualified Bids and the Auction Package applicable to such Qualified Bid; provided that the Debtors may permit a Qualified Bidder to bid on any other Auction Package; and

(d)     the time and place for the Auction of each Auction Package.

By the applicable Qualified Bid Designation Date, the Debtors shall file notice of the foregoing on the Court's docket and publish such notice on the Stretto Website and in the Data Room. As soon as practicable, but no later than two (2) days prior to the Auction, the Debtors will provide copies of each Baseline Bid to the Consultation Parties.

Between the date the Debtors notify a Potential Bidder that it is a Qualified Bidder and the Auction, the Debtors may discuss, negotiate or seek clarification of any Qualified Bid from a Qualified Bidder.

Without the written consent of the Debtors (in consultation with the Consultation Parties), a Qualified Bidder may not modify, amend or withdraw its Qualified Bid, except for proposed amendments to increase the purchase price or otherwise improve the terms of its Qualified Bid,

18

during the period that such Qualified Bid remains binding as specified herein; provided that any Qualified Bid may be improved at the Auction as set forth herein.

Except as otherwise provided in the Stalking Horse Agreement, Debtors are under no obligation to (i) select any Baseline Bid or (ii) conduct separate Auctions for any Business Segments, whether before or after selecting a Baseline Bid. Notwithstanding anything to the contrary contained herein, the Debtors may elect, in their reasonable discretion, and after consultation with the Consultation Parties, to adjourn any Auction.

Failure to Receive Two or More Qualified Bids

If no Qualified Bid for the Assets and/or any Business Segments, other than the applicable Stalking Horse Bid, is received by the Bid Deadline, or is the Qualified Bids received do not (in the aggregate) exceed the Stalking Horse Bid, the Debtors will not conduct the Auction, and shall file and serve a notice indicating that the Auction has been cancelled and that the applicable Stalking Horse Bidder is the sole Successful Bidder, and setting forth the date and time of the Sale Hearing.

Except as provided in the Stalking Horse Agreement, nothing herein shall obligate the Debtors to consummate or pursue any transaction with a Qualified Bidder.

## **Auction Procedures**

If there are two or more Qualified Bids for an Auction Package, the Debtors may conduct one or more Auctions for such Auction Package, on dates to be announced, at the offices of Shearman & Sterling LLP 599 Lexington Avenue, Lexington Ave, New York, NY 10022 or such other time and place as the Debtors, after consultation with the Baseline Bidder and the Consultation Parties, may notify Qualified Bidders who have submitted Qualified Bids.

Only a Qualified Bidder will be eligible to participate at an Auction, subject to such limitations as the Debtors may impose in good faith. Professionals and/or other representatives of the Consultation Parties will be permitted to attend and observe an Auction. At any Auction, Qualified Bidders (including the Stalking Horse Bidder) will be permitted to increase their bids. For each Baseline Bid, bidding will start at the purchase price and terms proposed in the applicable Baseline Bid and will proceed thereafter in increments to be announced (a "Minimum Overbid Amount"). The Minimum Overbid Amount for the Assets in the Stalking Horse Agreement, whether in one or a combination of Qualified Bids, shall be $150,000. The Debtors reserve the right to and may, after consultation with the Consultation Parties, increase or decrease the Minimum Overbid Amount at any time during the Auction for any Assets. The Stalking Horse Bidder is authorized to increase their respective bids at the Auction.

The Debtors may adopt rules, after consultation with the Consultation Parties, for an Auction at any time that the Debtors reasonably determine to be appropriate to promote the goals of the Bidding and Auction Process and are not inconsistent with these Bidding Procedures. At the start of an Auction, the Debtors shall describe the terms of the applicable Baseline Bid. Any rules

19

adopted by the Debtors will not unilaterally modify any of the terms of the Stalking Horse Agreement (as may be consensually modified at any Auction) without the consent of the Stalking Horse Bidder. Any rules developed by the Debtors will provide that all bids in a particular Auction will be made and received in one room, on an open basis, and all other bidders participating in that Auction will be entitled to be present for all bidding with the understanding that the true identity of each bidder will be fully disclosed to all other bidders participating in that Auction and that all material terms of each Qualified Bid submitted in response to the Baseline Bid or to any successive bids made at the Auction will be fully disclosed to all other bidders throughout the entire Auction. Each Qualified Bidder will be permitted what the Debtors reasonably determine, in consultation with the Consultation Parties, to be an appropriate amount of time to respond to the previous bid at the Auction.

The Debtors reserve the right to and may, after consultation with the Consultation Parties, reject at any time before entry of the relevant Sale Order any bid that, in the Debtors' judgment, is (i) inadequate or insufficient; (ii) not in conformity with the requirements of the Bankruptcy Code, these Bidding Procedures, or the terms and conditions of the applicable Sale; or (iii) contrary to the best interests of the Debtors and their estates, except that if the Stalking Horse Bid is the only Qualified Bid, the foregoing provisions of this sentence will be inoperative. In doing so, the Debtors may take into account the factors set forth above regarding the form and content of Qualified Bids and the Debtors' review of bids. No attempt by the Debtors to reject a bid under this paragraph will modify any rights of the Debtors or the Stalking Horse Bidder under the Stalking Horse Agreement (as may be consensually modified at any Auction).

Prior to the conclusion of an Auction, the Debtors, after consultation with the Consultation Parties, will (i) review and evaluate each bid made at the Auction on the basis of financial and contractual terms and other factors relevant to the sale process, including those factors affecting the speed and certainty of consummating a Sale; (ii) determine the highest or best offer or collection of offers for an Auction Package (as applicable to each Auction Package, a "Successful Bid"); (iii) except as provided in the Stalking Horse Agreement, determine which Qualified Bid is the next highest or best bid for such Auction Package (as applicable to each Auction Package, the "Back-Up Bid"); and (iv) notify all Qualified Bidders participating in an Auction, prior to its conclusion, of the successful bidder for such Auction Package (the "Successful Bidder"), the amount and other material terms of the Successful Bid, and the identity of the party that submitted the Back-Up Bid for such Auction Package (the "Back-Up Bidder"); provided that the Stalking Horse Bidder shall not be required to serve as the Back-Up Bidder.

Each Qualified Bidder shall be required to confirm, both before and after the Auction, that it has not engaged in any collusion with respect to the submission of any bid, the bidding, or the Auction.

## Post-Auction Process

A Successful Bidder shall, within one (1) business day after the close of the Auction, submit to the Debtors fully executed revised documentation memorializing the terms of the Successful Bid, which shall be in form and substance acceptable to the Debtors, in consultation

20

with the Consultation Parties. Promptly following the receipt of such documentation, the Debtors shall file with the Court notice of the Successful Bid(s), the Successful Bidder(s), and, if applicable, the Back-Up Bid(s) and the Back-Up Bidder(s). The Successful Bid(s) may not be assigned to any party without the consent of the Debtors after consultation with the Consultation Parties.

The Back-Up Bid(s) shall remain open and irrevocable until the earliest to occur of (i) thirty days after the completion of the Auction, or such other date as may be provided for in a separate agreement with the Back-Up Bidder, (ii) the consummation of the transaction with the Successful Bidder, and (iii) the release of such bid by the Debtors (such date, the "Back-Up Bid Termination Date"). If the transaction with a Successful Bidder is terminated prior to the Back-Up Termination Date, the Back-Up Bidder shall be deemed the Successful Bidder and shall be obligated to consummate the Back-Up Bid as if it were the Successful Bid.

## Notices Regarding Assumption and Assignment

The Debtors shall provide all notices regarding the proposed assumption and assignment of contracts and leases in connection with the Assumption and Assignment Procedures set forth in the Bidding Procedures Order.

## Treatment and Return of Deposits

Potential Bidders

Within three (3) business days after the Qualified Bid Designation Date, the Escrow Agent shall return to each Potential Bidder that was determined not to be a Qualified Bidder, as confirmed by the Debtors, such Potential Bidder's Deposit, plus any interest accrued thereon. Upon the authorized return of such Potential Bidder's Deposit, the bid of such Potential Bidder shall be deemed revoked and no longer enforceable.

Qualified Bidders

The Deposit of a Qualified Bidder will be forfeited to the Debtors if (i) the applicable Qualified Bidder attempts to modify, amend, or withdraw its Qualified Bid, except as permitted by these Bidding Procedures, during the time the Qualified Bid remains binding and irrevocable under these Bidding Procedures, or (ii) the Qualified Bidder is selected as the Successful Bidder and fails to enter into the required definitive documentation or to consummate the transaction according to these Bidding Procedures and the terms of the applicable transaction documents with respect to the Successful Bid. The Escrow Agent shall release the Deposit by wire transfer of immediately available funds to an account designated by the Debtors two (2) business days after the receipt by the Escrow Agent of a joint written notice by an authorized officer of the Debtors stating that the Qualified Bidder has breached or failed to satisfy its obligations or undertakings.

With the exception of the Deposit of a Successful Bidder and a Back-Up Bidder, the Escrow Agent shall return to any other Qualified Bidder any Deposit, plus any interest accrued

thereon, three (3) business days after the execution by the Successful Bidder and the Debtors of the documentation memorializing the Successful Bid, but in no event later than seven (7) business days after the conclusion of a Sale Hearing.

<u>Back-Up Bidder</u>

The Escrow Agent shall return a Back-Up Bidder's Deposit, plus any interest accrued thereon, within three (3) business days after the occurrence of the applicable Back-Up Bid Termination Date.

<u>The Successful Bidder</u>

The Deposit of a Successful Bidder shall be applied against the cash portion of the Purchase Price of such Successful Bidder upon the consummation of the transaction proposed in the applicable Successful Bid. For non-cash transactions, the Deposit shall be returned to the Successful Bidders three (3) Business Days following the closing of the Sale.

<u>Joint Notice to Escrow Agent</u>

The Debtors and, as applicable, the Potential Bidder, Qualified Bidder, and/or Back-Up Bidder agree to execute an appropriate joint notice to the Escrow Agent for the return of any Deposit to the extent such return is required by these Bidding Procedures. If either party fails to execute such written notice, the Deposit may be released by an order of the Court.

## **Consent to Jurisdiction and Authority to Condition to Bidding**

All Potential Bidders (including the Stalking Horse Bidder) shall be deemed to have (i) consented to the core jurisdiction of the Court to enter any order or orders, which shall be binding in all respects, in any way related to the Bidding Procedures, an Auction, or the construction and enforcement of any agreement or any other document relating to the applicable Sale, (ii) waived any right to a jury trial in connection with any disputes relating to the Bidding Procedures, an Auction, or the construction and enforcement of any agreement or any other document relating to the Sale, and (iii) consented to the entry of a final order or judgment in any way related to the Bidding Procedures, an Auction, or the construction and enforcement of any agreement or any other document relating to the Sale if it is determined that the Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the parties.

## **Reservation of Rights**

The Debtors reserve the right, in their discretion and business judgment, after consultation with the Consultation Parties, to alter or terminate these Bidding Procedures, to waive terms and conditions set forth herein with respect to all potential bidders, extend the deadlines set forth herein, alter the assumptions set forth herein, excuse technical non-compliance by bidders other than the Stalking Horse, provide reasonable accommodations to the Stalking Horse Bidder or any Potential Bidder with respect to such terms, conditions, and deadlines of the Bidding and Auction

Process to promote further bids by such bidders on any Business Segments or the Assets as a whole (including, without limitation, extending time deadlines as may be required for such Stalking Horse Bidder to comply with any additional filing and review procedures with the Federal Trade Commission in connection with their previous respective HSR Filings or any other Antitrust Law) and/or to terminate discussions with any and all prospective acquirers and investors (except for the Successful Bidder) at any time and without specifying the reasons therefor, in each case to the extent not materially inconsistent with these Bidding Procedures and/or the Bidding Procedures Order; provided that the Debtors' exercise of their discretion in evaluating bids and administering the Bidding and Auction Process does not permit, and shall not be construed as permitting, the Debtors to materially deviate from the procedures, terms, conditions, and protections set forth in these Bidding Procedures and/or the Bidding Procedures Order.

## **Fiduciary Matters**

Notwithstanding anything to the contrary in these Bidding Procedures or the Bidding Procedures Order, nothing in these Bidding Procedures or the Bidding Procedures Order shall require a Debtor or the board of directors or other governing body of a Debtor to take any action or to refrain from taking any action to the extent the board of directors or other governing body of such Debtor determines in good faith after consultation with counsel that continued performance under these Bidding Procedures or the Bidding Procedures Order (including taking any action or refraining from taking any action) would be inconsistent with the exercise of its fiduciary duties under applicable law.  For the avoidance of doubt, the Debtors' ability to conduct the Sale process and to consider or advance Alternative Proposals in a manner consistent with the foregoing shall not be impaired by anything in these Bidding Procedures or the Bidding Procedures Order.

**<u>Exhibit 2</u>**

**Form of Sale Notice**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| VICE GROUP HOLDING INC., *et al.* | Case No. 23-10738 (__) |
| Debtors.[1] | (Joint Administration Requested) |

**NOTICE OF SALE, BIDDING PROCEDURES, AUCTION, AND**
**SALE HEARING FOR THE SALE OF SUBSTANTIALLY ALL ASSETS**

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

On May 15, 2023, Vice Group Holding Inc. and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), filed with the United States Bankruptcy Court for the Southern District of New York (the "Court") the *Debtors' Motion for Entry of an Order (I) Establishing Bidding, Noticing, and Assumption and Assignment Procedures, (II) Authorizing and Approving the Debtors' Entry into the Stalking Horse Agreement (III) Approving the Sale of Substantially all of the Debtors' Assets and (IV) Granting Related Relief* [ECF No. [__]] (the "Motion"), among other things, approving certain bidding procedures (the "Bidding Procedures") in connection with the sale or sales of substantially all of the Debtors' assets (the "Assets") pursuant to section 363 of the Bankruptcy Code (the "Sale"), including certain dates and deadlines thereunder for the Sale process. [2]

On [__], 2022, the Court, entered the Bidding Procedures Order [ECF No. __].

**The Bidding Procedures provide the following**:

I.      **Stalking Horse Bidder**. The Debtors intend to enter into a purchase and sale agreement with Vice Acquisition HoldCo, LLC (the "Buyer" or the "Stalking Horse Bidder"), in the form attached to the Motion as Exhibit B (the "Stalking Horse Agreement," and such bid memorialized therein, the "Stalking Horse Bid") for the sale of substantially all of the

---

[1]    The last four digits of Debtor Vice Group Holding Inc.'s tax identification number are 4250.  Due to the large number of debtors in these chapter 11 cases, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://https://cases.stretto.com/vice/.  The location of the Debtors' service address for purposes of these chapter 11 cases is: 49 South 2nd Street, Brooklyn, NY 11249.

[2]    Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the Motion or the Bidding Procedures.

Debtors' Assets, free and clear of any and all liens, encumbrances, claims, and other interests, pursuant to which the Stalking Horse Bidder has committed to provide aggregate consideration consisting of: (i) a credit bid of $225 million pursuant to Section 363(k) of title 11 of the United States Code (the "Bankruptcy Code") against certain obligations owed by the Debtors under the Pre-Petition Senior Secured Credit Agreement and the DIP Credit Agreement as of the Closing (the "Credit Bid"), with the Credit Bid allocated *first*, to payment of any such obligations under the DIP Credit Agreement until paid in full, and *second*, to payment of any such obligations under the Pre-Petition Senior Secured Credit Agreement as of the closing of the Sale process (the "Closing") and (ii) the assumption of the Assumed Liabilities in full satisfaction of the obligations under the Prepetition Senior Secured Credit Agreement.

II.    **Description of the Assets**. The Debtors will consider bids (including bids from multiple bidders and multiple bids submitted by the same bidder) that are made for either:

(d)    *VICE* Media Group – a diversified content powerhouse comprised of all of the *VICE* business segments and all *VICE* Assets;

(e)    one or more of the following business segments:

- *VICE* Publishing – an award-winning global digital content business, which publishes content through its portfolio of brands;

- Refinery29, Inc. – a digital media and entertainment company focused on a female audience; or

(f)    Any combination of Assets or business segments that comprise *VICE* Media Group.

III.    **Important Dates and Deadlines**

(a)    **Bid Deadline. [__], 2023, at 4:00 p.m. (prevailing Eastern Time)** is the deadline by which all Qualified Bids must be actually received in writing by the Bid Notice Parties (the "Bid Deadline").

(b)    **Sale Objection Deadline**. Parties must file any objections to the proposed Sale (such objections, the "Sale Objections") with the Court and serve such objections on the Objection Recipients (as defined below) by no later than **[__] p.m. (prevailing Eastern Time)** on **[__], 2023** (the "Sale Objection Deadline"). **By receiving this Sale Notice, you are subject to the Sale Objection Deadline as disclosed herein, unless extended by the Debtors or the Court.[3]**

---

[3]    In addition to service of this Sale Notice, the Debtors will provide publication notice to parties who are not currently known to the Debtors by publishing this Sale Notice in the national edition of *USA Today* and once in the *New York Times*.

(c)     **Auction**: If the Debtors conduct an Auction, the Auction will be conducted at the offices of Shearman & Sterling LLP, 599 Lexington Avenue, Lexington Ave, New York, NY 10022 on **[__], 2023, at [10:00] [a.m.] (prevailing Eastern Time)**, or at such other time and location (including via remote video) as designated by the Debtors. If the Debtors hold the Auction, the Debtors will, as soon as reasonably practicable after selecting the Successful Bid(s), file (but not serve) and publish on the Case Website a notice of the results of the Auction (such notice, the "Notice of Auction Results"). If a Successful Bidder at the Auction is not the Stalking Horse Bidder, objections solely related to the identity of such Successful Bidder(s), changes to the Stalking Horse Agreement, and adequate assurance of future performance must be filed with the Court and served on the Objection Recipients so as to be received by **4:00 p.m. (prevailing Eastern Time) on the date that is two calendar days after the date that the Debtors file the Notice of Auction Results**. The Notice of Auction Results will set forth the specific deadline and procedures for filing any such objections in response to the Notice of Auction Results.

(d)     **Sale Hearing**. Unless accelerated upon a Sale Acceleration Election (as defined in the Bidding Procedures) made by the Debtors, the Sale Hearing shall be held before the Honorable [____] on [___], 2023, at [____] **(prevailing Eastern Time)** at the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004-1408.

## IV.    Procedures for Sale Objections

Sale Objections must be (a) be in writing; (b) comply with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Local Bankruptcy Rules for the Southern District of New York; (c) state, with specificity, the legal and factual bases thereof; (d) include any appropriate documentation in support thereof; and (f) be filed with the Court and served on the following parties (the "Objection Recipients") by the Sale Objection Deadline: (i) the Debtors, c/o VICE, 49 S 2nd St, Brooklyn, NY 11249 (Attn: Maria Harris (maria.harris@vice.com)); (ii) the Debtors' counsel, Togut, Segal & Segal LLP, One Penn Plaza, Suite 3335, New York, NY 10119 (Attn: Kyle J. Ortiz (kortiz@teamtogut.com and Brian F. Moore (bmoore@teamtogut.com)); (iii) special counsel for the Debtors, Shearman & Sterling LLP 599, Lexington Avenue, Lexington Ave, New York, New York, NY 10022 (Attn: Fredric Sosnick (fsosnick@shearman.com), Christopher Forrester (chris.forrester@shearman.com), Ian E. Roberts (ian.roberts@shearman.com); (iv) entities on the Master Service List (which may be obtained at the Debtors' case management website at https://cases.stretto.com/vice/); and (v) counsel to the Stalking Horse Bidder, Gibson, Dunn & Crutcher LLP, 333 South Grand Avenue Los Angeles, California 90071(Attn:     David Feldman         (DFeldman@gibsondunn.com),          Cromwell         Montgomery (CMontgomery@gibsondunn.com) , and Candice Choh (CChoh@gibsondunn.com)).

Any party who fails to file with the Court and serve on the Objection Recipients a Sale Objection by the applicable Sale Objection Deadline may be forever barred from asserting, at the Sale Hearing or Accelerated Sale Hearing, as applicable, or thereafter, any objection to the relief

requested in the Sale Motion, or to the consummation and performance of the Sale contemplated by the Stalking Horse Agreement, or purchase and sale agreement with a Successful Bidder free and clear of all liens, claims, interests, and encumbrances pursuant to section 363(f) of the Bankruptcy Code.

## V.      **Additional Information**

This Sale Notice and any Sale Hearing are subject to the fuller terms and conditions of the Sale Motion, the Bidding Procedures Order, and the Bidding Procedures, each of which shall control, as applicable, in the event of any conflict. The Debtors encourage parties in interest to review such documents in their entirety. Copies of the Motion, the Bidding Procedures Order, the Bidding Procedures, and the Sale Notice may be obtained free of charge at Case Website, located at https://cases.stretto.com/vice/.

**Any party who fails to file with the Court and serve on the Objection Recipients a Sale Objection by the applicable Sale Objection Deadline may be forever barred from asserting, at the Sale Hearing or Accelerated Sale Hearing, as applicable, or thereafter, any objection to the relief requested in the Motion, or purchase and sale agreement with a Successful Bidder free and clear of all liens, claims, interests, and encumbrances pursuant to section 363(f) of the Bankruptcy Code.**

Dated: May [__], 2023
      New York, New York

**SHEARMAN & STERLING LLP**

*DRAFT*                                   
Fredric Sosnick
William S. Holste
Jacob S. Mezei
599 Lexington Avenue
New York, NY  10022
Phone:   (212) 848-4000
Email:   fsosnick@shearman.com
            william.holste@shearman.com
            jacob.mezei@shearman.com

-and-

Ian E. Roberts (*pro hac vice* pending)
2601 Olive Street, 17th Floor
Dallas, TX  75201
Phone:   (214) 271-5777
Email:   ian.roberts@shearman.com

*Proposed Special Counsel to the Debtors and Debtors in Possession*

## Exhibit 3

**Form of Assumption and Assignment Notice**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| VICE GROUP HOLDING INC., *et al.* | Case No. 23-10738 (__) |
| Debtors.[1] | (Joint Administration Requested) |

**NOTICE OF PROPOSED**
**ASSUMPTION AND ASSIGNMENT OF CERTAIN**
**EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

---

**PLEASE TAKE NOTE OF THE FOLLOWING DEADLINES:**

**Cure Objection Deadline**: on or before **[__], 2023, at 4:00 p.m. (prevailing Eastern Time)**

**Auction Results Objection Deadline**: If the Stalking Horse Bidder is not the Successful Bidder at the Auction, on or before **4:00 p.m. (prevailing Eastern Time) on the date that is two days after the date that the Notice of Auction Results are published.**

---

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

On May 15, 2023, Vice Group Holding Inc. and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), filed with the United States Bankruptcy Court for the Southern District of New York (the "Court") the *Debtors' Motion for Entry of an Order (I) Establishing Bidding, Noticing, and Assumption and Assignment Procedures, (II) Authorizing and Approving the Debtors' Entry into the Stalking Horse Agreement (III) Approving the Sale of Substantially all of the Debtors' Assets and (IV) Granting Related Relief* [ECF No. [__]] (the "Motion"), seeking an order (the "Bidding Procedures Order"), among other things, seeking an order (the "Bidding Procedures Order"),[2] among other things, (a) approving certain bidding procedures (the "Bidding Procedures") in connection with the sale or sales of substantially all of the Debtors' assets (the "Assets") pursuant to section 363 of the Bankruptcy Code (the "Sale"), including certain dates and deadlines

---

[1]    The last four digits of Debtor Vice Group Holding Inc.'s tax identification number are 4250.  Due to the large number of debtors in these chapter 11 cases, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://https://cases.stretto.com/vice/.  The location of the Debtors' service address for purposes of these chapter 11 cases is:  49 South 2nd Street, Brooklyn, NY 11249.

[2]    Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the Motion or the Bidding Procedures.

thereunder for the Sale process; and (b) authorizing procedures (such procedures, the "Assumption and Assignment Procedures") to facilitate the fair and orderly assumption, assumption and assignment, and rejection of certain executory contracts (the "Contracts") or unexpired leases (the "Leases") of the Debtors. [3]

On [__], 2022, the Court, entered the Bidding Procedures Order [ECF No. __]. Pursuant to the Bidding Procedures Order, the Debtors hereby provide notice (this "Assumption and Assignment Notice") that they are seeking to assume and assign to Vice Acquisition HoldCo, LLC (the "Stalking Horse Bidder")[4], or, if the Stalking Horse Bidder is not the Successful Bidder at the Auction (if any), any other Successful Bidder(s), the Contracts or Leases listed on **Exhibit A** attached hereto (each, an "Assigned Contract").

**You are receiving this Assumption and Assignment Notice because you may be a counterparty to a Contract or Lease (a "Counterparty") that is proposed to be assumed and assigned to the Successful Bidder in connection with the Sale.**

If the Debtors assume and assign to the Successful Bidder(s) an Assigned Contract to which you are a party, on the closing date of the Sale, or as soon thereafter as practicable, such Successful Bidder will pay you the amount the Debtors' records reflect is owing for **pre-bankruptcy filing arrearages** as set forth on **Exhibit A** (the "Cure Cost"). The Debtors' records reflect that all postpetition amounts owing under your Assigned Contract have been paid and will continue to be paid in the ordinary course until the assumption and assignment of the Assigned Contract, and that other than the Cure Cost, there are no other defaults under the Assigned Contract.

The Debtors' inclusion of a Contract or Lease as an Assigned Contract on **Exhibit A** is not a guarantee that such Contract or Lease will ultimately be assumed and assigned to any Successful Bidder. Should it be determined that an Assigned Contract will not be assumed and assigned, the Debtors shall notify such party to the Assigned Contract in writing of such decision.

Notwithstanding anything to the contrary herein, the proposed assumption and assignment of each of the Assigned Contracts listed on **Exhibit A** hereto (a) shall not be an admission as to whether any such Assigned Contract was executory or unexpired as of the Petition Date or remains executory or unexpired postpetition within the meaning of Bankruptcy Code section 365; and (b) shall be subject to the Debtors', the Stalking Horse Bidder's, or any Successful Bidder(s)'s right to conduct further confirmatory diligence with respect to the Cure Cost of each Assigned Contract and to modify such Cure Cost accordingly. In the event that the Debtors or any Successful Bidder determine that your Cure Cost should be modified, you will receive a notice pursuant to the Assumption and Assignment Procedures below, which will provide for additional time to object to such modification.

---

[3]  Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the Motion or the Bidding Procedures.

[4]  A copy of the Stalking Horse Agreement is attached as **Exhibit B** to the Motion (the "Stalking Horse Agreement" and such bid memorialized therein, the "Stalking Horse Bid")

I.      **Assumption and Assignment Procedures**

The Assumption and Assignment Procedures set forth below regarding the assumption and assignment of the Assigned Contracts proposed to be assumed by the Debtors and assigned to the Successful Bidder(s) in connection with the Sale shall govern the assumption and assignment of all of the Assigned Contracts, subject to the payment of any Cure Costs:

(a)   **Cure Costs and Adequate Assurance of Future Performance.** The payment of the applicable Cure Costs by any party, as applicable, shall (i) effect a cure of all monetary defaults existing thereunder and (ii) compensate for any actual pecuniary loss to such Counterparty resulting from such default.

(b)   **Additions.** The Debtors may also designate additional executory contracts or unexpired leases as agreements to be assumed by the Debtors and assigned to a Successful Bidder (the "Additional Assigned Contracts") until one (1) business day before the closing of the Sale. Following the addition of an Additional Assigned Contract, the Debtors shall as soon as reasonably practicable thereafter serve an Assumption and Assignment Notice on each of the counterparties to such Additional Assigned Contracts and their counsel of record, if any, indicating (i) that the Debtors intend to assume and assign the Counterparty's Contract or Lease, as applicable, to the Successful Bidder(s), and (ii) the corresponding Cure Cost. The Debtors shall provide any counterparties to such Additional Assigned Contracts an opportunity to be heard, if necessary, with respect to the assumption and assignment of their Assigned Contract if no other notice was received by such Counterparty prior to the Sale Hearing.

(c)   **Eliminations**. The Debtors may remove any Contract or Lease, as applicable, to be assumed by the Debtors and assigned to the Successful Bidder (the "Eliminated Agreements") until one (1) business day before the closing of the Sale. Following the removal of an Eliminated Agreement, the Debtors shall as soon as reasonably practicable thereafter serve a notice (a "Removal Notice") on each of the impacted counterparties and their counsel of record, if any, indicating that the Debtors no longer intend to assign the Contract or Lease, as applicable, to the Successful Bidder(s) in connection with the Sale.

(d)   **Supplemental Contract Assumption Notice**. Although the Debtors intend to make a good faith effort to identify all Assigned Contracts that may be assumed and assigned in connection with the Sale, the Debtors may discover certain executory contracts inadvertently omitted from the Assigned Contracts list or the Successful Bidder(s) may identify other Contracts or Leases that they desire to have assumed and assigned in connection with the Sale. Accordingly, the Debtors reserve the right, but only in accordance with the Stalking Horse Agreement or the purchase and sale agreement with the Successful Bidder(s) (the "Successful Bidder Purchase Agreement"), as applicable, or as otherwise agreed by the Debtors and the Successful Bidder(s), at any time before the deadline for designation of additional Assigned Contracts or removal of potentially Assigned Contracts set forth in the Stalking Horse Agreement or the Successful Bidder Purchase Agreement, to (i) supplement the list of Assigned Contracts with previously omitted executory contracts, (ii) remove Assigned Contracts from the list of executory contracts ultimately selected as Assigned Contracts that a Successful Bidder proposes be assumed and assigned to it in connection with the Sale, or (iii) modify the previously stated Cure Cost associated with any Assigned Contracts. In

3

the event the Debtors exercise any of these reserved rights, the Debtors will promptly serve a supplemental notice of contract assumption (a "<u>Supplemental Assumption and Assignment Notice</u>") on each of the counterparties to such contracts and their counsel of record, if any; <u>provided</u>, <u>however</u>, the Debtors may not add an executory contract to the list of Assigned Contracts that has been previously rejected by the Debtors by order of the Court. Each Supplemental Assumption and Assignment Notice will include the same information with respect to listed Assigned Contracts as was included in the Assumption and Assignment Notice, or in the event of a removal, the information required in a Removal Notice. Any Supplemental Assumption and Assignment Notice will be served as soon as reasonably practicable following the Successful Bidder's identification of any such omissions, removals, or modifications to any Assigned Contracts.

(e)    **Objections**. Objections, if any, to the proposed assumption and assignment or the Cure Cost proposed with respect thereto, must (i) be in writing; (ii) comply with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules; (iii) state, with specificity, the legal and factual bases thereof; (iv) if a Cure Objection that pertains to the proposed Cure Costs, state the cure amount alleged to be owed to the objecting Counterparty, together with the appropriate documentation including the cure amount the Counterparty believes is required to cure defaults under the relevant Contract or Lease; (v) include any appropriate documentation in support thereof; and (vi) be filed with the Court and served on, so actually be received by, the Objection Recipients (as defined below) by the applicable deadlines below or such deadline as set forth in the applicable Supplemental Assumption and Assignment Notice.

(i)    <u>Cure Objection Deadline</u>. Any objection to the Cure Cost, to assumption and assignment of an Assigned Contract, or adequate assurance of must be filed with the Bankruptcy Court on or before **[__], 2023, at 4:00 p.m. (prevailing Eastern Time)** (the "<u>Cure Objection Deadline</u>"), **or such deadline set forth in the applicable Supplemental Assumption Notice**, and served on: (i) the Debtors, c/o *VICE*, 49 S 2nd St, Brooklyn, NY 11249 (Attn: Maria Harris (maria.harris@vice.com)); (ii) the Debtors' counsel, Togut, Segal & Segal LLP, One Penn Plaza, Suite 3335, New York, NY 10119 (Attn: Kyle J. Ortiz (kortiz@teamtogut.com and Brian F. Moore (bmoore@teamtogut.com)); (iii) special counsel for the Debtors, Shearman & Sterling LLP 599, Lexington Avenue, Lexington Ave, New York, NY 10022 (Attn: Fredric Sosnick (fsosnick@shearman.com), Christopher Forrester (chris.forrester@shearman.com), Ian E. Roberts (ian.roberts@shearman.com); (iv) entities on the Master Service List (which may be obtained at the Debtors' case management website at https://cases.stretto.com/vice/); and (v) counsel to the Stalking Horse Bidder, Gibson, Dunn & Crutcher LLP, 333 South Grand Avenue Los Angeles, California 90071(Attn: David Feldman (DFeldman@gibsondunn.com), Cromwell Montgomery (CMontgomery@gibsondunn.com) , and Candice Choh (CChoh@gibsondunn.com)) (collectively, the "<u>Cure Objection Recipients</u>").

(ii)   <u>Auction Results Objection Deadline</u>. If the Debtors hold an Auction and if a Successful Bidder that is not the Stalking Horse Bidder prevails at the Auction, as soon as reasonably practicable after selecting such Successful Bidder(s), the Debtors will file (but not serve) and cause to be published on the Case Website a notice of results of the Auction (the "<u>Notice of Auction Results</u>"). Upon the filing of any Notice of Auction Results, objections *solely* to the identity of the Successful Bidder(s), changes to the Stalking Horse Agreement, or adequate assurance of future performance (each, a "<u>Auction Results Objection</u>") may be made. Any Auction Results Objection must be served on (A) counsel for the Debtors and (B) the Successful Bidder(s) and its counsel, if any (collectively, the "<u>Auction Results Objection Recipients</u>," and together with the Cure Objection Recipients, the "<u>Objection Recipients</u>"), so as to be received by **4:00 p.m. (prevailing Eastern Time) on the date that is [___] days after the date that the Notice of Auction Results are published** (the "<u>Auction Results Objection Deadline</u>"); <u>provided</u>, <u>however</u>, that the Cure Objection Deadline shall not be extended.

(f)   Any party failing to timely file an objection to (i) the proposed Cure Cost, (ii) the proposed assumption and assignment of an Assigned Contract or Additional Assigned Contract listed on the Assumption and Assignment Notice or a Supplemental Assumption and Assignment Notice, or (iii) the amendment of the Assigned Contracts and releases of the Causes of Action and other rights of recovery as set forth in this Assumption and Assignment Notice; is deemed to have consented to (A) such Cure Cost, (B) the assumption and assignment of such Assigned Contract or Additional Assigned Contract (including the adequate assurance of future payment), and (C) the related relief requested in the Motion. Such party shall be forever barred and estopped from objecting to the Cure Cost, the assumption and assignment of the Assigned Contract, or Additional Assigned Contract, adequate assurance of future performance, or the related relief requested herein and in the Motion, whether applicable law excuses such Counterparty from accepting performance by, or rendering performance to, the Successful Bidder(s), and from asserting any additional cure or other amounts against the Debtors and the Successful Bidder(s) with respect to such party's Assigned Contract or Additional Assigned Contract.

(g)   If a Cure Objection or Auction Results Objection, as applicable, filed by the Cure Objection Deadline or Auction Results Objection Deadline, as applicable, cannot otherwise be resolved by the parties prior to the Sale Hearing, such objections and all issues regarding the Cure Cost amount to be paid or the adequate assurance of future performance, as applicable, shall be determined by the Court at the Sale Hearing, or at a later hearing on a date to be scheduled by the Debtors in their discretion, and in consultation with the Successful Bidder(s).

## II.   Additional Information

Unless otherwise provided in the Sale Order, the Debtors shall have no liability or obligation with respect to defaults relating to the Assigned Contracts arising, accruing, or relating to a period on or after the effective date of assignment.

Copies of the Motion, the Bidding Procedures Order, the Bidding Procedures, and the Sale Notice may be obtained free of charge at the Debtors' Case Website, located at https://cases.stretto.com/vice/.

Dated: May [__], 2023     **SHEARMAN & STERLING LLP**
   New York, New York

            *DRAFT*_____

            Fredric Sosnick
            William S. Holste
            Jacob S. Mezei
            599 Lexington Avenue
            New York, NY  10022
            Phone: (212) 848-4000
            Email: fsosnick@shearman.com
              william.holste@shearman.com
              jacob.mezei@shearman.com

            -and-

            Ian E. Roberts (*pro hac vice* pending)
            2601 Olive Street, 17th Floor
            Dallas, TX  75201
            Phone: (214) 271-5777
            Email: ian.roberts@shearman.com

            *Proposed Special Counsel to the Debtors and Debtors in Possession*

6

**Exhibit A**

**Assigned Contracts and Cure Costs**

## **Exhibit B**

**Stalking Horse Agreement**

**ASSET AND EQUITY PURCHASE AGREEMENT**

**by and among**

**VICE ACQUISITION HOLDCO, LLC,**

**as Buyer**

**and**

**VICE GROUP HOLDING INC.**

**and**

**THE OTHER SELLERS NAMED HEREIN,**

**as Sellers**

**[●], 2023**

*This draft agreement is not intended to create, nor will it be deemed to create, a legally binding or enforceable offer or agreement of any type or nature, unless and until agreed to and executed by all parties.*

## TABLE OF CONTENTS

PAGE

ARTICLE 1 DEFINITIONS ................................................................................................ 1

    SECTION 1.01    Definitions.................................................................... 1
    SECTION 1.02    Construction ............................................................... 16

ARTICLE 2 PURCHASE AND SALE ............................................................................. 17

    SECTION 2.01    Purchase and Sale ...................................................... 17
    SECTION 2.02    Assumed Liabilities ................................................... 20
    SECTION 2.03    Excluded Assets ......................................................... 21
    SECTION 2.04    Excluded Liabilities ................................................... 22
    SECTION 2.05    Assignment of Contracts and Rights.......................... 24
    SECTION 2.06    Purchase Price ........................................................... 26
    SECTION 2.07    Purchase Price Allocation .......................................... 26
    SECTION 2.08    Closing ...................................................................... 27
    SECTION 2.09    Withholding .............................................................. 29

ARTICLE 3 REPRESENTATIONS AND WARRANTIES OF SELLERS ............................... 30

    SECTION 3.01    Organization and Qualification................................... 30
    SECTION 3.02    Authorization; Execution and Delivery; Enforceability .............. 30
    SECTION 3.03    Noncontravention; Consents and Approvals ................ 30
    SECTION 3.04    Purchased Entities; JV Entities ................................... 31
    SECTION 3.05    Title to and Sufficiency of Purchased Assets .............. 32
    SECTION 3.06    Litigation................................................................... 32
    SECTION 3.07    Permits; Compliance with Laws ................................. 32
    SECTION 3.08    Material Contracts...................................................... 33
    SECTION 3.09    Anti-Corruption, Anti-Money Laundering, and International Trade Compliance. ........................................................... 35
    SECTION 3.10    Intellectual Property.................................................. 36
    SECTION 3.11    Data Privacy and Cybersecurity................................. 38
    SECTION 3.12    Real Property ............................................................ 39
    SECTION 3.13    Environmental, Health and Safety Matters.................. 39
    SECTION 3.14    Taxes ........................................................................ 40
    SECTION 3.15    Employee Benefits .................................................... 42
    SECTION 3.16    Labor Matters ........................................................... 44
    SECTION 3.17    Absence of Certain Changes ...................................... 45
    SECTION 3.18    Insurance Policies ...................................................... 45
    SECTION 3.19    Affiliate Transactions................................................ 45
    SECTION 3.20    Material Customers, Suppliers and Distributors........... 45
    SECTION 3.21    Financial Statements; Internal Controls...................... 46
    SECTION 3.22    Undisclosed Liabilities .............................................. 47
    SECTION 3.23    Brokers...................................................................... 47

SECTION 3.24        Items of Product ...................................................................... 47
SECTION 3.25        TID U.S. Business .................................................................... 48
SECTION 3.26        No Other Representations or Warranties ................................. 48

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF BUYER .................................. 48

SECTION 4.01        Corporate Existence and Power ............................................. 48
SECTION 4.02        Authorization; Execution and Delivery; Enforceability .............. 49
SECTION 4.03        Noncontravention; Consents and Approvals ............................ 49
SECTION 4.04        Availability of Funds; Solvency .............................................. 50
SECTION 4.05        Litigation ............................................................................. 50
SECTION 4.06        Brokers ................................................................................ 50
SECTION 4.07        Credit Bid ............................................................................ 50
SECTION 4.08        Buyer's Investigation and Reliance ......................................... 50

ARTICLE 5 COVENANTS OF SELLERS ....................................................................... 51

SECTION 5.01        Conduct of the Business ........................................................ 51
SECTION 5.02        Alternative Transaction ......................................................... 53
SECTION 5.03        Access to Information ............................................................ 54
SECTION 5.04        Bidding Protections .............................................................. 54
SECTION 5.05        Name Change ....................................................................... 54

ARTICLE 6 COVENANTS OF BUYER ......................................................................... 55

SECTION 6.01        Preservation of Books and Records ......................................... 55
SECTION 6.02        Insurance Matters ................................................................. 55

ARTICLE 7 COVENANTS OF BUYER AND SELLERS ................................................... 56

SECTION 7.01        Confidentiality ..................................................................... 56
SECTION 7.02        Further Assurances ................................................................ 56
SECTION 7.03        Certain Filings ...................................................................... 57
SECTION 7.04        Public Announcements .......................................................... 59
SECTION 7.05        Employee Matters ................................................................. 59
SECTION 7.06        Tax Matters .......................................................................... 61
SECTION 7.07        Misallocated Assets .............................................................. 63
SECTION 7.08        Payments from Third Parties after Closing ............................... 63
SECTION 7.09        Bulk Transfer Laws ............................................................... 64
SECTION 7.10        Bankruptcy Court Approval ................................................... 64
SECTION 7.11        No Successor Liability .......................................................... 67
SECTION 7.12        Communications with Customers and Suppliers ...................... 68
SECTION 7.13        Efforts to Consummate. ......................................................... 68

ARTICLE 8 CONDITIONS TO CLOSING ....................................................................... 68

SECTION 8.01        Conditions to Obligations of Buyer and Sellers ....................... 68
SECTION 8.02        Conditions to Obligation of Buyer .......................................... 68

SECTION 8.03          Conditions to Obligation of Sellers.................................................. 69
SECTION 8.04          Waiver of Conditions ...................................................................... 70

ARTICLE 9 SURVIVAL ............................................................................................... 70

SECTION 9.01          Survival ........................................................................................... 70

ARTICLE 10 TERMINATION ...................................................................................... 70

SECTION 10.01        Grounds for Termination ................................................................ 70
SECTION 10.02        Effect of Termination...................................................................... 73
SECTION 10.03        Costs and Expenses......................................................................... 73

ARTICLE 11 TAXES...................................................................................................... 73

SECTION 11.01        G Reorganization ........................................................................... 73

ARTICLE 12 MISCELLANEOUS ................................................................................ 75

SECTION 12.01        Notices ............................................................................................ 75
SECTION 12.02        Amendments and Waivers .............................................................. 76
SECTION 12.03        Successors and Assigns.................................................................... 76
SECTION 12.04        Governing Law ............................................................................... 77
SECTION 12.05        Jurisdiction ..................................................................................... 77
SECTION 12.06        WAIVER OF JURY TRIAL............................................................ 77
SECTION 12.07        Counterparts; Third-Party Beneficiaries ...................................... 77
SECTION 12.08        Specific Performance ..................................................................... 78
SECTION 12.09        Entire Agreement ........................................................................... 78
SECTION 12.10        No Strict Construction ................................................................... 78
SECTION 12.11        Severability ..................................................................................... 78
SECTION 12.12        Disclosure Schedules ..................................................................... 79

<u>EXHIBITS</u>

Exhibit A          Form of Assignment and Assumption Agreements
Exhibit B          Form of Bills of Sale
Exhibit C          Form of Assignment of IP

Disclosure Schedules
Original Contract & Cure Schedule

## ASSET AND EQUITY PURCHASE AGREEMENT

THIS **ASSET AND EQUITY PURCHASE AGREEMENT**, dated as of [●], 2023 (the "<u>Agreement</u>"), is made and entered into by and among Vice Acquisition Holdco, LLC, a Delaware limited liability company ("<u>Buyer</u>"), Vice Group Holding Inc., a Delaware corporation (the "<u>Company</u>"), and those certain Subsidiaries of the Company signatory hereto (collectively with the Company, "<u>Sellers</u>" and each entity individually, a "<u>Seller</u>").  Sellers and Buyer are sometimes referred to collectively herein as the "<u>Parties</u>" and individually as a "<u>Party</u>."  Capitalized terms used herein and not otherwise defined herein have the meanings set forth in <u>Article 1</u>.

### W I T N E S E T H:

**WHEREAS**, on May 14, 2023 (the "<u>Petition Date</u>"), the Company and its affiliated debtors and debtors in possession (the "<u>Debtors</u>") sought relief under Chapter 11 of Title 11, §§ 101-1330 of the United States Code (as amended, the "<u>Bankruptcy Code</u>") by filing cases (the "<u>Chapter 11 Cases</u>") in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>");

**WHEREAS**, subject to the terms and conditions set forth in this Agreement and the entry of the Sale Order, the Parties desire to enter into this Agreement, pursuant to which Sellers shall sell, assign, transfer, and convey to Buyer, and Buyer shall purchase and acquire from Sellers, all of Sellers' right, title and interest in and to the Purchased Assets, and Buyer shall assume all of the Assumed Liabilities, and the Parties intend to effectuate the transactions contemplated by this Agreement, upon the terms and conditions hereinafter set forth in a sale authorized by the Bankruptcy Court pursuant to, inter alia, Sections 105 and 363 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court; and

**WHEREAS**, Sellers' ability to consummate the transactions set forth in this Agreement is subject to, among other things, the entry of the Sale Order by the Bankruptcy Court.

**NOW, THEREFORE**, in consideration of the premises and the mutual promises herein made, and in consideration of the foregoing and of the representations, warranties, covenants, agreements and conditions herein contained, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound hereby, agree as follows:

ARTICLE 1

DEFINITIONS

SECTION 1.01     *Definitions*.

(a)     The following terms, as used herein, have the following meanings:

"**Affiliate**" means, with respect to any Person, another Person that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Person, where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities, by

contract or otherwise.  For the avoidance of doubt, ownership of more than fifty percent (50%) of the voting securities shall be deemed to be "control" for purposes of this definition.

"**Alternative Transaction**" means (a) any investment in, financing of, capital contribution or loan to or restructuring or recapitalization of Sellers or any of their respective direct or indirect Subsidiaries (including any exchange of all or a substantial portion of Sellers' or any of their respective Affiliates' outstanding debt obligations for equity securities of Sellers or any of their respective Affiliates), (b) any merger, consolidation, share exchange or other similar transaction to which Sellers or any of their respective Affiliates is a party that has the effect of transferring, directly or indirectly, any portion of the assets of, or any issuance, sale or transfer of equity interests in, Sellers, the Purchased Assets or the Business, (c) any direct or indirect sale of any portion of the assets of, or any issuance, sale or transfer of equity interests in, Sellers, the Purchased Assets or the Business (excluding, for the avoidance of doubt, any Items of Product sold in the Ordinary Course), or (d) any other transaction, including a plan of liquidation or agreement with a liquidation firm (or consortium) for the orderly liquidation of the Sellers, all or any portion of the Purchased Assets, or the Business (other than any wind-down or similar plan or transaction or dismissal with respect to the sale of Excluded Assets) or reorganization (in any jurisdiction, whether domestic, foreign, international or otherwise), in each instance that transfers or vests ownership of, economic rights to, or benefits in any portion of the assets of Sellers, the Purchased Assets or the Business to any party other than Buyer.

"**Anti-Corruption Laws**" means the U.S. Foreign Corrupt Practices Act of 1977, as amended, the Anti-Kickback Act of 1986, the UK Bribery Act of 2010, and any similar Laws in any other jurisdiction in which the Company or any of its Subsidiaries, or their respective agents and representatives, conduct business.

"**Anti-Money Laundering Laws**" means all anti-money laundering Laws applicable to the Company, including 18 U.S.C. §§ 1956 and 1957 and the Bank Secrecy Act, as amended by the USA PATRIOT Act, 31 U.S.C. §§ 5311 et seq., and its implementing regulations, 31 C.F.R. Chapter X.

"**Antitrust Laws**" means any antitrust, competition, trade regulation, foreign investment control or merger control Laws promulgated by any Governmental Authority.

"**Auction**" means an auction, if any, for the sale of Sellers' assets conducted pursuant to the terms and conditions of the Bid Procedures Order.

"**Bankruptcy and Equity Exception**" means any Laws relating to bankruptcy, reorganization, insolvency, moratorium, fraudulent conveyance or preferential transfers, or similar Laws relating to or affecting creditors' rights generally and subject, as to enforceability, to the effect of general principles of equity (regardless of whether such enforceability is considered in any Proceeding in equity or at Law).

"**Bid Procedures**" means the bidding procedures for the solicitation and submission of bids for a sale, reorganization, or other disposition of Sellers or all or substantially all of their assets approved by the Bankruptcy Court pursuant to the Bid Procedures Order, in form and substance satisfactory to Buyer.

"**Bid Procedures Motion**" means the motion seeking entry of the Bid Procedures Order, which shall be in form and substance satisfactory to Buyer.

"**Bid Procedures Order**" means an order of the Bankruptcy Court that shall be in form and substance satisfactory to Buyer and, among other things, approves (a) bid procedures, (b) the Expense Reimbursement, and provides that such Expense Reimbursement shall constitute an allowed superpriority administrative expense of the Debtors, (c) the form and manner of notice of auction(s), sale transaction(s), and hearing(s), (d) the procedures for assumption and assignment of Contracts and Leases, and (e) the date for auction(s), if necessary.

"**Business**" means the business of purchasing, creating, producing (including post-production), filming, managing, delivering and distributing wholly owned and licensed media content, channels, brands, programming, advertising and applications in the digital, television, audio, creative agency, news and studio spaces, amongst other media platforms, in various formats, including but not limited to: editorial, branded content, digital video, stories, music videos, commercials, podcasts, documentaries and docuseries, scripted and unscripted television, film, experiential, and commerce produced by the Company and its Subsidiaries and Joint Ventures and any other business described in the most recent Business Plan, in each case, as conducted by the Company and its Subsidiaries immediately prior to the Closing.

"**Business Day**" means a day other than Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by law to close.

"**Business Plan**" has the meaning given to it in the DIP Credit Agreement.

"**CARES Act**" means the CARES Act (Pub. L. 116-136 (2020)) and any similar Law providing for the deferral of Taxes, the conditional deferral, reduction, or forgiveness of Taxes, the increase in the utility of Tax attributes, or other Tax-related measures intended to benefit taxpayers in response to the COVID-19 pandemic and associated economic downturn.

"**Cash and Cash Equivalents**" means all of the Company's and its Subsidiaries' cash (including petty cash and checks received prior to the close of business on the Closing Date), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, security entitlements, securities accounts, commodity Contracts, commodity accounts, government securities and any other cash equivalents, whether on hand, in transit, in banks or other financial institutions, or otherwise held.

"**Claim**" means a "claim" as defined in Section 101 of the Bankruptcy Code, including any Indebtedness or Liability.

"**Closing Date**" means the date of the Closing.

"**COBRA**" means the health care continuation coverage requirements of the Consolidated Omnibus Reconciliation Act of 1985, as codified in Section 4980B of the Code and Section 601 et seq. of ERISA.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Collective Bargaining Agreement**" means any Contract that any Seller or any of its Affiliates has entered into with any union, works council or collective bargaining agent with respect to terms and conditions of employment of its employees.

"**Contingent Payment Obligations**" means any contingent payment obligations that are due or owing by, on behalf of or to the Sellers, solely in respect of the operation of the Business or the Use or exploitation of Items of Product, including (i) Residuals, (ii) Participations, (iii) author royalties related to publishing assets, (iv) pension, health and welfare contributions required by the Guilds or other Persons, (v) payments due to performing rights and other collection societies, (vi) music license royalties, (vii) merchandise royalties, (viii) supplemental market payments and other Guild payments and (ix) passive payments.

"**Contract**" means any contract, agreement, license, sublicense, Lease, sales order, purchase order, instrument, undertaking or commitment, in each case whether written or oral.

"**Cure Costs**" means, with respect to any Purchased Contract, the Liabilities that must be paid or otherwise satisfied to cure all monetary defaults under such Purchased Contract to the extent required by Section 365(b) of the Bankruptcy Code in connection with the assignment and assumption of such Purchased Contract.

"**DIP Credit Agreement**" means that certain debtor-in-possession financing agreement dated as of [●], 2023, and as agreed to by and among the Debtors, the Administrative Agent (as defined therein), the lenders party thereto and the collateral agent party thereto.

"**DIP Facility**" means a superpriority senior secured debtor-in-possession financing facility as further described in the DIP Credit Agreement, as approved by the Bankruptcy Court.

"**DIP Order**" means any order of the Bankruptcy Court approving the Debtors' entry into the DIP Facility, in form and substance satisfactory to the Administrative Agent (as defined in the DIP Credit Agreement).

"**Disclosure Schedules**" means the Disclosure Schedules delivered by Sellers to Buyer on the date hereof.

"**Distributor**" means any Person that has acquired or licensed the rights to exploit (whether by broadcast, cable, satellite, home video, online, mobile or other digital distribution or otherwise) any Items of Product.

"**Encumbrance**" means any mortgage, lien, pledge, security interest, charge, easement, purchase option, interest, right of first refusal or offer, covenant, right of way, option, claim, license, restriction, title defect, or other survey defect of any kind, including any restriction on or transfer or other assignment, as security or otherwise, of or relating to use, quiet enjoyment, voting, transfer, receipt of income or exercise of any other attribute of ownership.

"**Environmental, Health and Safety Requirements**" means all applicable Laws concerning or relating to worker/occupational health and safety, or pollution or protection of the environment, including those relating to the presence, use, manufacturing, refining, production, generation, handling, transportation, treatment, recycling, transfer, storage, disposal, distribution, importing, labeling, testing, processing, discharge, release, threatened release, control or other action or failure to act involving cleanup of any Hazardous Materials.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"**ERISA Affiliate**" means any entity which is a member of (a) a controlled group of corporations (as defined in Section 414(b) of the Code), (b) a group of trades or businesses under common control (as defined in Section 414(c) of the Code), (c) an affiliated service group (as defined under Section 414(m) of the Code) or (d) any group specified in Treasury Regulations promulgated under Section 414(o) of the Code, any of which includes or included any Seller or any Purchased Entity.

"**Estimated Wind-Down Expenses**" means any and all costs and expenses of Sellers and their Subsidiaries that are incurred or are reasonably expected to be incurred (including expenses incurred or reasonably expected to be incurred during the Chapter 11 Cases (whether before, on or after the Closing)) in connection with winding down their respective entities' bankruptcy estates. For the avoidance of doubt and notwithstanding anything to the contrary, Estimated Wind-Down Expenses shall not include any other Excluded Liabilities (Seller Retained Professional Fees or otherwise) or any Taxes of any of the Sellers and their Subsidiaries.

"**Expense Reimbursement**" means an aggregate amount up to $1,500,000 for reimbursement of reasonable and documented out-of-pocket third-party expenses (including costs of government filings, attorneys' fees and expenses) incurred by Buyer in connection with the consideration, evaluation and negotiation of this Agreement and the transactions contemplated hereby; provided, that the Expense Reimbursement shall not include any third-party expenses (including attorneys' fees and expenses) incurred by Buyer (or any affiliate, assignee, or assignor thereof) that are paid pursuant to the DIP Credit Agreement or DIP Order.

"**FFCRA**" means the Families First Coronavirus Response Act, Pub. L. No. 116-127 (116th Cong.) (Mar. 18, 2020).

"**Final Order**" means a judgment or Order of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the clerk of the Bankruptcy Court (or such other court) on the docket in the Chapter 11 Cases (or the docket of such other court), which has not been modified, amended, reversed, vacated or stayed (other than such modifications or amendments that are consented in writing to by Buyer) and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, stay, reargument or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, stay, reargument or rehearing thereof has been sought, such judgment or Order of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such judgment or Order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument or rehearing shall have expired, as a result of which such judgment or Order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure; provided that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedures, or any analogous rule under the Federal Rules of Bankruptcy Procedure, may be filed relating to such judgment or Order, shall not cause such judgment or Order not to be a Final Order.

"**GAAP**" means generally accepted accounting principles in the United States.

"**GMN Cayman Dispute**" means that certain contract dispute between Vice Media LLC, Vice Distribution LLC, on the one hand, and GMN Cayman Ltd, on the other.

"**GMN Cayman Termination Deed**" means that certain Termination Deed dated as of April 26, 2023, by and between Vice Group Holding Inc., Vice Media LLC, Vice Distribution LLC and Vice Holding Inc., on the one hand, and GMN Cayman Holdco LLC and GMN Cayman Ltd, on the other.

"**Governmental Authority**" means any (a) multinational, federal, state, municipal, local or other governmental or public department, central bank, court, commission, commissioner, tribunal, board, bureau, agency or instrumentality, domestic or foreign, (b) subdivision or authority of any of the foregoing or (c) regulatory or administrative authority.

"**Group Companies**" means the Company and its Subsidiaries and the JV Entities.

"**Guild**" means any and all of the Screen Actors Guild, American Federation of Television and Radio Artists, American Federation of Musicians, Directors Guild of America, Writers Guild of America, British Equity, British Musicians Union, Alliance of Canadian Cinema Television and Radio Artists, Directors Guild of Canada and all other applicable guilds, unions, trade associations or collectives.

"**Hazardous Materials**" means any material, substance or waste defined, listed, regulated, or characterized as "hazardous" or "toxic" or a "contaminant" (or words of similar intent or meaning) pursuant to Environmental, Health and Safety Requirements, including but not be limited to petroleum and petroleum products, polychlorinated biphenyls, per-and polyfluoroalkyl substances, radioactive materials and friable asbestos.

"**HSR Act**" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the regulations promulgated thereunder.

"**Income Tax**" means any Tax measured by or imposed on overall gross or net income, profits or receipts, and franchise taxes imposed in lieu of income taxes, capital gains and similar Taxes (however denominated), including any interest, penalty or addition thereto, whether disputed or not.

"**Indebtedness**" of any Person means, without duplication, (a) the principal of and premium (if any) in respect of (i) indebtedness of such Person for money borrowed, and (ii) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable, (b) all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable for goods and services and other accrued current liabilities arising in the Ordinary Course), (c) all obligations of such Person under leases required to be capitalized in accordance with GAAP, (d) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction, (e) the liquidation value of all redeemable preferred stock of such Person, (f) any accrued PIK dividends, (g) all obligations of the type referred to in clauses (a) through (f) of any Persons for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise, including

guaranties of such obligations, and (h) all obligations of the type referred to in <u>clauses</u> <u>(a)</u> through <u>(g)</u> of other Persons secured by any Encumbrance (other than Permitted Encumbrances) on any property or asset of such Person (whether or not such obligation is assumed by such Person).

"**Intellectual Property**" means all of the following in any jurisdiction throughout the world: (i) patents, patent applications, utility models, inventor's certificates and applications for inventor's certificates, and invention disclosure statements, together with all reissuances, continuations, continuations-in-part, divisionals, revisions, extensions, and reexaminations thereof (collectively, "<u>Patents</u>"); (ii) trademarks, service marks, trade names, logos, slogans, trade dress and other source indicators and registrations and applications to register any of the foregoing, including intent-to-use registrations or similar pending reservations (as well as all goodwill associated with each of the foregoing) (collectively, "<u>Trademarks</u>"); (iii) works of authorship and copyrights (whether registered or unregistered), applications for copyright registration, and all translations, adaptations, derivations and combinations of the foregoing (collectively, "<u>Copyrights</u>"); (iv) Internet domain names, URLs, and social media identifiers and handles (collectively, "<u>Domain Names</u>"); (v) rights in software (including object code, source code, or other form), data, data sets, databases, and collections of data; (vi) trade secrets, including, to the extent the following constitute trade secrets under applicable Law, confidential information, know-how, ideas, methods, formulae, methodologies, processes, technology, customer lists and inventions ("<u>Trade Secrets</u>"); (vii) moral rights and publicity rights; and (viii) any other intellectual property rights of any kind or nature, including the right to bring suit, pursue past, current and future violations, infringements or misappropriations and collections of any of the foregoing.

"**International Trade Laws**" means all applicable United States Laws pertaining to trade and economic sanctions, export controls, and imports, including such Laws, regulations, and orders administered and enforced by the U.S. Department of the Treasury, the U.S. Department of Commerce, the U.S. Department of State, and the U.S. Customs and Border Protection agency, including the sanctions and export controls administered and enforced by the Office of Foreign Assets Control ("<u>OFAC</u>"); the United States Export Administration Act of 1979, as amended, the Export Control Reform Act of 2018, and implementing Export Administration Regulations; the Arms Export Control Act and implementing International Traffic in Arms Regulations; the anti-boycott regulations, guidelines and reporting requirements under the Export Administration Regulations and Section 999 of the Code; and any similar Laws in any other jurisdiction in which the Company or any of its Subsidiaries, or their respective agents and representatives, conduct business.

"**Internet**" means the publicly accessible worldwide system of interconnected computer networks that transmit data by packet switching using a standardized Internet protocol (e.g., TCP/IP) or any successor thereto.

"**IRS**" means the Internal Revenue Service.

"**Items of Product**" means any motion picture, television series, digital, film or video product or other audiovisual work that is developed or produced, in each case, for theatrical, non-theatrical or television release, release on the Internet or a mobile application or exploitation in any other media in any case whether recorded on film, videotape, cassette, cartridge, disc or on or by any other means, method, process or device whether now known or hereafter developed, with

respect to which a Seller (a) owns or controls any copyright interest or (b) acquires any equity interest or distribution rights; <u>provided</u>, that all episodes of any television series, Internet series, webisodes, miniseries or other episodic series for a broadcast season shall be collectively regarded as a single Item of Product.  The term "Item of Product" includes, without limitation, the scenario, screenplay, teleplay or script upon which such Item of Product is finally based, all of the properties thereof, tangible and intangible, and whether now in existence or hereafter to be made or produced, whether or not in possession of a Seller, and all rights therein and thereto, of every kind and character.

"**KEIP Agreement**" means each agreement entered into by the Company providing for awards under the Company's key employee incentive program, or any similar program.

"**KERP Agreement**" means each agreement entered into by the Company providing for awards under the Company's key employee retention program, or any similar program.

"**Knowledge of Sellers**" means the actual knowledge of the individuals set forth on Section 1.01<u>(a)</u> of the Disclosure Schedules, after reasonable inquiry.

"**Law**" means any federal, state, provincial, local, municipal, foreign or international, multinational or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, decree, proclamation, treaty, convention, rule, regulation, ruling, directive, pronouncement, determination, decision, opinion or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Authority anywhere in the world.

"**Lease**" means all leases, subleases, licenses, concessions and other agreements pursuant to which any Seller holds any Leased Real Property, including the right to all security deposits and other amounts and instruments deposited by or on behalf of the applicable Seller thereunder.

"**Leased Real Property**" any real property leased, subleased or otherwise used or occupied by a Seller, or which Seller has the right to use or occupy, pursuant to a Lease.

"**Liability**" means any and all debts, liabilities, commitments and obligations of any kind, whether fixed, contingent or absolute, matured or unmatured, liquidated or unliquidated, accrued or not accrued, asserted or not asserted, known or unknown, determined, determinable or otherwise, whenever or however arising (including whether arising out of any Contract or tort based on negligence or strict liability) and whether or not the same would be required to be reflected in financial statements or disclosed in the notes thereto.

"**Material Adverse Effect**" means any change, effect, event, circumstance, occurrence or state of facts that, individually or in the aggregate, (a) has, or would reasonably be expected to have, a material adverse effect on the Business, the Purchased Assets or the Assumed Liabilities, taken as a whole, or (b) would reasonably be expected to impair or delay, in any material respect, the ability of Sellers to consummate the transactions contemplated by this Agreement and the other Transaction Documents; <u>provided</u>, <u>however</u>, that in the case of clause (a), in no event shall any change, effect, event, circumstance, occurrence or state of facts that results from or arises out of the following be deemed to constitute, or be taken into account, in determining whether there has been, or would be, a Material Adverse Effect: (i) general changes or developments in global or

national political, economic, business, monetary, financial or capital or credit market conditions or trends; (ii) general political, economic, business, monetary, financial or capital or credit market conditions or trends (including interest rates); (iii) geopolitical conditions or any outbreak or escalation of hostilities, acts of terrorism or war, civil unrest, epidemic, pandemic, disease outbreak or other health crisis or public health event, regional, national or international emergency, or any acts of God or any other force majeure events; (iv) the failure of the financial or operating performance of any Seller or any of their respective businesses to meet any projections, forecasts, budgets estimates or predictions for any period (it being understood that the underlying cause of such failure to meet such projections, forecasts, budgets, estimates or predictions may be taken into account in determining whether a Material Adverse Effect has occurred); (v) changes in Laws first proposed after the date hereof; (vi) changes in GAAP or other accounting regulations or principles first proposed after the date hereof; (vii) the Chapter 11 Cases, including, (A) without limitation, the Auction and any announced liquidation of Sellers or any of their respective assets, and (B) any objections in the Bankruptcy Court to (1) this Agreement or any of the transactions contemplated hereby, (2) the Sale Order or the reorganization or liquidation of Sellers, (3) the Bid Procedures Order, and (4) the assumption or rejection of any Purchased Contract otherwise in compliance with this agreement; (viii) the negotiation, execution, public announcement or performance of this Agreement, provided that the exception in this clause (viii) shall not apply to that portion of any representation or warranty contained in this Agreement to the extent that the purpose of such portion of such representation or warranty is to address the consequences resulting from the negotiation, execution, public announcement or performance of this Agreement; (ix) any actions taken by the Sellers as expressly required by this Agreement, provided that the exception in this clause (ix) shall not apply to any action taken pursuant to Section 5.01; or (x) any Law issued by a Governmental Authority requiring business closures, quarantine or sheltering-in-place or similar restrictions in connection with the COVID-19 pandemic; provided, further, that in the case of clause (i), (ii), (iii), (v), (vi) or (x), to the extent that the effects of any such change, effect, event, circumstance, occurrence or state of facts is disproportionately adverse to Sellers, the Purchased Entities, their respective businesses, the Purchased Assets or the Assumed Liabilities, taken as a whole, relative to other businesses in the industries in which Sellers and the Purchased Entities operate, then such matter, event, change, development, occurrence, circumstance or effect may be taken into account in determining whether there has been or will be, a Material Adverse Effect.

"**Open Source Software**" means software that is licensed pursuant to (i) any license that is, or is substantially similar to, a license approved by the Open Source Initiative and listed at http://www.opensource.org/licenses (which licenses shall include all versions of GNU GPL, GNU LGPL, GNU Affero, GPL, MIT license, Eclipse Public License, Common Public License, CDDL, Mozilla Public License, BSD license and Apache license) and any "copyleft" license or any other license under which such software or other materials are distributed or licensed as "free software," "open source software" or under similar terms, and/or (ii) any Reciprocal License.

"**Order**" means any award, writ, injunction, judgment, order, ruling, decision, subpoena, precept, directive, consent, approval, award, decree or similar determination or finding entered, issued, made or rendered by any Governmental Authority.

"**Ordinary Course**" means the ordinary course of business consistent with past practice.

"**Pandemic Response Laws**" means the CARES Act, the FFCRA, and other any similar, additional, or future federal, state, local, or foreign Law, or administrative guidance intended to benefit taxpayers in response to the COVID-19 pandemic and associated economic downturn.

"**Participations**" means, with respect to any Item of Product, all contingent amounts (whether described as a deferment, a gross participation, a net participation, a bonus based on such Item of Product being picked up for a season or otherwise), including third-party equity participations, that a Person may be contractually obligated to pay to another Person for rights, as a return on such Person's investment or for services in connection with such Item of Product and that are based on or dependent on (i) all or any percentage of the proceeds or any portion thereof of such Item of Product (irrespective of the manner in which such proceeds are defined or computed), whether or not such payment has then become due or been made, or (ii) the achievement of a particular level of performance of such Item of Product however determined.

"**Permits**" means any franchises, permits, licenses, consents, certificates, clearances, approvals, exceptions, variances, permissions, filings, publications, declarations, notices, waivers, and authorizations, including environmental permits, of or with any Governmental Authority held, used or made by any Seller in connection with the Purchased Assets or the Assumed Liabilities.

"**Permitted Encumbrances**" means the following Encumbrances: (a) statutory liens for current Taxes that are not yet due or payable or that are being contested in good faith by appropriate Proceedings and for which adequate reserves have been established in accordance with GAAP; (b) mechanics', materialmen's, repairmen's and other statutory Encumbrances incurred in the Ordinary Course and for which adequate reserves have been established in accordance with GAAP and which would not, individually or in the aggregate, have a material impact on the business or impair the ability of the Purchased Entities to use or operate the property to which they relate; (c) Encumbrances incurred or deposits made in the Ordinary Course and on a basis consistent with past practice in connection with workers' compensation, unemployment insurance or other types of social security; (d) with respect to Leased Real Property, easements, declarations, covenants or rights-of-way, restrictions and similar non-monetary Encumbrances (that would be disclosed by an accurate survey of real property and otherwise affecting title to real property and other title defects) which do not, individually or in the aggregate, adversely affect the use or occupancy of the Leased Real Property to which they relate; (e) zoning ordinances, variances, conditional use permits and similar regulations, permits, approvals and conditions that do not materially interfere with the business as currently conducted at the applicable Leased Real Property; (f) Encumbrances that will be released at the Closing with no Liability to Buyer or its Affiliates; (g) any Encumbrance granted or incurred pursuant to an Order of the Bankruptcy Court; (h) outbound Intellectual Property licenses that are subject to Section 365(n) of the Bankruptcy Code; and (i) non-exclusive licenses of, options to license, or covenant not to assert claims of infringement, misappropriation or other violation with respect to, Intellectual Property granted in the Ordinary Course.

"**Person**" means any individual, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, unincorporated organization, estate, trust, association, organization or other legal entity or group or Governmental Authority.

"**Personal Information**" means any information that identifies, relates to, describes, is reasonably capable of being associated with, or could reasonably be linked with any individual or

household or any information defined as "personal data", "personally identifiable information" or "personal information" under any applicable Privacy Laws.

"**Post-Closing Tax Period**" means any Tax period beginning after the Closing Date and, with respect to any Straddle Period, the portion thereof beginning after the Closing Date.

"**Pre-Closing Tax Period**" means any Tax period ending on or before the Closing Date and, with respect to any Straddle Period, the portion thereof ending on the Closing Date.

"**Pre-Petition Credit Agreement**" means that certain Amended and Restated Credit and Guaranty Agreement, dated as of November 4, 2019, among the Company, certain Subsidiaries of the Company as debtors and guarantors party thereto, Fortress Credit Corp. as Administrative Agent and Wilmington Trust, National Association as Collateral Agent (as amended, amended and restated, supplemented or otherwise modified from time to time through the Petition Date).

"**Privacy Laws**" means all Laws covering privacy, data security or data protection, including the European General Data Protection Regulation of April 27, 2016 (Regulation (EU) 2016/679) and/or any implementing or equivalent national Laws (collectively, the "**GDPR**"), the UK Data Protection Act 2018 and the GDPR as incorporated into UK Law pursuant the European Union (Withdrawal) Act 2018, and the California Consumer Privacy Act of 2018 as amended by the California Privacy Rights Act of 2022.

"**Proceeding**" means any claim, demand, action, suit, inquiry, examination, audit, investigation, arbitration, mediation or proceeding by or before any Governmental Authority or any other arbitration mediation or similar proceeding by or before an arbitral body, including any related to Claims, Liabilities, preference actions and preferential transfers, Contracts, debts, breaches of fiduciary duties, accounts, bills, covenants, agreements, damages, judgments, third-party Claims, counterclaims, and cross-claims, whether known or unknown, reduced to judgment or not reduced to judgment, liquidated or unliquidated, contingent or non-contingent, matured or unmatured, disputed or undisputed, secured or unsecured, assertable directly or derivatively, existing or hereinafter arising, in Law or equity or otherwise.

"**Professional**" means any Person retained by Sellers or a statutory committee of unsecured creditors in the Chapter 11 Cases pursuant to an Order of the Bankruptcy Court under Section 327, 363 or 1103 of the Bankruptcy Code.

"**Reciprocal License**" means a license of an item of software that requires or that conditions any rights granted in such license upon: (i) the disclosure, distribution or licensing of any other software (other than such item of software in its unmodified form); (ii) a requirement that any disclosure, distribution or licensing of any other software (other than such item of software in its unmodified form) be at no charge; or (iii) a requirement that any other licensee of the software be permitted to modify, make derivative works of, or reverse-engineer any such other software (other than such item of software in its unmodified form).

"**Registered**" means issued by, registered or filed with, renewed by or the subject of a pending application before any Governmental Authority or Internet domain name registrar.

"**Release**" means any actual or threatened release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, discharge, dispersal, leaching or migration into or through the indoor or outdoor environment.

"**Residuals**" means all amounts paid or payable to or for the benefit of actors, writers, composers, directors and others, pursuant to applicable Collective Bargaining Agreements and/or any Law now or hereafter in force by reason of, and/or as a condition or consideration for, any Use or an Item of Product and/or copies of all or any part thereof, on television, supplemental markets or otherwise.

"**Sale Hearing**" means the hearing conducted by the Bankruptcy Court to approve the transactions contemplated by this Agreement pursuant to the Sale Order.

"**Sale Order**" means an Order by the Bankruptcy Court, in form and substance reasonably acceptable to Buyer and Sellers, among other things, (a) approving this Agreement, (b) authorizing the sale of the Purchased Assets to Buyer pursuant to Section 363 of the Bankruptcy Code, pursuant to the terms and conditions set forth herein, free and clear of any Claims (other than Assumed Liabilities) and Encumbrances (other than Permitted Encumbrances), (c) authorizing the assumption by, and assignment to, Buyer of the Purchased Contracts and the Assumed Liabilities pursuant to Section 365 of the Bankruptcy Code and (d) authorizing the other transactions contemplated by this Agreement.

"**Sanctioned Jurisdiction**" means a country or territory which is, or during the past five (5) years has been, the subject or target of comprehensive U.S. sanctions (as of the date of this Agreement, such jurisdictions include Cuba, Iran, North Korea, Syria, the Crimea region of Ukraine, and the so-called Donetsk People's Republic and Luhansk People's Republic regions of Ukraine).

"**Sanctioned Person**" means any Person that is the subject or target of sanctions or restrictions under International Trade Laws, including: (i) any Person identified on any applicable U.S. or non-U.S. sanctions- or export-related restricted party list, including but not limited to OFAC's Specially Designated Nationals and Blocked Persons List, List of Persons Identified as Blocked Solely Pursuant to Executive Order 13599, and Sectoral Sanctions Identifications List; the Denied Persons, Unverified, or Entity Lists, maintained by the U.S. Department of Commerce; the Debarred List or non-proliferation sanctions lists maintained by the U.S. State Department; the Consolidated List of Persons, Groups and Entities Subject to Financial Sanctions, maintained by the European Union; the Consolidated List of Assets Freeze Targets, maintained by HM Treasury (U.K.); or the UN Consolidated List, maintained by the UN Security Council Committee; or any other similar list maintained by any other Governmental Authority having jurisdiction over the Agreement; (ii) any Person that is, in the aggregate, fifty percent (50%) or greater owned, directly or indirectly, or otherwise controlled by a Person or Persons described in clause (i) so as to subject the Person to sanctions; or (iii) any Person that is organized, resident, or located in a Sanctioned Jurisdiction.

"**Seller Plan**" means any employee benefit, fringe benefit, supplemental unemployment benefit, bonus, incentive, profit sharing, termination, change of control, pension, retirement, stock option, stock purchase, stock appreciation, health, welfare, medical, dental, disability, life

insurance and similar plans, programs, arrangements or practices relating to the current or former directors, officers or employees of Sellers or any of their Affiliates (including, for avoidance of doubt, each Purchased Entity), in each case, maintained, sponsored or funded by Sellers or their Affiliates, whether written or oral, funded or unfunded, insured or self-insured, registered or unregistered.

"**Seller Retained Professional Fees**" means an aggregate amount equal to the reasonable and documented out of pocket fees and expenses incurred by Professionals retained by Sellers pursuant to section 327 of the Bankruptcy Code or any other estate professionals, in each case, to the extent such out-of-pocket fees and expenses (x) are accrued and unpaid as of the Closing Date, and (y) with respect to transaction-based fees and hourly or monthly professional fees, have been authorized to be paid by the Bankruptcy Court in orders approving retention applications or otherwise.  For the avoidance of doubt, Seller Retained Professional Fees shall not include any other Excluded Liabilities (Estimated Wind-Down Expenses or otherwise).  Notwithstanding anything to the contrary herein, the Seller Retained Professional Fees shall be limited in all respects to the amounts approved for such fees in the DIP Budget (as defined in the DIP Order).

"**Service Provider**" means a director, officer, employee or individual independent contractor.

"**Subsidiary**" means, with respect to any Person, another Person in which such Person beneficially owns, directly or indirectly, capital stock or other equity securities representing more than fifty percent (50%) of the outstanding voting stock or other equity interests; <u>provided</u> that no JV Entity shall be a Subsidiary of any Seller for purposes of this Agreement.

"**Systems**" means all of the following that are owned by, used by, or relied on by Sellers in the operation of the Business: software, software engines, computer hardware (whether general or special purpose), websites, website content and links and equipment used to process, store, maintain and operate data, database operating systems and electronic data processing, record keeping, and communications, telecommunications systems, networks, interfaces, platforms, servers, peripherals, computer systems, and other information technology infrastructure, including any outsourced systems and processes, and information and functions owned, used or provided by Sellers to the Business.

"**Tax**" means all federal, state, local or non-U.S. income, gross receipts, franchise, estimated, alternative minimum, add-on minimum, sales, use, transfer, real property gains, registration, value added, excise, natural resources, severance, stamp, occupation, premium, windfall profit, environmental, customs, duties, real property, special assessment, personal property, capital stock, social security, unemployment, disability, payroll, license, employee or other withholding tax, profits, lease, service, recording, documentary, filing, permit or authorization, gains, escheat, unclaimed property, import, export, intangibles, or any other taxes, fees, levies, assessments or charges of any kind whatsoever including any interest, penalties or additions to tax or additional amounts in respect of the foregoing.

"**Tax Return**" means any report, return, election, extension or similar document (including declarations, disclaimers, notices, disclosures, estimates, claims (including claims for refunds), real property transfer tax returns, information returns, schedules or any related or supporting

information) filed or required to be filed or submitted with respect to Taxes with any Governmental Authority in connection with the determination, assessment or collection of any Tax or the administration of any Laws or administrative requirements relating to any Tax, including any information return, claim for refund, amended return or declaration of estimated Taxes.

"**Transaction Document**" means this Agreement, the Assignment and Assumption Agreements, the Bills of Sale, the Assignment of IP, the Transition Services Agreement and any other agreements, instruments or documents entered into pursuant to, or as contemplated by, this Agreement.

"**Transfer Taxes**" means any transfer (including a direct or indirect real property transfer tax), conveyance, sales, use, value added, goods and services, filing, documentary, stamp, registration, recording, transfer or similar Taxes payable in connection with the sale or transfer of the Purchased Assets contemplated by this Agreement, including any interest, penalty or addition thereto. For the avoidance of doubt and notwithstanding anything to the contrary, Transfer Taxes shall not include any Income Taxes of the Sellers or the Group Companies arising from the transactions contemplated by this Agreement.

"**Transferred Employees**" means, collectively, (a) all employees of Sellers who accept such offers of employment and commence such employment immediately after the Closing with Buyer or its Affiliates, (b) employees of Sellers who are absent due to vacation, family leave, short-term disability or other authorized leave of absence at the Closing Date but who accept such offer of employment within ten (10) days of receiving such offer and commence such employment with Buyer or its Affiliates as of such employee's return from vacation, family leave, short-term disability or other authorized leave, provided that such return must occur within ninety (90) days after the Closing, and (c) all employees of the Purchased Entities as of the Closing Date.

"**Transition Services Agreement**" means a transition services agreement to be entered into by the Sellers and Buyer in connection with the Closing, in a form reasonably acceptable to the Sellers and Buyer.

"**Use**" means to use, reproduce, prepare derivative works based upon, distribute, perform, display, make, have made, sell, license, sublicense or otherwise exploit.

"**WARN Act**" means the Worker Adjustment and Retraining Notification Act of 1988 and all similar state and local Laws.

(b)    Each of the following terms is defined in the Section set forth opposite such term:

| Term | Section |
| --- | --- |
| 401(k) Plans | Section 7.05(d) |
| Agreement | Preamble |
| Annual Financial Statements | Section 3.21(a) |
| Allocation Schedule | Section 2.07 |
| Annual Financial Statement | Section 3.21(a) |
| Antitrust Laws | Section 3.03(b) |
| Asset Sale Election | Section 7.06(f) |
| Assignment of IP | Section 2.08(a)(iii) |

| | |
|---|---|
| Assumed Liabilities | Section 2.02 |
| Assumed Plans | Section 2.01(h) |
| Assignment and Assumption Agreements | Section 2.08(b)(ii) |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Bankruptcy Court Milestones | Section 7.10(b) |
| Bankruptcy Period | Section 12.05 |
| Bills of Sale | Section 2.08(a)(ii) |
| Business Name | Section 5.05 |
| Buyer | Preamble |
| Buyer Designee | Section 2.01 |
| Buyer Plans | Section 7.05(b) |
| Chapter 11 Cases | Recitals |
| Closing | Section 2.08 |
| Company | Preamble |
| Contract & Cure Update Schedule | Section 2.05(a) |
| Credit Bid | Section 2.06 |
| Direction Letter | Section 4.07 |
| Disputed Amount Contract | Section 2.05(f) |
| Debtors | Recitals |
| DPA | Section 3.25 |
| End Date | Section 10.01(b) |
| Excluded Assets | Section 2.03 |
| Excluded Cash | Section 2.01(j) |
| Excluded Contracts | Section 2.03(b) |
| Excluded Liabilities | Section 2.04 |
| Final Allocation Schedule | Section 2.07 |
| Financial Statements | Section 3.21(a) |
| G Reorganization | Section 11.01(a) |
| G Reorganization Election | Section 11.01(a) |
| Independent Accounting Firm | Section 2.07 |
| Interim Balance Sheet | Section 3.21(a) |
| Interim Balance Sheet Date | Section 3.21(a) |
| Interim Financial Statements | Section 3.21(a) |
| JV Entity | Section 2.01(g) |
| L5 | Section 11.01(b) |
| Material Customers | Section 3.20(a) |
| Material Distributors | Section 3.20(c) |
| Material Suppliers | Section 3.20(b) |
| Original Contract & Cure Schedule | Section 2.05(a) |
| Party or Parties | Preamble |
| Permit Approvals | Section 7.03(b) |
| Petition Date | Recitals |
| Purchased Assets | Section 2.01 |
| Purchased Contracts | Section 2.01(a) |
| Purchased Entity or Purchased Entities | Section 2.01(d) |

| | |
|---|---|
| Purchased Entities' Plans | Section 2.01(h) |
| Purchased Shares | Section 2.01(d) |
| Purchased Intellectual Property | Section 2.01(e) |
| Purchased Trademarks | Section 5.05 |
| Purchase Price | Section 2.06 |
| Real Property Leases | Section 3.12(b) |
| Records | Section 2.01(t) |
| Renewal Period | Section 10.01(b) |
| Seller or Sellers | Preamble |
| Seller Fundamental Representations | Section 8.02(a)(ii) |
| Straddle Period | Section 7.06(c) |
| Surviving Post-Closing Covenants | Section 9.01 |
| Tax Proceedings | Section 3.14(c) |
| Third-Party Participations | Section 3.24(b) |
| Title IV Plans | Section 3.15(c) |
| Transfer Consent | Section 2.05(d) |
| US Person | Section 2.08(a)(ix) |

SECTION 1.02    *Construction*.  In construing this Agreement, including the Exhibits and Schedules hereto, the following principles shall be followed: (a) the terms "herein," "hereof," "hereby," "hereunder" and other similar terms refer to this Agreement as a whole and not only to the particular Article, Section or other subdivision in which any such terms may be employed unless otherwise specified; (b) except as otherwise set forth herein, references to Articles, Sections, Disclosure Schedules, Schedules and Exhibits refer to the Articles, Sections, Disclosure Schedules, Schedules and Exhibits of this Agreement, which are incorporated in and made a part of this Agreement; (c) a reference to any Person shall include such Person's successors and assigns; (d) the word "includes" and "including" and their syntactical variants mean "includes, but is not limited to" and "including, without limitation," and corresponding syntactical variant expressions; (e) a defined term has its defined meaning throughout this Agreement, regardless of whether it appears before or after the place in this Agreement where it is defined, including in any Schedule; (f) the word "dollar" and the symbol "$" refer to the lawful currency of the United States of America; (g) unless the context of this Agreement clearly requires otherwise, words importing the masculine gender shall include the feminine and neutral genders and vice versa; (h) the words "to the extent" shall mean "the degree by which" and not "if"; (i) the word "will" will be construed to have the same meaning and effect as the word "shall," and the words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive; (j) where a word is defined herein, references to the singular will include references to the plural and vice versa; (k) all references to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless Business Days are expressly specified; (l) any reference to any agreement or Contract will be a reference to such agreement or Contract, as amended, modified, supplemented or waived; (m) any reference to any particular Code section or any Law will be interpreted to include any amendment to, revision of or successor to that section or Law regardless of how it is numbered or classified; underline{provided} that, for the purposes of the representations and warranties set forth herein, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance, with any Code section or Law, the reference to such Code section or Law means such Code section or Law as in effect at the time of such violation or non-compliance or alleged violation or non-compliance; (n) references to "written" or "in

writing" include in electronic form; (o) the headings contained in this Agreement and the other Transaction Documents are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement and the other Transaction Documents; (p) when calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded and if the last day of such period is not a Business Day, the period shall end on the next succeeding Business Day; and (q) the word "or" shall not be exclusive.

ARTICLE 2

PURCHASE AND SALE

SECTION 2.01    *Purchase and Sale*.  Subject to the entry of the Sale Order and upon the terms and subject to the conditions of this Agreement and the Sale Order, on the Closing Date, Sellers shall sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, free and clear of all Claims (other than Assumed Liabilities) and Encumbrances (other than Permitted Encumbrances), to Buyer and/or one or more other Affiliates of Buyer as designated by Buyer (a "Buyer Designee"), and Buyer shall, and shall cause its Buyer Designees (if any) to, purchase, acquire and accept from Sellers, all of Sellers' right, title and interest in assets, properties (including Purchased Intellectual Property), interests, rights and other assets of Sellers as of the Closing of every kind and nature, whether tangible or intangible (including goodwill), real, personal or mixed, known or unknown, fixed or unfixed, accrued, absolute, contingent or otherwise, wherever located and whether or not required to be reflected on a balance sheet prepared in accordance with GAAP or specifically referred to in this Agreement, including any such properties, rights, interests, and other assets acquired by Sellers after the date hereof and prior to the Closing in accordance with Section 5.01, including the following assets, properties, rights, interests and other assets of Sellers (collectively, the "Purchased Assets" and, for the avoidance of doubt, the transfer of the Purchased Shares held by any Seller to Buyer or a Buyer Designee will constitute the transfer of any Purchased Assets owned by such Purchased Entity and such Purchased Assets shall not be separately transferred other than as required by applicable Law), other than the Excluded Assets, which, notwithstanding the foregoing provisions of this Section 2.01 to the contrary, will remain, as applicable, the assets, properties, interests and rights of Sellers and their Affiliates:

(a)    subject to Section 2.05, certain specified Contracts (including Leases with respect to Leased Real Property) arising from or related to the Business or the Purchased Assets to which a Seller or Purchased Entity is a party, under which a Seller or Purchased Entity may have any rights or by which a Seller or any Purchased Entity may be bound, which Contracts are set forth on Section 2.01(a) of the Disclosure Schedules (including (i) any confidentiality or non-disclosure agreements executed by any Person for the benefit of any Seller to the extent relating to the Purchased Assets or the Assumed Liabilities and (ii) all purchase orders) (collectively, the "Purchased Contracts");

(b)    the Leased Real Property set forth on Section 2.01(b) of the Disclosure Schedules, together with any buildings, fixtures and improvements located on or attached to such real property, and all rights arising therefrom, and all tenements, hereditaments, appurtenances and other real property rights appertaining thereto;

17

(c)      all tangible assets, including machinery, equipment, computers, information management systems (including software and hardware related thereto), telephone systems, supplies and other tangible personal property owned by any Seller, including any such personal property located at any Leased Real Property and any such property on order to be delivered to any Seller;

(d)      all warranties, indemnities or guaranties from any Person with respect to any Purchased Asset, including any item of real property, personal property or equipment;

(e)      all Intellectual Property owned by Seller, including the Intellectual Property set forth on Section 2.01(e) of the Disclosure Schedules (the "Purchased Intellectual Property");

(f)      all of Sellers' direct or indirect interests (the "Purchased Shares") in the Persons listed in Section 2.01(f) of the Disclosure Schedules (each, a "Purchased Entity," and collectively, the "Purchased Entities"); provided, however, that at any time prior to the Closing, the Buyer may, in its sole discretion and by written notice to the Sellers, exclude from the definition of "Purchased Entities" any entity that is not a debtor in the Chapter 11 Cases;

(g)      all of Sellers' direct or indirect interests in each entity set forth on Section 2.01(g) of the Disclosure Schedules (each, a "JV Entity") and any Contract (including any joint venture or services agreement) related to such JV Entity; provided, however, that at any time prior to the Closing, the Buyer may, in its sole discretion and by written notice to the Sellers, exclude from the definition of "JV Entities" any entity that is not a debtor in the Chapter 11 Cases;

(h)      the Seller Plans set forth on Section 2.01(h) of the Disclosure Schedules that Buyer elects to assume, if any, in accordance with Section 7.05(c) (the "Assumed Plans") and the Seller Plans of the Purchased Entities (the "Purchased Entities' Plans"), all funding arrangements related thereto (including all assets, trusts, insurance policies and administrative service Contracts related thereto), and all rights and obligations thereunder;

(i)      all Permits set forth on Section 2.01(i) of the Disclosure Schedules;

(j)      all Cash and Cash Equivalents (other than any Cash and Cash Equivalents expressly set forth on Section 2.01(j) of the Disclosure Schedules ("Excluded Cash") in the amount necessary to cover any (i) Estimated Wind-Down Expenses, unpaid Seller Retained Professional Fees and (ii) Taxes that Sellers and Buyer reasonably agree are, or will be, due and payable by Sellers for any Pre-Closing Tax Period);

(k)      all bank accounts of Sellers, to the extent feasible using commercially reasonable efforts;

(l)      all deposits, credits, prepaid expenses, deferred charges, advance payments, refunds, rights of set-off, rights of recovery, security deposits, prepaid items and duties related to the Purchased Assets (including Purchased Contracts);

(m)      all accounts receivable, notes, negotiable instruments and chattel paper owned or held, together with any unpaid interest or fees accrued thereon or other amounts due with respect

18

thereto, and other amounts receivable from any Person before the Closing, whether or not in the Ordinary Course;

(n)     all rights of Sellers under or arising out of all insurance policies relating to the Purchased Assets or the Assumed Liabilities (including returns and refunds of any premiums paid, or amounts due back to Sellers, with respect to cancelled insurance policies);

(o)     all confidentiality, non-competition, non-solicitation or similar agreements entered into by any Seller or any of their respective representatives in connection with a sale of any Seller, any Purchased Asset (including any Purchased Entity) or any Assumed Liabilities;

(p)     all rights against any Person (including (i) customers, suppliers, vendors, lessors, lessees, licensees or licensors of any Seller and (ii) Buyer, its Affiliates or any of its or their respective directors, officers, members, partners, shareholders, managers, advisors or representatives) arising under or related to any Purchased Contract, other Purchased Asset (including any use, ownership, possession, operation, sale or lease of such other Purchased Asset) or Assumed Liability or the operation or conduct of the Business, including Proceedings, Claims, counterclaims, defenses, credits, rebates (including any vendor or supplier rebates), demands, allowances, refunds (including any Tax refunds, Tax overpayments or Tax attributes, other than any Tax refunds described in Section 2.03(i)), cash Tax deposits, rights of set off, rights of recovery (including rights to insurance proceeds), rights of subrogation, rights of recoupment, rights under or with respect to express or implied guarantees, warranties, representations, covenants, indemnities, exculpation, advancement, reimbursement of expenses or contract renewal rights and other similar rights, in each case, whether direct or derivative, known or unknown, liquidated or unliquidated, contingent or otherwise;

(q)     all of the Group Companies' avoidance claims or causes of action arising under sections 544, 547, 548, 549 and 550 of the Bankruptcy Code and any similar state Law, and all other claims, causes of action, lawsuits, judgements, privileges, counterclaims, defenses, rights of recovery, rights of set-off, rights of subrogation and all other rights of any kind under any other provision of the Bankruptcy Code or applicable Laws, including the GMN Cayman Dispute (including any rights under that certain GMN Cayman Termination Deed), actions relating to any counterparty to the Purchased Contracts or relating to the Assumed Liabilities;

(r)     all goodwill related to the Purchased Assets;

(s)     all rights of Sellers under non-disclosure or confidentiality, invention assignment, work made for hire, non-compete, or non-solicitation agreements with current or former Service Providers of any Seller;

(t)     all of the current or historical written files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies, Tax Returns related to Taxes imposed with respect to the Purchased Assets (other than income Tax Returns of the Sellers but only if the Buyer does not elect to structure the transactions contemplated by this Agreement as a G Reorganization), ledgers, journals, title policies, customer lists, supplier lists, vendor lists, price lists, mailing lists, invoices, shipping records, standard forms of documents, regulatory filings,

19

operating data and plans, research material, technical documentation (design specifications, engineering information, test results, maintenance schedules, functional requirements, operating instructions, logic manuals, processes, flow charts, *etc.*), user documentation (installation guides, user manuals, training materials, release notes, working papers, *etc.*), marketing documentation (catalogs, sales brochures, flyers, pamphlets, web pages, *etc.*), consulting materials, opinions and other documents owned by the Sellers, development, quality control, quality assurance, regulatory documents, all personnel and employment records for the Transferred Employees or any individual independent contractors of the Sellers (excluding performance assessments), and other books and records owned by the Sellers, in each case whether stored in hard copy form or on electronic, magnetic, optical or other media (collectively, the "Records"); and

(u)      all interests and rights (including any rights of indemnification) of the Company or its Subsidiaries pursuant to all promissory notes, pledge agreements, indemnities or other Contracts or Indebtedness made or issued by Shane Smith in favor of the Company or its Subsidiaries.

Notwithstanding anything to the contrary in this Agreement, (A) at any time (but in any event no later than 11:59 p.m. Pacific Time on the date that is three (3) Business Days prior to the Closing) Buyer may, in its sole discretion and by written notice to the Company, designate any of the Purchased Assets (including, for the avoidance of doubt, the Purchased Entities) as additional Excluded Assets, which notice shall set forth in reasonable detail the Purchased Assets so designated; and (B) the Liabilities of Sellers under or related to any Purchased Asset designated as an Excluded Asset pursuant to this paragraph will constitute Excluded Liabilities.

SECTION 2.02   *Assumed Liabilities*.   Upon the terms and subject to the conditions of this Agreement, Buyer agrees, effective at the time of the Closing, to assume only the following Liabilities (and no other Liabilities, which other Liabilities shall be retained by Sellers), of Sellers (the "Assumed Liabilities"):

(a)      all Liabilities relating to or arising out of the ownership or operation of the Purchased Assets (including, for the avoidance of doubt, any Liabilities for Taxes arising from the ownership or operation of the Purchased Assets in a Post-Closing Tax Period (including, with respect to any Taxes arising in a Straddle Period, the portion of such Taxes that are allocable to Buyer under Section 7.06(d))) by Buyer solely for and in respect of periods following the Closing and excluding any Excluded Liabilities;

(b)      all Liabilities with respect to the Assumed Plans and the Purchased Entities' Plans, if any;

(c)      Liabilities associated with Transferred Employees relating to (i) payroll (including salary, wages and commissions), vacation, sick leave, parental leave, long service leave, workers' compensation claims and unemployment benefits and (ii) severance, retention and termination agreements to the extent such agreements are Assumed Plans or Purchased Entities' Plans;

(d)      all Liabilities of each Seller and Purchased Entity relating to or arising out of the Purchased Contracts solely in respect of periods following the Closing and not to the extent relating

to or arising out of any breach or default thereof or other activities on or prior to the Closing and excluding any Excluded Liabilities;

(e)     all Ordinary Course current Liabilities of the Sellers attributable to the ownership or operation of the Purchased Assets in respect of the period following the Petition Date to the extent consistent with and provided for in the DIP Budget (as defined in the DIP Order) or the backup or supporting material for the DIP Budget as provided to and approved by the Required DIP Lenders (as defined in the DIP Order) and not to exceed $20,000,000 in the aggregate (which shall, for the avoidance of doubt, exclude any Excluded Liabilities);

(f)     any and all Liabilities for Transfer Taxes;

(g)     Cure Costs required to be paid pursuant to Section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Purchased Contracts; and

(h)     any other Liability expressly to be assumed by the Buyer pursuant to the Sale Order.

Notwithstanding anything to the contrary in this Agreement, at any time (but in any event no later than 11:59 p.m. Pacific Time on the date that is three (3) Business Days prior to the deadline to object to entry of the Sale Order) Buyer may, in its sole discretion and by written notice to the Company, (i) designate any of the Assumed Liabilities as additional Excluded Liabilities, which notice shall set forth in reasonable detail the Assumed Liabilities so designated, or (ii) designate any of the Excluded Liabilities as additional Assumed Liabilities, which notice shall set forth in reasonable detail the Excluded Liabilities so designated.

SECTION 2.03     *Excluded Assets*.  Notwithstanding any provision in this Agreement to the contrary, Sellers shall not be deemed to sell, transfer, assign, convey or deliver, and Sellers will retain all right, title and interest to, in and under the following assets, properties, interests and rights of Sellers and their Affiliates (whether owned, licensed, leased or otherwise) (the "Excluded Assets"):

(a)     the organizational documents, corporate records and minute books, in each case, to the extent solely pertaining to the organization, existence or capitalization of Sellers (and not involving or related in any way to the Purchased Assets or the Assumed Liabilities);

(b)     subject to Section 2.05, any Contract that is not a Purchased Contract (collectively, the "Excluded Contracts");

(c)     any Excluded Cash;

(d)     all rights that accrue or will accrue to any Seller or any of their Subsidiaries pursuant to this Agreement or any of the other Transaction Documents;

(e)     other than the Purchased Shares, all shares of capital stock or other equity interests of any Seller or any Subsidiary of any Seller;

(f)     other than the Assumed Plans and the Purchased Entities' Plans, all Seller Plans, together with all funding arrangements related thereto (including all assets, trusts, insurance

21

policies and administrative service Contracts related thereto), and all rights and obligations thereunder;

(g)    all current and prior director and officer insurance policies of the Sellers and all rights of any nature with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries;

(h)    all attorney-client privilege and attorney work-product protection of Sellers or associated with their businesses solely to the extent arising with respect to legal counsel representation of Sellers or its Affiliates or their businesses in connection with the transactions contemplated by this Agreement or any of the Transaction Documents; and

(i)    all rights to any Tax refunds, or credits (in lieu of refunds) against Tax liabilities, of Sellers that relate to Taxes that are paid by Sellers after the Closing, but solely to the extent that such Tax refunds are not attributable to a loss, credit or other tax attribute of Buyer or any of its Affiliates including, without limitation, any tax attributes of any Seller or Group Companies that would otherwise be transferred to Buyer or any of its Affiliates (including any Purchased Entity or JV Entity) pursuant to the transactions contemplated by this Agreement; provided, that if Buyer or any of its Affiliates incurs any reasonable, out-of-pocket costs or expenses (including Taxes) as a direct result of the receipt any such Tax refund or credit (in lieu of a refund), Buyer shall be entitled to retain the portion of such Tax refund or credit (in lieu of a refund) equal to the amount of such reasonable, out-of-pocket costs or expenses.

SECTION 2.04    *Excluded Liabilities*.  Notwithstanding any provision in this Agreement to the contrary, except solely for the Assumed Liabilities, Buyer shall not assume, be required to pay, perform or discharge, or be liable for any Liabilities of any Seller or Purchased Entity, of whatever nature, whether presently in existence or arising hereafter, whether or not related to the Business or the Purchased Assets, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, matured or unmatured, direct or indirect, and however arising, whether existing prior to or on the Closing Date or arising thereafter as a result of any act, omission, or circumstances taking place prior to the Closing, and Sellers shall retain and be responsible for all Liabilities of a Seller other than solely the Assumed Liabilities, including the following (the Liabilities described in this Section 2.04, collectively, the "Excluded Liabilities"):

(a)    all Liabilities for any Taxes (i) arising from or with respect to the Purchased Assets, the Assumed Liabilities or the operation of the Business that are attributable to any Pre-Closing Tax Period (including, with respect to any Taxes arising in a Straddle Period, the portion of such Taxes that are allocable to the Seller under Section 7.06(d)), (ii) imposed on or with respect to the Excluded Assets or Excluded Liabilities, (iii) of any Seller or any Affiliate (other than a Purchased Entity or a JV Entity) or predecessor of Seller for any period, including Taxes of Seller or any Affiliate (other than a Purchased Entity or a JV Entity) or predecessor of Seller that could become a liability of, or be assessed or collected against, Buyer or any of its Affiliates (including the Purchased Entities and JV Entities), or that could become an Encumbrance on the Purchased Assets, (iv) for which Seller or any of its Affiliates, the Purchased Entities and the JV Entities would be liable as a result of being a member of an affiliated, consolidated, combined or unitary group on or prior to the Closing Date, pursuant to Treasury Regulations Section 1.1502-6 or any

22

analogous or similar Law, and (v) arising in connection with the transactions contemplated by this Agreement (other than Transfer Taxes for which the Buyer is liable pursuant to this Agreement) (for the avoidance of doubt and without limitation, for purposes of this Section 2.04(a), Taxes shall include Taxes imposed as a result of transferee Liability, of being a member of an affiliated, consolidated, combined or unitary group for any period or otherwise through operation of law);

(b)    all Liabilities arising under any (i) Excluded Contract or (ii) Purchased Contract, to the extent relating to periods prior to the Closing or any actions taken or not taken by Sellers or any Purchased Entity thereunder prior to the Closing;

(c)    all Liabilities of Sellers for Indebtedness, including any intercompany Indebtedness among Sellers or due from a Purchased Entity to a Seller;

(d)    all Liabilities and other obligations of Sellers relating to or arising from any Collective Bargaining Agreement (except as required by applicable Law);

(e)    all Liabilities associated with current or former employees of the Seller or its Affiliates (other than (i) payroll (including salary, wages and commissions), vacation, sick leave, parental leave, long-service leave, workers' compensation claims and unemployment benefits of any Transferred Employees and (ii) any Liabilities arising under Assumed Plans or Purchased Entities' Plans, including severance, retention and termination agreements);

(f)    all Liabilities arising out of, relating to, or with respect to any notice pay or benefits and claims under the WARN Act with respect to any current and/or former employee arising prior to the Closing Date;

(g)    all Seller Plans (other than the Assumed Plans and the Purchased Entities' Plans), and Liabilities arising out of, relating to or with respect to any Seller Plan (other than the Assumed Plans and the Purchased Entities' Plans);

(h)    all Liabilities arising in connection with any violation of any applicable Law relating to the period prior to the Closing;

(i)    all Liabilities of Sellers arising under or pursuant to any Environmental Health and Safety Requirements, including with respect to any real property owned, operated, leased or otherwise used by Sellers, whether or not used in the Ordinary Course, including any Liabilities for noncompliance with any Environmental Health and Safety Requirements (including the Release of Hazardous Materials), in each case to the extent arising as a result of any act, omission, or circumstances taking place on or prior to the Closing, whether known or unknown as of the Closing;

(j)    all Liabilities arising out of, relating to or with respect to any Order or Proceeding involving, against or affecting any Purchased Asset, the Business, any Seller or any assets or properties of any Seller (i) commenced, filed, initiated or threatened as of the Closing or (ii) relating to facts, events or circumstances arising or occurring prior to the Closing;

(k)      any obligation of any Seller to indemnify any Person by reason of, or in connection with, the fact that such Person was a director, officer, manager, employee or agent of such Seller or any Purchased Entity or any other Person;

(l)      any Cure Costs not otherwise assumed under Section 2.02(g);

(m)      all Liabilities for: (i) costs and expenses incurred or owed in connection with the administration of the Chapter 11 Cases by Sellers (including all Estimated Wind-Down Expenses and all Seller Retained Professional Fees); and (ii) all costs and expenses incurred in connection with the negotiation, execution and consummation of the transactions contemplated under this Agreement by Sellers;

(n)      all Liabilities arising from any Proceedings whether in existence prior to, at the Closing Date or arising thereafter; and

(o)      all other Liabilities of Sellers that are not expressly included as Assumed Liabilities or that relate to an Excluded Asset, whether arising prior to or after the Closing.

SECTION 2.05    *Assignment of Contracts and Rights*.

(a)      Sellers have delivered to Buyer a schedule that contains a substantially complete list of each Contract of Sellers and Sellers' good faith estimate of the amount of Cure Costs applicable to each such Contract (the "Original Contract & Cure Schedule").  From the date on which such Original Contract & Cure Schedule is provided to Buyer through (and including) the date which is three (3) days prior to the Closing Date, promptly following any changes to the information set forth on the Original Contract & Cure Schedule (including any new Contracts to which any Seller becomes a party and any change in the Cure Cost of any Contract), or as reasonably requested by Buyer, Sellers shall provide Buyer with a schedule that updates and corrects such information (as such schedule may be amended, supplemented or otherwise modified from time to time prior to the Closing Date in accordance with the terms of this Agreement, the "Contract & Cure Update Schedule").  Sellers shall be responsible for the verification of all Cure Costs for each Purchased Contract and shall, in consultation with and subject to the consent of Buyer, use commercially reasonable efforts to establish proper Cure Costs for each Purchased Contract prior to the Closing Date.

(b)      At any time, but in no event later than one (1) Business Day prior to the Closing Date, Buyer may, by written notice to the Company, add or eliminate any Contract (including any Lease) as a Purchased Contract.  Automatically upon the addition of any Contract as a Purchased Contract in accordance with the first sentence of this Section 2.05(b), such Contract will constitute a Purchased Asset and will be assigned to Buyer under, and in accordance with the terms of, this Agreement at Closing (and, if applicable, will cease to constitute an Excluded Asset).  Automatically upon the elimination of any Contract as a Purchased Contract in accordance with the first sentence of this Section 2.05(b), such Contract will constitute an Excluded Asset and will not be assigned to Buyer, and no Liabilities arising thereunder or relating thereto shall be assumed by Buyer.  The Parties acknowledge and agree that there will be no reduction in, or increase to, the Purchase Price as a result of any addition or elimination of any Contract as a Purchased

24

Contract; provided, however, that any such addition or elimination may increase or decrease (as applicable) the extent of the Assumed Liabilities, Purchased Assets and/or Excluded Contracts.

(c)     Sellers shall use their reasonable best efforts to assign the Purchased Contracts to Buyer, including using their reasonable best efforts to take all actions required to facilitate any negotiations with the counterparties to such Purchased Contracts and to obtain an Order containing a finding that the proposed assumption and assignment of the Purchased Contracts to Buyer satisfies all requirements of Section 365 of the Bankruptcy Code.

(d)     Except as to Purchased Contracts assigned pursuant to Section 365 of the Bankruptcy Code, this Agreement shall not constitute an agreement to contribute, transfer, assign or deliver any Purchased Asset or any claim, right or benefit arising thereunder or resulting therefrom if an attempted contribution, transfer, assignment, or delivery thereof without the consent of a third party or Governmental Authority (each, a "Transfer Consent"), would conflict with, violate, constitute a breach or default under any related Contract or violate any applicable Law or in any way otherwise adversely affect the rights of Buyer or Sellers thereunder.  If such Transfer Consent is not obtained or such assignment is not attainable pursuant to Section 365 of the Bankruptcy Code, to the extent permitted and subject to any approval of the Bankruptcy Court that may be required, Sellers and Buyer will reasonably cooperate in a mutually agreeable arrangement (at Sellers' cost and expense) under which Buyer would obtain the claims, rights or benefits and assume the obligations thereunder in accordance with this Agreement without any further additional consideration.  For the avoidance of doubt, the failure to obtain any Transfer Consent with respect to any Purchased Asset shall not delay the Closing; provided that, from and after the Closing, Sellers shall use their commercially reasonable efforts to obtain such Transfer Consent for Buyer with respect to such Purchased Asset.  Upon obtaining any such Transfer Consent with respect to the applicable Purchased Asset after the Closing, such Purchased Asset shall promptly be transferred and assigned to Buyer or a Buyer Designee in accordance with the terms of this Agreement, the Sale Order, and the Bankruptcy Code without any further additional consideration.  Buyer may request, in its reasonable business judgment, certain modifications and amendments to any Contract as a condition to such Contract being designated as a Purchased Contract, and Sellers shall use their reasonable best efforts to obtain such modifications or amendments.

(e)     At Closing, pursuant to the Sale Order and the Assignment and Assumption Agreements, Sellers shall assign or cause to be assigned to Buyer (the consideration for which is included in the Purchase Price) each of the Purchased Contracts that is capable of being assigned.

(f)     If any Contract requires the payment of Cure Costs in order to be assumed pursuant to Section 365 of the Bankruptcy Code, and such Cure Costs are undetermined on the Closing Date because a non-Seller counterparty to such Contract proposed Cure Costs in an amount that is different than the amount of Cure Costs proposed by Sellers and such difference will not be resolved prior to the Closing Date (each such Contract, a "Disputed Amount Contract"), then Sellers shall provide Buyer, not less than three (3) days prior to the Closing Date, with a schedule that lists each such Disputed Amount Contract and the amount of Cure Costs that has been proposed by each such non-Seller counterparty.  If Sellers, with the consent of Buyer, and the non-Seller counterparty with respect to any Disputed Amount Contract, are unable to agree on Cure Costs for such Disputed Amount Contract prior to the Sale Hearing, solely upon Buyer's written

request, Sellers shall seek to have the amount of Cure Costs related to such Disputed Amount Contract determined by the Bankruptcy Court. Upon final determination of such Cure Costs, Buyer may elect to re-designate such Purchased Contract as an Excluded Contract. If such Purchased Contract is not so re-designated, (x) the applicable Sellers shall promptly take such steps as are reasonably necessary, including, if applicable and reasonably practicable, promptly on delivery of no less than five (5) Business Days' notice to the non-Seller counterparty to such Contract, to cause such Contract to be assumed by the applicable Seller and assigned to Buyer, including by executing and delivering to Buyer an Assignment and Assumption Agreement with respect to such Purchased Contract, and (y) Buyer shall pay the Cure Costs with respect to such Purchased Contract either (i) concurrently with their assumption and assignment thereof to Buyer or (ii) as agreed in writing by Buyer and the applicable counterparty to such Purchased Contract, and Buyer shall execute and deliver to the applicable Sellers an Assignment and Assumption Agreement with respect to such Purchased Contract; _provided_ that all undisputed Cure Costs shall be paid by Buyer as soon as reasonably practicable after Closing, unless a later term is provided for in the Ordinary Course with respect to a Purchased Contract, or as otherwise agreement with any counterparty to a Purchased Contract. Notwithstanding the foregoing, if, following the Closing, it is discovered that a Contract that should have been listed on the Original Contract & Cure Schedule or any Contract & Cure Update Schedule was not so listed, Sellers shall, to the extent Sellers are still debtors-in-possession in the Chapter 11 Cases, promptly following the discovery thereof, notify Buyer in writing of any such Contract and the Seller's good faith estimate of the amount of Cure Costs applicable to each such Contract (and if no Cure Cost is estimated to be applicable with respect to any such Contract, the amount of such Cure Cost shall be designated for such Contract as "$0.00"), and upon Buyer's request, take all actions reasonably required to assume and assign to Buyer such Contract.

SECTION 2.06   _Purchase Price_.  On the terms and subject to the conditions contained herein, the aggregate consideration for the Purchased Assets (the "Purchase Price") shall consist of (i) a credit bid of $225,000,000 pursuant to Section 363(k) of the Bankruptcy Code against certain obligations owed by Sellers under the Pre-Petition Credit Agreement and the DIP Credit Agreement as of the Closing (the "Credit Bid"), with the Credit Bid allocated _first_, to payment of any such obligations under the DIP Credit Agreement until paid in full, and _second_, to payment of any such obligations under the Pre-Petition Credit Agreement, (ii) the assumption of the Assumed Liabilities, and (iii) the payment of the Cure Costs; provided, however, that Buyer reserves the right, in its sole discretion, to increase the Purchase Price (including any component thereof), subject to the Bid Procedures Order and applicable Law.

SECTION 2.07   _Purchase Price Allocation_.  Unless Buyer elects to structure the transactions contemplated by this Agreement as a G Reorganization pursuant to Article 11, no later than one hundred twenty (120) days after the Closing Date, the Buyer shall deliver to the Company a schedule (i) allocating the Purchase Price (and any adjustments thereto as determined for U.S. federal income tax purposes) between each Seller (or, in the case of a Seller that is an entity that is treated as disregarded for U.S. federal income tax purposes, such Seller's regarded owner for U.S. federal income tax purposes), (ii) allocating the Purchase Price (and any adjustments thereto as determined for U.S. federal income tax purposes) among the Purchased Assets (and if a Purchased Asset is an equity interest in a Purchased Entity that is classified as a disregarded entity for U.S. federal income tax purposes, the assets of such Purchased Entity) and Assumed Liabilities of such Seller (or such Seller's regarded owner for U.S. federal income tax purposes), and (iii) in the event

26

that an Asset Sale Election or an election under Section 338(g) of the Code is made with respect to any Purchased Entity, allocating the "aggregate deemed asset disposition price" and/or "aggregate deemed sales price", as applicable, within the meaning of the applicable Treasury Regulations under Section 336 or Section 338 of the Code, respectively, among the assets of such Purchased Entity (such schedule, the "Allocation Schedule"). The Allocation Schedule shall be prepared in accordance with Section 1060 of the Code, the regulations promulgated thereunder, and any similar provision of applicable Law. The Allocation Schedule shall be deemed final unless the Company notifies the Buyer in writing that Seller objects to one or more items reflected in the Allocation Schedule within twenty (20) calendar days after delivery of the Allocation Schedule to Seller. In the event of any such objection, Buyer and the Company shall negotiate in good faith to resolve such dispute. If the Buyer and the Company cannot agree on the Allocation Schedule, the dispute shall be resolved by a nationality recognized accounting firm mutually acceptable to Buyer and the Company ("Independent Accounting Firm"). The expenses and fees of the Independent Accounting Firm shall be borne equally by Buyer and the Company. "Final Allocation Schedule" shall mean, as the case may be, the final Allocation Schedule agreed to by the Buyer and the Company, provided by Buyer and not objected to by the Company within twenty (20) calendar days of delivery of such price allocation, or resolved by the Independent Accounting Firm. The Parties shall (and shall cause their respective Affiliates to) file all Tax Returns, including Form 8594 (Asset Acquisition Statement under Section 1060 of the Code), in a manner consistent with the Final Allocation Schedule and shall not take (or permit any of their respective Affiliates to take) any position inconsistent therewith upon examination of any Tax Return, in any Tax refund claim, in any Proceeding related to Taxes, or otherwise unless otherwise required by determination within the meaning of Section 1313(a) of the Code (and comparable provision of state, local, or non-U.S. Laws) or other binding settlement on audit. If any taxing authority disputes the Final Allocation Schedule, the Party receiving notice of the dispute shall promptly notify the other Party hereto of such dispute and the Parties shall cooperate in good faith in responding to such dispute in order to preserve the effectiveness of the Final Allocation Schedule; provided, that, subject to the immediately succeeding proviso, nothing in this Section 2.07 shall impede the ability of any of the Parties or any of their respective Affiliates to compromise and/or settle any Proceeding relating to the Final Allocation Schedule; provided, further, that no Seller shall, and no Seller shall permit its Affiliates to, settle or compromise any such Proceeding without first providing the Buyer, in writing, with the opportunity to take control of such Proceeding and, in such event, Buyer shall be entitled to control such Proceeding at its sole cost or expense (it being understood and agreed that if Buyer elects in writing to not take control of such Proceeding, Seller may, or may permit its Affiliate to, settle or compromise such Proceeding in its sole and absolute discretion).

SECTION 2.08    *Closing*. The closing (the "Closing") of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities hereunder shall take place via the exchange of documents by mail or electronic delivery services, as soon as possible following entry of the Sale Order, but in no event later than three (3) Business Days, after satisfaction of the conditions set forth in Article 8, or at such other time or place as Buyer and the Company may agree in writing. At the Closing:

(a)    Sellers shall deliver, or cause to be delivered, to Buyer:

(i)    one or more assignment and assumption agreements, in the form attached hereto as <u>Exhibit A</u> (the "<u>Assignment and Assumption Agreements</u>"), duly executed by each applicable Seller;

(ii)    one or more bills of sale, in the form attached hereto as <u>Exhibit B</u> (the "<u>Bills of Sale</u>"), duly executed by each applicable Seller;

(iii)    one or more instruments of assignment of the Trademarks, Copyrights and Domain Names in the form attached hereto as <u>Exhibit C</u> (the "<u>Assignment of IP</u>") duly executed by each applicable Seller;

(iv)    the Transition Services Agreement, duly executed by each applicable Seller;

(v)    original stock, unit or interest certificates evidencing the Purchased Shares (if any) duly endorsed in blank or accompanied by stock powers or other instruments of transfer duly executed in blank, with any required stock transfer tax stamps affixed thereto;

(vi)    a certificate, dated as of the Closing Date, executed by a duly authorized officer of the Company certifying that the conditions set forth in <u>Section 8.02(a)</u> and <u>Section 8.02(b)</u> have been satisfied;

(vii)    copies of all Records in the possession or control of any Seller or any Affiliate thereof;

(viii)    each third-party consent, waiver, authorization or approval set forth on <u>Section 2.08(a)(viii)</u> of the Disclosure Schedules, each in form and substance acceptable to Buyer;

(ix)    (A) with respect to any Seller that is a "United States person" within the meaning of Section 7701(a)(30) of the Code (a "<u>US Person</u>"), and any Seller that is disregarded as an entity from a US Person for income tax purposes, a properly completed and executed valid IRS Form W-9 of such Seller or such Seller's regarded owner that is a US Person, as applicable, or (B) with respect to any Seller not described in <u>clause (A)</u>, a properly completed IRS Form W-8 and any applicable underlying documentation, certificates or forms, that are needed to establish a complete exemption from withholding of any Taxes under applicable Law; and

(x)    such other deeds, bills of sale, assignments, share transfer forms and other good and sufficient instruments of conveyance and assignment as Buyer deems reasonably necessary to vest in, and transfer to, Buyer all right, title and interest in, to and under the Purchased Assets (including the Purchased Shares), each in form and substance acceptable to Buyer.

(b)    Buyer shall deliver, or cause to be delivered, to the Company or to such other Person(s) as may be entitled to payment therefrom, as applicable:

(i)      any amounts contemplated to be paid to Sellers by <u>Section 4.07</u>, by wire transfer of immediately available funds, to the bank account(s) designated in writing by the Company at least three (3) Business Days prior to the Closing Date;

(ii)     the Assignment and Assumption Agreements, duly executed by Buyer or the applicable Buyer Designee;

(iii)    the Bills of Sale, duly executed by Buyer or the applicable Buyer Designee;

(iv)    the Assignment of Patents, the Assignment of Trademarks and the Assignment of Copyrights, in each case, duly executed by Buyer or the applicable Buyer Designee;

(v)     the Transition Services Agreement, duly executed by Buyer or the applicable Buyer Designee;

(vi)    a certificate, dated as of the Closing Date, executed by a duly authorized officer of Buyer certifying that the conditions set forth in <u>Section 8.03(a)</u> and <u>Section 8.03(b)</u> have been satisfied; and

(vii)   such other assignments and other good and sufficient instruments of assumption and transfer, in form satisfactory to Buyer and Sellers, as Sellers may reasonably request to transfer and assign the Purchased Assets and Assumed Liabilities to Buyer.

SECTION 2.09    *Withholding*.  Buyer shall be entitled to deduct and withhold (or cause to be deducted and withheld) from the consideration otherwise payable pursuant to this Agreement to any Person such amounts as Buyer (or any agent thereof) is required to deduct and withhold under the Code, or any Tax Law, with respect to the making of such payment; <u>provided</u>, that (i) (a) at least three (3) Business Days prior to the Closing, Buyer shall use commercially reasonable efforts to promptly notify the applicable Seller of its intention to deduct or withhold in respect of any consideration otherwise payable to Sellers (unless Buyer obtains actual knowledge of the requirement to deduct and withhold after such date, in which case, Buyer shall notify the applicable Seller as soon as reasonably practicable of such requirement) and (b) the Parties shall use commercially reasonable efforts to cooperate to eliminate or reduce any such deduction or withholding and (ii) for the avoidance of doubt, to the extent there is insufficient cash consideration from which to deduct and withhold any such amounts payable to Sellers, Seller shall pay, or cause to be paid, any such amounts prior to the due date thereof to the Buyer to enable Buyer to satisfy its withholding obligations under the Code or other applicable Tax Law.  To the extent that amounts are withheld and paid to the appropriate Governmental Authority, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of whom such deduction and withholding was made.

ARTICLE 3

REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as set forth in the Disclosure Schedules, each Seller hereby jointly and severally represents and warrants to Buyer as follows:

SECTION 3.01    *Organization and Qualification*.  Each Seller is duly organized, validly existing and in good standing (where applicable) under the Laws of its respective jurisdiction of formation or organization and, subject to the provisions of the Bankruptcy Code, has requisite power and authority to own, lease and operate its properties, where such properties are now owned, leased or operated, and conduct its business (including the Business) as currently conducted.  Each Seller is duly qualified or licensed to do business and is in good standing as a foreign corporation in each jurisdiction where such qualification is required for the ownership or operation of the Purchased Assets, except for failures to be so qualified or to be in such good standing as would not, individually or in the aggregate, have a Material Adverse Effect.

SECTION 3.02    *Authorization; Execution and Delivery; Enforceability*.  The execution, delivery and performance of this Agreement and each Transaction Document to which each Seller is a party and the consummation of the transactions contemplated hereby and thereby have been, or prior to the Closing will be, duly authorized by all necessary corporate or other action on the part of such Seller.  Each Seller has all necessary power and authority to execute and deliver this Agreement and each other Transaction Document to which such Seller is a party and to consummate the transactions contemplated hereby and thereby and to perform its obligations hereunder and thereunder.  Subject to entry of the Sale Order and any other Order necessary to consummate the transactions contemplated by this Agreement and the other Transaction Documents, this Agreement has been, and at or prior to the Closing, each Transaction Document to which each Seller is a party will be, duly and validly executed and delivered by such Seller and, assuming due authorization, execution and delivery by the other Parties and the entry of the Sale Order, this Agreement constitutes, and each other Transaction Document (when duly and validly executed and delivered) will constitute, the legal, valid and binding obligation of such Seller, enforceable against such Seller in accordance with its terms, subject to the Bankruptcy and Equity Exception.

SECTION 3.03    *Noncontravention; Consents and Approvals*.

(a)    Neither the execution and delivery by Sellers of this Agreement and each other Transaction Document to which any Seller is a party, nor the consummation of the transactions contemplated hereunder or thereunder, will, subject to entry of the Sale Order, (i) conflict with or result in a breach of the organizational documents of any Seller, (ii) violate any Law or Order to which any Seller, or its assets or properties, or any of the Purchased Assets may be subject, or (iii) conflict with, result in a breach of, constitute a default (with or without notice or lapse of time, or both) under, result in the acceleration of, create in any Person the right to accelerate, terminate, modify or cancel or require any notice under, or result in the creation of any Encumbrance (other than Permitted Encumbrances) on, any Contract to which any Seller is a party or by which any Seller, or its assets or properties, is bound or to which any of the Purchased Assets is subject, after giving effect to the Sale Order and any applicable Order of the Bankruptcy Court authorizing the assignment and assumption of any such Contract that is a Purchased Contract hereunder, except,

30

in the case of clause (ii) or (iii), for such conflicts, breaches, defaults, rights or failures to give notice as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)    Other than (i) the entry of the Sale Order, (ii) compliance with applicable requirements, clearances and waiting periods (and extensions thereof) of the HSR Act or any other Antitrust Laws, (iii) the Permit Approvals and (iv) as set forth on Section 3.03(b) of the Disclosure Schedules, no consent, waiver, approval, Order or authorization of, or declaration or filing with, or notification to, any Person or Governmental Authority is required on the part of any Seller in connection with the execution and delivery of this Agreement or any other Transaction Document which any Seller is a party, the compliance by Sellers with any of the provisions hereof or thereof, the consummation of transactions contemplated hereby or thereby or any other action by any Seller contemplated hereby or thereby (with or without notice or lapse of time, or both), except for such consents, waivers, approvals, Orders, authorizations, declarations, filings or notifications, the failure of which to obtain or make would not, individually or in the aggregate, reasonably be expected to be material to the Business, the Purchased Assets or the Assumed Liabilities, taken as a whole.

SECTION 3.04    *Purchased Entities; JV Entities.*

(a)    Section 3.04(a) of the Disclosure Schedules sets forth, with respect to each Purchased Entity, (i) the name, (ii) the jurisdiction of formation or organization, (iii) the authorized, issued and outstanding equity interests and (iv) each owner of record of the Purchased Shares of such Purchased Entity (including the Purchased Shares). The Purchased Shares have been duly authorized and validly issued, are fully paid and non-assessable (where applicable) and have not been issued in violation of any preemptive rights, rights of first offer, rights of first refusal or similar rights, and are owned beneficially, of record and with good and valid title by the applicable Seller set forth on Section 3.04(a) of the Disclosure Schedules, free and clear of any Encumbrances (other than Permitted Encumbrances).

(b)    Section 3.04(a) of the Disclosure Schedules sets forth, with respect to each Purchased Entity, any Subsidiary or any other Person in which such Purchased Entity owns, of record or beneficially, any direct or indirect equity or similar interests or any right (contingent or otherwise) to acquire any direct or indirect equity or similar interests.

(c)    No Purchased Entity is under any obligation, or is bound by any Contract pursuant to which such Purchased Entity may become obligated to, following entry of the Sale Order, (i) declare, make or pay any dividends or distributions, whether current or accumulated or due or payable or (ii) make any loan to, investment in, or capital contribution to, any Person. There are no outstanding options, warrants, calls, rights, subscriptions, arrangements, claims, commitments (contingent or otherwise) or any other agreement or Contract to which any Purchased Entity is a party, or is otherwise subject, that requires the issuance, sale or transfer of any additional shares of capital stock or other equity securities of any Purchased Entity convertible into, exchangeable for or evidencing the right to subscribe for or purchase capital stock or other equity securities of any Purchased Entity. No Seller or any Purchased Entity is a party, or is otherwise subject, to any voting trust or other voting agreement with respect to the Purchased Shares or to any agreement

31

or Contract relating to the issuance, sale, redemption, transfer, acquisition, disposition or registration of the Purchased Shares.

(d)    Section 3.04(d) of the Disclosure Schedules sets forth the capitalization of each JV Entity (provided, any ownership of a JV Entity by a Person other than the Sellers and their Affiliates shall be to the best of the Company's knowledge).  Except as set forth on Section 3.04(d) of the Disclosure Schedules, there are no other limited liability companies, partnerships, joint ventures, associations or other entities or Persons in which any Seller holds any direct or indirect equity or other interest or any right (contingent or otherwise) to acquire the same.

SECTION 3.05    *Title to and Sufficiency of Purchased Assets*.  Sellers have good and valid title to, or valid leasehold interests in, all of the Purchased Assets, free and clear of all Encumbrances (other than Permitted Encumbrances) and, at the Closing, subject to the Sale Order, Sellers will transfer, convey and assign good and valid title to, or valid leasehold interests in, the Purchased Assets (including record and beneficial ownership of the Purchased Shares) free and clear of all Encumbrances (other than Permitted Encumbrances).  Except as set forth on Section 3.05 of the Disclosure Schedules, the Purchased Assets constitute all of the material assets, properties and rights held for use or necessary to operate and conduct the Business in the Ordinary Course.

SECTION 3.06    *Litigation*.  Except as set forth on Section 3.06 of the Disclosure Schedules: (a) there are no Proceedings pending, or, to the Knowledge of Sellers, threatened against any Seller, the Purchased Assets, the Assumed Liabilities or the Business or any Order outstanding which, in each case, would adversely affect the ability of any Seller to enter into this Agreement or, following entry of the Sale Order, to consummate the transactions contemplated hereby, or which would, individually or in the aggregate, reasonably be expected to be material to the Business, the Purchased Assets or the Assumed Liabilities, taken as a whole; (b) there are no Orders outstanding (including any settlement, administrative order, decree, or agreement) with respect to which any Seller, the Purchased Assets, the Assumed Liabilities or the Business have any continuing obligation; and (c) there are no actual or threatened Proceedings with respect to which the Purchased Assets, the Assumed Liabilities or the Business may have an indemnification obligation.

SECTION 3.07    *Permits; Compliance with Laws*.

(a)    Sellers are in possession of all Permits necessary for Sellers to own, lease and operate the Purchased Assets and to carry on and operate the Business as currently conducted, except as would not, individually or in the aggregate, reasonably be expected to be material to the Business, the Purchased Assets or the Assumed Liabilities, taken as a whole.  Section 2.01(i) of the Disclosure Schedule is a true, correct and complete list of material Permits used by Sellers with respect to the Purchased Assets and the Assumed Liabilities.  Sellers are qualified under Law to transfer control and assign the Permits to Buyer, and, to the Knowledge of Sellers, there is no fact or circumstance relating to the Permits or the Sellers that would cause a Governmental Authority to deny or refrain from issuing any Permit Approval, except as would not, individually or in the aggregate, reasonably be expected to be material to the Business, the Purchased Assets or the Assumed Liabilities, taken as a whole.

32

(b)    Except as set forth in Section 3.07(b) of the Disclosure Schedules: (i) all Permits are valid and in full force and effect, except where such failure to be valid or in full force and effect would not reasonably be expected to be, individually or in the aggregate, material to the Business, the Purchased Assets or the Assumed Liabilities, taken as a whole; (ii) Sellers are, and in the last three (3) years have been, in compliance in all respects with the terms of all Permits except where such failure to be in compliance would not reasonably be expected to be, individually or in the aggregate, material to the Business, the Purchased Assets or the Assumed Liabilities, taken as a whole, and there are no Proceedings pending or, to the Knowledge of Sellers, threatened that seeks the revocation, cancellation, suspension, failure to renew or adverse modification of any Permits or that could result in the imposition of a substantial fine, forfeiture, or civil penalty against any Seller except where such Proceedings would not reasonably be expected to be, individually or in the aggregate, material to the Business, the Purchased Assets or the Assumed Liabilities, taken as a whole; (iii) Sellers have timely filed applications to renew all Permits other than such Permits for which any failure to timely file to renew would not reasonably be expected to be, individually or in the aggregate, material to the Business, the Purchased Assets or the Assumed Liabilities, taken as a whole, and no Governmental Authority has commenced, or given written notice to Sellers that it intends to commence, any Proceeding to revoke, or suspend, rescind, modify or not renew, or to impose any adverse condition on, any Permit, except as would not reasonably be expected to be, individually or in the aggregate, material to the Business, the Purchased Assets or the Assumed Liabilities, taken as a whole; (iv) Sellers have no applications pending before a Governmental Authority relating to Permits or seeking the issuance of additional Permits, except as would not reasonably be expected to be, individually or in the aggregate, material to the Business, the Purchased Assets or the Assumed Liabilities, taken as a whole; and (v) all reports and filings required to be filed with any Governmental Authority by Sellers with respect to any Permit have been timely filed and are accurate and complete, and all regulatory fees, contributions and surcharges required to be paid by Sellers with respect to the Permits have been timely paid, except as would not reasonably be expected to be, individually or in the aggregate, material to the Business, the Purchased Assets or the Assumed Liabilities, taken as a whole.

(c)    Sellers are in compliance in all respects with applicable Laws with respect to the Purchased Assets and the Assumed Liabilities, except where any non-compliance, individually or in the aggregate, has not, and would not reasonably be expected to, adversely affect the ability of any Seller to enter into this Agreement or, following entry of the Sale Order, consummate the transactions contemplated hereby, or which has not been, and would not reasonably be expected to be, individually or in the aggregate, material to the Business, the Purchased Assets or the Assumed Liabilities, taken as a whole. No Seller has received any written notice from any Governmental Authority or any Person relating to violations or alleged violations of, failure to comply with or defaults under, any Law, Order or Permits, in each case, with respect to the Purchased Assets and the Assumed Liabilities, except where any non-compliance or default, individually or in the aggregate, has not, and would not reasonably be expected to, adversely affect the ability of any Seller to enter into this Agreement or, following entry of the Sale Order, consummate the transactions contemplated hereby, or which would be expected to be, individually or in the aggregate, material to the Business, the Purchased Assets or the Assumed Liabilities, taken as a whole.

SECTION 3.08    *Material Contracts*.

(a)    Section 3.08(a) of the Disclosure Schedules sets forth a true, correct and complete list of the following Contracts relating to the Purchased Assets or the Assumed Liabilities to which any Seller is a party as of the date hereof (and Sellers have made available to Buyer true, correct and complete copies of all such Contracts, together with all amendments, modifications or supplements thereto):

(i)    any Contract relating to the formation, creation, governance, economics or control of any partnership, joint venture, strategic alliance or similar arrangement (including any joint venture or services agreement with respect to each JV Entity);

(ii)    any Contract relating to any options, rights (preemptive or otherwise), warrants, calls, convertible securities or commitments or any other agreements or arrangements with respect to any equity securities of the Purchased Entities;

(iii)    any Contract relating to (A) the Indebtedness of any Seller in excess of $1,000,000 or (B) the mortgage or pledge of, or otherwise creating an Encumbrance (other than a Permitted Encumbrance) on, any of the Purchased Assets (in each case, other than intercompany Indebtedness amongst Sellers);

(iv)    any Contract relating to the acquisition or disposition of any business, assets or properties for consideration in excess of $1,000,000 (whether by merger, sale of stock, sale of assets or otherwise) as to which any material earn-out, indemnification or deferred or contingent payment obligations remain outstanding (in each case, excluding for the avoidance of doubt, purchase of inventory in the Ordinary Course);

(v)    any Lease with respect to the Leased Real Property;

(vi)    any Contract for the lease of tangible personal property to or from any Person providing for lease payments in excess of $200,000 per annum;

(vii)    any Contract with any Material Customer;

(viii)    any Contract with any Material Supplier;

(ix)    any Contract with any Governmental Authority;

(x)    any Contract that (A) prohibits or limits the freedom of any Seller of the Business to compete in any line of business with any Person or in any geographic area or (B) contains exclusivity obligations or restrictions binding on any Seller of the Business or (C) grants any right of first refusal or right of first offer obligations or restrictions to any Person;

(xi)    any material Contract (A) under which (1) any Seller is licensed any Intellectual Property by a third party (other than non-exclusive licenses for commercially available or off-the-shelf software or software that is subject to click-through or shrink wrap agreements), or (2) any Seller grants to any third party any right to use or exploit any Purchased Intellectual Property (other than non-exclusive licenses of any Purchased Intellectual Property granted in the Ordinary Course), or (B) in which Intellectual Property

is sold, purchased, transferred or developed by or for the benefit of any Seller (other than (i) Contracts with contractors performing services for any Seller in the Ordinary Course and (ii) Contracts with employees);

(xii)     any Contract with any current employee that (i) includes annual base salary in excess of $300,000 or (ii) is not terminable at-will, has more than a sixty (60) day contractual termination notice period and provides for contractual severance benefits; and

(xiii)    any Contract that is a Collective Bargaining Agreement.

(b)     With respect to each Contract set forth on <u>Section 3.08(a)</u> of the Disclosure Schedules, (i) such Contract is in full force and effect and constitutes the legal, valid and binding of the Seller party thereto and, to the Knowledge of Sellers, the counterparty thereto, enforceable against such Seller and, to the Knowledge of Sellers, the counterparty thereto in accordance with its terms and conditions, subject to the Bankruptcy and Equity Exception; (ii) neither the Seller party thereto nor, to the Knowledge of Sellers, the counterparty thereto is in material breach or default thereof that would permit or give rise to a right of termination, modification or acceleration thereunder; and (iii) no Seller and, to the Knowledge of Sellers, no counterparty thereto, has commenced any Proceeding against any other party to such Contract or given or received any written notice of any breach or default under such Contract that has not been withdrawn or dismissed, except, in the cases of clauses (ii) and (iii), for breaches or defaults caused by or resulting from the Chapter 11 Cases.

SECTION 3.09     *Anti-Corruption, Anti-Money Laundering, and International Trade Compliance.*

(a)     The Sellers, the Purchased Assets, the Assumed Liabilities, the Business, the Company and its Subsidiaries, including any of their respective directors, executives, representatives, agents or employees, are, and have been for the past three (3) years, and to the Knowledge of Sellers, for the two (2) years immediately preceding such three (3)-year period, and continue to be in compliance with International Trade Laws, and have not taken any action that violates, evades or avoids, or attempts to violate, evade or avoid International Trade Laws.  None of the Sellers, the Purchased Assets, the Assumed Liabilities, the Business, the Company, its Subsidiaries, nor any of their respective directors, executives, or employees, or, to the knowledge of the Company, any representative or agent acting on behalf of the Company or its Subsidiaries, currently or during the past three (3) years, and to the Knowledge of Sellers, for the two (2) years immediately preceding such three (3)-year period: (i) is or has been a Sanctioned Person or has acted, directly or indirectly, on behalf of a Sanctioned Person; (ii) is unlawfully conducting or has unlawfully conducted any business or engaged in making or receiving any contribution of funds, goods or services to or for the benefit of any Sanctioned Person; or (iii) is unlawfully dealing in or has unlawfully dealt in, or otherwise engaged in, any transaction relating to, any property or interests in property of any Sanctioned Person.

(b)     None of the Sellers, the Purchased Assets, the Assumed Liabilities, the Business, the Company and its Subsidiaries have received and, after due care and inquiry, none of them are aware of any current or threatened investigation, inquiry, complaint, lawsuit, voluntary or involuntary disclosure, warning letter, penalty notice, or other regulatory action or Proceeding,

whether internal, by a government regulator or agency, or a private party, relating to any alleged violation of International Trade Laws, Anti-Corruption Laws or Anti-Money Laundering Laws, nor have the Sellers, the Purchased Assets, the Assumed Liabilities, the Business, the Company and its Subsidiaries, nor any of their employees or representatives, been convicted of violating any International Trade Laws, Anti-Corruption Laws or Anti-Money Laundering Laws.

(c)     The Sellers, the Purchased Assets, the Assumed Liabilities, the Business, the Company and its Subsidiaries have adopted and implemented policies and procedures reasonably designed to prevent, detect and deter violations of applicable International Trade Laws.

(d)     During the past three (3) years, and to the Knowledge of Sellers, for the two (2) years immediately preceding such three (3)-year period, none of the Sellers, the Purchased Assets, the Assumed Liabilities, the Business, the Company and its Subsidiaries (nor, to the knowledge of the Company, any of their respective directors, executives, representatives, agents or employees) (i) has made, offered, authorized or promised any illegal contributions, gifts, entertainment or other unlawful expenses relating to political activity, (ii) has used or is using any corporate funds for any direct or indirect unlawful payments to any foreign or domestic governmental officials or employees or any employees of a foreign or domestic government-owned entity, (iii) has violated or is violating any provision of applicable Anti-Corruption Laws or Anti-Money Laundering Laws, (iv) has made, offered, authorized or promised any payment, rebate, payoff, influence payment, contribution, gift, bribe, rebate, kickback, or any other thing of value to any government official or employee, political party or official, campaign or candidate, or official, employee or representative of any public international organization or state-owned enterprise, regardless of form, to obtain favorable treatment in obtaining or retaining business or to pay for favorable treatment already secured, (v) has established or maintained, or is maintaining, any fund of corporate monies or other properties for the purpose of supplying funds for any of the purposes described in the foregoing clause (iv), (vi) has made any bribe, unlawful rebate, payoff, influence payment, kickback or other similar payment of any nature or (vii) has violated or is violating any Law that prohibits commercial bribery, domestic corruption or money laundering and the standards established by the Financial Action Task Force on Money Laundering.

SECTION 3.10   *Intellectual Property*.

(a)     Section 3.10(a) of the Disclosure Schedules contains a complete and accurate list, as of the date hereof, of all Registered Patents, Registered Trademarks, Registered Copyrights, and Registered Domain Names comprising the Purchased Intellectual Property.  As of the date hereof, there are no outstanding or unpaid registration or maintenance fees applicable to any material Purchased Intellectual Property.

(b)     Sellers exclusively own all right, title and interest in and to the Purchased Intellectual Property, free and clear of all Encumbrances (other than Permitted Encumbrances), except as would not be material to the Business.

(c)     The Purchased Intellectual Property together with the Purchased Contracts and the rights provided under the Transition Services Agreement provide sufficient Intellectual Property for the operation of the Business as conducted by Sellers immediately prior to the Closing; provided that the foregoing representation and warranty shall not constitute or be deemed or

construed as any representation or warranty with respect to infringement, misappropriation or violation by any Seller of any Intellectual Property, which is addressed solely in Section 3.10(d) below.  The consummation of the transactions will not materially and adversely alter, impair or extinguish any rights of the Sellers in the Purchased Intellectual Property, other than due to, arising from, or in connection with any acts or circumstances of the Buyer or factors that are otherwise not within the control of Sellers.  All material Registered Purchased Intellectual Property is subsisting and, to the Knowledge of Sellers, valid and enforceable.

(d)    To the Knowledge of Sellers and except as would not be material to the Business, as of the date hereof, no Person is infringing, diluting, misappropriating or otherwise violating any Purchased Intellectual Property.  To the Knowledge of Sellers with respect to Patents and Trademarks and except as would not be material to the Business, the Purchased Intellectual Property as used by Sellers in the operation of the Business as currently conducted is not infringing, diluting, misappropriating or otherwise violating any third party's Intellectual Property and, in the past three (3) years, the Sellers have not received service of process or, to the Knowledge of Sellers, been charged in writing as a defendant in any Proceeding, nor have Sellers received written notice of any actual, alleged or threatened Claim, that alleges that any of the Purchased Intellectual Property or other Intellectual Property used by the Sellers in the current conduct of the Business infringes, dilutes, misappropriates or otherwise violating any Intellectual Property of any third party.  As of the date hereof, there is no pending Proceeding with respect to the Purchased Intellectual Property (i) to which a Seller is a party or (ii) to the Knowledge of Sellers, threatened against a Seller, in each case challenging the ownership, validity or enforceability of any such Intellectual Property (other than in connection with the Ordinary Course prosecution of Registered Purchased Intellectual Property).

(e)    Sellers take commercially reasonable measures to protect and enforce the Purchased Intellectual Property including to maintain the secrecy and confidentiality of all material Trade Secrets and confidential information included in the Purchased Intellectual Property.  To the Knowledge of Sellers, no such Trade Secrets have been disclosed or authorized to be disclosed to any Person, other than in the Ordinary Course pursuant to a written confidentiality and/or non-disclosure agreement or professional obligations of confidentiality, except as would not be expected to be, individually or in the aggregate, material to the Business, the Purchased Assets or the Assumed Liabilities, taken as a whole.  All Persons who have created, developed or conceived any material Purchased Intellectual Property have done so pursuant to a valid and enforceable written agreement that assigns to the Sellers ownership of such Intellectual Property (unless all right, title and interest in such Purchased Intellectual Property automatically vests in a Seller by operation of Law). Section 3.10(a) of the Disclosure Schedules sets forth a list of material Contracts with employees of the Company in which Intellectual Property is transferred or developed for the benefit of the Company (i) that materially deviate from the Company's form Confidential Information and Invention Assignment Agreement or (ii) pursuant to which any such employee has excluded prior inventions from assignment to the Company.

(f)    Sellers, as of the date of this Agreement are, and have at all times been, in compliance in all material respects with all applicable licenses with respect to the use by Sellers of any third-party components that constitute Open Source Software and, to the Knowledge of Sellers, none of the software forming a part of the Purchased Intellectual Property contains, incorporates, includes or is embedded with any Open Source Software or other software subject to

any Reciprocal License or other licensing regime in such a manner that would require the licensing or distribution by Sellers to any Person of any source code for such software forming a part of the Purchased Intellectual Property. Sellers have not received any written demand from any Person for disclosure of any source code for software forming a part of the Purchased Intellectual Property based on the use by the Business of any Open Source Software or other software subject to any Reciprocal License.

(g)    Sellers have taken commercially reasonable actions, consistent in all material respects with generally accepted industry standards, designed to protect the security and integrity of the proprietary software of the Business, including by implementing procedures designed to the unauthorized introduction of any virus, worm, Trojan horse or similar disabling code or program and, to the Knowledge of Sellers, there are no such contaminants in the proprietary software of the Business, except as would not be material to the Business. Sellers have implemented commercially reasonable safeguards consistent in all material respects with generally accepted industry standards designed to secure the Systems owned or controlled by the Sellers from unauthorized access or use by any third party and to ensure the continuous operation and redundancy of the Systems owned or controlled by the Sellers. To the Knowledge of Sellers, as of the date hereof, there have been no unauthorized intrusions or breaches of security with respect to the Systems by a third party, or liabilities arising therefrom, that impacted the operations of, the Business in any material respect and have not been fully remediated as of the date hereof.

(h)    Notwithstanding anything in this Agreement to the contrary, (i) the representations and warranties contained in this Section 3.10 are the only representations and warranties being made in this Agreement with respect to the validity of, the right to register, or any activity that constitutes, or otherwise relates to, infringement, misappropriation or other violation of, Intellectual Property, and (ii) no other representation or warranty contained in this Agreement shall apply to any such matters and no other representation or warranty, express or implied, is being made in respect thereof.

SECTION 3.11    *Data Privacy and Cybersecurity.*

(a)    Except as would not reasonably be expected to be, individually or in the aggregate, material to the Business, the Purchased Assets or the Assumed Liabilities, taken as a whole, the Company is, and at all times during the last three (3) years has been, in compliance with all applicable Privacy Laws, and, as of the date hereof, there is no Proceeding pending or, to the Knowledge of Sellers, threatened, concerning a violation of applicable Privacy Laws.

(b)    The Company has implemented appropriate measures, designed to comply with all data security requirements under applicable Privacy Laws in all material respects, to maintain the integrity and security of all Personal Information that is processed by the Sellers in connection with the Business. To the Knowledge of Sellers, in the last three (3) years, the Company has not experienced any incident in which such Personal Information was stolen, lost, unavailable, destroyed, altered or improperly accessed, used or disclosed without authorization, except as would not reasonably be expected be, individually or in the aggregate, material to the Business, the Purchased Assets or the Assumed Liabilities, taken as a whole. To the Knowledge of Sellers, the Purchased Assets or the Assumed Liabilities, no circumstance has arisen in which applicable

Privacy Laws would require the Company to notify a Person or Governmental Authority of any security breach or incident suffered by the Business.

SECTION 3.12    *Real Property*.

(a)    Sellers do not own any real property.

(b)    Section 3.12(b) of the Disclosure Schedules sets forth a true, correct and complete list of all leases, licenses, subleases and occupancy agreements, together with any amendments and other modifications and guaranties with respect thereto (the "Real Property Leases"), with respect to all real property leased, licensed, subleased or otherwise used or occupied by any of the Sellers as of the date hereof.  Except as set forth in Section 3.12(b) of the Disclosure Schedules: (i) Sellers have a valid leasehold or sublease interest relating to the Leased Real Property, which, upon entry of the Sale Order, shall be free and clear of all Encumbrances (other than Permitted Encumbrances); (ii) the Company has delivered or made available to the Buyer complete and accurate copies of each of the Real Property Leases; (iii) none of the Leased Real Property is subject to any sublease, sublicense or grant to any Person of any right to the use, occupancy or enjoyment of the Leased Real Property (or any portion thereof) that would materially impair the use of the Leased Real Property in the operation of the Business; (iv) none of the Leased Real Property has been damaged or destroyed without being restored or repaired as appropriate for the use and occupancy thereof; (v) all amounts due and owing under each Real Property Lease by each Seller have been paid in full; (vi) neither the Company nor any Seller has collaterally assigned or granted any other security interest in such Real Property Lease or any interest therein; (vii) there is no condemnation or other proceeding in eminent domain pending or, to the Knowledge of Sellers, threatened, affecting any Leased Real Property or any portion thereof; (viii) there is no Order outstanding or Proceeding pending or, to the Knowledge of Sellers, threatened, relating to the Leased Real Property; (ix) there are no contractual or legal restrictions that preclude or restrict the ability to use the Leased Real Property as currently used by any Seller; and (x) no Seller has received any notice of violation of any applicable Law relating to any Leased Real Property.

SECTION 3.13    *Environmental, Health and Safety Matters*.

(a)    Sellers are, and have been since January 1, 2021, in compliance with all applicable Environmental, Health and Safety Requirements with respect to the Purchased Assets and the Leased Real Property, except in any such case where the failure to be in compliance would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  Sellers possess all material Permits issued pursuant to any Environmental, Health and Safety Requirements necessary for operation of the Business or the Purchased Assets, the absence of which would not reasonably be expected to have a Material Adverse Effect.  To the Knowledge of Sellers, no Seller has received any written notice or report regarding any material violation of Environmental, Health and Safety Requirements or any material Liabilities relating to the Purchased Assets or any Leased Real Property arising under Environmental, Health and Safety Requirements.  There are no material Orders outstanding, or any Proceedings pending or, to the Knowledge of Sellers, threatened, relating to compliance with or Liability under any Environmental, Health and Safety Requirements affecting the Purchased Assets or any Leased Real Property, which would reasonably be expected to have a Material Adverse Effect.

(b)    To the Knowledge of Sellers, there are no Hazardous Materials present at any Leased Real Property and there has been no Release of Hazardous Materials on, in, or at the Leased Real Property, that would reasonably be expected to result in material Liability to any Seller under Environmental, Health and Safety Requirements or in a manner that would reasonably be expected to result in a Material Adverse Effect.

(c)    Sellers have made available to Buyer (i) all material Permits issued pursuant to any Environmental, Health and Safety Requirements for the Business or the operations of the Purchased Assets, (ii) all material documents with respect to any outstanding material Orders or any pending or threatened Proceedings involving the Business or the Purchased Assets under or relating to any Environmental, Health and Safety Requirements and (iii) all material environmental reports, studies, analyses, investigations, audits and reviews in any Seller's possession with respect to the Purchased Assets and the Leased Real Property.

SECTION 3.14    *Taxes*.

(a)    All income or other material Tax Returns required to be filed by or on behalf of the Purchased Entities, the JV Entities, Sellers or relating to the Purchased Assets or the Assumed Liabilities have been timely and properly filed (taking into account any extensions of time for filing such Tax Returns that have been properly obtained) with the appropriate Governmental Authority.  Such Tax Returns are true, correct, and complete in all material respects.  All income or other material Taxes (whether or not reflected on such Tax Returns) required to be paid by or on behalf of any Purchased Entity, JV Entity, Sellers or relating to the Purchased Assets or the Assumed Liabilities have been timely paid to the appropriate Governmental Authority in full.

(b)    The Taxes of the Company and its Subsidiaries accrued as of the Interim Balance Sheet Date do not exceed the accruals for current Taxes set forth on the balance sheet included in the Interim Balance Sheet, and no Taxes of the Sellers, Purchased Entities and JV Entities have been incurred since the Interim Balance Sheet Date other than in the Ordinary Course of the Sellers, Purchased Entities and JV Entities consistent with amounts previously paid with respect to such Taxes for similar periods in prior years, adjusted for changes in Ordinary Course operating results.  The Purchased Entities and the JV Entities currently use the accrual method of accounting for income Tax purposes.

(c)    None of the Sellers or any Purchased Entity or JV Entity is a party to or the subject of any Proceedings relating to any income or other material Taxes ("Tax Proceedings").  There are no proposed, threatened (in writing) or pending Tax Proceedings currently under discussion with any Governmental Authority against any Seller, JV Entity or any Purchased Entity with respect to income or other material Taxes.  All deficiencies asserted or assessments made or proposed against any Seller or Purchased Entity in writing with respect to any income or other material Taxes have been fully satisfied or finally withdrawn.  No Tax rulings with respect to any income or other material Taxes have been applied for or received by any Seller, Purchased Entity or JV Entity that would be binding on Buyer or any of its Affiliates following the Closing.

(d)    Within the past three (3) years, no written claim has ever been made by a Governmental Authority that Tax Returns are required to be filed by a Purchased Entity or JV Entity or otherwise in relation to the Purchased Assets or the Purchased Entities in a jurisdiction

where no such Tax Returns are currently filed, which claim has not been resolved in full or settled. No Purchased Entity or JV Entity is or has been a resident of any country for Tax purposes, or is or has had, any branch, agency, permanent establishment or other taxable presence, in any jurisdiction other than the jurisdiction in which it was organized.  No Purchased Entity or JV Entity that is incorporated or organized in a jurisdiction outside of the United States is a (i) "passive foreign investment company" within the meaning of Section 1297 of the Code or (ii) "surrogate foreign corporation" within the meaning of Section 7874(a)(2)(B) of the Code.

(e)      No Purchased Entity or JV Entity, and no Seller in respect of the Purchased Assets or Assumed Liabilities has waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to an assessment or deficiency for Taxes (other than any such extension arising as a result of obtaining an extensions of time to file a Tax Return).

(f)      No Encumbrances for Taxes (other than Permitted Encumbrances) exist with respect to any of the assets of any Purchased Entity, JV Entity or any Purchased Shares, or any of the Purchased Assets or Assumed Liabilities.

(g)      No Purchased Entity or JV Entity is a party to or bound by or has any liability for, and none of the Assumed Liabilities includes, (i) any obligation to any Person under any Tax allocation, sharing, indemnity obligation, or similar agreement, arrangement, understanding, or practice with respect to Taxes (other than any commercial agreement entered into in the Ordinary Course, the principal purpose of which is not related to Taxes), (ii) an obligation under any transfer pricing, closing, gain recognition or other agreement or arrangement or offer in compromise with any Governmental Authority that will impose any Liability on Buyer, any Purchased Entity or JV Entity (or any of their respective Affiliates) after the Closing or (iii) any obligation to pay the Taxes of any Person (including any predecessor) as a transferee or successor, by operation of Law or under Treasury Regulations Section 1.1502-6 (or any similar provision of state, local or non-U.S. Law) or by Contract (other than, solely in respect of any obligations not yet due, any commercial agreement to be entered into in the Ordinary Course, the principal purpose of which is not related to Taxes). The Purchased Entities, the JV Entities, and Sellers have timely paid any Taxes that were required to be paid pursuant to any commercial agreement entered into in the Ordinary Course, the principal purpose of which is not related to Taxes.

(h)      No Purchased Entity or JV Entity has ever been a member of an affiliated group of corporations within the meaning of Section 1504 of the Code, or a member of a combined, consolidated, unitary or other group for state, local or foreign Tax purposes (other than a group of which the Company or any of its Affiliates is the common parent).

(i)      No Purchased Entity or JV Entity has been a party to a "listed transaction" as such term is defined in Section 6707A(c)(2) of the Code and Treasury Regulations Section 1.6011-4(b).

(j)      Each Purchased Entity or JV Entity has complied in all material respects with (i) all applicable Laws relating to the withholding of Taxes and the remittance of withheld Taxes and (ii) all applicable Laws relating to information reporting and record retention (including to the extent necessary to claim any exemption from sales Tax collection and maintaining adequate and current resale certificates to support any such claimed exemptions).

(k)     No Purchased Entity or JV Entity has distributed stock of another Person, or has had its stock distributed by another Person, in a transaction that was purported or intended to be governed in whole or in part by Section 355 or 361 of the Code.

(l)     No Purchased Entity or JV Entity, or Buyer or any of its Affiliates in respect of any Purchased Asset or JV Entity, will be required to include any material item of income in, or exclude any material item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date, as a result of any (i) change in method of, or use of an improper method of, accounting for a taxable period ending on or prior to the Closing Date made prior to the Closing, (ii) "closing agreement" as described in Section 7121 of the Code (or any corresponding or similar provision of state, local or non-U.S. income Tax Law) or gain recognition agreement executed prior to the Closing, (iii) intercompany transactions or any excess loss account described in Treasury Regulations under Section 1502 of the Code (or any corresponding or similar provision of state, local or non-U.S. income Tax Law) arising on or prior to the Closing, (iv) installment sale or open transaction disposition made on or prior to the Closing, (v) prepaid amount or deferred revenue received on or prior to the Closing, (vi) investment in "United States property" within the meaning of Section 956 of the Code made on or prior to the Closing or (vii) a Pandemic Response Law.  No Purchased Entity or JV Entity has made an election under Section 965(h) of the Code.

(m)     No Purchased Entity or JV Entity is, or has been, a "U.S. real property holding corporation" within the meaning of Section 897 of the Code.

(n)     Each Group Company (other than any JV Entity) organized in the United States as a limited liability company is currently and has been classified as a disregarded entity for U.S. federal and applicable state and local Income Tax purposes at all times during the eighty-four (84)-month period preceding the date of this Agreement, and each JV Entity organized in the United States is currently and has been classified as a partnership for U.S. federal and applicable state and local Income Tax purposes at all times during the eighty-four (84)-month period preceding the date of this Agreement.

(o)     None of the Purchased Entities or JV Entities has (i) deferred any payment of Taxes otherwise due (including through any automatic extension or other grant of relief provided by a Pandemic Response Law) or (ii) sought any other benefit from any applicable Governmental Authority related to any governmental response to the COVID-19 pandemic (including any benefit provided or authorized by a Pandemic Response Law).

Notwithstanding anything to the contrary herein, each reference to "Purchased Entity" or "Purchased Entities" in each representation set forth in this Section 3.14 shall include, in addition to a reference to each Purchased Entity, a reference to a parent of an affiliated, consolidated, combined or unitary group of which a Purchased Entity or a JV Entity is a member.

SECTION 3.15     *Employee Benefits*.

(a)     Section 3.15(a) of the Disclosure Schedules contains a true, correct and complete list of all Seller Plans (or templates or forms of individual Seller Plans, to the extent individuals are party to a Seller Plan on substantially the same template or form).  With respect to each Seller

Plan, Sellers have made available to Buyer true, correct and complete copies (or templates or forms thereof) of, to the extent applicable, (i) the current plan document, including any amendments thereto, (ii) the most recent summary plan description for which such a summary plan description is required (including any material modification), (iii) any material written communication to or from any Governmental Authority, (iv) the most recently filed IRS Form 5500, (v) the most recent actuarial report, financial statement and trustee report and (vi) the most recent determination or opinion letter from the IRS with respect to any Seller Plan intended to qualify under Section 401(a) of the Code.

(b)  (i) Each Seller Plan has been and is being administered, maintained and operated in all material respects in compliance with all applicable Laws and in accordance with its terms, (ii) each Seller Plan that is intended to be "qualified" within the meaning of Section 401(a) of the Code has received or is the subject of a currently applicable favorable determination letter, opinion letter or advisory letter from the IRS, stating that its related trust is exempt from taxation under Section 501(a) of the Code, and, to the Knowledge of Sellers, no event or circumstance exists that has affected or is likely to adversely affect the qualified status of any such Seller Plan, (iii) no Seller Plan is subject to Title IV of ERISA or Part 3 of Subtitle B of Title I of ERISA, (iv) there are no Proceedings (other than routine claims for benefits) relating to any Seller Plan or the assets, fiduciaries or administrators thereof and no audit by a Governmental Authority or other Proceeding pending or, to the Knowledge of Sellers, anticipated or threatened, (v) all contributions (including all employer contributions and employee salary reduction contributions) or premium payments required to have been made to or in respect of any Seller Plan under the terms of such Seller Plan or in accordance with Law, as of the date hereof, have been timely made or reflected on the applicable financial statements, and (vi) Sellers and their Affiliates (including, for the avoidance of doubt, each Purchased Entity) have complied in all material respects with the requirements of the Patient Protection and Affordable Care Act.

(c)  No Seller or any of its Affiliates (including, for the avoidance of doubt, each Purchased Entity) has any obligation to provide or make available postemployment benefits under any Seller Plan which is a "welfare plan" (as defined in Section 3(1) of ERISA), except as may be required under COBRA or similar Law, and at the sole expense of such individual.

(d)  Except as would not result in any Liability to Buyer, (i) neither Sellers, any Purchased Entity, nor their respective ERISA Affiliates maintain or contribute to, or have any Liability in respect of any plan that is subject to Section 412 or 430 of the Code, Section 302 or 303 of ERISA or Title IV of ERISA or that is subject to Section 4063, 4064 or 4069 of ERISA ("Title IV Plans"), (ii) no Title IV Plan has failed to meet the minimum funding standard (whether or not waived) within the meaning of Section 412 of the Code or Section 302 of ERISA, (iii) no Liability under Title IV or Section 302 of ERISA has been incurred by any Seller, any Purchased Entity, or any ERISA Affiliate that has not been satisfied in full, and no condition exists that presents a risk to Sellers, the Purchased Entities or any ERISA Affiliate of incurring any such Liability, (iv) all contributions required to be made by Sellers, the Purchased Entities or any of their respective ERISA Affiliates with respect to any Title IV Plan on or prior to the Closing Date have been timely made and (v) no Seller, Purchased Entity, nor any ERISA Affiliate has now or at any time contributed to, sponsored, or maintained a "multiemployer plan" (as defined in Section 3(37) of ERISA).

(e)      The consummation of the transactions contemplated by this Agreement will not, either alone or in combination with another event, (i) increase any benefits or result in the acceleration of the timing of payment, vesting or funding of any benefits under any Seller Plan, (ii) entitle any employee or other Service Provider to any Seller, Purchased Entity or any of their Affiliates who, as of the date of this Agreement, is providing services in connection with the Purchased Assets or the Assumed Liabilities, to, or accelerate the time of payment or vesting, or increase the amount of, any compensation or benefit due any employee or other Service Provider to any Seller, Purchased Entity or any of their Affiliates who, as of the date of this Agreement, is providing services in connection with the Purchased Assets or the Assumed Liabilities, (iii) result in the triggering or imposition of any restrictions or limitations on the rights of any Seller, Purchased Entity or any of their respective ERISA Affiliates to amend or terminate any Seller Plan or (iv) result in any payment that would be nondeductible pursuant to Section 280G of the Code. Sellers, the Purchased Entities and their Affiliates have no obligation to indemnify any Person for any Tax imposed pursuant to Section 409A or 4999 of the Code.

SECTION 3.16    *Labor Matters*.

(a)      Section 3.16(a) of the Disclosure Schedules is a true, complete and correct anonymized list of employees of Sellers and the Purchased Entities as of the date hereof specifying each individual's (i) title or position, (ii) base salary and short-term cash incentive or other bonus opportunity, (iii) date of hire, (iv) Fair Labor Standards Act classification, (v) leave status, (vi) accrued paid time-off, and (vii) location (country and state).

(b)      Except as set forth on Section 3.16(b) of the Disclosure Schedules, (i) no Seller or any Purchased Entity is a party to any Collective Bargaining Agreement with respect to its employees, (ii) no employee of any Seller or any Purchased Entity is represented by any labor organization, (iii) no labor organization or group of employees of any Seller or any Purchased Entity has made a demand for recognition or request for certification that is pending as of the date hereof, nor have there been any such demands or requests in the last three (3) years and (iv) there are no representation or certification Proceedings or petitions seeking a representation election presently pending or, to the Knowledge of Sellers, threatened, to be brought or filed with the National Labor Relations Board or other labor relations tribunal involving any Seller or any Purchased Entity, nor have there been any such Proceedings in the last three (3) years.  There are no strikes, lockouts, work stoppages or slowdowns pending or, to the Knowledge of Sellers, threatened against or involving any Seller or any Purchased Entity and there has been no such event in the last three (3) years.

(c)      Except as set forth on Section 3.16(c) of the Disclosure Schedules, there are no charges, arbitrations, grievances, complaints or Proceedings pending or, to the Knowledge of Sellers, threatened against any Seller or any Purchased Entity relating to the employment or termination of employment of any individual or group of individuals by any Seller or any of its Affiliates (including, for avoidance of doubt, each Purchased Entity).

(d)      Except as set forth on Section 3.16(d) of the Disclosure Schedules, in the last three (3) years, each Group Company has complied in all material respects with all applicable Laws respecting employment and employment practices, including Laws concerning terms and

44

conditions of employment, wages and hours, immigration, classification and occupational safety and health.

(e)     Except as set forth on <u>Section 3.16(e)(i)</u> of the Disclosure Schedules, no Seller or any Purchased Entity has experienced a "plant closing" or "mass layoff" or similar group employment loss (as defined in the WARN Act) with respect to which there is any unsatisfied Liability.  <u>Section 3.16(e)(ii)</u> of the Disclosure Schedules sets forth a list, on an aggregated basis by location, of the total number of all former employees of the Seller or any Purchased Entity whose employment was terminated by the Seller or any Purchased Entity during the ninety (90) days preceding the date hereof and the location of their employment.

SECTION 3.17     *Absence of Certain Changes*.  Since December 31, 2021, other than as a result of the commencement of the Chapter 11 Cases, (a) there has not been or occurred any Material Adverse Effect and (b) there has not been, occurred or arisen any agreement, condition, action, omission or event which, if occurred or existed after the date hereof, would be prohibited (or require consent from Buyer) under <u>Section 5.01</u> with respect to the Business, the Purchased Assets or the Assumed Liabilities.

SECTION 3.18     *Insurance Policies*.  <u>Section 3.18</u> of the Disclosure Schedules sets forth each material insurance policy (other than any insurance policy that funds or relates to any Seller Plans) held by any Seller relating to the Purchased Assets or the Assumed Liabilities.  With respect to each such material insurance policy, (a) such policy is in full force and effect, and constitutes the legal, valid and binding obligation of the Seller party thereto and, to the Knowledge of Sellers, the counterparty thereto, enforceable against such Seller and, to the Knowledge of Sellers, the counterparty thereto in accordance with its terms and conditions, subject to the Bankruptcy and Equity Exception, (b) no Seller has received any written notice of cancellation or termination with respect to such policy, (c) premiums due and payable by Sellers or their Affiliates under such policy prior to the date hereof have been duly paid (or if installment payments are due, will be paid by Sellers if incurred prior to the Closing Date), and (d) there is no material claim pending under such policy except as would not reasonably be expected to be, individually or in the aggregate, material to the Business, the Purchased Assets or the Assumed Liabilities, taken as a whole.

SECTION 3.19     *Affiliate Transactions*.  No Affiliate of any Seller (other than any other Seller or any Purchased Entity) or any officer, director or employee of any Seller (a) is a party to any Contract or arrangement with any Seller having a potential or actual value or a contingent or actual Liability exceeding $150,000, other than (i) employment arrangements in the Ordinary Course and (ii) the Seller Plans, (b) has any material interest in any tangible property used by any Seller in the operation of any Purchased Asset or (c) owns any material interest in, or is an officer, director or employee of, any Person which is a Material Customer or Material Supplier.

SECTION 3.20     *Material Customers, Suppliers and Distributors*.

(a)     Section 3.20(a) of the Disclosure Schedules sets forth a true, correct and complete list of the ten (10) largest customers of the Business during the twelve (12)-month period ending on March 31, 2023 (collectively, the "<u>Material Customers</u>"), as measured by the dollar amount of revenue during such period, including the approximate total revenue of the Business from each such customer during such period.  No Material Customer has terminated, cancelled, suspended,

failed to renew, or materially reduced, or given any Seller or Purchased Entity notice, in writing or, to the Knowledge of Sellers, orally, that references its intention to terminate, cancel, suspend, fail to renew, or materially reduce, its business relationship or dealings with the Business, except for such termination, cancellation, suspension, failure to renew or reduction that would not, individually or in the aggregate, reasonably be expected to be material to the Business, the Purchased Assets or the Assumed Liabilities, taken as a whole.

(b)      Section 3.20(b) of the Disclosure Schedules sets forth a true, correct and complete list of the ten (10) largest suppliers of the Business during the twelve (12)-month period ending on March 31, 2023 (collectively, the "Material Suppliers"), as measured by the dollar amount of purchases therefrom during such period, including the approximate total purchases by the Business from each such supplier during such period.  No Material Supplier has terminated, cancelled, suspended or failed to renew, or materially reduced, or given any Seller or Purchased Entity notice, in writing or, to the Knowledge of Sellers, orally, that references its intention to terminate, cancel, suspend or fail to renew, or materially reduced, its business relationship or dealings with the Business, except for such termination, cancellation, suspension, failure to renew or reduction that would not, individually or in the aggregate, reasonably be expected to be material to the Business, the Purchased Assets or the Assumed Liabilities, taken as a whole.

(c)      Section 3.20(c) of the Disclosure Schedules sets forth a true, correct and complete list of the ten (10) largest Distributors of Items of Product, on the basis of revenues paid or payable to any Sellers or Purchased Entity during the twelve (12)-month period ending on March 31, 2023 (collectively, the "Material Distributors").  No Material Distributor has (i) terminated, cancelled, suspended or failed to renew, or given any Seller or Purchased Entity notice, in writing or, to the Knowledge of Sellers, orally, that references its intention to terminate, cancel, suspend or fail to renew, its business relationship with the Business (whether or not subject to a Contract), or (ii) materially reduced, or given any Seller or Purchased Entity notice, whether in writing or orally, that references its intention to materially reduce, its business dealings with the Business.

SECTION 3.21    *Financial Statements; Internal Controls*.

(a)      Sellers have delivered to Buyer the unaudited consolidated balance sheet of the Company and its Subsidiaries as of, and the related unaudited consolidated statements of income, stockholders' equity and cash flows for, the twelve months ended December 31, 2022 and the audited consolidated balance sheet of the Company and its Subsidiaries as of, and the related audited consolidated statements of income, stockholders' equity and cash flows for the twelve months ended December 31, 2021 (collectively, the "Annual Financial Statements").  The Annual Financial Statements have been prepared in accordance GAAP consistently applied in accordance with Sellers' and the Company's past practice throughout the periods indicated.  Sellers have also delivered to Buyer the unaudited consolidated balance sheet of the Company and its Subsidiaries as of December 31, 2022 (such date, the "Interim Balance Sheet Date", and such balance sheet, the "Interim Balance Sheet") and the unaudited consolidated statements of income, stockholder's equity and cash flows for the period then ending (collectively, the "Interim Financial Statements"). The Interim Financial Statements have been prepared in accordance with GAAP consistently applied in accordance with Sellers' and the Company's past practice except for the absence of footnotes and customary year-end adjustments.  The Annual Financial Statements and the Interim Financial Statements (together, the "Financial Statements") (i) are true, correct and complete in all

material respects, (ii) are in accordance in all material respects with the books and records of Sellers and the Company, (iii) have been prepared on a consistent basis with respect to each period covered thereunder and (iv) fairly present in all material respects the financial position of Sellers and the Company at the dates specified and the results of their operations for the period covered. The copies of the Financial Statements delivered to Buyer are true, correct and complete.

(b)     With respect to the periods addressed in the Financial Statements, the Business has maintained a system of internal controls over financial reporting designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of the Financial Statements.  To the Knowledge of Sellers, such internal controls over financial reporting are effective in (i) ensuring that material information relating to the Business is made known to the chief executive officer and the chief financial officer and (ii) providing reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP in all material respects.  The Business has no significant deficiencies or material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect in any material respect the Business's ability to record, process, summarize and report financial information.  For the last five (5) years, there has been no fraud in connection with the Business or its respective financial condition or results of operations that involved management or other employees of the Business who have a significant role in the Business's internal control over financial reporting.

SECTION 3.22     *Undisclosed Liabilities*.  Sellers have no Liabilities, whether or not required by GAAP to be reflected in a consolidated balance sheet of the Company and its Subsidiaries or disclosed in the notes thereto, other than Liabilities (a) reflected in, reserved against or otherwise described in the Interim Balance Sheet, (b) that have arisen since the Interim Balance Sheet Date in the Ordinary Course and are similar in character and amount to the Liabilities set forth in the Interim Balance Sheet, none of which would, individually or in the aggregate, reasonably be expected to be material to the Business, the Purchased Assets or the Assumed Liabilities, taken as a whole, (c) that are executory performance obligations arising under Contracts to which a Seller is a party or otherwise bound (that are not arising from a breach thereof), or (d) that are for third-party expenses incurred in connection with the transactions contemplated by this Agreement.

SECTION 3.23     *Brokers*.  Except for LionTree Advisors LLC and PJT Partners LP, the fees and expenses of which, subject to the DIP Budget (as defined in the DIP Order), will be paid by the Company on or prior to the Closing Date, no broker, finder, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission, or the reimbursement of expenses in connection therewith, in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of the Company or any of its Subsidiaries.

SECTION 3.24     *Items of Product*.

(a)     Section 3.24(a) of the Disclosure Schedules sets forth a complete and accurate list of all Items of Product in which any Seller has any right, title or interest (and also identifies the location of the best available physical materials in respect of such Items of Product), indicating

whether such Item of Product is wholly owned (other than in respect of any Ordinary Course distribution rights granted with respect thereto) and identifying the Seller that is the owner thereof.

(b)    Section 3.24(b) of the Disclosure Schedules sets forth a true, correct and complete list of all third Persons (including any employees or consultants of any Seller) who are entitled to a material Participation payable by any Seller with respect to any Item of Product (the "Third-Party Participations").

(c)    The only Third-Party Participations owed to the participants listed on Section 3.24(b) of the Disclosure Schedules are pursuant to Contracts of which the Sellers have made available true, correct and complete copies to Buyer, including as they may have been amended or modified to the date hereof.  The Sellers have complied with (or have caused the appropriate third party to comply with) all applicable material Third-Party Participations and other Contingent Payment Obligations with respect to the Items of Product.

SECTION 3.25    *TID U.S. Business*.  None of the Sellers engage in (a) the design, fabrication, development, testing, production or manufacture of one or more "critical technologies" within the meaning of the Defense Production Act of 1950, including all implementing regulations thereof (the "DPA"), for which a U.S. regulatory authorization would be required for the export, reexport, transfer (in-country), or retransfer of such critical technology; (b) the ownership, operation, maintenance, supply, manufacture, or servicing of "covered investment critical infrastructure" within the meaning of the DPA (where such activities are covered by column 2 of Appendix A to 31 C.F.R. Part 800); or (c) the maintenance or collection, directly or indirectly, of "sensitive personal data" of U.S. citizens within the meaning of the DPA, and therefore, in turn, is not a "TID U.S. business" within the meaning of 31 C.F.R. § 800.248.

SECTION 3.26    *No Other Representations or Warranties*.  Sellers acknowledge and agree that, except for the representations and warranties contained in Article 4, the certificate contemplated by Section 2.08(b)(vi) and any other Transaction Documents executed by Buyer, none of Buyer, any of its Affiliates or any of its or their respective officers, directors, employees, agents, representatives or direct or indirect equityholders make or have made any representation or warranty, express or implied, at law or in equity, as to any matter whatsoever relating to the transactions contemplated by this Agreement or with respect to the accuracy or completeness of any other information provided, or made available, to Sellers in connection with therewith, and none of the Sellers have relied on any representation or warranty other than those expressly set forth in Article 4.

ARTICLE 4

REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to each Seller as follows:

SECTION 4.01    *Corporate Existence and Power*.  Buyer is a limited liability company duly formed, validly existing and in good standing under the Laws of the State of Delaware and has all power and authority to carry on its business as presently conducted.  Buyer is duly licensed or qualified to do business and is in good standing (where such concept is recognized under

applicable Law) in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets leased by it, if any, makes such licensing or qualification necessary, except where the failure to be so licensed, qualified or in good standing would not, individually or in the aggregate, reasonably be expected to prevent or materially delay Buyer's ability to consummate the transactions contemplated by this Agreement.

SECTION 4.02    *Authorization; Execution and Delivery; Enforceability*.  The execution, delivery and performance of this Agreement and each Transaction Document to which Buyer is a party and the consummation of the transactions contemplated hereby and thereby have been, or prior to the Closing will be, duly authorized by all necessary corporate or other action on the part of Buyer.  Buyer has all necessary power and authority to execute and deliver this Agreement and each other Transaction Documents to which Buyer is a party and to consummate the transactions contemplated hereby and thereby and to perform its obligations hereunder and thereunder.  Subject to entry of the Sale Order and any other Order necessary to consummate the transactions contemplated by this Agreement and the other Transaction Documents, this Agreement has been, and at or prior to the Closing, each Transaction Document to which each Seller is a party will be, duly and validly executed and delivered by Buyer and, assuming due authorization, execution and delivery by the other Parties and the entry of the Sale Order, this Agreement constitutes, and each other Transaction Document (when duly and validly executed and delivered) will constitute, the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, subject to the Bankruptcy and Equity Exception.

SECTION 4.03    *Noncontravention; Consents and Approvals*.

(a)    Neither the execution and delivery by Buyer of this Agreement and each other Transaction Document to which Buyer is a party, nor the consummation of the transactions contemplated hereunder or thereunder, will, subject to entry of the Sale Order, (i) conflict with or result in a breach of the organizational documents of Buyer, (ii) violate any Law or Order to which Buyer or its assets and properties may be subject, (iii) conflict with, result in a breach of, constitute a default (with or without notice or lapse of time, or both) under, result in the acceleration of, create in any Person the right to accelerate, terminate, modify or cancel or require any notice under, or result in the creation of any Encumbrance (other than Permitted Encumbrances) on, any Contract to which Buyer is a party or by which Buyer or its assets and properties is bound, except, in the case of clause (ii) or (iii), for such conflicts, breaches, defaults, rights or failures to give notice as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Buyer's ability to consummate the transactions contemplated by this Agreement.

(b)    Other than (i) the entry of the Sale Order, (ii) compliance with applicable requirements of the HSR Act or any other Antitrust Laws, (iii) the Permit Approvals and (iv) as set forth on Section 4.03(b) of the Disclosure Schedules, no consent, waiver, approval, Order or authorization of, or declaration or filing with, or notification to, any Person or Governmental Authority is required on the part of any Buyer in connection with the execution and delivery of this Agreement or any other Transaction Document which Buyer is a party, the compliance by Buyer with any of the provisions hereof or thereof, the consummation of transactions contemplated hereby or thereby or any other action by Buyer contemplated hereby or thereby (with or without notice or lapse of time, or both), except for such consents, waivers, approvals, Orders, authorizations, declarations, filings or notifications, the failure of which to obtain or make would

49

not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Buyer's ability to consummate the transactions contemplated by this Agreement.

SECTION 4.04    *Availability of Funds; Solvency*.  Buyer will have sufficient funds at the Closing to pay any costs, fees and expenses which may be required to be paid by or on behalf of Buyer under this Agreement and the other Transaction Documents.  Upon consummation of the transactions contemplated by this Agreement, (a) Buyer will not be insolvent as defined in Section 101 of the Bankruptcy Code, (b) Buyer will not be left with unreasonably small capital, (c) Buyer will not have incurred debts beyond its ability to pay such debts as they mature and (d) the capital of Buyer will not be impaired.

SECTION 4.05    *Litigation*.  There are no Proceedings to which Buyer is a party pending, or, to the knowledge of Buyer, threatened against Buyer that would affect in any material respect Buyer's ability to perform its obligations under this Agreement or any other Transaction Documents or to consummate the transactions contemplated hereby or thereby.

SECTION 4.06    *Brokers*.  Except for Houlihan Lokey, no broker, finder, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission, or the reimbursement of expenses in connection therewith, in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of Buyer.

SECTION 4.07    *Credit Bid*.  On or prior to the date of this Agreement, Buyer has provided to the Company a copy of the direction letter (the "Direction Letter") delivered by the Required Lenders (as defined in the DIP Credit Agreement, and, as applicable, the Pre-Petition Credit Agreement) as holders of outstanding Indebtedness under the DIP Credit Agreement, or, as applicable, the Pre-Petition Credit Agreement, to Buyer, on or prior to the date hereof, fully authorizing Buyer to, among other things, enter into and perform and comply with this Agreement and consummate the transactions contemplated hereby, including the Credit Bid contemplated in Section 2.06.  The Buyer represents that the Direction Letter complies in all material respects with the provisions of the DIP Credit Agreement and Pre-Petition Credit Agreement.

SECTION 4.08    *Buyer's Investigation and Reliance*.  The Buyer is a sophisticated purchaser and has made its own independent investigation, review and analysis regarding the Business, the Purchased Assets, the Assumed Liabilities and the transactions contemplated hereby, which investigation, review and analysis was conducted by the Buyer together with expert advisors, including legal counsel, that it has engaged for such purpose.  The Buyer and its representatives have been provided with access to the representatives, properties, premises and records of the Sellers relating to the Business and other information requested in connection with their investigation of the Business, the Purchased Assets, the Assumed Liabilities and the transactions contemplated hereby.  In entering into this Agreement, the Buyer acknowledges that it has relied solely upon (i) the aforementioned investigation, review and analysis and (ii) the representations and warranties set forth in Article 3 (and is not relying on any other factual representations or opinions of the Sellers or its representatives).  The Buyer acknowledges that, should the Closing occur, the Buyer shall acquire the Business and the Purchased Assets without any surviving representations or warranties, on an "as is" and "where is" basis and, other than the representations and warranties set forth in Article 3, the certificate contemplated by Section 2.08(a)(vi) and any other Transaction Documents executed by the Sellers, none of the Sellers, any of their Affiliates, or

any of their respective officers, directors, employees, agents, representatives or direct or indirect equityholders make or have made any representation or warranty, express or implied, at law or in equity, as to any matter whatsoever relating to the Business, the Purchased Assets, the Assumed Liabilities or any other matter relating to the transactions contemplated by this Agreement including as to: (a) merchantability or fitness for any particular use or purpose; (b) the operation of the Business by the Buyer after the Closing in any manner; or (c) the probable success or profitability of the Business after the Closing.  Except as expressly set forth in the representations and warranties of the Sellers set forth in Article 3, the certificate contemplated by Section 2.08(a)(vi) and any other Transaction Documents executed by the Sellers, none of the Sellers, any of their Affiliates or any their respective officers, directors, employees, agents, representatives or stockholders will, except in the case of fraud or willful misrepresentation, have or be subject to any Liability or indemnification obligation to the Buyer or any other Person resulting from the distribution to the Buyer or its Affiliates or representatives of, or the Buyer's use of, any information relating to the Business or any other matter relating to the transactions contemplated by this Agreement, including any descriptive memoranda, summary business descriptions or any information, documents or material made available to the Buyer or its Affiliates or representatives, whether orally or in writing, in certain "data rooms," management presentations, functional "break-out" discussions, responses to questions submitted on behalf of the Buyer or in any other form in expectation of the transactions contemplated by this Agreement.

## ARTICLE 5

## COVENANTS OF SELLERS

SECTION 5.01   *Conduct of the Business.*

(a)     Except (w) as consented to by Buyer, which consent shall not be unreasonably withheld, (x) as required or approved by the Bankruptcy Code or any Orders entered by the Bankruptcy Court in the Chapter 11 Cases prior to the date of this Agreement, (y) solely to the extent related to (i) an Excluded Asset following 11:59 p.m. Pacific Time on the date that is three (3) Business Days prior to the Closing or (ii) an Excluded Liability following 11:59 p.m. Pacific Time on the date that is three (3) Business Days prior to the deadline to object to entry of the Sale Order, or (z) as otherwise necessary to comply with this Agreement or applicable Law, from the date hereof until the Closing Date (or the earlier termination of this Agreement pursuant to Article 10), Sellers shall use commercially reasonable efforts to conduct the Business in the Ordinary Course and maintain in all material respects the goodwill associated with the Purchased Assets and Sellers' business relationships with employees, customers, suppliers, vendors, clients, contractors and other Persons in connection with the Purchased Assets.

(b)     Without limiting the generality of the restrictions set forth in Section 5.01(a), without the prior written consent of Buyer, which consent shall not be unreasonably withheld, Sellers shall not and shall cause each of its Subsidiaries and the JV Entities to not:

(i)     sell, lease, license on an exclusive basis or otherwise encumber or dispose of any Purchased Assets, other than in the Ordinary Course;

(ii)      renew, materially amend, modify, terminate, cancel, let lapse or waive any rights under, or create any Encumbrance on, any of the Purchased Contracts or any Permits, other than in the Ordinary Course;

(iii)      change in any material respect their policies or practices regarding accounts receivable or accounts payable, except as required by Law, a change in GAAP (or authoritative interpretation thereof) or by a Governmental Authority;

(iv)      make any capital expenditures in excess of $200,000;

(v)      acquire any Person or all or substantially all of the assets of any Person or make any other investment outside the Ordinary Course;

(vi)      incur, assume or guarantee any Indebtedness or Liability of any other Person in connection with the Purchased Assets, in an amount not to exceed $200,000 outstanding at any time, other than as permitted under the DIP Facility or any Indebtedness or Liability that will be repaid or assumed by Buyer under the terms hereof or used for the Credit Bid contemplated by Section 4.07 at or prior to the Closing or constitute an Excluded Liability;

(vii)      concede, settle, pay, discharge or satisfy any Proceedings that would constitute a Purchased Asset or Assumed Liability;

(viii)      terminate, let lapse or materially amend or modify any material insurance policy maintained by any Seller or any of its Affiliates with respect to any Purchased Assets or any Assumed Liability;

(ix)      (A) sell, transfer, assign, subject to an Encumbrance (other than Permitted Encumbrances) or otherwise dispose of any Purchased Intellectual Property, other than entering into non-exclusive license agreements in the Ordinary Course or (B) abandon, cancel, let lapse, or fail to renew, continue to prosecute, protect or defend any material Purchased Intellectual Property (including any Registered Intellectual Property);

(x)      (A) fail to exercise any rights of renewal with respect to any Leased Real Property that by its terms would otherwise expire and such expiration would be material to the Business or (B) enter into any Contract for the sublease of Leased Real Property that is material to the Business;

(xi)      grant or announce any increase in the compensation, perquisites or benefits (whether through the payment of, agreement to pay or otherwise) of any employee of or other Service Provider to Sellers or their Affiliates, other than increases required by applicable Law or required by the terms of Seller Plans in effect as of the date hereof or consistent with Ordinary Course practice;

(xii)      make any changes in any accounting methods, principles or practices in connection with the Purchased Assets or the Assumed Liabilities except as required by a change in GAAP (or authoritative interpretation thereof);

(xiii)   except (i) as expressly directed by Buyer in writing or (ii) where Buyer and Seller reasonably agree the relevant action is required by applicable Law or this Agreement prior to the Seller taking any such action (with such agreement not to be unreasonably withheld, conditioned or delayed), (A) make, change, or rescind any material election or material method of accounting relating to Taxes, (B) file any material Tax Return (other than in the Ordinary Course and pursuant to applicable Law) or amend any material Tax Return, (C) enter into any closing agreement or any other agreement in respect of material Taxes with any Governmental Authority, (D) surrender any material right or claim to a refund of material Taxes or commence, settle or compromise any Tax Proceeding in respect of material Taxes, (E) consent to any extension or waiver of the statute of limitations period relating to any Taxes or Tax Returns, or (F) enter into any Tax allocation, sharing, indemnity or similar agreement or arrangement (other than any commercial agreement to be entered into in the Ordinary Course, the principal purpose of which is not related to Taxes);

(xiv)   enter into, amend, terminate or renew (A) any Contracts with any employees, except with respect to employees who make less than $250,000 in aggregate compensation per year and in a manner consistent with terms consistent with Contract forms previously provided to the Buyer, or (B) any Seller Plan or any other agreement, plan or arrangement that would be a Seller Plan if in effect on the date hereof (including any Contracts for the administration of any Seller Plan), except for in the Ordinary Course;

(xv)   transfer the employment of any employee of Sellers or their Affiliates except for in the Ordinary Course;

(xvi)   terminate the employment of any officer or other key employee of Sellers or their Affiliates other than for cause;

(xvii)   hire any individual with base annual compensation in excess of $250,000 per annum;

(xviii)  enter into, amend, terminate or negotiate to enter into any Collective Bargaining Agreement;

(xix)   except for actions taken in accordance with the Bid Procedure Orders, take, or agree to commit to assist any Person in taking, any action that (A) would reasonably be expected to result in failure of any of the conditions to the Closing or (B) would reasonably be expected to (x) impair the ability of Sellers or Buyer to consummate the Closing in accordance with the terms hereof, or (y) materially delay such consummation; or

(xx)   agree or commit to do any of the foregoing.

Notwithstanding the foregoing, without limiting the rights otherwise granted in this Article 5, nothing in this Agreement is intended to give Buyer, directly or indirectly, the right to control or direct the business or operations of the Company at any time prior to the Closing.

SECTION 5.02   *Alternative Transaction*.  Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require the Sellers or the board of directors or other

governing body of the Sellers to take any action or to refrain from taking any action to the extent the board of directors or other governing body of such Seller determines in good faith after consultation with outside legal counsel that continued performance under this Agreement (including taking any action or refraining from taking any action) would be inconsistent with the exercise of its fiduciary duties under applicable Law; provided, that Sellers shall provide Buyer written notice of any decision by Sellers, or the board of directors or other governing body of the Sellers, within two (2) Business Days of such decision, to enter into any agreement with respect to an Alternative Transaction, including without limitation any term sheet, letter of intent, support agreement, or definitive agreement.  For the avoidance of doubt, the Sellers' ability to conduct the sale process and to consider or advance alternative proposals in a manner consistent with the foregoing shall not be impaired by anything in this Agreement.

SECTION 5.03    *Access to Information*.  From the date hereof until the Closing Date (or the earlier termination of this Agreement pursuant to Article 10), Buyer shall be entitled, through its Affiliates and representatives, to have such reasonable access to and make such reasonable investigation and examination of the books and records, properties, assets, operations and personnel of Sellers relating (and solely to the extent relating) to the Purchased Assets and the Assumed Liabilities as Buyer may reasonable request.  Any such investigation and examination shall be conducted during regular business hours upon reasonable advance notice.  Each Seller shall use commercially reasonable efforts to cause its representatives to cooperate with Buyer and its Affiliates and representatives in connection with such investigations and examinations.  No Seller shall be required to afford such access to the extent that such Seller reasonably believes (after consultation with legal counsel) that doing so would: (A) result in the loss of attorney-client privilege or (B) violate any applicable Law, provided that in the case of each of subclauses (A) and (B), such Seller shall use its commercially reasonable efforts to allow for such access or disclosure in a manner that does not result in a loss of attorney-client privilege or a violation of applicable Law.

SECTION 5.04    *Bidding Protections*.  In connection with the Auction, and as set forth in the Bid Procedures Order, Sellers agree that, unless Buyer shall otherwise agree in writing, any higher bid with respect to some or all of the Purchased Assets shall be no less than the Purchase Price *plus* the Expense Reimbursement, *plus* a reasonable minimum overbid amount to be calculated by the Debtors, subject in all respects to Section 5.02 of this Agreement.

SECTION 5.05    *Name Change*.  Sellers hereby acknowledge that any and all business names which contain, in whole or in part, any Trademarks comprising the Purchased Intellectual Property ("Purchased Trademarks") shall be solely owned by Buyer as of the Closing.  As reasonably promptly as possible following the Closing, but in no event more than thirty (30) days following the Closing, each Seller shall file documents with the appropriate Governmental Authorities necessary to change its corporate name, "doing business as" name, trade name and any other similar corporate identifier (each, a "Business Name") that contains any Purchased Trademarks (or any Business Name confusingly similar thereto) to a Business Name that does not contain any Purchased Trademarks (or any Business Name confusingly similar thereto), and to supply additional information, documents and materials that may be reasonably requested by Buyer with respect to such filings. Each Seller shall also cause the names of Sellers in the caption of the Chapter 11 Cases to be changed to the new names of each Seller.  For the avoidance of doubt, except as otherwise provided in Section 3.10 of this Agreement, Buyer agrees that no Seller or any

of its Affiliates shall have any responsibility for claims by third parties arising out of, or relating to, the use by Buyer of any Purchased Trademarks from and after the Closing. Notwithstanding anything in this Agreement to the contrary, and without limiting the rights otherwise granted in this Section 5.05, the Sellers and their Affiliates shall have the right, at all times after the Closing, to (i) keep records and other historical or archived documents containing or referencing the Purchased Trademarks, (ii) use the Purchased Trademarks to the extent required by or as permitted as a fair use under applicable Law, and (iii) refer to the historical fact that the Sellers and their Affiliates previously conducted their respective businesses under the Purchased Trademarks.

ARTICLE 6

COVENANTS OF BUYER

SECTION 6.01   *Preservation of Books and Records*.  For a period of three (3) years following the Closing Date, Buyer shall provide to Sellers and their respective Affiliates and representatives (after reasonable advance notice and during regular business hours) reasonable access to, including the right to make copies of, all books and records included in and otherwise related to the Purchased Assets, to the extent necessary to permit Sellers to determine any matter relating to their respective rights and obligations hereunder or to any Pre-Closing Tax Period (for example, for purposes of preparing any Tax Return or conducting a Tax or accounting audit or any claim or litigation matter) or otherwise related to the Excluded Assets, for periods prior to the Closing and shall preserve such books and records until the latest of (a) such period as shall be consistent with Buyer's records retention policy in effect from time to time, (b) the retention period required by applicable Law, (c) the conclusion of all bankruptcy proceedings relating to the Chapter 11 Cases and (d) in the case of books and records relating to Taxes, three (3) years following the Closing Date.  Such access shall include access to any information in electronic form to the extent reasonably available.  Unless otherwise consented to in writing by Sellers (such consent not to be unreasonably withheld, conditioned or delayed), Buyer will not, for a period of three (3) years following the Closing Date, destroy, alter or otherwise dispose of any such books and records, without first offering to surrender to Sellers such books and records or any portion thereof that Buyer may intend to destroy, alter or dispose of.

SECTION 6.02   *Insurance Matters*.  From and after the Closing, the Purchased Assets, the Assumed Liabilities and the operations and assets and Liabilities in respect thereof, shall cease to be insured by any insurance policies or self-insurance programs maintained by Sellers or any of their respective Affiliates (excluding the Purchased Entities), and neither Buyer nor its Affiliates (including the Purchased Entities) shall have any access, right, title or interest to or in any such insurance policies or self-insurance programs (including to all claims and rights to make claims and all rights to proceeds) to cover the Purchased Assets, the Assumed Liabilities or the operations or assets or Liabilities in respect thereof; provided, however, that Buyer shall have the right to make claims and shall have the right to any proceeds with respect to the Purchased Assets or the Assumed Liabilities under any insurance policy for occurrence-based claims pertaining to, arising out of and inuring to the benefit of any Seller for all periods prior to the Closing, and such Seller shall use reasonable best efforts to seek the maximum recovery or allow Buyer to seek recovery (including by executing or delivering any document, agreement, instrument or other information as Buyer may reasonably request to seek such recovery) under such insurance policy, in each case, at Buyer's sole cost and expense (including, if and to the extent unpaid and otherwise payable as a result of such

recovery, any deductibles, self-insured retentions or other out-of-pocket expenses required to be paid by Buyer or to the insurer in connection therewith), and such Seller shall cooperate with Buyer's reasonable requests if Buyer seeks recovery, with respect to such matters and shall remit (or, at Buyer's request, direct any such insurer to pay directly to Buyer) any insurance proceeds actually obtained therefrom (net of such Seller's reasonable and documented out-of-pocket costs and expenses of seeking such recovery, to the extent not otherwise paid or reimbursed by Buyer) to Buyer or a Buyer Designee.

ARTICLE 7

COVENANTS OF BUYER AND SELLERS

SECTION 7.01    *Confidentiality*.

(a)    Buyer acknowledges that the confidential information provided to Buyer in connection with this Agreement, including under Section 5.03, is subject to Section 10.17 (Confidentiality) of the Pre-Petition Credit Agreement.

(b)    Sellers acknowledge that from and after the Closing, all non-public information relating to the Purchased Assets and the Assumed Liabilities will be valuable and proprietary to Buyer and its Affiliates.  Sellers agree that, from and after the Closing, unless disclosure is required under the Bankruptcy Code or other applicable Law, no Seller will, and Sellers will cause their Affiliates not to, disclose to any Person any confidential information regarding Buyer and its Affiliates, the Purchased Assets or the Assumed Liabilities; provided that (x) confidential information shall not include information that becomes generally available to the public other than through any action by any Seller or any of its Affiliates in violation this Section 7.01(b) and (y) confidential information may be used by Sellers solely to the extent necessary to defend any claims against any Seller; provided that in the case of clause (y), Sellers shall (i) disclose only that portion of such information which such member of such Seller is advised by its legal counsel is legally required to be disclosed, (ii) other than in connection with any claims involving Buyer or its Affiliates, cooperate with Buyer (at its expense) to obtain a protective order or other confidential treatment with respect to such information and (iii) other than in connection with any claims involving Buyer or its Affiliates, provide Buyer with a reasonable opportunity to review and comment on such disclosure.

SECTION 7.02    *Further Assurances*.

(a)    At and after the Closing, and without further consideration therefor, each of Sellers and Buyer shall execute and deliver such further instruments and certificates (including deeds, bills of sale, instruments of conveyance, powers of attorney, assignments, assumptions and assurances) and use commercially reasonable efforts to take, or cause to be taken, all actions, and do or cause to be done all things as may be reasonably necessary, to effectuate the purposes and intent of and consummate the transactions contemplated by this Agreement and the other Transaction Documents.  Without limitation of the foregoing, to the extent this Agreement provides that any asset or Liability of a Purchased Entity is an Excluded Asset or Excluded Liability, Sellers shall from and after the date of this Agreement take, and cause to be taken, all

actions reasonably necessary for Sellers to assume any such Excluded Assets or Excluded Liabilities from the Purchased Entities prior to the Closing.

(b)    The Parties agree to (and shall cause each of their respective Affiliates to) provide each other with such information and assistance as is reasonably necessary for the preparation of any Tax Returns or for the defense of any Tax claim or assessment, whether in connection with an audit or otherwise, relating to the Purchased Assets, the Purchased Entities and the Assumed Liabilities, including the furnishing or making available on a timely basis of records, personnel (as reasonably required), books of account, or other necessary materials.

(c)    Each Party will, as promptly as reasonably practicable following the date hereof, negotiate in good faith to enter into the Transition Services Agreement with the other Party; provided that any services that Buyer may be obligated to provide to any Seller thereunder shall be limited to reasonable assistance reasonably requested by Sellers with respect to certain wind-down activities, all on terms and conditions to be mutually and reasonably agreed among the parties in the Transition Services Agreement.

SECTION 7.03    *Certain Filings*.

(a)    Sellers and Buyer shall cooperate with one another (i) with respect to their obligations set forth in Section 7.03(b), (ii) in determining whether any action by or in respect of, or filing with, any Governmental Authority is required, or any actions, consents, approvals or waivers are required to be obtained from parties to any material Contracts, in connection with the consummation of the transactions contemplated by this Agreement and the other Transaction Documents and (iii) in taking such actions or making any such filings, furnishing information required in connection therewith and seeking timely to obtain any such actions, consents, approvals or waivers.

(b)    Buyer and the Company shall use their commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary under applicable Law to consummate and make effective the transactions contemplated by this Agreement, including filing, or causing to be filed, as promptly as practicable, (i) any required notification and report forms under the HSR Act or any other Antitrust Laws with the applicable Governmental Authority and (ii) any applications, notices, reports, disclosures or other filings related to the Permits with the applicable Governmental Authority that are necessary or advisable in connection with the consummation of the transactions contemplated by this Agreement, including all such filings in connection with the consents, waivers, approvals, Orders and authorizations of any Person or Governmental Authority as set forth on Section 7.03(b) of the Disclosure Schedules (such applications, notices, reports, disclosures or other filings related to the Permits, the "Permit Approvals"); provided, however, that no Party shall be obligated to pay any consideration to any third party from whom consent or approval is requested under any Contract.  Buyer and the Company shall consult with each other as to the appropriate time of filing such notifications and shall agree upon the timing of such filings.

(c)    Subject to appropriate confidentiality safeguards, each Party shall (i) respond promptly to any request for additional information, documents or other materials made by any Governmental Authority with respect to any filings or any of the transactions contemplated by this

Agreement, (ii) promptly notify counsel to the other Party of, any communications from or with any Governmental Authority in connection with any of the transactions contemplated by this Agreement and, to the extent reasonably practicable, enable counsel to the other Party to participate in any such communications, (iii) not participate in any prescheduled telephonic or in-person meeting with any Governmental Authority in connection with any of the transactions contemplated by this Agreement unless such Party consults with counsel to the other Party in advance and, to the extent permitted by such Governmental Authority, gives the other Party a reasonable opportunity to attend, participate and speak thereat, (iv) furnish such information and assistance as may be reasonably requested in connection with the preparation of necessary filings or submission of information to the applicable Governmental Authority and provide counsel to the other Party the opportunity to review in advance any document, opinion or proposal to be made or submitted to any Governmental Authority, (v) use its commercially reasonable efforts to defend all Proceedings to which it or any of its affiliates is a party challenging or affecting this Agreement or the consummation of the transactions contemplated hereby, in each case until the issuance of a final, non-appealable Order with respect to each such Proceeding, (vi) use its commercially reasonable efforts to seek to have lifted or rescinded any injunction or restraining order which may adversely affect the ability of the Parties to consummate the transactions contemplated by this Agreement, in each case until the issuance of a final, non-appealable Order with respect thereto and (vii) take commercially reasonable measures to resolve any objection or assertion by any Governmental Authority challenging this Agreement or the transactions contemplated hereby. Sellers and Buyer shall use their commercially reasonable efforts to cause the waiting periods under the HSR Act and any other Antitrust Laws to terminate or expire at the earliest possible date after the date of filing and to obtain all Permit Approvals as promptly as practicable. Notwithstanding anything to the contrary herein or otherwise, (x) none of Buyer's Affiliates or equityholders shall be required to, or be required to agree to, (A) sell, hold, divest, discontinue or limit, before or after the Closing Date, any of their respective assets, businesses or interests or (B) any conditions relating to, or changes or restrictions in, the operations of any of their respective assets, businesses or interests, and (y) Buyer shall not be obligated to agree to any material restriction on any Person or the Business and neither any Seller nor any Affiliate thereof shall agree to any material restriction on any Person or the Business without the prior written consent of Buyer.  Buyer and Seller shall be jointly responsible for all filing fees relating to this Section 7.03, and such filing fees will be equally divided between Buyer, on the one hand, and Sellers, on the other hand.

(d)     Notwithstanding anything to the contrary herein or otherwise, (i) Buyer shall determine strategy and timing, lead all Proceedings and coordinate all activities with respect to seeking Permit Approvals and shall consult with the Company regarding the foregoing, (ii) the Company shall, and shall cause each Seller to, use its commercially reasonable efforts to take such actions as reasonably requested by Buyer, after consultation with the Company, in connection with obtaining any such Permit Approvals and (iii) unless otherwise provided for under the Transition Services Agreement, Buyer shall use its commercially reasonable efforts to seek to obtain any Permits that are subject to a Permit Approval that are not transferrable and that are required to conduct the business of the Company and its Subsidiaries in the Ordinary Course; provided, however, that neither Buyer nor the Sellers shall be obligated to pay any material consideration to any Person to obtain any such replacement Permits.

(e)    If any Permit Approval is not obtained prior to the Closing, then, until the earlier of such time as (i) such Permit Approval is obtained by Sellers, (ii) Buyer separately obtains any such Permit (sufficient to conduct the business of the Company and its Subsidiaries in the Ordinary Course) and (iii) the closing of the Chapter 11 Cases, Sellers shall, and shall cause their respective Subsidiaries to continue to, use reasonable best efforts to obtain, or cause to be obtained, such Permit Approval, and Buyer shall provide reasonable cooperation to Sellers, subject to any approval of the Bankruptcy Court that may be required, and Sellers shall, and shall cause their Subsidiaries to enter into an arrangement reasonably acceptable to Buyer intended to both (A) provide Buyer, to the fullest extent not prohibited by applicable Law, the claims, rights, remedies and benefits under, and pursuant to, such Permit(s) and (B) cause Buyer, subject to Buyer receiving such claims, rights, remedies and benefits, to assume and bear all Assumed Liabilities with respect to such Permits from and after the Closing (as if such Permit had been transferred to Buyer as of the Closing) in accordance with this Agreement (including by means of any subcontracting, sublicensing or subleasing arrangement).  Upon obtaining the relevant Permit Approval, each Seller shall, and shall cause any of its applicable Subsidiaries to, promptly sell, convey, assign, transfer and deliver to Buyer such Permit for no additional consideration.

In the event any notices, approvals or clearances identified in Section 8.01(a) of the Disclosure Schedules have not been obtained by the End Date (as extended by the Renewal Period), the Parties shall negotiate in good faith to amend this Agreement for the limited purpose of providing for a staged closing, with the closing of the Purchased Entities impacted by such outstanding notices, approvals or clearances being delayed until such notices, approvals or clearances are made or obtained.

SECTION 7.04    *Public Announcements*.  On and after the date hereof and through the Closing Date, the Parties shall consult with each other before issuing any press release or otherwise making any public statements with respect to this Agreement or the transactions contemplated hereby, and neither Party shall, except as may be required to comply with applicable Law, issue any press release or make any public statement prior to obtaining, with respect to Sellers, Buyer's, and with respect to Buyer, the Company's, prior written consent (which consent, in each case, shall not be unreasonably withheld, conditioned or delayed).

SECTION 7.05    *Employee Matters*.

(a)    Buyer or its Affiliates may, at its sole discretion, extend offers of employment to employees of Sellers providing services in connection with the Purchased Assets or the Assumed Liabilities who have not been terminated or otherwise left the employment of Sellers and their Affiliates prior to the Closing Date.  No later than ten (10) days after the execution and delivery of this Agreement and, upon the request of Buyer, no later than ten (10) days prior to the Closing, Sellers shall make available to Buyer true, correct and complete lists of employees as of such date. Sellers shall provide the Buyer with access to their personnel records and personnel files and such other information with respect to their employees as Buyer may reasonably request, to the extent compliant with applicable Laws.

(b)    Subject to Buyer's right to terminate any Transferred Employees, Buyer shall provide, or shall cause one of its Affiliates to provide, for a period of one (1) year from and after the Closing Date, each Transferred Employee with compensation and benefits (excluding, for this

purpose, equity-based compensation, long-term incentive awards, retention bonuses, change in control-related payments, defined benefit pensions and retiree welfare benefits) that are, in the aggregate, substantially comparable to those provided to such Transferred Employees as of the date of this Agreement.  For purposes of eligibility, vesting and participation under any employee benefit plans of Buyer providing benefits to the Transferred Employees after Closing Date (the "Buyer Plans"), Buyer shall use commercially reasonable efforts to credit each Transferred Employee with his or her years of service with Sellers and any predecessor entities, to the same extent as such Transferred Employee was entitled immediately prior to the Closing Date for such service under any similar Seller Plans in which such Transferred Employees participated before the Closing Date, except to the extent such credit would result in a duplication of benefits or the funding thereof.   For purposes of each Buyer Plan providing medical, dental, hospital, pharmaceutical or vision benefits to any Transferred Employee, Buyer shall use commercially reasonable efforts to cause to be waived any actively-at-work requirements, limitations on benefits relating to any pre-existing conditions and exclusions and waiting periods for any Transferred Employees and/or his or her covered dependents unless such requirements, limitations, exclusions or waiting periods were applicable under Seller Plans.  In addition, Buyer shall use commercially reasonable efforts to cause any co-payments, deductible and other eligible expenses incurred by such Transferred Employee and/or his or her covered dependents under any Seller Plan providing, medical, dental, hospital, pharmaceutical or vision benefits during the plan year that includes the Closing Date to be credited for purposes of satisfying all deductible, coinsurance and maximum out-of-pocket requirements applicable to such Transferred Employee and his or her covered dependents for the applicable plan year of each comparable Buyer Plan in which he or she participates.  Except as otherwise required by applicable Law, Buyer shall credit Transferred Employees for their accrued and unused vacation, sick days and personal days through the Closing Date to the extent such vacation, sick and personal days are not paid to such Transferred Employees by Sellers.   To the extent Buyer reaches agreement on or otherwise lawfully implements terms or conditions of employment applicable to any Transferred Employees represented by any labor union that differ from the terms of this Section 7.05(b), the former shall control.  For any Transferred Employees who are principally based outside the United States, the provisions of this Section 7.05 shall apply to such employees *mutatis mutandis* to the maximum extent permitted by applicable Law.

(c)      As soon as practicable following the date of this Agreement, but in no event later than the earlier of (i) the day immediately preceding the Closing Date and (ii) fifteen (15) days after Buyer is determined to be the "Successful Bidder" (as defined in the Bid Procedures Order), Buyer shall provide the Company with a list of the Assumed Plans and Purchased Entities' Plans. Sellers shall cooperate with Buyer and take, or cause to be taken, any and all necessary steps to assign and transfer sponsorship of the Assumed Plans, if any (and including all applicable service provider contracts with respect to such Assumed Plans) and, if necessary, the Purchased Entities' Plans, to Buyer.  Prior to the Closing, Sellers shall reasonably cooperate with Buyer and its Affiliates and use commercially reasonable efforts to provide assistance as Buyer may reasonably request in order to effectuate the foregoing.  Nothing herein shall prohibit Buyer or its Affiliates, as applicable, from terminating, amending, or otherwise affecting any Assumed Plan and/or Purchased Entity Plan, at any time and from time to time following the Closing in accordance with the terms of such Assumed Plans and/or Purchased Entity Plans, excluding, for the avoidance of doubt, those Assumed Plans and/or Purchased Entity Plans as set forth on Section 7.05 of the Disclosure Schedules, provided that Buyer or its Affiliates, as applicable, shall be permitted to

terminate or amend such Assumed Plans and/or Purchased Entity Plans as set forth on Section 7.05 of the Disclosure Schedules with the affected Transferred Employee's consent.

(d)      To the extent requested by Buyer, each Purchased Entity shall deliver or cause to be delivered to the Buyer duly adopted resolutions of the Purchased Entity that (A) terminate any Purchased Entities' Plan intended to be qualified under Section 401(a) of the Code (the "401(k) Plans") or any other Purchased Entities' Plan, subject to compliance with Section 409A of the Code, (B) amend the 401(k) Plans as necessary to bring them current with all applicable required plan amendments, and (C) one hundred percent (100%) vest all participants under the 401(k) Plans, in each case, effective no later than the Business Day preceding the Closing Date and in compliance with the terms of such plans and the requirements of applicable Law.

(e)      All outstanding equity awards held by a Transferred Employee will be treated in accordance with their terms and the terms of the applicable Seller Plan under which the award was granted, and the Seller shall take any necessary action to cancel all outstanding awards without the payment of consideration, effective as of immediately prior to the Closing Date, unless otherwise mutually agreed by the Parties.

(f)      No provision in this Section 7.05 or otherwise in this Agreement, whether express or implied, shall (a) create any third-party beneficiary or other rights in any employee or former employee of Sellers or any of their subsidiaries or Affiliates (including any beneficiary or dependent thereof), any other participant in any Seller Plan or any other Person; (b) create any rights to continued employment with Sellers, Buyer or any of their respective Subsidiaries or Affiliates or in any way limit the ability of Sellers, Buyer or any of their respective Subsidiaries or Affiliates to terminate the employment of any individual at any time and for any reason; or (c) constitute or be deemed to constitute an amendment to any Seller Plan or any other employee benefit plan, program, policy, agreement or arrangement sponsored or maintained by Sellers, Buyer or any of their subsidiaries or Affiliates.

SECTION 7.06    *Tax Matters.*

(a)      Any Transfer Taxes attributable to the sale or transfer of the Purchased Assets and not exempted under the Sale Order or by Section 1146(a) of the Bankruptcy Code shall be borne by Buyer. Sellers and Buyer shall reasonably cooperate to (i) mitigate and/or eliminate the amount of any such Transfer Taxes (including by providing any forms, certificates or documents to reduce or eliminate any such Transfer Taxes) and (ii) timely prepare and file any Tax Returns relating to such Transfer Taxes, including any claim for exemption or exclusion from the application or imposition of any Transfer Taxes. Buyer shall prepare, or cause to be prepared, all necessary Tax Returns or other documents with respect to Transfer Taxes. To the extent any Seller is required by applicable Law to pay Transfer Taxes, Buyer shall promptly reimburse in full the applicable Seller the amount of such Transfer Taxes upon written request by such Seller accompanied by a notice setting forth the amount of, and basis, for this Tax and evidence that such Tax was paid by such Seller.

(b)      Sellers shall prepare and timely file (or shall cause to be prepared and timely filed) all Tax Returns that are required to be filed (i) with respect to the Group Companies, (ii) Purchased Assets or (iii) by the Purchased Entities and JV Entities, in each case, that are first due under

applicable Law on or prior to the Closing Date (taking into account any extensions of time to file such Tax Returns), and Sellers shall be liable and responsible for, and timely pay or cause to be paid, in full any Taxes shown as due and owing on such Tax Returns.  Sellers shall provide drafts of each such United States federal Income Tax Return (and any other Tax Return to the extent requested by Buyer) to Buyer for Buyer's review and comment at least thirty (30) days prior to the due date for filing such Tax Return (including any applicable extensions) (or, if Buyer requests such Tax Return after such date, as soon as reasonably practicable).  Buyer will have twenty (20) days from receipt of each such draft Tax Return to review and comment on the Tax Return.  If Buyer disputes any such draft Tax Return and provides written comments to Sellers within such ten (10)-day period and the Parties are unable to resolve such dispute within five (5) days after the receipt of such comments, such dispute shall be settled by an Independent Accounting Firm mutually acceptable to both Parties.

(c)     Buyer shall prepare and timely file (or shall cause to be prepared and timely filed) all Tax Returns that are required to be filed (i) with respect to the Purchased Assets or (ii) by the Purchased Entities or the JV Entities, in each case, that are first due under applicable Law after the Closing Date (taking into account any extensions of time to file such Tax Returns).

(d)     For purposes of this Agreement, in order to apportion appropriately any Taxes relating to a taxable period beginning before and ending after the Closing Date (a "Straddle Period"), the amount of Taxes that are allocable to the portion of the Straddle Period ending on the Closing Date shall be, (i) in the case of Taxes imposed on a periodic basis (such as ad valorem and property Taxes) and exemptions, allowances or deductions that are calculated on an annual basis, such as depreciation, the amount of such Taxes, exemptions, allowances or deductions for the entire Straddle Period multiplied by a fraction, the numerator of which is the number of calendar days in the portion of the Straddle Period ending on and including the day immediately prior to the Closing Date, and the denominator of which is the number of calendar days in the entire Straddle Period (provided that any Tax exemption or allowance with respect to an annual period shall be pro-rated on an equal daily basis between the Pre-Closing Tax Period and the remainder of the Straddle Period), and (ii) in the case of all other Taxes, determined on a "closing of the books basis" as if the taxable period ended on the Closing Date.

(e)     Any and all existing Tax sharing or similar agreements, except for this Agreement, between any Purchased Entity or JV Entity, on the one hand, and any Sellers, any retained Subsidiaries or any of their Affiliates or any direct or indirect owner of the Company (excluding, for the avoidance of doubt, any other Purchased Entity or JV Entity), on the other hand, shall be terminated as of the Closing Date to the extent they relate to the Purchased Entity or JV Entity and shall ensure that there shall be no further liabilities or obligations imposed on any of them under any such agreements.

(f)     At the Buyer's request, with respect to the acquisition by Buyer of any Purchased Entity that is treated as a corporation for U.S. federal or state tax purposes, either (i) Seller (or, if applicable, its Affiliates) and Buyer (or, if applicable, its Affiliates) shall join together in making an election under Section 338(h)(10) or Section 336(e) of the Code (and all corresponding elections under state, local or foreign law) (each, and any election described in the last sentence of this Section 7.06(f), an "Asset Sale Election"), or (ii) Seller (or its Affiliates) shall convert such entity to a limited liability company that is treated as a disregarded entity for U.S. federal tax

62

purposes before the Closing; provided, that, unless Buyer elects to structure the transactions contemplated by this Agreement as a G Reorganization pursuant to Article 11, if Seller determines that the actions described in clause (i) or (ii) would result in material adverse tax consequences to Seller or any of its Affiliates (including as a result of a reduction or elimination of any tax attributes of a Seller or any of its Affiliates), Buyer and Seller shall cooperate in good faith in utilizing an alternative structure that (A) allows the Buyer to be treated as acquiring the assets of the applicable Purchased Entity for U.S. federal income tax purposes and would not otherwise adversely affect Buyer (or any of its Affiliates) by more than a *de minimis* extent, (B) does not result in any material adverse tax consequences to Sellers or any of their respective Affiliates (which transaction may include, a pre-closing reorganization described in Section 368(a)(1)(F) of the Code) and (C) is permitted under applicable Law (including the Bankruptcy Code) and would otherwise be permitted to be effected as a sale described in Section 363 of the Bankruptcy Code; provided further, that, for the avoidance of doubt, nothing in the foregoing proviso shall relieve Seller of its obligations under clauses (i) and (ii) to the extent an alternative structure is not undertaken in accordance with the foregoing proviso.  Buyer shall prepare and deliver to the Company for the Company's review initial drafts of all filings, agreements, elections and other documents that are necessary to effectuate the transactions described in this Section 7.06(f).  For the avoidance of doubt, and notwithstanding anything to the contrary herein, Buyer shall be permitted to make an election under Section 338(g) of the Code (and all corresponding elections under state, local or foreign law) with respect to any Purchased Entity that is a non-U.S. corporation for U.S. federal or state tax purposes.

(g)    Notwithstanding anything to the contrary in this Agreement, with respect to each acquisition of interests in a JV Entity classified as a partnership for U.S. federal and applicable state income tax purposes that is treated as an acquisition of a partnership interest in such JV Entity for applicable income tax purposes, there shall be made an election under Section 754 of the Code (and any analogous or similar election under applicable state or local Tax Law) on the U.S. federal income Tax Return (and any applicable state or local income Tax Return) of such JV Entity for the Tax period which includes the Closing Date (to the extent such election is not already in effect for such Tax period), unless such election is not permitted under the applicable JV Entity's governing documents.

SECTION 7.07    *Misallocated Assets*.  If, following the Closing, Buyer or its Affiliates own or hold any Excluded Asset (including by having an Excluded Asset located at any Leased Real Property that is or will be owned or leased by Buyer or any of its Affiliates), Buyer shall transfer, or shall cause its Affiliate to transfer, at no cost to Sellers, such Excluded Asset as soon as practicable to any Sellers designated by the Company, and such Excluded Asset will be deemed the property of such Seller held in trust by Buyer for such Seller until so transferred.  If, following the Closing, Sellers or any of their respective Affiliates own any Purchased Asset, Sellers shall transfer, or shall cause their respective Affiliates to transfer, such Purchased Asset as soon as practicable to Buyer or an Affiliate designated by Buyer, and such Purchased Asset will be deemed the property of Buyer held in trust by such Seller for Buyer until so transferred.  Buyer shall be responsible for any Transfer Taxes payable as a result of any such transfer in accordance with Section 7.06(a).

SECTION 7.08    *Payments from Third Parties after Closing*.  In the event that any Seller receives any payment from a third party (other than Buyer or any of its Affiliates) after the Closing Date pursuant to any of the Purchased Contracts (or otherwise with respect to the Business) and to

63

the extent such payment is not made in connection with an Excluded Asset or an Excluded Liability, Sellers shall forward such payment, as promptly as practicable but in any event within thirty (30) days after such receipt, to Buyer (or other entity nominated by Buyer in writing to Sellers) and notify such third party to remit all future payments (in each case, to the extent such payment is not in respect of an Excluded Asset or an Excluded Liability) pursuant to the Purchased Contracts to Buyer (or such other entity).  Notwithstanding anything to the contrary in this Agreement, in the event that Buyer or any of its Affiliates receives any payment from a third party after the Closing on account of, or in connection with, any Excluded Asset, Buyer shall forward such payment, as promptly as practicable but in any event within thirty (30) days after such receipt, to the Company (or other entity nominated by the Company in writing to Buyer) and notify such third party to remit all future payments on account of or in connection with the Excluded Assets to the Company (or such other entity as the Company may designate).  The Parties agree that the Party that is entitled to receive any amounts paid from a third party with respect to a Purchased Contract or Excluded Asset, as the case may be, pursuant to this Section 7.08 shall be treated as the recipient of the applicable payment for all Tax purposes, and the Parties agree not to (and to not permit any of their respective Affiliates to) take a position inconsistent therewith upon examination of any Tax Return, in any Tax refund claim, in any Proceeding related to Taxes, or otherwise unless otherwise required by a determination within the meaning of Section 1313(a) of the Code (and comparable provision of state, local, or non-U.S. Laws).

SECTION 7.09   *Bulk Transfer Laws*.  The Parties intend that pursuant to Section 363(f) of the Bankruptcy Code, the transfer of the Purchased Assets shall be free and clear of any free and clear of any Claims (other than Assumed Liabilities) and Encumbrances (other than Permitted Encumbrances), including any liens or claims arising out of the bulk transfer Laws, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order.

SECTION 7.10   *Bankruptcy Court Approval*.

(a)   Sellers shall comply in all respects with the obligations under the DIP Credit Agreement and the DIP Order, including the milestones and any similar undertakings or requirements set forth therein.

(b)   Seller shall comply with the following timeline (the "Bankruptcy Court Milestones"):

(i)   As promptly as practicable but in no event later than the Petition Date, Sellers shall file with the Bankruptcy Court the Bid Procedures Motion, together with a substantially final form of this Agreement; provided, however, that Sellers shall file an executed Agreement by no later than May 17, 2023.

(ii)   As soon as practicable following entry of the Bidding Procedures Order, but no later than May 26, 2023, Sellers shall file with the Bankruptcy Court the schedule of Purchased Contracts, including any Cure Costs.

(iii)   No later than May 29, 2023, Sellers shall obtain entry of the Bid Procedures Order.

64

(iv)    No later than June 18, 2023, the Auction (if necessary) shall have been held pursuant to the Bid Procedures Order.

(v)    No later than June 23, 2023, the Bankruptcy Court shall have held the Sale Hearing.

(vi)    No later than June 23, 2023, Sellers shall obtain entry by the Bankruptcy Court of the Sale Order and such order shall be in full force and effect and not reversed, modified or stayed.

(vii)    No later than July 8, 2023, the Closing Date shall have occurred.

(c)    Sellers shall serve on all non-Debtor counterparties to all of their Contracts a notice specifically stating that Sellers are or may be seeking the assumption and assignment of such Contracts and shall notify such non-Debtor counterparties of the deadline for objecting to the Cure Costs, if any, which deadline shall not be less than seven (7) days prior to the Sale Hearing.

(d)    Sellers and Buyer shall cooperate to obtain the Bankruptcy Court's entry of the Sale Order and any other Order reasonably necessary in connection with the transactions contemplated by this Agreement as promptly as reasonably practicable, including furnishing affidavits, non-confidential financial information, or other documents or information for filing with the Bankruptcy Court and making such advisors of Buyer and Sellers and their respective Affiliates available to testify before the Bankruptcy Court for the purposes of, among other things, providing adequate assurances of performance by Buyer as required under Section 365 of the Bankruptcy Code, and demonstrating that Buyer is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.

(e)    The Buyer and the Sellers acknowledge that this Agreement and the sale of the Purchased Assets and assumption and assignment of the Purchased Contracts are subject to Bankruptcy Court approval.  The Buyer and the Sellers acknowledge that (a) to obtain such approval, the Sellers may be required to demonstrate that consummating the sale is in the best interests of the Seller's bankruptcy estate in accordance with applicable Law, and that such demonstration shall include giving notice of the sale to creditors and other parties in interest to the extent required under applicable Law, (b) the Buyer must provide adequate assurance of future performance as may be required under Section 365 of the Bankruptcy Code with respect to the Purchased Contracts, and (c) to the extent such adequate assurance of future performance is not provided with respect to a Purchased Contract, then such Purchased Contract may be excluded from the Purchased Assets and included in the Excluded Assets.

(f)    Each of the Company and Buyer shall appear formally or informally in the Bankruptcy Court if reasonably requested by the other Party or required by the Bankruptcy Court in connection with the transactions contemplated by this Agreement and keep the other Party reasonably apprised of the status of material matters related to this Agreement, including, upon reasonable request promptly furnishing the other Party with copies of notices or other communications received by such Party from the Bankruptcy Court or any third party and/or any Governmental Authority with respect to the transactions contemplated by this Agreement. Nothing in this Agreement shall require Buyer or its Affiliates to give testimony to or submit any

pleading, affidavit or information to the Bankruptcy Court or any Person that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders.

(g)     Subject to entry of the Sale Order and consummation of the Closing, Buyer shall, promptly upon the Closing, pay the Cure Costs and cure any and all other defaults and breaches under the Purchased Contracts in accordance with the provisions of Section 365 of the Bankruptcy Code and this Agreement.

(h)     The Sale Order shall, among other things, (i) approve, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, (A) the execution, delivery and performance by Sellers of this Agreement, (B) the sale of the Purchased Assets to Buyer on the terms set forth herein and free and clear of all Claims (other than Assumed Liabilities) and Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances) and (C) the performance by Sellers of their respective obligations under this Agreement, (ii) authorize and empower Sellers to assume and assign to Buyer the Purchased Contracts, (iii) find that Buyer is a "good faith" buyer within the meaning of Section 363(m) of the Bankruptcy Code, find that Buyer is not a successor to any Seller and grant Buyer the protections of Section 363(m) of the Bankruptcy Code, (iv) find that Buyer shall have no Liability or responsibility for any Liability or other obligation of any Seller arising under or related to the Purchased Assets other than as expressly set forth in this Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, environmental, successor, or transferee Liability, labor Law, de facto merger, or substantial continuity, (v) find that Buyer has provided adequate assurance (as that term is used in Section 365 of the Bankruptcy Code) of future performance in connection with the assumption of the Purchased Contracts and (vi) find that Buyer shall have no Liability for any Excluded Liability.  Without limiting Sellers' obligation to take all such actions as are reasonably necessary to obtain Bankruptcy Court approval of the Sale Order, Buyer agrees that it will promptly take reasonable actions to assist in obtaining Bankruptcy Court approval of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (x) demonstrating that Buyer is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code and (y) establishing adequate assurance of future performance within the meaning of Section 365 of the Bankruptcy Code.

(i)     Sellers acknowledge and agree, and the Sale Order shall provide that, except as otherwise provided in Section 2.03, on the Closing Date and concurrently with the Closing, all then existing or thereafter arising obligations, Liabilities and Encumbrances of, against or created by Sellers or their bankruptcy estate, to the fullest extent permitted by Section 363 of the Bankruptcy Code, shall be fully released from and with respect to the Purchased Assets.  On the Closing Date, the Purchased Assets shall be transferred to Buyer free and clear of all Claims (other than Assumed Liabilities) and Encumbrances (other than Permitted Encumbrances) to the fullest extent permitted by Section 363 of the Bankruptcy Code.

(j)     In the event the entry of the Bid Procedures Order, the Sale Order or any other Orders of the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to the Bid Procedures Order, the Sale Order or other such Order), Sellers shall use commercially reasonable efforts to defend such appeal.  Sellers shall comply with all notice

requirements (i) of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure or (ii) imposed by the Sale Order, in each case, in connection with any pleading, notice or motion to be filed in connection herewith.

(k)    Notwithstanding anything contained herein to the contrary, during the pendency of the Chapter 11 Cases, Sellers shall not reject or transfer any Excluded Contract without first obtaining Buyer's prior written consent.  In the event that any of the Parties to this Agreement discovers a Contract related to the business of the Company and its Subsidiaries, the Purchased Assets or the Assumed Liabilities (whether prior to, on or following the Closing) and such Contract (i) was not set forth on the Original Contract & Cure Schedule, (ii) is a Contract which Buyer wishes to assume the rights and obligations of and (iii) has not been rejected by Sellers (with Buyer's prior written consent in compliance with the immediately preceding sentence), Buyer and Sellers shall execute, acknowledge and deliver such other instruments and take such further actions as are reasonably practicable for Buyer or Buyer Designee to assume the rights and obligations under such Contract as of the Closing (or, if applicable, as soon as reasonably practicable following the Closing), otherwise in accordance with Section 2.05.

(l)    At any time, but in no event later than ten (10) Business Days after the Petition Date, upon Buyer's written request, Sellers (i) shall and shall cause any requested additional wholly-owned Subsidiary that would otherwise be a Purchased Entity and (ii) shall use commercially reasonable efforts to obtain the consent of any requested additional non-wholly-owned Subsidiary that would otherwise be a Purchased Entity that are formed or organized under the laws of the United States of America or any State thereof or the District of Columbia (other than Vice Television Network, LLC), in each case of clauses (i) and (ii), to become signatories to this Agreement, commence additional cases in the Bankruptcy Court under Chapter 11 of the Bankruptcy Code and become additional Sellers under this Agreement in order to consummate the transactions contemplated by this Agreement, provided that, in the case of clause (ii) only, acting in accordance with the foregoing would not be inconsistent with the fiduciary obligations of the officers, directors or other control parties of the applicable Subsidiary.

SECTION 7.11    *No Successor Liability*.  The Parties intend that, to the fullest extent permitted by applicable Law (including under Section 363 of the Bankruptcy Code), upon the Closing, Buyer shall not be deemed to: (a) be the successor of any Seller, (b) have, de facto, or otherwise, merged with or into Sellers, (c) be a mere continuation or substantial continuation of Sellers or the enterprise(s) of Sellers or (d) be liable or have any Liability for any acts or omissions of Sellers in the conduct of their businesses or arising under or related to the Purchased Assets other than as expressly set forth and agreed in this Agreement.  Without limiting the generality of the foregoing, and except as otherwise expressly provided in this Agreement, the Parties intend that Buyer shall have no Liability for any Encumbrance (other than the Assumed Liabilities and Permitted Encumbrances on the Purchased Assets) against Sellers or any of Sellers predecessors or Affiliates, and Buyer shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date or in connection with the transactions contemplated to occur on the Closing, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the businesses of Sellers, the Purchased Assets or any Liability of Sellers arising prior to, or relating to any period occurring prior to, the Closing Date.  The Parties agree that the Sale Order shall contain provisions substantially in the form set forth in this Section 7.11.

SECTION 7.12   *Communications with Customers and Suppliers*.   Prior to the Closing, the Parties shall reasonably cooperate with each other in coordinating their communications with any Material Customer, Material Supplier or other material contractual counterparty of Sellers in relation to this Agreement and the transactions contemplated hereby.

SECTION 7.13   *Efforts to Consummate.*   From the date of this Agreement until the Closing, subject to the other terms and conditions set forth in this Agreement (including Section 7.03), each Party will use commercially reasonable efforts to take such actions as are necessary to satisfy the closing conditions set forth in Article 8.   Notwithstanding anything to the contrary in this Agreement, Buyer shall not be obligated to waive a failure of any of the closing conditions set forth in Section 8.01 and Section 8.02 and Sellers shall not be obligated to waive a failure of any of the closing conditions set forth in Section 8.01 and Section 8.03.

ARTICLE 8

CONDITIONS TO CLOSING

SECTION 8.01   *Conditions to Obligations of Buyer and Sellers*.   The obligations of each of Buyer and Sellers to consummate the Closing are subject to the satisfaction or valid waiver at or prior to the Closing of the following conditions:

(a)   (i) all waiting periods (including any extension thereof) applicable to the purchase and sale of the Purchased Assets under the HSR Act shall have expired or been terminated and (ii) all other filings, certificates, (non-jurisdiction) notices, approvals and clearances under any other Antitrust Law as identified in Section 8.01(a) of the Disclosure Schedules shall have been obtained, deemed obtained or shall have occurred, provided that Section 8.01(a) of the Disclosure Schedules shall be updated to include such additional filings, certificates, (non-jurisdiction) notices, approvals and clearances as identified by the Buyer within ten (10) Business Days following the date of this Agreement;

(b)   no provision of any applicable Law and no judgment, injunction or Order shall then be in effect prohibiting or making illegal the consummation of the Closing; and

(c)   the Bankruptcy Court shall have entered the Sale Order and the Bidding Procedures Order, and the Sale Order and the Bidding Procedures Order shall each be a Final Order.

SECTION 8.02   *Conditions to Obligation of Buyer*.   The obligation of Buyer to consummate the Closing is subject to the satisfaction (or valid waiver) at or prior to the Closing of the following further conditions:

(a)   (i) the representations and warranties of Sellers in this Agreement (other than the Seller Fundamental Representations) shall be true and correct on and as of the Closing, except to the extent expressly made as of an earlier date, in which case such representations and warranties shall be true and correct as of such earlier date, except where the failure of such representations and warranties to be true and correct (without giving effect to any limitation as to "materiality," "material adverse effect," "Material Adverse Effect" or similar qualifiers contained therein) has not had or would not reasonably be expected to have a Material Adverse Effect, and (ii) the representations and warranties of Sellers set forth in the first sentence of Section 3.01(Organization

and Qualification), all of Section 3.02(Authorization; Execution and Delivery; Enforceability), subsections (a), (b) and (d) of Section 3.04 (Purchased Entities; JV Entities), the first sentence of Section 3.05 (Title to and Sufficiency of Purchased Assets) and all of **Section 3.23** (Brokers) (collectively, the "Seller Fundamental Representations") shall be true and correct on and as of the Closing, except to the extent expressly made as of an earlier date, in which case such representations and warranties shall be true and correct as of such earlier date, in all material respects (without giving effect to any limitation as to "materiality," "material adverse effect," "Material Adverse Effect" or similar qualifiers contained therein);

(b)     the covenants and agreements that Sellers are required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been performed and complied with in all material respects;

(c)     Sellers shall have delivered, or cause to be delivered, to Buyer each item set forth in Section 2.08(a);

(d)     all Permit Approvals and all other notices, reports and other filings required to be made prior to the Closing by the Parties or any of their respective Subsidiaries with, and all other consents, registrations, approvals and authorizations required to be obtained prior to the Closing by the Company or Buyer or any of their respective Subsidiaries from, any Governmental Authority (including pursuant to any government contract) in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated by this Agreement by the Parties shall have been made or obtained (as the case may be); and

(e)     the DIP Credit Agreement and the DIP Order shall remain in full force and effect.

SECTION 8.03   *Conditions to Obligation of Sellers*.   The obligation of Sellers to consummate the Closing is subject to the satisfaction (or valid waiver) at or prior to the Closing of the following further conditions:

(a)     the representations and warranties of Buyer in this Agreement shall be true and correct on and as of the Closing, except to the extent expressly made as of an earlier date, in which case such representations and warranties shall be true and correct in all respects as of such earlier date, except where such failures to be true and correct (without giving effect to any limitation as to "materiality," "material adverse effect" or similar qualifiers contained therein) would not materially impair or prevent Buyer's ability to consummate the transactions contemplated by this Agreement;

(b)     the covenants and agreements that Buyer is required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been performed and complied with in all material respects;

(c)     Buyer shall have delivered, or cause to be delivered, to the Company each item set forth in Section 2.08(b); and

(d)     the Excluded Cash at Closing shall be sufficient to pay those expenses set forth on Section 2.01(j) of the Disclosure Schedules.

SECTION 8.04    *Waiver of Conditions*.    Upon the occurrence of the Closing, any condition set forth in this <u>Article 8</u> that was not satisfied as of the Closing will be deemed to have been waived for all purposes by the Party having the benefit of such condition as of and after the Closing.  None of Buyer or Sellers may rely on the failure of any condition set forth in this <u>Article 8</u>, as applicable, to be satisfied if such failure was primarily caused by such Party's failure to perform any of its obligations under this Agreement, including its obligation to use its reasonable best efforts to consummate the transactions contemplated hereby as required under this Agreement.

ARTICLE 9

SURVIVAL

SECTION 9.01    *Survival*.    The Parties, intending to modify any applicable statute of limitations, agree that (a)(i) the representations and warranties in this Agreement and in any certificate delivered pursuant hereto and (ii) the covenants in this Agreement only requiring performance prior to the Closing shall, in each case, terminate and be of no further force and effect effective as of the Closing and shall not survive the Closing for any purpose, and thereafter there shall be no Liability on the part of, nor shall any claim be made by or on behalf of, any Party or any Party's Affiliates in respect thereof and (b) the covenants in this Agreement that contemplate performance at or after the Closing or expressly by their terms survive the Closing shall survive the Closing in accordance with their respective terms (the "<u>Surviving Post-Closing Covenants</u>").  Except with respect to the Surviving Post-Closing Covenants, no other remedy shall be asserted or sought by Buyer, and Buyer shall cause its Affiliates not to assert or seek any other remedy, against Sellers or any of their respective Affiliates under any contract, misrepresentation, tort, strict liability, or statutory or regulatory Law or theory or otherwise, all such remedies being hereby knowingly and expressly waived and relinquished to the fullest extent permitted under applicable Law.

ARTICLE 10

TERMINATION

SECTION 10.01   *Grounds for Termination*.   This Agreement may be terminated at any time prior to the Closing:

(a)      by mutual written agreement of the Company and Buyer;

(b)      by Buyer if the Bankruptcy Court Milestones are not (i) met by Seller or (ii) waived, amended, or extended by Buyer;

(c)      by Buyer, if (i) Sellers enter into a definitive agreement with respect to an Alternative Transaction with one or more Persons other than Buyer, (ii) Sellers seek or support Bankruptcy Court approval of an Alternative Transaction with one or more Persons other than Buyer, or (iii) the Bankruptcy Court enters an order approving an Alternative Transaction with one or more Persons other than Buyer;

(d)      by either the Company or Buyer, if the Closing shall not have been consummated on or before July 8, 2023 (the "<u>End Date</u>"); <u>provided</u>, <u>however</u>, if all of the conditions to Closing,

70

other than the conditions set forth in Section 8.01(a), shall have been satisfied or shall be capable of being satisfied at the End Date, Buyer may, by written notice to the Company, extend the End Date for one (1) additional four (4)-week period (a "Renewal Period") and such date, as so extended to the end of the Renewal Period, shall be deemed the End Date; provided, further, that the right to terminate this Agreement pursuant to this Section 10.01(d) shall not be available to a Party whose breach of any of its representations, warranties, covenants or agreements contained herein has been the primary cause of the failure of the Closing to occur on or before the End Date;

(e)    by either the Company or Buyer, if at the end of the Auction for the Purchased Assets (if any), Buyer is not determined by the Company to be either the "Successful Bidder" or "Next-Highest Bidder" (each as defined in the Bid Procedures Order);

(f)    by the Company, if Sellers are not then in material breach of their obligations under this Agreement and Buyer breaches or fails to perform any of its representations, warranties, covenants or agreements contained in this Agreement and such breach or failure to perform (i) would prevent the satisfaction of a condition set forth in Section 8.01 or Section 8.03, (ii) cannot be, or has not been, cured within ten (10) days following delivery of written notice to Buyer of such breach or failure to perform and (iii) has not been waived by the Company;

(g)    by Buyer, if Buyer is not then in material breach of its obligations under this Agreement and Sellers breach or fail to perform any of their representations, warranties, covenants or agreements contained in this Agreement and such breach or failure to perform (i) would prevent the satisfaction of a condition set forth in Section 8.01 or Section 8.02, (ii) cannot be, or has not been, cured within ten (10) days following delivery of written notice to the Company of such breach or failure to perform and (iii) has not been waived by Buyer;

(h)    by either Buyer or the Company, (i) if, other than as a result of a request by the Company or any Seller, the Bankruptcy Court enter an Order dismissing, or converting into cases under Chapter 7 of the Bankruptcy Code, any of the cases commenced by Sellers under Chapter 11 of the Bankruptcy Code and comprising part of the Chapter 11 Cases, (ii) if a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of the Company is appointed in the Chapter 11 Cases or (iii) an Order or dismissal, conversion or appointment is entered with respect to the Chapter 11 Cases for any reason and not reversed or vacated within fourteen (14) days after entry thereof;

(i)    by either Buyer or the Company, if the Bankruptcy Court or any Governmental Authority issues any Order permanently enjoining or otherwise permanently prohibiting the transactions contemplated by this Agreement and such Order shall have become final and non-appealable; provided, however, that the right to terminate this Agreement pursuant to this Section 10.01(i) shall not be available to a Party that failed to use its reasonable best efforts to contest, resolve or lift such Order; provided, further, that the right to terminate this Agreement under this Section 10.01(i) shall not be available to any Party if such Order was primarily caused by (i) such Party's material breach of any provision of this Agreement or (ii) such Party's failure to comply in any material respect with its obligations hereunder.

(j)       by either Buyer or the Company, if an Order of the Bankruptcy Court is entered denying approval of the Bid Procedures Order or the Sale Order and such Order shall have become final and non-appealable;

(k)       by Buyer if Sellers withdraw or seek authority to withdraw the Bid Procedures Motion;

(l)       by Buyer if (i) following entry by the Bankruptcy Court of the Bid Procedures Order, such order is (x) amended, modified or supplemented in an adverse way without Buyer's prior written consent or (y) voided, reversed or vacated or is subject to a stay, or (ii) following entry by the Bankruptcy Court of the Sale Order, the Sale Order is (x) amended, modified or supplemented in an adverse way without Buyer's prior written consent or (y) voided, reversed or vacated or is subject to a stay;

(m)       by Buyer upon the occurrence of any "Event of Default" under the DIP Facility that has not been cured (if susceptible to cure) or waived by the applicable percentage of the lenders under the DIP Facility in accordance with the terms of the DIP Facility;

(n)       by Buyer if, under Section 363(k) of the Bankruptcy Code, Buyer is disallowed from providing a credit bid (or otherwise bidding on such other terms as may be agreed by Buyer, in its sole discretion) as contemplated by this Agreement in connection with the payment of the Purchase Price;

(o)       by the Company if its board of directors, based on the advice of outside legal counsel, determines in good faith that proceeding with the transactions contemplated by this Agreement or failing to terminate this Agreement would be inconsistent with its or such Person's or body's fiduciary duties; or

(p)       by the Sellers if (i) all of the conditions set forth in Section 8.01 and Section 8.02 have been satisfied (other than those conditions that, by their nature, are to be satisfied at the Closing, all of which are capable of being satisfied at the Closing) or waived, (ii) Sellers have irrevocably confirmed by written notice to Buyer that (A) all conditions set forth in Section 8.03 have been satisfied (other than those that, by their nature, are to be satisfied at the Closing, each of which is capable of being satisfied at the Closing) or that they would be willing to waive any unsatisfied conditions in Section 8.03 at the Closing, and (B) they are ready, willing and able to consummate the Closing and (iii) Buyer fails to complete the Closing within three (3) Business Days following the date the Closing should have occurred pursuant to Section 2.08.

The Party desiring to terminate this Agreement pursuant to this Section 10.01 (other than pursuant to Section 10.01(a)) shall give written notice of such termination to the other Party in accordance with Section 12.01.  For the avoidance of doubt, each condition permitting termination of this Agreement set forth in this Section 10.01 shall be considered separate and distinct from each other such condition and, if more than one termination condition set forth in this Section 10.01 is applicable, the Party exercising any such termination right shall have the right to choose the termination condition pursuant to which this Agreement is to be terminated.

SECTION 10.02   *Effect of Termination*.

(a)      Subject to Section 10.02(b), if this Agreement is terminated as permitted by Section 10.01, (i) this Agreement shall become null and void and of no further force and except, except for the provisions of Section 7.01(a), this Section 10.02, Section 10.03 and Article 12, which shall survive such termination of this Agreement and (ii) no Party (nor any stockholder, director, officer, employee, agent, consultant or representative of any such Party) shall thereafter have any Liability hereunder; provided that nothing in this Section 10.02 shall be deemed to release any Party from any Liability (x) for any breach of this Agreement occurring prior to its termination and (y) that may otherwise be provided in, or contemplated by, the provisions of Section 7.01(a) or Section 10.02(b).

(b)      Notwithstanding anything contained in this Agreement to the contrary: (i) if this Agreement is terminated by (A) either Party pursuant to Section 10.01(d), (B) the Company pursuant to Section 10.01(o) or (C) Buyer pursuant to Section 10.01(b), Section 10.01(g) or Section 10.01(k), then Sellers, on a joint and several basis, shall pay to Buyer (by wire transfer of immediately available funds), an amount equal to the Expense Reimbursement no later than the date that is one (1) Business Day following the date of such termination; and (ii) if this Agreement is terminated pursuant to Section 10.01(c) or Section 10.01(e), then Sellers, on a joint and several basis, shall pay to Buyer (by wire transfer of immediately available funds), an amount equal to the Expense Reimbursement upon the closing of the "Successful Bid" or "Next-Highest Bid" (each as defined in the Bid Procedures Order) or an Alternative Transaction.

SECTION 10.03   *Costs and Expenses*.   Except as otherwise expressly provided in this Agreement, including as set forth in Section 10.02(b) whether or not the transactions contemplated by this Agreement are consummated, all costs and expenses incurred in connection with this Agreement shall be paid by the Party incurring such cost or expense.

ARTICLE 11

TAXES

SECTION 11.01   *G Reorganization*.

(a)      Buyer has the right to elect at any time prior to the Closing to structure or restructure the transactions contemplated by this Agreement as a reorganization under Section 368(a)(1)(G) of the Code, with any actual or deemed distribution by the Company (or, if applicable, any of its Subsidiaries) qualifying solely under Sections 354 and 356 of the Code but not under Section 355 of the Code ("G Reorganization" and such election, the "G Reorganization Election").

(b)      In the event that a G Reorganization Election is made, Buyer and Sellers shall, and shall cause their applicable Affiliates to, (i) implement the G Reorganization in a manner that is otherwise consistent with the rights and obligations of Buyer and Sellers under this Agreement, (ii) treat the G Reorganization as a corporate acquisition of assets by Buyer to which Section 381 of the Code applies (unless otherwise required by determination within the meaning of Section 1313(a) of the Code (and comparable provision of state, local, or non-U.S. Laws)), (iii) agree that this Agreement constitutes a "plan of reorganization" within the meaning of Treasury Regulations

73

Section 1.368-2(g) with neither Buyer nor any Seller taking any action or failing to take an action that will preclude the transactions contemplated by this Agreement from qualifying as a G Reorganization, and (iv) take (or not take) any other actions that are reasonably requested by Buyer in order to secure and preserve the qualification of any of the transactions set forth in this Agreement as a G Reorganization but only if Buyer irrevocably commits to structure the transactions contemplated by this Agreement as a G Reorganization (to the extent such transactions can be structured as a G Reorganization under applicable Law), including with respect to (A) repayment, cancellation or settlement of, or other actions with respect to, any intercompany accounts on or before the Closing Date, (B) the merger of one member of the Company or its Subsidiaries with another member of the Company or its Subsidiaries on or before the Closing Date or conversion (or liquidation) of any such member into a limited liability company on or before the Closing Date, (C) the filing of any Tax elections to treat any such entity as a disregarded entity for U.S. federal income Tax purposes on or before the Closing Date, (D) causing the Company to form a corporation that will act as the acquiror in the G Reorganization, (E) liquidation of the Company for U.S. federal income tax purposes or any of its Subsidiaries no later than the date mutually agreed to by Buyer and Seller, <u>provided</u> that any date of liquidation shall not jeopardize the qualification of the transactions as a G Reorganization (as determined by Buyer in its reasonable discretion), and (F) satisfaction of the ownership requirements set forth in Section 382(l)(5)(A) of the Code ("L5") to the extent that Buyer is potentially eligible to make an L5 election and Buyer agrees that the preservation of the ability to make such election is in the best interests of Buyer; <u>provided</u> that (i) Buyer shall prepare and deliver to the Company initial drafts of all filings, agreements and other documents that are necessary to effectuate the transactions described in this clause (iv) (other than clause (iv)(E)); (ii) Sellers shall provide any assistance that is reasonably requested by Buyer in connection with the preparation of any such filings, agreements or other documents; and (iii) Buyer and Sellers shall not be limited in respect of disposing of any of its assets if and to the extent permitted under the other provisions of this Agreement and taking or refraining from taking any action required by law, including if such actions would be inconsistent with its obligations under the Bankruptcy Code. Notwithstanding the foregoing or anything to the contrary, Borrower may revoke any election to structure the transactions contemplated by this Agreement as a G Reorganization if Seller and its Affiliates have not taken any actions described in <u>clause (iv)</u> of this Section 11.01underlined{(b)} that resulted in an adverse effect to Seller or its Affiliates by more than a *de minimis* amount.

(c)      To the extent not addressed by the foregoing, Buyer and each Seller shall also furnish or cause to be furnished to each other all documentation and information of Sellers or any of their Affiliates as reasonably requested in connection with (i) the treatment of the transactions contemplated by this Agreement as one or more reorganizations under Section 368 of the Code and/or in connection with qualifying for the application of Section 382(l)(5) of the Code and (ii) the Tax basis, losses, and credits (including carryovers), income, gains, deductions and other attributes or Tax items of Sellers or any of their Affiliates.

(d)      In the event that a G Reorganization Election is made, if any taxing authority disputes the qualification of the transactions contemplated by this Agreement as a G Reorganization, the Party receiving notice of the dispute shall promptly notify the other Party hereto of such dispute and the Parties shall cooperate in good faith in responding to such dispute in order to preserve the qualification of the transactions contemplated by this Agreement as a G Reorganization; <u>provided</u>, that Buyer may at its election control any proceedings with this respect

to the qualification of the transactions contemplated by this Agreement as a G Reorganization and nothing in this Section 11.01 shall impede the ability of Buyer or any of its Affiliates to negotiate, compromise and/or settle any such Proceeding.

ARTICLE 12

MISCELLANEOUS

SECTION 12.01  *Notices*.  All notices, requests and other communications to any Party hereunder shall be in writing and shall be delivered to the addresses set forth below (or pursuant to such other address(es) as may be designated in writing by the Party to receive such notice):

if to Buyer:

> Fortress Credit Corp, as Administrative Agent
> c/o Fortress Investment Group LLC
> 1345 Avenue of the Americas, 46th Floor
> New York, NY, 10105
> Attention:    General Counsel
> Email:        gccredit@fortress.com

> with a copy to:

> c/o Fortress Investment Group LLC
> 1345 Avenue of the Americas, 46th Floor
> New York, NY, 10105
> Attention:    Brian Stewart
> Email:        bstewart@fortress.com

> with a copy, which shall not constitute notice, to:

> Gibson, Dunn & Crutcher LLP
> 333 South Grand Avenue
> Los Angeles, CA 90071
> Attention:    David Feldman
>               Cromwell Montgomery
>               Candice Choh
> Email:        DFeldman@gibsondunn.com
>               CMontgomery@gibsondunn.com
>               CChoh@gibsondunn.com

if to Sellers, to:

> 49 South 2nd Street
> Brooklyn, NY 11249
> Attention:    Maria Harris
> Email:        maria.harris@vice.com

with a copy, which shall not constitute notice, to:

Shearman & Sterling LLP
599, Lexington Avenue,
New York, NY 10022
Attention:      Christopher M. Forrester
                Fredric Sosnick
                Ian E. Roberts
                William S. Holste
                Jacob S. Mezei
Email:          chris.forrester@shearman.com
                fsosnick@shearman.com
                ian.roberts@shearman.com
                william.holste@shearman.com
                jacob.mezei@shearman.com

All such notices, requests and other communications shall be deemed received (a) if delivered prior to 5:00 p.m. New York time on a day which is a Business Day, then on such date of delivery if delivered personally, or, if by email, upon written confirmation of delivery by email (which may be electronic), and if delivered after 5:00 p.m. New York time (whether personally or by email) then on the next succeeding Business Day, (b) on the first (1st) Business Day following the date of dispatch if delivered utilizing a next-day service by a recognized next-day courier or (c) on the earlier of confirmed receipt or the fifth (5th) Business Day following the date of mailing if delivered by registered or certified mail, return receipt requested, postage prepaid.

SECTION 12.02  *Amendments and Waivers.*

(a)      Any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each of Buyer and the Company (on behalf of itself and each Seller) or, in the case of a waiver, by the Party against whom the waiver is to be effective; <u>provided</u> that any waiver asserted against any Seller shall be valid if given by the Company on behalf of such Seller.  For clarity, Bankruptcy Court approval shall not be required for any amendment to this Agreement.

(b)      No failure or delay by any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by Law.

SECTION 12.03  *Successors and Assigns.*  The provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns; <u>provided</u> that subject to Buyer's right to designate a Buyer Designee as set forth in <u>Section 2.01</u>, Buyer, on the one hand, may not assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the prior written consent of the Company, and each Seller, on the other hand, may not assign, delegate or otherwise transfer any of their respective

76

rights or obligations under this Agreement without the prior written consent of Buyer.   Any attempted assignment in violation of this <u>Section 12.03</u> shall be null and void, *ab initio*.

SECTION 12.04   *Governing Law*.   Except to the extent of the mandatory provisions of the Bankruptcy Code, this Agreement shall be governed by and construed in accordance with the Laws of the State of New York, without regard to the conflicts of law rules of such State.

SECTION 12.05   *Jurisdiction*.   The Parties agree that, during the period from the date hereof until the date on which the Chapter 11 Cases are closed or dismissed (the "<u>Bankruptcy Period</u>"), any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby shall be brought exclusively in the Bankruptcy Court.   The Parties further agree that, following the Bankruptcy Period, any Proceeding with respect to this Agreement or the transactions contemplated hereby shall be brought against any of the Parties exclusively in either the United States District Court for the Southern District of New York or any state court of the State of New York located in the borough of Manhattan, and each of the Parties hereby irrevocably consents to the jurisdiction of such court and the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such Proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such Proceeding in such courts or that any such Proceeding which is brought in such courts has been brought in an inconvenient forum.   Process in any such Proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of the Bankruptcy Court, the United States District Court for the Southern District of New York or any state court of the State of New York.   Without limiting the foregoing, each Party agrees that service of process on such Party as provided in <u>Section 12.01</u> shall be deemed effective service of process on such Party.

SECTION 12.06   *WAIVER OF JURY TRIAL*.   TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW THAT CANNOT BE WAIVED, EACH PARTY HEREBY WAIVES, AND COVENANTS THAT IT WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE, CLAIM, DEMAND, ACTION OR CAUSES OF ACTION ARISING IN WHOLE OR IN PART UNDER, RELATED TO, BASED ON OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER TRANSACTION DOCUMENT OR THE SUBJECT MATTER HEREOF OR THEREOF, WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER SOUNDING IN TORT OR CONTRACT OR OTHERWISE.   ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS <u>SECTION 12.06</u> WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF EACH SUCH PARTY TO THE WAIVER OF ITS RIGHT TO TRIAL BY JURY.

SECTION 12.07   *Counterparts; Third-Party Beneficiaries*.   This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.   This Agreement shall become effective when each Party shall have received a counterpart hereof signed by the other Party.   No other provision of this Agreement is intended to confer upon any Person other than the Parties any rights, benefits, Proceedings or remedies hereunder.   Delivery of a .pdf version of one or more signatures to this Agreement shall be deemed adequate delivery for purposes of this Agreement.

SECTION 12.08 *Specific Performance*. It is understood and agreed by the Parties that money damages (even if available) would not be a sufficient remedy for any breach of this Agreement by Sellers or Buyer and as a consequence thereof, after the Bankruptcy Court's entry of the Sale Order, Sellers and Buyer shall each be entitled to specific performance and injunctive or other equitable relief as a remedy for any such breach or threatened breach in addition to any other remedy to which such Party may be entitled in Law or in equity, including an Order of the Bankruptcy Court or other court of competent jurisdiction requiring Buyer or Sellers, as may be applicable, to comply promptly with any of their obligations hereunder. Each of the Parties agrees that it will not oppose the granting of an injunction, specific performance and other equitable relief on the basis that the other Party has an adequate remedy at Law or that any award of specific performance is not an appropriate remedy for any reason at Law or in equity. Any Party seeking an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement shall not be required to provide any bond or other security in connection with such Order.

SECTION 12.09 *Entire Agreement*. This Agreement and the other Transaction Documents (together with the Schedules and Exhibits hereto and thereto) constitute the entire agreement between the Parties with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings, both oral and written, between the Parties with respect to such subject matter. No Party to this Agreement shall be liable or bound to any other Party in any manner by any representations, warranties, covenants or agreements relating to such subject matter except as specifically set forth herein and therein. In the event an ambiguity or question of intent or interpretation arises with respect to this Agreement, the terms and provisions of the execution version of this Agreement will control and prior drafts of this Agreement and the documents referenced herein will not be considered or analyzed for any purpose (including in support of parol evidence proffered by any Person in connection with this Agreement), will be deemed not to provide any evidence as to the meaning of the provisions hereof or the intent of the Parties with respect hereto and will be deemed joint work product of the Parties.

SECTION 12.10 *No Strict Construction*. Buyer, on the one hand, and Sellers, on the other hand, participated jointly in the negotiation and drafting of this Agreement, and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by Buyer, on the one hand, and Sellers, on the other hand, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement. Without limitation as to the foregoing, no rule of strict construction construing ambiguities against the draftsperson shall be applied against any Person with respect to this Agreement.

SECTION 12.11 *Severability*. If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon such a determination, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transaction contemplated hereby be consummated as originally contemplated to the fullest extent possible.

SECTION 12.12  *Disclosure Schedules*.  The representations and warranties of Sellers set forth in this Agreement are made and given subject to the disclosures in the Disclosure Schedules. Inclusion of information in the Disclosure Schedules will not be construed as an admission that such information is material to the business, operations of condition (financial or otherwise) of Sellers or their respective businesses, in whole or in part, or as an admission of Liability or obligation of Sellers to any Person.  The sections of the Disclosure Schedules have been organized for purposes of convenience in numbered sections corresponding to the sections in this Agreement; provided, however, that any disclosure in any section of the Disclosure Schedules will apply to and will be deemed to be disclosed with respect to any other representation and/or warranty, so long as the applicability of such disclosure is reasonably apparent on its face.  It is understood and agreed that the specification of any dollar amount in the representations and warranties or covenants contained in this Agreement or the inclusion of any specific item in the Disclosure Schedules is not intended to imply that such amounts or higher or lower amounts, or the items so included or other items, are or are not material, and no Party or other Person shall use the fact of the setting of such amounts or the fact of the inclusion of any such item in the Disclosure Schedules in any dispute or controversy as to whether any obligation, item or matter not described in this Agreement or included in the Disclosure Schedules is or is not material for purposes of this Agreement.  Nothing in this Agreement (including the Disclosure Schedules) shall be deemed an admission by either Party or any of its Affiliates, in any Proceedings, that such Party or any such Affiliate, or any third party, is or is not in breach or violation of, or in default in, the performance or observance of any term or provisions of any Contract or Law.

*(Signature Pages Follow)*

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**VICE GROUP HOLDING INC.**

By:_____
Name: Hozefa Lokhandwala
Title:  Co-Chief Executive Officer

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**VICE HOLDING INC.**

By:_____

Name: Hozefa Lokhandwala

Title:   Co-Chief Executive Officer

**VICE FOOD LLC**

By: _____

Name: Hozefa Lokhandwala

Title:   Manager

**PROJECT CHANGE LLC**

By: _____

Name: Hozefa Lokhandwala

Title:   President

*(Signature Page to Asset and Equity Purchase Agreement)*

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**VICE MEDIA LLC**
**BOY WHO CRIED AUTHOR LLC**
**CARROT CREATIVE LLC**
**CARROT OPERATIONS LLC**
**DANA MADE LLC**
**INVERNESS COLLECTIVE LLC**
**JT LEROY HOLDING LLC**
**PLDM FILMS LLC**
**REFINERY 29 INC.**
**R29 PRIDE, LLC**
**R29 PRODUCTIONS, LLC**
**VALVI LLC**
**VICE CONTENT DEVELOPMENT, LLC**
**VICE DISTRIBUTION LLC**
**VICE IMPACT INC.**
**VICE INTERNATIONAL HOLDING, INC.**
**VICE MUSIC PUBLISHING LLC**
**VICE PAYROLL LLC**
**VICE PRODUCTIONS LLC**
**VICE PROJECT SERVICES LLC**
**VILLAIN LLC**
**VIRTUE WORLDWIDE, LLC**
**VISUR LLC**
**VTV PRODUCTIONS LLC**


By: _____
Name: Hozefa Lokhandwala
Title:   Chief Strategy Officer

*(Signature Page to Asset and Equity Purchase Agreement)*

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**CLIFFORD BENSKI, INC.**
**VICE EUROPE HOLDING LIMITED**
**VICE EUROPE PULSE HOLDING LIMITED**


By: _____
Name: Hozefa Lokhandwala
Title:   Director


**CHANNEL 271 PRODUCTIONS LLC**


By: _____
Name: Jason Guberman
Title:   Vice President

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**VICE ACQUISITION HOLDCO, LLC**


By:_____

Name:

Title:

*(Signature Page to Asset and Equity Purchase Agreement)*

## **Exhibit A**

**Form of Assignment and Assumption Agreements**

(*To come*)

**<u>Exhibit B</u>**

**Form of Bills of Sale**

(*To come*)

## **Exhibit C**

**Form of Assignment of IP**

(*To come*)