**TOGUT, SEGAL & SEGAL LLP**
Albert Togut
Kyle J. Ortiz
Brian F. Moore
One Penn Plaza, Suite 3335
New York, NY  10119
Phone:  (212) 594-5000
Email:   altogut@teamtogut.com
              kortiz@teamtogut.com
              bmoore@teamtogut.com

*Proposed Counsel to the Debtors and
Debtors in Possession*

**SHEARMAN & STERLING LLP**
Fredric Sosnick
William S. Holste
Jacob S. Mezei
599 Lexington Avenue
New York, NY  10022
Phone:  (212) 848-4000
Email:   fsosnick@shearman.com
              william.holste@shearman.com
              jacob.mezei@shearman.com

-and-

Ian E. Roberts (*pro hac vice* pending)
2601 Olive Street, 17th Floor
Dallas, TX  75201
Phone:  (214) 271-5777
Email:   ian.roberts@shearman.com

*Proposed Special Counsel to the Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| VICE GROUP HOLDING INC., *et al.* | Case No. 23-10738 (JPM) |
| Debtors.[1] | (Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING
AND (B) USE CASH COLLATERAL, (II) GRANTING LIENS AND SUPERPRIORITY**

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtors' tax identification number, are: Vice Group Holding Inc. (4250); Vice Impact Inc. (9603); Vice Media LLC (5144); Villain LLC (3050); Boy Who Cried Author LLC (6199); Carrot Operations LLC (1596); Carrot Creative LLC (8652); Channel 271 Productions LLC (1637); Clifford Benski, Inc. (9387); Dana Made LLC (1065); Inverness Collective LLC (6542); JT Leroy Holding LLC (7555); PLDM Films LLC (5217); Project Change LLC (2758); R29 Pride, LLC (7011); R29 Productions, LLC (6344); Refinery 29 Inc. (7749); Valvi LLC (6110); Vice Content Development, LLC (5165); Vice Distribution LLC (5515); Vice Europe Holding Limited (N/A);  Vice Europe Pulse Holding Limited (N/A); Vice Food LLC (1693); Vice Holding Inc. (2658); Vice International Holding, Inc. (5669); Vice Music Publishing LLC (3022); Vice Payroll LLC (6626); Vice Productions LLC (5399); Vice Project Services LLC (6473); Virtue Worldwide, LLC (7212); Visur LLC (9336); and VTV Productions LLC (6854). The location of the Debtors' service address for purposes of these Chapter 11 Cases is:  49 South 2nd Street, Brooklyn, NY 11249.

**CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, (IV) GRANTING
ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES,
(V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF**

Vice Group Holding Inc. ("Vice Parent") and its debtor affiliates, as debtors and debtors

in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter

11 Cases"), respectfully represent in support of this motion (the "Motion") as follows:

**Preliminary Statement**

1.      Access to post-petition liquidity was a primary impetus for these Chapter 11 Cases.

The Debtors filed these cases after months of negotiation with their lenders — including an

extended sale process, mounting liquidity pressures, industry turmoil, and the termination of a

material revenue contract — and ultimately for the use of the Cash Collateral (as defined below)

and DIP financing.  The need to use Cash Collateral and access DIP Financing is particularly acute,

due to the fact that, as described in greater detail below, a freeze on certain bank accounts (the

"Vice Media JPMC Accounts") of Debtor Vice Media LLC ("VML") effectively shut off much of

the Debtors' liquidity, imperiling the Debtors' ability to continue to fund their businesses around

the world.

2.      Chapter 11 affords the best opportunity for the Debtors to achieve a breathing space

within which they can work to preserve and maximize the value of their estates for the benefit of

all stakeholders, through a sale of the Debtors' businesses free and clear to parties that can realize

the significant potential of the Debtors' global brand and reputation.  To fund this sale process and

the administration of these cases, the Debtors seek the immediate use of Cash Collateral, and

particularly the funds held in the Vice Media JPMC Accounts.  Furthermore, to supplement the

Cash Collateral and help to fund the course of these Chapter 11 Cases, the Debtors negotiated a

senior secured superpriority debtor-in-possession multi-draw term loan facility (the "DIP

Facility") under the terms set forth in the Senior Secured Super-Priority Term Loan Debtor-In-

Possession Credit and Guaranty Agreement (as the same may be amended, restated, supplemented, waived or otherwise modified from time to time, the "DIP Credit Agreement"), among the DIP Borrower (as defined below), the DIP Guarantors (as defined below), the lenders party thereto (collectively in such capacity, the "DIP Lenders"), Fortress Credit Corp., as administrative agent ("Fortress", and in such capacity, the "DIP Administrative Agent"), and Wilmington Trust, National Association, as collateral agent ("Wilmington Trust", and in such capacity, the "DIP Collateral Agent" and, together with the DIP Administrative Agent, the "DIP Agents," and the DIP Lenders and DIP Agents, collectively, the "DIP Secured Parties"), proposed in this Motion.

3.      As described in the *Declaration of Frank A. Pometti in Support of the Debtors' Chapter 11 Petitions and First Day Relief* (the "First Day Declaration"), the Debtors faced a series of challenges that led them to chapter 11.  The use of Cash Collateral and the DIP Facility contemplated by this Motion are key to the Debtors' path forward.  The Debtors urgently require access to the Cash Collateral and the infusion of new money in order to make the payments authorized by the other first-day orders, conduct a meaningful sale process, and fund their operations worldwide.

4.      As described in the *Declaration of Brent Herlihy in Support of the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Superpriority Claims, (III) Modifying the Automatic Stay, (IV) Granting Adequate Protection to Prepetition Secured Parties, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "DIP Declaration" and, together with the First Day Declaration, the "Declarations"), the DIP Facility is being provided by lenders (the "Prepetition Term Lenders") of term loans (the "Prepetition Senior Secured Term Loans") outstanding under that certain Amended and Restated Credit and Guaranty Agreement,

dated November 4, 2019, as amended from time to time, through Amendment No. 33 to Amended

and Restated Credit and Guaranty Agreement, dated as of May 9, 2023 (the "Prepetition Senior

Secured Credit Agreement"), by and among Vice Parent, as borrower, certain subsidiaries of Vice

Parent from time to time as guarantors, Fortress (in its capacity as administrative agent under the

Prepetition Senior Secured Credit Agreement, the "Prepetition Administrative Agent"),

Wilmington Trust (in its capacity as collateral agent under the Prepetition Senior Secured Credit

Agreement, the "Prepetition Collateral Agent"), and the Prepetition Term Lenders (together with

the Prepetition Administrative Agent and the Prepetition Collateral Agent, the "Prepetition

Secured Parties").   As described in the DIP Declaration, the Debtors concluded, after a marketing

and diligence process, that the existing secured lenders were the logical and, ultimately, only

source of such new capital.

5.       Prior to entering into the DIP Facility, PJT Partners Inc. ("PJT"), the Debtors'

proposed investment banking advisor, sought proposals from potential third-party DIP financing

sources.  Those efforts confirmed that DIP financing on a junior basis was not possible, and the

Prepetition Term Lenders would not consent to being primed.  The DIP Facility, therefore, is the

only viable source of DIP financing and is critical to the preservation of the Debtors' businesses

and the maximization of recoveries for their creditors.

6.       As in any negotiated process, the Debtors made and received concessions.  When

viewed as a whole and in the context of these Chapter 11 Cases, the DIP Facility is fair and

reasonable.  As part of the negotiations, the Debtors sought to obtain, and ultimately reached

agreement on, the best terms (including the lowest possible interest rates and fees associated with

the DIP Facility) that were obtainable under the circumstances.

7.     The DIP Facility provides for a 5:1 roll-up of Prepetition Senior Secured Term Loans into the DIP Facility (the "Roll-Up").  Accordingly, of the $60 million of the DIP Facility, $10 million are new loans (the "New Money DIP Facility") and $50 million are the Roll-Up of the Prepetition Senior Secured Term Loans (the "Roll-Up DIP Loans").  Upon the closing, following entry of the Interim Order (as defined below), $5 million of the New Money DIP Facility would be available (the "Initial New Money DIP Loans") to the Debtors, and there would be a corresponding Roll-Up of $25 million of Prepetition Senior Secured Term Loans into DIP Loans (the "Initial Roll-Up DIP Loans").  The remainder of the New Money DIP Facility would become available, subject to satisfaction of the conditions precedent set forth in the DIP Credit Agreement, in new money draws in accordance with the DIP Budget (as defined below) upon the entry of the Final Order (as defined below), at which point the Roll-Up of the remainder of the Roll-Up DIP Loans will occur.

8.     Using the Cash Collateral and securing additional liquidity are vital to the preservation of the value of the Debtors' estates as the Debtors pursue an orderly process to support the sale efforts that the Debtors are continuing while in the Chapter 11 Cases.  Substantially all of the cash the Debtors have on hand is the Cash Collateral of the Prepetition Term Lenders, which the Debtors could not access, absent the Prepetition Term Lenders' consent, or authorization from this Court.  In any event, given the Debtors' current liquidity position, their cash balance is insufficient to fund their businesses for the anticipated duration of these cases.

9.     As the foregoing makes clear, and as further described below, the continued use of Cash Collateral and the DIP Facility are essential components of the Debtors' chapter 11 strategy.  Accordingly, the Debtors respectfully request that the Court grant the Motion.

## Relief Requested

10.    The Debtors request the entry of an interim order in the form attached hereto as

**Exhibit A** (the "Interim Order"), and a final order in substantially the same form (the "Final Order"

and, together with the Interim Order, the "DIP Orders"), providing for, among other things, the

following relief:

      i.    authorizing the Debtors to use "cash collateral," as defined in section 363 of the Bankruptcy Code (the "Cash Collateral"), including Cash Collateral of the DIP Secured Parties, the Prepetition Secured Parties, and the Cash Management Bank (as defined below);

     ii.    authorizing the Debtors to obtain a senior secured priming and superpriority debtor-in-possession multi-draw term loan facility, pursuant to the terms of the DIP Credit Agreement attached as **Exhibit B**, and to cause certain of the Debtors' non-Debtor affiliates (the "Non-Debtor Guarantors") to guarantee the Roll-Up DIP Loans, as set forth more particularly in the DIP Credit Agreement;

   iii.    authorizing the Debtors to execute and deliver the DIP Credit Agreement and any other agreements, instruments, pledge agreements, guarantees, control agreements, arrangement letters, and commitment letters, that certain fee letter between the DIP Borrower and the DIP Administrative Agent in the amount of $75,000 per annum and that certain fee letter between the DIP Borrower and the DIP Collateral Agent in the amount of $20,000 per annum (together, the "Fee Letters"), and other Credit Documents (as defined in the DIP Credit Agreement), each as may be amended, restated, supplemented, waived, or modified from time to time, in accordance with the terms hereof and thereof (collectively, and together with the DIP Credit Agreement, the "DIP Loan Documents") and to perform such other acts as may be necessary, desirable, or appropriate in connection with the DIP Loan Documents, including, without limitation, the payment of fees and interest;

   iv.    granting to the DIP Collateral Agent, for the benefit of the DIP Secured Parties, fully-perfected first-priority priming liens on and senior security interests (the "DIP Liens") in substantially all of the property, assets, and other interests in property and assets of the Debtors, subject only to (a) the Carve Out (as defined below), (b) certain senior liens permitted pursuant to the terms of the DIP Credit Agreement and (c) other valid, perfected and unavoidable senior liens, if any, existing as of the Petition Date (or perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code) (the "Prior Senior Liens"), in each case, that are senior in priority to the liens on the Prepetition Collateral securing the Prepetition Senior Secured Term Loans and the Prepetition Overdraft Facility, on the terms and conditions set forth in the DIP Loan Documents, and providing superpriority administrative expense claims to the DIP Secured Parties (the "DIP Superpriority Claims") with respect to the DIP Facility, subordinate only to the payment of the

Carve Out; *provided*, *however*, for the avoidance of doubt, that no right, title, or interest of Wipro, LLC ("Wipro"), or any of its affiliates in any of the DIP Collateral shall constitute a Prior Senior Lien;

v.   modifying the automatic stay to the extent necessary to effectuate the terms and conditions of the DIP Loan Documents and the DIP Orders, including by providing to lift the automatic stay to allow the DIP Secured Parties, the Prepetition Secured Parties, and the Cash Management Bank to exercise remedies against the Debtors five days after termination of the DIP Facility;

vi.   authorizing the Debtors at any time prior to the entry of the Final Order to borrow under the DIP Facility, on an interim basis, in an aggregate outstanding principal amount not to exceed $5 million in Initial New Money DIP Loans and, upon entry of the Interim Order, $25 million in Initial Roll-Up DIP Loans, subject to the terms of the DIP Credit Agreement;

vii.   approving, subject to the Carve Out and solely to the extent of any diminution in value of their interest in the Prepetition Collateral (as defined below), the forms of adequate protection to be provided by the Debtors to the Prepetition Secured Parties and the Cash Management Bank;

viii.   providing, notwithstanding the requirements of Local Rule 4001-2(g)(4), for a challenge period (the "Challenge Period") for the filing of adversary proceedings to contest the Prepetition Senior Secured Term Loans and the liens granted thereunder (the "Prepetition Senior Liens") of 30 days after the date of the entry of the Interim Order;

ix.   scheduling a final hearing (the "Final Hearing") to consider the relief requested in this Motion on a final basis, and approving the form of notice with respect to the Final Hearing;

x.   authorizing the DIP Secured Parties and the Prepetition Secured Parties to be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, waiving the "equities of the case" exception with respect to such, and waiving the Debtors' right to surcharge against the DIP Collateral and the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code;

xi.   providing for the automatic effectiveness of the Interim Order and waiving any applicable stay (including under Bankruptcy Rule 6004) to permit such immediate effectiveness; and

xii.   granting related relief.

### Jurisdiction and Venue

11.   The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334

and the *Amended Standing Order of Reference from the United States District Court for the*

*Southern District of New York*, dated January 31, 2012 (Preska, C.J.). Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409. The bases for relief are sections 105(a), 361, 362, 363, 364, 503, 507 and 552 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1, 4001-1, 4001-2 and 9013-1 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules").

12.    This Motion is a core proceeding pursuant to 28 U.S.C. § 157(b). The Debtors confirm their consent to the Court's entry of a final order in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

## Background

13.    On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code with this Court. They have requested joint administration of the Chapter 11 Cases for procedural purposes only, pursuant to Bankruptcy Rule 1015(b). The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases, and no official committees have been appointed or designated.

14.    From their humble beginnings as a niche magazine, the Debtors and their non-Debtor affiliates (collectively, "*VICE*" or the "Company") have grown into a global media company that focuses on content centered around news and culture, serving a largely global youth audience. Today, *VICE* is a global, multiplatform media company that has a powerful brand,

diversified financial profile, premium content, and rich engagement with its youth-targeted audience. With production hubs around the world, *VICE* creates thousands of pieces of content a week globally, including editorial, digital and social video, experiential events, commercials, music videos, scripted and unscripted television, feature documentaries, and movies. Additional facts relating to the Debtors' businesses and capital structure, and the commencement of these Chapter 11 Cases, are set forth in the First Day Declaration.[2] Certain additional facts related to this Motion are set forth in the DIP Declaration, which was filed contemporaneously with this Motion and is incorporated herein by reference.

## **Cash Collateral**

15.     As further described in the First Day Declaration, in the final days leading up to these Chapter 11 Cases, Wipro obtained a judgment against VML in the amount of approximately $9.9 million. Subsequently, on May 5, 2023, Wipro commenced the process of enforcing its judgment through the purported service of a restraining notice under CPLR § 5222(b) (the "Restraining Notice"), limiting the ability of VML to transfer or dispose of its assets, including its cash on hand.

16.     On or about May 10, 2023, Wipro served JPMC with a restraining notice similar to the Restraining Notice received by the Debtors, which sought to impose a stay on withdrawals from the VICE Media JPMC Accounts, and shortly thereafter, the Prepetition Collateral Agent sought to exercise remedies under their deposit account control agreements for all of the Debtors' accounts at JPMC, including the Vice Media JPMC Accounts. The Debtors understand that JPMC has frozen the VICE Media JPMC Accounts pending an order from a court that clarifies the control

---

[2]     Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the First Day Declaration or the DIP Credit Agreement, as applicable.

of the funds in the VICE Media JPMC Accounts.  The funds in the VICE Media JPMC Accounts are Cash Collateral, which the Debtors are seeking authority to use pursuant to this Motion.

17.     The freeze on the Vice Media JPMC Accounts has essentially shut off much of the liquidity of the Debtors.  The lack of liquidity is a particular concern for the Debtors as they rely heavily on the services of freelancers and independent contractors.   In addition, due to the international nature of the Company's businesses (as described in greater detail in the First Day Declaration), the Debtors require liquidity to ensure that their non-Debtor foreign subsidiaries are able to continue to operate in the ordinary course of business.

### Prepetition Capital Structure[3]

18.     As of the Petition Date, the Debtors collectively have outstanding prepetition funded debt obligations (the "Prepetition Funded Debt Obligations"), including capitalized paid-in-kind ("PIK") interest, in the aggregate amount of approximately $834 million (exclusive of other accrued and unpaid interest fees, penalties, or premiums).  The Prepetition Funded Debt Obligations comprise approximately (i) $505.3 million of secured obligations (the "Prepetition Funded Secured Obligations") and (ii) $328.7 million of unsecured obligations.

19.     The Prepetition Funded Secured Obligations consist of the following:

---

[3]     The description of the Debtors' indebtedness provided herein is for informational purposes only, is qualified in its entirety by reference to the actual documents that contain the specific terms and obligations, and is not an admission as to any rights or security interests under such documents and agreements.

| Prepetition Funded Secured Obligations | Amount Outstanding |
|---|---|
| Prepetition Senior Secured Credit Agreement | $474.6 million |
| Prepetition Overdraft Facility | $9.8 million[4] |
| Pulse Notes | $20.9 million |
| **Total** | **$505.3 million** |

The prepetition unsecured funded debt of the Debtors consists primarily of the Senior Subordinated

Unsecured Notes (as defined in the First Day Declaration).[5]

### A.    The Prepetition Senior Secured Credit Agreement

20.    As described in the DIP Declaration, the DIP Facility is being provided by certain

of the Debtors' Prepetition Term Lenders under the Prepetition Senior Secured Credit Agreement.

The Debtors concluded, after a marketing and diligence process, that the Prepetition Term Lenders

were the logical and, ultimately, only source of such new capital.

21.    As of the Petition Date, the Debtors had a total of $474.6 million aggregate

principal amount (inclusive of principal, PIK interest, and PIK forbearance fees) of outstanding

Prepetition Senior Secured Term Loans.  The Prepetition Senior Secured Term Loans consist of

two separate term loan facilities:  (i) an initial term loan facility in the aggregate principal amount

of $250 million (the "Initial Prepetition Secured Term Loans") and (ii) a multi-draw term loan

facility (the "2023 Multi-Draw Term Loans"), of which $57 million in principal was drawn and

outstanding as of the Petition Date.  All obligations under the Prepetition Senior Secured Credit

Agreement and the guarantees of those obligations are secured by a first-priority security interest

in substantially all of the property and assets of the Debtors and the Non-Debtor Guarantors (the

"Prepetition Collateral").

---

[4]    As discussed below, the Prepetition Overdraft Facility is denominated in British pounds sterling.  The U.S. dollar amounts set forth in this table represent an approximation based upon the conversion of GBP to USD.

[5]    A detailed description of the Senior Subordinated Unsecured Notes is set forth in the First Day Declaration.

22.     The Initial Prepetition Secured Term Loans matured on December 9, 2022 (the "Prepetition Maturity Date").  The Debtors failed to repay the Initial Prepetition Secured Term Loans on the Prepetition Maturity Date, which constituted an event of default under the Prepetition Senior Secured Credit Agreement (the "Prepetition Maturity Default").  The occurrence of the Prepetition Maturity Default caused interest on the Initial Prepetition Secured Term Loans to accrue at the Prepetition Default Rate (as defined below), and also triggered cross-defaults under the provisions of several of the Senior Subordinated Unsecured Notes and the Pulse Notes (as defined below).  The 2023 Multi-Draw Term Loans — which were contemplated by the Debtors' forbearance agreement with the Prepetition Term Lenders, dated January 12, 2023 (the "Third Forbearance Agreement"), and made available via a series of amendments to the Prepetition Senior Secured Credit Agreement — mature upon the earliest of a "Forbearance Termination Event" (as defined in the Third Forbearance Agreement), the closing of a "Sale" (as defined in the Third Forbearance Agreement) and May 12, 2023.  As more fully set out in the First Day Declaration, the 2023 Multi-Draw Term Loans were instituted to fund payroll, among other things, while the Debtors explored a sale process, and the Third Forbearance Agreement expressly contemplates that if such sale process was not successful, the 2023 Multi-Draw Term Loans would serve to provide a bridge to a bankruptcy filing where an in-court, value maximizing sale process could be consummated and certain of the Initial Prepetition Secured Term Loans (including the 2023 Multi-Draw Term Loans) held by the Prepetition Term Lenders would be "rolled up" into a DIP Facility that would be provided by the Prepetition Term Lenders.  The forbearance under the Third Forbearance Agreement terminated as a result of, among other things, the failure to satisfy certain Sale-related milestones.

23.     Interest on the Initial Prepetition Secured Term Loans accrues at the rate of SOFR

plus 9%, provided that the Debtors have the option (which they regularly exercised) to elect to pay

the non-SOFR portion of the interest on the Initial Prepetition Secured Term Loans in kind,

whereupon the interest rate on the Initial Prepetition Secured Term Loans would increase to SOFR

plus 12%.  The default rate of interest for the Initial Prepetition Secured Term Loans is +3% per

annum (in addition to the otherwise applicable interest rate), which may be paid in kind unless the

Prepetition Term Lenders make a contrary demand (the "Prepetition Default Rate").  The 2023

Multi-Draw Term Loans bear interest at the rate of SOFR plus 12%, with the SOFR portion

payable in cash, and the remainder payable in kind.

### B.      Prepetition Overdraft Facility

24.     Certain of the Debtors have outstanding obligations under an uncommitted

multicurrency overdraft facility (the "Prepetition Overdraft Facility") pursuant to that certain

Uncommitted Overdraft Facility, dated October 14, 2016, as amended or supplemented from time

to time, including on April 19, 2017, April 25, 2017, and September 25, 2017, between Vice

Europe Holding Limited ("VEHL") and JPMorgan Chase Bank, N.A. ("JPMC" and, in such

capacity, the "Cash Management Bank").  The Prepetition Overdraft Facility was established to

be available from time to time to cover overdrafts on the Debtors' accounts with JPMC.  Initially,

the Prepetition Overdraft Facility had an overdraft limit of GB£3 million; however, pursuant to an

amendment letter dated September 25, 2017, the overdraft limit was increased to GB£10 million.

The Prepetition Overdraft Facility accrues interest at a rate equal to 2% plus the market index rate

for specified currencies, and such interest is paid monthly or quarterly in arrears (the "Overdraft

Interest").  If amounts under the Prepetition Overdraft Facility are not paid when due, the

Prepetition Overdraft Facility bears interest at a rate of the Overdraft Interest plus 4%.  As of the

Petition Date, there are outstanding obligations under the Prepetition Overdraft Facility of

approximately $9.8 million.  JPMC has setoff rights against cash deposits of certain Debtors and also is secured pursuant to an Assignment of Deposits among Debtor Vice Media LLC and JPMC, dated May 1, 2019, pledging certain deposit accounts held by Vice Media LLC and its subsidiaries in favor of JPMC as security for costs and expenses incurred by JPMC in connection with the covered bank accounts.  The Prepetition Overdraft Facility is also a secured "Cash Management Agreement" under the Prepetition Credit Agreement and is supported by a *pari passu* security interest in the Prepetition Collateral.

C.    **The Pulse Notes**

25.    In connection with the Company's 2016 acquisition of a majority stake in Pulse Films Limited ("Pulse"), Vice Holding Inc. ("Vice Holding") entered into a shareholders agreement with the original founders and sellers of Pulse (the "Pulse Sellers"), which allowed such sellers to put their shares in Pulse to VEHL, such that it would be required to purchase such sellers' shares of Pulse (the "Pulse Seller Shares") for an amount determined in accordance with a specified formula (the "Put Option").  In April 2021, the Pulse Sellers exercised their Put Option, which would have obligated the Company to pay $53,240,000 in cash.

26.    In lieu of paying the obligations due in respect of the Put Option, on December 8, 2021, a wholly-owned subsidiary of VEHL, Vice Europe Pulse Holding Limited ("VEPH"), purchased the Pulse Seller Shares by paying a total aggregate amount of $10 million in cash and issuing $43,240,000 of 10% secured and guaranteed redeemable loan notes due 2023 (the "Pulse Notes") to the Pulse Sellers.  VEPH's obligations in respect of the Pulse Notes were guaranteed by VEHL and Vice Holding.  To secure its obligations under the Pulse Notes, VEPH pledged 100% of its equity interests in Pulse pursuant to a share charge (the "Share Charge").  The rights of the Pulse Sellers to receive payments under the Pulse Notes and to exercise any rights under the Share Charge are subordinate to the rights of the Prepetition Term Lenders under the Prepetition

Senior Secured Credit Agreement, pursuant to the Subordination and Intercreditor Agreement, dated December 8, 2021, among the Pulse Sellers, B & C 3, LLC, as the security agent for the holders of the Pulse Notes, the Prepetition Collateral Agent, and Fortress (the "<u>Pulse Notes Subordination Agreement</u>").    Under the terms of the Pulse Notes Subordination Agreement, payment to the holders of the Pulse Notes is precluded for so long as an event of default under the Prepetition Senior Secured Credit Agreement remains outstanding, and until the Prepetition Term Lenders have been repaid in full, and holders of the Pulse Notes may not exercise rights or remedies in respect of the Pulse Notes absent the prior written consent of the Prepetition Term Lenders.    Moreover, pursuant to the Pulse Notes Subordination Agreement, the Pulse Sellers waived the right to object to any use of the Cash Collateral or DIP financing that has the consent of the Prepetition Term Lenders, and likewise consented to the priming of the Pulse Notes by such DIP financing to the extent that the Prepetition Senior Secured Term Loans also are primed.    As of the Petition Date, the aggregate principal amount of the Pulse Notes is approximately $20.9 million.

<b><u>The DIP Facility</u></b>

27.    The DIP Facility consists of a multi-draw facility for up to $10 million in new money and, subject to entry of the Interim Order, an initial Roll-Up of $25 million of the outstanding amount of the Debtors' Prepetition Senior Secured Term Loans owing to the DIP Lenders, and subject to entry of the Final Order, a subsequent Roll-Up of $25 million of the outstanding amount of the Debtors' Prepetition Senior Secured Term Loans owing to the DIP Lenders.  The DIP Facility will be provided by the DIP Lenders:  Fortress Investment Group, Soros Fund Management, Monroe Capital, and their respective affiliated funds, each of which is a lender under the Prepetition Senior Secured Credit Agreement.

28.    The DIP Facility allows the Debtors to access up to $5 million immediately upon entry of the Interim Order and up to $5 million after the entry of the Final Order, which will be used to facilitate their operations and pay the amounts authorized by the first-day orders and administrative costs of this case, all in accordance with a budget that the Debtors prepared, and the DIP Administrative Agent has approved (subject to permitted variances) (the "DIP Budget").  The interest rates and fees associated with the DIP Facility are described below, as well as in the DIP Credit Agreement.

29.    The DIP Facility contains the following milestones:

i.    the Debtors shall have obtained approval of the Interim Order by the Court no later than five days following the Petition Date;

ii.    the Debtors shall have obtained approval of the Final Order by the Court no later than 30 days following the Petition Date;

iii.    the Debtors shall have obtained an extension of the time period to assume or reject non-residential leases of real property no later than 30 days following the Petition Date;

iv.    on the Petition Date, the Company shall have filed a motion to approve bidding and sale procedures, which shall contain customary "stalking horse" protections (the "Bid Procedures");

v.    within three days of the Petition Date, the Company shall have filed with the Bankruptcy Court a stalking horse asset purchase agreement, which shall provide that the DIP Lenders or their designee shall serve as the stalking horse bidder for certain of the Debtors' assets subject to overbids pursuant to the Bidding Procedures Order (as defined below) (the "Asset Purchase Agreement"). The Asset Purchase Agreement shall be pursuant to a credit bid of not less than the entire amount of all obligations due under or in connection with the DIP Facility, which credit bid right is expressly reserved for the benefit of the DIP Lenders in the DIP Orders, whether pursuant to an Auction (as defined in the DIP Credit Agreement) or plan of reorganization under Section 1129 of the Bankruptcy Code.

vi.    within 15 days of the Petition Date, the Company shall have obtained entry of an order approving the Bid Procedures (including the designation of the stalking horse) (the "Bidding Procedures Order");

vii.   within 35 days of the Petition Date, the Company will conduct the Auction (as defined in the Bidding Procedures Order or equivalent term used therein) in accordance with the Bidding Procedures Order;

viii.   by no later than 40 days after the Petition Date, the Court will conduct, to the extent necessary, the Sale Hearing (as defined in the Bidding Procedures Order) and enter an order approving the Sale Transaction (as defined in the DIP Credit Agreement); and

ix.   by no later than 55 days following the Petition Date, the Sale Transaction shall have closed; *provided* that if regulatory approvals associated with a Sale Transaction remain pending as of such date, such date shall be automatically extended to the date that is the third Business Day following receipt of all necessary regulatory approvals.

30.   Subject to the Carve Out, the DIP Facility is secured (subject to customary permitted liens) by security interests and liens on substantially all of the Debtors' property and substantially all of the property of the Non-Debtor Guarantors (such property, the "DIP Collateral").  These liens include: (i) first-priority liens on all of the DIP Collateral that is not otherwise subject to a valid and perfected lien prior to the Petition Date, including, subject to the entry of the Final Order, the proceeds of any avoidance actions belonging to the Debtors; and (ii) first-priority, senior priming liens on all other Prepetition Collateral (including Cash Collateral).  The DIP Facility also benefits from superpriority administrative expense status.   The Non-Debtor Guarantors will guarantee the Roll-Up DIP Loans.

31.   The Prepetition Secured Parties have consented to the execution of the DIP Facility and the priming of their liens on the Prepetition Collateral.  As adequate protection for the priming of the interest of the Prepetition Secured Parties and the use of Cash Collateral, for the benefit of all Prepetition Secured Parties, the Prepetition Collateral Agent will receive replacement liens on and security interests in the DIP Collateral, including, subject to the entry of the Final Order, the proceeds of avoidance actions, which liens will be junior only to the Carve Out, the DIP Liens, and Prior Senior Liens.  The Prepetition Administrative Agent and the Prepetition Collateral Agent

(together, the "Prepetition Term Agents") will also receive allowed superpriority administrative expense claims in these cases, subject only to the Carve Out and the superpriority claims of the DIP Agents. The Prepetition Secured Parties will also be entitled to reimbursement of any and all fees and expenses, including the reasonable and documented fees and expenses of their counsel and advisors.

32.    JPMC, as Cash Management Bank, also has consented to the execution of the DIP Facility and the priming of its liens on the Prepetition Collateral. As adequate protection for the priming of the interest of the Cash Management Bank and the use of Cash Collateral, the Prepetition Administrative Agent, for the benefit of itself and the Cash Management Bank, will receive replacement liens and security interests in the DIP Collateral, including, subject to the entry of the Final Order, the proceeds of avoidance actions, which liens will be junior only to the Carve Out, the DIP Liens, the adequate protection liens granted in favor of the Prepetition Secured Parties, the liens securing the obligations under the Prepetition Senior Secured Credit Agreement, and Prior Senior Liens.

## Summary of the DIP Credit Agreement

33.    In accordance with Bankruptcy Rule 4001(c)(1)(B) and Local Rule 4001-2, the below chart summarizes the significant terms of the proposed Interim Order and the DIP Loan Documents.[6]

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions |
|---|---|
| **Parties to the DIP Credit Agreement**<br>FRBP 4001(c)(1)(B) | **Borrower**: Vice Group Holding Inc., a Delaware corporation (the "DIP Borrower").<br>**Guarantors**: All Debtors other than the DIP Borrower and, solely with respect to the Roll-Up DIP Loans, all non-U.S. obligors under the Prepetition Senior Secured Credit Agreement (the "DIP Guarantors"). |

---

6    The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced, including, without limitation, the DIP Loan Documents and the Interim Order. To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents should control. Capitalized terms used in this summary chart but not otherwise defined have the meanings ascribed to them in the DIP Loan Documents or the Interim Order, as applicable.

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions |
|---|---|
| DIP Credit Agreement Preamble | **DIP Lenders**:  Fortress Investment Group, Soros Fund Management LLC, Monroe Capital, their respective affiliated funds, and any financial institution which is or becomes party to the DIP Credit Agreement. |
| **Term**<br><br>FRBP 4001(b)(l)(B)(iii); 4001(c)(1)(B)<br><br>L.R. 4001-2(a)(10)<br><br>DIP Credit Agreement Section 1.1 | Maturity at earliest of (i) the date that is six months after the Petition Date, (ii) the date that all Loans shall become due and payable in full, (iii) the effective date of a Chapter 11 Plan, (iv) the date of consummation of a sale of all or substantially all of the Debtors' assets under Section 363 of the Bankruptcy Code, (v) the first business day on which the Interim Order expires by its terms or is terminated, unless the Final Order has been entered and become effective prior thereto, (vi) conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code or any Credit Party seeks such conversion, unless otherwise consented to in writing by DIP Lenders holding in excess of 50% of the total principal amount of loans and commitments under the DIP Facility (the "Requisite Lenders"), (vii) dismissal of any of the Chapter 11 Cases, unless otherwise consented to in writing by the Requisite Lenders, and (viii) the date on which the Final Order ceases to be in full force and effect (unless otherwise consented to in writing by the Requisite Lenders). |
| **Commitment**<br><br>FRBP 4001(c)(1)(B)<br><br>L.R. 4001-2(a)(1); 4001-2(a)(7); 4001-2(c)<br><br>DIP Credit Agreement Recitals; Section 2.1(d) | The DIP Facility will be a superpriority multi-draw term loan credit facility provided by the DIP Lenders in an aggregate principal amount not to exceed $60 million, consisting of:  (i) a new money multi-draw term loan facility in the aggregate principal amount of up to $10 million (the "New Money DIP Loans"), with an initial draw of $5 million upon entry of the Interim Order and new money draws in accordance with the DIP Budget of up to $5 million in the aggregate after entry of the Final Order; and (ii) the Roll-Up DIP Loans (together with the New Money DIP Loans, the "DIP Loans"), which consist of (x) upon entry of the Interim Order, a $25 million Roll-Up of a portion of loans outstanding under the Prepetition Credit Agreement held by the DIP Lenders and (y) upon entry of the Final Order, a $25 million Roll-Up of a portion of the remaining Prepetition Senior Secured Term Loans held by the DIP Lenders. |
| **Conditions of Borrowing**<br><br>FRBP 4001(c)(1)(B)<br><br>L.R. 4001-2(a)(2)<br><br>DIP Credit Agreement Sections 3.1 and 3.2<br><br>Interim Order ¶ 30 | The DIP Orders include standard and customary conditions, including, without limitation: (i) receipt of DIP Loan Documents by the DIP Lenders, including the DIP Budget; (ii) payment by the Company of all required fees and expenses to the DIP Agents; (iii) the accuracy of representations and warranties in all material respects; (iv) the Final Order or the Interim Order, as applicable, shall be in full force and effect; (iv) delivery of a customary notice of borrowing; (v) no default or event of default; and (vi) continued employment of the chief restructuring officer; *provided* that, from and after entry of the Interim Order, the DIP Borrower may make a single borrowing of New Money DIP Loans of up to $5 million, and from and after entry of the Final Order, the DIP Borrower may make borrowings of New Money DIP Loans in an aggregate amount of up to $5 million outstanding at any time, in each case, subject to the satisfaction of the conditions set forth in the DIP Orders and the DIP Loan Documents, and in accordance with the DIP Budget. |
| **Interest Rates**<br><br>FRBP 4001(c)(1)(B)<br><br>L.R. 4001-2(a)(3)<br><br>DIP Credit Agreement Section 2.6 | SOFR + 12.0% (subject to 3.0% SOFR floor) (or Base Rate + 11.0% in the case of Base Rate Loans).  With respect to the New Money DIP Loans, SOFR interest (or Base Rate interest in the case of Base Rate Loans) will be paid in cash and the additional 12.0% (or 11.0% in the case of Base Rate Loans) paid in kind.  All interest on the Roll-Up DIP Loans will be paid in kind.  Interest will be paid on funded amounts only, including the Roll-Up DIP Loans.  No interest will be paid on any unused commitment amount. |
| **Use of DIP Facility and Cash Collateral**<br><br>FRBP 4001(b)(l)(B)(ii)<br><br>L.R. 4001-2(a)(1); 4001-2(a)(9); 4002-2(a)(15)<br><br>DIP Credit Agreement Section 2.4<br><br>Interim Order ¶ E(i) | The proceeds of the New Money DIP Loans and the DIP Collateral, including Cash Collateral, shall be used, among other things, (i) to pay related transaction costs, fees and expenses; (ii) to provide working capital and for other general corporate purposes of the Debtors and their non-Debtor affiliates in accordance with the DIP Budget; (iii) to make adequate protection payments as authorized by the Court in the Interim Order or the Final Order, as applicable; (iv) to pay obligations arising from or related to the Carve Out; and (v) to pay reasonable and documented transaction costs, fees and expenses incurred in connection with these Chapter 11 Cases.  The proceeds of the Roll-Up will be used to repay and refinance outstanding Prepetition Term Loans. |
| **Entities with Interests in Cash Collateral**<br><br>FRBP 4001(b)(l)(B)(i)<br><br>DIP Credit Agreement Section 1.1 | The following secured parties have an interest in Cash Collateral:  (i) the DIP Secured Parties, after entry of the Interim Order; (ii) the Prepetition Secured Parties; and (iii) the Cash Management Bank. |
| **Fees** | The Interim Order provides that the Debtors shall pay all fees, expenses (including legal and other reasonable and documented professional fees and expenses, subject to a review period of 10 |

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions |
|---|---|
| FRBP 4001(c)(1)(B)<br>L.R. 4001-2(a)(3); 4001-2(a)(16)<br>DIP Credit Agreement Section 2.9<br>Interim Order ¶ 3(e)(4)-(5) | business days (the "Review Period"), during which the Debtors, the Committee, or the U.S. Trustee may make an objection) and other charges payable under the terms of the DIP Loan Documents as and when due thereunder.  The Fee Letters provide for a $75,000 fee to the DIP Administrative Agent and a $25,000 fee to the DIP Collateral Agent.  The Debtors will pay also professional fees, costs, and expenses of the Prepetition Secured Parties' advisors.  The DIP Facility will also include the following fees:<br>• **Commitment Premium**: 10.0% PIK fee on funded amount of New Money DIP Loans; and<br>• **Exit Premium**: 6.0% PIK fee on funded amount of New Money DIP Loans unless the Lenders acquire the assets of the Debtors pursuant to a credit bid. |
| **DIP Budget**<br>FRBP 4001 (c)(1)(B)<br>L.R. 4001-2(a)(2)<br>DIP Credit Agreement Section 5.18<br>Interim Order ¶ 4 | The use of the proceeds of the New Money DIP Loans and the DIP Collateral, including the Cash Collateral, will be subject to the DIP Budget, to be agreed to by the Requisite Lenders and the Debtors and approved pursuant to the Interim Order.  A new DIP Budget will be issued every four weeks. |
| **Variance Covenant**<br>FRBP 4001(c)(l)(B)<br>L.R. 4001-2(a)(2)<br>DIP Credit Agreement Section 5.18(c)<br>Interim Order ¶ 4 | The DIP Budget will be subject to a 10% variance in the aggregate, to be tested on a rolling four-week basis, for three buckets: (i) operating disbursements; (ii) net investment and financing; and (iii) professional fees. |
| **Reporting Information**<br>FRBP 4001(c)(l)(B)<br>L.R. 4001-2(a)(2)<br>DIP Credit Agreement Sections 5.7 and 5.18<br>Interim Order ¶ 4 | The Debtors will provide regular updates to the DIP Lenders, including:  a weekly update call among the Company management and the Requisite Lenders; a weekly 13-week cash-flow forecast to be included in the DIP Budget; and regular sales process updates. |
| **Chapter 11 Milestones**<br>FRBP 4001(c)(1)(B)(vi)<br>L.R. 4001-2(a)(2); 4001-2(a)(12)<br>DIP Credit Agreement 5.21 | The DIP Facility will be subject to the following milestones:<br>i.    entry of the Interim Order within five days after the Petition Date;<br>ii.    entry of the Final Order within 30 days after the Petition Date;<br>iii.    entry of an order extending the deadline for assuming or rejecting nonresidential leases of real property within 30 days after the Petition Date;<br>iv.    filing of a motion to approve the Bid Procedures on the Petition Date;<br>v.    filing of a stalking-horse asset purchase agreement, which shall provide that the DIP Lenders shall serve as the stalking horse bidder via a credit bid, within three days after the Petition Date;<br>vi.    entry of an order approving the Bid Procedures (including designation of the stalking-horse bidder) within 15 days after the Petition Date;<br>vii.    an auction with respect to the Sale Transaction, if necessary, within 35 days after the Petition Date;<br>viii.    entry of an order approving the Sale Transaction within 40 days after the Petition Date; and<br>ix.    closing of the Sale Transaction within 55 days after the Petition Date. |
| **Liens and Priorities**<br>FRBP 4001(c)(1)(B)(i)<br>L.R. 4001-2(a)(3); 4001-2(a)(4); 4001-2(a)(6); 4001-2(a)(5)<br>DIP Credit Agreement Recitals | The DIP Facility will be a superpriority multi-draw term loan credit facility.<br>Subject to the Carve Out, the DIP Facility will be secured by a first-priority lien on unencumbered assets and a priming first-priority lien on the Prepetition Collateral.<br>The obligations under the DIP Credit Agreement will constitute allowed superpriority administrative expense claims, payable from all prepetition and postpetition property of the Debtors and all proceeds thereof, including any avoidance actions, subject only to the Carve-Out and the priorities set forth in the DIP Orders. |

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions |
|---|---|
| **Stipulation as to Validity of Prepetition Claims, Obligations, and Liens**<br>FRBP 4001(c)(1)(B)(iii)<br><br>Interim Order ¶ 6(i) | The Debtors stipulate as to the validity of the Prepetition Secured Parties' claims, obligations, and liens under the Prepetition Senior Secured Credit Agreement. |
| **Adequate Protection**<br>FRBP 4001(b)(1)(B)(iv), 4001(c)(1)(B)(ii)<br>L.R. 4001-2(a)(3); 4001-2(a)(4); 4001-2(a)(16)<br><br>Interim Order ¶¶ 9-10 | For the benefit of the Prepetition Secured Parties and the Cash Management Bank, to the extent of any diminution in value of their interests in the Prepetition Collateral, Prepetition Collateral Agent will receive, subject to the Carve-Out, replacement liens on and security interests in the DIP Collateral, including, subject to entry of the Final Order, proceeds of avoidance actions (such liens and security interests, the "Adequate Protection Liens"). The Prepetition Secured Parties will also receive allowed superpriority administrative expense claims in these Chapter 11 Cases, junior to the Carve Out and the DIP Superpriority Claims. The Prepetition Secured Parties will also be entitled to reimbursement of any and all fees and expenses, including reasonable and documented fees and expenses of their counsel and advisors, subject to the Review Period. |
| **Liens on Avoidance Actions**<br>FRBP 4001(c)(1)(B)(xi)<br>L.R. 4001-2(a)(4)<br><br>Interim Order ¶ 8 | Subject to entry of the Final Order, the DIP Collateral will include the proceeds of avoidance actions, and the DIP Liens and the Adequate Protection Liens will attach to any such proceeds. |
| **Carve Out**<br>FRBP 4001(c)(1)(B)<br>L.R. 4001-2(a)(5)<br><br>Interim Order ¶ 11 | Carve out (the "Carve Out") that covers United States Trustee and Court fees, up to $50,000 in fees for a chapter 7 trustee, and allowed unpaid fees and expenses of estate/committee professionals (including transaction and success fees earned and owed to any investment banker or professional advisor prior to the Trigger Date), and a capped amount of professional fees for the period after delivery of a "Carve Out Trigger Notice". The Carve Out reserve will be funded upon delivery of a Carve Out Trigger Notice. |
| **Challenge Period**<br>FRBP 4001(c)(1)(B)<br>L.R. 4001-2(a)(8)<br><br>Interim Order ¶ 13 | The Interim Order provides for a Challenge Period of 30 days after the date of entry of the Interim Order. |
| **Events of Default**<br>FRBP 4001(c)(1)(B)(iii)-(v)<br>L.R. 4001-2(a)(2); 4001-2(a)(10)<br>DIP Credit Agreement Section 8.1<br><br>Interim Order ¶ 15 | Events of Default under the DIP Credit Agreement include, but are not limited to, the following:<br><br>i.    failure of the DIP Borrower to make any payment under the DIP Loan Documents when due, with a five-business-day grace period for payments of interest, fees, costs, charges;<br><br>ii.    subject to customary grace periods and except for defaults arising from the Chapter 11 Cases, (a) failure to pay when due any principal or interest in respect of other indebtedness in aggregate principal amount of $1,000,000 or (b) breach or default under any other term under such agreements;<br><br>iii.    failure to observe or perform certain covenants in the DIP Credit Agreement;<br><br>iv.    any representation or warranty not being true and correct in all material respects;<br><br>v.    termination of the JPMC Forbearance, or JPMC Forbearance otherwise ceasing to be in full force and effect, in each case, subject to exceptions;<br><br>vi.    judgments entered against any of the Debtors, following the Petition Date, in an aggregate amount exceeding $1,000,000;<br><br>vii.    dissolution of any Credit Party;<br><br>viii.    an ERISA Event or Canadian Pension Event (each as defined in the DIP Credit Agreement) which results in a Material Adverse Effect;<br><br>ix.    a Change of Control other than pursuant to the Chapter 11 Plan;<br><br>x.    failure of any of the DIP Loan Documents to be in full force and effect;<br><br>xi.    the taking of any action by the Credit Parties to obtain additional financing, grant other liens, use cash collateral, or any other action adverse to the rights of the DIP Administrative Agent, the DIP Lenders, the Prepetition Administrative Agent, the Prepetition Collateral Agent or the Prepetition Term Lenders;<br><br>xii.    filing of a plan by any Credit Party that does not propose to indefeasibly repay the DIP Credit Agreement obligations and the obligations under the Prepetition Credit Agreement in |

|     |        |                                                                                                          |
|-----|--------|----------------------------------------------------------------------------------------------------------|
|     |        | full without the consent of the DIP Administrative Agent;                                                |
|     | xiii.  | confirmation of a plan that is not reasonably acceptable to the Requisite Lenders or does not contemplate the consummation of the Credit Bid transaction or contain a provision for the termination of the Commitments under the DIP Credit Agreement and repayment of the Obligations under the DIP Credit Agreement and the obligations under the Prepetition Credit Agreement; |
|     | xiv.   | (a) the filing or entry of any order in these Chapter 11 Cases modifying the DIP Credit Agreement documents or any order in these Chapter 11 Cases that would affect the DIP Credit Agreement in any material aspect without the written consent of the DIP Administrative Agent or the failure of the DIP Orders or the Cash Management Order to be in full force and effect or (b) the failure of the Debtors to comply with any order affecting the DIP Credit Agreement in any material aspect; |
|     | xv.    | (a) entry of an order granting stay relief to allow a third party to proceed against Debtor assets valued in excess of $500,000 or (b) entry of an order terminating exclusivity having been entered (or such an order is sought by any party and not actively contested by the Debtors and the Non-Debtor Guarantors); |
|     | xvi.   | the allowance of any claim under Section 506(c) of the Bankruptcy Code or otherwise against the DIP Agents, the DIP Lenders, any Collateral, the Prepetition Administrative Agent, the Prepetition Collateral Agent, any Prepetition Term Lender or any Prepetition Collateral; |
|     | xvii.  | entry of an order appointing a chapter 11 trustee, examiner (other than fee examiner) or other person with enlarged powers without the consent of the DIP Administrative Agent; |
|     | xviii. | (a) the dismissal of any Chapter 11 Case or (b) any Credit Party seeking the same;                       |
|     | xix.   | filing of a motion by any Credit Party seeking stay relief (a) to allow any creditor other than the DIP Agents to enforce a lien on any collateral, (b) to approve any settlement or stipulation not approved by the Requisite Lenders with any other creditor or (c) to permit other actions that would have a Material Adverse Effect on the Debtors or their estates (taken as a whole); |
|     | xx.    | entry of an order avoiding or permitting recovery of any portion of the payments made on account of the obligations under the DIP Credit Agreement or related documents; |
|     | xxi.   | failure of any Credit Party to perform its obligations under the Interim Order, the Final Order, the Cash Management Order, or any order of the Bankruptcy Court approving the Sale Transaction or to perform in any material respect its obligations under any order of the Bankruptcy Court approving bidding procedures; |
|     | xxii.  | the existence of any claims entitled to superpriority status *pari passu* or senior to the claims of the DIP Secured Parties, other than as permitted under the applicable DIP Credit Documents or DIP Orders; |
|     | xxiii. | the DIP Orders cease to create a valid and perfected lien or any material provision shall fail to be in full force and effect; |
|     | xxiv.  | the entry of any order in the Chapter 11 Cases charging any Collateral under Section 506(c) of the Bankruptcy Code against the DIP Agents or DIP Secured Parties or limiting the extension under Section 552(b) of the Bankruptcy Code of the liens of the Prepetition Collateral Agent on the Collateral to proceeds of the Collateral acquired by any Credit Party after the Petition Date, or the commencement of any action that is materially adverse to the DIP Agents, the DIP Secured Parties or their respective rights and remedies under the DIP Loan Documents or that is inconsistent with any of the DIP Loan Documents; |
|     | xxv.   | the entry or granting of any order by the Bankruptcy Court or any other court materially adversely impacting the rights and interests of the DIP Agents and the DIP Lenders, as determined by the Requisite Lenders acting reasonably, without the prior written consent of the DIP Administrative Agent; |
|     | xxvi.  | an order is entered denying or terminating use of cash collateral by the Credit Parties;                 |
|     | xxvii. | the Final Order failing to include a waiver satisfactory to the DIP Agents and the DIP Lenders of the right to surcharge the Collateral under Section 506(c) of the Bankruptcy Code and any ability to limit the extension under Section 552(b) of the Bankruptcy Code of the liens of the Prepetition Secured Parties on the Collateral to proceeds of the Collateral acquired by the Credit Parties after the Petition Date; |
|     | xxviii.| any Credit Party challenging or supporting a challenge of any payments or adequate                       |

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions |
|---|---|
| | protection to the DIP Agents or any DIP Lender with respect to the Pre-Petition Obligations; |
| | xxix.  entry of an order or filing of a motion by the Debtors seeking to use any cash proceeds of any of the Collateral without the DIP Administrative Agent's and the Requisite Lenders' consent or to obtain any financing other than under the DIP Loan Documents; |
| | xxx.  the entry of any order by the Bankruptcy Court providing for a change in venue with respect to the Chapter 11 Cases unless otherwise approved by the Requisite Lenders, and such order is not reversed or vacated within 10 days (or such later date as the DIP Administrative Agent may agree); |
| | xxxi.  any Credit Party or subsidiary files any motion seeking (a) to grant or impose liens or security interests in any Collateral or (b) to modify any of the rights of the DIP Agents or DIP Lenders under the DIP Orders, DIP Credit Documents, and related documents by any plan or subsequent order; |
| | xxxii.  any Credit Party or affiliate shall take any action in support of or fail to contest in good faith any Event of Default relating to the Chapter 11 Cases; |
| | xxxiii.  any Debtor is enjoined from conducting any material potion of its business, or any disruption, damage or loss to material business operations or assets occurs, such as to cause a Material Adverse Effect; |
| | xxxiv.  any Debtor denies in writing that it has liability under the DIP Credit Agreement or seeks to recover any monetary damages from the DIP Agents, any DIP Lender, the Prepetition Administrative Agent, the Prepetition Collateral Agent or the Prepetition Term Lenders; |
| | xxxv.  the Court grants relief under any pleading filed by any Debtor that results in the occurrence of an Event of Default; |
| | xxxvi.  failure of the Company or any other Credit Party to use the proceeds of the Loans in compliance with the DIP Budget and the DIP Credit Agreement; |
| | xxxvii. any sale of all or substantially all assets of the Debtors unless such sale is conducted in accordance with the Bid Procedures and consented to by the Requisite Lenders; |
| | xxxviii.  failure to meet a Milestone, unless extended or waived by the prior written consent of the Requisite Lenders; |
| | xxxix.  entry of an order restricting any Lender's right to credit bid for the Debtors' assets; and |
| | xl.  termination of the Asset Purchase Agreement due to a breach thereunder by any Debtor or pursuant to Sections 10.01(c) or (o) thereof. |
| **Remedies**<br>FRBP 4001(c)(1)(B)(iv)<br>Interim Order ¶ 17 | The DIP Secured Parties will have the right to exercise any and all rights and remedies under the DIP Loan Documents and applicable law, including, without limitation, the right to credit bid under the Sale Transaction. |
| **Waiver/Modification of the Automatic Stay**<br>FRBP 4001(c)(1)(B)(iv)<br>Interim Order ¶ 17 | The automatic stay imposed under section 362(a)(2) of the Bankruptcy Code is modified as necessary to effectuate all of the terms and provisions of the DIP Orders, including by providing to lift the automatic stay to allow the DIP Secured Parties, the Prepetition Secured Parties, and the Cash Management Bank to exercise remedies against the Debtors five days after termination of the DIP Facility. |
| **Waiver of Applicability of Nonbankruptcy Law Relating to Perfection or Enforceability of Liens**<br>FRBP 4001(c)(1)(B)(vii)<br>Interim Order ¶ 6(ix) | Subject to the Challenge Period, any challenge to the validity of the liens securing the Debtors' obligations under the DIP Loan Documents and the Prepetition Credit Agreement under the Bankruptcy Code or nonbankruptcy law is waived. |
| **Waiver of Sections 552(b) and 506(c)**<br>FRBP 4001(c)(1)(B)<br>Interim Order ¶ E(v) | Each of the DIP Secured Parties and the Prepetition Secured Parties is entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code.  Subject to the Final Order, the right of the Debtors to surcharge the DIP Collateral or the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code and the "equities of the case" exception of section 552(b) of the Bankruptcy Code with respect to the DIP Secured Parties and the Prepetition Secured Parties are waived.  The DIP Secured Parties and, subject to entry of the Final Order, the Prepetition Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine. |

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions |
|---|---|
| **Indemnification**<br>FRBP 4001(c)(1)(B)(ix)<br>DIP Credit Agreement Section 2.17(g)(h)<br>Interim Order ¶ 20 | The DIP Credit Agreement and Interim Order include customary expense and release and indemnification provisions.<br>The Debtor shall pay the reasonable and documented fees and expenses of the DIP Lenders' advisors in accordance with the terms of the DIP Loan Documents, subject to the Review Period. |

## Basis for Relief

### I.    The Debtors Should Be Authorized to Use the Cash Collateral.

34.    Section 363 of the Bankruptcy Code generally governs the use of estate property. Section 363(c)(2)(A) of the Bankruptcy Code permits a debtor-in-possession to use cash collateral with the consent of the secured party.  Here, the Prepetition Secured Parties and the Cash Management Bank have consented to the Debtors' use of Cash Collateral, subject to the terms and limitations set forth in the Interim Order.

35.    Section 363(e) of the Bankruptcy Code provides for adequate protection of interests in property when a debtor uses cash collateral.  Although section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis.  *See, e.g., In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("the determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case"); *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (explaining that the "determination of whether there is adequate protection is made on a case by case basis").

36.    The Prepetition Secured Parties and the Cash Management Bank will benefit inherently from the Debtors' proposed use of the Cash Collateral by enhancing the likelihood of preserving the Debtors' overall going-concern value as the Debtors move toward confirmation of a plan.  Preservation of the Debtors' business as a going concern in and of itself serves to provide such parties "adequate protection" for Bankruptcy Code purposes. *See 495 Cent. Park Ave. Corp.,*

136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (noting that, in determining whether protection is "adequate," courts consider "whether the value of the debtor's property will increase as a result of" use of collateral or provision of financing); *In re Sky Valley, Inc.*, 100 B.R. at 114 ("[A]n increase in the value of the collateral . . . resulting from superpriority financing could constitute adequate protection") (citing *In re First South Savings Association*, 820 F.2d 700 (5th Cir. 1987)), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117 (N.D. Ga. 1989).

37.     The Debtors submit that the proposed adequate protection measures protect the Prepetition Secured Parties and the Cash Management Bank from any diminution in the value of the Cash Collateral.  In light of the foregoing, the Debtors further submit, and the Prepetition Secured Parties and the Cash Management Bank agree, that the proposed adequate protection to be provided for the benefit of the Prepetition Secured Parties and the Cash Management Bank is appropriate and sufficient.  Not only is the proposed adequate protection necessary to protect the Prepetition Secured Parties and the Cash Management Bank against any diminution in value, but it also is fair and appropriate under the circumstances of this case and ensures that the Debtors have the consent of the Prepetition Secured Parties and the Cash Management Bank to use Cash Collateral, subject to the terms and limitations set forth in the Interim Order.

38.     As described above, on May 5, 2021, Debtor VML was purportedly served with a Restraining Notice pursuant to NY CPLR § 5222(b).  By the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Continue to (A) Utilize Their Existing Cash Management System, (B) Maintain Their Existing Bank Accounts, (C) Perform Intercompany Transactions, (D) Utilize and Maintain Their Existing Business Forms and (E) Utilize Their Corporate Credit Card Programs and (II) Granting Related Relief*, filed contemporaneously herewith (the "Cash Management Motion"), the Debtors are seeking confirmation that, having

commenced these Chapter 11 Cases, they now may nevertheless access, transfer and use their

funds at any Bank Accounts.  As described in greater detail in the Cash Management Motion, the

Restraining Notice is void and of no further effect as of the filing of these Chapter 11 Cases.  It

did not create a lien on the Cash Collateral, and the Debtors, accordingly, do not require Wipro's

consent to make use of the Cash Collateral pursuant to section 363(c)(2)(A) of the Bankruptcy

Code.

**II.      The Debtors Should Be Authorized to Obtain Postpetition Financing through the DIP Loan Documents.**

      **A.      Entering Into the DIP Loan Documents is an Exercise of the Debtors' Sound Business Judgment.**

39.      The Court should authorize the Debtors, as an exercise of their sound business

judgment, to enter into the DIP Loan Documents and obtain access to the DIP Facility.  Section

364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under

certain circumstances discussed in detail below.  Courts grant a debtor in possession considerable

deference in acting in accordance with its business judgment in obtaining postpetition secured

credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and

policies underlying, the Bankruptcy Code.  *See In re Barbara K. Enters., Inc.*, Case No. 08-11474,

2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a

debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy

process' and unfairly cede control of the reorganization to one party in interest"); *In re Ames Dep't*

*Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's

discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a

debtor's] reasonable business judgment to be exercised so long as the financing agreement does

not contain terms that leverage the bankruptcy process and powers or its purpose is not so much

to benefit the estate as it is to benefit a party-in-interest."); *accord In re Farmland Indus., Inc.*, 294

B.R. 855, 881 (Bankr. W.D. Mo. 2003) (noting that the first factor considered by bankruptcy courts is whether the "proposed financing is an exercise of sound and reasonable business judgment").

40.    Specifically, to determine whether the business judgment standard is met, a court need only "examine whether a reasonable businessperson would make a similar decision under similar circumstances," which "is not a difficult standard to satisfy." *In re AbitibiBowater Inc.*, 418 B.R. 815, 831 (Bankr. D. Del. 2009); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second-guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

41.    Furthermore, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of "the relative circumstances" of both the debtor and the potential lender. *In re Farmland Indus.* 294 B.R. at 886; *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.*), 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "a hard bargain" to acquire funds for its reorganization). The Court may also appropriately take into consideration non-economic benefits to the Debtors offered by a proposed postpetition facility. For example, in *In re ION Media Networks. Inc.*, the court held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms. *Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.* This is particularly true in a bankruptcy setting where cooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan. That which helps foster consensus

> may be preferable to a notionally better transaction that carries the
> risk of promoting unwanted conflict.

Case No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) (emphasis added).

42.    The Debtors have determined to move forward with the DIP Facility in a sound exercise of their business judgment following a market check and a careful evaluation of alternatives.    Specifically, the Debtors and their advisors determined that the Debtors would require significant postpetition financing to support the administration of this case and the Debtors' ongoing operations.    The terms of the DIP Facility are necessary to secure postpetition financing, to obtain the approval of the Prepetition Collateral Agent to priming liens, and to accomplish the Debtors' comprehensive restructuring.    The Debtors negotiated the DIP Loan Documents with the DIP Secured Parties in good faith, at arm's length, and with the assistance of their advisors, and believe that they have obtained the best financing available under the circumstances.    Accordingly, the Court should authorize the Debtors' entry into the DIP Loan Documents as a reasonable exercise of the Debtors' business judgment.

43.    Agreement to the proposed Roll-Up DIP Loans is also an exercise of the Debtors' sound business judgment.    Section 363(b) of the Bankruptcy Code permits a debtor to use, sell, or lease property, other than in the ordinary course of business, with court approval.    Courts have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including an operating business's going-concern value.    *See, e.g., In re Just For Feet, Inc.,* 242 B.R. 821, 824–25 (D. Del. 1999) (noting that Bankruptcy Code permits courts to "authorize the payment of pre-petition claims if such payment was essential to the continued operation of the debtor") (citing cases).    Moreover, the business judgment rule shields a debtor's management from judicial second-guessing.    *See In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) (noting that "the [Bankruptcy] Code

favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions").  The appropriateness of a proposed financing facility should also be considered in light of current market conditions.  *See In re Lyondell Chem. Co.*, No. 09-10023 (REG) (Bankr. S.D.N.Y. Feb. 27, 2009) (Hearing Transcript at 740:4-6) ("[B]y reason of present market conditions, as disappointing as the [DIP] pricing terms are, I find the provisions [of a DIP that included a roll-up of prepetition secured debt] reasonable here and now.").

44.    Roll-ups are increasingly common features in DIP financing packages when it is necessary to induce incumbent lenders to participate in a loan to a debtor with high levels of secured indebtedness, especially where the incumbent lenders have provided funding (like the 2023 Multi-Draw Term Loans) in the lead-up to a bankruptcy filing, or what has been termed a "pre-DIP DIP."  Courts have approved debtor-in-possession financing arrangements with similar roll-up features in other cases.  *See, e.g., In re Synergy Pharmaceuticals Inc.*, No. 18-14010 (JLG) [Docket No. 454] (Bankr. S.D.N.Y. Feb. 26, 2019) (approving $159 million DIP facility with roll up of $114 million of prepetition debt); *In re Aegean Marine Petroleum Network Inc.*, No. 18-13374 (MEW) (Bankr. S.D.N.Y. Jan. 15, 2019) [Docket No. 290] (approving $75 million DIP term loan facility, $160 million US DIP revolving credit facility, and $300 million global DIP revolving credit facility, with roll-up of entire amount of prepetition secured obligations); *In re BCBG Max Azria Holdings*, LLC, No. 17-10466 (Bankr. S.D.N.Y. Mar. 2, 2017) (approving "roll-up of all outstanding prepetition revolving obligations"); *In re Aéropostale, Inc.*, No. 16-11275 (Bankr. S.D.N.Y. May 6, 2016) (same); *In re OneWeb Glob. Ltd.*, No. 20-22437 (RDD) [Docket No. 121] (Bankr. S.D.N.Y. May 1, 2020) (approving $300 million DIP facility with roll-up of $225 million of prepetition debt); *In re Sears Holdings Corp.*, No. 18-23538 (RDD) [Docket No. 955]

(Bankr. S.D.N.Y. Nov. 30, 2018) (approving $1.83 billion DIP facility with roll-up of $1.53 billion prepetition debt); *In re Bed Bath & Beyond, Inc.*, No. 23-13359 (VFP) [Docket No. 76] (Bankr. D. N.J. April 24, 2023) (interim order approving DIP facility with $40 million of new money with a roll-up of prepetition obligations of $200 million).

45.     Although the Challenge Period is shorter than the time period provided in Local Rule 4001-2(g)(4), the shortened period is necessary in order to allow for the completion of the Sale Transaction in accordance with the Milestones.  Given the ambitious timeline proposed in these Chapter 11 Cases and required by the Prepetition Term Lenders, the Debtors submit that cause exists to shorten the Challenge Period, as provided in Local Rule 4001-2(g)(4).

46.     The Prepetition Term Lenders' willingness to provide the DIP Facility was conditioned expressly upon the Roll-Up DIP Loans, and specifically, that a substantial majority of the Prepetition Senior Secured Term Loans representing the 2023 Multi-Draw Term Loans would become Roll-Up DIP Loans.  Absent the DIP Facility, the Debtors' ability to continue operating will be jeopardized to the detriment of all parties in interest.   Given these circumstances, rolling up $50 million of the Prepetition Senior Secured Term Loans, with $25 million subject to entry of the Interim Order and $25 million subject to entry of the Final Order, is reasonable, appropriate, and a sound exercise of the Debtors' business judgment.

**B.      The Debtors Should Be Authorized to Grant Liens and Superpriority Claims.**

47.     The Debtors propose obtaining financing under the DIP Facility, in part, by providing superpriority claims and liens pursuant to section 364 of the Bankruptcy Code in favor of the DIP Lenders.  Specifically, subject to the Carve Out, the Debtors propose to provide the DIP Lenders and the DIP Agents with (i) superpriority claims and (ii) perfected and non-avoidable first-priority claims and fully consensual "priming liens" and security interests in the DIP Collateral.  The Debtors also propose to provide the Prepetition Secured Parties and the Cash

Management Bank with adequate protection for the priming of the Prepetition Term Lenders and the Cash Management Bank and the use of Cash Collateral in the form of replacement liens over the DIP Collateral (junior to the DIP Liens, the Carve Out, and the Prior Senior Liens) and, with respect to the Prepetition Secured Parties, superpriority administrative expense claims (junior to the Carve Out and the DIP Superpriority Claims), and reimbursement of the fees and expenses of the Prepetition Secured Parties.

48.    The statutory requirement for obtaining postpetition credit under section 364(c) of the Bankruptcy Code is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code]."  11 U.S.C. § 364(c).  *See In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (stating that secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).  Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether: (i) the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim; (ii) the credit transaction is necessary to preserve the assets of the estate; and (iii) the terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor-borrower and proposed lenders.  *In re Ames Dep't Stores*, 115 B.R. at 37–40; *In re St. Mary Hosp.*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *In re Crouse Grp.*, 71 B.R. at 549.

49.    As described above and as set forth in the First Day Declaration, the Debtors need an immediate capital infusion, yet substantially all of the Debtors' assets are encumbered under their existing capital structure.  Moreover, neither the Prepetition Term Lenders nor any entities that PJT contacted as part of the marketing process were interested in providing DIP financing to

the Debtors on a junior basis.  In light of the foregoing, the Debtors, in consultation with their advisors, concluded that the success of these cases hinges on whether any DIP financing had the support of, or could be provided by, the Prepetition Term Lenders.

50.     Without DIP financing, the Debtors lack sufficient funds to operate their business, continue paying their debts as they come due, and pursue a restructuring through these Chapter 11 Cases.   Absent the DIP Facility, which will provide the Debtors with sufficient liquidity to administer the case through the sale or reorganization process, the value of the Debtors' estates would be impaired significantly, to the detriment of all stakeholders.   In light of the current circumstances, the Debtors believe that the terms of the DIP Facility, as set forth in the DIP Loan Documents, are fair, reasonable, and adequate.   For all these reasons, the Debtors submit that they have met the standard for obtaining postpetition financing.

51.     With regards to the priority of the postpetition financing, section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1).   Consent by the secured creditors to priming obviates the need to show adequate protection. *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) (holding that "by tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected."). Accordingly, the Debtors may incur "priming" liens under the DIP Facility if either (i) the affected parties have consented, or (ii) the affected parties' interests in collateral are adequately protected. Here, the Prepetition Secured Parties and the Cash Management Bank have consented to the terms

of the DIP Facility on the condition that it contain the adequate protection provided for in the DIP Orders. Furthermore, as described in paragraph 26 above, the Pulse Sellers consented in advance to the priming of the Pulse Notes, as set forth in the Pulse Notes Subordination Agreement.

52.    The Prepetition Secured Parties and the Cash Management Bank will receive adequate protection of their interests in the Prepetition Collateral under the DIP Orders. Specifically, the Prepetition Secured Parties and the Cash Management Bank will receive adequate protection in the form of replacement liens over the DIP Collateral (junior to the DIP Liens and the Carve Out) and the Prepetition Secured Parties will receive reimbursement of the fees and expenses of the Prepetition Term Agents. Accordingly, the Debtors submit that the relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is both warranted and appropriate under the circumstances.

53.    Prior to the commencement of the Chapter 11 Cases, the Company entered into a forbearance agreement with the Cash Management Bank (the "JPMC Forbearance"), which provides for the ongoing use of the Cash Management Bank by the Debtors and certain of their non-Debtor affiliates. The DIP Credit Agreement contains a reciprocal forbearance by the DIP Agents and the DIP Lenders, providing that they will not exercise remedies against Non-Debtor Guarantors while the JPMC Forbearance is in effect. Together, these forbearance agreements are part of the adequate protection of the interest of the Cash Management Bank, and also protect the Debtors' businesses from potentially costly interference should the Cash Management Bank exercise remedies against the Debtors' non-Debtor affiliates. Accordingly, the Debtors submit that this relief is in the best interest of the Debtors and their estates, and is warranted under the circumstances.

C.      **No Comparable Alternative to the DIP Facility Is Reasonably Available.**

54.      A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by section 364(c) of the Bankruptcy Code. *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re LATAM Airlines Group S.A.*, 620 B.R. 722, 767 (Bankr. S.D.N.Y. 2020) (quoting *In re Ames*, 115 B.R. at 37) (finding that "[t]o demonstrate that it qualifies to seek secured financing . . . a debtor need only demonstrate that that 'it has reasonably attempted, but failed, to obtain unsecured credit'"). Courts have made clear that in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, as here, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Snowshoe Co.* at 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *Matter of Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (holding that bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 37–39 (approving secured loan where debtor approached four potential lenders).

55.      As described above and in the DIP Declaration, the Debtors and their advisors diligently solicited postpetition financing proposals from both existing lenders and third-party lending institutions. Here, the Prepetition Term Lenders have senior liens on substantially all of the Debtors' assets and were unwilling to consent to the priming of their Prepetition Senior Liens. No party was willing to provide postpetition financing on any basis other than a priming basis. *See supra* ¶¶ 5-6. The Debtors, in consultation with their advisors, did not believe a priming fight

with the Prepetition Secured Parties would be prudent at the outset of the Chapter 11 Cases, especially because the Debtors face a liquidity crunch that makes it impossible to fund these Chapter 11 Cases to provide the Prepetition Secured Parties with sufficient adequate protection.

56.    The proposed DIP Facility provides desperately needed liquidity to the Debtors without a value-destructive, and ultimately uncertain, priming fight, and the Debtors have determined that the DIP Facility provides the best opportunity available under the circumstances to fund these Chapter 11 Cases.  The Debtors, therefore, submit that the requirement of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtors is satisfied.

## III.    The Debtors Should Be Authorized to Pay the Interest and Fees Required by the DIP Agents and the DIP Lenders under the DIP Loan Documents.

57.    Under the DIP Loan Documents, the Debtors have agreed, subject to Court approval, to pay certain interest and fees to the DIP Secured Parties as described above. Additionally, pursuant to the proposed Interim Order, the Debtors have agreed to pay the prepetition and postpetition fees and expenses of the DIP Secured Parties and reasonable and documented out-of-pocket third-party expenses for the Prepetition Term Agents.

58.    The Debtors, in consultation with their advisors, believe that the payment of the fees and expenses required under the DIP Facility, including those of the advisors to the DIP Lenders, is an integral component of the overall terms of the DIP Facility, was required by the DIP Lenders as consideration for the extension of postpetition financing, and is reasonable and customary for similar transactions.  Accordingly, the Court should authorize the Debtors to pay the fees and expenses provided under the DIP Loan Documents and the Interim Order.

IV.     **The DIP Secured Parties Should Be Afforded Good-Faith Protection under Section 364(e).**

59.     Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any liens securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

60.     As explained herein and in the Declarations, the DIP Loan Documents are the result of (i) the Debtors' reasonable and informed determination that the DIP Lenders offered the most favorable terms on which to obtain vital postpetition financing, and (ii) vigorous, arm's-length, and good-faith negotiations between the Debtors and the DIP Lenders.  The Debtors submit that the terms and conditions of the DIP Loan Documents are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.  Accordingly, the Court should find that the obligations arising under the DIP Facility and other financial accommodations made to the Debtors have been extended by the DIP Secured Parties in "good faith" within the meaning of section 364(e) of the Bankruptcy Code and therefore the DIP Secured Parties are entitled to all of the protections afforded thereby.

## V.      The Automatic Stay Should Be Modified on a Limited Basis.

61.     The proposed Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to permit the Debtors to:  (i) grant the DIP Liens and the DIP Superpriority Claims, and to perform such acts as the DIP Lenders may request to assure the perfection and priority of the DIP Liens; (ii) take all appropriate action to grant the replacement liens and to take all appropriate action to ensure that such replacement liens are perfected and maintain the priority set forth in the Interim Order; (iii) incur all liabilities and obligations to the DIP Lenders and DIP Agents as contemplated under the DIP Loan Documents; (iv) pay all amounts referred to, required under, in accordance with, and subject to the Interim Order and the DIP Loan Documents; and (v) implement the terms of the Interim Order.  Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements and, in the Debtors' business judgment, are reasonable and fair under the circumstances of the Chapter 11 Cases.

## VI.      Failure to Obtain Immediate Interim Access to the DIP Facility and Cash Collateral Would Cause Immediate and Irreparable Harm.

62.     Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the Court may conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

63.     The Debtors request that the Court conduct a hearing to consider entry of the Interim Order authorizing the Debtors, from and after entry of the Interim Order until the Final Hearing, to receive initial funding under the DIP Facility.  The Debtors require the initial funding,

in the amount of $5 million, prior to the Final Hearing and entry of the Final Order to continue

operating, pay its administrative expenses and implement the relief requested in the Debtors' other

"first day" motions.  Absent receipt of the initial funding amount and access to the Cash Collateral,

the Debtors will be unable to continue operating during these Chapter 11 Cases or consummate

their value-maximizing restructuring.  *See* DIP Declaration ¶¶ 11-13.  Accordingly, this relief will

enable the Debtors to preserve and maximize value and avoid immediate and irreparable harm and

prejudice to its estate and all parties in interest, pending the Final Hearing.

### Request for Final Hearing

64.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that

the Court set a date for the Final Hearing within approximately 21 days after the entry of the

Interim Order and fix the time and date prior to the Final Hearing for parties to file objections to

this Motion.

### Reservation of Rights

65.     Nothing contained herein is or should be construed as:  (i) an admission as to the

validity of any claim against the Debtors; (ii) a waiver of the Debtors' rights to dispute any claim

on any grounds; (iii) a promise or requirement to pay any claim; (iv) an admission that any

particular claim is of a type specified or defined hereunder; (v) a request to assume any executory

contract or unexpired lease; or (vi) a waiver of the Debtors' rights under the Bankruptcy Code or

any other applicable law.

### The Requirements of Bankruptcy Rule 6003(b) Are Satisfied

66.     The Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days

after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable

harm."  Fed. R. Bankr. P. 6003.  As set forth in this Motion, the Debtors believe that an immediate

and orderly transition into chapter 11 is critical to the viability of their operations and any delay in

granting the relief requested could hinder the Debtors' operations and cause irreparable harm. Furthermore, the failure to receive the requested relief during the first 21 days of these Chapter 11 Cases would severely disrupt the Debtors' operations at this critical juncture and imperil the Debtors' chapter 11 process. Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support the relief requested herein.[7]

### **Request for Waiver of Bankruptcy Rules 6004(a) and 6004(h)**

67.     Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). As set forth throughout this Motion, any delay in obtaining the funding provided by the DIP Facility would be detrimental to the Debtors, their estates, and their creditors, as the Debtors' ability to manage and run their business without any unexpected or inopportune interruptions requires such funding. In light of the foregoing, the Debtors submit that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent applicable to the DIP Orders.

68.     To implement the foregoing relief requested in the Motion immediately, the Debtors also respectfully request a waiver of the notice requirements of Bankruptcy Rule 6004(a), to the extent they are deemed applicable to the DIP Orders.

---

[7]     Bankruptcy Rule 6003 provides that "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, grant relief regarding . . . a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate . . . ." Fed. R. Bankr. P. 6003.

**Motion Practice**

69.     This Motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated and a discussion of their application to this Motion. Accordingly, the Debtors submit that this Motion satisfies Local Rule 9013-1(a).

**Notice**

70.     Notice of this Motion will be provided to:  (i) the Office of the United States Trustee for Region 2, U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, NY 10014 (Attn:  Andrea B. Schwartz); (ii) the parties identified on the Debtors' consolidated list of 30 largest unsecured creditors; (iii) Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, NY 10166 (Attn:  David M. Feldman, Michael S. Neumeister, and Tommy Scheffer), counsel to the DIP/First Lien Group; (iv) Wachtell, Lipton, Rosen & Katz, 51 West 52nd Street, New York, NY 10019 (Attn:  Scott K. Charles and Neil M. Snyder), counsel to TPG Virat Holdings 1, L.P., and Sixth Street Virat Holdings 3, LLC; (v) Shipman & Goodwin LLP (Attn:  Marie C. Pollio), counsel to Wilmington Trust, National Association; (vi) the Internal Revenue Service; (vii) the Office of the United States Attorney for the Southern District of New York; (viii) the offices of the attorneys general in the states in which the Debtors operate; and (ix) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties").  The Debtors respectfully submit that, in light of the nature of the relief requested, no other or further notice need be given.

**No Previous Request**

71.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

*[Remainder of page intentionally left blank.]*

WHEREFORE, the Debtors respectfully request that the Court enter the Proposed Orders

granting the relief requested herein and such other and further relief as the Court deems just and

appropriate.


Dated: May 15, 2023
   New York, New York

       **SHEARMAN & STERLING LLP**

       */s/ Fredric Sosnick*
       Fredric Sosnick
       William S. Holste
       Jacob S. Mezei
       599 Lexington Avenue
       New York, NY  10022
       Phone:   (212) 848-4000
       Email:    fsosnick@shearman.com
           william.holste@shearman.com
           jacob.mezei@shearman.com

       -and-

       Ian E. Roberts (*pro hac vice* pending)
       2601 Olive Street, 17th Floor
       Dallas, TX  75201
       Phone:   (214) 271-5777
       Email:   ian.roberts@shearman.com

       *Proposed Special Counsel to the Debtors and Debtors in*
       *Possession*

## EXHIBIT A

**Interim Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| VICE GROUP HOLDING INC., et al., | Case No. 23-10738 (___) |
| Debtors.[1] | (Joint Administration Requested) |

### INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING AND (B) USE CASH COLLATERAL, (II) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, (IV) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") in the above captioned chapter 11 cases (collectively, the "Chapter 11 Cases") for entry of an interim order (this "Interim Order") and a final order (the "Final Order"), pursuant to sections 105, 361, 362, 363, 364, 503, 507, and 552 of title 11 of the United States Code (as amended, the "Bankruptcy Code"), rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1, 4001-1, 4001-2, and 9013-1 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules"):

(i)     authorizing Vice Group Holding Inc., in its capacity as borrower (the "DIP Borrower"), to obtain postpetition financing, and for each of the other Debtors to guarantee unconditionally (the "DIP Guarantors"), on a joint and several basis, the DIP Borrower's obligations in connection with a senior secured superpriority debtor-in-possession multi-draw term

---

[1]     The last four digits of Debtor Vice Group Holding Inc.'s tax identification number are 4250. Due to the large number of debtors in these chapter 11 cases, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.stretto.com/vice. The location of the Debtors' service address for purposes of these chapter 11 cases is: 49 South 2nd Street, Brooklyn, NY 11249.

[2]     Capitalized terms used but not defined herein have the meanings given to such terms in the Motion.

loan facility (the "DIP Facility") which consists of a multi-draw credit loan facility in an aggregate principal amount of up to $60 million, which shall be made available to the Debtors (a) in a single new money draw in the initial amount of $5 million (the "Initial New Money DIP Loans"),  in accordance with the terms and conditions set forth in the DIP Credit Agreement (as defined below) attached hereto as **Exhibit 1**, and effective upon entry of this Interim Order, and (b) in a roll-up (the "Initial Roll-Up DIP Loans") of approximately $25 million in Prepetition Senior Secured Term Loans (defined below) in accordance with the terms and conditions set forth in the DIP Credit Agreement and effective upon entry of this Interim Order, and (c) in  new money draws of the remaining principal amount of $5 million in accordance with the terms of the DIP Credit Agreement and the DIP Budget effective upon entry of the Final Order (such loans described in subsection (c) together with the Initial New Money DIP Loan, the "New Money DIP Loans"), and (d) in a roll-up of approximately $25 million in outstanding Prepetition Senior Secured Term Loans in accordance with the terms and conditions set forth in the DIP Credit Agreement and effective upon entry of the Final Order (such loans described in subsection (d) together with the Initial Roll Up DIP Loans, the "Roll-Up DIP Loans", and such New Money DIP Loans and the Roll-Up DIP Loans, the "DIP Loans");

(ii)    authorizing the Debtors to cause any non-Debtor subsidiary that is a Canadian Credit Party, a UK Credit Party, or a Jersey Credit Party (each, as defined in the DIP Credit Agreement, and together, the "Non-Debtor Guarantors") to guarantee the Roll-Up DIP Loans;

(iii)    authorizing the Debtors to enter into that certain Senior Secured Super-Priority Term Loan Debtor-in-Possession Credit and Guaranty Agreement dated as of May [   ], 2023 (as the same may be amended, restated, supplemented, waived or otherwise modified

from time to time, the "DIP Credit Agreement"), among the DIP Borrower, the DIP Guarantors, the Non-Debtor Guarantors, the lenders party thereto (collectively in such capacities, the "DIP Lenders"), and Fortress Credit Corp., as administrative agent (in such capacity, the "DIP Administrative Agent"), and Wilmington Trust, National Association, as collateral agent (in such capacity, the "DIP Collateral Agent," and together with the DIP Administrative Agent, the "DIP Agents," and the DIP Lenders and DIP Agents, collectively, the "DIP Secured Parties"); and together with this Interim Order, the Final Order, and all agreements, documents, and instruments delivered or executed in connection therewith (including the fee letters executed by the DIP Borrower in connection with the DIP Facility), and other guarantee and security documentation (collectively, the "DIP Loan Documents"), and to perform such other and further acts as may be required in connection with the DIP Loan Documents;

(iv)     authorizing the Debtors to use the proceeds of the New Money DIP Loans, the Prepetition Collateral (as defined below), and the DIP Collateral (as defined below), in accordance with the DIP Budget (as defined below) (subject to permitted variances set forth herein and in the DIP Credit Agreement) in form and substance acceptable to the Requisite Lenders under and pursuant to the DIP Credit Agreement (the "Requisite Lenders") to provide working capital for, and for other general corporate purposes of, the Debtors and their non-Debtor affiliates, including for payment of any Adequate Protection Payments (as defined below), the Carve Out (as defined below), and reasonable and documented transaction costs, fees, and expenses incurred in connection with any transactions to be implemented through the Chapter 11 Cases;

(v)     granting adequate protection to the Prepetition Secured Parties and Cash Management Bank (as defined below) to the extent of any Diminution in Value (as defined below) of their interests in the Prepetition Collateral (as defined below);

(vi)    granting valid, enforceable, binding, non-avoidable, and fully perfected first-priority priming liens on and senior security interests in substantially all of the property, assets, and other interests in property and assets of the Debtors, whether such property is presently owned or after-acquired, and each Debtor's estate as created by section 541 of the Bankruptcy Code, of any kind or nature whatsoever, real or personal, tangible, intangible, or mixed, now existing or hereafter acquired or created, whether existing prior to or arising after the Petition Date (as defined below), subject only to the (x) Carve Out (as defined below), (y) certain senior liens permitted pursuant to the terms of the DIP Credit Agreement and (z) other valid, perfected and unavoidable senior liens, if any, existing as of the Petition Date (or perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code) (the "Prior Senior Liens"), in each case, that are senior in priority to the Prepetition Senior Liens (as defined below), on the terms and conditions set forth herein and in the DIP Loan Documents, *provided*, *however*, for the avoidance of doubt, no right, title, or interest of Wipro, LLC or any of its affiliates in any of the DIP Collateral shall constitute a Prior Senior Lien;

(vii)    granting superpriority administrative expense claims against each of the Debtors' estates to the DIP Agents and the DIP Lenders with respect to the DIP Obligations (as defined below) over any and all administrative expenses of any kind or nature subject and subordinate only to the payment of the Carve Out on the terms and conditions set forth herein and in the DIP Loan Documents;

(viii)    subject to entry of a Final Order and to the extent set forth herein, waiving the Debtors' and the estates' right to surcharge against the DIP Collateral and the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code;

(ix)    subject to entry of a Final Order and to the extent set forth herein, for the

"equities of the case" exception under Bankruptcy Code section 552(b) to not apply to such parties

with respect to the proceeds, products, offspring, or profits of any of the Prepetition Collateral or

the DIP Collateral, as applicable;

(x)    pursuant to Bankruptcy Rule 4001, holding an interim hearing (the "Interim

Hearing") on the Motion before this Court to consider entry of this Interim Order, among other

things, (1) authorizing Debtors to, on an interim basis, borrow from the DIP Lenders a principal

amount of up to $5 million in Initial New Money DIP Loans and $25 million in Initial Roll-Up

DIP Loans, (2) authorizing the DIP Guarantors to guarantee the DIP Obligations, (3) authorizing

the Debtors to cause the Non-Debtor Guarantors to guarantee the Roll-Up Loans; (4) authorizing

the Debtors' use of Prepetition Collateral (including Cash Collateral), (5) granting the adequate

protection described in this Interim Order, and (6) authorizing the Debtors to execute and deliver

the DIP Loan Documents to which they are party and to perform their respective obligations

thereunder and such other and further acts as may be necessary or appropriate in connection

therewith;

(xi)    scheduling a final hearing (the "Final Hearing") to consider the relief

requested in the Motion and the entry of the Final Order, and approving the form of notice with

respect to the Final Hearing; and

(xii)    granting related relief.

This Court having considered the Motion, the exhibits thereto, the *Declaration of Frank A.*

*Pometti in Support of the Debtors' Chapter 11 Petitions and First Day Relief* [Docket No. __] (the

"First Day Declaration"), the *Declaration of Brent Herlihy in Support of the Debtors' Motion for*

*Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition*

*Financing and (B) Use Cash Collateral, (II) Granting Liens and Superpriority Claims, (III)*
*Modifying the Automatic Stay, (IV) Granting Adequate Protection to Prepetition Secured Parties,*
*(V) Scheduling a Final Hearing, and (VI) Granting Related Relief* [Docket No. __] (the "DIP
Declaration"), and the other evidence submitted or adduced and the arguments of counsel made at
the Interim Hearing held pursuant to Bankruptcy Rule 4001(b)(2) on _____ __, 2023 and this
Court having heard and resolved or overruled any objections, reservations of rights, or other
statements with respect to the relief requested in the Motion; and the Court having noted the
appearances of all parties in interest; and it appearing that approval of the interim relief requested
in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates
pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the
Debtors, their estates, and all parties-in-interest, and is essential for the continued operation of the
Debtors' businesses and the preservation of the value of the Debtors' assets; and it appearing that
the Debtors' entry into the DIP Credit Agreement and the other DIP Loan Documents is a sound
and prudent exercise of the Debtors' business judgment;  and the Debtors having provided notice
of the Motion as set forth in the Motion, and it appearing that no other or further notice of the
Motion need be given; and after due deliberation and consideration, and for good and sufficient
cause appearing therefor;

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE
COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND
CONCLUSIONS OF LAW:**[3]

---

[3]  Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings
of fact, pursuant to Bankruptcy Rule 7052.

A.      Petition Date.  On May 15, 2023 (the "Petition Date"), each of the Debtors filed a

voluntary petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court

for the Southern District of New York commencing these Chapter 11 Cases.

B.      Debtors in Possession.   The Debtors continue to manage and operate their

businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the

Bankruptcy Code.  No trustee or examiner has been appointed in these Chapter 11 Cases.

C.      Jurisdiction and Venue.  The Court has jurisdiction over the Motion, these Chapter

11 Cases, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334 and

the *Amended Standing Order of Reference from the United States District Court for the Southern

District of New York*, dated January 31, 2012.  Venue for these Chapter 11 Cases is proper pursuant

to 28 U.S.C. §§ 1408 and 1409.  This Court may enter a final order consistent with Article III of

the United States Constitution.

D.      Committee.  As of the date hereof, no official committee of unsecured creditors has

been appointed in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (any

such committee, the "Committee").

E.      Findings Regarding the DIP Facility and Use of Cash Collateral.

(i)      The Debtors have an immediate need to obtain the DIP Facility and to use

Cash Collateral (solely to the extent consistent with the DIP Budget (subject to permitted variances

as set forth in this Interim Order and the DIP Loan Documents)) to, among other things, (A) permit

the orderly continuation of their businesses while pursuing a sale of substantially all of their assets;

(B) pay certain Adequate Protection Payments; and (C) pay the costs of administration of their

estates and satisfy other working capital and general corporate purposes of the Debtors.

Specifically, the proceeds of the DIP Facility will provide the Debtors with the ability to fund

7

day-to-day operations, meet administrative obligations during the Chapter 11 Cases and preserve the value of their estates.  The DIP Facility will also reassure the Company's customers and employees that the Company will have access to additional liquidity to meet its commitments during the Chapter 11 Cases.  The ability of the Debtors to obtain sufficient working capital and liquidity through the incurrence of the new indebtedness for borrowed money and other financial accommodations is vital to the preservation and maintenance of the Debtors' going-concern values and successful reorganization.  The Debtors will not have sufficient sources of working capital and financing to operate their businesses in the ordinary course of business throughout the Chapter 11 Cases without access to the DIP Facility and authorized use of Cash Collateral.

(ii)     The Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Lenders under the DIP Loan Documents and are unable to obtain unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense. The Debtors also are unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2), and 364(c)(3) of the Bankruptcy Code for the purposes set forth in the DIP Loan Documents without the Debtors granting to the DIP Secured Parties, subject to the Carve Out as provided for herein, the DIP Liens (as defined below) and the DIP Superpriority Claims (as defined below) under the terms and conditions set forth in this Interim Order and the DIP Loan Documents.

(iii)     The DIP Facility has been negotiated in good faith and at arm's length among the Debtors and the DIP Secured Parties, and all of the Debtors' obligations and indebtedness arising under, in respect of, or in connection with the DIP Facility and the DIP Loan Documents, including, without limitation, all loans made to and guarantees issued by the Debtors pursuant to the DIP Loan Documents and all other obligations under the DIP Loan Documents (collectively, the "DIP Obligations") shall be deemed to have been extended by the DIP Secured

Parties in good faith as that term is used in section 364(e) of the Bankruptcy Code and in express

reliance upon the protections offered by section 364(e) of the Bankruptcy Code. The DIP

Obligations, the DIP Liens, and the DIP Superpriority Claims shall be entitled to the full protection

of Bankruptcy Code section 364(e) in the event that this Interim Order or any provision hereof is

vacated, reversed, or modified on appeal or otherwise, and any liens or claims granted to, or

payments made to, the DIP Agents or the DIP Lenders hereunder arising prior to the effective date

of any such vacatur, reversal, or modification of this Interim Order shall be governed in all respects

by the original provisions of this Interim Order, including entitlement to all rights, remedies,

privileges, and benefits granted herein.

(iv)    <u>Adequate Protection</u>. Each of the Prepetition Secured Parties and the Cash

Management Bank are entitled, pursuant to sections 105, 361, 362 and 363(e) of the Bankruptcy

Code, to adequate protection of their respective interests in the Prepetition Collateral, including

Cash Collateral, for any diminution in the value thereof.

(v)    <u>Sections 506(c) and 552(b)</u>. In light of the DIP Secured Parties' agreement

to fund the DIP Facility, and the Prepetition Secured Parties' agreement to subordinate their liens

and superpriority claims to the DIP Obligations and the Carve Out and to permit the use of their

Cash Collateral as set forth herein, the DIP Secured Parties and the Prepetition Secured Parties are

entitled to the rights and benefits of section 552(b) of the Bankruptcy Code and, subject to and

upon entry of the Final Order, (i) a waiver of any "equities of the case" claims under section 552(b)

of the Bankruptcy Code and (ii) a waiver of the provisions of section 506(c) of the Bankruptcy

Code.

(vi)    <u>Consent by Prepetition Term Agents</u>. The Prepetition Term Agents (at the

direction of the Required Lenders (as defined in the Prepetition Senior Secured Credit

Agreement)), on behalf and for the benefit of each of the Prepetition Secured Parties, has consented

to, conditioned on the entry of this Interim Order, the Debtors' incurrence of the DIP Facility and

proposed use of Cash Collateral on the terms and conditions set forth in this Interim Order, and

the terms of the adequate protection provided for in this Interim Order, including that the Adequate

Protection Liens and Adequate Protection Superpriority Claims (as defined below) are subject and

subordinate to the Carve Out.

(vii)   <u>Consent by Cash Management Bank</u>.   The Cash Management Bank (as

defined in the Motion) has consented to, conditioned on the entry of this Interim Order, the

Debtors' incurrence of the DIP Facility and proposed use of Cash Collateral on the terms and

conditions set forth in this Interim Order, and the terms of the adequate protection provided for in

this Interim Order, including that the Adequate Protection Liens are subject and subordinate to the

Carve Out.

(viii)   <u>No Control</u>.   The Prepetition Secured Parties and the DIP Secured Parties

do not control the Debtors or their properties or operations, have authority to determine the manner

in which any Debtors' operations are conducted, or are controlling persons or insiders of the

Debtors by virtue of any of the actions taken with respect to, in connection with, related to or

arising from this Interim Order, the DIP Facility, the DIP Loan Documents, the Prepetition Senior

Secured Term Loans or the Prepetition Senior Secured Credit Agreement.

F.   <u>Credit Bidding</u>.   The Prepetition Secured Parties, or certain affiliates or assignees

thereof, as well as the DIP Secured Parties, or certain affiliates or assignees thereof, intend to enter

into a stalking horse purchase agreement for certain of the Debtors' assets (the "<u>Asset Purchase</u>

<u>Agreement</u>").   Subject to the terms of the DIP Credit Agreement, no Debtor or Debtor's affiliate

shall object to any Prepetition Secured Party's or DIP Secured Party's right to credit bid, in full or

in part, the Prepetition Senior Secured Term Loans or DIP Obligations, as applicable, in each case including, without limitation, any accrued interest, fees, and expenses, in any sale, as applicable, whether such sale is effectuated through Bankruptcy Code section 363, in a chapter 11 or chapter 7 proceeding, under Bankruptcy Code section 1129, by a chapter 7 or chapter 11 trustee, or otherwise.

G.    <u>Good Cause Shown; Best Interest</u>.  Good cause has been shown for entry of this Interim Order, and entry of this Interim Order is in the best interests of the Debtors' respective estates and creditors as its implementation will, among other things, allow for the continued operation of the Debtors' existing business and enhance the Debtors' prospects for a successful reorganization.  Absent granting the relief sought by this Interim Order, the Debtors' estates will be immediately and irreparably harmed.

H.    <u>Notice</u>.  In accordance with Bankruptcy Rules 2002, 4001(b) and (c), and 9014, and the Local Rules, notice of the Interim Hearing and the emergency relief requested in the Motion has been provided by the Debtors.  Under the circumstances, the notice given by the Debtors of the Motion, the relief requested herein, and of the Interim Hearing complies with Bankruptcy Rules 2002, 4001(b) and (c), and 9014 and applicable Local Rules.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED THAT:

1.      <u>DIP Financing Approved</u>.  The Motion is granted on an interim basis as set forth

herein, and the use of Cash Collateral on an interim basis is authorized, subject to the terms of this

Interim Order.

2.      <u>Objections Overruled</u>.  Any objections, reservations of rights, or other statements

with respect to entry of the Interim Order, to the extent not withdrawn or resolved, are overruled

on the merits.  This Interim Order shall become effective immediately upon its entry.

3.      <u>Authorization of the DIP Facility and the DIP Loan Documents</u>.

(a)      The Debtors are hereby immediately authorized and empowered to enter

into, and execute and deliver, the DIP Loan Documents, and such additional documents,

instruments, certificates, and agreements as may be reasonably required or requested by the

DIP Secured Parties to implement the terms or effectuate the purposes of this Interim Order and

the DIP Loan Documents.  To the extent not entered into as of the date hereof, the Debtors and the

DIP Secured Parties shall negotiate the DIP Loan Documents in good faith, and in all respects such

DIP Loan Documents shall be consistent with the terms of the DIP Credit Agreement and

otherwise acceptable to the DIP Agents and the Requisite Lenders.  Upon entry of this Interim

Order and until execution and delivery of the DIP Credit Agreement and other DIP Loan

Documents required or requested by the DIP Secured Parties, the Debtors and the DIP Secured

Parties shall be bound by (x) the terms and conditions and other provisions set forth in the other

executed DIP Loan Documents (including the fee letters executed in connection with the DIP

Facility), with the same force and effect as if duly executed and delivered to the DIP

Administrative Agent by the Debtors, and (y) this Interim Order and the other executed DIP Loan

Documents (including the fee letters executed in connection with the DIP Facility) shall govern

and control the DIP Facility.  Upon entry of this Interim Order, the Interim Order, the DIP Credit

Agreement, and other DIP Loan Documents shall govern and control the DIP Facility. The DIP

Agents are hereby authorized to execute and enter into its respective obligations under the DIP

Loan Documents, subject to the terms and conditions set forth therein and this Interim Order.

Upon execution and delivery thereof, the DIP Loan Documents shall constitute valid and binding

obligations of the Debtors enforceable in accordance with their terms. To the extent there exists

any conflict among the terms and conditions of the DIP Loan Documents and this Interim Order,

the terms and conditions of this Interim Order shall govern and control.

(b)    Upon entry of this Interim Order, the DIP Borrower is hereby authorized to

borrow, and the DIP Guarantors are hereby authorized to guarantee, borrowings up to an aggregate

principal amount of $5 million of Initial New Money DIP Loans and $25 million of Initial Roll-

Up DIP Loans, subject to and in accordance with this Interim Order, without any further action by

the Debtors or any other party.

(c)    Upon entry of this Interim Order, the Debtors are hereby authorized to cause

the Non-Debtor Guarantors to guarantee $25 million of Initial Roll-Up DIP Loans, subject to and

in accordance with this Interim Order, without any further action by the Debtors or any other party.

(d)    In accordance with the terms of this Interim Order and the DIP Loan

Documents, proceeds of the DIP Loans shall be used solely for the purposes permitted under the

DIP Loan Documents and this Interim Order, and in accordance with the DIP Budget, subject to

permitted variances as set forth in this Interim Order and the DIP Loan Documents. Attached as

**Exhibit 2** hereto and incorporated herein by reference is a budget prepared by the Debtors and

approved by the Requisite Lenders in accordance with Section 5.18 of the DIP Credit Agreement

(the "DIP Budget").

(e)    In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized, and the automatic stay imposed by section 362 of the Bankruptcy Code is hereby lifted to the extent necessary, to perform all acts and to make, execute, and deliver all instruments and documents (including, without limitation, the DIP Credit Agreement, any security and pledge agreement, and any mortgage to the extent contemplated thereby), and to pay all fees (including all amounts owed to the DIP Lenders and the DIP Agents under the DIP Loan Documents) that may be reasonably required or necessary for the Debtors' performance of their obligations under the DIP Facility, including, without limitation:

(1)    the execution, delivery, and performance of the DIP Loan Documents, including, without limitation, the DIP Credit Agreement, any security and pledge agreement, and any mortgage to the extent contemplated thereby;

(2)    the execution, delivery, and performance of one or more amendments, waivers, consents, or other modifications to and under the DIP Loan Documents (in each case in accordance with the terms of the applicable DIP Loan Documents and in such form as the Debtors, the DIP Administrative Agent, and the Requisite Lenders may agree), it being understood that no further approval of the Court shall be required for amendments, waivers, consents, or other modifications to and under the DIP Loan Documents or the DIP Obligations that do not shorten the maturity of the extensions of credit thereunder or modify the commitments or the rate of interest or other amounts payable thereunder;

(3)    the non-refundable payment to each of and/or on behalf of the DIP Secured Parties, as applicable, of the fees referred to in the DIP Loan Documents,

including (x) all fees and other amounts owed to the DIP Agents and the

DIP Lenders and (y) all reasonable and documented costs and expenses as

may be due from time to time, including, without limitation, the reasonable

and documented fees and expenses of counsel and other professionals

retained as provided for in the DIP Loan Documents and this Interim Order

(whether incurred before or after the Petition Date or in connection with the

Chapter 11 Cases (in any capacity) or the DIP Facility), including, for the

avoidance of doubt, (a) Gibson, Dunn & Crutcher LLP (as counsel) and

Houlihan Lokey, Inc. (as financial advisor), (collectively, the "DIP/First

Lien Advisors") to the DIP Lenders, the DIP Administrative Agent, and the

ad hoc group of the Prepetition Term Lenders (the "DIP/First Lien Group");

and (b) Shipman & Goodwin LLP (as counsel) to the DIP Collateral Agent

and the Prepetition Collateral Agent, and, to the extent necessary to exercise

its rights and fulfill their obligations under the DIP Loan Documents, one

counsel to each of the DIP Agents in each local jurisdiction, which such

fees and expenses shall not be subject to the approval of the Court, nor shall

any recipient of any such payment be required to file with respect thereto

any interim or final fee application with the Court, provided that any fees

and expenses of a professional shall be subject to the provisions of

Paragraph 19 of this Interim Order;

(4)     a commitment premium of 10.00% of the total aggregate amount of the New

Money DIP Loans in respect of the DIP Facility, which is deemed earned

upon entry of this Interim Order, (the "Commitment Premium"), which

Commitment Premium shall be added to the outstanding principal amount of the DIP Loans and thereafter constitute principal for all purposes and accrue interest in accordance with the DIP Loan Documents;

(5)     an exit premium of 6.00% of the total aggregate amount of the New Money DIP Loans in respect of the DIP Facility (the "Exit Premium"), which is deemed earned upon maturity, acceleration, termination, conversion, and/or repayment/prepayment in full (unless the Lenders shall acquire the Debtors' assets pursuant to a credit bid), which Exit Premium shall be added to the outstanding principal amount of the DIP Loans and thereafter constitute principal for all purposes, including for purposes of any credit bid by the DIP Secured Parties (or certain affiliates or assignees thereof);

(6)     the payment of interest, in cash or in kind, pursuant to the DIP Credit Agreement, and any prepayment, repayment, or payment pursuant to the DIP Credit Agreement;

(7)     the performance of all other acts required under or in connection with the DIP Loan Documents.

(f)     Upon entry of this Interim Order, such DIP Loan Documents, the DIP Obligations, and the DIP Liens shall constitute valid, binding, and non-avoidable obligations of the Debtors enforceable against each Debtor party thereto in accordance with their respective terms and the terms of this Interim Order for all purposes during the Chapter 11 Cases, any subsequently converted Case of any Debtor to a case under chapter 7 of the Bankruptcy Code or after the dismissal of any Case. No obligation, payment, transfer, or grant of security under the DIP Credit Agreement, the other DIP Loan Documents, or this Interim Order shall be stayed, restrained,

voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 548, or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, Uniform Voidable Transactions Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment, or counterclaim.  All payments or proceeds remitted (a) to or on behalf of the DIP Agents on behalf of any DIP Secured Parties or (b) to or on behalf of the Prepetition Secured Parties, in each case, pursuant to the DIP Loan Documents, the provisions of this Interim Order, or any subsequent order of this Court shall be received free and clear of any claim, charge, assessment, or other liability, including, without limitation, any such claim or charge arising out of or based on, directly or indirectly, section 506(c) or the "equities of the case" exception of section 552(b) of the Bankruptcy Code (and, solely in the case of waivers of rights under sections 506(c) and 552(b) of the Bankruptcy Code, subject to the entry of the Final Order).

(g)      The DIP Guarantors hereby are authorized and directed to jointly, severally, and unconditionally guarantee, and upon entry of this Interim Order shall be deemed to have guaranteed, in full, all of the DIP Obligations of the DIP Borrower.

4.      <u>Budget and Variance Reporting</u>.  On the final business day of every fourth calendar week following entry of this Interim Order beginning with the first full week following the Petition Date (or more frequently if determined by the Debtors), the Debtors will deliver to the Prepetition Administrative Agent and the DIP/First Lien Advisors an updated Budget for the subsequent 13-week period, which shall be in form and substance satisfactory to the Requisite Lenders.  The initial DIP Budget or any subsequent DIP Budget shall be deemed to constitute the "DIP Budget" for purposes of this Interim Order with the most recently delivered Budget constituting the "DIP Budget," upon (i) approval by the Requisite Lenders (which must be in writing, email being

sufficient) or (ii) 5:00 p.m. (prevailing Eastern time) three (3) business days following delivery of

such Budget if the Requisite Lenders have neither approved nor rejected the Budget.  The Debtors

will deliver to the Prepetition Administrative Agent and the DIP/First Lien Advisors an updated

Budget for the subsequent 13-week period on the final business day of every fourth calendar week

following entry of this Interim Order beginning with the fourth full week following the Petition

Date.  In the event the conditions for the most recently delivered Budget to constitute an "DIP

Budget" are not met as set forth herein, the prior DIP Budget shall remain in full force and effect.

Commencing on the first full calendar week after the Petition Date, on or before 5:00 p.m.

(prevailing Eastern time) on Thursday of every other week, the Debtors shall deliver to the DIP

Administrative Agent and the DIP/First Lien Advisors a budget variance report/reconciliation

(the "DIP Budget Variance Report"), setting forth in reasonable detail actual operating receipts

and operating disbursements on a rolling two-week basis (the "Budget Period")\ and all Budget

Variances (as defined below), in each case, for items (i-iii) below, as compared to the projected

amounts therefor set forth in the then applicable DIP Budget, together with a statement confirming

compliance with the budget covenants set forth in Section 5.18 of the DIP Credit Agreement.  The

DIP Budget Variance Report shall include indications as to whether each variance therein is

temporary or permanent and an explanation, in reasonable detail, of any material variance.  The

Debtors shall not permit the percentage variance with respect to (i) total projected operating

disbursements in each then-current DIP Budget to exceed 10% on an aggregate basis of total actual

operating disbursements, (ii) total projected net investment and financing disbursements in each

then-current DIP Budget to exceed 10% on an aggregate basis of total actual net investment and

financing disbursements, and (iii) total projected restructuring professional fees in each then-

current DIP Budget to exceed 10% on an aggregate basis of total restructuring professional fees,

in each case, for measuring the variance, beginning with the week ending May 20, 2023, which would be reported by the DIP Budget Variance Report delivered May 24, 2023, tested bi-weekly on a four week rolling basis, in each case, for the Budget Period under the then-current DIP Budget (the "Budget Variances"; all references in this Interim Order and the DIP Loan Documents to "DIP Budget" shall mean the DIP Budget as it is subject to the Budget Variances).

5.      Access to Records.  The Debtors shall provide the DIP/First Lien Advisors with all reporting and other information required to be provided to the DIP Administrative Agent under the DIP Loan Documents.  In addition to, and without limiting, whatever rights of access the DIP Secured Parties have under the DIP Loan Documents, upon reasonable notice to Debtors' counsel (email being sufficient), at reasonable times during normal business hours, the Debtors shall permit representatives, agents, and employees of the DIP Secured Parties to have reasonable access to (i) inspect the Debtors' assets, and (ii) all information (including historical information and the Debtors' books and records) and personnel, including regularly scheduled meetings as mutually agreed with senior management of the Debtors and other company advisors (during normal business hours), and the DIP Secured Parties shall be provided with access to all information they shall reasonably request, excluding any information for which confidentiality is owed to third parties, information subject to attorney client or similar privilege, or where such disclosure would not be permitted by any applicable requirements of law.

6.      Debtors' Stipulations.  Without prejudice to the rights of parties in interest (other than the Debtors), including any Committee, as set forth in Paragraph 13 herein, and subject to the limitations thereon contained in Paragraphs 21 and 29 herein, the Debtors are authorized to stipulate and agree that (collectively, Paragraphs 6(i) through (x) below are referred to herein as the "Debtors' Stipulations"):

(i)    <u>Prepetition Senior Secured Term Loans</u>.

(a)    Under that certain Amended and Restated Credit and Guaranty Agreement, dated as of November 4, 2019 (as amended, restated, or otherwise modified from time to time, the "<u>Prepetition Senior Secured Credit Agreement</u>" and, together with the other "Loan Documents" (as defined in the Prepetition Senior Secured Credit Agreement, the "<u>Prepetition Term Loan Documents</u>"), by and among Vice Group Holding Inc. (the "<u>Borrower</u>"), certain of the Debtors (the "<u>Guarantors</u>"), the lenders party thereto (collectively, the "<u>Prepetition Term Lenders</u>"), Fortress Credit Corp., as administrative agent (in such capacity, the "<u>Prepetition Administrative Agent</u>"), and Wilmington Trust, National Association, as collateral agent (in such capacity, the "<u>Prepetition Collateral Agent</u>" and, together with the Prepetition Administrative Agent, the "<u>Prepetition Term Agents</u>," and the Prepetition Term Lenders and Prepetition Term Agents, collectively, the "<u>Prepetition Secured Parties</u>"), the Prepetition Term Lenders provided loans thereunder (the "<u>Prepetition Senior Secured Term Loans</u>") in a total aggregate principal amount outstanding as of the Petition Date of $474,572,920.

(b)    As of the Petition Date, the Debtors were jointly and severally indebted to the Prepetition Secured Parties pursuant to the Prepetition Term Loan Documents, without defense, counterclaim, or offset of any kind, in an amount equal to the aggregate principal amount of the Prepetition Senior Secured Term Loans plus accrued and unpaid interest with respect thereto and any additional fees, costs, expenses (including any attorneys', financial advisors', and other professionals' fees and expenses), reimbursement obligations, indemnification obligations, contingent obligations, and other charges of whatever nature, whether or not contingent, whenever arising, due, or owing, and all other Obligations (as defined in the Prepetition Senior Secured

Credit Agreement) owing under or in connection with the Prepetition Term Loan Documents (collectively, the "Prepetition First Lien Obligations").

   (ii) First Lien Loan Collateral.   In connection with the Prepetition Senior Secured Credit Agreement, the Debtors entered into that certain Security Agreement, dated as of November 4, 2019 (as amended, supplemented or otherwise modified from time to time, the "Security Agreement"), by and between the Borrower, the other loan parties thereto, and the Prepetition Collateral Agent.   Pursuant to the Security Agreement and the other Prepetition Term Loan Documents, the Prepetition First Lien Obligations are secured by valid, binding, perfected, and enforceable first-priority security interests in and liens (the "Prepetition Senior Liens") on the "Collateral" (the "Prepetition Collateral"), pursuant to, and as such term is defined in, the Security Agreement, consisting of substantially all of the Debtors' assets, except as set forth in the Security Agreement.

   (iii) Second Lien Note. Under that certain Instrument, among Vice Europe Pulse Holding Limited ("VEPH"), the Guarantors (as defined therein), and the Sellers (as defined therein), dated as of December 8, 2021 (as amended, restated, or otherwise modified from time to time, the "Second Lien Note") the Sellers hold subordinated notes in an aggregate principal amount of approximately $20.9 million.

   (iv) Second Lien Collateral. In connection with the Second Lien Note, VEPH, the Sellers, and B & C 3, LLC (the "Second Lien Agent", together with the Sellers, the "Prepetition Second Lien Secured Parties"), entered into that certain Second Lien Share Charge, dated as of December 8, 2021 (as amended, supplemented or otherwise modified from time to time, the "Share Charge", together with the Second Lien Note, the "Second Lien Note Documents").   Pursuant to

the Share Charge, the Second Lien Agent was granted security interests in and liens on certain assets of VEPH (the "Second Lien Loan Liens").

(v)  Pulse Notes Subordination Agreement. The Prepetition Administrative Agent, the Prepetition Collateral Agent, and the Second Lien Agent are parties to that certain Subordination and Intercreditor Agreement, dated as of December 8, 2021 (as amended, restated, or otherwise modified from time to time, the "Pulse Notes Subordination Agreement") to govern, among other things, the respective rights, interests, obligations, priority, and positions of the Prepetition Secured Parties and the Prepetition Second Lien Secured Parties with respect to the assets and properties of the Debtors and other obligors.  Each of the Borrower and Guarantors acknowledged and agreed to the Pulse Notes Subordination Agreement.

(vi)  Cash Collateral.  Any and all of the Debtors' cash, including the Debtors' cash and other amounts on deposit or maintained in any account or accounts by the Debtors, and any amounts generated by the collection of accounts receivable or other disposition of the Prepetition Collateral existing as of the Petition Date, and the proceeds of any of the foregoing are the Prepetition Secured Parties' cash collateral within the meaning of Bankruptcy Code section 363(a) (the "Cash Collateral").

(vii)  Bank Accounts.  The Debtors acknowledge and agree that, to the knowledge of the Debtors, as of the Petition Date, none of the Debtors has either opened or maintains any bank accounts other than the accounts listed in the exhibit attached to any order authorizing the Debtors to continue to use the Debtors' existing cash management system.

(viii)  Cash Management Obligations. JPMorgan Chase Bank, N.A. (together with its affiliates, a "Cash Management Bank") is a party to that certain Facility Agreement, dated 17 October 2016, (as amended, supplemented or otherwise modified from time to time, the

"Prepetition Overdraft Facility", and the obligations thereunder, the "Overdraft Obligations"; the Overdraft Obligations, together with all other obligations of the Debtors to the Cash Management Bank pursuant to the Prepetition Senior Secured Credit Agreement, the "Cash Management Obligations") with Vice Europe Holding Limited ("VEHL").   In connection with the Cash Management Obligations, and pursuant to the Security Agreement, the Cash Management Bank was granted *pari passu* security interests in and liens (the "Cash Management Liens" and, together with the Prepetition Senior Liens, the "Prepetition Liens") on the Prepetition Collateral.

(ix)    Validity, Perfection, and Priority of Prepetition Senior Liens and Prepetition First Lien Obligations.  Subject to the Challenge Period (as defined herein), each of the Debtors acknowledges and agrees that, in each case as of the Petition Date:  (A) the Prepetition Senior Liens are valid, binding, enforceable, non-avoidable, and properly perfected liens on and security interests in the Prepetition Collateral; (B) the Prepetition Senior Liens are subject and subordinate only to Prior Senior Liens; (C) the Prepetition First Lien Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtors; (D) no offsets, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition Senior Liens or Prepetition First Lien Obligations exist, and no portion of the Prepetition Senior Liens or Prepetition First Lien Obligations is subject to any challenge or defense including impairment, set-off, right of recoupment, avoidance, attachment, disallowance, disgorgement, reduction, recharacterization, recovery, subordination (whether equitable or otherwise), attack, offset, defense, counterclaims, cross-claims, or "claim" (as defined in the Bankruptcy Code), pursuant to the Bankruptcy Code or applicable nonbankruptcy law; and (E) the Debtors and their estates have no claims, objections, challenges, causes of actions, recoupments, counterclaims, cross-claims, setoff rights, and/or choses in action, including "lender liability" causes of action or avoidance

claims under chapter 5 of the Bankruptcy Code, whether arising under applicable state law or federal law (including any recharacterization, subordination, avoidance, disgorgement, recovery, or other claims arising under or pursuant to sections 105, 510, or 542 through 553 of the Bankruptcy Code), against the Prepetition Administrative Agent, the Prepetition Collateral Agent, the other Prepetition Secured Parties, or any of their respective affiliates, agents, representatives, attorneys, advisors, professionals, officers, directors, and employees arising out of, based upon, or related to their loans under the Prepetition Term Loan Documents, the Prepetition First Lien Obligations, or the Prepetition Senior Liens.

(x)    <u>Pulse Notes Subordination Agreement</u>.  Pursuant to section 510 of the Bankruptcy Code, the Pulse Notes Subordination Agreement, and any other applicable intercreditor or subordination provisions contained in any of the Prepetition Term Loan Documents, the Second Lien Note, the Second Lien Share Charge, or the Prepetition Overdraft Facility, shall (i) remain in full force and effect, (ii) continue to govern the relative obligations, priorities, rights and remedies of the Prepetition Secured Parties, the Prepetition Second Lien Secured Parties, and the Cash Management Bank, and (iii) not be deemed to be amended, altered or modified by the terms of this Interim Order or the DIP Loan Documents, in each case, unless expressly set forth herein or therein.

7.    <u>DIP Superpriority Claims</u>.  Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims against each of the Debtors' estates (the "<u>DIP Superpriority Claims</u>") (without the need to file any proof of claim) with priority over any and all administrative expenses, adequate protection claims, diminution claims, and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind

specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503(b), 506(c), 507(a), 507(b), 726, 1113, or 1114 of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall for the purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code and which shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, including, without limitation, subject to entry of the Final Order, any proceeds or property recovered in connection with the pursuit of claims or causes of action arising under chapter 5 of the Bankruptcy Code, if any (the "Avoidance Actions"), subject only to, and subordinated in all respects to, the payment of the Carve Out.  Except as set forth in this Interim Order or the Final Order, no other superpriority claims shall be granted or allowed in these Chapter 11 Cases.

8.      DIP Liens.  As security for the DIP Obligations, effective and perfected upon the date of this Interim Order, and without the necessity of the execution, recordation of filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements, or other similar documents, or the possession or control by the DIP Agents or any DIP Lender of, or over, any DIP Collateral (as defined below), the following security interests and liens are hereby granted by the Debtors to the DIP Collateral Agent, for the benefit of the DIP Secured Parties (all property identified in clause (a) and (b) below being collectively referred to as the "DIP Collateral"), subject to (x) Liens permitted pursuant to the terms of the DIP Credit Agreement and (y) the Carve Out (all such liens and security interests granted to the DIP Collateral

Agent, for the benefit of the DIP Secured Parties, pursuant to this Interim Order and the DIP Loan

Documents, the "<u>DIP Liens</u>"):

        (a)    <u>First Priority Lien On Any Unencumbered Property</u>.  Pursuant to section

364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected, non-

avoidable, automatically, and properly perfected first-priority senior security interest in and lien

upon all property of the Debtors, whether existing on the Petition Date or thereafter acquired, that,

on or as of the Petition Date is not subject to Prior Senior Liens (subject to the Carve Out),

including, without limitation (in each case, to the extent not subject to Prior Senior Liens), a 100%

equity pledge of any first-tier foreign subsidiaries; unencumbered cash of the Debtors (whether

maintained with the DIP Agents or otherwise) and any investment of such cash, accounts,

inventory, goods, contract rights, instruments, documents, chattel paper, patents, trademarks,

copyrights, and licenses therefor, accounts receivable, receivables and receivables records, general

intangibles, payment intangibles, tax or other refunds, insurance proceeds, letters of credit,

contracts, owned real estate, real property leaseholds, fixtures, deposit accounts, commercial tort

claims, securities accounts, instruments, investment property, letter-of-credit rights, supporting

obligations, machinery and equipment, real property, leases (and proceeds from the disposition

thereof), all of the issued and outstanding capital stock of each Debtor, other equity or ownership

interests in or of any entity (including equity interests in subsidiaries of each Debtor), money,

investment property, intercompany claims, claims arising on account of transfers of value from a

Debtor to (x) another Debtor and (y) a non-Debtor affiliate incurred on or following the Petition

Date, causes of action, including causes of action arising under section 549 of the Bankruptcy

Code (but excluding all other Avoidance Actions), all products and proceeds of the foregoing and,

subject to entry of the Final Order, all proceeds and property recovered in respect of Avoidance

Actions (collectively, the "Previously Unencumbered Property"); *provided*, *further*, that, for the avoidance of doubt and notwithstanding anything to the contrary contained herein, to the extent a lien cannot attach to any of the foregoing pursuant to applicable law, the liens granted pursuant to this Interim Order shall attach to the Debtors' economic rights, including, without limitation, any and all proceeds of the foregoing.

(b)  Liens Priming the Prepetition Liens.  Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first-priority senior priming security interest in and lien upon all property of the Debtors that was subject to the Prepetition Liens (subject to the Carve Out), including, without limitation, the Prepetition Collateral and Cash Collateral; *provided* that such liens shall be immediately junior to any Prior Senior Liens; *provided*, *further*, that, for the avoidance of doubt and notwithstanding anything to the contrary contained herein, to the extent a lien cannot attach to any of the foregoing pursuant to applicable law, the liens granted pursuant to this Interim Order shall attach to the Debtors' economic rights, including, without limitation, any and all proceeds of the foregoing.

(c)  Liens Junior to Certain Other Liens.  Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected junior security interest in and lien upon all property of the Debtors, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date, is not Prepetition Collateral but is subject to a Prior Senior Lien.

9.  Adequate Protection for the Prepetition Secured Parties.  Subject only to the Carve Out and the terms of this Interim Order, pursuant to sections 361, 363(e), and 364 of the Bankruptcy Code, and in consideration of the stipulations and consents set forth herein, as adequate protection of their interests in the Prepetition Collateral (including Cash Collateral),

solely for and equal in amount to the postpetition diminution in value of such interests (each such diminution, a "Diminution in Value"), resulting from, among other things, the imposition of the priming DIP Liens on the Prepetition Collateral, the Carve Out, the Debtors' use of the Prepetition Collateral (including Cash Collateral), and the imposition of the automatic stay, the applicable Prepetition Term Agent, for the benefit of itself and the other Prepetition Secured Parties, is hereby granted the following (collectively, the "First Lien Adequate Protection Obligations"):

(a)    First Lien Adequate Protection Liens.    As security for and solely to the extent of any Diminution in Value, additional and replacement, valid, binding, enforceable, non-avoidable, and effective and automatically perfected postpetition security interests in and liens as of the date of this Interim Order (together, the "First Lien Adequate Protection Liens"), without the necessity of the execution by the Debtors (or recordation or other filing), of security agreements, control agreements, pledge agreements, financing statements, mortgages, or other similar documents, on all DIP Collateral and, upon entry of the Final Order, all proceeds or property recovered from Avoidance Actions.    Subject to the terms of this Interim Order, the First Lien Adequate Protection Liens shall be subordinate only to the (A) Carve Out, (B) the DIP Liens, and (C) Prior Senior Liens.    The First Lien Adequate Protection Liens shall otherwise be senior to all other security interests in, liens on, or claims against any of the DIP Collateral (including, for the avoidance of doubt, any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code).

(b)    Adequate Protection Superpriority Claims.    As further adequate protection, and to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code, allowed administrative expense claims in each of the Chapter 11 Cases ahead of and senior to any and all other administrative expense claims in such Cases to the extent of any postpetition Diminution in

Value (the "Adequate Protection Superpriority Claims"), but junior to the Carve Out and the DIP

Superpriority Claims.  Subject to the Carve Out and the DIP Superpriority Claims in all respects,

the Adequate Protection Superpriority Claims will not be junior to any claims and shall have

priority over all administrative expense claims against each of the Debtors, now existing or

hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative

expense claims of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331,

365, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(d), 726, 1113

and 1114 of the Bankruptcy Code.  The Prepetition Secured Parties shall not receive or retain any

payments, property or other amounts in respect of the Adequate Protection Superpriority Claims

under section 507(b) of the Bankruptcy Code granted hereunder unless and until the DIP

Obligations have been indefeasibly paid in full, in cash, or satisfied in a manner otherwise agreed

to by the Requisite Lenders, in each case as provided in the DIP Loan Documents.

(c)      First Lien Adequate Protection Payments.  As further adequate protection,

the Debtors are authorized and directed to pay, in accordance with the terms of Paragraph 19 of

this Interim Order, all reasonable and documented fees and expenses (the "Adequate Protection

Fees"), whether incurred before or after the Petition Date or in connection with the Chapter 11

Cases (in any capacity), to the extent not duplicative of any fees and/or expenses paid pursuant to

paragraph 3(d)(3) hereof, including all reasonable and documented fees and expenses of counsel

and other professionals retained as provided for in the DIP Loan Documents and this Interim Order,

including, for the avoidance of doubt, of (i)  the DIP/First Lien Group Advisors, and (ii) to the

extent necessary to exercise and fulfill its obligations under the Prepetition Term Loan Documents,

one counsel to the Prepetition Collateral Agent and one counsel to the other Prepetition Secured

Parties (taken as a whole) in each local jurisdiction that is material to the Prepetition Secured

Parties (taken as a whole) (all payments referenced in this sentence, collectively, the "Adequate Protection Payments"). None of the Adequate Protection Fees shall be subject to separate approval by this Court or the U.S. Trustee Guidelines, and no recipient of any such payment shall be required to file any interim or final fee application with respect thereto or otherwise seek the Court's approval of any such payments.

(d)   Right to Seek Additional Adequate Protection. This Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the Prepetition Secured Parties to request further or alternative forms of adequate protection at any time or the rights of the Debtors or any other party to contest such request.

10.   Adequate Protection for the Cash Management Bank. Pursuant to the terms of this Interim Order and sections 361, 363(e), and 364 of the Bankruptcy Code, as adequate protection of their interests in the Prepetition Collateral (including Cash Collateral), solely for and equal in amount to the postpetition Diminution in Value, resulting from, among other things, the imposition of the priming DIP Liens on the Prepetition Collateral, the Carve Out, the Debtors' use of the Prepetition Collateral (including Cash Collateral), and the imposition of the automatic stay, the Prepetition Collateral Agent, for the benefit of itself and the Cash Management Bank, is hereby granted the following (collectively, the "Cash Management Adequate Protection Obligations" and, together with the First Lien Adequate Protection Obligations, the "Adequate Protection Obligations"):

(a)   Cash Management Adequate Protection Liens. As security for and solely to the extent of any Diminution in Value, additional and replacement, valid, binding, enforceable, non-avoidable, and effective and automatically perfected postpetition security interests in and liens as of the date of this Interim Order (together, the "Cash Management Adequate Protection Liens"

and, together with the First Lien Adequate Protection Liens, the "Adequate Protection Liens"),

without the necessity of the execution by the Debtors (or recordation or other filing), of security

agreements, control agreements, pledge agreements, financing statements, mortgages, or other

similar documents, on all DIP Collateral and, upon entry of the Final Order, all proceeds or

property recovered from Avoidance Actions.  Subject to the terms of this Interim Order, the Cash

Management Adequate Protection Liens shall be subordinate only to the (A) Carve Out, (B) the

DIP Liens, (C) the First Lien Adequate Protection Liens, (D) the Prepetition Senior Liens, and (E)

Prior Senior Liens.  The Cash Management Adequate Protection Liens shall otherwise be senior

to all other security interests in, liens on, or claims against any of the DIP Collateral (including,

for the avoidance of doubt, any lien or security interest that is avoided and preserved for the benefit

of the Debtors and their estates under section 551 of the Bankruptcy Code).

11.     Carve Out.

(a)     Priority of Carve Out.  Subject to the terms and conditions contained in this

Paragraph 11, and notwithstanding anything to the contrary elsewhere in this Interim Order, each

of the DIP Liens, DIP Superpriority Claims, Prepetition Liens, Adequate Protection Liens, and

Adequate Protection Superpriority Claims shall be subject and subordinate to payment of the Carve

Out.  The Carve Out shall have such priority claims and liens over all assets of the Debtors,

including any DIP Collateral, Prepetition Collateral, and any funds in the escrow account into

which the DIP Loans are funded (the "DIP Loan Escrow").

(b)     Definition of Carve Out.  As used in this Interim Order, the "Carve Out"

means the sum of (i) all fees required to be paid to the Clerk of the Court and to the United States

Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory

rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up

to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, and to the extent provided for under the DIP Budget, all unpaid fees and expenses (including any success or transaction fees earned and owed to any investment banker or professional advisor prior to the Trigger Date) (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and the Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first business day following delivery by the DIP Administrative Agent (at the direction of the Requisite Lenders) of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice, (the amounts set forth in clauses (i) through (iii), the "Pre-Carve Out Trigger Notice Cap"); and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $1,000,000 incurred after the first business day following delivery by the DIP Administrative Agent of the Carve Out Trigger Notice (such date, the "Trigger Date"), to the extent allowed at any time, whether by interim order, procedural order, or otherwise, less the amount of any prepetition retainers received by any such Professional Persons and not previously returned or applied to fees and expenses (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap" and, together with the Pre-Carve Out Trigger Notice Cap, the "Carve Out Cap").  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Administrative Agent to the Debtors, their lead restructuring counsel Togut, Segal & Segal LLP, One Penn Plaza, Suite 3335, New York, NY 10119 (Attn:  Kyle J. Ortiz and Brian F. Moore), the U.S. Trustee, and

counsel to the Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default (as defined in the DIP Credit Agreement) and acceleration of the DIP Obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

        (c)    <u>Carve Out Reserve</u>.  Notwithstanding the occurrence of an Event of Default or conditions to borrowing or release of funds from the DIP Loan Escrow, on the day on which a Carve Out Trigger Notice is given by the DIP Administrative Agent to the Debtors with a copy to counsel to the Committee (the "<u>Termination Declaration Date</u>"), the Carve Out Trigger Notice shall (i) be deemed a draw request and notice of borrowing by the Debtors for DIP Loans under the DIP Facility (on a pro rata basis based on the then outstanding DIP Obligations) and/or request to release funds from the DIP Loan Escrow, in an amount equal to the then unpaid amounts of the Allowed Professional Fees plus reasonably estimated fees not yet allowed for the period through and including the Termination Declaration Date (any such amounts actually advanced shall constitute DIP Loans and shall be deposited in the DIP Loan Escrow), and (ii) also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor or available in the DIP Loan Escrow to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees plus reasonably estimated fees not yet allowed for the period through and including the Termination Declaration Date.  The Debtors shall deposit and hold such amounts in a segregated account in trust to pay such then-unpaid Allowed Professional Fees plus reasonably estimated fees not yet allowed for the period through and including the Termination Declaration Date (the "<u>Pre-Carve Out Trigger Notice Reserve</u>") prior to any and all other claims.  On the Termination Declaration Date, the Carve Out Trigger Notice shall also (i) be deemed a request by the Debtors for DIP Loans under the DIP Facility (on a pro

rata basis based on the then outstanding DIP Obligations) and/or request to release funds from the

DIP Loan Escrow in an amount equal to the Post-Carve Out Trigger Notice Cap (any such amounts

actually advanced shall constitute DIP Loans) and (ii) constitute a demand to the Debtors to utilize

all cash on hand as of such date and any available cash thereafter held by any Debtor or available

in the DIP Loan Escrow, after funding the Pre-Carve Out Trigger Notice Reserve, to fund a reserve

in an amount equal to the Post-Carve Out Trigger Notice Cap.  The Debtors shall deposit and hold

such amounts in a segregated account in trust to pay such Allowed Professional Fees benefiting

from the Post-Carve Out Trigger Notice Cap (the "Post-Carve Out Trigger Notice Reserve" and,

together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to any

and all other claims.  On the first business day after the DIP Administrative Agent gives such

notice to such DIP Lenders, notwithstanding anything in the DIP Credit Agreement to the contrary,

including with respect to the existence of a Default (as defined in the DIP Credit Agreement) or

Event of Default, the failure of the Debtors to satisfy any or all of the conditions precedent for DIP

Loans under the DIP Facility, any termination of the DIP Obligations following an Event of

Default, or the occurrence of the Maturity Date (as defined in the DIP Credit Agreement), each

DIP Lender with an outstanding Commitment (as defined in the DIP Credit Agreement, on a pro

rata basis based on the then outstanding Commitments) shall make available to the DIP

Administrative Agent such DIP Lender's pro rata share with respect to such borrowing in

accordance with the DIP Facility.  All funds in the Pre-Carve Out Trigger Notice Reserve shall be

used first to pay the obligations set forth in the Pre-Carve Out Trigger Notice Cap (the "Pre-Carve

Out Amounts"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until

paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced

to zero, to pay the DIP Administrative Agent for the benefit of the DIP Lenders, unless the DIP

Obligations have been indefeasibly paid in full, in cash, and all Commitments have been terminated, in which case any such excess shall be paid to the Prepetition Secured Parties in accordance with their rights and priorities as of the Petition Date. All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in the Post-Carve Out Trigger Notice Cap (the "Post-Carve Out Amounts"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Administrative Agent for the benefit of the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all Commitments have been terminated, in which case any such excess shall be paid to the Prepetition Secured Parties in accordance with their rights and priorities as of the Petition Date. Notwithstanding anything to the contrary in the DIP Loan Documents, or this Interim Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this Paragraph 11, then any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserves, up to the applicable amount set forth in this Paragraph 11, prior to making any payments to the DIP Administrative Agent or the Prepetition Secured Parties, as applicable. Notwithstanding anything to the contrary in the DIP Loan Documents or this Interim Order, following delivery of a Carve Out Trigger Notice, the DIP Administrative Agent and the Prepetition Administrative Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but the DIP Collateral Agent shall have a security interest in any residual interest in the Carve Out Reserves (for its benefit and the benefit of the other DIP Secured Parties), with any excess paid to the DIP Administrative Agent for application in accordance with the DIP Loan Documents. Further, notwithstanding anything to the contrary in this Interim Order,

(i) disbursements by the Debtors from the Carve Out Reserves shall not constitute DIP Loans or increase or reduce the DIP Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the Initial Budget, Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors.  For the avoidance of doubt and notwithstanding anything to the contrary in this Interim Order, the DIP Facility, or the Prepetition First Lien Documents, the Carve Out shall be senior to all liens and claims securing the DIP Facility, the Adequate Protection Liens, the Adequate Protection Superpriority Claims, any claims arising under section 507(b) of the Bankruptcy Code, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations, the Prepetition First Lien Obligations, and the obligations pursuant to the Asset Purchase Agreement.

(d)    Payment of Allowed Professional Fees Prior to the Termination Declaration Date.  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(e)    No Direct Obligation to Pay Allowed Professional Fees.  Except for funding the Carve Out Reserves as provided herein, none of the DIP Agents, DIP Lenders, or the Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any successor cases under any chapter of the Bankruptcy Code.  Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Agents, the DIP Lenders, or the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional

Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(f)      Payment of Carve Out on or after the Termination Declaration Date.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.  Any funding of the Carve Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Interim Order, the DIP Loan Documents, the Bankruptcy Code, and applicable law.

12.     Reservation of Rights of the DIP Agents, DIP Lenders, and Prepetition Secured Parties.  Subject in all cases to the Carve Out, notwithstanding any other provision in this Interim Order or the DIP Loan Documents to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair: (a) any of the rights of any of the Prepetition Secured Parties to seek any other or supplemental relief in respect of the Debtors, including the right to seek additional adequate protection at and following the Final Hearing; provided that any such further or different adequate protection shall at all times be subordinate and junior to the Carve Out and the claims and liens of the DIP Secured Parties granted under this Interim Order and the DIP Loan Documents; (b) any of the rights of the DIP Secured Parties or the Prepetition Secured Parties under the DIP Loan Documents, the Prepetition Term Loan Documents, or the Bankruptcy Code or under non-bankruptcy law (as applicable), including, without limitation, the right of any of the DIP Secured Parties or the Prepetition Secured Parties to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Chapter 11 Cases, conversion of any of the

Chapter 11 Cases to cases under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers in any of the Chapter 11 Cases, (iii) seek to propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans; or (c) any other rights, claims, or privileges (whether legal, equitable, or otherwise) of any of the DIP Secured Parties or the Prepetition Secured Parties.  The delay in or failure of the DIP Secured Parties and/or the Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies shall not constitute a waiver of any of the DIP Secured Parties' or the Prepetition Secured Parties' rights and remedies.

13.    <u>Reservation of Certain Committee and Third-Party Rights and Bar of Challenges and Claims</u>.  Subject to the Challenge Period (as defined herein), the stipulations, admissions, waivers, and releases contained in this Interim Order, including the Debtors' Stipulations, shall be binding upon the Debtors, their estates, and any of their respective successors in all circumstances and for all purposes, and the Debtors are deemed to have irrevocably waived and relinquished all Challenges (as defined below) as of the Petition Date.  The stipulations, admissions, and waivers contained in this Interim Order, including, the Debtors' Stipulations, shall be binding upon all other parties in interest, including any Committee and any other person acting on behalf of the Debtors' estates, unless and to the extent that a party in interest with proper standing granted by order of the Court (or other court of competent jurisdiction) has timely and properly filed an adversary proceeding or contested matter under the Bankruptcy Rules before thirty (30) calendar days after entry of the Interim Order, subject to further extension by (x) written agreement of the Debtors and the DIP Administrative Agent or (y) an order of this Court obtained on notice and after a hearing, such time, the "<u>Challenge Period</u>"); provided, however, that if, prior to the end of the Challenge Period, (1) the Chapter 11 Cases convert to chapter 7, or (2) if a chapter 11 trustee

is appointed, then, in each such case, the Challenge Period shall be extended by the later of (A) the time remaining under the Challenge Period plus ten (10) days or (B) such other time as ordered by the Court solely with respect to any such trustee, commencing on the occurrence of either of the events discussed in the foregoing clauses (x) and (y); (ii) seeking to avoid, object to, or otherwise challenge the findings or Debtors' Stipulations regarding: (a) the validity, enforceability, extent, priority, or perfection of the mortgages, security interests, and liens of the Prepetition Collateral Agent and the Prepetition Secured Parties; or (b) the validity, enforceability, allowability, priority, secured status, or amount of the Prepetition First Lien Obligations (any such claim, a "Challenge"), and (iii) in which the Court enters a final order in favor of the plaintiff sustaining any such Challenge in any such timely filed adversary proceeding or contested matter. Upon the expiration of the Challenge Period Termination Date without the filing of a Challenge (or if any such Challenge is filed and overruled):  (a) any and all such Challenges by any party (including the Committee, any chapter 11 trustee, and/or any examiner or other estate representative appointed or elected in these Chapter 11 Cases, and any chapter 7 trustee and/or examiner or other estate representative appointed or elected in any Successor Case) shall be deemed to be forever barred; (b) the Prepetition First Lien Obligations shall constitute allowed claims, not subject to counterclaim, setoff, recoupment, reduction, subordination, recharacterization, defense, or avoidance for all purposes in the Debtors' Cases and any Successor Cases; (c) the Prepetition Senior Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, and perfected secured claims, not subject to recharacterization, subordination, or avoidance; and (d) all of the Debtors' stipulations and admissions contained in this Interim Order, including the Debtors' Stipulations, and all other waivers, releases, affirmations, and other stipulations as to the priority, extent, and validity as to the Prepetition Secured Parties' claims,

liens, and interests contained in this Interim Order shall be of full force and effect and forever binding upon the Debtors, the Debtors' estates, and all creditors, interest holders, and other parties in interest in these Chapter 11 Cases and any Successor Cases.  If any such adversary proceeding or contested matter is timely and properly filed under the Bankruptcy Rules and remains pending and the Chapter 11 Cases are converted to chapter 7, the chapter 7 trustee may continue to prosecute such adversary proceeding or contested matter on behalf of the Debtors' estates. Furthermore, if any such adversary proceeding or contested matter is timely and properly filed under the Bankruptcy Rules, the stipulations and admissions contained in this Interim Order, including the Debtors' Stipulations, shall nonetheless remain binding and preclusive on any Committee and any other person or entity except to the extent that such stipulations and admissions were expressly challenged in such adversary proceeding or contested matter prior to the Challenge Period Termination Date.  Nothing in this Interim Order vests or confers on any person (as defined in the Bankruptcy Code), including, without limitation, any Committee appointed in the Chapter 11 Cases, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation, any challenges (including a Challenge) with respect to the Prepetition Term Loan Documents, the Prepetition Senior Liens, and the Prepetition First Lien Obligations, and a separate order of the Court conferring such standing on any Committee or other party-in-interest shall be a prerequisite for the prosecution of a Challenge by such Committee or such other party-in-interest.

14.    <u>DIP Termination Date</u>.    On the DIP Termination Date (as defined below), consistent with Section 8.2 of the DIP Credit Agreement, (a) all DIP Obligations shall be immediately due and payable, all Commitments will terminate, and the Carve Out Reserves shall be immediately funded; (b) all authority to use Cash Collateral shall cease; provided, however,

that during the Remedies Notice Period (as defined below), the Debtors may use Cash Collateral solely to fund the Carve Out and pay payroll and other expenses critical to the administration of the Debtors' estates strictly in accordance with the DIP Budget, subject to such variances as permitted in the DIP Credit Agreement; and (c) the DIP Secured Parties shall be otherwise entitled to exercise rights and remedies under the DIP Loan Documents in accordance with this Interim Order.

15.    <u>Events of Default</u>.  The occurrence of any of the following events, unless waived by the Requisite Lenders in accordance with the terms of the DIP Loan Documents, shall constitute an event of default (collectively, the "<u>Events of Default</u>"):  (a) the failure of the Debtors to perform, in any material respect, any of the terms, provisions, conditions, covenants, or obligations under this Interim Order, (b) the failure of the Debtors to comply with any of the Milestones (as defined below) or (c) the occurrence of an "Event of Default" under the DIP Credit Agreement, (d) the entry of an order authorizing the use of Cash Collateral of the Prepetition Secured Parties or the DIP Lenders on a non-consensual basis or financing under Bankruptcy Code section 364 that is pari passu or senior to the Prepetition Senior Secured Term Loans or the DIP Loans or the filing by the Debtors of a motion seeking such authority; (e) dismissal or conversion of the Chapter 11 Cases;  (f) any suit, indictment, or similar action by the Department of Justice or a regulatory agency (or entry of any order granting relief from the automatic stay related to the foregoing) against or with respect to any Debtor, the business, operations or assets of any Debtor or any current or former employee of any Debtor, that the Requisite Lenders determines (in their sole discretion) may be adverse in any material respect to the value of the business, operations or assets of any Debtor; (g) termination of the Interim Order or the Final Order, as applicable (except in the

case of the Interim Order, as a result of the entry of the Final Order); and (h) the filing of a plan or disclosure statement that has not been approved by the DIP Administrative Agent.

16.      Milestones.  The Debtors' failure to comply with those certain case milestones set forth in Section 5.21 of the DIP Credit Agreement (collectively, the "Milestones") shall constitute an "Event of Default" in accordance with the terms of the DIP Credit Agreement.

17.      Rights and Remedies Upon Event of Default.  Immediately upon the occurrence and during the continuation of an Event of Default, notwithstanding the provisions of section 362 of the Bankruptcy Code, without any application, motion, or notice to, hearing before, or order from the Court, but subject to the terms of this Interim Order, subject to the Remedies Notice Period (defined below), (a) the DIP Administrative Agent (at the direction of the Requisite Lenders) may declare (any such declaration shall be referred to herein as a "Termination Declaration") (i) all DIP Obligations owing under the DIP Loan Documents to be immediately due and payable, (ii) the termination, reduction or restriction of any further commitment to extend credit to the Debtors to the extent any such commitment remains under the DIP Facility, (iii) termination of the DIP Facility and the DIP Loan Documents as to any future liability or obligation of the DIP Agents and the DIP Lenders, but without affecting any of the DIP Liens or the DIP Obligations, and (iv) that  the Carve Out shall be triggered, through the delivery of the Carve Out Trigger Notice to the DIP Borrower and (b) subject to paragraph 13(b), the DIP Administrative Agent (at the direction of the Requisite Lenders) may declare a termination, reduction or restriction on the ability of the Debtors to use Cash Collateral (the date on which a Termination Declaration is delivered, the "DIP Termination Date").  The Termination Declaration shall not be effective until notice has been provided by electronic mail (or other electronic means) to counsel to the Debtors, counsel to a Committee (if appointed), and the U.S. Trustee.  The automatic stay in the

Chapter 11 Cases otherwise applicable to the DIP Agents, the DIP Lenders, and the Prepetition

Secured Parties is hereby modified so that five (5) business days after the DIP Termination Date

(the "Remedies Notice Period"):  (a) the DIP Agents (at the direction of the Requisite Lenders)

shall be entitled to exercise its rights and remedies in accordance with the DIP Loan Documents

and this Interim Order to satisfy the DIP Obligations, DIP Superpriority Claims, and DIP Liens,

subject to the Carve Out; and (b) subject to the foregoing clause (a), the applicable Prepetition

Secured Parties and the Cash Management Bank shall be entitled to exercise their respective rights

and remedies to the extent available in accordance with the applicable Prepetition Term Loan

Documents and this Interim Order with respect to the Debtors' use of Cash Collateral.  During the

Remedies Notice Period, the Debtors, the Committee (if appointed), and/or any party in interest

shall be entitled to seek an emergency hearing within the Remedies Notice Period with the Court

for the sole purpose of contesting whether an Event of Default has occurred or is continuing or for

the contested use of Cash Collateral.  Except as set forth in this Paragraph 17 or otherwise ordered

by the Court prior to the expiration of the Remedies Notice Period, after the Remedies Notice

Period, the Debtors shall waive their right to and shall not be entitled to seek relief, including,

without limitation, under section 105 of the Bankruptcy Code, to the extent such relief would in

any way impair or restrict the rights and remedies of the DIP Agents, the DIP Lenders, or the

Prepetition Secured Parties under this Interim Order.  Unless the Court has determined that an

Event of Default has not occurred and/or is not continuing or the Court orders otherwise, the

automatic stay, as to all of the DIP Agents, DIP Lenders, and Prepetition Secured Parties (solely

with respect to the use of Cash Collateral to the extent permitted hereunder) shall automatically be

terminated at the end of the Remedies Notice Period without further notice or order.  Upon

expiration of the Remedies Notice Period, the DIP Agents (at the direction of the Requisite

Lenders) and the Prepetition Secured Parties shall be permitted to exercise all remedies set forth herein, and in the DIP Loan Documents, and as otherwise available at law without further order of or application or motion to this Court consistent with this Interim Order; provided, that the Prepetition Secured Parties and the Cash Management Bank shall be permitted to exercise remedies to the extent available solely with respect to the Debtors' use of Cash Collateral.

18.    <u>Limitation on Charging Expenses Against Collateral</u>.    No expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from (a) the DIP Collateral (except to the extent of the Carve Out), the DIP Agents, or the DIP Lenders or (b) subject to entry of the Final Order, the Prepetition Collateral (except to the extent of the Carve Out) or the Prepetition Secured Parties, in each case, pursuant to sections 105(a) or 506(c) of the Bankruptcy Code or any similar principle of law or equity, without the prior written consent of the DIP Agents, the DIP Lenders, and the Prepetition Secured Parties, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Agents, the DIP Lenders, or the Prepetition Secured Parties.

19.    <u>Use of Cash Collateral</u>.    The Debtors are hereby authorized to use all Cash Collateral of the Prepetition Secured Parties, but solely for the purposes set forth in this Interim Order and in accordance with the DIP Budget (subject to permitted variances as set forth in this Interim Order and the DIP Loan Documents), including, without limitation, to make payments on account of the Adequate Protection Obligations provided for in this Interim Order, from the date of this Interim Order through and including the date of termination of the DIP Credit Agreement.  Except on the terms and conditions of this Interim Order, the Debtors shall be enjoined and prohibited from at any time using the Cash Collateral.

20.    <u>Expenses and Indemnification</u>.

(a)    The Debtors are hereby authorized and directed to pay, in accordance with this Interim Order, the principal, interest, fees, payments, expenses, and other amounts described in the DIP Loan Documents as such amounts become due and without need to obtain further Court approval, including, without limitation, backstop, fronting, closing, arrangement or commitment payments (including all payments and other amounts owed to the DIP Lenders), administrative agent's fees, collateral agent's fees, and escrow agent's fees (including all fees and other amounts owed to the DIP Agents), the reasonable and documented fees and disbursements of counsel and other professionals to the extent set forth in Paragraphs 3(d)(3) and 8(c) of this Interim Order, whether or not such fees arose before or after the Petition Date, all to the extent provided in this Interim Order or the DIP Loan Documents.  Notwithstanding the foregoing, the Debtors are authorized and directed to pay on the Closing Date (as defined in the DIP Loan Documents) all reasonable and documented fees, costs, and expenses, including the fees and expenses of counsel to the DIP Lenders, the DIP Agents, the Prepetition Term Agents, and the DIP/First Lien Group, incurred on or prior to such date without the need for any professional engaged by the DIP Lenders, the DIP Agents, the Prepetition Term Agents, or the DIP/First Lien Group to first deliver a copy of its invoice as provided for herein.

(b)    The Debtors shall be jointly and severally obligated to pay all fees and expenses described above, which obligations shall constitute the DIP Obligations.  The Debtors shall pay the reasonable and documented professional fees, expenses, and disbursements of professionals to the extent provided for in Paragraphs 3(d)(3) and 8(c) of this Interim Order (collectively, the "<u>Lender Professionals</u>" and, each, a "<u>Lender Professional</u>") no later than ten (10) business days (the "<u>Review Period</u>") after the receipt by counsel for the Debtors, any Committee,

or the U.S. Trustee of each of the invoices therefor (the "Invoiced Fees") and without the necessity

of filing formal fee applications or complying with the U.S. Trustee Guidelines, including such

amounts arising before the Petition Date.  Invoiced Fees shall be in the form of an invoice summary

for professional fees and categorized expenses incurred during the pendency of the Chapter 11

Cases, and such invoice summary shall not be required to contain time entries, but shall include a

general, brief description of the nature of the matters for which services were performed, and which

may be redacted or modified to the extent necessary to delete any information subject to the

attorney-client privilege, any work product doctrine, privilege or protection, common interest

doctrine privilege or protection, any other evidentiary privilege or protection recognized under

applicable law, or any other confidential information, and the provision of such invoices shall not

constitute any waiver of the attorney-client privilege, work product doctrine, privilege or

protection, common interest doctrine privilege or protection, or any other evidentiary privilege or

protection recognized under applicable law.  The Debtors, any Committee, or the U.S. Trustee may

dispute the payment of any portion of the Invoiced Fees (the "Disputed Invoiced Fees") if, within

the Review Period, a Debtor, any Committee that may be appointed in these Chapter 11 Cases, or

the U.S. Trustee notifies the submitting party in writing setting forth the specific objections to the

Disputed Invoiced Fees (to be followed by the filing with the Court, if necessary, of a motion or

other pleading, with at least ten (10) days prior written notice to the submitting party of any hearing

on such motion or other pleading).  For avoidance of doubt, the Debtors shall promptly pay in full

all Invoiced Fees other than the Disputed Invoiced Fees.

       (c)     In addition, the Debtors will indemnify the DIP Lenders, the DIP Agents,

and their respective affiliates, successors, and assigns and the officers, directors, employees,

agents, attorneys, advisors, controlling persons, and members of each of the foregoing (each an

"Indemnified Person") and hold them harmless from and against all costs, expenses (including but not limited to reasonable and documented legal fees and expenses), and liabilities arising out of or relating to the transactions contemplated hereby and any actual or proposed use of the proceeds of any loans made under the DIP Facility; provided that no such person will be indemnified for costs, expenses, or liabilities to the extent determined by a final, non-appealable judgment of a court of competent jurisdiction to have been incurred solely by reason of the gross negligence, fraud, or willful misconduct of such person (or their related persons).  No Indemnified Person shall have any liability (whether direct or indirect, in contract, tort, or otherwise) to the Debtors or any shareholders or creditors of the Debtors for or in connection with the transactions contemplated hereby, except to the extent such liability is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified Person's gross negligence, fraud, or willful misconduct or breach of their obligations under the DIP Facility, and in no event shall any Indemnified Person be liable on any theory of liability for any special, indirect, consequential, or punitive damages.

21.     No Third-Party Rights.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

22.     Section 507(b) Reservation.  Subject to the Carve Out, nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition Secured Parties is insufficient to compensate for any Diminution in Value of their interests in the Prepetition Collateral during the Chapter 11 Cases. Nothing contained herein shall be deemed a finding by the Court, or an acknowledgment by any of the Prepetition Secured Parties that the adequate protection granted herein does in fact

adequately protect any of the Prepetition Secured Parties against any Diminution in Value of their respective interests in the Prepetition Collateral (including the Cash Collateral).

23.    <u>Insurance</u>.   Until the DIP Obligations have been indefeasibly paid in full, at all times the Debtors shall maintain casualty and loss insurance coverage for the Prepetition Collateral and the DIP Collateral on substantially the same basis as maintained prior to the Petition Date and shall name the DIP Collateral Agent as loss payee thereunder.

24.    <u>No Waiver for Failure to Seek Relief</u>.   The failure or delay of the DIP Agents or the Requisite Lenders to exercise rights and remedies under this Interim Order, the DIP Loan Documents, or applicable law, as the case may be, shall not constitute a waiver of their respective rights hereunder, thereunder, or otherwise.

25.    <u>Perfection of the DIP Liens and Adequate Protection Liens</u>.

(a)    The DIP Agents and the Prepetition Term Agents are hereby authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, depository account control agreements, notices of lien, or similar instruments in any jurisdiction in order to validate and perfect the liens and security interests granted hereunder.  Whether or not the DIP Agents or the Prepetition Term Agents shall (at the direction of the applicable required lenders) choose to file such financing statements, intellectual property filings, mortgages, notices of lien, or similar instruments, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable, and not, subject to the Challenge Period, subject to challenge, dispute, or subordination as of the date of entry of this Interim Order.  If the DIP Agents or the Prepetition Term Agents, (each, at the direction of the applicable required lenders) determines to file or execute any financing statements, agreements, notice of liens, or similar instruments, the Debtors shall cooperate and assist in any such execution and/or filings as

reasonably requested by the DIP Agents or the Prepetition Term Agents (each, at the direction of the applicable required lenders), and the automatic stay shall be modified to allow such filings.

(b)     A certified copy of this Interim Order may, at the direction of the applicable Requisite Lenders, be filed with or recorded in filing or recording offices by the DIP Agents or the Prepetition Term Agents, in addition to or in lieu of such financing statements, mortgages, notices of lien, or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Interim Order for filing and recording; provided, however, that notwithstanding the date of any such filing, the date of such perfection shall be the date of this Interim Order.

(c)     Any provision of any lease or other license, contract or other agreement that requires (i) the consent or approval of one or more landlords or other parties or (ii) the payment of any fees or obligations to any governmental entity, in order for any Debtor to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest, or the proceeds thereof, or other collateral related thereto, is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code, subject to applicable law.  Any such provision shall have no force and effect with respect to the granting of the DIP Liens and the Adequate Protection Liens on such leasehold interest or the proceeds of any assignment and/or sale thereof by any Debtor in accordance with the terms of the DIP Credit Agreement or this Interim Order, subject to applicable law.

26.     <u>Release</u>.  Subject to the rights and limitations set forth in Paragraph 13 of this Interim Order, effective upon entry of this Interim Order, each of the Debtors and the Debtors' estates, on its own behalf and on behalf of each of their predecessors, their successors, and assigns, shall, to the maximum extent permitted by applicable law, unconditionally, irrevocably, and fully forever release, remise, acquit, relinquish, irrevocably waive, and discharge each of the DIP Secured Parties and the Prepetition Secured Parties, and each of their respective affiliates,

former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, assigns, and predecessors in interest, each in their capacity as such, of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened, including, without limitation, all legal and equitable theories of recovery, arising under common law, statute, or regulation or by contract, of every nature and description that exist on the date hereof with respect to or relating to the DIP Obligations, the DIP Liens, the DIP Loan Documents, the Prepetition First Lien Obligations, the Prepetition Senior Liens or the Prepetition Term Loan Documents, as applicable, including, without limitation, (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under the Bankruptcy Code, and (iii) any and all claims and causes of action regarding the validity, priority, extent, enforceability, perfection, or avoidability of the liens or claims of the DIP Secured Parties and the Prepetition Secured Parties; provided that nothing in this paragraph shall in any way limit or release the obligations of any DIP Secured Party under the DIP Loan Documents.

27. <u>Credit Bidding</u>. The DIP Administrative Agent (at the direction of the Requisite Lenders) and the Prepetition Administrative Agent (at the direction of the Requisite Lenders (as defined in the Prepetition Credit Agreement)) shall have the right to credit bid (either directly or through one or more acquisition vehicles), up to the full amount of the underlying lenders' respective claims, including, for the avoidance of doubt, Adequate Protection Superpriority

Claims, if any, in any sale of all or any portion of the Prepetition Collateral or DIP Collateral including, without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any chapter 11 plan subject to confirmation under Bankruptcy Code section 1129(b)(2)(A)(ii)-(iii). The DIP Secured Parties shall have the absolute right to assign, sell, or otherwise dispose of their right to credit bid in connection with any credit bid by or on behalf of the DIP Secured Parties, as applicable, to any acquisition entity or joint venture formed in connection with such bid.

28.   <u>Preservation of Rights Granted Under this Interim Order</u>.

(a)   Unless and until all DIP Obligations are indefeasibly paid in full, in cash, and all Commitments are terminated, the Prepetition Secured Parties shall: (i) have no right to and shall take no action to foreclose upon, or recover in connection with, the liens granted thereto pursuant to the Prepetition Term Loan Documents or this Interim Order, or otherwise seek to exercise or enforce any rights or remedies against such DIP Collateral; and (ii) not file any further financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or otherwise take any action to perfect their security interests in the DIP Collateral, except as set forth in Paragraph 24 herein.

(b)   In the event this Interim Order or any provision hereof is vacated, reversed, or modified on appeal or otherwise, any liens or claims granted to the DIP Secured Parties or the Prepetition Secured Parties hereunder arising prior to the effective date of any such vacatur, reversal, or modification of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges, and benefits granted herein, and the Prepetition Secured Parties shall be entitled to all the rights, remedies, privileges, and benefits afforded in section 364(e) of the Bankruptcy Code.

(c)      Unless and until all DIP Obligations, Prepetition First Lien Obligations, and Adequate Protection Payments are indefeasibly paid in full, in cash, and all Commitments are terminated, the Debtors irrevocably waive the right to seek and shall not seek or consent to, directly or indirectly (i) except as permitted under the DIP Loan Documents or, if not provided for therein, with the prior written consent of the DIP Administrative Agent, the Requisite Lenders, and the Prepetition Administrative Agent, (x) any modification, stay, vacatur, or amendment of this Interim Order or (y) a priority claim for any administrative expense or unsecured claim against any of the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in sections 503(b), 507(a), or 507(b) of the Bankruptcy Code) in any of the Chapter 11 Cases, pari passu with or senior to the DIP Superpriority Claims, the Adequate Protection Superpriority Claims, or the Prepetition First Lien Obligations, or (z) any other order allowing use of the DIP Collateral; (ii) except as permitted under the DIP Loan Documents (including the Carve Out), any lien on any of the DIP Collateral or the Prepetition Collateral with priority equal or superior to the DIP Liens, the Adequate Protection Liens or the Prepetition Senior Liens, as applicable; (iii) the use of Cash Collateral for any purpose other than as permitted in the DIP Loan Documents and this Interim Order; (iv) except as set forth in the DIP Loan Documents, the return of goods pursuant to section 546(h) of the Bankruptcy Code (or other return of goods on account of any prepetition indebtedness) to any creditor of any Debtor; (v) an order converting or dismissing any of the Chapter 11 Cases; (vi) an order appointing a chapter 11 trustee in any of the Chapter 11 Cases; or (vii) an order appointing an examiner with enlarged powers in any of the Chapter 11 Cases.

(d)      Notwithstanding any order dismissing any of the Chapter 11 Cases entered at any time, (x) the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the

Adequate Protection Superpriority Claims, and the other administrative claims granted pursuant to this Interim Order shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations and Adequate Protection Payments are indefeasibly paid in full in cash (and such DIP Liens, DIP Superpriority Claims, Adequate Protection Liens, Adequate Protection Superpriority Claims, and the other administrative claims granted pursuant to this Interim Order, shall, notwithstanding such dismissal, remain binding on all parties in interest); and (y) to the fullest extent permitted by law the Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens, and security interests referred to in clause (x) above.

(e)     Except as expressly provided in this Interim Order or in the DIP Loan Documents, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Superpriority Claims, and all other rights and remedies of the DIP Agents, the DIP Lenders and the Prepetition Secured Parties granted by the provisions of this Interim Order and the DIP Loan Documents shall survive, and shall not be modified, impaired, or discharged by (i) the entry of an order converting any of the Chapter 11 Cases to a case under chapter 7, dismissing any of the Chapter 11 Cases, terminating the joint administration of these Chapter 11 Cases or by any other act or omission, (ii) the entry of an order approving the sale of any Prepetition Collateral or DIP Collateral pursuant to section 363(b) of the Bankruptcy Code, or (iii) the entry of an order confirming a chapter 11 plan in any of the Chapter 11 Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any remaining DIP Obligations or Adequate Protection Obligations.  The terms and provisions of this Interim Order and the DIP Loan Documents shall continue in these Chapter 11 Cases, in any successor cases if these Chapter 11 Cases cease to be jointly administered, or in any superseding

chapter 7 cases under the Bankruptcy Code.  The DIP Liens, the DIP Superpriority Claims, the

Adequate Protection Liens, the Adequate Protection Superpriority Claims, and all other rights and

remedies of the DIP Secured Parties, and the Prepetition Secured Parties granted by the provisions

of this Interim Order shall continue in full force and effect until the DIP Obligations and the

Adequate Protection Payments are indefeasibly paid in full, in cash (or, with respect to the DIP

Obligations, otherwise satisfied in a manner agreed to by the Requisite Lenders and the DIP

Administrative Agent).

(f)     Other than as set forth in this Interim Order, neither the DIP Liens nor the

Adequate Protection Liens shall be made subject to or pari passu with any lien or security interest

granted in any of the Chapter 11 Cases or arising after the Petition Date, and neither the DIP Liens

nor the Adequate Protection Liens shall be subject or junior to any lien or security interest that is

avoided and preserved for the benefit of the Debtors' estates under Bankruptcy Code section 551.

29.   <u>Limitation on Use of DIP Facility Proceeds, DIP Collateral, and Cash Collateral</u>.

Notwithstanding anything to the contrary set forth in this Interim Order, none of the DIP Facility,

the DIP Collateral, the Prepetition Collateral, including Cash Collateral, or the Carve Out or

proceeds thereof may be used:  (a) to investigate (including by way of examinations or discovery

proceedings), initiate, assert, prosecute, join, commence, support, or finance the initiation or

prosecution of any claim, counterclaim, action, suit, arbitration, proceeding, application, motion,

objection, defense, adversary proceeding, or other litigation of any type (i) against any of the

DIP Secured Parties or the Prepetition Secured Parties (each in their capacities as such), and each

of their respective affiliates, officers, directors, employees, agents, representatives, attorneys,

consultants, financial advisors, affiliates, assigns, or successors, with respect to any transaction,

occurrence, omission, action, or other matter (including formal discovery proceedings in

anticipation thereof), including, without limitation, any so-called "lender liability" claims and causes of action, or seeking relief that would impair the rights and remedies of the DIP Secured Parties or the Prepetition Secured Parties (each in their capacities as such) under the DIP Loan Documents, the Prepetition Term Loan Documents, or this Interim Order, including, without limitation, for the payment of any services rendered by the professionals retained by the Debtors or any Committee appointed in these Chapter 11 Cases in connection with the assertion of or joinder in any claim, counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense, adversary proceeding, or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment, determination, declaration, or similar relief that would impair the ability of any of the DIP Secured Parties or the Prepetition Secured Parties to recover on the DIP Collateral or the Prepetition Collateral or seeking affirmative relief against any of the DIP Secured Parties or the Prepetition Parties related to the DIP Obligations or the Prepetition First Lien Obligations; (ii) invalidating, setting aside, avoiding, or subordinating, in whole or in part, the DIP Obligations or the Prepetition First Lien Obligations, or the DIP Agents', the DIP Lenders,' and the Prepetition Secured Parties' liens or security interests in the DIP Collateral or Prepetition Collateral, as applicable; or (iii) for monetary, injunctive, or other affirmative relief against the DIP Secured Parties or the Prepetition Secured Parties, or the DIP Agents', the DIP Lenders,' the Prepetition Secured Parties' respective liens on or security interests in the DIP Collateral or the Prepetition Collateral that would impair the ability of any of the DIP Secured Parties or the Prepetition Secured Parties, as applicable, to assert or enforce any lien, claim, right, or security interest or to realize or recover on the DIP Obligations or the Prepetition First Lien Obligations, to the extent applicable; (b) for objecting to or challenging in any way the legality, validity, priority, perfection, or enforceability of the claims, liens, or

interests (including the Prepetition Senior Liens) held by or on behalf of each of the Prepetition

Secured Parties related to the Prepetition First Lien Obligations, or by or on behalf of the DIP

Agents and the DIP Lenders related to the DIP Obligations; (c) for asserting, commencing, or

prosecuting any claims or causes of action whatsoever, including, without limitation, any

Avoidance Actions related to the DIP Obligations, the DIP Liens, the Prepetition First Lien

Obligations, or the Prepetition Senior Liens; or (d) for prosecuting an objection to, contesting in

any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or

enforceability of: (x) any of the DIP Liens or any other rights or interests of the DIP Agents or the

DIP Lenders related to the DIP Obligations or the DIP Liens, or (y) any of the Prepetition Senior

Liens or any other rights or interests of any of the Prepetition Secured Parties related to the

Prepetition First Lien Obligations or the Prepetition Senior Liens, provided that no more than

$50,000 of the proceeds of the DIP Facility, the DIP Collateral, or the Prepetition Collateral,

including the Cash Collateral, in the aggregate, may be used by any Committee appointed in these

Chapter 11 Cases, if any, solely to investigate, within the Challenge Period (as defined below), the

claims, causes of action, adversary proceedings, or other litigation against the Prepetition Secured

Parties solely concerning the legality, validity, priority, perfection, enforceability or extent of the

claims, liens, or interests (including the Prepetition Senior Liens) held by or on behalf of each of

the Prepetition Secured Parties related to the Prepetition First Lien Obligations. Nothing contained

in this Paragraph 28 shall prohibit the Debtors from responding or objecting to or complying with

discovery requests of any Committee, in whatever form, made in connection with such

investigation or the payment from the DIP Collateral (including Cash Collateral) of professional

fees related thereto or from contesting or challenging whether a Termination Declaration has in

fact occurred.

30.     <u>Conditions Precedent</u>.  Except as provided for in the Carve Out, no DIP Lender shall have any obligation to make any DIP Loan under the respective DIP Loan Documents unless all of the conditions precedent to the making of such extensions of credit under the applicable DIP Loan Documents have been satisfied in full or waived in accordance with such DIP Loan Documents.

31.     <u>Binding Effect; Successors and Assigns</u>.  The DIP Loan Documents and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in these Chapter 11 Cases, including, without limitation, the DIP Secured Parties, the Prepetition Secured Parties, any Committee appointed in these Chapter 11 Cases, and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Secured Parties and the applicable Prepetition Secured Parties; provided that, except to the extent expressly set forth in this Interim Order, the Prepetition Secured Parties shall have no obligation to permit the use of Cash Collateral or to extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors.  In determining to make any loan (whether under the DIP Credit Agreement, a promissory note or otherwise) to permit the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Loan Documents, the DIP Secured Parties and the Prepetition Secured Parties shall not (i) be deemed to be in control of the operations of the Debtors, or (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders, or estates.

32.  <u>Pulse Notes Subordination Agreement</u>.  Pursuant to section 510 of the Bankruptcy Code, the Pulse Notes Subordination Agreement and any other applicable intercreditor or subordination provisions contained in any of the Prepetition Term Loan Documents or any of the Second Lien Note Documents (i) shall remain in full force and effect, and (ii) shall continue to govern the relative priorities, rights, and remedies of the Prepetition Secured Parties and the Prepetition Second Lien Secured Parties; provided that nothing in this Interim Order shall be deemed to provide liens to any Prepetition Secured Party or Prepetition Second Lien Secured Party on any assets of the Debtors except as set forth herein.

33.  <u>Limitation of Liability</u>.  Subject to entry of a Final Order, in determining to make any loan under the DIP Loan Documents, permitting the use of Cash Collateral, or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Loan Documents, the DIP Secured Parties and the Prepetition Secured Parties shall not, solely by reason thereof, be deemed in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq. as amended, or any similar federal or state statute).  Furthermore, nothing in this Interim Order or in the DIP Loan Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agents, the DIP Lenders, or any Prepetition Secured Parties of any liability for any claims arising from the prepetition or post-petition activities of any of the Debtors.

34.  <u>No Requirement to File Claim for DIP Obligations</u>.  Notwithstanding anything to the contrary contained in any prior or subsequent order of the Court, including, without limitation, any order establishing a deadline for the filing of proofs of claim or requests for payment of

administrative expenses under section 503(b) of the Bankruptcy Code, neither the DIP Agents nor any DIP Lender shall be required to file any proof of claim or request for payment of administrative expenses with respect to any of the DIP Obligations, all of which shall be due and payable in accordance with the DIP Loan Documents without the necessity of filing any such proof of claim or request for payment of administrative expenses, and the failure to file any such proof of claim or request for payment of administrative expenses shall not affect the validity, priority, or enforceability of any of the DIP Loan Documents or of any indebtedness, liabilities, or obligations arising at any time thereunder or prejudice or otherwise adversely affect the DIP Agents' or any DIP Lender's rights, remedies, powers, or privileges under any of the DIP Loan Documents, this Interim Order, or applicable law.  The provisions set forth in this paragraph are intended solely for the purpose of administrative convenience and shall not affect the substantive rights of any party-in-interest or their respective successors-in-interest.

35.    No Requirement to File Claim for Prepetition First Lien Obligations. Notwithstanding anything to the contrary contained in any prior or subsequent order of the Court, including, without limitation, any order establishing a deadline for the filing of proofs of claim or requests for payment of administrative expenses under section 503(b) of the Bankruptcy Code, neither the Prepetition Term Agents nor any Prepetition Term Lender shall be required to file any proof of claim or request for payment of administrative expenses with respect to any of the Prepetition First Lien Obligations; and the failure to file any such proof of claim or request for payment of administrative expenses shall not affect the validity, priority, or enforceability of any of the Prepetition Term Loan Documents or of any indebtedness, liabilities, or obligations arising at any time thereunder or prejudice or otherwise adversely affect the Prepetition Term Agent's or any Prepetition Term Lender's rights, remedies, powers, or privileges under any of the Prepetition

Term Loan Documents, this Interim Order, or applicable law.    The provisions set forth in this paragraph are intended solely for the purpose of administrative convenience and shall not affect the substantive rights of any party-in-interest or their respective successors-in-interest.

36.    <u>Cash Management Obligations</u>.  The Debtors are authorized to continue utilizing the products and services of the Cash Management Bank and incur obligations in connection with various cash management products and services (including, without limitation, treasury, depository, credit card, debit card, stored value cards, purchasing or procurement cards and cash management services or automated clearinghouse transfer of funds or any overdraft or similar services) provided to the Debtors and/or any of their affiliates (for which the Debtors are otherwise liable) on a postpetition basis consistent with historical practices (the "<u>Postpetition Cash Management Obligations</u>") on the terms set forth in the *Interim Order (I) Authorizing the Debtors to Continue to (A) Utilize Their Existing Cash Management System, (B) Maintain Their Existing Bank Accounts, (C) Perform Intercompany Transactions, (D) Utilize and Maintain Their Existing Business Forms, and (E) Utilize Their Corporate Credit Card Programs and (II) Granting Related Relief* [Docket No. ___] and any subsequent final order.

37.    <u>Cash Management Bank Forbearance</u>.  In accordance with that certain Consent and Forbearance Agreement by and among the Cash Management Bank, Vice Group Holding Inc., Vice Media LLC, and Vice Europe Holding Limited, dated as of May 14, 2023 (the "<u>JPM Forbearance Agreement</u>"), the Cash Management Bank shall not terminate any "Cash Management Agreement" (as defined in the JPM Forbearance Agreement), shall continue to provide cash management services to the Debtors' non-Debtor affiliates, and shall permit such non-Debtor affiliates of the Debtors to withdraw and transfer funds as of the Petition Date.

38.    <u>No Marshaling</u>.    Upon entry of this Interim Order, the DIP Agents and the DIP Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral, and proceeds of the DIP Collateral shall be received and applied pursuant to this Interim Order, the DIP Loan Documents and the Prepetition Term Loan Documents, notwithstanding any other agreement or provision to the contrary, and subject to entry of the Final Order, the Prepetition Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Prepetition Collateral.

39.    <u>Application of Proceeds of DIP Collateral</u>.    Subject to entry of a Final Order, the DIP Obligations, at the option of the Requisite Lenders, to be exercised in their sole and absolute discretion, shall be repaid (a) first, from the DIP Collateral comprising Previously Unencumbered Property and (b) second, from all other DIP Collateral.

40.    <u>Application of Sale Proceeds</u>.    Subject to the entry of a Final Order, in the event of any sale or other disposition of DIP Collateral (other than pursuant to the Asset Purchase Agreement (as defined in the DIP Credit Agreement)), any cash or cash equivalents that are proceeds of such sale or other disposition shall be paid or reserved in the following order of priority immediately upon closing of such sale or other disposition:  (a) *first*, cash or cash equivalents shall be reserved by the Debtors for the benefit of the estate in an amount equal to the Excluded Cash (as defined in the Asset Purchase Agreement) and the Carve Out (provided that there shall be no duplication of expenses or liabilities to the extent provided for in both the Excluded Cash and the Carve Out), (b) *second*, the DIP Obligations shall be indefeasibly paid in cash pursuant to the DIP Credit Agreement, and (c) *third*, the Prepetition First Lien Obligations shall be indefeasibly paid in cash pursuant to the Prepetition Senior Secured Credit Agreement.  Upon satisfaction of the

amounts and obligations set forth in the immediately preceding sentence, any proceeds from the sale or other disposition of DIP Collateral shall be available to the Debtors and creditors pursuant to the priorities set forth in the Bankruptcy Code or as otherwise provide pursuant to an order of this Court.

41.    Equities of the Case.  Subject to entry of a Final Order, the Prepetition Secured Parties shall each be entitled to all the rights and benefits of section 522(b) of the Bankruptcy Code, and, subject to and upon entry of the Final Order, the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties with respect to proceeds, product, offspring, or profits of any of the Collateral (including the Prepetition Collateral).

42.    Final Hearing.  The Final Hearing on the Motion shall be held on _____, 2023, at__:__ _.m., prevailing Eastern time.  Any objections or responses to entry of a final order on the Motion shall be filed on or before 4:00 p.m., prevailing Eastern time, on _____, 2023, and shall be served on:  (a) the Debtors, Vice Group Holding Inc., 49 South 2nd Street, Brooklyn, NY 11249, Attention:  Maria Harris, Email:  maria.harris@vice.com; (b) proposed lead counsel to the Debtors, Togut, Segal & Segal LLP, One Penn Plaza, Suite 3335, New York, NY 10119 (Attn: Kyle J. Ortiz and Brian F. Moore); (c) proposed special counsel to the Debtors, Shearman & Sterling LLP, 599 Lexington Avenue, New York, NY 10022 (Attn.: Fredric Sosnick) and Shearman & Sterling LLP, 2601 Olive Street, 17th Floor, Dallas, TX 75201 (Attn.:  Ian E. Roberts); (d) counsel to the DIP Lenders, the DIP Administrative Agent, and the DIP/First Lien Group, Gibson, Dunn & Crutcher LLP, 200 Park Ave., New York, NY 10166, Attn:  David M. Feldman, Esq., Michael S. Neumeister, Esq., and Matthew C. Rowe, Esq.; (e) counsel to the DIP Agent, Collateral Agent and the Prepetition First Lien Collateral Agent, Shipman & Goodwin LLP,

One Constitution Plaza, Hartford, Connecticut 06103, Attn: Marie C. Pollio, Esq. and Latonia Williams, Esq.; (f) the United States Trustee, U.S. Department of Justice, Office of the U.S. Trustee, 201 Varick Street, Room 1006, New York, NY 10014, (Attn: Andrea B. Schwartz, Esq. (Andrea.B.Schwartz@usdoj.gov)); and (g) counsel to any statutory committee appointed in these chapter 11 cases.  In the event no objections to entry of the Final Order on the Motion are timely received, this Court may enter such Final Order without need for the Final Hearing.

43.    <u>Effect of this Interim Order</u>.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable immediately upon execution hereof.

44.    <u>Retention of Jurisdiction</u>.  The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Interim Order.

Dated: _____, 2023

_____
UNITED STATES BANKRUPTCY JUDGE

## **Exhibit 1**

**Form of DIP Credit Agreement**

## Exhibit 2

**Budget**

**Vice Media Group**

DRAFT - Preliminary and Subject to Material Change

DIP Exhibit

| Week of Forecast<br>Week Ending | | 19-May-23<br>Week 1 | 26-May-23<br>Week 2 | 2-Jun-23<br>Week 3 | 9-Jun-23<br>Week 4 | 16-Jun-23<br>Week 5 | 23-Jun-23<br>Week 6 | 30-Jun-23<br>Week 7 | 7-Jul-23<br>Week 8 | 14-Jul-23<br>Week 9 | 21-Jul-23<br>Week 10 | 28-Jul-23<br>Week 11 | 4-Aug-23<br>Week 12 | 11-Aug-23<br>Week 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Receipts** | $ | 6,664 $ | 8,537 $ | 4,649 $ | 5,395 $ | 26,635 $ | 17,296 $ | 6,967 $ | 5,389 $ | 7,050 $ | 9,817 $ | - $ | - $ | - |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| Compensation and Benefits | | (633) | (3,969) | (6,695) | (358) | (4,633) | (2,112) | (7,089) | (342) | (4,002) | (4,703) | - | - | - |
| Freelancers | | (1,253) | (1,253) | (946) | (1,144) | (1,144) | (734) | (758) | (457) | (707) | (707) | - | - | - |
| Production | | (2,012) | (3,129) | (3,644) | (3,348) | (3,562) | (2,083) | (2,083) | (2,134) | (2,134) | (2,134) | - | - | - |
| Other Operating Expenses | | (1,533) | (1,753) | (3,524) | (3,627) | (3,165) | (2,685) | (2,245) | (2,950) | (2,249) | (1,999) | - | - | - |
| **Total Operating Disbursements** | | **(5,431)** | **(10,104)** | **(14,808)** | **(8,478)** | **(12,504)** | **(7,614)** | **(12,176)** | **(5,884)** | **(9,092)** | **(9,543)** | **-** | **-** | **-** |
| **Operating Cash Flow** | | **1,233** | **(1,568)** | **(10,160)** | **(3,082)** | **14,131** | **9,682** | **(5,208)** | **(495)** | **(2,042)** | **274** | **-** | **-** | **-** |
| **Restructuring Costs** | | | | | | | | | | | | | | |
| One-Time Costs | | - | (85) | - | - | - | - | - | - | - | (100) | - | - | - |
| Professional Fees | | (1,192) | - | (400) | (650) | - | - | (800) | (2,045) | - | (10,681) | (250) | (1,275) | (2,312) |
| **Total Restructuring Costs** | | **(1,192)** | **(85)** | **(400)** | **(650)** | **-** | **-** | **(800)** | **(2,045)** | **-** | **(10,781)** | **(250)** | **(1,275)** | **(2,312)** |
| **Investment & Financing** | | | | | | | | | | | | | | |
| DIP Interest & Fees | | - | - | - | - | (18) | - | - | - | (35) | (9) | - | - | - |
| Non-Debtor Funding | | (3,000) | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Financing Items | | - | - | (30) | - | - | - | (30) | - | - | - | - | - | - |
| JV Related Flows | | 3,098 | (2,320) | 543 | (257) | 3,465 | (3,638) | (257) | (257) | 3,230 | (3,638) | - | - | - |
| Taxes | | - | (75) | (993) | (79) | (11) | - | (75) | - | (90) | (53) | - | - | - |
| **Total Investment & Financing** | | **98** | **(2,395)** | **(480)** | **(336)** | **3,436** | **(3,638)** | **(362)** | **(257)** | **3,105** | **(3,700)** | **-** | **-** | **-** |
| **Net Cash Flow** | $ | **139** $ | **(4,048)** $ | **(11,040)** $ | **(4,068)** $ | **17,567** $ | **6,043** $ | **(6,370)** $ | **(2,798)** $ | **1,063** $ | **(14,206)** $ | **(250)** $ | **(1,275)** $ | **(2,312)** |
| Beginning Cash Balance | $ | 66,775 $ | 66,914 $ | 62,867 $ | 51,827 $ | 56,827 $ | 52,759 $ | 75,325 $ | 81,369 $ | 74,999 $ | 72,201 $ | 73,264 $ | 13,471 $ | 13,221 $ | 11,946 |
| Net Cash Flow | | 139 | (4,048) | (11,040) | (4,068) | 17,567 | 6,043 | (6,370) | (2,798) | 1,063 | (14,206) | (250) | (1,275) | (2,312) |
| Ending Cash Balance | $ | 66,914 $ | 62,867 $ | 51,827 $ | 52,759 $ | 70,325 $ | 81,369 $ | 74,999 $ | 72,201 $ | 73,264 $ | 59,057 $ | 13,221 $ | 11,946 $ | 9,634 |
| Less: Restricted & JV Cash | $ | (46,605) $ | (43,712) $ | (43,742) $ | (42,973) $ | (49,080) $ | (46,709) $ | (45,940) $ | (45,107) $ | (47,760) $ | (43,546) $ | - $ | - $ | - |
| Less: Credit Party Restricted | | (2,041) | (2,041) | (2,041) | (2,041) | (2,041) | (2,041) | (2,041) | (2,041) | (2,041) | (2,041) | - | - | - |
| DIP Draw | | - | - | 5,000 | - | 5,000 | - | - | - | - | - | - | - | - |
| **Ending Non-Restricted Cash** | $ | **18,268** $ | **17,114** $ | **11,044** $ | **7,745** $ | **24,205** $ | **32,619** $ | **27,018** $ | **25,054** $ | **23,463** $ | **13,471** $ | **13,221** $ | **11,946** $ | **9,634** |
| **Total Liquidity** | | | | | | | | | | | | | | |
| DIP Commitment | $ | 10,000 $ | 10,000 $ | 10,000 $ | 10,000 $ | 10,000 $ | 10,000 $ | 10,000 $ | 10,000 $ | 10,000 $ | 10,000 $ | 10,000 $ | 10,000 $ | 10,000 |
| Draw | | - | - | 5,000 | - | 5,000 | - | - | - | - | - | - | - | - |
| DIP Balance | $ | - $ | - $ | 5,000 $ | 5,000 $ | 10,000 $ | 10,000 $ | 10,000 $ | 10,000 $ | 10,000 $ | 10,000 $ | 10,000 $ | 10,000 $ | 10,000 |
| DIP Availability | $ | 10,000 $ | 10,000 $ | 5,000 $ | 5,000 $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - |
| Ending Non-Restricted Cash | | 18,268 | 17,114 | 11,044 | 7,745 | 24,205 | 32,619 | 27,018 | 25,054 | 23,463 | 13,471 | 13,221 | 11,946 | 9,634 |
| **Ending Liquidity** | $ | **28,268** $ | **27,114** $ | **16,044** $ | **12,745** $ | **24,205** $ | **32,619** $ | **27,018** $ | **25,054** $ | **23,463** $ | **13,471** $ | **13,221** $ | **11,946** $ | **9,634** |

**<u>EXHIBIT B</u>**

**DIP Credit Agreement**

**SENIOR SECURED SUPER-PRIORITY TERM LOAN DEBTOR-IN-POSSESSION CREDIT AND GUARANTY AGREEMENT**

**dated as of May [  ], 2023**

**among**

**VICE GROUP HOLDING INC.,**
**a Debtor and a Debtor-in-Possession under Chapter 11 of the Bankruptcy Code, as Company,**

**CERTAIN SUBSIDIARIES OF COMPANY,**
**each a Debtor and a Debtor-in-Possession under Chapter 11 of the Bankruptcy Code, from time to time party hereto as Guarantors,**

**VARIOUS LENDERS,**

**FORTRESS CREDIT CORP.**
**as Administrative Agent,**

**and**

**WILMINGTON TRUST, NATIONAL ASSOCIATION**
**as Collateral Agent**

_____

**Senior Secured Credit Facilities**

_____

## TABLE OF CONTENTS

Page

**SECTION 1.    DEFINITIONS AND INTERPRETATION** ....................................2

1.1.    Definitions .................................................................................2
1.2.    Accounting Terms ....................................................................42
1.3.    Interpretation, etc. ...................................................................43
1.4.    Quebec Interpretation Provision .............................................44
1.5.    Divisions ...................................................................................44
1.6.    Rates .........................................................................................44

**SECTION 2.    LOANS** ......................................................................................45

2.1.    Loans ........................................................................................45
2.2.    [Reserved] ................................................................................46
2.3.    Pro Rata Shares; Availability of Funds ...................................46
2.4.    Use of Proceeds .......................................................................47
2.5.    Evidence of Debt; Register; Lenders' Books and Records; Notes ...........47
2.6.    Interest on Loans .....................................................................48
2.7.    Continuation .............................................................................50
2.8.    Default Interest ........................................................................50
2.9.    Fees ..........................................................................................50
2.10.    Voluntary Prepayments/Commitment Reductions ..................51
2.11.    Mandatory Prepayments/Commitment Reductions .................52
2.12.    Application of Payments ..........................................................53
2.13.    General Provisions Regarding Payments .................................55
2.14.    Ratable Sharing ........................................................................57
2.15.    Making or Maintaining SOFR Loans ......................................57
2.16.    Increased Costs; Capital Adequacy .........................................58
2.17.    Taxes; Withholding, etc. ..........................................................59
2.18.    Obligation to Mitigate .............................................................63
2.19.    Defaulting Lenders ...................................................................63
2.20.    Removal or Replacement of a Lender ......................................65
2.21.    Interest Act ...............................................................................66
2.22.    Effect of Benchmark Transition Event ....................................66
2.23.    Reorganization Matters ............................................................69

**SECTION 3.    CONDITIONS PRECEDENT** .....................................................70

3.1.    Closing Date .............................................................................70
3.2.    Conditions to Each Credit Extension .......................................72

**SECTION 4.    REPRESENTATIONS AND WARRANTIES** ..............................73

4.1.    Existence and Power .................................................................73
4.2.    Authority and No Violation ......................................................74
4.3.    Governmental Approvals ..........................................................74
4.4.    Binding Agreements .................................................................75

i

TABLE OF CONTENTS (*continued*)

Page

4.5.     Financial Statements ....................................................................75
4.6.     [Reserved] ...................................................................................75
4.7.     Ownership of Capital Stock, Subsidiaries, etc. ..........................75
4.8.     Intellectual Property ....................................................................76
4.9.     Fictitious Names ..........................................................................77
4.10.    Title to Properties .......................................................................77
4.11.    Litigation .....................................................................................77
4.12.    Federal Reserve Regulations .......................................................77
4.13.    Investment Company Act .............................................................77
4.14.    Taxes ...........................................................................................77
4.15.    Compliance with ERISA; Pension Plans .....................................78
4.16.    Agreements ..................................................................................78
4.17.    Rights ..........................................................................................79
4.18.    Environmental Liabilities .............................................................79
4.19.    Compliance with Laws .................................................................80
4.20.    True and Complete Disclosure .....................................................80
4.21.    Anti-Corruption and Anti-Bribery Laws and Sanctions ..............80
4.22.    No Registered or Publicly Traded Securities ...............................80
4.23.    Affected Financial Institution ......................................................81
4.24.    Beneficial Ownership Certification ..............................................81
4.25.    No Intent to Defraud ....................................................................81
4.26.    Collateral Matters ........................................................................81

SECTION 5.     AFFIRMATIVE COVENANTS ..................................................81

5.1.     Financial Statements and Other Reports ......................................81
5.2.     Existence .....................................................................................85
5.3.     Payment of Taxes and Claims .....................................................85
5.4.     Maintenance of Properties ...........................................................86
5.5.     Insurance .....................................................................................86
5.6.     Inspections ..................................................................................87
5.7.     Lenders Calls ...............................................................................87
5.8.     Compliance with Laws .................................................................87
5.9.     Subsidiaries .................................................................................89
5.10.    [Reserved] ...................................................................................89
5.11.    Further Assurances .......................................................................89
5.12.    Post-Closing Matters ...................................................................90
5.13.    Subordinated Debt .......................................................................90
5.14.    Miscellaneous Business Covenants ..............................................90
5.15.    [Reserved] ...................................................................................90
5.16.    Cash Management ........................................................................90
5.17.    Joint Ventures and Content Development Subsidiaries ................91
5.18.    Approved Budget and Compliance ...............................................92
5.19.    [Reserved] ...................................................................................93
5.20.    Chief Restructuring Officer .........................................................93
5.21.    Required Milestones ....................................................................93

**TABLE OF CONTENTS** (*continued*)

Page

5.22.   Additional Bankruptcy Matters ........................................................94
5.23.   Debtor-In-Possession Obligations ....................................................94

**SECTION 6.      NEGATIVE COVENANTS** ..............................................................95

6.1.    Limitations on Indebtedness ............................................................95
6.2.    Limitations on Liens .........................................................................99
6.3.    Limitations on Investments ............................................................102
6.4.    Restricted Payments .......................................................................104
6.5.    Consolidation, Merger, Amalgamation or Sale of Assets, Etc. ...............105
6.6.    Restricted Transactions ..................................................................105
6.7.    Places of Business; Change of Name; Jurisdiction .................106
6.8.    Transactions with Affiliates ..........................................................106
6.9.    Fiscal Year End ...............................................................................107
6.10.   Subordinated Debt; Preferred Equity ...........................................107
6.11.   Amendments, Modifications and Terminations of Material Agreements 107
6.12.   No Negative Pledge; Restrictions on Subsidiary Distributions ...............107
6.13.   [Reserved] .......................................................................................108
6.14.   Use of Proceeds ..............................................................................108
6.15.   [Reserved] .......................................................................................108
6.16.   Canadian Pension Plans .................................................................108
6.17.   Existing Joint Ventures ..................................................................108
6.18.   Pulse Put Payments ........................................................................109
6.19.   Pulse Intercompany Transactions .................................................109
6.20.   Orders .............................................................................................109
6.21.   Insolvency Proceeding Claims ......................................................109
6.22.   Bankruptcy Actions ........................................................................109

**SECTION 7.      GUARANTY** .........................................................................110

7.1.    Guaranty of the Obligations ..........................................................110
7.2.    Contribution by Guarantors ...........................................................110
7.3.    Payment by Guarantors ..................................................................111
7.4.    Liability of Guarantors Absolute ...................................................111
7.5.    Waivers by Guarantors ...................................................................113
7.6.    Guarantors' Rights of Subrogation, Contribution, etc. ...............113
7.7.    Subordination of Other Obligations ..............................................114
7.8.    Continuing Guaranty ......................................................................115
7.9.    Authority of Guarantors or Company ............................................115
7.10.   Financial Condition of Company ...................................................115
7.11.   Bankruptcy, etc. .............................................................................115
7.12.   Discharge and Release of Guaranty ...............................................116
7.13.   Keepwell .........................................................................................116

**SECTION 8.      EVENTS OF DEFAULT** .........................................................116

**TABLE OF CONTENTS** (*continued*)

Page

8.1. Events of Default ............................................................................116
8.2. Payments Upon Acceleration..........................................................124

**SECTION 9.    AGENTS** .............................................................................**124**

9.1. Appointment of Agents....................................................................124
9.2. Powers and Duties............................................................................125
9.3. General Immunity ............................................................................125
9.4. Agents Entitled to Act as Lender ....................................................128
9.5. Lenders' Representations, Warranties and Acknowledgment .........129
9.6. Right to Indemnity ..........................................................................131
9.7. Successor Administrative Agent and Collateral Agent ..................131
9.8. Collateral Documents and Guaranty ..............................................133
9.9. Withholding Taxes ..........................................................................135
9.10. Administrative Agent May File Bankruptcy Disclosure and Proofs of
Claim.................................................................................................136
9.11. Quiet Enjoyment .............................................................................137

**SECTION 10.    MISCELLANEOUS** ..........................................................**137**

10.1. Notices .............................................................................................137
10.2. Expenses ..........................................................................................139
10.3. Indemnity ........................................................................................140
10.4. Set-Off.............................................................................................141
10.5. Amendments and Waivers ..............................................................142
10.6. Successors and Assigns; Participations ..........................................144
10.7. Independence of Covenants ............................................................149
10.8. Survival of Representations, Warranties and Agreements .............149
10.9. No Waiver; Remedies Cumulative ..................................................149
10.10. Marshalling; Payments Set Aside ...................................................149
10.11. Severability .....................................................................................149
10.12. Obligations Several; Actions in Concert.........................................150
10.13. Headings ..........................................................................................150
10.14. APPLICABLE LAW ......................................................................150
10.15. CONSENT TO JURISDICTION.....................................................150
10.16. WAIVER OF JURY TRIAL............................................................151
10.17. Confidentiality ................................................................................152
10.18. Effectiveness; Counterparts ...........................................................154
10.19. Entire Agreement ............................................................................154
10.20. Patriot Act .......................................................................................154
10.21. Electronic Execution of Agreements ..............................................154
10.22. No Fiduciary Duty ..........................................................................154
10.23. Usury Savings Clause .....................................................................155
10.24. Acknowledgement and Consent to Bail-In of Affected Financial
Institutions.......................................................................................156
10.25. No Additional Perfection Steps Required.......................................157

**TABLE OF CONTENTS** (*continued*)

Page

10.26.  Orders Control ......................................................................157
10.27.  Parties Including the Trustees; Bankruptcy Court Proceedings ..............157
10.28.  Forbearance. ..........................................................................158

| **APPENDICES:** | A | New Money Commitments |
| | B | Notice Addresses |

| **SCHEDULES:** | 4.5 | Material Differences from GAAP |
| | 4.7(a) | Jurisdiction, Capital Stock and Ownership |
| | 4.7(c) | Structure Chart |
| | 4.8(a) | Intellectual Property Not Wholly-Owned by Credit Parties |
| | 4.8(b) | Owned Intellectual Property |
| | 4.8(c) | Material Infringement Litigation |
| | 4.9 | Fictitious Names |
| | 4.11 | Certain Litigation |
| | 4.15 | Pension Plans |
| | 4.16(a) | Material Defaults |
| | 4.16(b) | Material Contracts |
| | 5.12 | Post-Closing Obligations |
| | 6.1(m) | Existing Indebtedness as of the Closing Date |
| | 6.2 | Certain Liens |
| | 6.3 | Certain Investments |
| | 6.5 | Certain Dispositions |
| | 6.8 | Certain Transactions with Affiliates |
| | 6.11 | Certain Agreements |
| | E | Excluded Subsidiaries |
| | P | Permitted Holders |

| **EXHIBITS:** | A-1 | Funding Notice |
| | A-2 | Continuation Notice |
| | B | Form of Note |
| | C | Compliance Certificate |
| | D | Assignment Agreement |
| | E-1 | U.S. Tax Compliance Certificate (For Foreign Person Non-Partnership Recipients) |
| | E-2 | U.S. Tax Compliance Certificate (For Foreign Person Non-Partnership Participant Recipients) |
| | E-3 | U.S. Tax Compliance Certificate (For Foreign Person Partnership Participant Recipients) |
| | E-4 | U.S. Tax Compliance Certificate (For Foreign Person Partnership Recipients) |
| | F | [Reserved] |

**TABLE OF CONTENTS** (*continued*)

Page

G        Counterpart Agreement
H        [Reserved]
I        [Reserved]
J        Master Intercompany Subordinated Note

## SENIOR SECURED SUPER-PRIORITY TERM LOAN DEBTOR-IN-POSSESSION CREDIT AND GUARANTY AGREEMENT

This SENIOR SECURED SUPER-PRIORITY TERM LOAN DEBTOR-IN-POSSESSION CREDIT AND GUARANTY AGREEMENT, dated as of May [ ], 2023, is entered into by and among VICE GROUP HOLDING INC., a Delaware corporation and a debtor and a debtor-in-possession, as borrower ("**Company**"), and CERTAIN SUBSIDIARIES OF COMPANY, including those that are a debtor and a debtor-in-possession, from time to time party hereto as Guarantors, the Lenders party hereto from time to time, FORTRESS CREDIT CORP. ("**Fortress**"), as administrative agent (in such capacity, "**Administrative Agent**"), and WILMINGTON TRUST, NATIONAL ASSOCIATION ("**Wilmington Trust**"), as collateral agent (in such capacity, "**Collateral Agent**").

### RECITALS:

**WHEREAS**, capitalized terms used in these Recitals shall have the respective meanings set forth for such terms in Section 1.1 hereof;

**WHEREAS**, on May [ ], 2023 (the "**Petition Date**"), the Company and certain of its Subsidiaries and Affiliates that are or become debtors under the Chapter 11 Cases (collectively, the "**Debtors**", and each individually, a "**Debtor**") commenced chapter 11 cases in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), jointly administered under Case No. [ ] (collectively, the "**Chapter 11 Cases**" and each individually, a "**Chapter 11 Case**"), and the Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

**WHEREAS**, prior to the Petition Date, the lenders from time to time party thereto (the "**Pre-Petition Lenders**") provided financing to the Company pursuant to that certain Amended and Restated Credit and Guaranty Agreement, dated as of November 4, 2019, among the Company, the Guarantors, Fortress as Administrative Agent and Wilmington Trust as Collateral Agent (collectively, the "**Pre-Petition Agents**") (as amended, amended and restated, supplemented or otherwise modified from time to time through the Petition Date, the "**Pre-Petition Credit Agreement**");

**WHEREAS**, on the Petition Date, the outstanding principal balance of the Loans (as defined in the Pre-Petition Credit Agreement (the "**Existing Loans**")) under the Pre-Petition Credit Agreement was approximately $474,572,920;

**WHEREAS**, the Company has requested, and, upon the terms and subject to the conditions set forth in this Agreement, the Lenders have agreed to make available to the Company, a senior secured credit facility in an aggregate principal committed amount of $60,000,000 (the "**DIP Facility**"), consisting of (i) a $10,000,000 tranche of loans to be funded by certain of the Pre-Petition Lenders (the "**New Money Loans**") and (ii) a $50,000,000 tranche of term loans resulting from the roll-up and refinancing of certain of the Existing Loans in each case subject to the conditions set forth herein and in the DIP Order (the "**Roll-Up Loans**" and, together with the New Money Loans, the "**DIP Loans**"), in each case to fund the costs and expenses relating to the

Chapter 11 Cases, the Carve-Out, the general corporate purposes and working capital requirements of the Company during the pendency of the Chapter 11 Cases, in each case, pursuant to and in accordance with the Approved Budget;

**WHEREAS**, subject to the terms of this Agreement and the DIP Order, the Company and the Guarantors have agreed to secure all of their Obligations under the Credit Documents by granting to the Collateral Agent, for the benefit of the Agents and the other Secured Parties, a first priority priming security interest in and lien upon substantially all of their property, whether now existing or acquired after the date hereof;

**WHEREAS**, the Company and the Guarantors' business is a mutual and collective enterprise and the Company and the Guarantors believe that the loans and other financial accommodations to the Company under this Agreement will enhance the aggregate borrowing capacity of the Company and facilitate the administration of the Chapter 11 Cases and their loan relationship with the Administrative Agent and the Lenders, all to the mutual advantage of the Company and the Guarantors;

**WHEREAS**, the Company and each Guarantor will receive substantial direct and indirect benefits by reason of the making of loans and other financial accommodations to the Company as provided in this Agreement; and

**WHEREAS**, the Lenders' willingness to extend financial accommodations to the Company, and the Agents' willingness to administer the Company's and the Guarantors' collateral security therefor, on a combined basis as more fully set forth in this Agreement and the other Credit Documents, is done solely as an accommodation to the Company and the Guarantors and at the Company's and the Guarantors' request and in furtherance of the Company's and the Guarantors' mutual and collective enterprise.

**NOW**, **THEREFORE**, in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto hereby agree as follows:

**SECTION 1.    DEFINITIONS AND INTERPRETATION**

1.1.    **Definitions**.  The following terms used herein, including in the preamble, recitals, exhibits and schedules hereto, shall have the following meanings:

"**Actual Cash Receipts**" means, with respect to any period, as the context requires, the amount of total cash receipts during such period of the Credit Parties and their Subsidiaries on a consolidated basis (excluding any borrowings under this Agreement) that correspond to the line item under the heading "Operating Receipts" in the Approved Budget.  For the avoidance of doubt, "Actual Cash Receipts" shall exclude any discounts, holdbacks or other reductions.

"**Actual Disbursement Amounts**" means, with respect to any period, as the context requires, the amount of actual disbursements made by the Credit Parties on a consolidated basis (other than disbursements to and from other Credit Parties) during such period that correspond to the sum of the line items for "Operating Disbursements" in the Approved Budget. For the avoidance of doubt, (i) such amount will include any payments or other distributions made by the Credit Parties to Subsidiaries of the Company that are not Credit Parties.

"**Actual Liquidity**" means, as of any date of determination, as the context requires, for the Credit Parties on a consolidated basis, the actual amounts as of such date that correspond to the line item under the heading "Consolidated Closing Cash" for such date in the Approved Budget.

"**Actual Net Investments and Financing**" means, as of any date of determination, as the context requires, for the Credit Parties on a consolidated basis, the actual amounts as of such date that correspond to the line item under the heading "Net Investment and Financing Cashflows" for such date in the Approved Budget.

"**Actual Professional Fees**" means, as of any date of determination, as the context requires, for the Credit Parties on a consolidated basis, the actual amounts as of such date that correspond to the line item under the heading "Restructuring and Professional Fees" for such date in the Approved Budget.

"**Adequate Protection Claims**" has the meaning assigned to such term in the Interim Order (or the Final Order, when applicable).

"**Adequate Protection Liens**" has the meaning assigned to such term in the Interim Order (or the Final Order, when applicable).

"**Adjusted Term SOFR**" means, for purposes of any calculation, the rate per annum equal to (a) Term SOFR for such calculation plus (b) the Term SOFR Adjustment; provided that if Adjusted Term SOFR as so determined shall ever be less than the Floor, then Adjusted Term SOFR shall be deemed to be the Floor.

"**Administrative Agent**" as defined in the preamble hereto.

"**Adverse Proceeding**" means any action, suit, proceeding (whether administrative, judicial or otherwise), governmental investigation or arbitration (whether or not purportedly on behalf of Company or any Subsidiary) at law or in equity, or before or by any Governmental Authority, domestic or foreign (including any Environmental Claims), whether pending or, to the knowledge of Company or any Subsidiary, threatened against or affecting Company or any Subsidiary or any property of Company or any Subsidiary.

"**Affected Financial Institution**" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"**Affiliate**" means, as applied to any Person, any other Person directly or indirectly controlling (including any member of the senior management group of such Person), controlled by, or under common control with, that Person. For the purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with"), as applied to any Person, means the possession, directly or indirectly, of the power (a) to vote 10% or more of the Securities having ordinary voting power for the election of directors of such Person, or (b) to direct or cause the direction of the management and policies of that Person, whether through the ownership of voting securities or by contract or otherwise.

"**Agent**" means each of Administrative Agent, Collateral Agent and any other Person appointed under the Credit Documents to serve in an agent or similar capacity.

"**Aggregate Amounts Due**" as defined in Section 2.14.

"**Aggregate Payments**" as defined in Section 7.2.

"**Agreement**" means this Senior Secured Super-Priority Term Loan Debtor-in-Possession Credit and Guaranty Agreement, dated as of May [   ], 2023, as it may be amended, supplemented or otherwise modified from time to time.

"**Anti-Corruption and Anti-Bribery Laws**" means all requirements of law related to anti-bribery or anti-corruption matters, including, without limitation, the United States Foreign Corrupt Practices Act of 1977, the *Criminal Code* (Canada), the *Corruption of Foreign Public Officials Act* (Canada) and Canadian Anti-Terrorism Laws.

"**Anti-Terrorism and Anti-Money Laundering Laws**" means all requirements of law related to engaging in, financing, or facilitating terrorism or money laundering, including the PATRIOT Act, The Currency and Foreign Transactions Reporting Act (also known as the "Bank Secrecy Act," 31 U.S.C. §§5311-5330 and 12 U.S.C. §§1818(s), 1820(b) and 1951-1959), Trading With the Enemy Act (50 U.S.C. §1 et seq.), Executive Order 13224 (effective September 24, 2001) and each of the associated laws, regulations, and executive orders administered by OFAC (31 C.F.R., Subtitle B, Chapter V) and Canadian Anti-Terrorism Laws.

"**Applicable Law**" means all provisions of statutes, rules, regulations and orders of any Governmental Authority applicable to the Person in question, and all orders and decrees of all courts, tribunals and arbitrators in proceedings or actions in which the Person in question is a party.

"**Approved Budget**" shall mean the then most current budget prepared by the Company and approved by the Requisite Lenders in accordance with Section 5.18.

"**Approved Budget Variance Report**" shall mean a report provided by the Company to the Administrative Agent and the Lenders on or prior to 5:00 p.m. (Eastern Time) on the Wednesday after each Variance Testing Period  (a) showing, in each case, on a line item by line item and cumulative basis, the Actual Cash Receipts, the Actual Disbursement Amounts, the Actual Net Investments and Financing, the Actual Professional Fees and the Actual Liquidity for the Variance Testing Period then most recently ended, noting therein (i) all variances, on a line item by line item basis and a cumulative basis, from the Budgeted Cash Receipts, the Budgeted Disbursement Amounts, the Budgeted Net Investments and Financing, the Budgeted Professional Fees and the Budgeted Liquidity for such period as set forth in the Approved Budget as in effect for such period, (ii) containing an indication as to whether each variance is temporary or permanent and an analysis and explanations for all material variances, (iii) certifying compliance or non-compliance with the maximum permitted variances set forth in Section 5.18(c), and (iv) including explanations for all material variances and violations, if any, of such covenant and if any such violation exists, setting forth the actions which the Company has taken or intends to take with respect thereto, and (b) which such reports shall be certified by an Authorized Officer of the Company and shall be in a form, and shall contain supporting information satisfactory to the Requisite Lenders in their sole discretion.

4

"**Approved Electronic Communications**" means any notice, demand, communication, information, document or other material that any Credit Party provides to any Agent that is distributed to any Agent or any Lender by means of electronic communications pursuant to Section 10.1(b).

"**Asset Sale**" means a sale, lease or sublease (as lessor or sublessor), sale and leaseback, assignment, conveyance, transfer, license (as licensor or sublicensor) or other disposition to, or any exchange of property with, any Person (other than to or with a Credit Party), in one transaction or a series of transactions, of all or any part of any Credit Party's or any of its Subsidiary's businesses, assets or properties of any kind, whether real, personal, or mixed and whether tangible or intangible, whether now owned or hereafter acquired, including the Capital Stock of any Credit Party or Subsidiaries thereof, other than pursuant to an Ordinary Course Asset Sale.  For purposes of clarification, "**Asset Sale**" shall include (x) the sale or other disposition for value of any contracts and (y) the early termination or modification of any contract resulting in the receipt by any Credit Party or any of its Subsidiaries of a cash payment or other consideration in exchange for such event (other than payments in the ordinary course for accrued and unpaid amounts that would have been due through the date of termination or modification).

"**Assignment Agreement**" means an Assignment and Assumption Agreement substantially in the form of Exhibit D.

"**Attorney Costs**" means and includes all reasonable and documented fees, out of pocket expenses and disbursements of any law firm or other external legal counsel.

"**Authorized Officer**" means, as applied to any Person, any individual holding the position of chairman of the board (if an officer), chief executive officer, president or one of its vice presidents (or the equivalent thereof), chief legal officer, chief strategy officer and the chief financial officer or treasurer of such Person; provided that, when such term is used in reference to any document executed by, or a certification of, an Authorized Officer, the secretary, assistant secretary or general counsel of such Person shall have delivered an incumbency certificate to the Agents as to the authority of such individual.

"**Automatic Stay**" shall mean the automatic stay imposed pursuant to Section 362 of the Bankruptcy Code.

"**Available Tenor**" means, as of any date of determination and with respect to the then-current Benchmark, as applicable, (a) if such Benchmark is a term rate, any tenor for such Benchmark (or component thereof) that is or may be used for determining the length of an interest period pursuant to this Agreement or (b) otherwise, any payment period for interest calculated with reference to such Benchmark (or component thereof) that is or may be used for determining any frequency of making payments of interest calculated with reference to such Benchmark, in each case, as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to Section 2.22(c)(iv).

"**Bail-In Action**" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

5

"**Bail-In Legislation**" means, (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time that is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliate (other than through liquidation, administration or other insolvency proceedings).

"**Bankruptcy Code**" means Title 11 of the United States Code, entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"**Base Rate**" means, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus ½ of 1% and (c) 4.00%.  Any change in the Base Rate due to a change in the Prime Rate or the Federal Funds Effective Rate shall be effective on the effective day of such change in the Prime Rate or the Federal Funds Effective Rate, as the case may be.

"**Base Rate Loan**" means a Loan bearing interest at a rate determined by reference to the Base Rate.

"**Benchmark**" means, initially, the Term SOFR Reference Rate; provided that, if a Benchmark Transition Event has occurred with respect to the Term SOFR Reference Rate or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to Section 2.22(c)(i).

"**Benchmark Replacement**" means, with respect to any Benchmark Transition Event, the sum of: (a) the alternate benchmark rate that has been selected by the Administrative Agent and the Company giving due consideration to (i) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement for the then-current Benchmark for Dollar-denominated syndicated credit facilities and (b) the related Benchmark Replacement Adjustment; provided that, if such Benchmark Replacement as so determined would be less than the Floor, such Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Credit Documents.

"**Benchmark Replacement Adjustment**" means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement for any applicable Available Tenor, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Administrative Agent and the Company giving due consideration to (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (b) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such

6

spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for Dollar-denominated syndicated credit facilities.

"**Benchmark Replacement Date**" means the earlier to occur of the following events with respect to the then-current Benchmark:

(a)     in the case of clause (a) or (b) of the definition of "Benchmark Transition Event," the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof); or

(b)     in the case of clause (c) of the definition of "Benchmark Transition Event," the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative; provided that such non-representativeness will be determined by reference to the most recent statement or publication referenced in such clause (c) and even if any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

For the avoidance of doubt, the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (a) or (b) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"**Benchmark Transition Event**" means the occurrence of one or more of the following events with respect to the then-current Benchmark:

(a)     a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely; provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

(b)     a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the FRB, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely; provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

(c)     a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are not, or as of a specified future date will not be, representative.

For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"**Benchmark Transition Start Date**" means, in the case of a Benchmark Transition Event, the earlier of (a) the applicable Benchmark Replacement Date and (b) if such Benchmark Transition Event is a public statement or publication of information of a prospective event, the 90th day prior to the expected date of such event as of such public statement or publication of information (or if the expected date of such prospective event is fewer than 90 days after such statement or publication, the date of such statement or publication).

"**Benchmark Unavailability Period**" means the period (if any) (x) beginning at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Credit Document in accordance with Section 2.22(c)(i) and (y) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Credit Document in accordance with Section 2.22(c)(i).

"**Beneficial Ownership Certification**" means a certification regarding beneficial ownership required by the Beneficial Ownership Regulation.

"**Beneficial Ownership Regulation**" means 31 C.F.R. § 1010.230.

"**Beneficiary**" means each Agent and Lender.

"**Bid Procedures**" as defined in Section 5.21.

"**Bidding Procedures Order**" as defined in Section 5.21.

"**Board of Directors**" means, (a) with respect to any corporation or company, the board of directors of the corporation or company or any committee thereof duly authorized to act on behalf of such board, (b) with respect to a partnership, the board of directors or equivalent governing body of the general partner of the partnership, (c) with respect to a limited liability company, the manager, the managing member or members or any controlling committee or board of managers (or equivalent governing body) of such company or the sole member or the managing member thereof, and (d) with respect to any other Person, the entity, individual, board or committee of such Person serving a similar function.

"**Budgeted Cash Receipts**" shall mean, with respect to any period, as the context requires, with respect to the Credit Parties and their Subsidiaries on a consolidated basis (excluding any borrowings under this Agreement) (x) the amount that corresponds to the applicable line item

under the heading "Operating Receipts" in the Approved Budget, as determined by reference to the Approved Budget as then in effect.

"**Budgeted Disbursement Amounts**" shall mean, with respect to any period, as the context requires, the amount that corresponds to the sum of the line items for "Operating Disbursements" in the Approved Budget. For the avoidance of doubt, such line item will include any payments or other distributions made by the Credit Parties to Subsidiaries of the Company that are not Credit Parties.

"**Budgeted Liquidity**" means, as of any date of determination, as the context requires, for the Credit Parties on a consolidated basis, the amounts set forth as of such date that correspond to the line item "Consolidated Closing Cash" in the Approved Budget for the relevant period, as determined by reference to the Approved Budget as then in effect.

"**Budgeted Net Investments and Financing**"  means, as of any date of determination, as the context requires, for the Credit Parties on a consolidated basis, the amounts as of such date that correspond to the line item "Net Investment and Financing Cashflows" in the Approved Budget for the relevant period, as determined by reference to the Approved Budget as then in effect.

"**Budgeted Professional Fees**" means, as of any date of determination, as the context requires, for the Credit Parties on a consolidated basis, the amounts as of such date that correspond to the line item under the heading "Restructuring and Professional Fees" in the Approved Budget for the relevant period, as determined by reference to the Approved Budget as then in effect.

"**Business Day**" means any day excluding Saturday, Sunday and any day which is a legal holiday under the laws of the State of New York or the State of California or is a day on which banking institutions located in either such state are authorized or required by law or other governmental action to close.

"**Business Plan**" means each annual business plan of Company and its Subsidiaries, in form reasonably acceptable to the Requisite Lenders.

"**Canadian Anti-Terrorism Laws**" means any Canadian federal or provincial laws or regulations relating to money laundering, terrorism, or financing terrorism including  Part II.1 of the Criminal Code, R.S.C. 1985, c. C-46, the Proceeds of Crime (Money Laundering) and Terrorist Financing Act, S.C. 2000, c. 17 and the United Nations Act, R.S.C. 1985, c.U-2, together with all rules, regulations and interpretations thereunder or related thereto including the Regulations Implementing the United Nations Resolutions on the Suppression of Terrorism and the United Nations Al-Qaida and Taliban Regulations promulgated under the *United Nations Act*, and any similar laws in effect in Canada from time to time.

"**Canadian Credit Party**" means any Credit Party organized under the laws of Canada or under the laws of a Province or Territory of Canada.

"**Canadian Defined Benefit Pension Plan**" means any Canadian Pension Plan which contains a "defined benefit provision" as defined in subsection 147.1(1) of the *Income Tax Act* (Canada).

"**Canadian Insolvency Laws**" means any federal or provincial Canadian law from time to time in effect relating to bankruptcy, winding-up, insolvency, reorganization, receivership, plans of arrangement or relief or protection of debtor, including the *Bankruptcy and Insolvency Act* (Canada), the *Companies' Creditors Arrangement Act* (Canada), the *Winding-up and Restructuring Act* (Canada), the *Canada Business Corporations Act* and any other applicable corporations legislation.

"**Canadian Pension Plan**" means each pension plan that is a "registered pension plan" (as defined in the *Income Tax Act* (Canada)) or that is required to be registered under the *Pension Benefits Act* (Ontario) or other Canadian federal or provincial law which is maintained or contributed to, or to which there is or may be an obligation to contribute by a Credit Party or a Subsidiary thereof, for its Canadian employees or former employees, but does not include the Canada Pension Plan or Quebec Pension Plan as maintained by the Government of Canada or the Government of Quebec, as applicable.

"**Canadian Pension Event**" means the occurrence of any one or more of the following events:

(a)     non-payment of any amounts that are due to the pension fund of any Canadian Pension Plan from a Credit Party or any of their respective Affiliates;

(b)     improper withdrawal or application of the assets of the Canadian Pension Plans;

(c)     the occurrence of any event which could reasonably be expected to give rise to a partial or full termination of any Canadian Pension Plan; or

(d)     the occurrence of any event which could trigger or otherwise require immediate or accelerated funding in respect of any Canadian Pension Plan.

"**Capital Lease**" means, as applied to any Person, any lease of any property (whether real, personal or mixed) by that Person (a) as lessee that, in conformity with GAAP, is or should be accounted for as a capital lease on the balance sheet of that Person or (b) as lessee which is a transaction of a type commonly known as a "synthetic lease" (i.e., a transaction that is treated as an operating lease for accounting purposes but with respect to which payments of rent are intended to be treated as payments of principal and interest on a loan for Federal income tax purposes).

"**Capitalized Lease Obligations**" means, as applied to any Person, all obligations under Capital Leases of such Person or any of its subsidiaries, in each case taken at the amount thereof accounted for as liabilities in accordance with GAAP.

"**Capital Stock**" means any and all shares, stock, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent

ownership or profits interests in a Person that is another type of entity, including partnership interests, membership interests, voting trust certificates, certificates of interest, and profits interests, participations, or similar arrangements, and any and all warrants, rights or options to purchase, or other arrangements or rights to acquire, subscribe, convert to or otherwise receive or participate in the economic or other rights associated with any of the foregoing.

"**Carve-Out**" has the meaning assigned to such term in the DIP Order.

"**Carve-Out Trigger Notice**" has the meaning assigned to such term in the DIP Order.

"**Cash**" means money, currency or a credit balance in any demand or Deposit Account.

"**Cash Equivalents**" means:

(a)       U.S. dollars;

(b)       securities issued or directly and fully guaranteed or insured by the United States government or any agency or instrumentality of the United States government (<u>provided</u> that the full faith and credit of the United States is pledged in support of those securities) having maturities of not more than one year from the date of acquisition;

(c)       certificates of deposit and time deposits with maturities of one year or less from the date of acquisition, bankers' acceptances with maturities not exceeding one year and overnight bank deposits, in each case, with any domestic commercial bank having capital and surplus in excess of $500,000,000;

(d)       repurchase obligations with a term of not more than ninety (90) days for underlying securities of the types described in clauses (b) and (c) above entered into with any financial institution meeting the qualifications specified in clause (c) above;

(e)       commercial paper rated at least A-1 by S&P or at least P-1 by Moody's and in each case maturing within one year after the date of acquisition;

(f)       investment or money market funds at least 95% of the assets of which constitute Cash Equivalents of the kinds described in clauses (a) through (e) of this definition;

(g)       securities with maturities of one year or less from the date of acquisition issued or fully guaranteed by any State or commonwealth of the United States of America, or by any political subdivision or taxing authority thereof, and rated at least A-1 by S&P or at least P-1 by Moody's;

(h)       money market funds that (i) comply with the criteria set forth in Rule 2a-7 under the Investment Company Act of 1940, (ii) are rated A-1 by S&P and P-1 by Moody's and (iii) have portfolio assets of at least $500,000,000;

11

(i)      in the case of any Foreign Subsidiary, investments denominated in the currency of the jurisdiction in which such Foreign Subsidiary is organized or has its principal place of business which are similar to the items specified in subsections (a) through (f) of this definition and are used in the ordinary course of business by similar companies for cash management purposes in the relevant jurisdiction; and

(j)      any other item determined under GAAP to constitute Cash and Cash Equivalents.

"**Cash Management Order**" means the order of the Bankruptcy Court entered in the Chapter 11 Cases after the "first day" hearing, together with all extensions, modifications and amendments thereto, in form and substance reasonably satisfactory to the Administrative Agent and the Requisite Lenders, which among other matters authorizes the Debtors to maintain their existing cash management and treasury arrangements (as set forth in the Pre-Petition Credit Agreement) or such other arrangements as shall be reasonably acceptable to the Administrative Agent and the Requisite Lenders in all material respects.

"**Cash Management Agreement**" means any agreement to provide to Company or any of its Subsidiaries and/or Joint Ventures cash management services for collections, treasury management services (including pooling arrangements, controlled disbursement, overdraft, automated clearing house fund transfer services, return items and interstate depository network services), any demand deposit, payroll, trust or operating account relationships, commercial credit cards, merchant card, purchase or debit cards, stored value cards, non-card e-payables services, merchant processing services, and other cash management services, including electronic funds transfer services, lockbox services, stop payment services, wire transfer services and intercompany self-insurance arrangements, but excluding any Swap Agreements.

"**Change in Law**" means the occurrence, after the Closing Date, of any of the following:  (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that, notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law," regardless of the date enacted, adopted, promulgated or issued.

"**Change of Control**" means any person, entity or "group" (within the meaning of Section 13(d) or 14(d) of the Exchange Act), other than the Permitted Holders (i) shall at any time have acquired direct or indirect beneficial ownership (as defined in Rules 13(d)-3 and 13(d)-5 under the Exchange Act) of more than 49.9% on a fully diluted basis of the voting and/or economic interests in the Capital Stock of Company, or (ii) shall have obtained the power (whether or not exercised) to elect a majority of the members of the Board of Directors of Company, *provided that*, in no event shall the commencement of the Chapter 11 Cases constitute a "Change of Control".

"**Chapter 11 Cases**" has the meaning assigned to such term in the Recitals.

"**Chapter 11 Plan**" means a chapter 11 plan of liquidation or reorganization in the Chapter 11 Cases.

"**Class**", when used with respect to (a) any Loan or Credit Extension, refers to whether such Loan, or the Loans comprising such Credit Extension, are New Money Loans or Roll-Up Loans, (b) any Commitment, refers to whether such Commitment is a New Money Commitment or a Roll-Up Commitment and (c) any Lender, refers to whether such Lender has a Loan or Commitment of such Class.

"**Closing Date**" means the date of satisfaction (or waiver by the Requisite Lenders (in their sole discretion)) of the conditions precedent set forth in Section 3.1.

"**Collateral**" means, collectively, (a) all of the real, personal and mixed property (including Capital Stock) in which Liens are granted and/or purported to be granted pursuant to the Collateral Documents as security for the Obligations and (b) the "DIP Collateral" referred to in the DIP Order, it being understood that "Collateral" shall include all such DIP Collateral.

"**Collateral Agent**" as defined in the preamble hereto.

"**Collateral Agent Fee Letter**" means the letter agreement dated as of the Closing Date between Company and Collateral Agent.

"**Collateral Documents**" means the DIP Order, the Pledge and Security Agreement, any intellectual property security agreement to be filed in any jurisdiction in which a Credit Party is formed or organized, each Counterpart Agreement, any UCC financing statements and PPSA financing statements, all security documentation executed by a Licensing Intermediary in favor of any Agent or a Credit Party, and all other security or ancillary documents, instruments, documents and agreements delivered by any Credit Party pursuant to this Agreement or any of the other Credit Documents in order to grant to Collateral Agent, for the benefit of Secured Parties, a Lien on any real, personal or mixed property of that Credit Party as security for the Obligations.

"**Collateral Questionnaire**" means a certificate in form satisfactory to the Requisite Lenders that provides information with respect to the real, personal or mixed property of each Credit Party and each of their respective Subsidiaries.

"**Commitment**" means any New Money Commitment or Roll-Up Commitment, and "**Commitments**" means such commitments of all Lenders.

"**Company**" as defined in the preamble hereto.

"**Company Intellectual Property**" as defined in Section 4.8.

"**Competitor**" means any Person that is a bona fide direct operating company competitor of, and in the same industry (or an industry offering a substitute product or service) and market as, Company or any of its Subsidiaries.

13

"**Compliance Certificate**" means a compliance certificate substantially in the form of Exhibit C.

"**Conforming Changes**" means, with respect to either the use or administration of Term SOFR or the use, administration, adoption or implementation of any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Base Rate," the definition of "Business Day," the definition of "U.S. Government Securities Business Day," the definition of "Interest Period" or any similar or analogous definition (or the addition of a concept of "interest period"), timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of Section 5.9 and other technical, administrative or operational matters) that the Administrative Agent, in consultation with the Company, decides may be appropriate to reflect the adoption and implementation of any such rate or to permit the use and administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent, in consultation with the Company, decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent, in consultation with the Company, determines that no market practice for the administration of any such rate exists, in such other manner of administration as the Administrative Agent decides is reasonably necessary in connection with the administration of this Agreement and the other Credit Documents).

"**Connection Income Taxes**" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"**Consolidated Subsidiaries**" means, with respect to any Person at any time, all Subsidiaries of such Person which are required to be consolidated with such Person for financial reporting purposes in accordance with GAAP then in effect.

"**Content Development Subsidiary**" means any Subsidiary of Company identified as a Content Development Subsidiary on Part I of Schedule E.

"**Continuation Date**" means the effective date of a continuation, as the case may be, as set forth in the applicable Continuation Notice.

"**Continuation Notice**" means a Continuation Notice substantially in the form of Exhibit A-2.

"**Contributing Guarantors**" as defined in Section 7.2.

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "**Controlling**" and "**Controlled**" have meanings analogous thereto.

"**Copyrights**" as defined in any applicable Collateral Document, and such term shall include any analogous term.

"**Counterpart Agreement**" means a Counterpart Agreement substantially in the form of <u>Exhibit G</u> delivered by a Credit Party pursuant to Section 5.9.

"**Credit Date**" means the date of a Credit Extension.

"**Credit Document**" means any of this Agreement, the Notes, if any, the Collateral Documents, the Fee Letter, the Collateral Agent Fee Letter, the Approved Budget and any other ancillary documentation which is required to be or is otherwise executed and delivered to Administrative Agent, Collateral Agent or any Lender in connection with this Agreement or any of the documents listed above (including any amendments or modifications to any of the documents listed above).

"**Credit Extension**" means the making of a Loan.

"**Credit Party**" means Company and the Guarantors.

"**Credit Party Representatives**" as defined in Section 10.22.

"**CRO**" means a representative of AP Services, LLC designated as the Chief Restructuring Officer of the Debtors, or a successor thereto acceptable to the Requisite Lenders.

"**Debtor**" as defined in the recitals to this Agreement.

"**Debtor Relief Laws**" means the Bankruptcy Code, Canadian Insolvency Laws and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the U.S., any state or territory thereof, the District of Columbia, Canada, the United Kingdom or any other applicable jurisdictions.

"**Default**" means a condition or event that, after notice or lapse of time or both, would constitute an Event of Default.

"**Default Rate**" means the interest rate applicable pursuant to Section 2.8.

"**Defaulting Lender**" means subject to Section 2.19(b), any Lender that (a) has failed to (i) fund all or any portion of its Loans within two Business Days of the date such Loans were required to be funded hereunder or (ii) pay to Administrative Agent, Collateral Agent or any other Lender any other amount required to be paid by it hereunder within two Business Days of the date when due, (b) has notified Company or Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect, (c) has failed, within three Business Days after written request by Administrative Agent or Company, to confirm in writing to Administrative Agent and Company that it will comply with its prospective funding obligations hereunder (<u>provided</u> that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by Administrative Agent and Company), or (d) has, or has a direct or indirect parent company that has (i) become the subject of a proceeding under any Debtor Relief Law, (ii) appointed for it a receiver, custodian, trustee, conservator, administrator, assignee for the benefit of creditors, or similar Person charged with reorganization or liquidation of its business or assets, including the

Federal Deposit Insurance Corporation or any other state, provincial or federal regulatory authority acting in such a capacity, or (iii) taken any action in furtherance of, or indicated its consent to, approval of or acquiescence in any such proceeding or appointment described in the preceding clause (ii); or (iv) become the subject of a Bail-In Action; provided that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any Capital Stock in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the U.S. or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender. Any determination by Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to Section 2.19(b)) upon delivery of written notice of such determination to Company, and each Lender.

"**Delivery**" or "**Delivered**" means, with respect to any Item of Product, that such Item of Product is finished, edited and titled and synchronized with language, dialogue, sound and music (if applicable), recorded with sound equipment pursuant to valid licenses and in all respects ready for distribution.

"**Deposit Account**" means any "deposit account" as defined in Article 9 of the UCC or any similar provision of the PPSA.

"**DIP Collateral**" has the meaning assigned to such term in the DIP Order.

"**DIP Facility**" has the meaning assigned to such term in the Recitals.

"**DIP Loans**" has the meaning assigned to such term in the Recitals.

"**DIP Order**" means the Interim Order, unless the Final Order shall have been entered, in which case it means the Final Order.

"**DIP Maturity Date**" means the earliest of (i) the date that is six months after the Petition Date, (ii) the date that all Loans shall become due and payable in full hereunder, whether by acceleration or otherwise, (iii) the effective date of a Chapter 11 Plan for the Debtors, (iv) the date of consummation of a sale of all or substantially all of the Debtors' assets under Section 363 of the Bankruptcy Code, (v) the first Business Day on which the Interim Order expires by its terms or is terminated, unless the Final Order has been entered and become effective prior thereto, (vi) conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code or any Credit Party having filed a motion or other pleading seeking the conversion of the Chapter 11 Cases to Chapter 7 of the Bankruptcy Code unless otherwise consented to in writing by the Requisite Lenders, (vii) dismissal of any of the Chapter 11 Cases, unless otherwise consented to in writing by Requisite Lenders, and (viii) the date on which the Final Order is vacated, terminated, rescinded, revoked, declared null and void or otherwise ceases to be in full force and effect (unless consented to by the Requisite Lenders).

"**Disqualified Stock**" means any Capital Stock which, by its terms (or by the terms of any other instrument, agreement or Capital Stock into which it is convertible or for which it is

exchangeable), or upon the happening of any event or condition, (a) matures (excluding any maturity as the result of an optional redemption by the issuer thereof) or is mandatorily redeemable, in whole or in part, or required to be repurchased or redeemed, in whole or in part, in each case other than for Capital Stock of Company that is not otherwise Disqualified Stock, pursuant to a sinking fund obligation or otherwise, on or prior to 180 days after the latest possible maturity date of the Loans, (b) is or becomes convertible into or exchangeable (unless at the sole option of the issuer thereof) for (i) debt securities or (ii) any Capital Stock of Company or any of its Subsidiaries that would constitute Disqualified Stock, in each case at any time on or prior to 180 days after the latest possible maturity date of the Loans, (c) contains any mandatory repurchase obligation which may come into effect on or prior to 180 days after the latest possible maturity date of the Loans or (d) provides for the scheduled payments of dividends in Cash on or prior to 180 days after the latest possible maturity date of the Loans.

"**Dollars**" and the sign "**$**" mean the lawful money of the United States of America.

"**Domestic Subsidiary**" means any Subsidiary formed or organized under the laws of the United States of America, any State thereof or the District of Columbia.

"**EEA Financial Institution**" means (a) any credit institution or investment firm established in any EEA Member Country that is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country that is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country that is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"**EEA Member Country**" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"**EEA Resolution Authority**" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**Eligible Assignee**" means:

(a)      with respect to any assignment, transfer or sale of Loans, (i) any Lender, any Affiliate of a Lender or any Related Fund (any two or more Related Funds being treated as a single Eligible Assignee for all purposes hereof), (ii) any commercial bank, insurance company, finance company, investment or mutual fund or other entity that (A) is an "accredited investor" (as defined in Regulation D under the Securities Act), (B) which extends credit or buys loans as one of its principal businesses, and (C) has total assets in excess of $500,000,000 or (iii) any other Person approved by Administrative Agent; and

(b)      with respect to any assignment, assumption, transfer or sale of Commitments, (i) any Lender that already holds unfunded Commitments at such time, any Affiliate of such a Lender or any Related Fund with respect to such a Lender (any two or more Related Funds being treated as a single Eligible Assignee for all purposes hereof) or (ii) any commercial bank, insurance company, finance company, investment or mutual fund or other entity organized under the laws of the United States or of any other country which is a member of the

Organization of Economic Cooperation and Development, or a political subdivision of any such country, in each case that (A) is an "accredited investor" (as defined in Regulation D under the Securities Act), (B) which extends credit or buys loans as one of its principal businesses, and (C) has total assets in excess of $500,000,000;

provided, no (x) Defaulting Lender or (y) natural person (or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural person) (in each case, unless approved by both Administrative Agent and Company) shall, in any event, be an Eligible Assignee.

"**Employee Benefit Plan**" means any material "employee benefit plan" as defined in Section 3(3) of ERISA that is or was sponsored, maintained or contributed to by, or required to be contributed by, Company, any of its Subsidiaries or any of their respective ERISA Affiliates.

"**Environmental Claim**" means any investigation, notice of liability, notice of violation, claim, action, suit, proceeding, demand, abatement order or other order or directive (conditional or otherwise), in each case in writing, by any Governmental Authority or any other Person, arising (i) pursuant to or in connection with any actual or alleged violation of any Environmental Law; (ii) in connection with the Release of any Hazardous Material or any Hazardous Materials Activity; or (iii) in connection with any actual or alleged damage, injury, threat or harm to natural resources or the environment.

"**Environmental Laws**" means any and all current or future foreign or domestic, federal, state or provincial (or any subdivision of either of them), statutes, ordinances, orders, rules, regulations, judgments, Governmental Authorizations, or any other legally binding requirements of Governmental Authorities relating to (i) the protection of the environment, (ii) any Hazardous Materials Activity; (iii) the generation, use, storage, transportation or disposal of Hazardous Materials; or (iv) occupational safety and health or industrial hygiene as they relate to Hazardous Materials, or the protection of human, plant or animal health or welfare, or land use related to the same, in any manner applicable to Company or any of its Subsidiaries or any Facility.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended to the date hereof and from time to time hereafter, and any successor statute.

"**ERISA Affiliate**" means, as applied to any Person, (i) any corporation that is a member of a controlled group of corporations within the meaning of Section 414(b) of the Internal Revenue Code of which that Person is a member; and (ii) any trade or business (whether or not incorporated) that is a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the Internal Revenue Code of which that Person is a member. Any former ERISA Affiliate of Company or any of its Subsidiaries shall continue to be considered an ERISA Affiliate of Company or any such Subsidiary within the meaning of this definition with respect to the period such entity was an ERISA Affiliate of Company or such Subsidiary and with respect to liabilities arising after such period for which Company or such Subsidiary could be liable under the Internal Revenue Code or ERISA.

"**ERISA Event**" means (i) a "reportable event" within the meaning of Section 4043 of ERISA and the regulations issued thereunder with respect to any Pension Plan (excluding those

for which the notice to the PBGC has been waived by regulation); (ii) the failure to meet the minimum funding standard of Section 412 of the Internal Revenue Code with respect to any Pension Plan (whether or not waived in accordance with Section 412(c) of the Internal Revenue Code) or the failure to make by its due date a required installment under Section 430(j) of the Internal Revenue Code with respect to any Pension Plan or the failure to make any required contribution to a Multiemployer Plan; (iii) the provision by the administrator of any Pension Plan pursuant to Section 4041(a)(2) of ERISA of a notice of intent to terminate such plan in a distress termination described in Section 4041(c) of ERISA; (iv) the withdrawal by Company, any of its Subsidiaries or any of their respective ERISA Affiliates from any Pension Plan with two or more contributing sponsors or the termination of any such Pension Plan resulting in liability to Company, any of its Subsidiaries or any of their respective Affiliates pursuant to Section 4063 or 4064 of ERISA; (v) the institution by the PBGC of proceedings to terminate any Pension Plan, or the occurrence of any event or condition that would constitute grounds under ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan; (vi) the imposition of liability on Company, any of its Subsidiaries or any of their respective ERISA Affiliates pursuant to Section 4062(e) or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA; (vii) the withdrawal of Company, any of its Subsidiaries or any of their respective ERISA Affiliates in a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) from any Multiemployer Plan if there is any potential liability therefor, or the receipt by Company, any of its Subsidiaries or any of their respective ERISA Affiliates of notice from any Multiemployer Plan that it is insolvent pursuant to Section 4245 of ERISA, or that it intends to terminate or has terminated under Section 4041A or 4042 of ERISA; (viii) the occurrence of an act or omission that could give rise to the imposition on Company, any of its Subsidiaries or any of their respective ERISA Affiliates of fines, penalties, taxes or related charges under Chapter 43 of the Internal Revenue Code or under Section 409, Section 502(c), (i) or (l), or Section 4071 of ERISA in respect of any Employee Benefit Plan; (ix) receipt from the Internal Revenue Service of notice of the failure of any Pension Plan (or any other Employee Benefit Plan intended to be qualified under Section 401(a) of the Internal Revenue Code) to qualify under Section 401(a) of the Internal Revenue Code, or the failure of any trust forming part of any Pension Plan to qualify for exemption from taxation under Section 501(a) of the Internal Revenue Code; or (x) the imposition of a Lien pursuant to Section 430(k) of the Internal Revenue Code or pursuant to Section 303(k) of ERISA with respect to any Pension Plan.

"**EU Bail-In Legislation Schedule**" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"**Event of Default**" means any condition or event set forth in Section 8.1.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended from time to time, and any successor statute.

"**Excluded Subsidiary**" means:

(a)    any non-Debtor Subsidiary identified on <u>Schedule E</u> as of the Closing Date; provided that, if such Subsidiary later becomes a Debtor, it shall automatically cease to be an Excluded Subsidiary for all purposes hereof;

(b)    any Subsidiary that is not wholly owned, including Joint Ventures (with all such Subsidiaries as of the Closing Date being identified on Schedule E); and

(c)    any Subsidiary to the extent such Subsidiary's guarantee of the Obligations is prohibited by any Applicable Law or requires the consent, approval, license or authorization of any Governmental Authority (unless such consent, approval, license or authorization has been received or such Applicable Law is rendered inapplicable by the DIP Order; provided, that there shall be no obligation on any Credit Party to seek any such consent) (with all such Subsidiaries as of the Closing Date being identified on Schedule E).

"**Excluded Taxes**" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by Company under Section 2.20) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.17, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with Section 2.17(c) or (d), and (d) any withholding Taxes imposed under FATCA.

"**Existing Joint Venture**" means any Joint Venture existing as of the Closing Date.

"**Existing Loans**" as defined in the recitals to this Agreement.

"**Exit Fee**" as defined in Section 2.9(e).

"**Facility**" means any real property (including all buildings, fixtures or other improvements located thereon) now, hereafter or heretofore owned, leased, operated or used by Company or any of its Subsidiaries or any of their respective predecessors.

"**Fair Market Value**" means, with respect to any property or other asset, the price (after taking into account any liabilities relating to such assets) that would be negotiated in an arm's-length transaction for cash between a willing seller and a willing and able buyer, neither of which is under any compulsion to complete the transaction, as such price is determined by the Bankruptcy Court, or by Company in good faith; provided, that with respect to any determination by the Company, if the fair market value exceeds (a) $5,000,000, such determination shall be made by the Board of Directors of Company or an authorized committee thereof in good faith, as evidenced by a resolution of the Board of Directors (or committee thereof, as applicable) delivered to Administrative Agent, and (b) $25,000,000, such determination shall be made by an un-affiliated accounting, appraisal, investment banking firm or consultant acceptable to the Lenders

that is, in the good faith judgment of Company, qualified to perform the task for which it has been engaged.

"**Fair Share**" as defined in Section 7.2.

"**Fair Share Contribution Amount**" as defined in Section 7.2.

"**FATCA**" means Sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations promulgated thereunder or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Internal Revenue Code and any fiscal or regulatory legislation, rules, or official practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Internal Revenue Code.

"**Federal Funds Effective Rate**" means for any day, the rate per annum (expressed, as a decimal, rounded upwards, if necessary, to the next higher 1/100 of 1%) equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided, (i) if such day is not a Business Day, the Federal Funds Effective Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (ii) if no such rate is so published on such next succeeding Business Day, the Federal Funds Effective Rate for such day shall be the average rate charged to commercial banks selected by Administrative Agent on such day on such transactions as determined by Administrative Agent.

"**Fee Letter**" means the letter agreement dated as of the Closing Date between Company and Administrative Agent.

"**Final Order**" means an order entered by the Bankruptcy Court approving the DIP Facility on a final basis under the Bankruptcy Code, which order shall be in form and substance satisfactory to the Requisite Lenders in their sole and absolute discretion (as such order may be amended, modified or extended in a manner satisfactory to the Requisite Lenders), which order is not subject to a stay, injunction or other limitation not approved by the Requisite Lenders.

"**First Priority**" means, with respect to any Lien purported to be created in any Collateral pursuant to any Collateral Document, that such Lien is the only Lien to which such Collateral is subject, other than any Permitted Lien.

"**Fiscal Quarter**" means a fiscal quarter of any Fiscal Year.

"**Fiscal Year**" means the fiscal year of Company and its Subsidiaries ending on December 31 of each calendar year.

"**Floor**" means 3.00%.

"**Forbearance Period**" as defined in Section 10.28(a).

"**Forbearance Termination Date**" as defined in Section 10.28(b).

"**Forbearing Agent**" as defined in Section 10.28(a).

"**Forbearing Lender**" as defined in Section 10.28(a).

"**Foreign Subsidiary**" means any Subsidiary of Company that is not a Domestic Subsidiary.

"**FRB**" means the Board of Governors of the Federal Reserve System of the United States.

"**Funding Guarantors**" as defined in Section 7.2.

"**Funding Notice**" means a notice substantially in the form of Exhibit A-1.

"**GAAP**" means generally accepted accounting principles in the United States of America in effect from time to time consistently applied (except for accounting changes in response to the Financial Accounting Standards Board release, or other authoritative pronouncements).

"**Governmental Authority**" means any federal, state, provincial, territorial, municipal, national, supranational or other government, governmental department, commission, board, bureau, court, agency or instrumentality or political subdivision thereof or any entity, officer or examiner exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case whether associated with the United States of America, any State thereof or the District of Columbia, or a foreign entity or government (including any supranational body exercising such powers or functions, such as the European Union or the European Central Bank).

"**Governmental Authorization**" means any permit, license, authorization, plan, directive, consent order or consent decree of or from any Governmental Authority.

"**Grantor**" as defined in the Pledge and Security Agreement or the DIP Order, as applicable, and shall include any analogous term in any other Collateral Document.

"**guarantee**" means, as to any Person, any direct or indirect obligation of such Person guaranteeing or intended to guarantee any Indebtedness ("**primary obligation**") of any other Person (the "**primary obligor**") in any manner, whether directly or indirectly, including, without limitation, any obligation of such Person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (a) for the purchase or payment of any such primary obligation, or (b) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, or (iii) to purchase property, securities or services, in each case, primarily for the purpose of assuring the performance by the primary obligor of any such primary obligation; provided, however, the term "**guarantee**" shall not include endorsements for collection or collections for deposit, in either case, in the ordinary course of business. The amount of any guarantee shall be deemed to be an amount equal to the lesser of (x) the stated or

22

determinable amount of the primary obligation in respect of which such guarantee is made (or, if the amount of such primary obligation is not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder)), or (y) the stated maximum liability under such guarantee.

"**Guaranteed Obligations**" as defined in Section 7.1.

"**Guarantor**" means each Subsidiary of Company that becomes a party hereto (other than Company) from time to time; <u>provided</u> that no Excluded Subsidiary shall be required to become a Guarantor hereunder; <u>provided</u> further that no Guarantor shall be released from its Guaranty solely because it becomes an Excluded Subsidiary, unless released pursuant to Section 7.12.

"**Guaranty**" means the guaranty of each Guarantor set forth in Section 7.

"**Hazardous Materials**" means any petroleum or petroleum products, radioactive materials or wastes, asbestos in any form, polychlorinated biphenyls, hazardous or toxic substances and any other chemical, material, waste or substance, in each case exposure to which is prohibited, limited or regulated by any Governmental Authority under any Environmental Law.

"**Hazardous Materials Activity**" means any past, current, proposed or threatened use, manufacture, possession, storage, holding, presence, location, Release, threatened Release, discharge, placement, generation, transportation, processing, treatment, abatement, removal, remediation, disposal, disposition or handling of any Hazardous Materials, and any corrective action or response action with respect to any of the foregoing.

"**Highest Lawful Rate**" means the maximum lawful interest rate, if any, that at any time or from time to time may be contracted for, charged, or received under the laws applicable to any Lender that are in effect as of the Closing Date or, to the extent allowed by law, under such applicable laws that may be in effect after the Closing Date and allow a higher maximum nonusurious interest rate than applicable laws in effect as of the Closing Date.

"**Historical Financial Statements**" as defined in Section 4.5.

"**Increased-Cost Lenders**" as defined in Section 2.20.

"**Indebtedness**" as applied to any Person, means, without duplication, (a) all indebtedness for borrowed money; (b) that portion of obligations with respect to Capital Leases that is properly classified as a liability on a balance sheet in conformity with GAAP; (c) notes payable and drafts accepted representing extensions of credit whether or not representing obligations for borrowed money; (d) any obligation owed for all or any part of the deferred purchase price of property or services (excluding therefrom any trade payables or other accounts payable incurred in the ordinary course of such Person's business that are not more than ninety days past due); (e) all indebtedness secured by any Lien on any property or asset owned or held by that Person regardless of whether the indebtedness secured thereby shall have been assumed by that Person or is nonrecourse to the credit of that Person; (f) the face amount of any letter of credit issued for the account of that Person or as to which that Person is otherwise liable for reimbursement of drawings; (g) the direct or indirect guaranty, endorsement (otherwise than for

collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of the obligation of another; (h) any obligation of such Person the primary purpose or intent of which is to provide assurance to an obligee that the obligation of the obligor thereof will be paid or discharged, or any agreement relating thereto will be complied with, or the holders thereof will be protected (in whole or in part) against loss in respect thereof; (i) any liability of such Person for an obligation of another through any agreement (contingent or otherwise) (i) to purchase, repurchase or otherwise acquire such obligation or any security therefor, or to provide funds for the payment or discharge of such obligation (whether in the form of loans, advances, stock purchases, capital contributions or otherwise) or (ii) to maintain the solvency or any balance sheet item, level of income or financial condition of another if, in the case of any agreement described under subclauses (i) or (ii) of this clause (i), the primary purpose or intent thereof is as described in clause (h) above; (j) all obligations of such Person in respect of any exchange traded or over the counter derivative transaction; and (k) all Disqualified Stock issued by such Person, with the amount of Indebtedness represented by such Disqualified Stock being equal to the greater of its voluntary or involuntary liquidation preference and its maximum fixed repurchase price (for purposes hereof, the "maximum fixed repurchase price" of any Disqualified Stock that does not have a fixed repurchase price shall be calculated in accordance with the terms of such Disqualified Stock as if such Disqualified Stock were purchased on any date on which Indebtedness shall be required to be determined pursuant to this Agreement, and if such price is based upon, or measured by, the Fair Market Value of such Disqualified Stock).

"**Indemnified Liabilities**" means, collectively, any and all liabilities, obligations, losses, damages (including natural resource damages), penalties, claims (including Environmental Claims), actions, judgments, suits, costs (including the costs of any investigation, study, sampling, testing, abatement, cleanup, removal, remediation or other response action necessary to remove, remediate, clean up or abate any Hazardous Materials Activity), expenses and disbursements of any kind or nature whatsoever (including the reasonable and documented (in summary form) Attorney Costs and other expenses (including the cost of any investigation and preparation) incurred in connection with any investigative, administrative or judicial proceeding or hearing commenced or threatened by any Person (including any Credit Party or any Affiliate thereof), whether or not any such Indemnitee shall be designated as a party or a potential party thereto, and any reasonable and documented (in summary form) fees or expenses incurred by the Indemnitees in enforcing this indemnity), whether direct, indirect, special or consequential or otherwise and whether based on any federal, state, provincial or foreign laws, statutes, rules or regulations (including securities and commercial laws, statutes, rules or regulations and Environmental Laws), on common law or equitable cause or on contract or otherwise, that may be imposed on, incurred by, or asserted against any such Indemnitee, in any manner relating to, in connection with or arising out of (i) this Agreement or the other Credit Documents or the transactions contemplated hereby or thereby (including the Lenders' agreement to make Credit Extensions or the use or intended use of the proceeds thereof, any amendments, waivers or consents with respect to any provision of this Agreement or any of the other Credit Documents or any enforcement of any of the Credit Documents (including any sale of, collection from, or other realization upon any of the Collateral or the enforcement of the Guaranty)); (ii) the statements contained in the commitment letter, engagement letter, fee letter or other letter or agreement delivered by Agent or any Lender to any Credit Party with respect to the arrangement of the credit facilities provided for herein or in connection with the transactions contemplated by this Agreement; or (iii) any Environmental Claim or any Hazardous Materials Activity relating to or arising from, directly or indirectly, any

past or present activity, operation, land ownership, or practice of Company or any of its Subsidiaries; provided that so long as no Default or Event of Default shall have occurred and be continuing, Indemnified Liabilities consisting of attorney's fees shall be limited to the reasonable and documented (in summary form) fees of one primary counsel to Administrative Agent, an additional primary counsel to Collateral Agent and, if reasonably required by either Administrative Agent or Collateral Agent (as applicable), additional local counsel and such specialist counsel as Administrative Agent or Collateral Agent (as applicable) may reasonably determine is required; provided further that no such limitation shall apply to the extent that Administrative Agent, Collateral Agent or their respective counsel determines in good faith that there is a conflict of interest that requires separate representation for any Agent or any group of similarly situated Indemnitees.

"**Indemnified Taxes**" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Credit Party under any Credit Document and (b) to the extent not otherwise described in (a), Other Taxes.

"**Indemnitee**" as defined in Section 10.3.

"**Indemnitee Agent Party**" as defined in Section 9.6.

"**Insurance/Condemnation Reinvestment Amount**" as defined in Section 2.11(b).

"**Insurance/Condemnation Reinvestment Period**" as defined in Section 2.11(b).

"**Intellectual Property**" as defined in the Pledge and Security Agreement, and shall include any analogous term in any other Collateral Document.

"**Interest Payment Date**" means (a) the last day of each Interest Period applicable to such Loan, (b) in the case of Interest Periods longer than three months, each date occurring at three-month intervals after the commencement of such Interest Period and (c) the DIP Maturity Date. In the event a Loan is priced by reference to the Base Rate, the Interest Payment Date shall be the last day of each calendar month (or if such day is not a Business Day, the immediately preceding Business Day).

"**Interest Period**" means, in connection with a SOFR Loan, an interest period of one-, three- or six-months, as selected by Company in the applicable Funding Notice or Continuation Notice (or, in the case of the Roll-Up Loans, as automatically converted in accordance with the terms hereof), (i) initially, commencing on the Credit Date or Continuation Date thereof, as the case may be; and (ii) thereafter, commencing on the day on which the immediately preceding Interest Period expires; provided, (a) if an Interest Period would otherwise expire on a day that is not a Business Day, such Interest Period shall expire on the next succeeding Business Day unless no further Business Day occurs in such calendar month, in which case such Interest Period shall expire on the immediately preceding Business Day; (b) any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall, subject to clause (c) of this definition, end on the last Business Day of a calendar month; and (c)

no Interest Period with respect to any portion of any Class of Loans shall extend beyond such Class's DIP Maturity Date.

"**Interest Rate Determination Date**" means, with respect to any Interest Period, the date that is two Business Days prior to the first day of such Interest Period.

"**Interim Order**" means an order entered by the Bankruptcy Court approving the DIP Facility on an interim basis under the Bankruptcy Code, which order shall be in form and substance satisfactory to the Requisite Lenders in their sole and absolute discretion (as such order may be amended, modified or extended in a manner satisfactory to the Requisite Lenders), which order is not subject to a stay, injunction or other limitation not approved by the Requisite Lenders.

"**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended to the date hereof and from time to time hereafter, and any successor statute.

"**Investment**" means (a) any direct or indirect purchase or other acquisition by Company or any of its Subsidiaries of, or of a beneficial interest in, any of the Securities of any other Person (other than of or in a Guarantor); (b) any direct or indirect redemption, retirement, purchase or other acquisition for value, by any Subsidiary of Company from any Person (other than from Company or any Guarantor), of any Capital Stock of such Person; and (c) any direct or indirect loan, advance or capital contributions by Company or any of its Subsidiaries to any other Person (other than to Company or any Guarantor), including all indebtedness and accounts receivable from that other Person that are not current assets or did not arise from sales of inventory to that other Person in the ordinary course of business. The amount of any Investment shall be the original cost of such Investment plus the cost of all additions thereto, without any adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect to such Investment.

"**Investment Proceeds**" as defined in Section 5.15(c).

"**Items of Product**" means any motion picture, television series, digital, film or video product or other audio visual work that is produced, in each case, for theatrical, non-theatrical or television release, release on the internet or a mobile application or exploitation in any other media in any case whether recorded on film, videotape, cassette, cartridge, disc or on or by any other means, method, process or device whether now known or hereafter developed, with respect to which a Credit Party or Subsidiary (a) is a copyright owner, or (b) acquires any equity interest or distribution rights; provided, that all episodes of any television series, internet series, webisodes, miniseries or other episodic series for a broadcast season shall be collectively regarded as a single Item of Product. The term "**Item of Product**" includes, without limitation, the scenario, screenplay, teleplay or script upon which such Item of Product is finally based, all of the properties thereof, tangible and intangible, and whether now in existence or hereafter to be made or produced, whether or not in possession of a Credit Party or Subsidiary, and all rights therein and thereto, of every kind and character.

"**Jersey Credit Party**" means any Credit Party organized under the laws of Jersey.

"**Joint Venture**" means a joint venture, partnership or other similar arrangement, whether in corporate, partnership or other legal form.

"**JPMCB**" as defined in Section 10.28(a).

"**JPMCB Forbearance Agreement**" means certain Consent and Forbearance Agreement dated as of May [●], 2023, by and among the Company, Vice Europe Holding Limited, a company incorporated under the laws of Jersey, and JPMorgan Chase Bank, N.A. (including acting through its London branch).

"**JV Holdco**" means a Credit Party that is organized solely to hold Capital Stock in one or more Joint Ventures, and holds no assets other than Capital Stock in such Joint Ventures, has no liabilities other than corporate and administrative expenses in the ordinary course of business related to ownership of the Capital stock of such Joint Ventures, and does not engage in any business or activities other than holding the Capital Stock of such Joint Ventures and activities incidental or related thereto.  There shall not at any time be more than one JV Holdco that is a Domestic Subsidiary and one JV Holdco that is a Foreign Subsidiary (provided, for the avoidance of doubt, that each such JV Holdco shall at all times be a Credit Party and all of the issued and outstanding Capital Stock of such JV Holdco shall be directly owned by a Credit Party).

"**Lakestar**" means Lakestar Finance LLC, a Delaware limited liability company.

"**Lender**" means each financial institution listed on the signature pages hereto as a Lender, and any other Person that becomes a party hereto pursuant to an Assignment Agreement.

"**Lender Advisors**" means (x) Gibson, Dunn & Crutcher LLP, (y) Houlihan Lokey, Inc. and (z) any other financial advisor, auditor, attorney, accountant, appraiser, auditor, business valuation expert, environmental engineer or consultant, turnaround consultant, and other consultants, professionals and experts retained by the Requisite Lenders.

"**License Agreement**" means any license agreement heretofore or hereafter entered into by a Credit Party, as licensor, with a Licensee, as licensee, with respect to the distribution, license or other exploitation of one or more Items of Product in any medium or territory, in each case, as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms hereof and thereof.

"**Licensee**" means any Person which a Credit Party engages to distribute, license or otherwise exploit an Item of Product in any medium.

"**Licensing Intermediary**" means a Person reasonably acceptable to Administrative Agent through which any distribution or other exploitation rights are sold, leased, licensed or assigned as a conduit between a Credit Party and the ultimate Licensee in order to mitigate withholding taxes or to satisfy local quota requirements; provided, in each case, that Administrative Agent may from time to time by written notice to Company withdraw its approval of any such Person as a Licensing Intermediary on a prospective basis.

"**Lien**" means (a) any lien, mortgage, pledge, assignment, security interest, right of set-off, hypothecation, charge or encumbrance of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, and any lease or license in the nature thereof) and any option, trust or other preferential arrangement having the practical

27

effect of any of the foregoing, and (b) in the case of Capital Stock, any purchase option, call or similar right of a third party with respect to such Capital Stock.

"**Loan**" means a DIP Loan or a New Money Loan (and shall include any loans made available to Company under the Commitments).

"**Margin Stock**" as defined in Regulation U of the FRB as in effect from time to time.

"**Master Intercompany Subordinated Note**" means an intercompany promissory note substantially in the form of Exhibit J.

"**Material Adverse Effect**" means a circumstance or condition that would reasonably be expected to materially and adversely affect (a) the business operations, properties, assets, condition (financial or otherwise) or prospects of Company and its Subsidiaries taken as a whole, excluding (i) the effect of filing the Chapter 11 Cases, the events and conditions leading up to and customarily resulting from the commencement and continuation of the Chapter 11 Cases, the effects thereof and any action required to be taken under the Credit Documents or the DIP Order, and the Chapter 11 Cases themselves; (b) a significant portion of the industry or business segment in which Company or its Subsidiaries operate or rely upon if such effect or development is reasonably likely to have a material adverse effect on Company and its Subsidiaries taken as a whole; (c) the ability of Company individually or the Credit Parties (taken as a whole) to fully and timely perform their Obligations; (d) the legality, validity, binding effect, or enforceability against a Credit Party, in each case, in any material respect, of a Credit Document to which it is a party; (e) the validity, perfection or priority of a material portion of Collateral Agent's Liens over the Collateral; or (f) any of the material rights, remedies and benefits available to, or conferred upon, any Agent and any Lender or any Secured Party under any Credit Document.

"**Material Contract**" means (a) any contract or other arrangement to which Company or any of its Subsidiaries is a party (other than the Credit Documents) for which breach, nonperformance, cancellation or failure to renew would reasonably be expected to have a Material Adverse Effect and (b) those contracts and arrangements listed on Schedule 4.16(b).

"**Material Real Estate Asset**" means any fee-owned Real Estate Asset.

"**Milestones**" means the milestones set forth in Section 5.21 or similar undertakings or requirements set forth in the DIP Order.

"**Moody's**" means Moody's Investor Services, Inc.

"**Multiemployer Plan**" means any Employee Benefit Plan that is a "multiemployer plan" as defined in Section 3(37) of ERISA.

"**Net Asset Sale Proceeds**" means, with respect to any Asset Sale, an amount equal to:  (i) Cash payments received by Company or any of its Subsidiaries (or in the case of any non-wholly owned Subsidiary, the actual share of such cash payments received by the wholly owned Subsidiary that directly (or indirectly via another non-wholly owned Subsidiary) owns such non-wholly owned Subsidiary) from such Asset Sale (including any Cash received by way of deferred

payment pursuant to, or by monetization of, a note receivable or otherwise (including by way of a milestone payment, as applicable), but only as and when so received), minus (ii) any bona fide direct costs incurred in connection with such Asset Sale to the extent paid or payable to non-Affiliates, including (a) income or gains taxes payable by the seller as a result of any gain recognized in connection with such Asset Sale during the tax period the sale occurs, (b) payment of the outstanding principal amount of, premium or penalty, if any, and interest on any Indebtedness (other than the Loans) that is secured by a Permitted Lien (provided that such Lien is not subordinated to Collateral Agent's Lien) on the stock or assets in question and that is required to be repaid under the terms thereof as a result of such Asset Sale, and (c) any escrow or reasonable reserve for any indemnification payments (fixed or contingent) attributable to seller's indemnities and representations and warranties to purchaser in respect of such Asset Sale undertaken by Company or any of its Subsidiaries in connection with such Asset Sale; provided that upon release of any such escrow or reserve, the amount released shall be considered Net Asset Sale Proceeds.

"**Net Insurance/Condemnation Proceeds**" means an amount equal to: (i) any Cash payments or proceeds received by Company or any of its Subsidiaries (or in the case of any non-wholly owned Subsidiary, the actual share of such cash payments or proceeds received by the wholly owned Subsidiary that directly (or indirectly via another non-wholly owned Subsidiary) owns such non-wholly owned Subsidiary) (a) under any casualty insurance policies in respect of any covered loss thereunder, or (b) as a result of the taking of any assets of Company or any of its Subsidiaries by any Person pursuant to the power of eminent domain, condemnation or otherwise, or pursuant to a sale of any such assets to a purchaser with such power under threat of such a taking, minus (ii) (a) any actual and reasonable costs incurred by Company or any of its Subsidiaries in connection with the adjustment or settlement of any claims of Company or such Subsidiary in respect thereof, (b) any *bona fide* direct costs incurred in connection with any collection of amounts referred to in clause (i)(a) or in connection with any sale of assets referred to in clause (i)(b) of this definition to the extent paid or payable to non-Affiliates, including taxes payable as a result of any gain recognized in connection therewith, and (c) any actual and reasonable costs incurred by Company or any of its Subsidiaries in connection with the temporary replacement or substitution for the assets, services or property to which such payments or proceeds relate (including, without limitation, actual and reasonable costs incurred in connection with the rental or lease of such substitute or replacement assets, services or property) in order to mitigate losses or disruption to the business of Company or its Subsidiaries.

"**New Money Commitment**" means the commitment of a Lender to make or otherwise fund a New Money Loan and "**New Money Commitments**" means such commitments of all Lenders in the aggregate. The amount of each Lender's New Money Commitment, if any, is set forth on Appendix A-1 or in the applicable Assignment Agreement, subject to any adjustment or reduction pursuant to the terms and conditions hereof.

"**New Money Exposure**" means, with respect to any Lender, as of any date of determination and without duplication, the *sum* of (x) the outstanding principal amount of the New Money Loans of such Lender, *plus* (y) the principal amount of such Lender's unfunded New Money Commitment.

"**New Money Lender**" means any Lender with a New Money Commitment or an outstanding New Money Loan.

29

"**New Money Loans**" as defined in the recitals to this Agreement.

"**Non-Consenting Lender**" as defined in Section 2.20.

"**Non-Defaulting Lender**" means, at any time, each Lender that is not a Defaulting Lender at such time.

"**Non-U.S. Lender**" as defined in Section 2.17(c).

"**Non-U.S. Plan**" means any plan, fund (including any superannuation fund) or other similar program established, contributed to (regardless of whether through direct contributions or through employee withholding) or maintained outside the United States by Company or any of its Subsidiaries primarily for the benefit of employees of Company or such Subsidiaries residing outside the United States, which plan, fund or other similar program provides, or results in, retirement income, a deferral of income in contemplation of retirement, or payments to be made upon termination of employment, and which plan is not subject to ERISA or the Internal Revenue Code, but does not include a Canadian Pension Plan.

"**Note**" means a promissory note in the form of Exhibit B, as it may be amended, supplemented or otherwise modified from time to time.

"**Notice**" means a Funding Notice or a Continuation Notice.

"**Obligations**" means all obligations (whether now existing or hereafter arising, absolute or contingent, joint, several, or independent, including as a guarantor) of every nature of each Credit Party from time to time owed to the Agents (including former Agents) or the Lenders, under any Credit Document, in each case whether for principal, interest (including interest which, but for the filing of a petition in bankruptcy with respect to such Credit Party, would have accrued on any Obligation, whether or not a claim is allowed against such Credit Party for such interest in the related bankruptcy proceeding), fees (including the Exit Fee and fees accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), expenses, Attorney Costs, indemnification or otherwise; provided, that with respect to any Guarantor that is a Canadian Credit Party, a UK Credit Party, or a Jersey Credit Party, "Obligations" shall not include the New Money Loans (including any amounts of principal, interest or fees with respect thereto) solely with respect to such Credit Party.

"**Obligee Guarantor**" as defined in Section 7.7.

"**OFAC**" means the Office of Foreign Assets Control of the U.S. Department of the Treasury and any successor Governmental Authority.

"**Ordinary Course Asset Sales**" means:

(a)    inventory sold or leased to customers in the ordinary course of business;

(b)      any sale, transfer, assignment or other disposition of used, obsolete, worn out or surplus equipment or other property (excluding Intellectual Property) not used or useful in, or non-core to, the principal business of Company or its Subsidiaries;

(c)      licenses for the distribution, exhibition or other exploitation of Items of Product and other Intellectual Property pursuant to content production agreements and distribution agreements entered into in the ordinary course of business;

(d)      outright sales, transfers, assignments or licenses of Items of Product (not involving library sales) and other Intellectual Property or of rights therein in the ordinary course of business;

(e)      dispositions of development properties for Fair Market Value or the actual development costs of the Credit Parties in each case in the ordinary course of business;

(f)      the disposition of Cash Equivalents in the ordinary course of business;

(g)      leases, licenses or subleases or sublicenses any real or personal property in the ordinary course of business;

(h)      abandonment of Intellectual Property of the Credit Parties determined in good faith by the applicable Credit Party to be no longer useful or necessary in the operation of its business;

(i)      leases or subleases (or assignments of leases) of any real estate assets and related improvements in the ordinary course of business; and

(j)      taking of any assets of Company or any of its Subsidiaries by any Person pursuant to the power of eminent domain or condemnation, or pursuant to a sale of any such assets to a purchaser with such power under threat of such a taking;

provided, however, that any of the foregoing transactions where the counterparty is a Prohibited Affiliate shall not be an Ordinary Course Asset Sale.

"**Organizational Documents**" means (i) with respect to any corporation or company, its certificate, memorandum, or articles of incorporation or organization, and its by-laws, (ii) with respect to any limited partnership, its certificate or declaration of limited partnership and its partnership agreement, (iii) with respect to any general partnership, its partnership agreement, and (iv) with respect to any limited liability company, its articles of organization and its operating agreement.  In the event any term or condition of this Agreement or any other Credit Document requires any Organizational Document to be certified by a secretary of state or similar governmental official, the reference to any such "Organizational Document" shall only be to a document of a type customarily certified by such governmental official.

"**Other Connection Taxes**" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a

security interest under, engaged in any other transaction pursuant to or enforced any Loan(s) or Credit Document, or sold or assigned an interest in any Loan(s) or Credit Document).

"**Other Taxes**" means any and all present or future stamp, court, intangible, recording, filing or documentary, excise, property, or similar Taxes arising from any payment made hereunder or from the execution, delivery or enforcement of, or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Credit Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.20).

"**Overnight Rate**" shall mean, for any day, the greater of (a) the Federal Funds Effective Rate and (b) an overnight rate determined by the Administrative Agent, in accordance with banking industry rules on interbank compensation.

"**Paid in Full**" and "**Payment in Full**" mean, with respect to any or all of the Obligations or Guaranteed Obligations, as the context requires, that each of the following events has occurred, as applicable:  (a) the payment or repayment in full in immediately available funds of (i) the principal amount of all outstanding Loans, (ii) all accrued and unpaid interest, fees, premiums or other charges owing in respect of any Loan or Commitment or otherwise under any Credit Document, and (iii) all accrued and unpaid costs and expenses payable by any Credit Party to any Agent or Lender pursuant to any Credit Document, including any interest, fees and other charges accruing during the Chapter 11 Cases, whether or not demand has been made therefor, including any and all indemnification and reimbursement claims that have been asserted by any such Person prior to such time in accordance with the applicable provisions of this Agreement, (b) the payment or repayment in full in immediately available funds of all other outstanding Obligations or Guaranteed Obligations other than unasserted contingent indemnification and contingent reimbursement obligations, and (c) the termination in writing of all of the Commitments.

"**Participant Register**" as defined in Section 10.6(h)(i).

"**PATRIOT Act**" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)).

"**PBGC**" means the Pension Benefit Guaranty Corporation or any successor thereto.

"**Pension Plan**" means any Employee Benefit Plan, other than a Multiemployer Plan, that is subject to Section 412 of the Internal Revenue Code or Section 302 of ERISA.

"**Permitted Holders**" means (a) each of the beneficial owners of Company owning any of the Capital Stock issued by Company as of the Closing Date listed on Schedule P and any of their respective Permitted Transferees or Affiliates, (b) any person that has no assets other than the capital stock of Company and of which no other person or "group" (within the meaning of Rules 13d-3 and 13d-5 under the Exchange Act as in effect on the Closing Date), other than any of the other Permitted Holders specified in clause (a), beneficially owns more than 50% on a fully diluted basis of the Capital Stock thereof, and (c) any "group" (within the meaning of Rules 13d-

32

3 and 13d-5 of the Exchange Act as in effect on the Closing Date) the members of which include any of the other Permitted Holders specified in clause (a) and clause (b) and that, directly or indirectly, hold or acquire beneficial ownership of the Capital Stock of Company (a "**Permitted Holder Group**"), so long as no person or other "group" (other than the other Permitted Holders specified in clause (a) and (b)) beneficially owns more than 49.9% on a fully diluted basis of the Capital Stock held by the Permitted Holder Group.

> "**Permitted Liens**" means each of the Liens permitted pursuant to Section 6.2.

> "**Permitted Transferee**" means with respect to any Person that is a natural person (and any Permitted Transferee of such Person), (a) such Person's immediate family, including his or her spouse, ex-spouse, children, stepchildren and their respective lineal descendants, (b) the estate of such Person, (c) any other trust (including any charitable trust) or other legal entity the primary beneficiary of which is such Person and/or such Person's immediate family, including his or her spouse, ex-spouse, children, stepchildren or their respective lineal descendants, and (d) any Series B Permitted Transferee (as defined in the certificate of incorporation of Company).

> "**Person**" means and includes natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies, Joint Ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and Governmental Authorities.

> "**Petition Date**" as defined in the recitals to this Agreement.

> "**Phase I Report**" means, with respect to any Facility, a report that (a) conforms to the ASTM Standard Practice for Environmental Site Assessments: Phase I Environmental Site Assessment Process, E 1527, (b) was conducted no more than six months prior to the date such report is required to be delivered hereunder, by one or more environmental consulting firms reasonably satisfactory to Administrative Agent, (c) includes a limited assessment of asbestos-containing materials at such Facility to be conducted concurrently with the activities covered by clause (a) above, (d) is accompanied by (i) an estimate of the reasonable worst-case cost of investigating and remediating any Hazardous Materials Activity identified in the Phase I Report as giving rise to an actual or potential material violation of any Environmental Law or as presenting a material risk of giving rise to a material Environmental Claim, and (ii) a limited compliance audit to be conducted concurrently with the activities covered by clause (a) above, setting forth an assessment of Company's, its Subsidiaries' and such Facility's compliance with Environmental Laws and an estimate of the cost of rectifying any non-compliance with current Environmental Laws identified therein and the cost of compliance with reasonably anticipated future Environmental Laws identified therein.

> "**PIK Interest**" as defined in Section 2.6(a).

> "**PIK Pay Interest Election**" as defined in Section 2.6(a).

> "**Platform**" means materials and/or information provided by or on behalf of the Credit Parties under this Agreement via Debt Domain, IntraLinks, SyndTrak or another similar Electronic System.

"**Pledged Securities**" as defined in the Pledge and Security Agreement, and shall include any analogous term in any other Collateral Document.

"**Pledge and Security Agreement**" means the Senior Secured Super-Priority Pledge and Security Agreement, dated as of the Closing Date, executed by Company and each Guarantor in favor of Collateral Agent, as it may be amended, supplemented or otherwise modified from time to time.

"**PPSA**" means the *Personal Property Security Act* (Ontario); <u>provided</u> that, if by reason of mandatory provisions of applicable law, attachment, perfection, the effect of perfection or non-perfection, or priority of a security interest in any Collateral or the availability of any remedy hereunder is governed by the personal property security laws in effect in a jurisdiction in Canada other than Ontario, "**PPSA**" means the personal property security laws in effect in such other jurisdiction (including for the Province of Quebec, the *Civil Code of Quebec* and the regulations respecting the register of personal and movable rights thereunder) for purposes of the provisions hereof relating to such attachment, perfection or effect of perfection or non-perfection, priority, or availability of such remedy, as the case may be, and for the definitions related to such provisions, as all such legislation now exists or may from time to time hereafter be amended, modified, supplemented or replaced, together with all rules, regulations and interpretations thereunder or related thereto.

"**Pre-Petition Collateral**" means the "Collateral" as defined in the Pre-Petition Credit Agreement.

"**Pre-Petition Credit Agreement**" as defined in the recitals to this Agreement.

"**Pre-Petition Credit Documents**" means the "Credit Documents" as defined in the Pre-Petition Credit Agreement.

"**Pre-Petition Lenders**" as defined in the recitals to this Agreement.

"**Pre-Petition Obligations**" means the "Obligations" as defined in the Pre-Petition Credit Agreement.

"**Pre-Petition Secured Parties**" means the "Secured Parties" as defined in the Pre-Petition Credit Agreement.

"**Prime Rate**" means the rate of interest quoted in the print edition of *The Wall Street Journal*, Money Rates Section as the Prime Rate (currently defined as the base rate on corporate loans posted by at least 75% of the nation's thirty largest banks), as in effect from time to time, or, if such source or rate is unavailable, any replacement or successor source or rate as determined by Administrative Agent. The Prime Rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer. Administrative Agent or any other Lender may make commercial loans or other loans at rates of interest at, above or below the Prime Rate.

"**Principal Office**" means, for Administrative Agent, such Person's "Principal Office" as set forth on Appendix B, or such other office as such Person may from time to time

designate in writing to Company, Administrative Agent and each Lender; provided, however, that for the purpose of making any payment on the Obligations or any other amount due hereunder or any other Credit Document, the Principal Office of Administrative Agent shall be 1345 Avenue of the Americas, 46th Floor, New York, NY, 10105 (or such other location as Administrative Agent may from time to time designate in writing to Company and each Lender).

"**Prohibited Affiliate**" means, as applied to Company and its Subsidiaries, any Affiliate of Company or any Subsidiary (other than, to the extent constituting an Affiliate of Company, an Affiliate of a third-party investor in a Joint Venture) that is a private equity investment firm, or any fund thereof, that principally engages in investments in and/or the management of one or more operating and portfolio companies; provided, however, that, for the avoidance of doubt, the foregoing shall not apply to any Person (i) that is an operating company generally recognized in the industry in which such operating company participates and (ii) as to which any transaction with such operating company is entered into in the ordinary course of business and is not designed to circumvent the requirements of or restrictions under this Agreement.

"**Prohibited Affiliate Transaction**" means any commercial transaction with a Prohibited Affiliate.

"**Pro Rata Share**" means (a) with respect to all payments, computations and other matters relating to the New Money Loans of any Lender, the percentage obtained by dividing (i) the New Money Exposure of that Lender, by (ii) the aggregate New Money Exposure of all Lenders; and (b) with respect to all payments, computations and other matters relating to the Roll-Up Loans of any Lender, the percentage obtained by dividing (i) the Roll-Up Exposure of that Lender, by (ii) the aggregate Roll-Up Exposure of all Lenders. For all other purposes with respect to each Lender, "**Pro Rata Share**" means the percentage obtained by dividing (A) an amount equal to the sum of the New Money Exposure and the Roll-Up Exposure of that Lender, by (B) an amount equal to the sum of the aggregate New Money Exposure and the aggregate Roll-Up Exposure of all Lenders.

"**Public-Sider**" means a Lender whose representatives may trade in securities of Company or its controlling person or any of its Subsidiaries, including 144A securities, while in possession of the financial statements provided by Company under the terms of this Agreement.

"**Pulse Subordinated Notes**" means those certain 10.0% secured and guaranteed redeemable loan notes due 2023 in the original principal amount of $43,240,000.00 issued by Vice Europe Pulse Holdings Limited to Clifford Benski and Marisa Clifford on December 8, 2021 (as in effect on December 8, 2021 and not giving effect to any amendments thereto).

"**Qualified ECP Guarantor**" means, in respect of any Swap Obligation, each Credit Party that has total assets exceeding $10,000,000 at the time the relevant Guaranty or grant of the relevant security interest becomes or would become effective with respect to such Swap Obligation or such other Person as constitutes as "eligible contract participant" under the Commodity Exchange Act or any rules or regulations promulgated thereunder and can cause another Person to qualify as an "eligible contract participant" at such time by entering into a

keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act or any rules or regulations promulgated thereunder.

"**Quiet Enjoyment**" means, in connection with the rights of a Licensee under a License Agreement, Collateral Agent's and each other Secured Party's agreement that their respective rights under this Agreement and the other Credit Documents and in the Collateral are subject to the rights of such Licensee to distribute, exhibit and/or exploit the Items of Product licensed to it under such License Agreement, and to receive prints or tapes and other delivery items or have access to preprint material or master tapes and other items to which such Licensee is entitled in connection therewith, and that even if a Secured Party shall become the owner of such Collateral in case of an Event of Default, such Secured Party's ownership rights shall be subject to the rights of such Licensee under such agreement, subject to a reservation by Collateral Agent (for the benefit of the Secured Parties) of any rights available to the applicable Credit Party if such Licensee is in default under the applicable License Agreement.

"**Real Estate Asset**" means, at any time of determination, any interest (fee, leasehold or otherwise) then owned by any Credit Party in any real property.

"**Recipient**" means any Agent or any Lender.

"**Register**" as defined in Section 2.5(b).

"**Related Fund**" means, with respect to any Lender that is an investment fund, any other investment fund that invests in commercial loans and that is managed or advised by the same investment advisor as such Lender or by an Affiliate of such investment advisor.

"**Related Parties**" means, with respect to any specified Person, such Person's Affiliates and the respective officers, directors, employees, agents and advisors of such Person and such Person's Affiliates.

"**Release**" means any release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, dispersal, dumping, leaching or migration of any Hazardous Material into the indoor or outdoor environment (including the abandonment or disposal of any barrels, containers or other closed receptacles containing any Hazardous Material), including the movement of any Hazardous Material through soil, surface water or groundwater.

"**Relevant Governmental Body**" means the FRB or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the FRB or the Federal Reserve Bank of New York, or any successor thereto.

"**Remaining Pre-Petition Loans**" shall have the meaning assigned to such term in Section 2.1(d).

"**Replacement Lender**" as defined in Section 2.20.

"**Requisite Class Lenders**" means, at any time of determination, (a) for the Class of Lenders having New Money Exposure, Lenders (other than Defaulting Lenders) holding more than 50% of the aggregate New Money Exposure of all Lenders which are not Defaulting Lenders;

and (b) for the Class of Lenders having Roll-Up Exposure, Lenders (other than Defaulting Lenders) holding more than 50% of the aggregate Roll-Up Exposure of all Lenders which are not Defaulting Lenders; provided, however, that (i) at any time there are two (2) or more Lenders in such Class, Requisite Class Lenders shall include at least two (2) Lenders, and (ii) Lenders that are affiliates of one another shall be considered as one (1) Lender.

"**Requisite Lenders**" means one or more Lenders (other than Defaulting Lenders) having or holding aggregate New Money Exposure and/or Roll-Up Exposure representing more than 50% of the sum of (A) the aggregate New Money Exposure of all Lenders which are not Defaulting Lenders and (B) the aggregate Roll-Up Exposure of all Lenders which are not Defaulting Lenders.

"**Restricted Payment**" means (a) any dividend, distribution or other direct or indirect payment on account of any Capital Stock issued by any Credit Party or Subsidiary, (b) any redemption or other acquisition for value, reacquisition or retirement by a Credit Party or Subsidiary of any Capital Stock issued by any Credit Party or Subsidiary, now or hereafter outstanding, (c) any payment made by any Credit Party or Subsidiary to retire, or obtain the surrender of, any outstanding warrants, puts or options or other rights to purchase or otherwise acquire any Capital Stock issued by any Credit Party or Subsidiary, now or hereafter outstanding, (d) any payment under any Synthetic Purchase Agreement, and (e) any payment on account of Subordinated Debt. The amount of any Restricted Payment made other than in the form of cash or cash equivalents shall be the Fair Market Value thereof.

"**Resolution Authority**" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"**Roll-Up Amount**" shall have the meaning assigned to such term in Section 2.1(d).

"**Roll-Up Commitment**" means (a) as to each Lender that is a Pre-Petition Lender, an amount of commitments that is equal to the amount of such Lender's New Money Commitment *multiplied* by five, and (b) as to all Lenders constituting Pre-Petition Lenders, the aggregate amount of the Roll-Up Commitments of all such Lenders.

"**Roll-Up Exposure**" means, with respect to any Lender, as of any date of determination and without duplication, the *sum* of (x) the outstanding principal amount of the Roll-Up Loans of such Lender plus (y) the principal amount of such Lender's then-unused Roll-Up Commitment.

"**Roll-Up Lender**" means any Lender with a Roll-Up Commitment or an outstanding Roll-Up Loan.

"**Roll-Up Loans**" as defined in the recitals to this Agreement.

"**Rolled-Up Pre-Petition Loans**" has the meaning assigned to such term in Section 2.1(d).

"**S&P**" means Standard & Poor's Ratings Group, a division of The S&P Global Inc.

"**Sale and Leaseback Transaction**" means any sale or other transfer of any property or asset by any Person with the intent to lease such property or asset as lessee (it being understood that ordinary course sale or transfer of distribution rights by a Credit Party in an Item of Product to an Affiliate followed by a license back of such rights to such Person shall not constitute a Sale and Leaseback Transaction hereunder).

"**Sale Order**" as defined in the Bidding Procedures Order.

"**Sale Transaction**" as defined in the Bidding Procedures Order.

"**Sanctioned Country**" means, at any time, a country, territory or region that is, or whose government is, the subject of any Sanctions, including, as of the Closing Date, Cuba, Iran, North Korea, Syria, Crimea, the non-government controlled areas of the Zaporizhzhia and Kherson Regions of Ukraine, the so-called Donetsk People's Republic and the so-called Luhansk People's Republic.

"**Sanctioned Person**" means, at any time, any Person with whom dealings are restricted or prohibited under Sanctions, including (i) any Person listed in any Sanctions-related list of designated Persons maintained by the U.S. (including by OFAC, the U.S. Department of the Treasury, or the U.S. Department of State), or by the United Nations Security Council, Canada, the European Union or any EU member state, His Majesty's Treasury of the United Kingdom or any other relevant sanctions authority, (ii) any Person located, operating, organized or resident in a Sanctioned Country or (iii) any Person Controlled or more than 50% owned, directly or indirectly, by any such Person described in clause (i) or (ii) of this definition.

"**Sanctions**" means sanctions or trade embargoes enacted, imposed, administered or enforced from time to time by (i) the U.S. government, including those administered by OFAC, U.S. Department of State, or U.S. Department of Commerce, (ii) the United Nations Security Council, the European Union or any of its member states, His Majesty's Treasury of the United Kingdom, (iii) the government of Canada, including the *Criminal Code* (Canada), the *Freezing Assets of Corrupt Foreign Officials Act* (Canada), the *Special Economic Measures Act* (Canada), the *United Nations Act* (Canada), *Proceeds of Crime (Money Laundering) and Terrorist Financing Act* (Canada) or any other similar Canadian statute or regulation, or (iv) any other applicable sanctions authority.

"**SEC**" means the United States Securities and Exchange Commission.

"**Secured Parties**" means, collectively (a) Collateral Agent, and (b) the other "Secured Parties" as defined in each of the Pledge and Security Agreement and the DIP Order, as applicable, and shall include any other Persons designated by an analogous term in any other Collateral Document.

"**Securities**" means any stock, shares, partnership interests, voting trust certificates, certificates of interest or participation in any profit-sharing agreement or arrangement, options, warrants, bonds, debentures, notes, or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim

certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing, including any Capital Stock.

"**Securities Account**" means any "securities account" as defined in Article 8 of the UCC and any "commodity account" as defined in Article 9 of the UCC and/or, with respect to any securities accounts of any Canadian Credit Party, as defined in the PPSA.

"**Securities Act**" means the Securities Act of 1933.

"**Series A Dividend Notes**" means any unsecured notes issued prior to the Closing Date by Company to holders of Series A Preferred Stock as payment of dividends due thereupon from time to time.

"**Series A Preferred Stock**" means Company's Series A Preferred Stock, par value $0.01 per share.

"**Side Letter (PMO)**" means the amended and restated letter agreement, dated as of the November 4, 2019, by and between Company, TPG Virat Holdings 1, L.P. and TPG Virat Holdings 2, LLC addressing, among other things, the Project Management Office (as defined in the Side Letter (PMO)).

"**SOFR**" means a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"**SOFR Administrator**" means the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"**SOFR Loan**" means any Loan bearing interest at a rate based on Adjusted Term SOFR as provided in Section 2.6.

"**Soft Dollar Transaction**" means any tax benefit or subsidy transaction, or other transaction commonly referred to as a "soft dollar transaction" in connection with the production and/or exploitation of an Item of Product.

"**Special Committee**" means the Special Committee of the Company's Board of Directors.

"**Subordinated Debt**" means any subordinated Indebtedness of any Credit Party which is unsecured and has interest rates, payment terms, maturities, amortization schedules, covenants, defaults, remedies and subordination provisions in form and substance reasonably satisfactory to the Requisite Lenders in their sole discretion.

"**Subsidiary**" means, with respect to any Person, any corporation, partnership, limited liability company, association, Joint Venture or other business entity (whether now existing or hereafter organized) (a) the accounts of which would be consolidated with those of such Person in such Person's consolidated financial statements if such financial statements were prepared in accordance with GAAP or (b) of which more than 50% of the total voting power of shares of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote

in the election or appointment of the Person or Persons (whether directors, managers, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof; provided, in determining the percentage of ownership interests of any Person controlled by another Person, no ownership interest in the nature of a "qualifying share" of the former Person shall be deemed to be outstanding; provided, further, that for purposes of this Agreement and the other Credit Documents, Starworks, LLC shall be deemed not to be a Subsidiary so long as it is not consolidated for financial reporting purposes with Company or any Subsidiary.

"**Swap Agreement**" means any agreement with respect to any swap, forward, future or derivative transaction, financial exchange transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; provided, that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of Company or the Subsidiaries shall be a Swap Agreement.

"**Swap Obligation**" means, with respect to any Credit Party, any obligation to pay or perform under any Swap Agreement, contract, or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act or any rules or regulations promulgated thereunder.

"**Synthetic Purchase Agreement**" means any Swap Agreement or similar agreement or combination of agreements pursuant to which any Credit Party or Subsidiary is or may become obligated to make (a) any payment in connection with a purchase by any third Person from a Person other than a Credit Party of any Capital Stock issued by any Credit Party or Subsidiary or in respect of any Subordinated Debt, or (b) any payment by any Credit Party or Subsidiary the amount of which is determined by reference to the price or value at any time of any Capital Stock issued by any Credit Party or Subsidiary.

"**Tax**" means any present or future tax, levy, impost, duty, assessment, charge, fee, deduction or withholding (together with interest, penalties and other additions thereto), imposed, levied, collected, withheld or assessed by any Governmental Authority.

"**Term SOFR**" means,

(a)    for any calculation with respect to a SOFR Loan, the Term SOFR Reference Rate for a tenor comparable to the applicable Interest Period on the day (such day, the "Periodic Term SOFR Determination Day") that is two (2) U.S. Government Securities Business Days prior to the first day of such Interest Period, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (Eastern time) on any Periodic Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S.

Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day, and

(b)      for any calculation with respect to a Base Rate Loan on any day, the Term SOFR Reference Rate for a tenor of one month on the day (such day, the "**Base Rate Term SOFR Determination Day**") that is two (2) U.S. Government Securities Business Days prior to such day, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (Eastern time) on any Base Rate Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Base Rate Term SOFR Determination Day.

"**Term SOFR Adjustment**" means, for any calculation with respect to (i) a Base Rate Loan, 0.11448% (11.448 basis points) or (ii) a SOFR Loan, a percentage per annum as set forth below for the applicable  Interest Period therefor:

| **Interest Period** | **Percentage** |
|---|---|
| One month | 0.11448% (11.448 basis points) |
| Three months | 0.26161% (26.161 basis points) |
| Six months | 0.42826% (42.826 basis points) |

"**Term SOFR Administrator**" means CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the Administrative Agent in its reasonable discretion).

"**Term SOFR Reference Rate**" means the forward-looking term rate based on SOFR.

"**Terminated Lender**" as defined in Section 2.20.

"**UCC**" means the Uniform Commercial Code (or any similar or equivalent statute or law) as in effect in any applicable jurisdiction.

"**UK Credit Party**" means any Credit Party organized under the laws of the United Kingdom.

"**UK Financial Institution**" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended form time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person subject to IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"**UK Resolution Authority**" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"**Unadjusted Benchmark Replacement**" means the Benchmark Replacement excluding the Benchmark Replacement Adjustment.

"**U.S. Government Securities Business Day**" means any day except for (a) a Saturday, (b) a Sunday or (c) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities; provided, that for purposes of notice requirements in Sections 2.1(b), 2.7(b) and 2.10(b), in each case, such day is also a Business Day.

"**U.S. Lender**" as defined in Section 2.17(c).

"**U.S. Tax Compliance Certificate**" means a certificate substantially in the form of one of Exhibits E-1, E-2, E-3 or E-4, as applicable.

"**Variance Testing Period**" means each rolling four-week period ending on every other Friday, commencing with the first Friday after the Closing Date and every other Friday thereafter.

"**Write-Down and Conversion Powers**" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

1.2.   **Accounting Terms.**  Except as otherwise expressly provided herein, all accounting terms not otherwise defined herein shall have the meanings assigned to them in conformity with GAAP.  Financial statements and other information required to be delivered by Company to Lenders pursuant to Sections 5.1(a) and 5.1(b) shall be prepared in accordance with GAAP as in effect at the time of such preparation; provided that, for the avoidance of doubt, no footnotes are required to be included in the financial statements required to be delivered under Section 5.1(b). Subject to the foregoing, calculations in connection with the definitions, covenants and other

42

provisions hereof shall utilize accounting principles and policies in conformity with those used to prepare the Historical Financial Statements. Notwithstanding the foregoing, for purposes of determining compliance with any covenant (including the computation of any financial covenant) contained herein, Indebtedness of the Credit Parties shall be deemed to be carried at 100% of the outstanding principal amount thereof and the effects of any election under Accounting Standards Codification 825-10-25 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect on financial liabilities) shall be disregarded. For purposes of determining *pro forma* compliance with any financial covenant as of any date prior to the first date on which such financial covenant is to be tested hereunder, the level of any such financial covenant shall be deemed to be the covenant level for such first test date. When used herein, the term "financial statements" shall be construed to include all notes and schedules thereto. Whenever the term "Company" is used in respect of a financial covenant or a related definition, it shall be construed to mean "Company and its Subsidiaries on a consolidated basis" unless the context clearly requires otherwise. Except as otherwise provided therein, this Section 1.2 shall apply equally to each other Credit Document as if fully set forth therein, *mutatis mutandis*.

1.3.    **Interpretation, etc.**  Any of the terms defined herein may, unless the context otherwise requires, be used in the singular or the plural, depending on the reference. References herein to any Section, Appendix, Schedule or Exhibit shall be to a Section, an Appendix, a Schedule or an Exhibit, as the case may be, hereof unless otherwise specifically provided. Any requirement for a referenced agreement, instrument, certificate or other document to be in "substantially" the form of an Appendix, Schedule, or Exhibit hereto means that such referenced document shall be in the form of such Appendix, Schedule, or Exhibit with such modifications to such form as are approved by Administrative Agent (without any requirement for Lender consent), and, in the case of any Collateral Document, Administrative Agent, in each case in such Agent's sole discretion (without any requirement for Lender consent). The words "hereof," "hereunder," "hereby," and words of similar import used in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement. The use herein of the words "include" or "including," when following any general statement, term or matter, shall not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not non-limiting language (such as "without limitation" or "but not limited to" or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter. The use herein of the words "continuing," "continuance," "existing," or any words of similar import or derivatives of any such words in reference to any Event of Default means that such Event of Default has not been expressly waived or cured in accordance with the terms hereof (to the extent it is capable of being cured). The word "will" shall be construed as having the same meaning and effect as the word "shall." The words "assets" and "property" shall be construed as having the same meaning and effect and to refer to any and all tangible and intangible assets and properties of any relevant Person or Persons. The terms lease and license shall be construed to include sub-lease and sub-license, respectively. Whenever the context may require, any pronoun shall be construed to include the corresponding masculine, feminine, and neuter forms. References to Persons include their respective permitted successors and assigns. Except as otherwise expressly provided herein, references to statutes, legislative acts, laws, regulations, and rules shall be deemed to refer to such statutes, acts, laws, regulations, and rules as in effect from time to time, including any amendments of the same and any successor statutes, acts, laws, regulations, and rules, unless any such reference is expressly

limited to refer to any statute, act, law, regulation, or rule "as in effect on" a specified date. Except as otherwise expressly provided herein, any reference in or to this Agreement, any other Credit Document, or any other agreement, instrument, or other document shall be construed to refer to the referenced agreement, instrument, or document as assigned, amended, restated, supplemented, or otherwise modified from time to time, in each case in accordance with the express terms of this Agreement and any other relevant Credit Document unless such reference is expressly limited to refer to such agreement, instrument, or other document "as in effect on" a specified date. Except as otherwise provided therein, this Section 1.3 shall apply equally to each other Credit Document as if fully set forth therein, *mutatis mutandis*.

1.4.    **Quebec Interpretation Provision**.  For the purposes of any assets, liabilities or entities located in the Province of Québec or to which the laws of the Province of Québec apply and for all other purposes pursuant to which the interpretation or construction of this Agreement may be subject to the laws of the Province of Québec or a court or tribunal exercising jurisdiction in the Province of Québec, (i) "personal property" shall be deemed to include "movable property", (ii) "real property" shall be deemed to include "immovable property", (iii) "tangible property" shall be deemed to include "corporeal property", (iv) "intangible property" shall be deemed to include "incorporeal property", (v) "security interest", "mortgage" and "lien" shall be deemed to include a "hypothec", "prior claim", "reservation of ownership" and a "resolutory clause", as applicable, (vi)  all references to "perfection" of or "perfected" liens or security interests shall be deemed to include a reference to an "opposable" or "set up" hypothec as against third parties, (vii) any "right of offset", "right of setoff" or similar expression shall be deemed to include a "right of compensation", (viii) "goods" shall be deemed to include "corporeal movable property" other than chattel paper, documents of title, instruments, money and securities, (ix) an "agent" shall be deemed to include a "mandatary", (x) "construction liens" shall be deemed to include "legal hypothecs in favour of persons having taken part in the construction or renovation of an immovable", (xi) "joint and several" shall be deemed to include "solidary", (xii) "gross negligence or willful misconduct" shall be deemed to be "gross or intentional fault", (xiii) "beneficial ownership" shall be deemed to include "ownership", (xiv) "legal title" shall be deemed to include "holding title on behalf of an owner as mandatary or prête-nom", (xv) "easement" shall be deemed to include "servitude", (xvi) "priority" shall be deemed to include "rank" or "prior claim", as applicable; (xvii) "survey" shall be deemed to include "certificate of location and plan", (xviii) "leasehold interest" shall be deemed to include "valid rights resulting from a lease", (xix) "lease" shall be deemed to include a "contract of leasing (*crédit-bail*)", and (xx) "deposit account" shall be deemed to include a "financial account".

1.5.    **Divisions**.  For all purposes under the Credit Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws):  (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized and acquired on the first date of its existence by the holders of its Capital Stock at such time.

1.6.    **Rates**.  The Administrative Agent does not warrant or accept responsibility for, and shall not have any liability with respect to, the administration, submission or any other matter related to the rates in the definition of "Base Rate" or with respect to any rate that is an alternative

or replacement for or successor to any such rate (including, without limitation, any Benchmark Replacement) or the effect of any of the foregoing, or of any Conforming Changes.

## SECTION 2.    LOANS

2.1.   **Loans**.

(a)   <u>Commitments and Loans</u>.  Subject to the terms and conditions set forth herein and in the DIP Order, each Lender severally, not jointly, agrees to make Loans denominated in Dollars to the Company in an aggregate amount not to exceed such Lender's respective Commitments in one or more advances of New Money Loans and exchanges into Roll-Up Loans (in each case, in accordance with the terms of the DIP Order).  Amounts borrowed or exchanged under this Section 2.1(a) and repaid or prepaid may not be reborrowed.

(b)   <u>Borrowing Mechanics for Term Loans</u>.

(i)   Company shall deliver to Administrative Agent a fully executed Funding Notice no later than 12:00 noon (New York City time) one Business Day prior to the Closing Date with respect to New Money Loans.  Following the Closing Date, whenever Company desires that Lenders make New Money Loans, Company shall deliver to Administrative Agent a fully executed and delivered Funding Notice no later than 4:00 p.m. (New York City time) at least three U.S. Government Securities Business Days in advance of the proposed Credit Date.  Except as otherwise provided herein, if Company fails to make a borrowing in accordance with any Funding Notice for a SOFR Loan, then Company may be liable to compensate the Lenders pursuant to Section 2.15(c).  Promptly upon receipt by Administrative Agent of any such Funding Notice, Administrative Agent shall notify each Lender of the proposed borrowing.

(ii)   Each Lender shall make its New Money Loans available to Company not later than 5:00 p.m. (New York City time) on the Closing Date or applicable Credit Date, as applicable, by wire transfer of same day funds in Dollars to such account or accounts as may be designated in writing to Lenders by Company.

(c)   Drawings under the New Money Commitments shall be made in an aggregate minimum amount of $250,000 and integral multiples of $50,000 in excess of that amount.

(d)   <u>Roll-Up Loans</u>.

(i)   On the Closing Date, concurrently with the making of the New Money Loans pursuant to Section 2.1(b) above, the Lenders shall be deemed to have converted and exchanged Existing Loans for Roll-Up Loans in an aggregate principal amount equal to five times the amount of New Money Loans funded on the Closing Date, and all such Roll-Up Loans shall be deemed funded on the Closing Date (such Roll-Up Loans, the "<u>Closing Date Roll-Up Loans</u>"), without constituting a novation, and each Lender hereunder shall be deemed to have converted and exchanged an aggregate principal amount of Existing Loans equal to the principal amount of the Closing Date Roll-Up Loans deemed made by such Lender (the Existing Loans rolled-up pursuant to this Section

2.01(b), the "Rolled-Up Pre-Petition Loans" and, the Existing Loans that are not Rolled-Up Pre-Petition Loans, the "Remaining Pre-Petition Loans"), and such conversion and exchange shall satisfy and discharge an aggregate principal amount of Rolled-Up Pre-Petition Loans equal to the amount of the Closing Date Roll-Up Loans.

(ii)    Upon the entry, and subject to the terms, of the Final Order, the Lenders shall be deemed to have converted and exchanged Remaining Pre-Petition Loans for Roll-Up Loans in an aggregate principal amount equal to five times the amount of the remaining unfunded New Money Commitments as of such date (such amount, the "Roll-Up Amount"), and all such Roll-Up Loans shall be deemed funded on such date, without constituting a novation, and such conversion and exchange shall satisfy and discharge an aggregate principal amount of Remaining Pre-Petition Loans equal to the Roll-Up Amount.

(iii)    Interest shall begin to accrue on the Roll-Up Loans from the date of the deemed borrowing thereof.

2.2.    **[Reserved]**.

2.3.    **Pro Rata Shares; Availability of Funds**.

(a)    Pro Rata Shares. All Loans shall be made, and all participations purchased, by Lenders simultaneously and proportionately to their respective Pro Rata Shares, it being understood that no Lender shall be responsible for any default by any other Lender in such other Lender's obligation to make a Loan requested hereunder or purchase a participation required hereby nor shall any Commitment of any Lender be increased or decreased as a result of a default by any other Lender in such other Lender's obligation to make a Loan requested hereunder or purchase a participation required hereby.

(b)    Availability of Funds. Unless Administrative Agent shall have been notified by any Lender prior to the applicable Credit Date that such Lender does not intend to make available to Administrative Agent the amount of such Lender's Loan requested on such Credit Date, Administrative Agent may assume that such Lender has made such amount available to Administrative Agent on such Credit Date and Administrative Agent may, in its sole discretion, but shall not be obligated to, make available to Company a corresponding amount on such Credit Date. If such corresponding amount is not in fact made available to Administrative Agent by such Lender, Administrative Agent shall be entitled to recover such corresponding amount on demand from such Lender together with interest thereon, for each day from such Credit Date until the date such amount is paid to Administrative Agent, at the customary rate set by Administrative Agent for the correction of errors among banks for three Business Days and thereafter at the Overnight Rate. In the event that (i) Administrative Agent declines to make a requested amount available to Company until such time as all applicable Lenders have made payment to Administrative Agent, (ii) a Lender fails to fund to Administrative Agent all or any portion of the Loans required to be funded by such Lender hereunder prior to the time specified in this Agreement, and (iii) such Lender's failure results in Administrative Agent failing to make a corresponding amount available to Company on the Credit Date, at Administrative Agent's option, such Lender shall not receive interest hereunder with respect to the requested amount of such Lender's Loans for the period commencing with the time specified in this Agreement for receipt of payment by Company

through and including the time of Company's receipt of the requested amount.  If such Lender does not pay such corresponding amount forthwith upon Administrative Agent's demand therefor, Administrative Agent shall promptly notify Company and Company shall immediately pay such corresponding amount to Administrative Agent together with interest thereon, for each day from such Credit Date until the date such amount is paid to Administrative Agent, at the Overnight Rate.  Nothing in this Section 2.3(b) shall be deemed to relieve any Lender from its obligation to fulfill its Commitments hereunder or to prejudice any rights that Company may have against any Lender as a result of any default by such Lender hereunder.

2.4.    **Use of Proceeds**.

(a)    The proceeds of the New Money Loans will be used solely in accordance with the DIP Order and the Approved Budget (including, to the extent provided for therein, to fund operations, overdue accounts payable, and for working capital and to make adequate protection payments (if any)), and the payment of professional fees stipulated to in the Approved Budget, to pay administration costs of the Chapter 11 Cases and claims or amounts approved by the Bankruptcy Court in accordance with the Approved Budget and the proceeds of the Roll-Up Loans will be used to repay and refinance on a dollar for dollar basis the then-outstanding Existing Loans.

(b)    No portion of the proceeds of any Credit Extension shall be used in any manner that causes such Credit Extension or the application of such proceeds to violate Regulation T, Regulation U or Regulation X of the FRB or any other regulation thereof or to violate the Exchange Act.  The Credit Parties will not, directly or indirectly, use the proceeds of the Loans, or lend, contribute or otherwise make available such proceeds to any subsidiary, Joint Venture partner or other Person, (i) to fund any activities or business of or with any Person, or in any country or territory, that, at the time of such funding, is, or whose government is, the subject of Sanctions, (ii) in any other manner that would result in a violation of Sanctions by any Person (including any Person participating in the Loans, whether as underwriter, advisor, investor, or otherwise) or (iii) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of applicable Anti-Corruption and Anti-Bribery Laws.

2.5.    **Evidence of Debt; Register; Lenders' Books and Records; Notes**.

(a)    <u>Lenders' Evidence of Debt</u>.  Each Lender shall maintain on its internal records an account or accounts evidencing the Obligations of Company to such Lender, including the amounts of the Loans made by it and each repayment and prepayment in respect thereof.  Any such recordation shall be conclusive and binding on Company, absent manifest error; <u>provided</u>, that the failure to make any such recordation, or any error in such recordation, shall not affect any Lender's Commitments or Company's Obligations in respect of any applicable Loans; and <u>provided further</u>, in the event of any inconsistency between the Register and any Lender's records, the recordations in the Register shall govern.

(b)    <u>Register</u>.  Administrative Agent (or its agent or sub agent appointed by it) shall maintain at its Principal Office a register for the recordation of the names and addresses of Lenders and the Commitments and Loans of each Lender (including the principal amounts and stated interests owing to such Lender) from time to time (the "**Register**").  The Register shall be

available for inspection by Company, Collateral Agent or any Lender (with respect to (i) any entry relating to such Lender's Loans, and (ii) the identity of the other Lenders (but not any information with respect to such other Lenders' Loans)) at any reasonable time and from time to time upon reasonable prior notice.  Administrative Agent agrees to confirm whether the Lenders delivering a request or direction to Collateral Agent constitute Requisite Lenders promptly upon the request of Collateral Agent. Administrative Agent shall record, or shall cause to be recorded, in the Register the Commitments and the Loans, and each repayment or prepayment in respect of the principal amount of the Loans, and any such recordation shall be conclusive and binding on Company and each Lender, absent manifest error; provided, failure to make any such recordation, or any error in such recordation, shall not affect any Lender's Commitments or Company's Obligations in respect of any Loan.  Company hereby designates the entity serving as Administrative Agent to serve as Company's non-fiduciary agent solely for purposes of maintaining the Register as provided in this Section 2.5, and Company hereby agrees that, to the extent such entity serves in such capacity, the entity serving as Administrative Agent and its officers, directors, employees, agents and affiliates shall constitute "Indemnitees."

(c)     Notes.  If so requested by any Lender by written notice to Company (with a copy to Administrative Agent) at least two Business Days prior to the Closing Date or at any time thereafter, Company shall execute and deliver to such Lender (and/or, if applicable and if so specified in such notice, to any Person who is an assignee of such Lender pursuant to Section 10.6) on the Closing Date (or, if such notice is delivered after the Closing Date promptly after Company's receipt of such notice) a Note or Notes to evidence such Lender's Commitment and Loans, as the case may be.

2.6.   **Interest on Loans**.

(a)     Except as otherwise set forth herein, each Class of Loan shall bear interest on the unpaid principal amount thereof from the date made through repayment (whether by acceleration or otherwise) thereof, except as provided in clause (b) below, at a rate per annum equal to the applicable Adjusted Term SOFR plus 12.00% (or, in the case of a Base Rate Loan, the applicable Base Rate plus 11.00%), payable in cash or in kind on each Interest Payment Date as set forth in clause (b) below.  For the avoidance of doubt, Roll-Up Loans shall be deemed to be outstanding, and shall begin to accrue interest upon the entry of the Final Order and the deemed making of such Loans.

(b)     On each Interest Payment Date, the Company shall pay the interest accrued and payable on the Loans on such Interest Payment Date in an amount equal to the principal amount of Loans outstanding hereunder during the relevant calculation period times a rate per annum equal to the applicable Adjusted Term SOFR plus 12.00% (or, in the case of Base Rate Loans, Base Rate plus 11.00%)  and (x) in the case of the New Money Loans, in lieu of paying all accrued but unpaid interest on such New Money Loans in cash, shall (i) pay the accrued but unpaid interest on the New Money Loans in cash at a rate per annum equal to the applicable Adjusted Term SOFR (or, in the case of a Base Rate Loan, Base Rate) (such interest, the "**Partial Cash Interest**") on each such Interest Payment Date and (ii) pay the accrued but unpaid interest attributable to the excess (such excess, the "**PIK Interest**") over the Partial Cash Interest (at an annual rate equal to 12.00%, or, in the case of Base Rate Loans, 11.00%) by capitalizing and adding such PIK Interest to (and thereby increasing) the principal amount of New Money Loans

outstanding hereunder on each such Interest Payment Date and (y) in the case of Roll-Up Loans, in lieu of paying all accrued but unpaid interest on such Roll-Up Loans in cash, shall capitalize and add the accrued but unpaid interest on each such Interest Payment Date to the principal amount of Roll-Up Loans outstanding hereunder on such Interest Payment Date.

(c)    The basis for determining the rate of interest with respect to any Loan, and the Interest Period with respect to any SOFR Loan, shall be selected by Company and notified to Administrative Agent and Lenders pursuant to the applicable Funding Notice or Continuation Notice, as the case may be.  If on any day a Loan is outstanding with respect to which a Funding Notice or Continuation Notice has not been delivered to Administrative Agent in accordance with the terms hereof specifying the applicable basis for determining the rate of interest, then such Loan shall be automatically continued as a SOFR Loan with a one month Interest Period on the last day of the then-current Interest Period for such Loan (unless such one month Interest Period would end on a date after the stated DIP Maturity Date, in which case such Loan shall automatically be converted into a Base Rate Loan).  In the event Company fails to specify an Interest Period for any SOFR Loan in the applicable Funding Notice or Continuation Notice, Company shall be deemed to have selected an Interest Period of one month.

(d)    In connection with SOFR Loans there shall be no more than five (5) Interest Periods outstanding at any time.  As soon as practicable after 10:00 a.m. (New York City time) on each Interest Rate Determination Date, Administrative Agent shall determine (which determination shall be conclusive and binding upon all parties, absent manifest error) the interest rate that shall apply to the SOFR Loans for which an interest rate is then being determined for the applicable Interest Period and shall promptly give notice thereof (in writing or by telephone confirmed in writing) to Company and each Lender.

(e)    Interest payable pursuant to this Section 2.6 shall be computed on the basis of a 360-day year, in each case for the actual number of days elapsed in the period during which it accrues.  In computing interest on any Loan, the date of the making of such Loan or the first day of an Interest Period applicable to such Loan (or, with respect to a Base Rate Loan, the date such Loan was first priced by reference to the Base Rate) shall be included, and the date of payment of such Loan or the expiration date of an Interest Period applicable to such Loan shall be excluded; provided that, if a Loan is repaid on the same day on which it is made, one day's interest shall be paid on that Loan.

(f)    Except as otherwise set forth herein, interest on each Loan shall accrue on a daily basis and shall be payable in arrears (i) on each Interest Payment Date applicable to that Loan (including, if applicable, capitalizing a portion of such interest, as provided above), (ii) upon any prepayment of that Loan, whether voluntary or mandatory, to the extent accrued on the amount being prepaid, and (iii) at maturity, including the DIP Maturity Date.

(g)    Term SOFR Conforming Changes.  In connection with the use or administration of Term SOFR, the Administrative Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Credit Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Credit Document.  The Administrative Agent will promptly notify the Company and the Lenders

of the effectiveness of any Conforming Changes in connection with the use or administration of Term SOFR.

2.7.   **Continuation**.

(a)   Subject to Sections 2.6(b) and 2.15, Company shall have the option, upon the expiration of any Interest Period applicable to any SOFR Loan, to continue all or any portion of such Loan equal to $500,000 and integral multiples of $100,000 in excess of that amount as a SOFR Loan for one or more further Interest Periods, of the same or different durations.

(b)   Company shall deliver a Continuation Notice to Administrative Agent no later than 4:00 p.m. (New York City time) at least three (3) U.S. Government Securities Business Days (or such shorter time as Administrative Agent shall agree) in advance of the proposed Continuation Date.  Except as otherwise provided herein, a Continuation Notice (or telephonic notice in lieu thereof) shall be irrevocable on and after the related Interest Rate Determination Date, and Company shall be bound to effect a continuation in accordance therewith.

2.8.   **Default Interest**.  Upon the occurrence and during the continuance of an Event of Default, the principal amount of Loans, as well as all fees and other amounts, in each case that are not paid when due, to the extent permitted by applicable law, shall thereafter bear interest (including post-petition interest in any proceeding under any Debtor Relief Laws) payable on demand in cash, or if no such demand is made, payable in kind on each Interest Payment Date by capitalizing and adding such Default Interest to (and thereby increasing) the principal amount of Loans outstanding hereunder on each such Interest Payment Date, at a rate that is 3.00% per annum in excess of the applicable interest rate otherwise payable hereunder with respect to the applicable Loans, and increasing by an additional 1.00% per annum for each 90-day period that elapses following the occurrence of an Event of Default and for so long as such Event of Default has not been cured or waived in accordance with the terms hereof, up to a maximum amount of 5.00% per annum in excess of the applicable interest rate otherwise payable hereunder with respect to the applicable Loans.  Payment or acceptance of the increased rates of interest provided for in this Section 2.8 is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of Administrative Agent, Collateral Agent or any Lender.  Notwithstanding anything to the contrary in this Section 2.8, no default rate interest shall accrue or be payable to any Defaulting Lender so long as such Lender shall be a Defaulting Lender.

2.9.   **Fees**.

(a)   [Reserved].

(b)   [Reserved].

(c)   [Reserved].

(d)   Company agrees to pay to Administrative Agent for the ratable benefit of the Lenders, a fee equal to the funded amount of each such Lender's New Money Commitment multiplied by 10.00%, which fee shall, in each case, be earned and payable upon the funding of

each such New Money Loan.  All fees referred to in this Section 2.9(d) shall be paid in kind as set forth in Section 2.6.

(e)     Except in the event that the Lenders (or any entity on their behalf) shall acquire the assets of the Debtors pursuant to a credit bid, the Company agrees to pay to the Administrative Agent for the ratable benefit of the Lenders an exit fee in kind (the "**Exit Fee**") in an amount equal to, without duplication, 6.00% of (i) the principal amount of the New Money Loans accelerated pursuant to Section 8.1, (ii) any principal amount of the New Money Loans outstanding as of the DIP Maturity Date, (iii) any principal amount of New Money Loans optionally or mandatorily prepaid, repaid, converted or otherwise outstanding as of the date of termination of this Agreement, (iv) the principal amount of the New Money Loans satisfied or released by foreclosure (whether by power of judicial proceeding or otherwise), deed in lieu of foreclosure, credit bid or by any other means, and (v) the principal amount of New Money Loans if any acceleration of the Obligations is "decelerated" by the Company, or the principal amount of New Money Loans reinstated by the Company, including, without limitation, under a plan of reorganization or similar manner in any bankruptcy, insolvency or similar proceeding. EACH OF THE COMPANY AND THE OTHER CREDIT PARTIES EXPRESSLY WAIVE (TO THE FULLEST EXTENT THEY MAY LAWFULLY DO SO) THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE EXIT FEE IN CONNECTION WITH ANY  ACCELERATION OF THE TERM LOANS HEREUNDER OR BY OPERATION OF LAW.  Each of the Company and the other Credit Parties expressly agree (to the fullest extent they may lawfully do so) that: (A) the Exit Fee is reasonable and the product of an arm's length transaction between sophisticated business people, ably represented by counsel; (B) the Exit Fee shall be payable notwithstanding the then prevailing market rates at the time payment or redemption is made; (C) there has been a course of conduct between the  Lenders, the Company and the other Credit Parties giving specific consideration in this transaction for such agreement to pay the Exit Fee;  (D) any such Credit Party shall not challenge or question, or support any other Person in challenging or questioning, the validity or enforceability of the Exit Fee or any similar or comparable prepayment fee, and such Credit Party shall be estopped from raising or relying on any judicial decision or ruling questioning the validity or enforceability of any prepayment fee similar or comparable to the Exit Fee; and (E) the Company and the other Credit Parties shall be estopped hereafter from claiming differently than as agreed to in this Section 2.9(e). Each of the Company and the other Credit Parties expressly acknowledge that its agreement to pay or guarantee the payment of the Exit Fee to the Lenders as herein described are individually and collectively a material inducement to Lenders to make available (or be deemed to make available) the Loans and Commitments hereunder.

(f)     In addition to any of the foregoing fees, Company agrees to pay to Agents the fees in the amounts and at the times set forth in the Fee Letter and the Collateral Agent Fee Letter.

2.10.   **Voluntary Prepayments/Commitment Reductions**.

(a)     Subject to making any payment required under Section 2.9(c), at any time and from time to time, Company may prepay any Loan on any Business Day in whole or in part (together with accrued and unpaid interest thereon and any amounts due pursuant to Section

2.15(d)) in an aggregate minimum amount of $500,000 and integral multiples of $100,000 in excess of that amount.

(b)    All such prepayments shall be made upon not less than three (3) U.S. Government Securities Business Days' (or such shorter time as Administrative Agent may agree) prior written or telephonic notice, in each case given by Company to Administrative Agent by 4:00 p.m. (New York City time) on the date required and, if given by telephone, promptly confirmed in writing to Administrative Agent (and Administrative Agent will promptly transmit (which may be by telephone) such telephonic or original notice for Loans to each Lender). Upon the giving of any such notice, the principal amount of the Loans specified in such notice shall become due and payable on the prepayment date specified therein; provided, that any notice of prepayment of Obligations delivered by Company may state that such notice is conditioned upon the receipt of the proceeds of the issuance of Indebtedness or Capital Stock, in which case such notice of prepayment may be revoked by Company if such condition is not satisfied by written notice to Administrative Agent on or prior to the date of repayment and termination stated in the prepayment notice. Any such voluntary prepayment shall be applied as specified in Section 2.12 with respect to Loans.

2.11.    **Mandatory Prepayments/Commitment Reductions**.

(a)    Asset Sales. Any Net Asset Sale Proceeds shall be applied directly to prepay the Obligations an aggregate amount equal to such Net Asset Sale Proceeds; provided, that Net Asset Sale Proceeds shall be applied as set forth in Section 2.12.

(b)    Insurance/Condemnation Proceeds. No later than one (1) Business Day following the date of receipt by Company or any of its Subsidiaries, or Administrative Agent as loss payee, of any Net Insurance/Condemnation Proceeds, Company shall prepay the Obligations in an aggregate amount equal to such Net Insurance/Condemnation Proceeds; provided that so long as no Default or Event of Default shall have occurred and be continuing, upon delivery of a written notice of reinvestment to Administrative Agent, Company shall have the option, directly or through one or more Subsidiaries, to invest Net Insurance/Condemnation Proceeds (the "**Insurance/Condemnation Reinvestment Amounts**") in any combination of (1) long-term productive and/or short-term replacement assets, licenses and acquisitions of personnel of the general type used in the business of Company and its Subsidiaries and/or (2) other Investments permitted under Section 6.3, in each case if such assets, licenses, acquisitions or Investments are purchased, constructed or made, as applicable, within one hundred and eighty (180) days following receipt of such Net Insurance/Condemnation Proceeds (or, if Company or any Subsidiary shall have entered into a legally binding commitment within such initial 180-day period to restore, rebuild, repair, construct, improve, replace or otherwise invest such Insurance/Condemnation Reinvestment Amounts in accordance with this Section 2.11(b), within one hundred and eighty (180) days following the date of entry into such legally binding commitment) (such period to reinvest, the "**Insurance/Condemnation Reinvestment Period**"). In the event that the Insurance/Condemnation Reinvestment Amounts are not reinvested by Company prior to expiration of the applicable Insurance/Condemnation Reinvestment Period, Administrative Agent may apply such Insurance/Condemnation Reinvestment Amounts to the Obligations as set forth in Section 2.12.

(c)    Issuance of Debt.  On the date of receipt by Company or any of its Subsidiaries of any Cash proceeds from the incurrence of any Indebtedness of Company or any of its Subsidiaries (other than with respect to any Indebtedness permitted to be incurred pursuant to Section 6.1), Company shall prepay the Obligations in an aggregate amount equal to 100% of such proceeds, net of underwriting discounts, fees and commissions and other reasonable costs and expenses associated therewith, in each case, paid to non-Affiliates, including reasonable legal fees and expenses.

(d)    [Reserved].

(e)    Excluded Amounts.  Notwithstanding the foregoing, to the extent that any Net Asset Sale Proceeds attributable to any Foreign Subsidiary that is required to be applied to prepay the Loans pursuant to this Section 2.11 (i) would be prohibited or restricted under applicable local law (including, without limitation, as a result of laws or regulations relating to financial assistance, corporate benefit, restrictions on upstreaming of cash intragroup and fiduciary and statutory duties of directors of relevant subsidiaries) or the organizational documents (including, without limitation, as a result of minority ownership of a Foreign Subsidiary) or any other material agreement of such Foreign Subsidiary, or (ii) would result in adverse tax consequences as determined in good faith by Company in consultation with Administrative Agent (including, without limitation, as a result of any withholding of Taxes on the upstreaming of cash), then in each case, Company shall not be required to prepay such amounts (the "**Excluded Amounts**") as otherwise would be required under this Section 2.11 (any such limitation, a "**Repatriation Limitation**"); provided that in the circumstances described in clause (i) of this Section 2.11(b), Company and its Subsidiaries will take all commercially reasonable actions available under applicable local law to permit such prepayment.  The non-application of the Excluded Amounts as a consequence of any Repatriation Limitation will not constitute an Event of Default hereunder.  Excluded Amounts shall be allocated among Subsidiaries in various jurisdictions determined by Company in good faith and the Excluded Amounts shall be available for working capital or other purposes of Company, the Foreign Subsidiary or any Subsidiary, in each case, subject to any applicable limitations otherwise set forth herein.  Excluded Amounts shall not be deemed to be Net Asset Sale Proceeds, regardless of whether the Repatriation Limitation ceases to apply after such initial determination.

(f)    Prepayment Certificate.  Concurrently with any prepayment of the Loans and/or reduction of the Commitments pursuant to this Section 2.11, Company shall deliver to Administrative Agent a certificate of an Authorized Officer demonstrating the calculation of the amount of the applicable net proceeds and compensation owing to Lenders under any of the Credit Documents, if any, as the case may be.  In the event that Company shall subsequently determine that the actual amount received by Company exceeded the amount set forth in such certificate, Company shall promptly make an additional prepayment of the Loans and/or the Commitments shall be permanently reduced in an amount equal to such excess, and Company shall concurrently therewith deliver to Administrative Agent a certificate of an Authorized Officer demonstrating the derivation of such excess.

2.12.    **Application of Payments**.

(a)    <u>Pre-Default Allocation of Payments</u>.  At all times when <u>Section 2.12(b)</u> does not apply and except as otherwise expressly provided herein, monies to be applied to the Obligations and the Pre-Petition Obligations, whether arising from payments by the Credit Parties, realization on Collateral, setoff or otherwise, shall be allocated as follows (subject, in all respects, to the Carve-Out and the other terms of the DIP Order):

(i)    *First*, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest, but including Attorney Costs) payable to the Agents in their capacity as such pursuant to any Credit Document, until Paid in Full;

(ii)    *Second*, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the Lenders pursuant to any Credit Document (including Attorney Costs and fees and expenses of Lender Advisors payable hereunder), ratably among them in proportion to the amounts described in this clause (ii) payable to them, until Paid in Full;

(iii)    *Third*, to pay interest and principal due in respect of all Loans, until Paid in Full;

(iv)    *Fourth*, to the payment of all other Obligations of the Credit Parties that are due and payable to the Agents and the other Secured Parties (other than any Defaulting Lenders) on such date, ratably based upon the respective aggregate amounts of all such Obligations owing to the Agents and the other Secured Parties (other than any Defaulting Lenders) on such date, until Paid in Full;

(v)    *Fifth*, ratably to pay any Obligations that are that are due and payable to Defaulting Lenders, until Paid in Full;

(vi)    *Sixth*, subject to the terms of the DIP Order and any applicable intercreditor agreement, to the Pre-Petition Agents for the payment of the Pre-Petition Obligations in accordance with the Pre-Petition Credit Agreement until payment in full; and

(vii)    *Last*, the balance, if any, to the Company or as otherwise required by law.

Amounts shall be applied to each category of Obligations set forth above until Paid in Full thereof and then to the next category.  If amounts are insufficient to satisfy a category, they shall be applied on a *pro rata* basis among the Obligations in the category.

(b)    <u>Post-Default Allocation of Payments</u>.  Notwithstanding anything herein to the contrary, after the occurrence and during the continuation of an Event of Default, the Requisite Lenders may elect that monies to be applied to the Obligations, whether arising from payments by the Credit Parties, realization on Collateral, setoff or otherwise, shall, to the extent elected by the Requisite Lenders (in writing to the Administrative Agent), be allocated as follows (subject, in all respects, to the Carve-Out and the other terms of the DIP Order):

(i)    *First*, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest, but including Attorney Costs) payable to the Agents pursuant to any Credit Document in their capacity as such, until Paid in Full;

(ii)    *Second*, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the Lenders pursuant to any Credit Document (including Attorney Costs and fees and expenses of the Lender Advisors payable hereunder), ratably among them in proportion to the amounts described in this clause (ii) payable to them, until Paid in Full;

(iii)    *Third*, to pay interest and principal due in respect of all Loans, until Paid in Full;

(iv)    *Fourth*, to the payment of all other Obligations of the Credit Parties that are due and payable to the Agents and the other Secured Parties (other than any Defaulting Lenders) on such date, ratably based upon the respective aggregate amounts of all such Obligations owing to the Agents and the other Secured Parties (other than any Defaulting Lenders) on such date, until Paid in Full;

(v)    *Fifth*, ratably to pay any Obligations that are that are due and payable to Defaulting Lenders, until Paid in Full;

(vi)    *Sixth*, to pay any other Obligations until Paid in Full;

(vii)    *Seventh*, to the Pre-Petition Agents for the payment of the Pre-Petition Obligations in accordance with the Pre-Petition Credit Agreement; and

(viii)    *Last*, the balance, if any, after Payment in Full of the Obligations, to the Company or as otherwise required by any Laws.

Amounts shall be applied to each category of Obligations set forth above until Payment in Full thereof and then to the next category.  The allocations set forth in this Section 2.12(b) may be changed by agreement among the Administrative Agent and the Lenders without the consent of any Credit Party and are subject to Section 2.19 (regarding Defaulting Lenders).  If amounts are insufficient to satisfy a category, they shall be applied on a *pro rata* basis among the Obligations in the category.  Appropriate adjustments shall be made with respect to payments from other Credit Parties to preserve the allocation to Obligations otherwise set forth above in this Section 2.12(b).  For the avoidance of doubt, subject to the terms of any applicable intercreditor agreement, nothing contained in this Agreement shall relieve or waive payment of the Pre-Petition Obligations in accordance with the Pre-Petition Credit Agreement.

2.13.  **General Provisions Regarding Payments**.

(a)    All payments by Company of principal, interest, fees and other Obligations shall be made in Dollars in immediately available funds, without defense, recoupment, setoff or counterclaim, free of any restriction or condition, and delivered to Administrative Agent, for the account of Lenders not later than 4:00 p.m. (New York City time) on the date specified for payment

55

under this Agreement by wire transfer to the account designated by Administrative Agent from time to time maintained by Administrative Agent or its Affiliates for the account of the Lenders or Administrative Agent, as the case may be, in U.S. Dollars in immediately available funds. Any payment received after 4:00 p.m. (New York City time) shall be deemed received on the next Business Day.

(b)      All payments in respect of the principal amount of any Loan shall be accompanied by payment of accrued interest on the principal amount being repaid or prepaid.

(c)      Administrative Agent shall promptly distribute to each Lender at such address as such Lender shall indicate in writing, such Lender's applicable Pro Rata Share of all payments and prepayments of principal and interest due hereunder, together with all other amounts due with respect thereto, including all fees payable with respect thereto, to the extent received by Administrative Agent.

(d)      [Reserved].

(e)      Subject to the provisos set forth in the definition of "Interest Period," whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in the computation of the payment of interest hereunder or of the commitment fees hereunder.

(f)      Administrative Agent shall deem any payment by or on behalf of Company hereunder that is not made in same day funds prior to 4:00 p.m. (New York City time) to be a non-conforming payment. Any such payment shall not be deemed to have been received by Administrative Agent until the later of (i) the time such funds become available funds, and (ii) the applicable next Business Day. Administrative Agent shall give prompt telephonic notice to Company and each applicable Lender (confirmed in writing) if any payment is non-conforming. Any non-conforming payment may constitute or become a Default or Event of Default in accordance with the terms of Section 8.1(a). Interest shall continue to accrue on any principal as to which a non-conforming payment is made until such funds become available funds (but in no event less than the period from the date of such payment to the next succeeding applicable Business Day) at the Default Rate determined pursuant to Section 2.8 from the date such amount was due and payable until the date such amount is Paid in Full.

(g)      If an Event of Default shall have occurred and not otherwise been waived, and the Obligations shall have become due and payable in full hereunder, whether by acceleration, maturity or otherwise, all payments or proceeds received by any Agent hereunder or under any Collateral Document in respect of any of the Obligations, including, but not limited to all proceeds received by any Agent in respect of any sale, any collection from, or other realization upon all or any part of the Collateral, shall be applied in full or in part as follows: *first*, to the payment of all costs and expenses of such sale, collection or other realization, including reasonable compensation to each Agent and its agents and counsel, and all other expenses, liabilities and advances made or incurred by any Agent in connection therewith, and all amounts for which any Agent is entitled to indemnification hereunder or under any Collateral Document (in its capacity as an Agent and not as a Lender) and all advances made by any Agent under any Collateral Document for the account

56

of the applicable Grantor, and to the payment of all costs and expenses paid or incurred by any Agent in connection with the exercise of any right or remedy hereunder or under any Collateral Document, all in accordance with the terms hereof or thereof; *second*, to the extent of any excess of such proceeds, to the payment of all other Obligations for the ratable benefit of the Lenders; and *third*, to the extent of any excess of such proceeds, to the payment to or upon the order of such Grantor or to whosoever may be lawfully entitled to receive the same or as a court of competent jurisdiction may direct.

2.14.    **Ratable Sharing**.  Lenders hereby agree among themselves that if any of them shall, whether by voluntary payment (other than a voluntary prepayment of Loans made and applied in accordance with the terms hereof), through the exercise of any right of set-off or banker's lien, by counterclaim or cross action or by the enforcement of any right under the Credit Documents or otherwise, or as adequate protection of a deposit treated as cash collateral under the Bankruptcy Code or any other Debtor Relief Law, receive payment or reduction of a portion of the aggregate amount of principal, interest, fees and other amounts then due and owing to such Lender hereunder or under the other Credit Documents (collectively, the "**Aggregate Amounts Due**" to such Lender) which is greater than the proportion received by any other Lender in respect of the Aggregate Amounts Due to such other Lender, then the Lender receiving such proportionately greater payment shall immediately (a) notify Administrative Agent and each other Lender of the receipt of such payment and (b) apply such proportionally greater portion of such payment to purchase participations (which it shall be deemed to have purchased from each seller of a participation simultaneously upon the receipt by such seller of its portion of such payment) in the Aggregate Amounts Due to the other Lenders so that all such recoveries of Aggregate Amounts Due shall be shared by all Lenders in proportion to the Aggregate Amounts Due to them; provided, if all or part of such proportionately greater payment received by such purchasing Lender is thereafter recovered from such Lender upon the bankruptcy or reorganization of Company or otherwise, those purchases shall be rescinded and the purchase prices paid for the participations shall be returned to such purchasing Lender ratably to the extent of such recovery, but without interest.  Company expressly consents to the foregoing arrangement and agrees that any holder of a participation so purchased may exercise any and all rights of banker's lien, set-off or counterclaim with respect to any and all monies owing by Company to that holder with respect thereto as fully as if that holder were owed the amount of the participation held by that holder. The provisions of this Section 2.14 shall not be construed to apply to (i) any payment made by Company pursuant to and in accordance with the express terms of any Credit Document, including the application of funds arising from the existence of a Defaulting Lender, or (ii) any payment obtained by any Lender as consideration for the assignment of or sale of a participation in Loans or other Obligations owing to it pursuant to and in accordance with the express terms of this Agreement.

2.15.    **Making or Maintaining SOFR Loans**.

(a)      [Reserved].

(b)      [Reserved].

(c)      Compensation for Breakage or Non-Commencement of Interest Periods. Company shall compensate each Lender, upon written request by such Lender (which request shall

set forth in reasonable detail the basis for requesting such amounts), for all reasonable losses, expenses and liabilities (including any interest paid or calculated to be due and payable by such Lender to lenders of funds borrowed by it to make or carry its SOFR Loans and any loss, expense or liability sustained by such Lender in connection with the liquidation or re-employment of such funds but excluding loss of anticipated profits) which such Lender may sustain:  (i) if for any reason (other than a default by such Lender or revocation of a Funding Notice as permitted hereunder) a borrowing of any SOFR Loan does not occur on a date specified therefor in a Funding Notice or a telephonic request for borrowing, or a continuation of any SOFR Loan does not occur on a date specified therefor in a Continuation Notice or a telephonic request for continuation; (ii) if any prepayment or other principal payment of, any of its SOFR Loans occurs on any day other than the last day of an Interest Period applicable to that Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise); or (iii) if any prepayment of any of its SOFR Loans is not made on any date specified in a notice of prepayment given by Company.  To request compensation under this Section 2.15(c), a Lender shall deliver to Company a certificate setting forth in reasonable detail the basis and calculation of any amount or amounts that such Lender is entitled to receive pursuant to this Section 2.15(c), which certificate shall be conclusive and binding absent manifest error.  Company shall pay such Lender the amount shown as due on any such certificate within ten (10) Business Days after receipt thereof.  With respect to any Lender's claim for compensation under this Section 2.15, Company shall not be required to compensate such Lender for any amount incurred more than two hundred seventy (270) calendar days prior to the date that such Lender notifies Company of the event that gives rise to such claim.

(d)     Booking of SOFR Loans.  Any Lender may make, carry or transfer SOFR Loans at, to, or for the account of any of its branch offices or the office of an Affiliate of such Lender.

2.16.   **Increased Costs; Capital Adequacy**.

(a)     Compensation For Increased Costs and Taxes.  In the event that any Lender shall determine (which determination shall be conclusive and binding upon all parties hereto, absent manifest error) that any Change in Law:  (i) subjects such Lender to any Tax (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letter of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; (ii) imposes, modifies or holds applicable any reserve (including any marginal, emergency, supplemental, special or other reserve, including pursuant to regulations issued from time to time by the FRB for determining the maximum reserve requirement (including any emergency, special, supplemental or other marginal reserve requirement) with respect to eurocurrency funding (currently referred to as "Eurocurrency liabilities" in Regulation D of the FRB, as amended and in effect from time to time)), special deposit, liquidity, compulsory loan, FDIC insurance or similar requirement against assets held by, or deposits or other liabilities in or for the account of, or advances or loans by, or other credit extended by, or any other acquisition of funds by, any office of such Lender or any company controlling such Lender; or (iii) imposes any other condition (other than with respect to a Tax matter) on or affecting such Lender (or its applicable lending office) or any company controlling such Lender or such Lender's obligations hereunder; and the result of any of the foregoing is to increase the cost to such Lender of agreeing to make, making or maintaining Loans hereunder or to reduce any amount received or receivable by such Lender (or

its applicable lending office) with respect thereto; then, in any such case, Company shall promptly pay to such Lender, upon receipt of the statement referred to in the next sentence, such additional amount or amounts (in the form of an increased rate of, or a different method of calculating, interest or otherwise as such Lender in its sole discretion shall determine) as may be necessary to compensate such Lender for any such increased cost or reduction in amounts received or receivable hereunder. Such Lender shall deliver to Company (with a copy to Administrative Agent) a written statement, setting forth in reasonable detail the basis for calculating the additional amounts owed to such Lender under this Section 2.16(a), which statement shall be conclusive and binding upon all parties hereto absent manifest error.

(b)    Capital Adequacy and Liquidity Adjustment.    In the event that any Lender shall have determined (which determination shall be conclusive and binding upon all parties hereto, absent manifest error) that (A) any Change in Law regarding capital adequacy or liquidity requirements, or (B) compliance by any Lender (or its applicable lending office) or any company controlling such Lender with any Change in Law regarding capital adequacy or liquidity requirements, has or would have the effect of reducing the rate of return on the capital of such Lender or any company controlling such Lender as a consequence of, or with reference to, such Lender's Loans, or participations therein or other obligations hereunder with respect to the Loans to a level below that which such Lender or such controlling company could have achieved but for such Change in Law (taking into consideration the policies of such Lender or such controlling company with regard to capital adequacy or liquidity), then from time to time, within five Business Days after receipt by Company from such Lender of the statement referred to in the next sentence, Company shall pay to such Lender such additional amount or amounts as will compensate such Lender or such controlling company for such reduction. Such Lender shall deliver to Company (with a copy to Administrative Agent) a written statement, setting forth in reasonable detail the basis for calculating the additional amounts owed to Lender under this Section 2.16(b), which statement shall be conclusive and binding upon all parties hereto absent manifest error.

(c)    Delay in Requests.    Failure or delay on the part of any Lender to demand compensation pursuant to this Section 2.16 shall not constitute a waiver of such Lender's right to demand such compensation; provided that Company shall not be required to compensate a Lender pursuant to this Section 2.16 for any increased costs incurred or reductions suffered more than nine (9) months prior to the date that such Lender notifies Company of the Change in Law giving rise to such increased costs or reductions, and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

2.17.    **Taxes; Withholding, etc.**

(a)    Payments to Be Free and Clear.    All sums payable by or on behalf of any Credit Party hereunder and under the other Credit Documents shall (except to the extent required by law) be paid free and clear of, and without any deduction or withholding on account of, any Tax.

(b)    Withholding of Taxes.    If any Credit Party, Administrative Agent, or any other Person (acting as a withholding agent) is (in such withholding agent's reasonable good faith

discretion) required by law to make any deduction or withholding on account of any Tax from any sum paid or payable by any Credit Party to any Agent or any Lender under any of the Credit Documents:  (i) Company shall notify Administrative Agent of any such requirement or any change in any such requirement as soon as is reasonably practicable; (ii) Company, Administrative Agent, or any other Person (acting as a withholding agent) as the case may be, shall be entitled to make such deduction or withholding and shall timely pay or cause to be paid the full amount deducted to the relevant Governmental Authority; and (iii) if such Tax is an Indemnified Tax, then the sum payable by such Credit Party in respect of which the relevant deduction, withholding or payment is required shall be increased to the extent necessary to ensure that, after the making of that deduction, withholding or payment (including such deductions or withholding applicable to additional amounts payable under this Section 2.17), the applicable Agent or such Lender, as the case may be, receives on the due date a net sum equal to what it would have received had no such deduction, withholding or payment of Indemnified Taxes been required or made.

(c)      Evidence of Exemption From U.S. Withholding Tax.  Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan(s) or Credit Document shall deliver to Company and Administrative Agent, at the time or times reasonably requested by Company or Administrative Agent, such properly completed and executed documentation reasonably requested by Company or Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by Company or Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by Company or Administrative Agent as will enable Company or Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in the immediately following two sentences of this Section 2.17(c) or in Section 2.17(d)) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.  Each Lender that is (or is disregarded from an entity that is) not a "United States person" (as such term is defined in Section 7701(a)(30) of the Internal Revenue Code) for U.S. federal income tax purposes (a "**Non-U.S. Lender**") shall, to the extent such Lender is legally entitled to do so, deliver to Administrative Agent for transmission to Company, on or prior to the Closing Date (in the case of each Lender listed on the signature pages hereof on the Closing Date) or on or prior to the date of the Assignment Agreement pursuant to which it becomes a Lender (in the case of each other Lender), and at such other times as may be necessary in the determination of Company or Administrative Agent (each in the reasonable exercise of its discretion), (i) two copies of Internal Revenue Service Form W-8BEN, W-8BEN-E, W-8ECI, W-8EXP and/or W-8IMY (accompanied, in the case of W-8IMY, by Form W-8BEN, W-8BEN-E, W-8ECI, W-9 and/or W-8EXP, as applicable, from each beneficial owner) (or, in each case, any successor forms), properly completed and duly executed by such Lender to establish, to the extent applicable, that such Lender is not subject to (or is subject to a reduced rate of) deduction or withholding of U.S. federal income tax with respect to any payments to such Lender of principal, interest, fees or other amounts payable under any of the Credit Documents, or (ii) if such Lender is not a "bank" or other Person described in Section 881(c)(3) of the Internal Revenue Code, and if such Lender is claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, a U.S. Tax Compliance Certificate together with two copies of

Internal Revenue Service Form W-8BEN, W-8BEN-E or W-8IMY (accompanied, in the case of W-8IMY, by Form W-8BEN or W-8BEN-E, as applicable, and a U.S. Tax Compliance Certificate from each beneficial owner or from a Lender that is a partnership on behalf of each beneficial owner) (or, in each case, any successor form), properly completed and duly executed by such Lender to establish that such Lender is not subject to (or is subject to a reduced rate of) deduction or withholding of U.S. federal income tax with respect to any payments to such Lender of interest payable under any of the Credit Documents.  Each Lender that is (or is disregarded from an entity that is) a "United States person" (as such term is defined in Section 7701(a)(30) of the Internal Revenue Code) for U.S. federal income tax purposes (a "**U.S. Lender**") shall deliver to Administrative Agent and Company on or prior to the Closing Date (or, if later, on or prior to the date on which such Lender becomes a party to this Agreement), and at such other times as may be necessary in the determination of Company or Administrative Agent (each in the reasonable exercise of its discretion), two copies of Internal Revenue Service Form W-9 (or any successor form), properly completed and duly executed by such Lender, certifying that such U.S. Lender is entitled to an exemption from U.S. backup withholding tax, or otherwise prove that it is entitled to such an exemption.  Each Non-U.S. Lender shall, to the extent it is legally entitled to do so, deliver to Administrative Agent and Company (in such number of copies as shall be requested by the recipient) on or about the date on which such Non-U.S. Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of Administrative Agent or Company), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit Administrative Agent or Company to determine the withholding or deduction required to be made.  Each Lender required to deliver any forms, certificates or other evidence with respect to U.S. federal income tax withholding matters pursuant to this Section 2.17(c) hereby agrees, from time to time after the initial delivery by such Lender of such forms, certificates or other evidence, whenever a lapse in time or change in circumstances renders such forms, certificates or other evidence obsolete or inaccurate in any material respect, that such Lender shall promptly deliver to Administrative Agent for transmission to Company two new copies of Internal Revenue Service Form W-8BEN, W-8BEN-E, W-8ECI, W-8EXP, W-8IMY, and/or W-9 (or, in any case, any successor form), or a U.S. Tax Compliance Certificate and two copies of Internal Revenue Service Form W-8BEN, W-8BEN-E, or W-8IMY (or, in each case, any successor form), as the case may be, properly completed and duly executed by such Lender, or notify Administrative Agent and Company of its inability to deliver any such forms, certificates or other evidence.

(d)    FATCA.  If a payment made to a Lender under any Credit Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Internal Revenue Code, as applicable), such Lender shall deliver to Company and Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by Company or Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Internal Revenue Code) and such additional documentation reasonably requested by Company or Administrative Agent as may be necessary for Company and Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (d), "FATCA" shall include any amendments made to FATCA

after the Closing Date.  Each Lender agrees that if any form or certification it previously delivered under this Section 2.17(d) expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify Company and Administrative Agent in writing of its legal inability to do so.

(e)     Payment of Other Taxes by Company.  Without limiting the provisions of Section 2.17(b), Company shall timely pay all Other Taxes to the relevant Governmental Authorities in accordance with applicable law (or, at the option of Administrative Agent, timely reimburse it for the payment of any Other Taxes).  Company shall deliver to Administrative Agent official receipts or other evidence of such payment reasonably satisfactory to Administrative Agent in respect of any Other Taxes payable hereunder promptly after payment of such Other Taxes.

(f)     Indemnification by Credit Parties.  Credit Parties shall jointly and severally indemnify Administrative Agent and any Lender, within 10 days after demand therefor, for the full amount of Indemnified Taxes (including any Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 2.17) arising in connection with payments made under this Agreement or any other Credit Document and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability (setting forth a good faith basis for requesting such amount) delivered to any Credit Party shall be conclusive and binding absent manifest error.

(g)     Indemnification by the Lenders.  Each Lender shall severally indemnify each Agent, within 10 days after demand therefor, for (i) Indemnified Taxes attributable to such Lender (but only to the extent that Company has not already indemnified Administrative Agent therefor and without limiting the obligation of Company to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 10.6(h)(i) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by an Agent in connection with any Credit Document and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by Administrative Agent shall be conclusive and binding, absent manifest error.  Such payment shall be due within ten days of such Lender's receipt of such certificate.  Each Lender hereby authorizes any Agent to set off and apply any and all amounts at any time owing to such Lender under any Credit Document or otherwise payable by such Agent to such Lender from any other source against any amount due to such Agent under this paragraph (g).

(h)     Treatment of Certain Refunds.  If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.17 (including additional amounts pursuant to this Section 2.17), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 2.17 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (h) (plus any penalties, interest

or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (h), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (h) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(i)     Evidence of Payments.  As soon as practicable after any payment of Taxes by any Credit Party to a Governmental Authority pursuant to this Section 2.17, such Credit Party shall deliver to Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to Administrative Agent.

(j)     Defined Terms.  For purposes of this Section 2.17, the term "applicable law" includes FATCA.

(k)     Survival.  Each party's obligations under this Section 2.17 shall survive the resignation or replacement of any Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Credit Document.

2.18.     **Obligation to Mitigate**.  Each Lender agrees that, if such Lender requests payment under Section 2.15, 2.16 or 2.17, it will, to the extent not inconsistent with the generally applied and enforced internal policies of such Lender and any applicable legal or regulatory restrictions, use reasonable efforts to (a) make, issue, fund or maintain its Credit Extensions through another office of such Lender, or (b) take such other measures as such Lender may deem reasonable, if as a result thereof the additional amounts which would otherwise be required to be paid to such Lender pursuant to Section 2.15, 2.16 or 2.17 would be reduced and if, as determined by such Lender in its sole discretion, the making, issuing, funding or maintaining of Loans through such other office or in accordance with such other measures, as the case may be, would not otherwise adversely affect such Loans or the interests of such Lender; provided, such Lender will not be obligated to utilize such other office or take any other measure  pursuant to this Section 2.18 unless Company agrees to pay all incremental expenses incurred by such Lender as a result of utilizing such other office or taking such measure as described above.  A certificate as to the amount of any such expenses payable by Company pursuant to this Section 2.18 (setting forth a good faith basis for requesting such amount) submitted by such Lender to Company (with a copy to Administrative Agent) shall be conclusive and binding absent manifest error.

2.19.     **Defaulting Lenders**.

(a)    <u>Defaulting Lender Adjustments</u>.  Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as such Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(i)    <u>Defaulting Lender Waterfall</u>.  Any payment of principal, interest, fees or other amounts received by Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Section 8 or otherwise) or received by Administrative Agent from a Defaulting Lender pursuant to Section 10.4 shall be applied at such time or times as may be determined by Administrative Agent as follows:  *first*, to the payment of any amounts owing by such Defaulting Lender to Agents hereunder on a pro rata basis until paid in full; *second*, as Company may request (so long as no Event of Default shall have occurred and be continuing), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by Administrative Agent; *third*, if so determined by Administrative Agent and Company, to be held in a Deposit Account and released pro rata in order to satisfy such Defaulting Lender's potential future funding (if any) obligations with respect to Loans under this Agreement; *fourth*, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; *fifth*, so long as no Event of Default shall have occurred and be continuing, to the payment of any amounts owing to Company as a result of any judgment of a court of competent jurisdiction obtained by Company against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and *sixth*, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; <u>provided</u> that if (x) such payment is a payment of the principal amount of any Loans in respect of which such Defaulting Lender has not fully funded its appropriate share, and (y) such Loans were made at a time when the conditions set forth in Section 3.2 were satisfied or waived, such payment shall be applied solely to pay the Loans of all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of, such Defaulting Lender until such time as all Loans are held by the Lenders pro rata in accordance with the applicable Commitments without giving effect to Section 2.19(a)(iii).  Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender or to post cash collateral pursuant to this Section 2.19(a)(i) shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(ii)    <u>Certain Fees</u>.

(A)    No Defaulting Lender shall be entitled to receive any fee pursuant to Section 2.9(a) for any period during which that Lender is a Defaulting Lender (and Company shall not be required to pay any such fee that otherwise would have been required to have been paid to that Defaulting Lender).

(B)    With respect to any fees not required to be paid to any Defaulting Lender pursuant to clause (A) above, Company shall not be required to pay the remaining amount of any such fee.

(iii)    Reallocation of Participations.    Subject to Section 10.22, no reallocation hereunder shall constitute a waiver or release of any claim of any party hereunder against a Defaulting Lender arising from that Lender having become a Defaulting Lender, including any claim of a Non-Defaulting Lender as a result of such Non-Defaulting Lender's increased exposure following such reallocation.

(b)    Defaulting Lender Cure.    If Company and Administrative Agent agree in writing that a Lender is no longer a Defaulting Lender, Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to any Cash Collateral), that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as Administrative Agent may determine to be necessary to cause the Loans to be held pro rata by the Lenders in accordance with the applicable Commitments (without giving effect to Section 2.19(a)(iii)), whereupon such Lender will cease to be a Defaulting Lender; provided that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of Company while that Lender was a Defaulting Lender; and provided further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender having been a Defaulting Lender.

2.20.    **Removal or Replacement of a Lender**.    Anything contained herein to the contrary notwithstanding, in the event that:  (a) (i) any Lender (an "**Increased-Cost Lender**") shall give notice to Company that such Lender is entitled to receive payments under Section 2.15, 2.16 or 2.17, (ii) the circumstances which entitle such Lender to receive such payments shall remain in effect, and (iii) such Lender shall fail to withdraw such notice within five Business Days after Company's request for such withdrawal; (b) (i) any Lender shall become and continue to be a Defaulting Lender, and (ii) such Defaulting Lender shall fail to cure the default pursuant to Section 2.19(b) within five Business Days after Company's or Administrative Agent's request that it cure such default; or (c) in connection with any proposed amendment, modification, termination, waiver or consent with respect to any of the provisions hereof as contemplated by Section 10.5(b), the consent of the Requisite Lenders or Requisite Class Lenders shall have been obtained but the consent of one or more of such other Lenders (each, a "**Non-Consenting Lender**") whose consent is required shall not have been obtained; then, with respect to each such Increased-Cost Lender, Defaulting Lender or Non-Consenting Lender (the "**Terminated Lender**"), the Requisite Lenders may (which, in the case of an Increased-Cost Lender, only after receiving written request from Company to remove such Increased-Cost Lender), by giving written notice to Company and any Terminated Lender of its election to do so, elect to cause such Terminated Lender (and such Terminated Lender hereby irrevocably agrees) to assign its outstanding Loans and its Commitments, if any, in full to one or more Eligible Assignees (each, a "**Replacement Lender**") in accordance with the provisions of Section 10.6 and Terminated Lender shall pay any fees payable thereunder in connection with such assignment; provided, (1) on the date of such assignment, the Replacement Lender shall pay to Terminated Lender an amount equal to the sum of (A) the principal of, and all accrued interest on, all outstanding Loans of the Terminated Lender plus (B) all accrued, but theretofore unpaid fees owing to such Terminated Lender pursuant to Section 2.9; (2) on the date of such assignment, Company shall pay any amounts payable to such Terminated Lender pursuant to Section 2.15, 2.16 or 2.17 or under any other Credit Document, in each case as if such assignment was a prepayment, including any premium or other amount that

65

would be payable in connection with a voluntary prepayment or otherwise; (3) such assignment does not conflict with applicable law, and (4) in the event such Terminated Lender is a Non-Consenting Lender, each Replacement Lender shall consent, at the time of such assignment, to each matter in respect of which such Terminated Lender was a Non-Consenting Lender. Each Lender agrees that if Administrative Agent exercises its option to cause an assignment by such Lender as a Terminated Lender, such Lender shall, promptly after receipt of written notice of such option, execute and deliver all documentation necessary to effectuate such assignment in accordance with Section 10.6. In the event that the Terminated Lender fails to execute an Assignment Agreement pursuant to Section 10.6 within five Business Days after receipt by the Terminated Lender of notice of replacement pursuant to this Section 2.20 and presentation to such Terminated Lender of an Assignment Agreement evidencing an assignment pursuant to this Section 2.20, the Terminated Lender shall be deemed to have executed and delivered such Assignment Agreement, and upon the execution and delivery of Assignment Agreement by the Replacement Lender and Administrative Agent, shall be effective for purposes of this Section 2.20 and Section 10.6. Upon the prepayment of all amounts owing to any Terminated Lender and the termination of such Terminated Lender's Commitments, if any, such Terminated Lender shall no longer constitute a "Lender" for purposes hereof; provided, any rights of such Terminated Lender to indemnification hereunder shall survive as to such Terminated Lender.

2.21.   **Interest Act**.   For the purposes of the Interest Act (Canada), the yearly rate of interest to which any rate calculated on the basis of a period of time different from the actual number of days in the year (360 days, for example) is equivalent is the stated rate multiplied by the actual number of days in the year (365 or 366, as applicable) and divided by the number of days in the shorter period (360 days, in the example), and the parties hereto acknowledge that there is a material distinction between the nominal and effective rates of interest and that they are capable of making the calculations necessary to compare such rates and that the calculations herein are to be made using the nominal rate method and not on any basis that gives effect to the principle of deemed reinvestment of interest. Each Credit Party hereby irrevocably agrees not to plead or assert, whether by way of defense or otherwise, in any proceeding relating to the Credit Documents, that the interest payable under the Credit Documents and the calculation thereof has not been adequately disclosed to Company or Credit Party, whether pursuant to Section 4 of the Interest Act (Canada) or any other applicable law or legal principle.

2.22.   **Effect of Benchmark Transition Event**.

(a)   <u>Circumstances Affecting Benchmark Availability</u>.   Subject to clause (c) below, in connection with any request for a SOFR Loan or a conversion to or continuation thereof or otherwise, if for any reason (i) the Administrative Agent shall determine (which determination shall be conclusive and binding absent manifest error) that reasonable and adequate means do not exist for ascertaining Term SOFR for the applicable Interest Period with respect to a proposed SOFR Loan on or prior to the first day of such Interest Period or (ii) the Requisite Lenders shall determine (which determination shall be conclusive and binding absent manifest error) that Adjusted Term SOFR does not adequately and fairly reflect the cost to such Lenders of making or maintaining such Loans during such Interest Period and, in the case of clause (ii), the Requisite Lenders have provided notice of such determination to the Administrative Agent, then, in each case, the Administrative Agent shall promptly give notice thereof to the Company. Upon notice thereof by the

Administrative Agent to the Company, any obligation of the Lenders to make SOFR Loans, and any right of the Company to convert any Loan to or continue any Loan as a SOFR Loan, shall be suspended (to the extent of the affected SOFR Loans or the affected Interest Periods) until the Administrative Agent (with respect to clause (ii), at the instruction of the Requisite Lenders) revokes such notice. Upon receipt of such notice, (A) the Company may revoke any pending request for a borrowing of, conversion to or continuation of SOFR Loans (to the extent of the affected SOFR Loans or the affected Interest Periods) or, failing that, the Company will be deemed to have converted any such request into a request for a borrowing of or conversion to Base Rate Loans in the amount specified therein and (B) any outstanding affected SOFR Loans will be deemed to have been converted into Base Rate Loans at the end of the applicable Interest Period. Upon any such prepayment or conversion, the Company shall also pay accrued interest on the amount so prepaid or converted, together with any additional amounts required pursuant to Section 5.9.

(b)    Laws Affecting SOFR Availability.    If, after the date hereof, the introduction of, or any change in, any Applicable Law or any change in the interpretation or administration thereof by any Governmental Authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by any of the Lenders (or any of their respective Lending Offices) with any request or directive (whether or not having the force of law) of any such Governmental Authority, central bank or comparable agency, shall make it unlawful or impossible for any of the Lenders (or any of their respective Lending Offices) to honor its obligations hereunder to make or maintain any SOFR Loan, or to determine or charge interest based upon SOFR, the Term SOFR Reference Rate, Adjusted Term SOFR or Term SOFR, such Lender shall promptly give notice thereof to the Administrative Agent and the Administrative Agent shall promptly give notice to the Company and the other Lenders (an "Illegality Notice"). Thereafter, until each affected Lender notifies the Administrative Agent and the Administrative Agent notifies the Company that the circumstances giving rise to such determination no longer exist, any obligation of the Lenders to make SOFR Loans, and any right of the Company to convert any Loan to a SOFR Loan or continue any Loan as a SOFR Loan, shall be suspended. Upon receipt of an Illegality Notice, the Company shall, if necessary to avoid such illegality, upon demand from any Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all SOFR Loans to Base Rate Loans, on the last day of the Interest Period therefor, if all affected Lenders may lawfully continue to maintain such SOFR Loans to such day, or immediately, if any Lender may not lawfully continue to maintain such SOFR Loans to such day. Upon any such prepayment or conversion, the Company shall also pay accrued interest on the amount so prepaid or converted, together with any additional amounts required pursuant to Section 2.15(c).

(c)    Benchmark Replacement Setting.

(i)    Benchmark Replacement. Notwithstanding anything to the contrary herein or in any other Credit Document, upon the occurrence of a Benchmark Transition Event, the Administrative Agent and the Company may amend this Agreement to replace the then-current Benchmark with a Benchmark Replacement. Any such amendment with respect to a Benchmark Transition Event will become effective at 5:00 p.m. on the fifth (5th) Business Day after the Administrative Agent

67

has posted such proposed amendment to all affected Lenders and the Company so long as the Administrative Agent has not received, by such time, written notice of objection to such amendment from Lenders comprising the Requisite Lenders.  No replacement of a Benchmark with a Benchmark Replacement pursuant to this Section 2.22(c)(i) will occur prior to the applicable Benchmark Transition Start Date.

(ii)    Benchmark Replacement Conforming Changes. In connection with the use, administration, adoption or implementation of a Benchmark Replacement, the Administrative Agent will have the right to make Conforming Changes from time to time, in consultation with the Company, and, notwithstanding anything to the contrary herein or in any other Credit Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Credit Document.

(iii)    Notices; Standards for Decisions and Determinations. The Administrative Agent will promptly notify the Company and the Lenders of (A) the implementation of any Benchmark Replacement and (B) the effectiveness of any Conforming Changes in connection with the use, administration, adoption or implementation of a Benchmark Replacement.  The Administrative Agent will promptly notify the Company of the removal or reinstatement of any tenor of a Benchmark pursuant to Section 2.22(c)(iv).  Any determination, decision or election that may be made by the Administrative Agent or, if applicable, any Lender (or group of Lenders) pursuant to this Section 2.22(c), including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Credit Document, except, in each case, as expressly required pursuant to this Section 2.22(c).

(iv)    Unavailability of Tenor of Benchmark.  Notwithstanding anything to the contrary herein or in any other Credit Document, at any time (including in connection with the implementation of a Benchmark Replacement), (A) if the then-current Benchmark is a term rate (including the Term SOFR Reference Rate) and either (1) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion or (2) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is not or will not be representative, then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (B) if a tenor that was removed pursuant to clause (A) above either (1) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (2) is not, or is no longer, subject to an

announcement that it is not or will not be representative for a Benchmark (including a Benchmark Replacement), then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(v)     Benchmark Unavailability Period. Upon the Company's receipt of notice of the commencement of a Benchmark Unavailability Period, (A) the Company may revoke any pending request for a borrowing of, conversion to or continuation of SOFR Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Company will be deemed to have converted any such request into a request for a borrowing of or conversion to Base Rate Loans and (B) any outstanding affected SOFR Loans will be deemed to have been converted to Base Rate Loans at the end of the applicable Interest Period. During any Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an Available Tenor, the component of the Base Rate based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, will not be used in any determination of the Base Rate.

2.23.   **Reorganization Matters**.

(a)     The Chapter 11 Cases were commenced on the Petition Date in accordance with applicable law and proper notice thereof was given for (x) the motion seeking approval of the Interim Order, (y) the hearing for the entry of the Interim Order and (z) the hearing for the entry of the Final Order.  The Debtors shall give, on a timely basis as specified in the DIP Orders, all notices required to be given to all parties specified in the DIP Orders.

(b)     After entry of the Interim Order, and pursuant to and to the extent permitted in the Interim Order and the Final Order, the Obligations will constitute allowed administrative expense claims in the Chapter 11 Cases having priority over all administrative expense claims and unsecured claims against each Credit Party now existing or hereafter arising of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113, 1114 or any other provision of the Bankruptcy Code or otherwise, as provided under Section 364(c)(1) of the Bankruptcy Code, subject only to the Carve-Out and the priorities set forth in the Interim Order or the Final Order, as applicable.

(c)     After entry of the Interim Order (and the Final Order when applicable) and pursuant to and to the extent provided in the Interim Order and the Final Order, as applicable, the Obligations will be automatically secured by a valid and perfected first priority Lien on all of the Collateral, (i) encumbered by no Liens other than Liens permitted by Section 6.2 and (ii) prior and superior to any other Person or Lien, in each case, other than the Carve-Out and subject to the priorities set forth in the Interim Order or the Final Order, as applicable.

(d)     The Interim Order (with respect to the period prior to the entry of the Final Order) or the Final Order (with respect to the period on and after the entry of the Final Order), as the case may be, is in full force and effect and has not been reversed, stayed (whether by statutory stay or otherwise), modified or amended without the written consent of the Administrative Agent.

(e)     Notwithstanding the provisions of Section 362 of the Bankruptcy Code and subject to the applicable provisions of the Interim Order or the Final Order, as the case may be, upon the DIP Maturity Date (whether by acceleration or otherwise), the Administrative Agent, Collateral Agent and Lenders shall be entitled to immediate payment of such Obligations in cash and to enforce the remedies provided for hereunder or under applicable law, without further notice, motion or application to, hearing before, or order by the Bankruptcy Court.

## SECTION 3.     CONDITIONS PRECEDENT

3.1.     **Closing Date**.  The obligation of each Lender to make a Credit Extension (or, in the case of Roll-Up Loans, to be deemed to have made a Credit Extension) hereunder is subject to the satisfaction, or waiver in accordance with Section 10.5, of the following conditions on or before the Closing Date:

(a)     <u>Credit Documents</u>.  Administrative Agent and Collateral Agent shall have received sufficient copies of each of the following documents, in each case, executed and delivered in counterpart form by each applicable Credit Party and each other Person party thereto:

(i)     this Agreement;

(ii)     the Fee Letter;

(iii)     the Notes (if requested by any Lender at least two (2) Business Days prior to the Closing Date);

(iv)     the Collateral Agent Fee Letter; and

(v)     the Pledge and Security Agreement.

(b)     <u>Organizational Documents; Incumbency</u>.  Administrative Agent shall have received (i) copies of each Organizational Document of each Credit Party and, to the extent applicable, certified as of a recent date by the appropriate Governmental Authority, each dated the Closing Date or a recent date prior thereto (and the Organizational Documents of Company shall have been amended in form and substance satisfactory to the Lenders to address any Restricted Payment obligations of Company); (ii) signature and incumbency certificates of the officers and/or other authorized signers of such Person executing the Credit Documents to which it is a party; (iii) resolutions of the Board of Directors or similar or equivalent governing body of each Credit Party approving and authorizing the execution, delivery and performance of the Credit Documents to which it is a party or by which it or its assets may be bound, certified as of the Closing Date by its secretary, an assistant secretary, president, chief strategy officer, chief executive officer, sole member or other Authorized Officer as being in full force and effect without modification or amendment; and (iv) a good standing certificate from the applicable Governmental Authority of each Credit Party's jurisdiction of incorporation, organization or formation and in each jurisdiction in which it is qualified as a foreign corporation or other entity to do business (to the extent that such concept exists in such jurisdictions), each dated a recent date prior to the Closing Date.

(c)     [Reserved].

(d)    <u>Governmental Authorizations and Consents</u>.  Except for the entry of, and subject to the terms of, the Interim Order or the Final Order, as applicable, each Credit Party shall have obtained all Governmental Authorizations and all consents of other Persons, in each case that are required in connection with the transactions contemplated by the Credit Documents (as in effect on the Closing Date), and each of the foregoing shall be in full force and effect and in form and substance reasonably satisfactory to Administrative Agent.  Except for the entry of, and subject to the terms of, the Interim Order or the Final Order, as applicable, all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority which would restrain, prevent or otherwise impose materially adverse conditions on the transactions contemplated by the Credit Documents (as in effect on the Closing Date) and no action, request for stay, petition for review or rehearing, reconsideration, or appeal with respect to any of the foregoing shall be pending, and the time for any applicable agency to take action to set aside its consent on its own motion shall have expired; *provided*, *however*, in each case, that the applicable Challenge Periods (as defined in the DIP Order) shall not have expired.

(e)    [Reserved].

(f)    <u>Approved Budget</u>.  Administrative Agent shall have received the Approved Budget.

(g)    <u>Fees and Expenses</u>.  Company shall have paid to each Agent the fees payable on the Closing Date referred to in Section 2.9 and all expenses payable pursuant to Section 10.2 that have accrued to the Closing Date (in each case, to the extent invoiced at least one (1) Business Day prior to the Closing Date).

(h)    <u>No Litigation</u>.  Except for the Chapter 11 Cases and matters that are subject to a stay in the Chapter 11 Cases, there shall not exist any action, suit, investigation, litigation or proceeding or other legal or regulatory developments, pending or threatened in writing in any court or before any arbitrator or Governmental Authority that, in the reasonable judgment of Administrative Agent, singly or in the aggregate, (i) materially impairs the transactions contemplated by the Credit Documents, or (ii) would reasonably be expected to have a Material Adverse Effect.

(i)    <u>No Material Adverse Change</u>.  Since the Petition Date, no event, circumstance or change shall have occurred that has caused, either in any case or in the aggregate, a Material Adverse Effect.

(j)    <u>Completion of Proceedings</u>.  All partnership, corporate and other proceedings taken or to be taken in connection with the transactions contemplated hereby and all documents incidental thereto not previously found acceptable by Administrative Agent and its counsel shall be reasonably satisfactory in form and substance to Administrative Agent and such counsel, and Administrative Agent, and such counsel shall have received all such counterpart originals or certified copies of such documents as Administrative Agent may reasonably request.

(k)    <u>KYC Documentation, Beneficial Ownership Certification</u>.  At least three Business Days prior to the Closing Date, the Lenders shall have received all documentation and other information, including the Beneficial Ownership Certification, required by bank regulatory

71

authorities under applicable "know-your-customer" and anti-money laundering rules and regulations, including the PATRIOT Act, in each case that has been requested by Administrative Agent or any Lender prior to the date that is five Business Days prior to the Closing Date.

(l)    Compliance with DIP Order.  The Company shall be in compliance with (i) the Interim Order, which shall have been entered no later than five (5) days after the Petition Date and (ii) the Approved Budget (subject to the Approved Budget Variance Report).

(m)    Adequate Protection.  The Pre-Petition Agents and the Pre-Petition Lenders shall have each consented to the use of collateral or received adequate protection (if applicable) in respect of the liens securing their respective obligations pursuant to the Interim Order.

Each Lender, by delivering its signature page to the Existing Credit Agreement and funding a Loan on the Closing Date, shall be deemed to have acknowledged receipt of, and consented to and approved, each Credit Document (as in effect on the Closing Date) and each other document required to be approved by any Agent, Requisite Lenders or Lenders, as applicable on the Closing Date.

3.2.    **Conditions to Each Credit Extension**.

(a)    Conditions Precedent.  The obligation of each Lender to make any Loan on any Credit Date, including the Closing Date, is subject to the satisfaction, or waiver in accordance with Section 10.5, of the following conditions precedent:

(i)    Administrative Agent shall have received a fully executed and delivered Funding Notice for such Loan and the Requisite Lenders shall not have objected in writing to such Funding Notice on the basis of any failure to satisfy any of the conditions precedent to such Loan;

(ii)    as of such Credit Date, the representations and warranties contained herein and in the other Credit Documents shall be true and correct in all material respects on and as of that Credit Date to the same extent as though made on and as of that date (unless any such representation and warranty is qualified as to materiality or Material Adverse Effect, in which case such representation and warranty shall be true and correct in all respects), except to the extent such representations or warranties specifically relate to an earlier date, in which case such representations or warranties shall have been true and correct in all material respects on and as of such earlier date (unless any such representation and warranty is qualified as to materiality or Material Adverse Effect, in which case such representation and warranty shall be true and correct in all respects as of such earlier date);

(iii)    as of such Credit Date, no event shall have occurred and be continuing or would result from the consummation of the applicable Credit Extension that would constitute an Event of Default or a Default;

(iv)    the Company shall be in compliance with the Approved Budget in all respects and the proceeds of each borrowing shall be used solely in accordance with the Approved Budget, in each case, subject to the variances permitted by Section 5.18(c);

(v)    as of such Credit Date, the Interim Order or Final Order, as applicable, shall be in full force and effect, and the making of the applicable Loan shall be authorized thereby;

(vi)    if such Credit Date is thirty (30) days after the Petition Date, the Final Order, in form and substance satisfactory to the Requisite Lenders, shall have been entered;

(vii)    the Company has continued to retain the CRO;

(viii)    the Company shall have paid to Administrative Agent all fees and expenses required to be paid hereunder and under the DIP Orders, including but not limited to all accrued and unpaid fees and out-of-pocket expenses incurred by Gibson, Dunn & Crutcher LLP and monthly fees and expense of Houlihan Lokey; and

(ix)    the Company shall have paid to the Collateral Agent all fees and expenses required to be paid hereunder and under the DIP Orders, including but not limited to all accrued and unpaid fees and out-of-pocket expenses incurred by Shipman & Goodwin LLP.

Any Agent or Requisite Lenders shall be entitled, but not obligated to, request and receive, prior to the making of any Credit Extension, additional information reasonably satisfactory to the requesting party confirming the satisfaction of any of the foregoing if, in the good faith judgment of such Agent or Requisite Lender such request is warranted under the circumstances.

(b)    Notices. Any Notice shall be executed by an Authorized Officer in a writing delivered to Administrative Agent. In lieu of delivering a Notice, Company may give Administrative Agent telephonic notice by the required time of any proposed borrowing or continuation, as the case may be; provided each such notice shall be promptly confirmed in writing by delivery (which may be delivered electronically) of the applicable Notice to Administrative Agent on or before the applicable date of borrowing or continuation. Neither Administrative Agent nor any Lender shall incur any liability to Company in acting upon any telephonic notice referred to above that Administrative Agent believes in good faith to have been given by a duly authorized officer or other person authorized on behalf of Company or for otherwise acting in good faith.

## SECTION 4.    REPRESENTATIONS AND WARRANTIES

In order to induce Agents and Lenders to enter into this Agreement and to make each Credit Extension to be made thereby, the Credit Parties, jointly and severally, represent and warrant to each Agent and Lender, on the Closing Date and on each Credit Date (all of which shall survive the execution and delivery of this Agreement, the issuance of the Notes, and the making of the Loans), that:

4.1.    **Existence and Power**.

(a)    Company and each of its Subsidiaries is either a limited liability company or corporation, duly formed or organized, validly existing and in good standing under the laws of its jurisdiction of formation or organization, and in good standing as a foreign entity in all other

jurisdictions where (i) the nature of its properties or business so requires, or (ii) the failure to be so qualified or be in good standing in such other jurisdictions would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  A list of the foregoing jurisdictions of Company and its Subsidiaries as of the Closing Date is attached hereto as <u>Schedule 4.7(a)</u>.

(b)     Subject to the Bankruptcy Code and applicable orders entered into by the Bankruptcy Court, Company and each of its Subsidiaries have the power and authority (i) to own its respective properties and carry on its respective business as now being conducted, (ii) to execute, deliver and perform, as applicable, its Obligations under each Credit Document and any other documents contemplated thereby to which it is or will be a party, (iii) in the case of each Credit Party, to grant to Collateral Agent, for the benefit of the Secured Parties, a security interest in the Collateral as contemplated by the Collateral Documents, and (iv) in the case of the Guarantors, to guaranty the Obligations as contemplated by Section 7.

4.2.   **Authority and No Violation**.

(a)     Upon the entry of the DIP Order, the execution, delivery and performance by Company and each other Credit Party of the Credit Documents to which it is a party, the grant by each Credit Party to Collateral Agent (for the benefit of the Secured Parties) of the security interest in the Collateral as contemplated by the Collateral Documents, in the case of Company, the Loans hereunder and the execution, delivery and performance of the Notes and, in the case of each Guarantor, the guaranty of the Obligations as contemplated by, Section 7, (i) have been duly authorized by all necessary company action (or similar action) on the part of such Person, (ii) will not constitute a violation of any provision of Applicable Law or any order of any Governmental Authority applicable to such Person or any of its properties or assets, (iii) will not violate any provision of the certificate of formation or organization, bylaws, limited liability agreement, partnership agreement or any other organizational document of such Person, (iv) will not violate any provision of, be in conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under, or create any right to terminate, any Material Contract, or any indenture, agreement, bond, note or other similar instrument to which such Person is a party or by which such Person or any of its properties or assets are bound, in each case, other than where any such violation, conflict, breach, default or termination would not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, and (v) will not result in the creation or imposition of any Lien, charge or encumbrance of any nature whatsoever upon any of the properties or assets of such Person other than pursuant to the Credit Documents.

(b)     Except as set forth in the DIP Order, there are no restrictions on the transfer of any of the Pledged Securities other than as a result of this Agreement, any other Credit Document, or Applicable Law, including any securities laws and the regulations promulgated thereunder.

4.3.   **Governmental Approvals**.  Subject to the entry of the Interim Order or Final Order, as applicable, all material authorizations, consents, approvals, registrations or filings from or with any Governmental Authority (other than UCC or PPSA financing statements) required for the consummation of the execution, delivery and performance by Company and each other Credit Party of the Credit Documents to which it is a party, and the execution and delivery by Company

of the Notes, have been obtained or made and are in full force and effect and, if any further such material authorizations, consents, approvals, registrations or filings should hereafter become necessary, such Person shall reasonably undertake to obtain or make all such authorizations, consents, approvals, registrations or filings.

4.4.    **Binding Agreements**.  Subject to the entry of the Interim Order or Final Order, as applicable, this  Agreement and the other Credit Documents to which Company and/or any other Credit Party is party have been duly executed and delivered by Company and/or each of the other Credit Parties, and, when executed and delivered by the other parties hereto and thereto, shall constitute the legal, valid and binding Obligations of each such Credit Party (in each case, to the extent such Credit Party is a party thereto), enforceable against each such Credit Party in accordance with their respective terms, subject, as to the enforcement of remedies, to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights generally and to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

4.5.    **Financial Statements**.

(a)    The financial statements that have been provided to the Administrative Agent hereunder have been prepared in accordance with GAAP applied on a consistent basis throughout the periods indicated and fairly present in all material respects in accordance with GAAP the financial condition and operating results of Company as of the dates, and for the periods, indicated therein, except (i) as otherwise set forth on Schedule 4.5 and (ii) in the case of the quarterly financial statements, for the absence of footnote disclosures and changes resulting from normal year-end adjustments, which are not, individually or in the aggregate, material.

(b)    Except as set forth in the financial statements referred to in Sections 5.1(a) and 5.1(b) and the schedules, statements and reports in the Chapter 11 Cases, there are no liabilities of any Credit Party of any kind, whether accrued, contingent, absolute, determined, determinable or otherwise, which could reasonably be expected to result in a Material Adverse Effect.

4.6.    **[Reserved]**.

4.7.    **Ownership of Capital Stock, Subsidiaries, etc.**

(a)    Attached hereto as Schedule 4.7(a) is a correct and complete list, as of the Closing Date, in respect of Company and each of its Subsidiaries, showing as to each (i) the name of such Person, (ii) the jurisdiction of formation or organization (as the case may be) of such Person, (iii) if such Person is a corporation and is a Credit Party, the authorized capitalization and the number of shares of its Capital Stock outstanding and, in the case of any direct Subsidiary of a Credit Party, the number of shares of its Capital Stock owned by such Credit Party, (iv) the name of each Person holding ownership interests in such Person, (v) the nature of such ownership interests, (vi) the percentage of ownership represented by such ownership interests, and (vii) whether any such Subsidiary is an Excluded Subsidiary.

(b)    As of the Closing Date, except as disclosed on Schedule 4.7(a), (i) no Credit Party or Subsidiary thereof owns any voting stock, Capital Stock or other beneficial interest, either directly or indirectly, in any Person other than another Credit Party or Subsidiary, and (ii) no Credit

Party or Subsidiary is a general or limited partner in any partnership or a participant in a Joint Venture.

(c)    Attached hereto as Schedule 4.7(c) is a correct and complete organizational chart as of Closing Date reflecting the organizational structure of the Credit Parties and their Subsidiaries as of the Closing Date.

4.8.    **Intellectual Property**.

(a)    Except as set forth in Schedule 4.8(a), as of the Closing Date, Company or one of its wholly-owned Subsidiaries is the exclusive owner of all right, title and interest in and to, or has an enforceable right to use pursuant to a written license, all material Intellectual Property used in the operation of its business as presently conducted (the "**Company Intellectual Property**"), free and clear of all Liens, without payments, fees, and royalties due to any other Person.  To the knowledge of Company, except for the Chapter 11 Cases, the consummation of the transactions contemplated by this Agreement will not materially alter, impair or extinguish any rights of Company or any of its Subsidiaries in the Company Intellectual Property.

(b)    Schedule 4.8(b) sets forth a complete and accurate list as of the Closing Date of all Company Intellectual Property owned by Company or any of its Subsidiaries that is (x) registered or issued by a Governmental Authority, or (y) subject to an application for such registration or issuance.  Except as would not be material to Company and its Subsidiaries, taken as a whole, all registered or issued intellectual property set forth on Schedule 4.8(b) is, to the knowledge of Company, valid, subsisting, enforceable, in full force and effect, and has not been or is not, as applicable, cancelled, expired, abandoned or otherwise terminated, and payment of all renewal and maintenance fees in respect thereof, and all filings related thereto, have been duly made.  Except as would not be material to Company and its Subsidiaries, taken as a whole, all current consultants, contractors and employees of Company and its Subsidiaries that are involved in the creation of Company Intellectual Property have executed agreements with Company or such Subsidiary that assign to Company or such Subsidiary all rights, title and interest in and to any material Intellectual Property created or developed by such individuals arising out of their work with Company or any of its Subsidiaries.  Except as set forth on Schedule 4.8(b), and except for immaterial infringement threats and ordinary course office actions, since January 1, 2021, there is no pending or, to the knowledge of Company, threatened opposition in writing, interference or cancellation proceeding before any Governmental Authority in any jurisdiction related to any Company Intellectual Property or, to the knowledge of Company, against any other Intellectual Property used by Company and/or its Subsidiaries.

(c)    To the knowledge of Company, neither the Company Intellectual Property nor any products, content, creative works, or publications owned or created by Company or one of its Subsidiaries, in each case as used by the Company or its Subsidiaries in the operation of their businesses, infringe, misappropriate or otherwise violate any Intellectual Property rights, of any other Person, except as would not be material to Company and its Subsidiaries, taken as a whole. Except as set forth on Schedule 4.8(c), since January 1, 2021, neither Company nor any of its Subsidiaries has received any written notice, complaint, or claim of any such infringement, misappropriation or violation (including any demand or request that Company or any of its Subsidiaries license any rights from a third party), in each case, except as would not be material to

76

Company and its Subsidiaries, taken as a whole.  To the knowledge of Company, no Person is infringing, misappropriating or otherwise violating any Intellectual Property rights of Company or any of its Subsidiaries, in each case, except as would not be material to Company and its Subsidiaries, taken as a whole.

4.9.    **Fictitious Names**.  Except as disclosed on Schedule 4.9, no Credit Party has done business, is doing business or intends to do business other than under its full legal name, including, without limitation, under any trade name or other "doing business as" name.

4.10.    **Title to Properties**.  Each Credit Party and Subsidiary has good title to, or valid leasehold or license interests in, each of the properties and assets reflected on the most recent Historical Financial Statements referred to in Section 4.5, and all such properties and assets are free and clear of Liens except Permitted Liens.

4.11.    **Litigation**.  Except for the Chapter 11 Cases and matters that are subject to a stay in the Chapter 11 Cases, the right of the relevant parties to investigate and challenge the DIP Facility during the applicable Challenge Periods (as provided in the DIP Order), or as set forth on Schedule 4.11, there are no pending actions, suits or other proceedings at law or in equity by or before any arbitrator, arbitration panel or Governmental Authority (except for any matters before any governmental trademark tribunal), and to each Credit Party's knowledge, there are no investigations by any Governmental Authority of the affairs of, or threatened action, suit or other proceeding against or affecting, any Credit Party or its properties or rights, except for any threatened actions seeking only money damages that would not, if adversely determined, create liability for Company and its Subsidiaries in excess of $2,500,000 individually or $10,000,000 in the aggregate for all undisclosed matters.  There are no actions, suits or other proceedings at law or in equity by or before any arbitrator, arbitration panel or Governmental Authority (including, but not limited to, matters relating to environmental liability) or, to each Credit Party's knowledge, any investigation by any Governmental Authority of the affairs of, or threatened action, suit or other proceeding against or affecting, any Credit Party or its properties or rights which would reasonably be expected to have a Material Adverse Effect.  No Credit Party is in default with respect to any order, writ, injunction, decree, rule or regulation of any Governmental Authority binding upon such Person.

4.12.    **Federal Reserve Regulations**.  No Credit Party is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any Margin Stock.  No part of the proceeds of any Loan will be used, directly or indirectly, whether immediately, incidentally or ultimately (i) to purchase or carry any Margin Stock or to extend credit to others for the purpose of purchasing or carrying any Margin Stock, or (ii) for any other purpose, which in the case of either clauses (i) or above would violate or be inconsistent with any of the provisions of any regulation of the Federal Reserve Board, including, without limitation, Regulations T, U and X thereto.

4.13.    **Investment Company Act**.  No Credit Party is required to register as an "investment company" under, the Investment Company Act of 1940, as amended.

4.14.    **Taxes**.  Each Credit Party and Subsidiary thereof has timely filed or caused to be filed all material federal, state, provincial, local and foreign tax returns which were required to be

filed with any Governmental Authority after giving effect to applicable extensions, and has timely paid or has caused to be timely paid all material Taxes required to be paid by or on behalf of it or on any assessment received by it, except as permitted under Section 5.3 or the nonpayment of which is permitted or required under the Bankruptcy Code. No Credit Party knows of any material additional assessments or any basis therefor. The charges, accruals and reserves on its books in respect of Taxes or other governmental charges are accurate and adequate, in accordance with GAAP.

4.15.   **Compliance with ERISA; Pension Plans**.

(a)      Schedule 4.15 sets forth a true and complete list, as of the Closing Date, of each Pension Plan and Non-U.S. Plan.  Except as would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect, (i) each Employee Benefit Plan and Non-U.S. Plan has been maintained and operated in all respects in accordance with all Applicable Laws, including, where applicable, ERISA and the Internal Revenue Code, and each Employee Benefit Plan intended to qualify under section 401(a) of the Internal Revenue Code has received a favorable determination letter or is entitled to rely on a favorable opinion letter from the IRS, in either case, that has not been revoked and, to Company's knowledge, no event or circumstance exists that has adversely affected such qualification.  Except as would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect, (ii) no ERISA Event or Canadian Pension Event has occurred or is reasonably expected to occur, (iii) no liability to the PBGC (other than required premium payments) or the IRS has been or is expected to be incurred by Company or any ERISA Affiliate with respect to any Employee Benefit Plan, and (iv) Company and each ERISA Affiliate has made all required contributions to each Pension Plan and each Multiemployer Plan.

(b)      Except as would not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect: (i) each Canadian Pension Plan is in compliance in form and operation with its terms and with the Pension Benefits Act (Ontario) or the pension standards legislation of any other applicable jurisdiction in Canada and the Income Tax Act (Canada) and all other applicable law and (ii) there are no pending or, to the knowledge of any Canadian Credit Party, threatened claims (other than claims for benefits in the ordinary course), sanctions, actions, suits or proceedings asserted or instituted by any Person against any Canadian Pension Plan or any Canadian Credit Party in respect of any Canadian Pension Plan.

(c)      No Canadian Credit Party has maintained or maintains a Canadian Pension Plan that is a Canadian Defined Benefit Pension Plan or contributes to a "multi-employer pension plan" as defined in the Pension Benefits Act (Ontario) or an equivalent plan under the pension standards legislation of any other applicable jurisdiction in Canada.

4.16.   **Agreements**.

(a)      Except as set forth on Schedule 4.16(a) hereof and other than any default that arises solely as a result of the commencement of the Chapter 11 Cases, no Credit Party or Subsidiary is in default in the performance, observance or fulfillment of any of the Obligations, covenants or conditions contained in any agreement or instrument to which such Credit Party or Subsidiary is a party and no condition exists that, with the giving of notice or the lapse of time or

both, would reasonably be expected to constitute such a default, except where the consequences, direct or indirect, of such default or defaults, if any, would not reasonably be expected to result in a Material Adverse Effect.

(b)    Schedule 4.16(b) is a true and complete list as of the Closing Date of all material contractual arrangements entered into by any Credit Party or Subsidiary or by which any Credit Party or Subsidiary is bound, including, but not limited to, any material guarantees and material employment agreements.  The Credit Parties and their respective Subsidiaries have delivered or made available to Administrative Agent a true and complete copy of each agreement (or, if not yet executed, the most recent draft) described on Schedule 4.16(b), including all exhibits and schedules thereto.  For purposes of the foregoing, a contract, agreement or arrangement shall be deemed "material" if any Credit Party reasonably expects that any Credit Party would, pursuant to the terms thereof, (A) recognize future revenues in excess of $3,000,000, (B) incur liabilities or Obligations in excess of $3,000,000, or (C) would reasonably be likely to suffer damages or losses in excess of $3,000,000 by reason of the breach or termination thereof.

4.17.   **Rights**.  Each of the Credit Parties and their respective Subsidiaries has sufficient right, title and interest in each Item of Product owned by or licensed to it (including under copyright, except where Company or any such Subsidiary is using an Item of Product in reliance upon the defense of copyright fair use as reasonably determined by Company in accordance with Company's standard practices) to enable it (i) with regard to each Item of Product produced by it or on its behalf to produce such Item of Product and (ii) to perform under the License Agreements relating to each such Item of Product and to satisfy any qualification requirements thereunder.

4.18.   **Environmental Liabilities**.

(a)    No Credit Party or Subsidiary (and to each Credit Party's knowledge no other Person) has used, stored, treated, transported, manufactured, refined, handled, produced, Released or disposed of any Hazardous Materials on, under, at, from or in any way affecting, any of the properties or assets owned, operated, occupied or leased by a Credit Party or Subsidiary, in material violation of any Environmental Law or in a manner that would reasonably be expected to result in a Material Adverse Effect.

(b)    (i) No Credit Party or Subsidiary has any obligations or liabilities, known or unknown, matured or not matured, absolute or contingent, or assessed or unassessed, arising under or related to Environmental Laws or Hazardous Materials which would reasonably be expected to have a Material Adverse Effect, and (ii) no claims have been made against any Credit Party or Subsidiary in the past five (5) years and no pending, threatened or outstanding citations, orders, proceedings or notices have been issued against any Credit Party or Subsidiary arising under or related to Environmental Laws or Hazardous Materials, which would reasonably be expected to have a Material Adverse Effect, in each case of (i) and (ii), including, without limitation, any such Obligations or liabilities relating to or arising out of activities of any of its respective employees, agents, representatives, affiliates or predecessors in interest or any other Person with respect to which any Credit Party is responsible, either contractually, by operation of law or otherwise.

4.19.    **Compliance with Laws**.  Other than any default that arises solely as a result of the commencement of the Chapter 11 Cases, no Credit Party is in material violation of any Applicable Law, and the Loans hereunder, the intended use of the proceeds of the Loans as contemplated by Section 2.4 and any other transactions contemplated hereby will not violate any Applicable Law.

4.20.    **True and Complete Disclosure**.  Neither any Credit Document nor any other agreement, document, instrument, certificate or statement (other than (i) any projections, estimates, or other forward-looking information, and (ii) any forward-looking *pro forma* financial information) furnished to Administrative Agent and the Lenders by or on behalf of any Credit Party in connection with the transactions contemplated hereby, at the time it was furnished contained any untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements contained herein or therein, under the circumstances under which they were made, not materially misleading (considered in the context of all other information provided to the Lenders).  Any projections, estimates, forward-looking information or any forward-looking *pro forma* financial information furnished to Administrative Agent pursuant to this Agreement are based on good faith estimates and assumptions believed by management of Company to be reasonable at the time made, it being understood by Administrative Agent and the Lenders that, without limiting the foregoing representation, such projections or other information as it relates to future events is not to be viewed as fact and actual results during the period or periods covered by such projections or such other information are subject to significant uncertainties and contingencies and may differ materially from the projected results set forth therein.

4.21.    **Anti-Corruption and Anti-Bribery Laws and Sanctions**.  The Credit Parties and their respective Subsidiaries have implemented and maintain in effect, policies and procedures designed to ensure compliance by each Credit Party, their respective Subsidiaries and their respective affiliates, directors, officers, employees and agents with applicable Anti-Corruption and Anti-Bribery Laws and applicable Sanctions, and each Credit Party, their respective Subsidiaries and their respective affiliates, directors, officers and employees and, to the knowledge of such Credit Party or Subsidiary, and their respective Agents, are in compliance with applicable Anti-Corruption and Anti-Bribery Laws and applicable Sanctions in all respects.  None of (a) the Credit Parties, their respective Subsidiaries or any of their respective affiliates, directors, officers or employees or (b) to the knowledge of any Credit Party or any of their respective Subsidiaries or any agent thereof that will act in any capacity in connection with or benefit from this Agreement, is a Sanctioned Person.  No Loans, use of proceeds or any other transaction contemplated by this Agreement will violate applicable Anti-Corruption and Anti-Bribery Laws or applicable Sanctions.

4.22.    **No Registered or Publicly Traded Securities**.  Company hereby represents and warrants that as of the Closing Date that neither it nor its Controlling Person (i) has registered or publicly traded securities outstanding, including no 144A securities or (ii) files its financial statements with the Securities and Exchange Commission and/or makes its financial statements available to potential holders of its 144A securities, and, accordingly, Company hereby authorizes Administrative Agent to make the financial statements to be provided under Sections 5.1(a) and (b) hereof, along with the Credit Documents, available to Public-Siders.  Company covenants that if any Lender has advised Company that such Lender is a Public-Sider, Company will not request that any other material be posted to Public-Siders without Company first expressly representing

and warranting to Administrative Agent in writing that such materials do not constitute material non-public information within the meaning of the federal securities laws or that Company has no outstanding publicly traded securities, including 144A securities. Notwithstanding anything herein to the contrary, if any Lender has advised Company that such Lender is a Public-Sider, in no event shall Company request that Administrative Agent make available to Public-Siders any budgets or any certificates, reports or calculations with respect to Company's compliance with the covenants contained herein.

4.23. **Affected Financial Institution**. No Credit Party is an Affected Financial Institution.

4.24. **Beneficial Ownership Certification**. As of the Closing Date, to the Credit Parties' knowledge, the information included in the Beneficial Ownership Certification, if applicable, is true and correct in all material respects.

4.25. **No Intent to Defraud**. No Credit Party has entered, or is entering, into the arrangements contemplated hereby and by the other Credit Documents, or intends to make any transfer or incur any obligations hereunder or thereunder, with actual intent to hinder, delay or defraud either present or future creditors.

4.26. **Collateral Matters**. Upon entry by the Bankruptcy Court of the Interim Order or Final Order, as applicable, and pursuant to its terms, each Collateral Document, upon execution and delivery thereof by the parties thereto, will create in favor of Collateral Agent, for the benefit of the Secured Parties, a valid and enforceable security interest in the Collateral described therein and the proceeds thereof, subject, as to enforceability, to applicable bankruptcy, insolvency or similar laws affecting creditors' rights generally and to general principles of equity and principles of good faith and fair dealing. Upon the entry by the Bankruptcy Court of the Interim Order or Final Order, as applicable, and in accordance therewith, the security interests and liens granted pursuant to the Interim Order, the Final Order and the Collateral Documents shall automatically, and without further action, constitute a perfected security interest in (to the extent intended to be created thereby and required to be perfected under the Credit Documents) all right, title and interest of each pledgor or mortgagor (as applicable) party thereto in the Collateral described therein respect to such pledgor or mortgagor (as applicable, and subject to the Carve-Out).

## SECTION 5.      AFFIRMATIVE COVENANTS

Each Credit Party covenants and agrees that until Payment in Full of all Obligations, each Credit Party shall perform, and shall cause each of its Subsidiaries to perform, all covenants in this Section 5.

5.1. **Financial Statements and Other Reports**. Unless otherwise provided below, Company will deliver to Administrative Agent and Lenders:

(a) <u>Annual Financial Statements</u>. As soon as available, and in any event by April 30 of the following year after the end of each Fiscal Year, commencing with the Fiscal Year ending December 31, 2023, the audited consolidated balance sheets of Company and its Consolidated Subsidiaries as at the end of such Fiscal Year, and the related consolidated statements of income, stockholders' equity and cash flows of Company and its Consolidated Subsidiaries for

such Fiscal Year, also setting forth in each case in comparative column from the corresponding figures for the previous Fiscal Year, accompanied by a report and opinion of independent public accountants of nationally recognized standing as shall be retained by Company and be reasonably satisfactory to Administrative Agent (it being understood that the "Big Four" accounting firms are hereby approved by Administrative Agent), which report and opinion shall be prepared in accordance with generally accepted auditing standards relating to reporting and which report and opinion shall not be subject to any qualification or exception or any explanation, qualification or exception as to the scope of such audit, other than solely with respect to, or resulting solely from, an upcoming maturity date of the Loans and Commitments under this Agreement occurring within one year from the time such opinion is delivered, together with a certificate signed by an Authorized Officer of Company, to the effect that such financial statements fairly present in all material respects the consolidated financial position of Company and its Consolidated Subsidiaries as at the dates indicated and the consolidated results of their operations for the periods indicated in conformity with GAAP;

(b)    Quarterly Financial Statements.  As soon as available, and in any event by May 15 (with respect to each Fiscal Quarter ending March 31 of any Fiscal Year), August 15 (with respect to each Fiscal Quarter ending June 30 of any Fiscal Year), November 15 (with respect to each Fiscal Quarter ending September 30 of any Fiscal Year) and February 15 (with respect to each Fiscal Quarter ending December 31 of any Fiscal Year), as applicable, commencing with the Fiscal Quarter ended June 30, 2023 (including the fourth Fiscal Quarter of each Fiscal Year), the unaudited consolidated balance sheets of Company and its Consolidated Subsidiaries, and the related unaudited consolidated statements of income, stockholders' equity and cash flows for such Fiscal Quarter, and for the portion of the Fiscal Year through the end of such Fiscal Quarter and the corresponding figures, all as at the end of the corresponding Fiscal Quarter, and in comparative columnar form for the corresponding period, in the preceding Fiscal Year, together with (i) a certificate signed by an Authorized Officer of Company, to the effect that such financial statements, while not examined by independent public accountants, reflect, in the opinion of Company, all adjustments necessary to present fairly in all material respects the consolidated financial position of Company and its Consolidated Subsidiaries as at the end of the Fiscal Quarter and the consolidated results of operations for the Fiscal Quarter then ended in conformity with GAAP, subject to normal year-end and audit adjustments and the absence of footnotes and (ii) a schedule summarizing, to the best of Company's knowledge, any material, non-ordinary course transactions with Affiliates (including the value thereof) during the period covered by such financial statements;

(c)    Compliance Certificate.    Together with each delivery of financial statements of Company and its Subsidiaries pursuant to Sections 5.1(a) and 5.1(b), a duly executed and completed Compliance Certificate;

(d)    Statements of Reconciliation after Change in Accounting Principles.  If, as a result of any change in accounting principles and policies from those used in the preparation of the Historical Financial Statements, the consolidated financial statements of Company and its Subsidiaries delivered pursuant to Section 5.1(a) or 5.1(b) will differ in any material respect from the consolidated financial statements that would have been delivered pursuant to such subdivisions had no such change in accounting principles and policies been made, then, together with the first

82

delivery of such financial statements after such change, one or more statements of reconciliation for all such prior financial statements in form and substance satisfactory to Administrative Agent;

      (e)    <u>Business Plan; Cash Flow Forecasts; Management Reports</u>.

      (i)    As soon as available and in any event no later than February 28 of each Fiscal Year, a copy of the Business Plan for the then-current Fiscal Year (with quarterly figures) and the subsequent full Fiscal Year (with annual figures), including (i) forecasts showing calculation on a *pro forma* basis of the targets set forth in Section 6.13 through the final maturity date of the Loans, and (ii) forecasts showing calculation on a *pro forma* basis of liquidity through the final maturity date of the Loans, together, in each case, with an explanation of the assumptions on which such forecasts are based, all in form reasonably satisfactory to the Requisite Lenders, in each case, accompanied by a certificate of an Authorized Officer of Company certifying that such forecasts represent Company's reasonable good faith estimates and assumptions as to future performance, which Company believes to be fair and reasonable as of the time made in light of then-current and reasonably foreseeable business conditions (it being understood that forecasts and projections by their nature involve approximations and uncertainties); <u>provided</u>, that for the avoidance of doubt, it shall not constitute a Default or Event of Default under this Agreement if such forecasts do not show compliance with such targets;

      (f)    <u>Notice of Default or Material Adverse Effect</u>.   Promptly upon any Authorized Officer of any Credit Party obtaining knowledge (i) of any Default or Event of Default; (ii) that any Person has given any notice to Company or any Guarantor or taken any other action with respect to any event or condition set forth in Section 8.1(b); or (iii) of the occurrence of any event or change that has caused, either in any single case or in the aggregate, a Material Adverse Effect, a certificate of its Authorized Officers specifying the nature and period of existence of such condition, event or change, or specifying the notice given and action taken by any such Person and the nature of such claimed Event of Default, Default, default, event or condition, and what action the Credit Parties have taken, are taking and propose to take with respect thereto;

      (g)    <u>Notice of Litigation</u>.  Promptly upon any Authorized Officer of any Credit Party obtaining knowledge of (i) the institution of, or non-frivolous written threat of, any Adverse Proceeding not previously disclosed in writing by the Credit Parties to Lenders (other than in connection with the Chapter 11 Cases), or (ii) any material development in any other Adverse Proceeding that, in each case if adversely determined, would be reasonably expected to result in a Material Adverse Effect or liability of Company or any of its Subsidiaries in excess of $2,500,000, individually, or $5,000,000, in the aggregate for all such Adverse Proceedings, or seeks to enjoin or otherwise prevent the consummation of, or to recover any damages or obtain relief as a result of, the transactions contemplated hereby, written notice thereof together with such other information as may be reasonably available to the Credit Parties to enable Lenders and their counsel to evaluate such matters;

      (h)    <u>Notices of ERISA Events</u>.   Except where it would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect, (1) promptly upon becoming aware of the occurrence of or forthcoming occurrence of any ERISA Event, a written notice specifying the nature thereof, what action Company, any of its Subsidiaries or any of their

respective ERISA Affiliates has taken, is taking or proposes to take with respect thereto and, when known, any action taken or threatened by the Internal Revenue Service, the Department of Labor or the PBGC with respect thereto; and (2) with reasonable promptness, with respect to each Employee Benefit Plan and/or Multiemployer Plan affected by an ERISA Event, copies of (x) each Schedule B (Actuarial Information) to the annual report (Form 5500 Series) filed by Company, any of its Subsidiaries or any of their respective ERISA Affiliates with the Internal Revenue Service with respect to each such Employee Benefit Plan; (y) all notices received by Company, any of its Subsidiaries or any of their respective ERISA Affiliates from a Multiemployer Plan sponsor concerning an ERISA Event; and (z) copies of such other documents or governmental reports or filings relating to each such Employee Benefit Plan and/or Multiemployer Plan as Administrative Agent shall reasonably request;

(i)    Notice of Canadian Pension Events.  Except where it would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect, promptly upon becoming aware of the occurrence of or forthcoming occurrence of any Canadian Pension Event, a written notice specifying the nature thereof and what action Company or any of its Subsidiaries has taken with respect thereto;

(j)    Insurance Report. As soon as practicable and promptly upon renewal of any material insurance policy, a summary of all material insurance coverage maintained by Company and its Subsidiaries;

(k)    Notice Regarding Material Contracts.  Promptly, and in any event within ten Business Days (i) after any Material Contract is terminated or amended in a manner that is materially adverse to Company or such Subsidiary, as the case may be, (ii) after receipt by the Company or a Subsidiary of any written notice of any breach or non-performance of, or any default under, any Material Contract, or (iii) after any new Material Contract is entered into, a written statement describing such event, with copies of such material amendments or new contracts, delivered to Administrative Agent, and an explanation of any actions being taken with respect thereto;

(l)    Information Regarding Collateral.  (a)  The Credit Parties will furnish to Administrative Agent and Collateral Agent prior written notice of any change (i) in any Credit Party's legal name, (ii) in any Credit Party's identity or corporate structure, (iii) in any Credit Party's jurisdiction of organization or formation, or (iv) in any Credit Party's Federal Taxpayer Identification Number.  Each Credit Party agrees not to effect or permit any change referred to in the preceding sentence unless all filings have been made under the UCC or PPSA or otherwise that are required in order for Collateral Agent to continue at all times following such change to have a valid, legal and perfected security interest in all the Collateral as contemplated in the Collateral Documents.  Each Credit Party also agrees promptly to notify Administrative Agent and Collateral Agent if any material portion of the Collateral is damaged or destroyed;

(m)    [Reserved];

(n)    PATRIOT Act, Beneficial Ownership Regulation, etc.  Promptly upon written request therefor, any information reasonably required by any Agent or any Lender under or in connection with the PATRIOT Act or the Beneficial Ownership Regulation; and

(o) <u>Other Information</u>. (A) Promptly upon their becoming available, copies of (i) all information sent or made available generally by Company to any of its debt or equity investors or other security holders acting in such capacity or by any Subsidiary of Company to its debt or equity investors or other security holders other than Company or another Subsidiary of Company, (ii) all regular and periodic reports and all registration statements and prospectuses, if any, filed by Company or any of its Subsidiaries with any securities exchange or with the Securities and Exchange Commission or any Governmental Authority, (iii) all press releases and other statements made available generally by Company or any of its Subsidiaries to the public concerning material developments in the business of Company or any of its Subsidiaries, and (iv) any marketing materials for prospective investors prepared and widely distributed by Company or any Subsidiary (or any advisor thereto); and (B) promptly after any request, such other information and data with respect to Company or any of its Subsidiaries as from time to time may be reasonably requested by any Lender; <u>provided</u>, <u>however</u>, that such registration statements, proxy statements, notices and reports and other materials required to be delivered pursuant to this Section 5.1(o) shall be deemed delivered for purposes of this Agreement when posted to the website of Company or the website of the SEC and written notice of such posting has been delivered to Administrative Agent.

(p) <u>Chapter 11 Filings</u>. To the extent reasonably practicable, (i) at least three (3) calendar days (or such shorter review period as is necessary or appropriate under the circumstances) prior to the date when the Company intends to file the same, any documents implementing and achieving the transactions contemplated by the Credit Documents, as applicable, including any substantive "first day" or "second day" motions, the Chapter 11 Plan and any supplement thereto, the Chapter 11 Plan Disclosure Statement, any proposed order of the Bankruptcy Court approving the Chapter 11 Plan, any proposed order of the Bankruptcy Court approving the Chapter 11 Plan Disclosure Statement, and any proposed Interim Order and Final Order, in each case, with the Bankruptcy Court and (ii) at least one (1) calendar day (or such shorter review period as necessary or appropriate) prior to the date when the Company intends to file any other material pleading with the Bankruptcy Court (but excluding retention applications, fee applications, and any declarations in support thereof or related thereto) with the Bankruptcy Court.

5.2.    **Existence**.  Except as otherwise permitted under Section 6.5, each Credit Party will, and will cause each of its Subsidiaries to, at all times preserve and keep in full force and effect (a) its existence and (b) all rights and franchises, licenses and permits material to its business.

5.3.    **Payment of Taxes and Claims**.  Each Credit Party will, and will cause each of its Subsidiaries to, pay all federal income and other material Taxes imposed upon it or any of its properties or assets or in respect of any of its income, businesses or franchises before any penalty or fine accrues thereon, and all claims (including claims for labor, services, materials and supplies) for sums that have become due and payable and that by law have or may become a Lien upon any of its properties or assets, prior to the time when any penalty or fine shall be incurred with respect thereto; provided, no such Tax or claim need be paid if it is being contested in good faith by appropriate proceedings promptly instituted and diligently conducted, so long as (a) adequate reserve or other appropriate provision, as shall be required in conformity with GAAP shall have been made therefor, or (b) failure to pay or discharge the same pending such contest is permitted or required under the Bankruptcy Code.  No Credit Party will, nor will it permit any of its wholly-

owned Subsidiaries to, file or consent to the filing of any consolidated income tax return with any Person (other than Company or any of its Subsidiaries).

5.4.    **Maintenance of Properties**.

(a)    Each Credit Party will, and will cause each of its Subsidiaries to, subject to their reasonable business judgment, maintain or cause to be maintained in good repair, working order and condition, ordinary wear and tear excepted, all material properties used or useful in the business of Company and its Subsidiaries and from time to time will make or cause to be made all appropriate repairs, renewals and replacements thereof.

(b)    Except as would not be material to Company and its Subsidiaries, taken as a whole, Company and each Subsidiary will take all actions reasonably necessary to protect all Intellectual Property, including protecting the secrecy and confidentiality of the confidential information and trade secrets of Company and each Subsidiary; provided that, notwithstanding anything in this Agreement to the contrary, with respect to any Intellectual Property or Item of Product, Company and its Subsidiaries shall not be required to register or apply for any registration of any Copyright in the United States Copyright Office, or any foreign counterpart thereof, unless, in its reasonable business judgment, Company or such Subsidiary shall deem such registration necessary or advisable to protect its interest therein.

5.5.    **Insurance**.  Company and its Subsidiaries will maintain or cause to be maintained, with financially sound and reputable insurers, (i) business interruption insurance reasonably satisfactory to Administrative Agent, and (ii) casualty insurance, such public liability insurance, third party property damage insurance with respect to liabilities, losses or damage in respect of the assets, properties and businesses of Company and its Subsidiaries as may customarily be carried or maintained under similar circumstances by Persons of established reputation engaged in similar businesses, in each case in such amounts (giving effect to self-insurance), with such deductibles, covering such risks and otherwise on such terms and conditions as shall be customary for such Persons.  Without limiting the generality of the foregoing, Company and its Subsidiaries will maintain or cause to be maintained, with financially sound and reputable insurance companies, (a) flood insurance with respect to each Flood Hazard Property that is located in a community that participates in the National Flood Insurance Program, in each case in compliance with any applicable regulations of the FRB, and (b) replacement value casualty insurance on the Collateral (other than on assets or property that constitute an immaterial portion of the Collateral) under such policies of insurance, with such insurance companies, in such amounts, with such deductibles, and covering such risks as are at all times carried or maintained under similar circumstances by Persons of established reputation engaged in similar businesses.  Each such policy of insurance maintained by or on behalf of the Credit Parties shall (a) in the case of liability insurance policies (other than workers' compensation and other policies for which such endorsements are not customary), shall (i) name Collateral Agent, for the benefit of the Secured Parties as an additional insured thereunder, and (ii) in the case of business interruption and casualty insurance policies, contain a lender's loss payable clause or endorsement, satisfactory in form and substance to Administrative Agent, that names Collateral Agent, on behalf of Secured Parties as the lender's loss payee thereunder and, solely with respect to any modifications, cancellations or renewals to take effect after May 30, 2019, provides for at least five (5) Business Days' prior written notice to Administrative Agent and Collateral Agent of any modification or cancellation of such policy.

5.6.    **Inspections**.  Each Credit Party will, and will cause each of its Subsidiaries to, keep proper books of record and accounts in which full, true, and correct entries in conformity in all material respects with GAAP shall be made of all dealings and transactions in relation to its business and activities.  Each Credit Party will, and will cause each of its Subsidiaries to, permit any authorized representatives designated by any Agent or any Lender to visit and inspect any of the properties of any Credit Party and any of its respective Subsidiaries, to inspect, copy and take extracts from its and their financial and accounting records, and to discuss its and their affairs, finances and accounts with its and their officers, and with its independent public accountants (so long as an appropriate representative of Company shall have been offered a reasonable opportunity to be present at any such meeting with Company's independent public accountants), in each case other than information subject to confidentiality obligations and/or attorney client or other privilege, (a) unless an Event of Default has occurred and is continuing, no more than two (or such greater number as such Credit Party shall consent to) times in any twelve-month period, and (b) if an Event of Default has occurred and is continuing, as frequently as requested by Administrative Agent, in each case upon reasonable notice and at such reasonable times during normal business hours.

5.7.    **Lenders Calls**.  Company will (a) hold conference with the Lenders on Thursday of each week, or such other day as may be mutually agreed by the Company and the Requisite Lenders, to discuss disbursements and (b) upon the request of Requisite Lenders, participate in quarterly conference calls at such time as may be mutually agreed to by Company and Requisite Lenders.

5.8.    **Compliance with Laws**.

(a)    Each Credit Party will comply, and shall cause each of its Subsidiaries, if any, on or occupying any Facilities to comply, with (i) the requirements of all applicable laws, rules, regulations and orders of any Governmental Authority (including, without limitation, all material Environmental Laws) in all material respects (it being understood, in the case of any laws, rules, regulations, and orders specifically referred to any other provision of this Agreement, the Credit Parties shall also be required to represent and/or comply with, as applicable, the express terms of such provision) and (ii) all applicable Sanctions, Anti-Corruption and Anti-Bribery Laws, and Anti-Terrorism and Anti-Money Laundering Laws.  Company shall maintain in effect and enforce policies and procedures designed to ensure compliance by Company, its Subsidiaries and their respective directors, officers, employers and agents with Anti-Corruption and Anti-Bribery Laws and applicable Sanctions.

(b)    Company will deliver to Administrative Agent and Lenders:

(i)    as soon as practicable following receipt by any Credit Party thereof, copies of all environmental audits, investigations, analyses and reports of any kind or character, whether prepared by personnel of Company or any of its Subsidiaries or by independent consultants, Governmental Authorities or any other Persons, with respect to significant environmental matters at any Facility or with respect to any material Environmental Claims;

(ii)        promptly upon the occurrence thereof, written notice describing in reasonable detail (1) any Release required to be reported to any Governmental Authority under any applicable Environmental Laws, (2) any remedial action taken by Company, any Subsidiary or any other Person in response to (A) any Hazardous Materials Activities the existence of which has a reasonable possibility of resulting in one or more Environmental Claims having, individually or in the aggregate, a Material Adverse Effect, or (B) any Environmental Claims that, individually or in the aggregate, have a reasonable possibility of resulting in a Material Adverse Effect, (3) any Credit Party's discovery of any occurrence or condition on any Real Estate Asset or real property adjoining or in the vicinity of any Facility that could cause such Real Estate Asset or Facility or any part thereof to be subject to any material restrictions on the ownership, occupancy, transferability or use thereof under any Environmental Laws and (4) Company or any Subsidiary obtaining knowledge of any Environmental Claims involving Company or any Subsidiary;

(iii)        as soon as practicable following the sending or receipt thereof by Company or any of its Subsidiaries, a copy of any and all written communications with respect to (1) any Environmental Claims that, individually or in the aggregate, have a reasonable possibility of giving rise to a Material Adverse Effect, (2) any Release required to be reported to any Governmental Authority, and (3) any request for information from any Governmental Authority that suggests such Governmental Authority is investigating whether Company or any of its Subsidiaries may be potentially responsible for any Hazardous Materials Activity;

(iv)        prompt written notice describing in reasonable detail (1) any proposed acquisition of stock, assets, or property by Company or any of its Subsidiaries that could reasonably be expected to (A) expose Company or any of its Subsidiaries to, or result in, Environmental Claims that could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect or (B) affect the ability of Company or any of its Subsidiaries to maintain in full force and effect all material Governmental Authorizations required under any Environmental Laws for their respective operations and (2) any proposed action to be taken by Company or any of its Subsidiaries to modify current operations in a manner that could reasonably be expected to subject Company or any of its Subsidiaries to any additional material obligations or requirements under any Environmental Laws; and

(v)        with reasonable promptness, such other documents and information as from time to time may be reasonably requested by Administrative Agent in relation to any matters disclosed pursuant to this Section 5.8(b).

(c)        Each Credit Party shall promptly take, and shall cause each of its Subsidiaries promptly to take, any and all actions necessary to (i) cure any violation of applicable Environmental Laws by such Credit Party or its Subsidiaries that would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, and (ii) make an appropriate response to any Environmental Claim against such Credit Party or any of its Subsidiaries and discharge any obligations it may have to any Person thereunder where failure to do so would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

5.9.    **Subsidiaries**.  In the event that any Person becomes a Subsidiary (other than any Excluded Subsidiary) (or, with respect to any Excluded Subsidiary, such Person ceases to be an Excluded Subsidiary, including if any Content Development Subsidiary ceases to be a Content Development Subsidiary pursuant to Section 5.11(b)) of any Credit Party, such Credit Party shall (a) concurrently with such Person becoming a Subsidiary or ceasing to be an Excluded Subsidiary, cause such Subsidiary to become a Guarantor hereunder and execute and deliver a Counterpart Agreement and any other documents reasonably requested by the Administrative Agent, the Collateral Agent or the Requisite Lenders, in the form specified therefor or otherwise reasonably acceptable to the Requisite Lenders, in each case, duly executed and delivered on behalf of such Subsidiary, that will provide a perfected security interest in the Collateral with the priority required by the DIP Order (subject in all respects to the Carve-Out).  With respect to each such Subsidiary, Company shall promptly send to Administrative Agent and Collateral Agent written notice setting forth with respect to such Person (i) the date on which such Person became a Subsidiary of Company, and (ii) all of the data required to be set forth in Schedule 4.7(a) with respect to all Subsidiaries of Company; provided, such written notice shall be deemed to supplement Schedule 4.7(a) for all purposes hereof automatically upon such Person becoming a Subsidiary.

5.10.    **[Reserved]**.

5.11.    **Further Assurances**.

(a)    At any time or from time to time upon the request of Administrative Agent, each Credit Party will, at its expense, promptly execute, acknowledge and deliver such further documents and do such other acts and things as Administrative Agent or Collateral Agent may reasonably request in order to effect fully the purposes of the Credit Documents or to maintain perfection or renew the rights of Collateral Agent for the benefit of Secured Parties with respect to the Collateral (or with respect to any additions thereto or replacements or proceeds thereof or with respect to any other property or assets hereafter acquired by Holdings or any Subsidiary that may be deemed to be part of the Collateral), including providing Lenders with any information reasonably requested pursuant to Section 10.20.  In furtherance and not in limitation of the foregoing, each Credit Party shall take such actions as Administrative Agent or Collateral Agent may reasonably request from time to time to ensure that the Obligations are guaranteed by the Guarantors and are secured by a First Priority Lien on substantially all of the assets of the Credit Parties, all of the outstanding Capital Stock of each Credit Party's direct Subsidiaries.  Company will provide to Administrative Agent and Collateral Agent, from time to time upon request, evidence reasonably satisfactory to Administrative Agent or Collateral Agent, as applicable, as to the perfection and priority of the Liens created or intended to be created by the Collateral Documents; provided that, the foregoing authorization shall not relieve Company of its obligation to grant and maintain perfected First Priority Liens on the Collateral for the benefit of Collateral Agent and the Secured Parties.  No Credit Party (other than Company) shall, nor shall it permit any of its Subsidiaries to, issue any Capital Stock after the Closing Date unless concurrently with such issuance, the Credit Parties shall cause such Capital Stock to be subject to a perfected First Priority Lien in favor of Collateral Agent for the benefit of the Secured Parties, and shall deliver all such documents, opinions, filings, searches and other deliverables as are necessary or that Administrative Agent or Collateral Agent shall reasonably request in connection therewith.

(b)      Unless the Requisite Lenders shall otherwise agree in writing, Company shall cause any Subsidiary, including any Content Development Subsidiary, that wholly-owns any Item of Product (other than ordinary course distribution rights with respect thereto) (i) which has been Delivered or as to which production has been completed and (ii) as to which any development, production and distribution financing with respect thereto and liens securing such development, production and distribution financing shall have been fully repaid, released or terminated, as applicable, within ten (10) Business Days after such event, to either (A) except in the case of any Excluded Subsidiary (other than by reason of being a Content Development Subsidiary), become a Guarantor under this Agreement and to become a party to all applicable Collateral Documents (upon which, any such entity that is a Content Development Subsidiary shall automatically cease to be a Content Development Subsidiary, and may not thereafter be redesignated a Content Development Subsidiary), or (B) transfer all of its rights in such Item of Product to a Credit Party.

5.12.   **Post-Closing Matters**.  The Credit Parties shall satisfy each of the requirements set forth on Schedule 5.12 on or before the date specified for such requirement or such later date to be determined by Administrative Agent (without any requirement for Lender consent).

5.13.   **Subordinated Debt**.  In the event that Company or any other Credit Party shall at any time incur, issue or have outstanding any Subordinated Debt, such Credit Party shall take all such actions as shall be necessary to cause all Obligations to constitute senior indebtedness (however denominated) in respect of such Subordinated Debt and to enable Administrative Agent and the Lenders to have and exercise any payment blockage or other remedies available or potentially available to holders of senior indebtedness under the terms of such Subordinated Debt. Without limiting the foregoing, all Obligations are hereby designated as "senior indebtedness" and as "designated senior indebtedness" and words of similar import under and in respect of any indenture or other agreement or instrument under which such Subordinated Debt is outstanding and are further given all such other designations as shall be required under the terms of any such Subordinated Debt in order that the Lenders may have and exercise any payment blockage or other remedies available or potentially available to holders of senior indebtedness under the terms of such Subordinated Debt.

5.14.   **Miscellaneous Business Covenants**.  Company will cause each of its Subsidiaries that are not Credit Parties to: (i) maintain entity records and books of account separate from those of any other entity that is an Affiliate of such entity; (ii) not commingle its funds or assets with those of any other entity that is an Affiliate of such entity, except that such non-Guarantor Subsidiaries may participate in Company's cash pooling arrangements as in effect  on the date hereof; and (iii) provide that its Board of Directors or other analogous governing body will hold all appropriate meetings to authorize and approve such entity's actions, which meetings will be separate from those of other entities.

5.15.   **[Reserved]**.

5.16.   **Cash Management**.  Company and its Subsidiaries shall establish and maintain cash management systems substantially consistent with those in place for Company and/or its Subsidiaries as of the Closing Date, except as set forth in the Cash Management Order, or as

Administrative Agent shall otherwise agree in its reasonable discretion (such consent not to be unreasonably withheld, delayed or conditioned).

5.17.   **Joint Ventures and Content Development Subsidiaries** .

(a)   <u>Domestic Joint Ventures and Content Development Subsidiaries</u>.   With respect to any Joint Venture or Content Development Subsidiary formed or designated, as applicable, after the Closing Date that is formed or organized under the laws of the United States of America, any State thereof or the District of Columbia, Company and its Subsidiaries shall ensure that all Capital Stock owned by Company or its Subsidiaries in such Joint Venture or Content Development Subsidiary shall be directly owned by a Credit Party or, in the case of an entity formed by a Joint Venture, by such Joint Venture.

(b)   <u>Foreign Joint Ventures and Content Development Subsidiaries</u>.   With respect to any Joint Venture or Content Development Subsidiary formed or designated by a Credit Party or Subsidiary, as applicable, after the Closing Date that is formed or organized under the laws of any jurisdiction other than the United States of America, any State thereof or the District of Columbia, Company and its Subsidiaries shall ensure that all Capital Stock in such Joint Venture or Content Development Subsidiary, as applicable, owned by Company or its Subsidiaries shall be directly owned by a Subsidiary or a Credit Party.

(c)   <u>Investment Proceeds</u>.   In the event that any Subsidiary shall receive proceeds from any Joint Venture, or Content Development Subsidiary (including by way of repayment, interest payments, dividends, liquidation proceeds, participation payments, asset transfer, distributions or other direct or indirect payments from such Joint Venture or Content Development Subsidiary), after deducting all reasonable costs and expenses (including for taxes) related thereto on account of such Subsidiary's equity interests and Investments in such Joint Venture or Content Development Subsidiary, as applicable (such proceeds, "**Investment Proceeds**"), such Subsidiary shall, if such Subsidiary is not a Credit Party, further dividend, distribute or transfer such Investment Proceeds to a Credit Party within five (5) Business Days of receipt of such Investment Proceeds.

(d)   <u>Excluded Amounts</u>.   Notwithstanding the foregoing, to the extent that any Investment Proceeds attributable to any Foreign Subsidiary that is required to be applied, transferred or deposited pursuant to clause (c) above (i) would be prohibited or restricted under applicable local law (including, without limitation, as a result of laws or regulations relating to financial assistance, corporate benefit, restrictions on upstreaming of cash intragroup and fiduciary and statutory duties of directors of relevant subsidiaries) or the organizational documents (including, without limitation, as a result of minority ownership of a Foreign Subsidiary) or any other material agreement of such Foreign Subsidiary, or (ii) would result in adverse tax consequences as determined in good faith by Company in consultation with the Requisite Lenders (including, without limitation, as a result of any withholding of Taxes on the upstreaming of cash), then in each case, Company shall not be required to apply, transfer or deposit such amounts (the "**Excluded Investment Amounts**") as otherwise would be required under clause (c) above (any such limitation, the "**Investment Repatriation Limitation**"); <u>provided</u> that in the circumstances described in clause (i) of this Section 5.15(d), Company and its Subsidiaries will take all commercially reasonable actions available under applicable local law to permit such application,

transfer and/or deposit. The non-application of the Excluded Investment Amounts as a consequence of any Investment Repatriation Limitation will not constitute an Event of Default hereunder. Excluded Investment Amounts shall be allocated among Subsidiaries in various jurisdictions determined by Company in good faith and the Excluded Investment Amounts shall be available for working capital or other purposes of Company, the Foreign Subsidiary or any Subsidiary, in each case, subject to any applicable limitations otherwise set forth herein. Excluded Investment Amounts shall not be deemed to be Investment Proceeds, regardless of whether the Investment Repatriation Limitation ceases to apply after such initial determination.

5.18.   **Approved Budget and Compliance**

(a)   The use of New Money Loans by the Credit Parties under this Agreement and the other Credit Documents shall be applied (and the Company agrees to so limit its use the proceeds of such New Money Loans so as to be) solely in accordance with the Approved Budget (subject to the variances set forth in Section 5.18(c)) and the other restrictions set forth herein and in the other Credit Documents.

(b)   Each Approved Budget shall set forth, on a weekly basis, among other things, cash flows, Budgeted Cash Receipts, Budgeted Disbursement Amounts and Budgeted Liquidity, for the 13-week period commencing with the week ending May 20, 2023 and such Approved Budget shall be approved by, and be in form and substance satisfactory to, the Requisite Lenders in their reasonable discretion. The Approved Budget shall include a 13-week cash flow forecast, which shall (i) include line-item reporting, the nature and scope of which shall be reasonably satisfactory to the Requisite Lenders, (ii) otherwise be in form and substance reasonably satisfactory to, and subject to the approval of, the Requisite Lenders, (iii) update the 13-week cash flow forecast from the prior Approved Budget to add additional weeks to the forecast in order to present a 13-week forecast period, (iv) include a report reconciling the Company's actual performance for the relevant Variance Testing Period with the Company's projected performance pursuant to the previous month's 13-week cash flow forecast and (v) include a discussion of any material variances in actual results in cash flow as compared to the forecasted performance. The Approved Budget shall be updated, modified or supplemented by the Company once every four weeks from May 14, 2023 (for the avoidance of doubt, the first such update, modification or supplement being due on June 14, 2023), and each such updated, modified or supplemented budget shall be approved in writing by, and shall be in form and substance reasonably satisfactory to, the Requisite Lenders in their sole discretion, and no such updated, modified or supplemented budget shall be effective until so approved and once so approved shall be deemed an Approved Budget; provided, however, that in the event the Requisite Lenders, on the one hand, and the Company, on the other hand, cannot agree as to an updated, modified or supplemented budget, such disagreement shall constitute an immediate Event of Default once the period covered by the prior Approved Budget has terminated; provided, further, that if an updated 13-week cash flow forecast is not approved by the Requisite Lenders, the most recently approved 13-week cash flow forecast shall remain the Approved Budget. The Approved Budget may be amended at any time, subject to the approval of the Requisite Lenders. Each Approved Budget delivered to the Lenders shall be accompanied by such supporting documentation as reasonably requested by the Lenders. Each Approved Budget shall be prepared in good faith based upon assumptions which the Credit Parties believe to be reasonable.

(c)     For each Variance Testing Period, the Company shall not permit Actual Disbursement Amounts to exceed the Budgeted Disbursement Amounts, Actual Net Investments and Financing to exceed Budgeted Net Investments and Financing, or Actual Professional Fees to exceed Budgeted Professional Fees, in each case, for such Variance Testing Period, by more than 10%.

(d)     The Company shall deliver to the Administrative Agent and the Lenders on or before 5:00 p.m. New York City time on Wednesday following the end of each Variance Testing Period (or such later date as the Requisite Lenders may agree in their sole discretion, which may be communicated via email delivered by counsel to the Requisite Lenders) a certificate including such detail as is satisfactory to the Requisite Lenders, signed by an Authorized Officer of the Company certifying that (i) the Credit Parties are in compliance with the covenants contained in Sections 5.18(a), (b) and (c) above and (ii) no Default or Event of Default has occurred or, if such a Default or Event of Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto, together with an Approved Budget Variance Report.

5.19.   **[Reserved]**.

5.20.   **Chief Restructuring Officer**

(a)     For so long as any Obligations are outstanding hereunder, the CRO shall continue to be retained and performing services as the CRO performed prior to the Petition Date, unless otherwise agreed to by the Lenders.

(b)     The CRO will provide support as necessary to the Special Committee, including with respect to (i) the Sale Transaction (ii) the Approved Budget, and (iii) any other items requested by the Special Committee.

5.21.   **Required Milestones**.  The Company shall, or shall cause the following to occur, by the times and dates set forth below (as any such time and date may be extended, or any of such milestones set forth below may be modified, with the consent of the Requisite Lenders):

(a)     By no later than five (5) days following the Petition Date, the Bankruptcy Court shall enter the Interim Order, in form and substance acceptable to the Requisite Lenders.

(b)     By no later than thirty (30) days following the Petition Date, the Bankruptcy Court shall enter the Final Order, in form and substance acceptable to the Requisite Lenders.

(c)     By no later than (30) days following the Petition Date, the Bankruptcy Court shall enter a motion to extend the time period to assume or reject non-residential leases of real property, in form and substance acceptable to the Requisite Lenders.

(d)     Sale Milestones

(i)     On the Petition Date, the Company shall file a motion to approve bidding and sale procedures, which shall contain customary "stalking horse" protections (the "**Bid Procedures**").

(ii)    Within three (3) days of Petition Date, the Company shall have filed with the Bankruptcy Court a fully executed stalking horse asset purchase agreement (the "**Asset Purchase Agreement**"), which shall provide that the Lenders (or a designee thereof) shall serve as the stalking horse bidder for certain of the Debtors' assets (as set forth in the Asset Purchase Agreement) subject to overbids pursuant to the Bidding Procedures Order (as defined below). The Asset Purchase Agreement shall be pursuant to a credit bid of not less than the entire amount of all Obligations due under or in connection with the DIP Facility, which credit bid right shall be expressly reserved for the benefit of the Lenders in the DIP Orders, whether pursuant to an Auction (as defined below) or plan of reorganization under Section 1129 of the Bankruptcy Code.

(iii)    Within fifteen (15) days of Petition Date, the Company shall have obtained entry of the Bidding Procedures Order, in form and substance acceptable to the Requisite Lenders (the "**Bidding Procedures Order**") (including designation of the Asset Purchase Agreement as stalking horse).

(iv)    Within thirty five (35) days of Petition Date, the Company shall conduct the Auction (as defined in the Bidding Procedures Order or equivalent term used therein) in accordance with the Bidding Procedures Order.

(v)    By no later than forty (40) days following the Petition Date, the Bankruptcy Court shall have conducted, to the extent necessary, the Sale Hearing (as defined in the Bidding Procedures Order) and entered the Sale Order in form and substance acceptable to the Requisite Lenders approving the Sale Transaction.

(vi)    By no later than fifty-five (55) days following the Petition Date, the Sale Transaction shall have closed; provided that if regulatory approvals associated with a Sale Transaction remain pending as of such date, such date shall be automatically extended to the date that is the third Business Day following receipt of all necessary regulatory approvals.

5.22.    **Additional Bankruptcy Matters**.  The Company will provide the Administrative Agent, the Lenders and the Lender Advisors with updates of any material developments in connection with the Credit Parties' efforts under the Chapter 11 Cases. The Company shall deliver or cause to be delivered to the Lenders and the Lender Advisors, in accordance with the Bid Procedures, copies of any term sheets, proposals, presentations, amendments to any asset purchase agreement(s) or other documents, from any party, related to (i) the restructuring of the Debtors, or (ii) the sale of assets of one or more of the Debtors.  Notwithstanding the foregoing, the Debtors will not provide copies of any term sheets, proposals, presentations, amendments to any asset purchase agreement(s), bids or other confidential information to the Lenders if any of the Lenders are an active bidder or involved in the bidding process as to the relevant asset(s) at the applicable time.

5.23.    **Debtor-In-Possession Obligations**.  The Company shall comply in a timely manner with their obligations and responsibilities as debtors-in-possession under the Bankruptcy Code, the Bankruptcy Rules, the DIP Order, and any other order of the Bankruptcy Court.

**SECTION 6.       NEGATIVE COVENANTS**

Each Credit Party covenants and agrees that until Payment in Full of all Obligations, each of the Credit Parties agrees that it will not, and will not allow any Subsidiary to:

6.1.    **Limitations on Indebtedness**.   Incur, create, assume or suffer to exist any Indebtedness or permit any partnership in which a Credit Party or Subsidiary is a general partner to incur, create, assume or suffer to exist any Indebtedness, <u>except</u>:

(a)     Indebtedness represented by the Loans, the Notes and the other Obligations;

(b)     Indebtedness in respect of performance bonds, bid bonds, appeal bonds, surety bonds and completion guarantees and similar obligations, in each case provided in the ordinary course of business or consistent with past practice or industry practices, including those incurred to secure health, safety and environmental obligations in the ordinary course of business; <u>provided</u>, no Credit Party shall incur any such Indebtedness in support of any obligation of another Person, other than another Credit Party, except (i) with respect to any obligations in favor of guilds or in connection with agreements with talent, in each case, in the ordinary course of business or (ii) in support of obligations of any Content Development Subsidiary for purposes of development of the specified Items of Product being developed by such Content Development Subsidiary; provided, however, that all payments made in respect of any such Indebtedness under this Section 6.1(b)(ii) on an after the Closing Date, when taken together with the aggregate principal amount of Indebtedness guaranteed pursuant to Section 6.1(d), the aggregate principal amount of Indebtedness incurred and outstanding pursuant to Section 6.1(aa) and the aggregate amount of Investments made pursuant to Section 6.3(r), in each case, without duplication, on and after the Closing Date, shall not exceed $8,000,000;

(c)     guarantees by any Credit Party of Indebtedness otherwise permitted hereunder of any other Credit Party; <u>provided</u>, that to the extent such Indebtedness is subordinate to the Obligations, such guarantee shall be subordinated on substantially the same terms as such underlying Indebtedness;

(d)     guarantees by any Credit Party or any of their respective Subsidiaries of Indebtedness of any Content Development Subsidiary; *provided,* that (i) to the extent the Indebtedness that is guaranteed is subordinate to the Obligations, such guarantee shall be subordinated on substantially the same terms as such underlying Indebtedness; (ii) all such guarantees shall be unsecured and non-recourse to the assets of the Credit Parties and their respective Subsidiaries and (iii) the proceeds of the Indebtedness to be guaranteed are used solely to pay the fees and costs of such Indebtedness and the costs incurred in connection with the development of Items of Product by such Content Development Subsidiary; and *provided, however,* that the sum of the aggregate principal amount of Indebtedness that is guaranteed pursuant to this <u>Section 6.1(d)</u> on and after the Closing Date, when taken together with the aggregate amount of payments made in respect of Indebtedness incurred pursuant to Section 6.1(b)(ii), the aggregate principal amount of Indebtedness incurred and outstanding pursuant to Section 6.1(aa) and the aggregate amount of Investments made pursuant to Section 6.3(r), in each case, without duplication, on and after the Closing Date, shall not exceed $8,000,000;

(e)    customary guarantees in connection with participations and deferments relating to an Item of Product or guarantees of obligations of another Credit Party that the Credit Party could have incurred directly or indirectly as a primary obligor without violating the terms of any Credit Document;

(f)    unsecured liabilities for acquisitions of underlying rights in Items of Product; provided, that with respect to any such liabilities that are incurred outside of the ordinary course of business in support of any obligation of another Person, other than another Credit Party, such liabilities shall also constitute an Investment made under Section 6.3(s);

(g)    ordinary course liabilities relating to profit participations and other contingent compensation arising in connection with the exploitation of Items of Product, including royalties, deferments, guild residuals;

(h)    to the extent constituting an Investment otherwise permitted hereunder, Indebtedness payable by:

(i)    a Credit Party to another Credit Party;

(ii)    a Credit Party to a Subsidiary (including any Joint Venture) that is not a Credit Party;

(iii)    a Subsidiary that is not a Credit Party to (A) a Credit Party or (B) another Subsidiary that is not a Credit Party;

provided, that, in the case, of any Indebtedness incurred in reliance upon the prior clause (h)(i) or (h)(ii), all such Indebtedness is evidenced by the Master Intercompany Subordinated Note or other subordination agreement in form and substance reasonably satisfactory to the Requisite Lenders;

(i)    [reserved];

(j)    Indebtedness of Credit Parties and Subsidiaries to co-financiers existing on the Closing Date and incurred in connection with the development of Items of Product;

(k)    [reserved];

(l)    Indebtedness outstanding as of the Closing Date in respect of secured equipment and software purchase-money financing (including Capitalized Lease Obligations);

(m)    Indebtedness outstanding on the Closing Date and (except to the extent the principal amount of any such Indebtedness is not greater than $50,000 individually or $250,000 in the aggregate for all such undisclosed Indebtedness) and as set forth on Schedule 6.1(m);

(n)    [reserved];

(o)    Subordinated Debt of the Credit Parties existing on the Closing Date;

(p)    Indebtedness owed to any person providing workers' compensation, health, disability or other employee benefits or property, casualty or liability insurance to any Credit Party or Subsidiary, pursuant to reimbursement or indemnification obligations to such person, in each case in the ordinary course of business or consistent with past practice or industry practices;

(q)    Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently drawn against insufficient funds in the ordinary course of business; provided, that such Indebtedness is repaid within ten (10) Business Days of Company's notice of its incurrence thereof;

(r)    Indebtedness (and related Obligations) in respect of letters of credit, bank guarantees or similar instruments, or otherwise arising in connection with Cash Management Agreements, so long as (i) such Indebtedness is incurred in the ordinary course of business, (ii) no such Indebtedness is incurred in favor of any Person, other than (A) the issuer of any such letter of credit, bank guarantee or similar instrument, (B) the depository bank counterparties to the relevant Cash Management Agreements to which Company or a Subsidiary are party, and (C) wholly-owned Subsidiaries of Company or any Credit Party, (iii) if in respect of any overdraft or similar cash management product any liabilities arising therefrom are extinguished within ten (10) Business Days of Company's notice of the incurrence thereof and (iv) on and after the Closing Date, no additional cash collateral may be posted in support of any such cash management services;

(s)    Indebtedness consisting of the financing of insurance premiums in the ordinary course of business;

(t)    Indebtedness incurred in the ordinary course of business in respect of obligations of the Credit Parties to pay the deferred purchase price of goods or services or progress payments in connection with such goods and services; provided, that such obligations are incurred in connection with open accounts extended by suppliers on customary trade terms in the ordinary course of business and not in connection with (i) the borrowing of money, (ii) any Swap Agreements or (iii) the acquisition of Items of Product;

(u)    Indebtedness representing deferred compensation to employees, consultants or independent contractors of the Credit Parties and their Subsidiaries incurred in the ordinary course of business and consistent with past practice;

(v)    the endorsement of negotiable instruments for deposit or collection in the ordinary course of business;

(w)    [reserved];

(x)    the "Obligations" under, and as defined in, the Pre-Petition Credit Agreement and the other Pre-Petition Credit Documents;

(y)    Indebtedness with respect to any Series A Preferred Stock or Series A Dividend Notes existing on the Closing Date;

(z)    Adequate Protection Claims;

(aa)    Indebtedness of any Content Development Subsidiary to finance development, production and distribution of the Items of Product or other Intellectual Property owned by such Content Development Subsidiary; provided, however, that the sum of the aggregate principal amount of such Indebtedness incurred and outstanding on and after the Closing Date under this Section 6.1(aa), when taken together with the aggregate amount of payments made in respect of Indebtedness incurred pursuant to Section 6.1(b)(ii), the aggregate principal amount of Indebtedness guaranteed pursuant to Section 6.1(d) and the aggregate amount of Investments made pursuant to Section 6.3(r), in each case, without duplication, on and after the Closing Date, shall not exceed $8,000,000;

(bb)    all premium (if any, including tender premiums) expenses, defeasance costs, interest (including post-petition interest), fees, expenses, charges and additional or contingent interest on obligations described in clauses (a) through (aa) above or Refinancings thereof;

(cc)    Indebtedness in an aggregate principal amount not to exceed $8,000,000 incurred and outstanding at any time by a Content Development Subsidiary of Pulse Films Limited for the sole purpose of funding the development, production and distribution of an Item of Product consisting of a returning single scripted television series which has been identified to the Administrative Agent prior to the Closing Date (including the bridge financing of tax credits in respect of such Item of Product); and

(dd)    guarantees by Pulse Films Limited of Indebtedness incurred by a Content Development Subsidiary thereof pursuant to Section 6.1(cc); *provided* that (i) to the extent the Indebtedness that is guaranteed is subordinate to the Obligations, such guarantee shall be subordinated on substantially the same terms as such underlying Indebtedness; (ii) all such guarantees shall be non-recourse to the assets of the Credit Parties and their respective Subsidiaries, *provided*, *however*, that such guarantees may be secured by the Capital Stock of the Content Development Subsidiary that is the primary obligor under the Indebtedness to be guaranteed by the grantor Subsidiary that is not a Credit Party or a Debtor; and (iii) the outstanding principal amount of Indebtedness guaranteed pursuant to this Section 6.1(dd) shall not exceed $8,000,000.

For purposes of determining compliance with this Section 6.1, the amount of any Indebtedness denominated in any currency other than Dollars shall be calculated based on customary currency exchange rates in effect, in the case of such Indebtedness incurred (in respect of term Indebtedness) or committed (in respect of revolving Indebtedness) on or prior to the Closing Date and, in the case of such Indebtedness incurred (in respect of term Indebtedness) or committed (in respect of revolving Indebtedness) after the Closing Date, on the date on which such Indebtedness was incurred (in respect of term Indebtedness) or committed (in respect of revolving Indebtedness); provided, that, if such Indebtedness is incurred to refinance other Indebtedness denominated in a currency other than Dollars (or in a different currency from the Indebtedness being refinanced), and such refinancing would cause the applicable Dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such refinancing, such Dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed (i) the outstanding or committed principal amount, as applicable, of such Indebtedness being refinanced plus (ii) the

98

aggregate amount of fees, underwriting discounts, premiums (including tender premiums), defeasance costs and other costs and expenses incurred in connection with such refinancing.

Notwithstanding the foregoing, (a) the Indebtedness contemplated by Sections 6.1(j), (l), (o), (r) and (z) shall not be provided by any Lender unless each Lender either (x) provides its Pro Rata Share of such Indebtedness or (y) declines to provide its Pro Rata Share of such Indebtedness (or fails to respond within five (5) Business Days of written notice thereof), in each case on the same terms as all other Lenders and (b) no Indebtedness shall be permitted to be incurred after the Closing Date that is not provided for, and made in compliance with, the Approved Budget.

6.2.    **Limitations on Liens**.  Incur, create, assume or suffer to exist any Lien on any of its revenue stream, property or assets, whether now owned or hereafter acquired, except:

(a)    Liens of any Agent (for the benefit of the Secured Parties) under this Agreement, the other Credit Documents and any other document contemplated hereby or thereby;

(b)    Liens pursuant to written security agreements (on customary terms reasonably acceptable to Administrative Agent) in favor of guilds that are required pursuant to collective bargaining agreements;

(c)    Liens imposed by law, or liens customarily granted or incurred in the ordinary course of business with regard to goods provided or services rendered by laboratories and production houses, record warehouses, common carriers, materialmen, repairmen, construction workers, landlords, warehousemen, mechanics and suppliers of materials and equipment; provided, that such Liens are limited to the goods provided or to the goods relating to which services were rendered;

(d)    Liens arising out of attachments, judgments or awards as to which an appeal or other appropriate proceedings for contest or review are timely commenced (and as to which foreclosure and other enforcement proceedings shall not have been commenced (unless fully bonded or otherwise effectively stayed)) and as to which appropriate reserves have been established in accordance with GAAP and that do not otherwise result in an Event of Default;

(e)    Liens for Taxes (1) the validity or amount of which is currently being contested in good faith by appropriate proceedings pursuant to the terms of Section 5.3 or (2) the non-payment of which is permitted by Section 5.3 and, in each case, as to which appropriate reserves have been established in accordance with GAAP;

(f)    Liens arising by virtue of any statutory or common law provision relating to banker's liens, rights of setoff or similar rights with respect to deposit accounts;

(g)    Liens in favor of Licensees to secure their right to enjoy their licensed rights pursuant to License Agreements entered into in the ordinary course of business;

(h)    Liens existing on the Closing Date granted by a Credit Party in favor of a co-financier that secures solely Indebtedness permitted under Section 6.1(j); provided, that the collateral that is the subject of any such Lien is limited to the Item(s) of Product (and related

proceeds thereof) to be developed with the proceeds of Indebtedness to be provided by the applicable co-financier;

(i)    (1) pledges and deposits (i) under workers' compensation, unemployment insurance, old age pensions, and social security and similar laws or regulations and deposits securing liability to insurance carriers under insurance or self-insurance arrangements in respect of such obligations; (ii) to secure the performance of bids, trade contracts (other than for Indebtedness), leases (other than Capitalized Lease Obligations), statutory obligations, surety and appeal bonds (other than any bonds in respect of Items of Product), performance and return of money bonds (other than any bonds in respect of Items of Product), bids, leases, government contracts, trade contracts, agreements with utilities, and other obligations of a like nature, including those incurred to secure health, safety and environmental obligations; or (iii) securing liability for reimbursement or indemnification obligations of insurance carriers providing property, casualty or liability insurance to any Credit Party or Subsidiary, in each case incurred in the ordinary course of business; and (2) to the extent consistent with past practice, Liens in favor of a completion guarantor in connection with an Item of Product to secure the rights of such completion guarantor to recoup its contribution to the costs of such Item of Product and other amounts recoupable by such completion guarantor with regard to such Item of Product;

(j)    zoning restrictions, easements, survey exceptions, trackage rights, leases (other than Capitalized Lease Obligations), licenses, special assessments, rights-of-way, covenants, conditions, restrictions and declarations on or with respect to the use of Real Estate Assets, servicing agreements, development agreements, site plan agreements and other similar encumbrances incurred in the ordinary course of business and title defects or irregularities that are of a minor nature and that, in the aggregate, do not interfere in any material respect with the ordinary conduct of the business of the Credit Parties;

(k)    any Lien existing on the Closing Date and (except to the extent the obligations secured by any such Lien is less than $50,000 individually or $250,000 in the aggregate for all such undisclosed Liens) as set forth on Schedule 6.2;

(l)    [reserved];

(m)    possessory Liens (other than those of laboratories and production houses permitted under Section 6.2(c)) that (i) occur in the ordinary course of business, (ii) secure normal trade debt that is not yet due and payable and (iii) do not secure Indebtedness;

(n)    Liens in favor of a banking or other financial institution arising as a matter of any statutory or common law provision or in the ordinary course of business under customary general terms and conditions encumbering deposits or other funds maintained with a financial institution (including the right of setoff) and that are within the general parameters customary in the banking industry or arising pursuant to such banking institution's general terms and conditions;

(o)    Liens that are contractual rights of setoff relating to (i) the establishment of depository relations with banks and other financial institutions not given in connection with the issuance of Indebtedness, (ii) pooled deposits, sweep accounts, reserve accounts or similar accounts of Company or any Subsidiary to permit satisfaction of overdraft or similar obligations

100

incurred in the ordinary course of business of Company or any Subsidiary, including with respect to credit card charge-backs and similar obligations and any other services provided under or with respect to Cash Management Agreements permitted pursuant to Section 6.1, or (iii) purchase orders and other agreements entered into with customers, suppliers or service providers of Company or any Subsidiary in the ordinary course of business;

(p)    any interest or title of a lessor or sublessor under any leases or subleases entered into by any Credit Party in the ordinary course of business;

(q)    licenses or sublicenses (including with respect to Intellectual Property) granted to others in the ordinary course of business and consistent with past practice not interfering with the business of the Credit Parties; provided, that any such license or sublicense of rights in Intellectual Property does not result in a substantive disposition of any material Item of Product;

(r)    Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(s)    [reserved];

(t)    Liens arising from precautionary Uniform Commercial Code financing statements regarding operating leases or other obligations not constituting Indebtedness;

(u)    to the extent in existence on the Closing Date, Liens on Capital Stock in Joint Ventures which are not required to be pledged and which do not constitute Collateral pursuant to the relevant joint venture agreement or arrangement, as applicable (it being agreed, with respect to any Joint Venture, that Company and its Subsidiaries shall use commercially reasonable efforts to obtain consent of any joint venture partner to cause the Capital Stock in such Joint Venture to be Collateral hereunder);

(v)    Liens securing insurance premiums financing arrangements; provided, that such Liens are limited to the applicable unearned insurance premiums;

(w)    in the case of any Real Estate Asset that constitutes a leasehold  interest, any Lien  to which the fee simple interest (or any superior leasehold interest) is subject;

(x)    Liens securing purchase money Indebtedness permitted pursuant to Section 6.1(l); provided, that any such Lien shall encumber only the asset acquired with the proceeds of such Indebtedness (or the Indebtedness Refinanced thereby), and accessions and additions thereto, proceeds and products thereof and customary security deposits;

(y)    Liens constituting cash collateral to the extent posted prior to the Closing Date in reliance upon Section 6.1(r);

(z)    director Liens on the Capital Stock of any Foreign Subsidiary, to the extent arising from the mandatory application of applicable local foreign law;

(aa)    [reserved];

(bb)    Liens granted to distributors, guilds, and other Liens granted (i) in the ordinary course of business or (ii) in specified Items of Product developed by a Content Development Subsidiary;

(cc)    Liens on assets of any Content Development Subsidiary solely to secure Indebtedness of such Content Development Subsidiary permitted under Section 6.1(aa) or 6.1(cc);

(dd)    Liens on the Capital Stock of any Content Development Subsidiary that is the primary obligor under the Indebtedness, securing the guaranty of such Indebtedness by a grantor Subsidiary that is not a Credit Party or a Debtor to the extent permitted by Section 6.1(dd);

(ee)    Liens imposed on the assets of any Content Development Subsidiary by any Governmental Authority to secure performance or payment with respect to funding pursuant to tax incentive law or other similar program, including rebate and grant programs;

(ff)    Adequate Protection Liens; and

(gg)    Liens solely on shares of Pulse Films Limited held by the issuer of the Pulse Subordinated Notes, securing obligations in respect of the Pulse Subordinated Notes in a principal amount not to exceed $33,000,000, provided that such Liens are subordinated to the Liens securing the Obligations on terms and conditions satisfactory to the Requisite Lenders.

If any Credit Party or any of its Subsidiaries shall create or assume any Lien upon any of its properties or assets, whether now owned or hereafter acquired, other than Permitted Liens, it shall make or cause to be made effective provisions whereby the Obligations will be secured by such Lien equally and ratably with any and all other Indebtedness secured thereby as long as any such Indebtedness shall be so secured; provided, notwithstanding the foregoing, this covenant shall not be construed as a consent by Requisite Lenders to the creation or assumption of any such Lien not otherwise permitted hereby.

6.3.    **Limitations on Investments**.  Create, make or incur any Investment, except:

(a)    Investments in Cash Equivalents;

(b)    Investments by:

(i)    a Credit Party in any other Credit Party (including guarantees of operating leases or of other obligations that do not constitute Indebtedness);

(ii)    a Subsidiary that is not a Credit Party in (A) solely to the extent a debt investment, a Credit Party or (B) another Subsidiary that is not a Credit Party; and

(iii)    a Credit Party in a Subsidiary that is not a Credit Party in accordance with the Approved Budget, which Investments made on and after the Closing Date shall not exceed $11,500,000 in the aggregate;

(c)     Investments (including debt obligations) received in connection with the bankruptcy or reorganization of suppliers, customers or other debtors, or in settlement of delinquent obligations arising in the ordinary course of business;

(d)     Investments constituting the dollar amount of any payment received by a Credit Party from a third party for the purpose of financing or otherwise paying for the production and/or distribution of Items of Product by a Content Development Subsidiary or Third Party, which is then contributed by such Credit Party to such Content Development Subsidiary or Joint Venture reasonably promptly following the receipt thereof;

(e)     [reserved];

(f)     accounts receivable, security deposits and prepayments arising and trade credit granted in the ordinary course of business and any assets or securities received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss and any prepayments and other credits to suppliers made in the ordinary course of business;

(g)     Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with or judgments against, customers and suppliers, in each case in the ordinary course of business or Investments acquired by any Credit Party or Subsidiary thereof as a result of a foreclosure by any of the Credit Parties or Subsidiaries with respect to any secured Investments or other transfer of title with respect to any secured Investment in default;

(h)     to the extent constituting Investments, Indebtedness incurred pursuant to Sections 6.1(b)(ii), 6.1(d) or 6.1(dd);

(i)     Investments resulting from pledges and deposits under Sections 6.2(i)(1) and (x);

(j)     [reserved];

(k)     [reserved];

(l)     [reserved];

(m)     Investments in the ordinary course of business consisting of Uniform Commercial Code Article 3 endorsements for collection or deposit and Uniform Commercial Code Article 4 customary trade arrangements with customers;

(n)     advances in the form of a prepayment of expenses, so long as such expenses are being paid in accordance with customary trade terms of the Credit Parties;

(o)     Investments consisting of the licensing of Intellectual Property or provision of services, in either case, pursuant to joint marketing arrangements entered into in the ordinary course of business; provided, that the counterparty in any such arrangement shall not be a Prohibited Affiliate;

103

(p)    to the extent constituting Investments, purchases and acquisitions of equipment or purchases of contract rights or licenses or leases of Intellectual Property in each case in the ordinary course of business;

(q)    Investments existing on the Closing Date and (except to the extent such Investment has remaining commitments as of such date of not more than $50,000 individually or $250,000 in the aggregate for all undisclosed Investments) as set forth on Schedule 6.3;

(r)    Investments in Content Development Subsidiaries for the purpose of investing in the production and/or distribution of Items of Product (including, if necessary, Acquisitions of Intellectual Property); *provided* that (i) the aggregate amount of all such Investments in all Content Development Subsidiaries made pursuant to this Section 6.3(r) on and after the Closing Date shall not exceed $2,500,000, and (ii) the sum of the aggregate amount of Investments made on and after the Closing Date pursuant to this Section 6.3(r), when taken together with the aggregate amount of payments made in respect of Indebtedness incurred pursuant to Section 6.1(b)(ii), the aggregate principal amount of Indebtedness guaranteed pursuant to Section 6.1(d) and the aggregate amount of Indebtedness incurred and outstanding pursuant to Section 6.1(aa), in each case, without duplication, on and after the Closing Date, shall not exceed $8,000,000.

Any Investment in any Person other than a Credit Party that is otherwise permitted by this Section 6.3 may be made through intermediate Investments in Subsidiaries that are not Credit Parties and such intermediate Investments shall be disregarded for purposes of determining the outstanding amount of Investments pursuant to any clause set forth above. The amount of any Investment made other than in the form of cash or Cash Equivalents shall be the Fair Market Value thereof, valued at the time of the making thereof, and without giving effect to any write-downs or write-offs thereof. In no event shall any loans or other Investments be made in any Person that is a direct or indirect stockholder of Company or any Person under the control of any such Person, other than to such Persons as are set forth on Part III of Schedule 6.3.

Notwithstanding the foregoing, no Investment shall be permitted after the Closing Date that is not provided for, and made in compliance with, the Approved Budget.

6.4.    **Restricted Payments**. Pay or declare or enter into any agreement to pay or otherwise become obligated to make any Restricted Payment, except:

(a)    [reserved];

(b)    Restricted Payments may be made by Subsidiaries of Company to Company or any Credit Party, on a *pro rata* basis (or more favorable basis from the perspective of Company or such Credit Party) based on their relative ownership interests;

(c)    [reserved];

(d)    Restricted Payments by Company that are deemed to occur upon exercise of stock options if such Capital Stock represent a portion of the exercise price of such options; and

(e)      Restricted Payments may be made to pay, or to make payments, in cash, in lieu of the issuance of fractional shares, upon the exercise of warrants or upon the conversion or exchange of Capital Stock of any such Person.

Notwithstanding the foregoing, no Restricted Payment shall be permitted after the Closing Date that is not provided for, and made in compliance with, the Approved Budget.

6.5.      **Consolidation, Merger, Amalgamation or Sale of Assets, Etc.**   Whether in one transaction or a series of transactions, wind up, liquidate or dissolve its affairs, or enter into any transaction of merger, amalgamation or consolidation or division, or sell or otherwise dispose of any assets or property (including Capital Stock of any Subsidiary, and including pursuant to a Sale and Leaseback Transaction) or suffer any of the foregoing, except:

(a)      the Sale Transaction;

(b)      [reserved];

(c)      Ordinary Course Asset Sales;

(d)      dispositions constituting Investments permitted by Section 6.3 and Restricted Payments permitted by Section 6.4;

(e)      dispositions required to obtain anti-trust approval;

(f)      wind ups, liquidations or dissolutions commenced prior to the Closing Date or contemplated as of the Closing Date and, in each case, set forth on Schedule 6.5; provided, that:

(i)      immediately prior to and after giving *pro forma* effect thereto, no Event of Default shall have occurred and be continuing or would result therefrom; and

(ii)      not less than 100% of any consideration received therefor is comprised of Cash and Cash Equivalents;

(g)      Dispositions constituting the rejection or abandonment of any lease or contract in accordance with the U.S. Bankruptcy Code and any order of the Bankruptcy Court.

Except pursuant to a Sale Transaction, each of the Credit Parties agrees that it will not, and will not allow any Subsidiary to, sell or otherwise dispose of any Capital Stock of Pulse Films Limited or the assets of Pulse Films Limited or its Subsidiaries without the prior written consent of the Requisite Lenders.

Notwithstanding the foregoing, no disposition other than Ordinary Course Asset Sales shall be permitted after the Closing Date that is not approved by the Special Committee and provided for, and made in compliance with, the Approved Budget.

6.6.      **Restricted Transactions**.   Enter into (a) any Sale and Leaseback Transaction, (b) any Soft Dollar Transaction, or (c) any co-financing arrangement (other than any financing

105

incurred under Section 6.1(j) or 6.1(aa)) with respect to any Item of Product.  Notwithstanding the foregoing, no payment otherwise permitted under this Section 6.6 shall be permitted that is not provided for, and made in compliance with, the Approved Budget.

6.7.    **Places of Business; Change of Name; Jurisdiction**.  (i) Change the location of its chief executive office or principal place of business, (ii) change any of the locations where it  keeps any material portion of the Collateral or any material books and records with respect to the Collateral, (iii) move any portion of the Collateral of a Credit Party to a different Canadian province or territory other than Canadian provinces or territories where Collateral of such Credit Party is located as of the Closing Date, or (iv) change its name or jurisdiction of formation or organization without, in each case, giving Administrative Agent and Collateral Agent ten (10) days' (or such lesser period as is acceptable to Administrative Agent) prior written notice of such change and filing (or authorizing Administrative Agent to file) any additional UCC or PPSA financing statements, and such other documents reasonably requested by Administrative Agent to maintain perfection of the security interest of Administrative Agent (for the benefit of the Secured Parties) in the Collateral.

6.8.    **Transactions with Affiliates**.  Enter into any transaction with any of its Affiliates, other than (i) any transaction existing on the Closing Date, and as set forth on Schedule 6.8, (ii) the transactions set forth in the Side Letter (PMO), as in effect on the Closing Date, (iii) any transaction solely between or among Credit Parties and Subsidiaries, (iv) any transaction that is (A) fully disclosed in writing to the Agents and (B) on terms no less favorable to the Credit Parties than could be obtained in an arm's-length, third-party transaction, or (v) any of the following transactions to the extent not otherwise prohibited hereunder:

(a)    any issuance of securities, or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment arrangements, equity purchase agreements, stock options and stock ownership plans approved by the board of directors (or compensation committee or other committee, subcommittee or subset of directors) of Company;

(b)    [reserved];

(c)    transactions with any entity that becomes a Credit Party as a result of such transaction (including via merger, consolidation or amalgamation in which a Credit Party is the surviving entity);

(d)    the payment of fees, reasonable out-of-pocket costs and indemnities to directors, officers, consultants and employees of Company in the ordinary course of business;

(e)    (A) any employment agreements or services agreements entered into by any of the Credit Parties with a natural Person in the ordinary course of business, and (B) any ordinary course employee compensation, benefit plan or arrangement, any health, disability or similar insurance plan which covers employees;

(f)    Restricted Payments permitted under Section 6.4 (other than any Prohibited Affiliate Transaction); and

(g)     Transactions (other than any Prohibited Affiliate Transaction) (with Joint Ventures or otherwise) for the purchase or sale of goods, equipment, products, parts and services entered into in the ordinary course of business and which are otherwise fair to the applicable Credit Party or Credit Parties (as reasonably determined in good faith by such Credit Party or Credit Parties).

Notwithstanding the foregoing, no payment otherwise permitted under this Section 6.8 shall be permitted after the Closing Date that is not provided for, and made in compliance with, the Approved Budget, and no payments of any kind shall be made to any of the Permitted Holders.

6.9.     **Fiscal Year End**.  Change its Fiscal Year-end to a day other than December 31 or change Company's method of determining fiscal quarters, without at least one hundred eighty (180) days' prior written notice to Administrative Agent.

6.10.     **Subordinated Debt; Preferred Equity**.  **(**a) Prepay, redeem, purchase, defease, retire or extinguish or otherwise satisfy prior to the scheduled maturity thereof in any manner any Subordinated Debt or (b) make any payment with respect to any put right relating to the any preferred stock of the Company.

6.11.     **Amendments, Modifications and Terminations of Material Agreements**.  Amend, alter, modify, terminate or waive, or permit any amendment, alteration, modification, termination or waiver of:

(a)     the certificate of formation, limited liability company agreement or articles or certificate of incorporation, by-laws or other analogous organizational or governance document of any Credit Party or Subsidiary in any manner that is adverse to the Lenders in any material respect, without the prior written consent of Administrative Agent; provided, that any such amendment solely to remove or replace any individual named in the certificate of incorporation of Company with another individual shall be deemed not to be adverse to the Lenders and shall not require the consent of Administrative Agent;

(b)     any documentation governing any Subordinated Debt, except to the extent permitted pursuant to the terms of the subordination agreement governing any such Subordinated Debt;

(c)     any Material Contract in any manner that is adverse to the Lenders in any material respect; or

(d)     any agreement listed on Schedule 6.11 in any manner that is adverse to the Lenders in any material respect.

The applicable Credit Party shall provide Administrative Agent and the Lenders with a substantially final form of any such amendment, alteration, modification, waiver or agreement referred to above prior to the execution thereof, and promptly following the execution of any such document, and Company shall provide Administrative Agent and the Lenders with an executed copy thereof.

6.12.     **No Negative Pledge; Restrictions on Subsidiary Distributions**.

(a)     Other than with respect to (x) specific property encumbered to secure payment of particular Indebtedness or to be sold pursuant to an executed agreement with respect to a permitted Asset Sale and (y) restrictions by reason of customary provisions restricting assignments, subletting or other transfers contained in leases, licenses and similar agreements entered into in the ordinary course of business (provided that such restrictions are limited to the property or assets secured by such Liens or the property or assets subject to such leases, licenses or similar agreements, as the case may be), enter into any agreement (i) prohibiting the creation or assumption of any Lien in favor of Collateral Agent (for the benefit of the Secured Parties) or any Person(s) refinancing the Loans upon the Collateral of any Credit Party, whether now owned or hereafter acquired, or (ii) requiring an obligation to be secured as a result of any Lien being granted to Collateral Agent (for the benefit of the Secured Parties) or any Person(s) refinancing the Facility, in each case, except for the Credit Documents.

(b)     Except as provided herein, create or otherwise cause or suffer to exist or become effective any consensual encumbrance or restriction of any kind on the ability of any Subsidiary of Company to (a) pay dividends or make any other distributions on any of such Subsidiary's Capital Stock owned by Company or any other Subsidiary of Company, (b) repay or prepay any Indebtedness owed by such Subsidiary to Company or any other Subsidiary of Company, (c) make loans or advances to Company or any other Subsidiary of Company, or (d) transfer any of its property or assets to Company or any other Subsidiary of Company other than restrictions (i) in agreements evidencing purchase money Indebtedness permitted by Section 6.1(l) that impose restrictions on the property so acquired, (ii) by reason of customary provisions restricting assignments, subletting or other transfers contained in leases, licenses, joint venture agreements and similar agreements entered into in the ordinary course of business, (iii) in the certificate of formation, limited liability company agreement or articles or certificate of incorporation, by-laws or other analogous organizational or governance document of any Joint Venture that is directly owned by Company or such Subsidiary, or (iv) that are or were created by virtue of any transfer of, agreement to transfer or option or right with respect to any property, assets or Capital Stock not otherwise prohibited under this Agreement.

6.13.    **[Reserved]**.

6.14.    **Use of Proceeds**.  Use, or permit the use of, the proceeds of Loans other than for the purposes set forth in Section 2.4.

6.15.    **[Reserved]**.

6.16.    **Canadian Pension Plans**. Each Credit Party will not, and will not permit any of its Subsidiaries to establish, maintain, sponsor, administer, contribute to, participate in or assume or incur any liability in respect of any Canadian Defined Benefit Pension Plan or amalgamate with any Person if such Person sponsors, administers, contributes to, participates in or has liability in respect of, any Canadian Defined Benefit Pension Plan.

6.17.    **Existing Joint Ventures**. Notwithstanding any other provision in Section 5 or 6 to the contrary, such Sections 5 and 6 shall not apply to restrict the activities of any Existing Joint Venture, other than Sections 6.1, 6.2, 6.3, 6.5 and 6.8, which shall apply to such Existing Joint Ventures solely to the extent the Credit Parties can, directly or indirectly, cause, through the

exercise or non-exercise of any contractual rights, such Existing Joint Ventures to comply with the provisions thereof. In addition, the provisions of Section 2.11 shall only apply to Existing Joint Ventures to the extent that the Credit Parties can, directly or indirectly, cause, through the exercise or non-exercise of any contractual rights, such Existing Joint Ventures to comply with the provisions thereof. In addition, each of the Lenders, the Requisite Lenders, the Requisite Class Lenders, Administrative Agent and Collateral Agent hereby acknowledge and agree that the relevant Credit Party, in performing its respective obligations under such provisions with respect to any Existing Joint Venture as provided in this Section 6.17, has contractual and/or fiduciary duties, duties of good faith and fair dealing or similar duties ("**Existing Duties**") to other constituents in such Existing Joint Venture. To the extent that any Credit Party would be deemed in breach of any obligation of such Credit Party set forth in such provisions by reason of its taking of any action, or omission to take any action, in either case, as a result of the good faith determination by such Credit Party, after consultation with nationally recognized legal counsel, that the taking of such action, or omission to take any such action, would constitute a breach of the terms of the applicable governing documents or of such Existing Duties, such Credit Party shall be deemed not to be in breach of such obligations under such above-listed provisions.

6.18.    **Pulse Put Payments**. Notwithstanding anything to the contrary in this Agreement or any of the schedules hereto, no Credit Party shall, nor shall it permit any of its Subsidiaries to, make any payments with respect to any put rights pursuant to the Shareholders Agreement, dated March 24, 2016, by and among Vice Holding Inc., Vice Europe Holding Limited, Pulse Films Limited, Thomas Benski, Marisa Clifford, and Patrick Vien, and agreements entered into pursuant to or in connection therewith.

6.19.    **Pulse Intercompany Transactions**. Notwithstanding anything to the contrary in this Agreement or any of the schedules hereto, no Credit Party shall, nor shall it permit any of its Subsidiaries to, engage in or permit any transactions between Pulse Films Limited or any of its Subsidiaries, on the one hand, and any other Credit Parties or any of their Subsidiaries, on the other hand (including, without limitation, Investments, incurrence of Indebtedness, Restricted Payments and dispositions) other than in the ordinary course of business. In addition to and without limiting the foregoing, in no event shall any non-cash assets be sold or contributed to Pulse Films Limited or any of its Subsidiaries by any other Credit Party or any of their Subsidiaries.

6.20.    **Orders**. Notwithstanding anything to the contrary in this Agreement, herein, use any portion or proceeds of the Loans or the Collateral, or disbursements set forth in the Approved Budget, for payments or purposes that would violate the terms of the applicable DIP Order.

6.21.    **Insolvency Proceeding Claims**. Incur, create, assume, suffer to exist or permit any other super priority administrative claim which is *pari passu* with or senior to the claim of any Agent or the Lenders against the Debtors, except as set forth in the DIP Order.

6.22.    **Bankruptcy Actions**. Seek, consent to, or not contest, without the prior written consent of the Requisite Lenders (which consent shall constitute authorization under this Agreement), any order granting authority to take any action that is prohibited by the terms of this Agreement, the DIP Order or the other Credit Documents or refrain from taking any action that is required to be taken by the terms of the DIP Order or any of the other Credit Documents. It is understood and agreed that the filing of a chapter 11 plan of liquidation or the pursuit of

confirmation of a chapter 11 plan of liquidation, confirmation of which plan shall take place solely following the Bankruptcy Court's entry of the Sale Order, with the occurrence of any "effective date" or similar concept under such plan subject to the occurrence of the Closing Date, if applicable, provided that such chapter 11 plan is not inconsistent with the timeline under the Bidding Procedures Order or Sale Transaction, shall not constitute or be deemed to be a breach or default of this Section 6.22 or of any other term or provision of this Agreement or of any other Credit Document, and shall not constitute or be deemed to be a Default or an Event of Default for any purpose under the Credit Documents, including, without limitation, for purposes of Section 8.1(m).

## SECTION 7.    GUARANTY

7.1.    **Guaranty of the Obligations**.  Subject to the provisions of Section 7.2 and upon entry of the DIP Order, Guarantors jointly and severally hereby irrevocably and unconditionally guaranty to Administrative Agent for the ratable benefit of the Beneficiaries the due and punctual Payment in Full of all Obligations when the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a) or any similar law in another jurisdiction) (collectively, the "**Guaranteed Obligations**").

7.2.    **Contribution by Guarantors**.  All Guarantors desire to allocate among themselves (collectively, the "**Contributing Guarantors**"), in a fair and equitable manner, their obligations arising under this Guaranty.  Accordingly, in the event any payment or distribution is made on any date by a Guarantor (a "**Funding Guarantor**") under this Guaranty such that its Aggregate Payments exceeds its Fair Share as of such date, such Funding Guarantor shall be entitled to a contribution from each of the other Contributing Guarantors in an amount sufficient to cause each Contributing Guarantor's Aggregate Payments to equal its Fair Share as of such date.  "**Fair Share**" means, with respect to a Contributing Guarantor as of any date of determination, an amount equal to (a) the ratio of (i) the Fair Share Contribution Amount with respect to such Contributing Guarantor, to (ii) the aggregate of the Fair Share Contribution Amounts with respect to all Contributing Guarantors multiplied by, (b) the aggregate amount paid or distributed on or before such date by all Funding Guarantors under this Guaranty in respect of the obligations Guaranteed. "**Fair Share Contribution Amount**" means, with respect to a Contributing Guarantor as of any date of determination, the maximum aggregate amount of the obligations of such Contributing Guarantor under this Guaranty that would not render its obligations hereunder or thereunder subject to avoidance as a fraudulent transfer or conveyance under Section 548 of Title 11 of the United States Code or any comparable applicable provisions of state law; provided, solely for purposes of calculating the "Fair Share Contribution Amount" with respect to any Contributing Guarantor for purposes of this Section 7.2, any assets or liabilities of such Contributing Guarantor arising by virtue of any rights to subrogation, reimbursement or indemnification or any rights to or obligations of contribution hereunder shall not be considered as assets or liabilities of such Contributing Guarantor.  "**Aggregate Payments**" means, with respect to a Contributing Guarantor as of any date of determination, an amount equal to (1) the aggregate amount of all payments and distributions made on or before such date by such Contributing Guarantor in respect of this Guaranty (including, in respect of this Section 7.2), minus (2) the aggregate amount of all payments received on or before such date by such Contributing Guarantor from the other

Contributing Guarantors as contributions under this Section 7.2. The amounts payable as contributions hereunder shall be determined as of the date on which the related payment or distribution is made by the applicable Funding Guarantor. The allocation among Contributing Guarantors of their obligations as set forth in this Section 7.2 shall not be construed in any way to limit the liability of any Contributing Guarantor hereunder. Each Guarantor is a third party beneficiary to the contribution agreement set forth in this Section 7.2.

7.3.    **Payment by Guarantors**. Subject to Section 7.2, Guarantors hereby jointly and severally agree, in furtherance of the foregoing and not in limitation of any other right which any Beneficiary may have at law or in equity against any Guarantor by virtue hereof, that upon the failure of Company to pay any of the Guaranteed Obligations when and as the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a) or any analogous Debtor Relief Laws), Guarantors will upon demand pay, or cause to be paid, in Cash, to Administrative Agent for the ratable benefit of Beneficiaries, an amount equal to the sum of the unpaid principal amount of all Guaranteed Obligations then due as aforesaid, accrued and unpaid interest on such Guaranteed Obligations (including interest which, but for Company's becoming the subject of a case under the Bankruptcy Code or any analogous Debtor Relief Laws, would have accrued on such Guaranteed Obligations, whether or not a claim is allowed against Company for such interest in the related bankruptcy case) and all other Guaranteed Obligations then owed to Beneficiaries as aforesaid.

7.4.    **Liability of Guarantors Absolute**. Each Guarantor agrees, subject to the entry of the DIP Order, that its obligations hereunder are irrevocable, absolute, independent and unconditional and shall not be affected by any circumstance which constitutes a legal or equitable discharge of a guarantor or surety other than Payment in Full of the Guaranteed Obligations. In furtherance of the foregoing and without limiting the generality thereof, each Guarantor agrees as follows:

(a)    this Guaranty is a guaranty of payment when due and not of collectability. This Guaranty is a primary obligation of each Guarantor and not merely a contract of surety;

(b)    Administrative Agent may enforce this Guaranty upon the occurrence of an Event of Default notwithstanding the existence of any dispute between Company and any Beneficiary with respect to the existence of such Event of Default;

(c)    the obligations of each Guarantor hereunder are independent of the obligations of Company and the obligations of any other guarantor (including any other Guarantor) of the obligations of Company, and a separate action or actions may be brought and prosecuted against such Guarantor whether or not any action is brought against Company or any of such other guarantors and whether or not Company is joined in any such action or actions;

(d)    payment by any Guarantor of a portion, but not all, of the Guaranteed Obligations shall in no way limit, affect, modify or abridge any Guarantor's liability for any portion of the Guaranteed Obligations which has not been paid. Without limiting the generality of the foregoing, if Administrative Agent is awarded a judgment in any suit brought to enforce any

111

Guarantor's covenant to pay a portion of the Guaranteed Obligations, such judgment shall not be deemed to release such Guarantor from its covenant to pay the portion of the Guaranteed Obligations that is not the subject of such suit, and such judgment shall not, except to the extent satisfied by such Guarantor, limit, affect, modify or abridge any other Guarantor's liability hereunder in respect of the Guaranteed Obligations;

(e)    any Beneficiary, upon such terms as it deems appropriate, without notice or demand and without affecting the validity or enforceability hereof or giving rise to any reduction, limitation, impairment, discharge or termination of any Guarantor's liability hereunder, from time to time may, in accordance with the terms of this Agreement, (i) renew, extend, accelerate, increase the rate of interest on, or otherwise change the time, place, manner or terms of payment of the Guaranteed Obligations; (ii) settle, compromise, release or discharge, or accept or refuse any offer of performance with respect to, or substitutions for, the Guaranteed Obligations or any agreement relating thereto and/or subordinate the payment of the same to the payment of any other obligations; (iii) request and accept other guarantees of the Guaranteed Obligations and take and hold security for the payment hereof or the Guaranteed Obligations; (iv) release, surrender, exchange, substitute, compromise, settle, rescind, waive, alter, subordinate or modify, with or without consideration, any security for payment of the Guaranteed Obligations, any other guarantees of the Guaranteed Obligations, or any other obligation of any Person (including any other Guarantor) with respect to the Guaranteed Obligations; (v) enforce and apply any security now or hereafter held by or for the benefit of such Beneficiary in respect hereof or the Guaranteed Obligations and direct the order or manner of sale thereof, or exercise any other right or remedy that such Beneficiary may have against any such security, in each case as such Beneficiary in its discretion may determine consistent herewith and any applicable security agreement, including foreclosure on any such security pursuant to one or more judicial or nonjudicial sales, whether or not every aspect of any such sale is commercially reasonable, and even though such action operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Guarantor against any other Credit Party or any security for the Guaranteed Obligations; and (vi) exercise any other rights available to it under the Credit Documents; and

(f)    this Guaranty and the obligations of Guarantors hereunder shall be valid and enforceable and shall not be subject to any reduction, limitation, impairment, discharge or termination for any reason (other than Payment in Full of the Guaranteed Obligations), including the occurrence of any of the following, whether or not any Guarantor shall have had notice or knowledge of any of them: (i) any failure or omission to assert or enforce or agreement or election not to assert or enforce, or the stay or enjoining, by order of court, by operation of law or otherwise, of the exercise or enforcement of, any claim or demand or any right, power or remedy (whether arising under the Credit Documents, at law, in equity or otherwise) with respect to the Guaranteed Obligations or any agreement relating thereto, or with respect to any other guaranty of or security for the payment of the Guaranteed Obligations; (ii) any rescission, waiver, amendment or modification of, or any consent to departure from, any of the terms or provisions (including provisions relating to events of default) hereof, any of the other Credit Documents or any agreement or instrument executed pursuant thereto, or of any other guaranty or security for the Guaranteed Obligations, in each case whether or not in accordance with the terms hereof or such Credit Document or any agreement relating to such other guaranty or security; (iii) the Guaranteed Obligations, or any agreement relating thereto, at any time being found to be illegal, invalid or unenforceable in any respect; (iv) the application of payments received from any source (other

than payments received pursuant to the other Credit Documents or from the proceeds of any security for the Guaranteed Obligations, except to the extent such security also serves as collateral for indebtedness other than the Guaranteed Obligations) to the payment of indebtedness other than the Guaranteed Obligations, even though any Beneficiary might have elected to apply such payment to any part or all of the Guaranteed Obligations; (v) any Beneficiary's consent to the change, reorganization or termination of the corporate structure or existence of Company or any of its Subsidiaries and to any corresponding restructuring of the Guaranteed Obligations; (vi) any failure to perfect or continue perfection of a security interest in any collateral which secures any of the Guaranteed Obligations; (vii) any defenses, set-offs or counterclaims which any Credit Party may allege or assert against any Beneficiary in respect of the Guaranteed Obligations, including failure of consideration, breach of warranty, payment, statute of frauds, statute of limitations, accord and satisfaction and usury; and (viii) any other act or thing or omission, or delay to do any other act or thing, which may or might in any manner or to any extent vary the risk of any Guarantor as an obligor in respect of the Guaranteed Obligations.

7.5.    **Waivers by Guarantors**.  Each Guarantor hereby waives, for the benefit of Beneficiaries:  (a) any right to require any Beneficiary, as a condition of payment or performance by such Guarantor, to (i) proceed against Company, any other guarantor (including any other Guarantor) of the Guaranteed Obligations or any other Person, (ii) proceed against or exhaust any security held from Company, any such other guarantor or any other Person, (iii) proceed against or have resort to any balance of any Deposit Account or credit on the books of any Beneficiary in favor of Company or any other Person, or (iv) pursue any other remedy in the power of any Beneficiary whatsoever; (b) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of Company or any other Guarantor including any defense based on or arising out of the lack of validity or the unenforceability of the Guaranteed Obligations or any agreement or instrument relating thereto or by reason of the cessation of the liability of Company or any other Guarantor from any cause other than Payment in Full of the Guaranteed Obligations; (c) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; (d) any defense based upon any Beneficiary's errors or omissions in the administration of the Guaranteed Obligations, except behavior which amounts to bad faith; (e) (i) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms hereof and any legal or equitable discharge of such Guarantor's obligations hereunder, (ii) the benefit of any statute of limitations affecting such Guarantor's liability hereunder or the enforcement hereof, (iii) any rights to set-offs, recoupments and counterclaims, and (iv) promptness, diligence and any requirement that any Beneficiary protect, secure, perfect or insure any security interest or lien or any property subject thereto; (f) notices, demands, presentments, protests, notices of protest, notices of dishonor and notices of any action or inaction, including acceptance hereof, notices of default hereunder, notices of any renewal, extension or modification of the Guaranteed Obligations or any agreement related thereto, notices of any extension of credit to Company and notices of any of the matters referred to in Section 7.4 and any right to consent to any thereof; and (g) any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms hereof.

7.6.    **Guarantors' Rights of Subrogation, Contribution, etc.**  Until the Guaranteed Obligations shall have been Paid in Full, each Guarantor hereby waives any claim, right or remedy,

direct or indirect, that such Guarantor now has or may hereafter have against Company or any other Guarantor or any of its assets in connection with this Guaranty or the performance by such Guarantor of its obligations hereunder, in each case whether such claim, right or remedy arises in equity, under contract, by statute, under common law or otherwise and including (a) any right of subrogation, reimbursement or indemnification that such Guarantor now has or may hereafter have against Company with respect to the Guaranteed Obligations, (b) any right to enforce, or to participate in, any claim, right or remedy that any Beneficiary now has or may hereafter have against Company, and (c) any benefit of, and any right to participate in, any collateral or security now or hereafter held by any Beneficiary.  In addition, until the Guaranteed Obligations shall have been Paid in Full, each Guarantor shall withhold exercise of any right of contribution such Guarantor may have against any other guarantor (including any other Guarantor) of the Guaranteed Obligations, including, any such right of contribution as contemplated by Section 7.2.  Each Guarantor further agrees that, to the extent the waiver or agreement to withhold the exercise of its rights of subrogation, reimbursement, indemnification and contribution as set forth herein is found by a court of competent jurisdiction to be void or voidable for any reason, any rights of subrogation, reimbursement or indemnification such Guarantor may have against Company or against any collateral or security, and any rights of contribution such Guarantor may have against any such other guarantor, shall be junior and subordinate to any rights any Beneficiary may have against Company, to all right, title and interest any Beneficiary may have in any such collateral or security, and to any right any Beneficiary may have against such other guarantor.  If any amount shall be paid to any Guarantor on account of any such subrogation, reimbursement, indemnification or contribution rights at any time when all Guaranteed Obligations shall not have been Paid in Full, such amount shall be held in trust for Administrative Agent on behalf of Beneficiaries and shall forthwith be paid over to Administrative Agent for the benefit of Beneficiaries to be credited and applied against the Guaranteed Obligations, whether matured or unmatured, in accordance with the terms hereof.  Notwithstanding anything to the contrary contained herein, no Guarantor may exercise any rights of subrogation, contribution, indemnity, reimbursement or other similar rights against, and may not proceed or seek recourse against or with respect to any property or asset of, any other Credit Party (the "**Foreclosed Guarantor**"), including after the Obligations have been Paid in Full, if all or any portion of the Obligations have been satisfied in connection with an exercise of remedies in respect of the Capital Stock of such Foreclosed Guarantor whether pursuant to this Agreement or otherwise.

7.7.    **Subordination of Other Obligations**.  Any Indebtedness of Company or any Guarantor now or hereafter held by any Guarantor (the "**Obligee Guarantor**") is hereby subordinated in right of payment to the Guaranteed Obligations, and any Distribution collected or received by the Obligee Guarantor after an Event of Default has occurred and is continuing shall be held in trust for Administrative Agent on behalf of Beneficiaries and shall forthwith be paid over to Administrative Agent for the benefit of Beneficiaries to be credited and applied against the Guaranteed Obligations but without affecting, impairing or limiting in any manner the liability of the Obligee Guarantor under any other provision hereof.  For purposes of this Section 7.7, "**Distribution**" means, with respect to any Indebtedness subordinated pursuant to this Section 7.7, (a) any payment or distribution by any Person of cash, securities or other property, by set-off or otherwise, on account of such Indebtedness, (b) any redemption of or purchase or other acquisition of such Indebtedness from the Obligee Guarantor by any other Person, and (c) the granting of any lien or security interest to or for the benefit of the Obligee Guarantor or any other Person in or upon any property of any Person to secure such Indebtedness.

114

7.8.    **Continuing Guaranty**.  This Guaranty is a continuing guaranty and shall remain in effect until all of the Guaranteed Obligations shall have been Paid in Full.  Each Guarantor hereby irrevocably waives any right to revoke this Guaranty as to future transactions giving rise to any Guaranteed Obligations.

7.9.    **Authority of Guarantors or Company**.  It is not necessary for any Beneficiary to inquire into the capacity or powers of any Guarantor or Company or the officers, directors or any agents acting or purporting to act on behalf of any of them.

7.10.    **Financial Condition of Company**.  Any Credit Extension may be made to Company or continued from time to time, in each case without notice to or authorization from any Guarantor regardless of the financial or other condition of Company at the time of any such grant or continuation.  No Beneficiary shall have any obligation to disclose or discuss with any Guarantor its assessment, or any Guarantor's assessment, of the financial condition of Company.  Each Guarantor has adequate means to obtain information from Company on a continuing basis concerning the financial condition of Company and its ability to perform its obligations under the Credit Documents, and each Guarantor assumes the responsibility for being and keeping informed of the financial condition of Company and of all circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations.  Each Guarantor hereby waives and relinquishes any duty on the part of any Beneficiary to disclose any matter, fact or thing relating to the business, operations or conditions of Company now known or hereafter known by any Beneficiary.

7.11.    **Bankruptcy, etc.**

(a)    Except for the Chapter 11 Cases, so long as any Guaranteed Obligations remain outstanding, no Guarantor shall, without the prior written consent of Administrative Agent acting pursuant to the instructions of Requisite Lenders, commence or join with any other Person in commencing any bankruptcy, reorganization or insolvency case or proceeding of or against Company or any other Guarantor.  The obligations of Guarantors hereunder shall not be reduced, limited, impaired, discharged, deferred, suspended or terminated by any case or proceeding, voluntary or involuntary, involving the bankruptcy, insolvency, receivership, reorganization, liquidation or arrangement of Company or any other Guarantor or by any defense which Company or any other Guarantor may have by reason of the order, decree or decision of any court or administrative body resulting from any such proceeding.

(b)    Each Guarantor acknowledges and agrees that any interest on any portion of the Guaranteed Obligations which accrues after the commencement of any case or proceeding referred to in clause (a) above (or, if interest on any portion of the Guaranteed Obligations ceases to accrue by operation of law by reason of the commencement of such case or proceeding, such interest as would have accrued on such portion of the Guaranteed Obligations if such case or proceeding had not been commenced) shall be included in the Guaranteed Obligations because it is the intention of Guarantors and Beneficiaries that the Guaranteed Obligations which are guaranteed by Guarantors pursuant hereto should be determined without regard to any rule of law or order which may relieve Company of any portion of such Guaranteed Obligations.  Guarantors will permit any trustee in bankruptcy, receiver, debtor in possession, assignee for the benefit of creditors or similar Person to pay Administrative Agent, or allow the claim of Administrative

115

Agent in respect of, any such interest accruing after the date on which such case or proceeding is commenced.

(c)    In the event that all or any portion of the Guaranteed Obligations are paid by Company, the obligations of Guarantors hereunder shall continue and remain in full force and effect or be reinstated, as the case may be, in the event that all or any part of such payment(s) are rescinded or recovered directly or indirectly from any Beneficiary as a preference, fraudulent transfer or otherwise, and any such payments which are so rescinded or recovered shall constitute Guaranteed Obligations for all purposes hereunder.

7.12.   **Discharge and Release of Guaranty**.

(a)    <u>Upon Sale of Guarantor</u>. If all of the Capital Stock of any Guarantor or any of its successors-in-interest hereunder shall be sold or otherwise disposed of (including by merger, amalgamation or consolidation) in accordance with the terms and conditions hereof (but excluding any sale or disposition to a Credit Party, any Subsidiary of a Credit Party or any Prohibited Affiliate), the Guaranty of such Guarantor or such successor in interest, as the case may be, hereunder shall automatically be discharged and released without any further action by any Beneficiary or any other Person effective as of the time of such Asset Sale or disposition (<u>provided</u> that Administrative Agent and Collateral Agent may, as provided in Section 9.8(a), execute and deliver any documentation reasonably requested by Company in writing to further evidence or reflect any such release, all at the expense of Company).

7.13.   **Keepwell**.  Each Qualified ECP Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Credit Party to honor all of its obligations under this Guaranty in respect of Swap Obligations; <u>provided</u>, <u>however</u>, that each Qualified ECP Guarantor shall only be liable under this Section 7.13 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 7.13 or other under this Guaranty voidable under Applicable Law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount.  The obligations of each Qualified ECP Guarantor under this Section 7.13 shall remain in full force and effect until a discharge of its Guaranty hereunder.  Each Qualified ECP Guarantor intends that this Section 7.13 constitute, and this Section 7.13 shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Credit Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act or any rules or regulations promulgated thereunder.

## SECTION 8.    EVENTS OF DEFAULT

8.1.   **Events of Default**.  Notwithstanding the provisions of Section 362 of the Bankruptcy Code to the extent provided in the DIP Order, with respect to the Debtors and without notice, application or motion, hearing before, or order of the Bankruptcy Court or any notice to any Credit Party, if any one or more of the following conditions or events shall occur:

(a)    <u>Failure to Make Payments When Due</u>.  Failure by Company to pay (i) when due, the principal of and premium, if any, on any Loan whether at stated maturity, by acceleration or otherwise; (ii) when due, any installment of principal of any Loan, by notice of voluntary

116

prepayment, by mandatory prepayment or otherwise; or (iii) within five (5) Business Days after the same shall be due, any interest, fees, costs, charges, or other amounts payable under any Credit Document;

(b)     <u>Default in Other Agreements</u>.  Except for defaults arising as a result of the entry into this Agreement or occasioned by the filing of the Chapter 11 Cases and defaults from obligations with respect to which the Bankruptcy Code prohibits any Credit Party from complying, (i) failure of any Credit Party or Subsidiary (other than any Joint Venture) thereof to pay when due any principal of or interest on or any other amount payable in respect of one or more items of Indebtedness (other than Indebtedness referred to in Section 8.1(a)) in an aggregate principal amount of $1,000,000, in each case beyond the grace period, if any, provided therefor or a stay imposed in connection with the Chapter 11 Cases; or (ii) breach or default by any Credit Party or Subsidiary (other than any Joint Venture) thereof with respect to any other term of (1) one or more items of Indebtedness in the individual or aggregate principal amounts referred to in clause (i) above, or (2) any loan agreement, mortgage, indenture or other agreement relating to such item(s) of Indebtedness, in each case beyond the grace period, if any, provided therefor, if the effect of such breach or default is to cause, or to permit the holder or holders of that Indebtedness (or a trustee on behalf of such holder or holders), to cause, that Indebtedness to become or be declared due and payable (or subject to a compulsory repurchase or other redemption) prior to its stated maturity or the stated maturity of any underlying obligation, as the case may be; or

(c)     <u>Breach of Certain Covenants</u>.  Failure of any Credit Party to perform or comply with any term or condition contained in Section 2.11(d), Section 5.1(f), Section 5.2 (with respect to the existence of Company), Section 5.12, Section 5.15, Section 5.18, 5.19, 5.20, 5.21, 5.22, 5.23 or Section 6; or

(d)     <u>Breach of Representations, etc.</u>  Any representation, warranty, certification or other statement made or deemed made by any Credit Party or Subsidiary in any Credit Document or in any statement or certificate at any time given by or on behalf of any Credit Party or Subsidiary in writing pursuant to or in connection with any Credit Document shall be incorrect in any material respect as of the date made or deemed made (or in any representation or warranty is expressly stated to have been made as of a specific date incorrect in any material respect as of such specific date); or

(e)     <u>Other Defaults Under Credit Documents</u>.  Any Credit Party shall default in the performance of or compliance with any term contained herein or any of the other Credit Documents, other than any such term referred to in any other Section of this Section 8.1, and such default shall not have been remedied or waived within (i) in the case of any default under Section 5.1 (other than Section 5.1(f) and clause (ii) of Section 5.1(b)), Section 5.3, Section 5.5, Section 5.6, Section 5.7, Section 5.8, Section 5.10, Section 5.11 or Section 5.13, five (5) Business Days, and (ii) in the case of any default not listed in clause (c) above or in the immediately preceding subclause (i) (other than clause (ii) of Section 5.1(b)), ten (10) days, in each case after the earlier of (i) an officer of such Credit Party becoming aware of such default, or (ii) receipt by Company of notice from Administrative Agent or the Requisite Lenders of such default; or

(f)     <u>Termination of JPMCB Forbearance Agreement</u>.  The occurrence of any Forbearance Termination Event under and as defined in the JPMCB Forbearance Agreement, or

117

the JPMCB Forbearance Agreement otherwise ceases to be in full force and effect, in each case, other than a Forbearance Termination Event under clause (g) of (h) of the definition thereof that does not then apply to all of the Foreign Subsidiary Credit Parties.

(g)    [Reserved].

(h)    Judgments and Attachments.  Any money judgment, writ or warrant of attachment or similar process involving in any individual case an amount in excess of $1,000,000 (in each case to the extent not adequately covered by insurance as to which a solvent and unaffiliated insurance company has acknowledged coverage) shall be entered or filed against any Credit Party or any of their respective assets and shall remain undischarged, unvacated, unbonded or unstayed for a period of thirty (30) days (or in any event later than five (5) days prior to the date of any proposed sale thereunder); or

(i)    Dissolution.  Any order, judgment or decree of a court of competent jurisdiction shall be entered against any Credit Party decreeing the dissolution or split up of such Credit Party, and such order shall remain undischarged or unstayed for a period in excess of sixty (60) days; or

(j)    Employee Benefit Plans.  There shall occur one or more ERISA Events or Canadian Pension Events which individually or in the aggregate results in or would reasonably be expected to result in a Material Adverse Effect; or

(k)    Change of Control.  Other than pursuant to the Chapter 11 Plan, a Change of Control shall occur; or

(l)    Guarantees, Collateral Documents and other Credit Documents.  At any time after the execution and delivery thereof, (i) the Guaranty for any reason, other than the Payment in Full of all Obligations, shall cease to be in full force and effect (other than in accordance with its terms) or shall be declared to be null and void by a court of competent jurisdiction, or any Guarantor shall repudiate its obligations thereunder, (ii) this Agreement or any Collateral Document ceases to be in full force and effect (other than by reason of a release of Collateral in accordance with the terms hereof or thereof or the Payment in Full of the Obligations in accordance with the terms hereof) or shall be declared null and void by a court of competent jurisdiction, or Collateral Agent shall not have or shall cease to have a valid and perfected Lien in any Collateral (other than assets or property that constitute an immaterial portion of the Collateral) purported to be covered by the Collateral Documents with the priority required by the relevant Collateral Document, in each case for any reason other than the failure of Collateral Agent or any Secured Party to perform its duties or obligations under the Credit Documents, or (iii) any Credit Party shall contest the validity or enforceability of any Credit Document in writing or deny in writing that it has any further liability, including with respect to future advances by Lenders, under any Credit Document to which it is a party or shall contest the validity of or perfection of any Lien in any Collateral granted or purported to be granted pursuant to the Collateral Documents; or

(m)    Chapter 11. The occurrence of any of the following in any of the Chapter 11 Cases:

(i)    other than a motion in support of the DIP Order, the bringing of a

118

motion, taking of any action or the filing of any plan of reorganization or plan of liquidation (subject to the last sentence of Section 6.22) or disclosure statement attendant thereto by any of the Credit Parties or any of their Subsidiaries, in the Chapter 11 Cases: (A) to obtain additional financing under Section 364(c) or Section 364(d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement; (B) to grant any Lien other than Liens permitted pursuant to Section 6.2 upon or affecting any Collateral; (C) except as provided in the DIP Order, to use cash collateral of the Administrative Agent and the other Secured Parties or Pre-Petition Lenders or Pre-Petition Agents under Section 363(c) of the Bankruptcy Code without the prior written consent of the Administrative Agent; or (D) any other action or actions adverse to (x) the Administrative Agent, Collateral Agent and Lenders or the Pre-Petition Agents and Pre-Petition Lenders or their rights and remedies hereunder, under any other Credit Documents, or their interest in the Collateral or (y) the Pre-Petition Agents, the Pre-Petition Lenders or their rights under the Pre-Petition Credit Agreement or the other Pre-Petition Credit Documents or their interest in the Pre-Petition Collateral;

(ii)    (A) the filing of any plan of reorganization or plan of liquidation (subject to the last sentence of Section 6.22) or disclosure statement attendant thereto, or any direct or indirect amendment to any such plan or disclosure statement, by a Credit Party, in each case without the consent of the Administrative Agent, that does not propose to indefeasibly repay in full in cash the Obligations under this Agreement and the Pre-Petition Obligations, or any of the Credit Parties or their Subsidiaries shall seek, support or fail to contest in good faith the filing or confirmation of any such plan or entry of any such order, (B) the entry of any order terminating any Credit Party's exclusive right to file a plan of reorganization or plan of liquidation, or (C) the expiration of any Credit Party's exclusive right to file a plan of reorganization or plan of liquidation;

(iii)    the entry of an order in any of the Chapter 11 Cases confirming a plan of reorganization or plan of liquidation (subject to the last sentence of Section 6.22) that (A) is not acceptable to the Requisite Lenders in their sole discretion or (B) does not contain a provision for termination of the Commitments and indefeasible repayment in full in cash of all of the Obligations under this Agreement and the Pre-Petition Obligations on or before the effective date of such plan or plans;

(iv)    (x) the entry of an order amending, supplementing, staying, vacating or otherwise modifying the Credit Documents, the Interim Order, the Final Order, the Cash Management Order or any other order with respect to any of the Chapter 11 Cases affecting in any material respect this Agreement and/or the other Credit Documents (including any order in respect of the milestones specified herein and/or in the DIP Order) without the written consent of the Administrative Agent or the filing by a Credit Party of a motion to alter, amend, vacate, supplement, modify, or reconsider, in any respect, the Interim Order, the Final Order or the Cash Management Order, or any other order with respect to any of the Chapter 11 Cases affecting in any material respect this Agreement and/or the other Credit Documents, or the failure of any of the Interim Order, the Final Order or the Cash Management Order to be in full force and effect or (y) any Credit Party or any Subsidiary shall fail to comply with the DIP Order, the Cash Management Order or any other order with respect to any of the Chapter 11 Cases affecting in any material respect this Agreement

and/or the other Credit Documents, in any material respect;

(v)     the Bankruptcy Court's (A) entry of an order granting relief from the Automatic Stay to permit foreclosure of security interests in assets of the Credit Parties of a value in excess of $500,000; or (B) entry of an order terminating exclusivity having been entered (or such an order is sought by any party and not actively contested by the Credit Parties);

(vi)     the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code or otherwise against the Administrative Agent, any Lender or any of the Collateral or against the Pre-Petition Agents, any Pre-Petition Lender or any Pre-Petition Collateral;

(vii)     the appointment of an interim or permanent trustee in the Chapter 11 Cases or the appointment of a trustee receiver or an examiner in the Chapter 11 Cases with expanded powers to operate or manage the financial affairs, the business, or reorganization of the Credit Parties (without consent of the Administrative Agent);

(viii)     (A) the dismissal of any Chapter 11 Case or (B) any Credit Party shall file a motion or other pleading seeking the dismissal of the Chapter 11 Cases under Section 1112 of the Bankruptcy Code or otherwise;

(ix)     any Credit Party shall file a motion (without consent of the Administrative Agent) seeking, or the Bankruptcy Court shall enter an order granting, relief from or modifying the Automatic Stay of Section 362 of the Bankruptcy Code (A) to allow any creditor (other than the Administrative Agent) to execute upon or enforce a Lien on any Collateral, (B) approving any settlement or other stipulation not approved by the Requisite Lenders with any creditor of any Credit Party providing for payments as adequate protection or otherwise to such secured creditor or (C) permit other actions that would have a Material Adverse Effect on the Debtors or their estates (taken as a whole);

(x)     [reserved];

(xi)     the entry of an order in the Chapter 11 Cases avoiding or permitting recovery of any portion of the payments made on account of the Obligations owing under this Agreement or the other Credit Documents;

(xii)     the failure of any Credit Party to perform any of its obligations under the Interim Order, the Final Order, the Cash Management Order, or any order of the Bankruptcy Court approving any Sale Transaction or to perform in any material respect its obligations under any order of the Bankruptcy Court approving bidding procedures;

(xiii)     the existence of any claims or charges, or the entry of any order of the Bankruptcy Court authorizing any claims or charges, other than in respect of this Agreement and the other Credit Documents, or as otherwise permitted under the applicable Credit Documents or permitted under the DIP Order, entitled to superpriority administrative expense claim status in any Chapter 11 Case pursuant to Section 364(c)(1) of the Bankruptcy Code pari passu with or senior to the claims of the Administrative Agent

and the Secured Parties under this Agreement and the other Credit Documents, or there shall arise or be granted by the Bankruptcy Court (i) any claim having priority over any or all administrative expenses of the kind specified in clause (b) of Section 503 or clause (b) of Section 507 of the Bankruptcy Code or (ii) any Lien on the Collateral having a priority senior to or pari passu with the Liens and security interests granted herein, except, in each case, as expressly provided in the Credit Documents or in the DIP Order then in effect but only in the event specifically consented to by the Administrative Agent, whichever is in effect;

(xiv)    the DIP Order shall cease to create a valid and perfected Lien (which creation and perfection shall not require any further action other than the entry of the DIP Order) on the Collateral or to be in full force and effect, shall have been reversed, modified, amended, stayed, vacated, or subject to stay pending appeal, in the case of modification or amendment, without prior written consent of the Administrative Agent;

(xv)    an order in the Chapter 11 Cases shall be entered (i) charging any of the Collateral under Section 506(c) of the Bankruptcy Code against the Administrative Agent and the Secured Parties, or (ii) limiting the extension under Section 552(b) of the Bankruptcy Code of the Liens of the Pre-Petition Agents on the Collateral to any proceeds, products, offspring, or profits of the Collateral acquired by any Credit Party after the Petition Date, or the commencement of other actions that is materially adverse to the Administrative Agent, the Secured Parties or their respective rights and remedies under the Credit Documents in any of the Chapter 11 Cases or inconsistent with any of the Credit Documents;

(xvi)    any order having been entered or granted (or requested, unless actively opposed by the Credit Parties) by either the Bankruptcy Court or any other court of competent jurisdiction materially adversely impacting the rights and interests of the Administrative Agent and the Lenders, as determined by the Requisite Lenders, acting reasonably, without the prior written consent of the Administrative Agent;

(xvii)    an order of the Bankruptcy Court shall be entered denying or terminating use of cash collateral by the Credit Parties authorized by the DIP Order;

(xviii)    if the Final Order does not include a waiver, in form and substance satisfactory to the Administrative Agent and the Lenders  (which satisfaction may be communicated via an email from either of the Lender Advisors), of (i) the right to surcharge the Collateral under Section 506(c) of the Bankruptcy Code and (ii) any ability to limit the extension under Section 552(b) of the Bankruptcy Code of the Liens of the Pre-Petition Agents on the Collateral to any proceeds, products, offspring, or profits of the Collateral acquired by any Credit Party after the Petition Date;

(xix)    any Credit Party shall challenge, support or encourage a challenge of any payments made to the Administrative Agent, Collateral Agent or any Lender with respect to the Obligations or to the Pre-Petition Agents or the Pre-Petition Lenders with respect to the Pre-Petition Obligations, or without the consent of the Administrative Agent, the filing of any motion by the Credit Parties seeking approval of (or the entry of an order

121

by the Bankruptcy Court approving) adequate protection to any Pre-Petition Agents or Pre-Petition Lender that is inconsistent with the DIP Order;

(xx)    without the Administrative Agent's and the Requisite Lenders' consent, the entry of any order by the Bankruptcy Court granting, or the filing by any Credit Party or any of its Subsidiaries of any motion or other request with the Bankruptcy Court (in each case, other than the DIP Order and motions seeking entry thereof or permitted amendments or modifications thereto) seeking authority to use any cash proceeds of any of the Collateral without the Administrative Agent's and the Requisite Lenders' consent or to obtain any financing under Section 364 of the Bankruptcy Code other than the Credit Documents;

(xxi)    if, unless otherwise approved by the Requisite Lenders, an order of the Bankruptcy Court shall be entered providing for a change in venue with respect to the Chapter 11 Cases and such order shall not be reversed or vacated within ten (10) days (or such later date as the Administrative Agent in its sole discretion may agree in writing);

(xxii)    without the Requisite Lenders' consent, any Credit Party or any Subsidiary thereof shall file any motion or other request with the Bankruptcy Court seeking (a) to grant or impose, under Section 364 of the Bankruptcy Code or otherwise, liens or security interests in any Collateral, whether senior, equal or subordinate to the Administrative Agent's liens and security interests; or (b) to modify or affect any of the rights of the Administrative Agent, Collateral Agent or the Lenders under the DIP Order, the Credit Documents, and related documents by any plan of reorganization confirmed in the Chapter 11 Cases or subsequent order entered in the Chapter 11 Cases;

(xxiii)    any Credit Party or any Subsidiary thereof or any Debtor shall take any action in support of any matter set forth in this Section 8.1(m) or any other Person shall do so and such application is not contested in good faith by the Credit Parties and the relief requested is granted in an order that is not stayed pending appeal;

(xxiv)    any Debtor shall be enjoined from conducting any material portion of its business, any disruption of the material business operations of the Debtors shall occur, or any material damage to or loss of material assets of any Debtor shall occur and, in each case, such event or circumstance would reasonably be expected to have a Material Adverse Effect;

(xxv)    any Debtor shall deny in writing that such Debtor has liability or obligation under this Agreement for the Obligations or seeks to recover any monetary damages from the Administrative Agent, any Lender, any of the Pre-Petition Agents or Pre-Petition Lenders;

(xxvi)    [reserved];

(xxvii)    the Bankruptcy Court shall grant relief under any motion or other pleading filed by any Debtor that results in the occurrence of an Event of Default; provided that the Credit Parties hereby agree that the Administrative Agent shall be entitled to request an expedited hearing on any such motion and hereby consent to such expedited

hearing (and the Administrative Agent is authorized to represent to the Bankruptcy Court that the Credit Parties have consented to such expedited hearing on the motion);

(xxviii) [reserved];

(xxix)  failure of the Company or any other Credit Party to use the proceeds of the Loans as set forth in and in compliance with the Approved Budget (subject to variances permitted hereunder) and this Agreement;

(xxx)  any sale of all or substantially all assets of the Debtors pursuant to Section 363 of the Bankruptcy Code, unless such sale is conducted in accordance with the Bid Procedures and consented to by the Requisite Lenders;

(xxxi)  failure to meet a Milestone, unless extended or waived by the prior written consent of the Requisite Lenders;

(xxxii) an order shall have been entered by the Bankruptcy Court prohibiting, limiting or restricting the right of any Lender to credit bid for any or all of the Debtors' assets; and

(xxxiii) the termination of the Asset Purchase Agreement due to a breach thereunder by any Debtor, or pursuant to Sections 10.01(c) or (o) of the Asset Purchase Agreement;

**THEN**, subject to the terms of the DIP Order, notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from the Bankruptcy Court, then, upon the occurrence of any other Event of Default, at the request of (or with the consent of) the Requisite Lenders, upon notice to Company by Administrative Agent, (A) the Commitments, if any, of each Lender having such Commitments shall immediately terminate; (B) each of the following shall immediately become due and payable, in each case without presentment, demand, protest or other requirements of any kind, all of which are hereby expressly waived by each Credit Party:  (I) the unpaid principal amount of and accrued interest on the Loans, (II) the Exit Fee, and (III) all other Obligations; (C) Administrative Agent may, subject to Section 9, cause Collateral Agent to enforce any and all Liens and security interests created pursuant to Collateral Documents; and (D) Administrative Agent and Collateral Agent may enforce any other rights and remedies available to it under any Credit Document or under applicable law.

Subject to any previously granted rights or licenses, each of the Administrative Agent and Collateral Agent is hereby granted an irrevocable, non-exclusive license or other right to use, license or sub-license (to the extent permitted under the applicable licenses and without payment of royalty or other compensation to any Person) any or all Intellectual Property of Credit Parties, computer hardware and software, trade secrets, brochures, customer lists, promotional and advertising materials, labels, packaging materials and other property, in advertising for sale, marketing, selling, collecting, completing manufacture of, or otherwise exercising any rights or remedies with respect to, any Collateral (in each case after the occurrence, and solely during the continuance, of an Event of Default).  Each of the Administrative Agent and Collateral Agent (together with its agents, representatives and designees) is hereby granted a non-exclusive right to

have access to, and a rent free right to use, any and all owned or leased locations (including, without limitation, warehouse locations, distribution centers and store locations) for the purpose of arranging for and effecting the sale or disposition of Collateral, including the production, completion, packaging and other preparation of such Collateral for sale or disposition (it being understood and agreed that each of the Administrative Agent and the Collateral Agent and its representatives (and Persons employed on their behalf), may continue to operate, service, maintain, process and sell the Collateral, as well as to engage in bulk sales of Collateral).  Upon the occurrence and solely during the continuance of an Event of Default and the exercise by the Administrative Agent, Collateral Agent or Lenders of their rights and remedies under this Agreement and the other Credit Documents, the Company shall assist the Administrative Agent, the Collateral Agent and Lenders in effecting a sale or other disposition of the Collateral upon such terms as are reasonably acceptable to the Requisite Lenders.

8.2.    **Payments Upon Acceleration**.  After the occurrence of an Event of Default and the acceleration of the Obligations pursuant to Section 8.1, Administrative Agent shall apply all payments in respect of the Obligations and all proceeds of Collateral to the Obligations as set forth in Section 2.12(b).

## SECTION 9.    AGENTS

9.1.    **Appointment of Agents**.

(a)    Fortress is hereby appointed Administrative Agent and Wilmington Trust is hereby appointed as Collateral Agent hereunder and under the other Credit Documents and each Lender hereby authorizes Fortress, in such capacity, to act as Administrative Agent and Wilmington Trust, in such capacity, to act as Collateral Agent in accordance with the terms hereof and the other Credit Documents.  Each Agent accepts such appointment and hereby agrees to act in its capacity as such upon the express conditions contained herein and the other Credit Documents, as applicable.  The provisions of this Section 9 are solely for the benefit of Agents and Lenders and no Credit Party shall have any rights as a third party beneficiary of any of the provisions thereof.  In performing its functions and duties hereunder, each Agent shall act solely as an agent of Lenders and does not assume and shall not be deemed to have assumed any obligation towards or relationship of agency or trust with or for Company or any of its Subsidiaries.

(b)    Each Lender hereby irrevocably authorizes the Administrative Agent, based upon the instruction of the Requisite Lenders (with respect to amounts owing to the Lender New Money Lenders and the Roll-Up Lenders) to credit bid and purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral at any sale thereof conducted by the Administrative Agent under the provisions of the UCC, including pursuant to Sections 9-610 or 9-620 of the UCC (or any equivalent provision of the UCC), at any sale thereof conducted under the provisions of the Bankruptcy Code, including Section 363 of the Bankruptcy Code, or at any other sale or foreclosure conducted by the Administrative Agent (whether by judicial action or otherwise) in accordance with Applicable Law.

(c)    Each Lender irrevocably appoints each other Lender as its agent and bailee for the purpose of perfecting Liens (whether pursuant to Section 8-301(a)(2) of the UCC or otherwise), for the benefit of the Secured Parties, in assets in which, in accordance with the UCC

or any other applicable Requirement of Law a security interest can be perfected by possession or control. Should any Lender (other than the Administrative Agent or the Collateral Agent) obtain possession or control of any such Collateral, such Lender shall notify the Administrative Agent and Collateral Agent thereof, and, promptly following the Administrative Agent's request therefor, shall deliver such Collateral to the Administrative Agent or otherwise deal with such Collateral in accordance with the Administrative Agent's instructions.

9.2.    **Powers and Duties**.  Each Lender irrevocably authorizes each Agent to take such action on such Lender's behalf and to exercise such powers, rights and remedies hereunder and under the other Credit Documents as are specifically delegated or granted to such Agent by the terms hereof and thereof, together with such powers, rights and remedies as are reasonably incidental thereto.  The permissive rights of the Agents set forth herein and in the other Credit Documents shall not be construed as duties.  In the event that any obligations are permitted to be incurred and subordinated in right of payment to the Obligations hereunder and/or are permitted to be secured by Liens on all or a portion of the Collateral, each Lender authorizes each of Administrative Agent and Collateral Agent, as applicable, to enter into intercreditor agreements, subordination agreements and amendments to the Collateral Documents to reflect such arrangements on terms that are acceptable to the Requisite Lenders, Administrative Agent and Collateral Agent (at the direction of Administrative Agent or the Requisite Lenders), in their respective sole discretion, as applicable to execute and deliver the Credit Documents to which it is a party and to exercise its rights and remedies thereunder.  Each Agent shall have only those duties and responsibilities that are expressly specified herein and the other Credit Documents. Each Agent may exercise such powers, rights and remedies and perform such duties by or through its Related Parties, and the exculpatory provisions of the Credit Documents shall apply to the actions of such Related Parties.  No Agent shall have, by reason hereof or any of the other Credit Documents, a fiduciary relationship in respect of any Secured Party; and nothing herein or any of the other Credit Documents, expressed or implied, is intended to or shall be so construed as to impose upon any Agent any obligations in respect hereof or any of the other Credit Documents except as expressly set forth herein or therein, regardless of whether a Default or Event of Default shall have occurred or be continuing.

9.3.    **General Immunity**.

(a)    <u>No Responsibility for Certain Matters</u>.  No Agent shall be responsible to any Secured Party for (i) the execution, effectiveness, genuineness, validity, enforceability, collectability or sufficiency hereof or any other Credit Document; (ii) the creation, perfection, maintenance, preservation, continuation or priority of any Lien or security interest created, purported to be created or required under any Credit Document; (iii) the value or the sufficiency of any Collateral; (iv) the satisfaction of any condition set forth in Section 3 or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to such Agent; (v) the failure of any Credit Party, Lender or other Agent to perform its obligations hereunder or under any other Credit Document; or (vi) any representations, warranties, recitals or statements made herein or therein or made in any written or oral statements or in any financial or other statements, instruments, reports or certificates or any other documents furnished or made by any Agent to Lenders or other Secured Parties or by or on behalf of any Credit Party to any Agent or any Lender or other Secured Parties in connection with the Credit Documents and the transactions contemplated thereby or for the financial condition or  affairs of any Credit Party or any other

Person liable for the payment of any Obligations, nor shall any Agent be required to ascertain or inquire as to the performance or observance of any of the terms, conditions, provisions, covenants or agreements contained in any of the Credit Documents or as to the use of the proceeds of the Loans or as to the existence or possible existence of any Default or Event of Default (nor shall any Agent be deemed to have knowledge of the existence or possible existence of any Default or Event of Default unless and until written notice thereof (stating that it is a "notice of default") is given to such Agent by Company, any Lender or another Agent) or Company or any of its Subsidiaries causes as to the value or sufficiency of any Collateral or as to the satisfaction of any condition set forth in <u>Section 3</u> or otherwise herein (other than to confirm receipt of items expressly required to be delivered to such Agent) or to inspect the properties, books or records of or to make any disclosures with respect to the foregoing.    Anything contained herein to the contrary notwithstanding, Administrative Agent shall not have any liability arising, or be responsible for any loss, cost or expense suffered by Company, any other Subsidiary or any Lender as a result of, confirmations of the amount of outstanding Loans or the component amounts thereof.

(b)    <u>Exculpatory Provisions</u>.  No Agent nor any of its Related Parties shall be liable to Lenders or other Secured Party for any action taken or omitted by any Agent (i) under or in connection with any of the Credit Documents, in each case except to the extent caused by such Agent's gross negligence or willful misconduct, as determined by a final, non-appealable judgment of a court of competent jurisdiction or (ii) with the consent or at the request of the Requisite Lenders (or, if so specified by this Agreement, all Lenders or any other instructing group of Lenders specified by this Agreement) or Administrative Agent (with respect to Collateral Agent), which consent or request shall be binding on all Lenders.  No Agent shall, except as expressly set forth herein and in the other Credit Documents, have any duty to disclose or be liable for the failure to disclose, any information relating to Company or any of its Affiliates that is communicated to or obtained by such Agent or any of its Affiliates in any capacity.  Each Agent shall be entitled to refrain from any act or the taking of any action (including the failure to take an action) in connection herewith or with any of the other Credit Documents or from the exercise of any power, discretion or authority (including the making of any requests, determinations, judgments, calculations or the expression of any satisfaction or approval) vested in it hereunder or thereunder unless and until such Agent shall have received instructions in respect thereof from Requisite Lenders (or such other Lenders as may be required, or as such Agent shall believe in good faith to be required, to give such instructions under Section 10.5), or Administrative Agent (with respect to Collateral Agent) accompanied by indemnity or security satisfactory to such Agent in such Agent's sole discretion and, upon receipt of such instructions from the Requisite Lenders (or such other Lenders or Administrative Agent, as the case may be), such Agent shall be entitled to act or (where so instructed) refrain from acting, or to exercise such power, discretion or authority, in accordance with such instructions; <u>provided</u> that such Agent shall not be required to take any action that, in its opinion, could expose such Agent to liability or be contrary to any Credit Document or applicable law, including any action that may be in violation of the automatic stay under any Debtor Relief Law, or that may affect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law.  Without prejudice to the generality of the foregoing, (i) each Agent shall be entitled to rely, and shall be fully protected in relying, upon any notice, request, certificate, consent, statement, instrument, document or other writing (including any telephonic notice, electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and correct and to have been signed, sent or otherwise provided by the proper Person (whether or not such Person in fact meets the requirements set forth

in the Credit Documents for being the signatory, sender or provided thereof), and shall be entitled to rely and shall be protected in relying on opinions and judgments of attorneys (who may be attorneys for Company and its Subsidiaries), accountants, insurance consultants, architects, engineers and other experts or other professional advisors selected by it, and such Agent shall not be liable for any action it takes or omits to take in good faith in reliance on any of the foregoing documents; and (ii) no Lender (or other Secured Party) shall have any right of action whatsoever against any Agent as a result of such Agent acting or (where so instructed) refraining from acting hereunder or any of the other Credit Documents in accordance with the instructions of the Requisite Lenders (or such other Lenders as may be required, or as such Agent shall believe in good faith to be required, to give such instructions under Section 10.5). Collateral Agent shall be entitled to conclusively presume without investigation that any request or instruction by Administrative Agent has been approved by Requisite Lenders or such other percentage of Lenders as may be required under the circumstances. In determining compliance with any condition hereunder to the making of any Credit Extension that by its terms must be fulfilled to the satisfaction of a Lender, Administrative Agent may presume the satisfaction of such Lender unless Administrative Agent shall have received notice to the contrary from such Lender reasonably in advance of such Credit Extension. In no event shall any Agent be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, future changes in applicable law or regulation, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services; it being understood that the Agents shall use reasonable efforts consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances. Neither the Collateral Agent nor any of its directors, officers, employees, agents or affiliates shall be responsible for nor have any duty to monitor the performance of any Credit Party, or any of their directors, members, officers, agents, affiliates or employees, nor have any liability in connection with the misconduct of any such party.

(c)     Delegation of Duties. The Agents may perform any and all of its duties and exercise its rights and powers under this Agreement or under any other Credit Document by or through any one or more sub-agents appointed by such Agent. The Agents and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Affiliates. The exculpatory, indemnification and other provisions of this Section 9.3 and of Section 9.6 shall apply to any Affiliates of the Agents and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as the Agents. All of the rights, benefits, and privileges (including the exculpatory and indemnification provisions) of this Section 9.3 and of Section 9.6 shall apply to any such sub-agent and to the Affiliates of any such sub-agent, and shall apply to their respective activities as sub-agent as if such sub-agent and Affiliates were named herein. Notwithstanding anything herein to the contrary, with respect to each sub-agent appointed by an Agent, (i) such sub-agent shall be a third party beneficiary under this Agreement with respect to all such rights, benefits and privileges (including exculpatory rights and rights to indemnification) and shall have all of the rights and benefits of a third party beneficiary, including an independent right of action to enforce such rights, benefits and privileges (including exculpatory rights and rights to indemnification) directly, without the consent or joinder of any other Person, against any or all of Credit Parties and the Lenders, (ii) such rights, benefits and privileges (including exculpatory rights and rights to

127

indemnification) shall not be modified or amended without the consent of such sub-agent, and (iii) such sub-agent shall only have obligations to the applicable Agent and not to any Credit Party, Lender or any other Person and no Credit Party, Lender or any other Person shall have any rights, directly or indirectly, as a third party beneficiary or otherwise, against such sub-agent.  No Agent shall be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that such Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

(d)    Notice of Default or Event of Default.  No Agent shall be deemed to have knowledge of any Default or Event of Default unless and until written notice describing such Default or Event of Default is given to such Agent by a Credit Party or a Lender.  In the event that Administrative Agent shall receive such a notice, Administrative Agent will endeavor to give notice thereof to the Lenders and Collateral Agent, provided that failure to give such notice shall not result in any liability on the part of Administrative Agent.

(e)    Nothing in this Agreement or any other Credit Document shall require the Collateral Agent to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties or in the exercise of any of its rights or powers hereunder or thereunder.

(f)    If at any time any Agent is served with any judicial or administrative order, judgment, decree, writ or other form of judicial or administrative process (including orders of attachment or garnishment or other forms of levies or injunctions or stays relating to the transfer of any Collateral), such Agent is authorized to comply therewith in any manner as it or its legal counsel of its own choosing deems appropriate, and if such Agent complies with any such judicial or administrative order, judgment, decree, writ or other form of judicial or administrative process, such Agent shall not be liable to any of the parties hereto or to any other Person even though such order, judgment, decree, writ or process may be subsequently modified or vacated or otherwise determined to have been without legal force or effect.

9.4.    **Agents Entitled to Act as Lender**.  The agency hereby created shall in any way impair or affect any of the rights and powers of, or impose any duties or obligations upon, any Agent in its individual capacity as a Lender hereunder.  With respect to its Loans, each Agent shall have the same rights and powers hereunder as any other Lender and may exercise the same as if it were not performing the duties and functions delegated to it hereunder, and the term "Lender" shall, unless the context clearly otherwise indicates, include each Agent in its individual capacity. Any Agent and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of banking, trust, financial advisory, commodity, derivative or other business with Company or any of its Affiliates as if it were not performing the duties specified herein, and may accept fees and other consideration from Company and its Affiliates for services in connection herewith and otherwise without having to account for the same to Lenders.  The Lenders acknowledge that pursuant to such activities, the Agents or their Affiliates may receive information regarding any Credit Party or any Affiliate of any Credit Party (including information that may be subject to confidentiality obligations in favor of such Credit Party or such Affiliate) and acknowledge that the Agents and their Affiliates shall be under no obligation to provide such information to them. Each Agent and its Affiliates, when acting under any agreement in respect of any such activity or

under any related agreements, will be acting for its own account as principal and will be under no obligation or duty as a result of such Agent's role in connection with the credit facility provided herein or otherwise to take any action or refrain from taking any action (including refraining from exercising any right or remedy that might be available to it).

9.5.    **Lenders' Representations, Warranties and Acknowledgment**.

(a)     Each Lender represents and warrants that it has made, and will continue to make, its own independent investigation of the financial condition and affairs of Company and its Subsidiaries in connection with Credit Extensions or taking or not taking action under or based upon any Credit Documents, in each case, without reliance on any Agent or any of its Related Parties hereunder and that it has made and shall continue to make its own appraisal of the creditworthiness of Company and its Subsidiaries. No Agent shall have any duty or responsibility, either initially or on a continuing basis, to make any such investigation or any such appraisal on behalf of Lenders or to provide any Lender with any credit or other information with respect thereto, whether coming into its possession before the making of the Loans or at any time or times thereafter, and no Agent shall have any responsibility with respect to the accuracy of or the completeness of any information provided to Lenders.

(b)     Each Lender, by delivering its signature page to this Agreement or an Assignment Agreement shall be deemed to have acknowledged receipt of, and consented to and approved, each Credit Document and each other document required to be approved by any Agent, Requisite Lenders or Lenders, as applicable on the Closing Date.

(c)     Each Lender represents and warrants that as of the Closing Date neither such Lender nor its Affiliates or Related Funds owns or controls, or owns or controls any Person owning or controlling, any trade obligations or Indebtedness of any Credit Party or any of their respective Subsidiaries or Affiliates other than the Obligations or any Capital Stock of any Credit Party or any of their respective Subsidiaries or Affiliates (except as set forth in Section 9.4).

(d)     Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Agents and their respective Affiliates that at least one of the following is and will be true:

(i)     such Lender is not using "plan assets" (within the meaning of 29 CFR § 2510.3-101, as modified by Section 3(42) of ERISA) of one or more Benefit Plans in connection with the Loans or the Commitments;

(ii)     the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of

and performance of the Loans, the Commitments and this Agreement, and the conditions for exemptive relief thereunder have been satisfied in connection therewith;

(iii)    (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Letters of Credit, the Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement; or

(iv)    such other representation, warranty and covenant as may be agreed in writing between Administrative Agent, in its sole discretion, and such Lender.

(e)    In addition, unless the immediately preceding clause (d)(i) is true with respect to a Lender or such Lender has not provided another representation, warranty and covenant as provided in the immediately preceding clause (d)(iv), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Agents and their respective Affiliates that:

(i)    none of the Agents or any of their respective Affiliates is a fiduciary with respect to the assets of such Lender (including in connection with the reservation or exercise of any rights by any Agent under this Agreement, any Credit Document or any documents related hereto or thereto);

(ii)    the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement is capable of evaluating investment risks independently, both in general and with regard to particular transactions and investment strategies (including in respect of the Obligations);

(iii)    the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement is a fiduciary under ERISA or the Internal Revenue Code, or both, with respect to the Loans, the Commitments and this Agreement, and is responsible for exercising independent judgment in evaluating the transactions hereunder, and

(iv)    no fee or other compensation is being paid directly to the Agents or any of their respective Affiliates for investment advice (as opposed to other services) in connection with the Loans, the Commitments or this Agreement.

(f)    Administrative Agent hereby informs the Lenders that each such Person is not undertaking to provide impartial investment advice, or to give advice in a fiduciary capacity,

in connection with the transactions contemplated hereby, and that such Person has a financial interest in the transactions contemplated hereby in that such Person or an Affiliate thereof (i) may receive interest or other payments with respect to the Loans, the Letters of Credit, the Commitments and this Agreement, (ii) may recognize a gain if it extended the Loans or the Commitments for an amount less than the amount being paid for an interest in the Loans or the Commitments by such Lender or (iii) may receive fees or other payments in connection with the transactions contemplated hereby, the Credit Documents or otherwise, including structuring fees, commitment fees, arrangement fees, facility fees, upfront fees, underwriting fees, ticking fees, agency fees, administrative agent or collateral agent fees, utilization fees, minimum usage fees, letter of credit fees, fronting fees, deal-away or alternate transaction fees, amendment fees, processing fees, term out premiums, banker's acceptance fees, breakage or other early termination fees or fees similar to the foregoing.

9.6.    **Right to Indemnity**.  Each Lender, in proportion to its Pro Rata Share, severally agrees to indemnify each Agent, their Affiliates and their Related Parties (each, an "**Indemnitee Agent Party**"), to the extent that such Indemnitee Agent Party shall not have been reimbursed by any Credit Party (and without limitation of each Credit Party's obligations hereunder to do so), for and against any and all liabilities, obligations, losses, damages, penalties, claims, actions, judgments, suits, costs, expenses (including fees, expenses and other charges of counsel) or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against such Indemnitee Agent Party in exercising its powers, rights and remedies or performing its duties hereunder or under the other Credit Documents, or otherwise in its capacity as such Indemnitee Agent Party in any way relating to or arising out of this Agreement or the other Credit Documents; provided, no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from such Indemnitee Agent Party's gross negligence or willful misconduct, as determined by a court of competent jurisdiction in a final, non-appealable order.  If any indemnity furnished to any Indemnitee Agent Party for any purpose shall, in the opinion of such Indemnitee Agent Party, be insufficient or become impaired, such Indemnitee Agent Party may call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished; provided, in no event shall this sentence require any Lender to indemnify any Indemnitee Agent Party against any liability, obligation, loss, damage, penalty, claim, action, judgment, suit, cost, expense or disbursement in excess of such Lender's Pro Rata Share thereof; and provided further, this sentence shall not be deemed to require any Lender to indemnify any Indemnitee Agent Party against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement described in the proviso in the immediately preceding sentence. For purposes of this Section 9.6, "Pro Rata Share" shall be determined as of the time that the applicable indemnity payment is sought (or, in the event at such time all the Commitments shall have terminated and all the Loans shall have been repaid in full, as of the time most recently prior thereto when any Loans or Commitments remained outstanding).  The undertaking in this Section 9.6 shall survive termination of the Commitments, the payment of all other Obligations and the resignation or removal of any Agent.

9.7.    **Successor Administrative Agent and Collateral Agent**.

(a)    Administrative Agent may resign at any time by giving thirty days' prior written notice thereof to Collateral Agent, Lenders and Company.  Administrative Agent shall

have the right to appoint a financial institution to act as successor Administrative Agent hereunder in such notice, subject to the reasonable satisfaction of Company and the Requisite Lenders (provided, no such approval by Company shall be required (i) in connection with the appointment of a Lender or an Affiliate of a Lender as Administrative Agent or (ii) if an Event of Default has occurred and is continuing), and Administrative Agent's resignation shall become effective on the earliest of (i) thirty (30) days after delivery of the notice of resignation (regardless of whether a successor has been appointed or not), (ii) the acceptance of such successor Administrative Agent by Company and the Requisite Lenders or (iii) such other date, if any, agreed to by the Requisite Lenders.  Upon any such notice of resignation, if a successor Administrative Agent has not already been appointed by the resigning Administrative Agent, then the Requisite Lenders shall have the right, upon five Business Days' notice to Company, to appoint a successor Administrative Agent. If neither the Requisite Lenders nor Administrative Agent have appointed a successor Administrative Agent (or Company shall not have consented to such appointment), then the Requisite Lenders shall be deemed to have succeeded to and become vested with all the rights, powers, privileges and duties of the resigning Administrative Agent automatically upon the effectiveness of such resignation; provided that, until a successor Administrative Agent is so appointed by the Requisite Lenders or Administrative Agent, if Administrative Agent is also the Collateral Agent, any collateral security held by Administrative Agent in its role as Collateral Agent on behalf of the Lenders under any of the Credit Documents shall continue to be held by the resigning Collateral Agent as nominee until such time as a successor Collateral Agent is appointed.  Upon the acceptance of any appointment as Administrative Agent hereunder by a successor Administrative Agent, that successor Administrative Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the resigning Administrative Agent and the resigning Administrative Agent shall promptly (i) transfer to such successor Administrative Agent all sums, Securities and other items of Collateral held under the Collateral Documents, together with all records and other documents necessary or appropriate in connection with the performance of the duties of the successor Administrative Agent under the Credit Documents, and (ii) execute and deliver to such successor Administrative Agent such amendments to financing statements, and take such other actions, as may be necessary or appropriate in connection with the assignment to such successor Administrative Agent of the security interests created under the Collateral Documents, whereupon such resigning Administrative Agent shall be discharged from its duties and obligations hereunder.  After any resigning Administrative Agent's resignation hereunder as Administrative Agent, the provisions of this Section 9 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Administrative Agent hereunder.

(b)      In addition to the foregoing, Collateral Agent may resign by giving thirty days' prior written notice thereof to Administrative Agent, Lenders and Company.  Administrative Agent shall have the right to appoint a financial institution as Collateral Agent hereunder, subject to the reasonable satisfaction of Company and the Requisite Lenders (provided, no such approval by Company shall be required (i) in connection with the appointment of a Lender or an Affiliate of a Lender as Collateral Agent or (ii) if an Event of Default has occurred and is continuing) and Collateral Agent's resignation shall become effective on the earliest of (i) thirty (30) days after delivery of the notice of resignation, (ii) the acceptance of such successor Collateral Agent by Company and the Requisite Lenders or (iii) such other date, if any, agreed to by the Requisite Lenders. Upon any such notice of resignation or any such removal, if a successor Collateral Agent has not already been appointed by the resigning Administrative Agent, then Requisite Lenders

shall have the right, upon five Business Days' notice to Administrative Agent, to appoint a successor Collateral Agent.    Until a successor Collateral Agent is so appointed by Requisite Lenders or Administrative Agent, any collateral security held by Collateral Agent for the benefit of the Lenders under any of the Credit Documents shall continue to be held by the resigning Collateral Agent as nominee until such time as a successor Collateral Agent is appointed.    Upon the acceptance of any appointment as Collateral Agent hereunder by a successor Collateral Agent, that successor Collateral Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the resigning or removed Collateral Agent under this Agreement and the Collateral Documents, and the resigning or removed Collateral Agent under this Agreement shall promptly (i) transfer to such successor Collateral Agent all sums, Securities and other items of Collateral held hereunder or under the Collateral Documents, together with all records and other documents reasonably requested by the Credit Parties or Administrative Agent, at Company's cost and expense, and (ii) execute and deliver to such successor Collateral Agent or otherwise authorize the filing of such amendments to financing statements, and take such other actions, as may be reasonably requested by the Credit Parties or Administrative Agent, at Company's cost and expense, in connection with the assignment to such successor Collateral Agent of the security interests created under the Collateral Documents, whereupon such resigning or removed Collateral Agent shall be discharged from its duties and obligations under this Agreement and the Collateral Documents.    After any resigning or removed Collateral Agent's resignation or removal hereunder as Collateral Agent, the provisions of this Agreement and the Collateral Documents shall inure to its benefit as to any actions taken or omitted to be taken by it under this Agreement or the Collateral Documents while it was Collateral Agent hereunder.

(c)    Notwithstanding anything herein to the contrary, Administrative Agent may assign its rights and duties as Administrative Agent to an Affiliate of Fortress or any Lender and Collateral Agent may assign its rights and duties as Collateral Agent to an Affiliate of Wilmington Trust or any Lender without the prior written consent of, or prior written notice to, Company or the Lenders; provided that Company and the Lenders may deem and treat such assigning Administrative Agent and Collateral Agent as Administrative Agent and Collateral Agent for all purposes hereof, unless and until such assigning Administrative Agent or Collateral Agent, as the case may be, provides written notice to Company and the Lenders of such assignment.    Upon such assignment such Affiliate shall succeed to and become vested with all rights, powers, privileges and duties as Administrative Agent or Collateral Agent, as applicable, hereunder and under the other Credit Documents.

(d)    Any corporation or association into which the Collateral Agent may be converted or merged, or with which it may be consolidated, or to which it may sell or transfer all or substantially all of its corporate trust business and assets as a whole or substantially as a whole, or any corporation or association resulting from any such conversion, sale, merger, consolidation or transfer to which the Collateral Agent is a party, will be and become the successor the Collateral Agent under this Agreement and will have and succeed to the rights, powers, duties, immunities and privileges as its predecessor, without the execution or filing of any instrument or paper or the performance of any further act.

9.8.    **Collateral Documents and Guaranty**.

(a)    Agents under Collateral Documents and Guaranty.  Each Lender hereby further authorizes Administrative Agent or Collateral Agent, as applicable, on behalf of and for the benefit of Secured Parties, to execute and deliver the Collateral Documents and to be the agent for and representative of Secured Parties with respect to the Guaranty, the Collateral and the Collateral Documents; provided that neither Administrative Agent nor Collateral Agent shall owe any fiduciary duty, duty of loyalty, duty of care, duty of disclosure, or any other obligation whatsoever to any holder of Obligations, regardless of whether a Default or Event of Default shall have occurred or be continuing.  Subject to Section 10.5, without further written consent or authorization from any Secured Party, Administrative Agent or Collateral Agent acting upon the direction of Administrative Agent, as applicable may execute any documents or instruments necessary to (i) in connection with a sale or disposition of assets permitted by this Agreement, release any Lien encumbering any item of Collateral that is the subject of such sale or other disposition of assets or to which Requisite Lenders (or such other Lenders as may be required to give such consent under Section 10.5) have otherwise consented, or (ii) release any Guarantor from the Guaranty pursuant to Section 7.12 or with respect to which Requisite Lenders (or such other Lenders as may be required to give such consent under Section 10.5) have otherwise consented. Upon request by Administrative Agent or Collateral Agent at any time, the Lenders will confirm in writing Administrative Agent's or Collateral Agent's authority to release its interest in particular types or items of property, or to release any Guarantor from its obligations under the Guaranty pursuant to this Section 9.8.  Upon the reasonable request of Company, Administrative Agent and/or Collateral Agent shall, after receipt of a written certificate of an Authorized Officer of Company certifying that such transaction is permitted pursuant to the Credit Documents, execute and deliver any such release (and/or exclusion, or acknowledgment of exclusion, from the Collateral) documentation reasonably requested by Company in connection with such permitted releases as described above (or, if reasonably requested by Company, in connection with any leasing arrangement that is permitted under the terms of this Agreement), all at the expense of Company and without recourse or warranty to the Agents or Lenders.

(b)    Credit Bid.  Each Credit Party acknowledges that each Lender may (a) credit bid or purchase (either directly or indirectly through one or more entities) all or any portion of the DIP Collateral at any sale thereof conducted under the provisions of the Bankruptcy Code, including Section 363 of the Bankruptcy Code and any similar laws in any other jurisdictions in which a Credit Party is subject, (b) credit bid or purchase (either directly or indirectly through one or more entities) all or any portion of the DIP Collateral at any sale or other disposition thereof conducted under the provisions of the Uniform Commercial Code, including pursuant to Sections 9-610 or 9- 620 of the Uniform Commercial Code, or (c) credit bid or purchase (either directly or indirectly through one or more entities) all or any portion of the DIP Collateral at any other sale or foreclosure conducted in accordance with applicable law in any judicial action or proceeding or by the exercise of any legal or equitable remedy. In connection with any such credit bid or purchase, (x) the Obligations owed to the Lender shall be entitled to be, and shall be, credit bid (with Obligations with respect to contingent or unliquidated claims being estimated for such purpose if the fixing or liquidation thereof would not impair or unduly delay the ability of the Lender to credit bid or purchase at such sale or other disposition of the DIP Collateral and, if such contingent or unliquidated claims cannot be estimated without impairing or unduly delaying the ability of the Lender to credit bid at such sale or other disposition, then such claims shall be disregarded, not credit bid, and not entitled to any interest in the DIP Collateral that is the subject of such credit bid or purchase) and the Lender shall be entitled to receive interests in the DIP

134

Collateral that is the subject of such credit bid or purchase (or in the equity interests of the any entities that are used to consummate such credit bid or purchase), and (y) the Lender may accept non-cash consideration, including debt and equity securities issued by any entities used to consummate such credit bid or purchase and in connection therewith the Lender may reduce the Obligations based upon the value of such non-cash consideration.

(c)     Release of Collateral and Guarantees, Termination of Credit Documents. Notwithstanding anything to the contrary contained herein or any other Credit Document, when all Obligations have been Paid in Full, upon request of Company, Administrative Agent shall (and shall direct Collateral Agent to), without notice to, or vote or consent of, any Lender, take such actions as shall be required to release its security interest in all Collateral, and to release all guarantee obligations provided for in any Credit Document.   Any such release of guarantee obligations shall be deemed subject to the provision that such guarantee obligations shall be reinstated if after such release any portion of any payment in respect of the Obligations guaranteed thereby shall be rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of Company or any Guarantor, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, Company or any Guarantor or any substantial part of its property, or otherwise, all as though such payment had not been made.

(d)     No Duty.   Collateral Agent shall not be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of Collateral Agent's Lien thereon, or any certificate prepared by any Credit Party in connection therewith, nor shall Collateral Agent be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the Collateral.   Collateral Agent shall have no obligation to file financing statements, amendments to financing statements, or continuation statements, or to perfect or maintain the perfection of the Lien on the Collateral.

(e)     Agency for Perfection.   Each Agent and each Lender hereby appoints each other Agent and each other Lender as agent and bailee for the purpose of perfecting the security interests in and liens upon the Collateral in assets that, in accordance with Article 9 of the UCC (or any similar provision of the PPSA), can be perfected only by possession or control (or where the security interest of a Secured Party with possession or control has priority over the security interest of another Secured Party) and each Agent and each Lender hereby acknowledges that it holds possession of or otherwise controls any such Collateral for the benefit of the other Secured Parties, except as otherwise expressly provided in this Agreement.   Should Administrative Agent or any Lender obtain possession or control of any such Collateral, Administrative Agent or such Lender shall notify Collateral Agent thereof, and, promptly upon Administrative Agent's request therefor shall deliver such Collateral to Collateral Agent or in accordance with Collateral Agent's instructions.   Each Credit Party by its execution and delivery of this Agreement hereby consents to the foregoing.

9.9.    **Withholding Taxes**.   To the extent required by any applicable law, Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding Tax.   Without duplication of the provisions of Section 2.17(g), if the Internal Revenue Service or any other Governmental Authority asserts a claim that Administrative Agent did not

properly withhold Tax from amounts paid to or for the account of any Lender because the appropriate form was not delivered or was not properly executed or because such Lender failed to notify Administrative Agent of a change in circumstance that rendered the exemption from, or reduction of, withholding Tax ineffective or for any other reason, or if Administrative Agent reasonably determines that a payment was made to a Lender pursuant to this Agreement without deduction of applicable withholding tax from such payment, such Lender shall indemnify Administrative Agent fully for all amounts paid, directly or indirectly, by Administrative Agent as Tax or otherwise, including any penalties or interest and together with all expenses (including legal expenses, allocated internal costs and out-of-pocket expenses) incurred.

9.10.  **Administrative Agent May File Bankruptcy Disclosure and Proofs of Claim**. In case of the pendency of any proceeding under any Debtor Relief Laws with respect to any Credit Party, Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether Administrative Agent shall have made any demand on Company) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(a)     to file a verified statement pursuant to rule 2019 of the Federal Rules of Bankruptcy Procedure that, in its sole opinion, complies with such rule's disclosure requirements for entities representing more than one creditor;

(b)     to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, Administrative Agent, Collateral Agent and any other Secured Party (including any claim under Sections 2.6, 2.8, 2.13, 2.16, 2.17, 2.19, 10.2 and 10.3) allowed in such judicial proceeding; and

(c)     to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, receiver and manager, administrator, examiner, monitor, assignee, trustee, liquidator, sequestrator or other similar official in any such proceeding is hereby authorized by each Lender, and each other Secured Party to make such payments to Administrative Agent and, in the event that Administrative Agent shall consent to the making of such payments directly to the Lenders or the other Secured Parties, to pay to Administrative Agent any amount due to Administrative Agent, Collateral Agent, or to their Related Parties under the Credit Documents (including under Sections 10.2 and 10.3).  To the extent that the payment of any such amounts due to Administrative Agent, in such capacity or in its capacity as Collateral Agent, or to its Related Parties out of the estate in any such proceeding shall be denied for any reason, payment of the same shall be secured by a Lien on, and shall be paid out of, any and all distributions, dividends, money, securities and other property that the Lenders or the other Secured Parties may be entitled to receive in such proceeding, whether in liquidation or under any plan of reorganization or arrangement or otherwise.  Nothing contained herein shall be deemed to authorize Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of

any Lender, or to authorize Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

In case of the pendency of any proceeding under any Debtor Relief Laws relative to any Credit Party, each Lender shall submit any vote on a plan of reorganization or similar disposition plan of restructuring or liquidation (a "**Plan**") to Administrative Agent so that it is received by Administrative Agent no later than three (3) Business Days prior to voting deadline established pursuant to the terms of such Plan or any court order establishing voting procedures with respect to the Plan (the "**Voting Procedures Order**"). If Lenders constituting more than half of the total number of Lenders and having or holding more than two-thirds of the aggregate Commitments and Loans of all Lenders timely vote to accept the Plan, Administrative Agent shall submit a ballot on behalf of all Lenders voting to accept the Plan in accordance with the terms of the Plan or the Voting Procedures Order. If Lenders constituting more than half of the total number of Lenders and having or holding more than two-thirds of the aggregate Commitments and Loans of all Lenders do not timely vote to accept the Plan, Administrative Agent shall submit a ballot on behalf of all Lenders voting to reject the Plan in accordance with the terms of the Plan or the Voting Procedures Order. For purposes of calculating the total number of Lenders and the number of Lenders voting to accept the Plan, Lenders that are Affiliates shall be deemed to be a single Lender. No Lender may submit a ballot with respect to a Plan in contravention of the procedures set forth in this Section 9.10, and Administrative Agent is irrevocably authorized by each Lender to withdraw any vote submitted by such Lender in contravention of the procedures set forth in this Section 9.10.

9.11.    **Quiet Enjoyment**. The Agents and Lenders acknowledge and agree that the security interest hereunder of Collateral Agent (on behalf of the Secured Parties) is subject to the rights of Quiet Enjoyment of the Licensees under the License Agreements, whether existing on the Closing Date or thereafter executed. Neither Agent nor any other Secured Party shall be responsible for any liability or obligation of any Credit Party, such Licensee or any other Person under the applicable License Agreement. Collateral Agent agrees that, upon the reasonable request of a Credit Party, it will provide written confirmation (pursuant to an interparty agreement, a notice of assignment or such other agreement in form and substance reasonably acceptable to Administrative Agent) of such rights of Quiet Enjoyment to Licensees under the License Agreements.

## SECTION 10.    MISCELLANEOUS

10.1.    **Notices**.

(a)    <u>Notices Generally</u>. Unless otherwise specifically provided herein, any notice or other communication herein required or permitted to be given to a Credit Party, Collateral Agent, or Administrative Agent, shall be sent to such Person's mailing address as set forth on Appendix B or in the other relevant Credit Document, and in the case of any Lender, the address as indicated on Appendix B or otherwise indicated to Administrative Agent in writing. Except as provided in clause (b) below, each notice hereunder shall be in writing and may be personally served or sent by courier service, and shall be deemed to have been given when delivered in person or by courier service and signed for against receipt thereof with postage or other delivery cost

137

prepaid, or upon receipt of email (in accordance with clause (b) below); provided, no notice to any Agent shall be effective until received by such Agent.

(b)    Electronic Communications.

(i)    Notices and other communications to any Agent, Lenders, and any Credit Party hereunder may be delivered or furnished by other electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the applicable Agent in its sole discretion, provided that, notwithstanding the foregoing, in no event will notices by electronic communication be effective to any Agent or any Lender pursuant to Section 2 if any such Person has notified Administrative Agent that it is incapable of receiving notices under such Section 2 by electronic communication.  Any Agent may, in its sole discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, provided that approval of such procedures may be limited to particular notices or communications. In the case of any notices by electronic communication permitted in accordance with this Agreement, unless the applicable Agent otherwise prescribes, (A) any notices and other communications permitted to be sent to an e-mail address shall be delivered during normal business hours and deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgment, but excluding any automatic reply to such e-mail), except that, if such notice or other communication is not sent prior to 2:00 p.m., local time at the location of the recipient, then such notice or communication shall be deemed not to have been received until the opening of business on the next Business Day for the recipient, at the earliest, and (B) notices or communications permitted to be posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (A) of notification that such notice or communication is available and clearly identifying an accessible website address therefor.

(ii)    Each Credit Party understands that the distribution of material through an electronic medium is not necessarily secure and that there are confidentiality and other risks associated with such distribution, and agrees and assumes the risks associated with such electronic distribution, except to the extent caused by the willful misconduct or gross negligence of, or material breach of the terms of this Agreement by, Administrative Agent, as determined by a final, non-appealable judgment of a court of competent jurisdiction.

(iii)    Any Approved Electronic Communications are provided "as is" and "as available."  None of the Agents or any of their respective officers, directors, employees, agents, advisors or representatives (the "**Agent Affiliates**") warrant the accuracy, adequacy, or completeness of the Approved Electronic Communications and each expressly disclaims liability for errors or omissions in any Approved Electronic Communications.  No warranty of any kind, express, implied or statutory, including any warranty of merchantability, fitness for a particular purpose, non-infringement of third party rights or freedom from viruses or other code defects is made by the Agent Affiliates in connection with any Approved Electronic Communications.  In no event shall the Agent

138

Affiliates have any liability to any of the Credit Parties, any Lender or any other Person for damages of any kind, including direct or indirect, special, incidental or consequential damages, losses or expenses (whether in tort, contract or otherwise) arising out of any Credit Party's or Administrative Agent's transmission of communications through the Platform. Each party hereto agrees that no Agent has any responsibility for maintaining or providing any equipment, software, services or any testing required in connection with any Approved Electronic Communication or otherwise required for the Platform.

(iv)    Each Credit Party, each Lender, and each Agent agrees that Administrative Agent may, but shall not be obligated to, store any Approved Electronic Communications on the Platform in accordance with Administrative Agent's customary document retention procedures and policies.

(v)    All uses of the Platform shall be governed by and subject to, in addition to this Section 10.1, separate terms and conditions posted or referenced in such Platform and related agreements executed by the Lenders and their Affiliates in connection with the use of such Platform.

(vi)    Any notice of Default or Event of Default may be provided by telephone if confirmed promptly thereafter by delivery of written notice thereof.

(c)    <u>Change of Address, etc</u>. Any party hereto may change its address for notices and other communications hereunder by notice to the other parties hereto.

10.2.    **Expenses**. Company agrees to pay promptly (a) all actual, reasonable and documented (in summary form) costs and expenses incurred by any Agent or any Lender party hereto, in each case in connection with the negotiation, preparation and execution of the Credit Documents and any consents, amendments, waivers or other modifications thereto (excluding fees, expenses and disbursements of legal counsel, which shall be pursuant to clause (c) below); (b) all costs of furnishing all opinions by counsel for Company and the other Credit Parties; (c) the reasonable and documented (in summary form) fees, expenses and disbursements of (A) Gibson Dunn & Crutcher LLP as primary legal counsel to Administrative Agent and the Lenders, (B) Shipman & Goodwin LLP as primary legal counsel to Collateral Agent, (C) Houlihan Lokey as financial adviser to the Lenders, (D) if necessary, one local counsel to Administrative Agent and the Lenders and a separate counsel to Collateral Agent in each relevant jurisdiction and (E) such specialist counsel as Agents and the Lenders may reasonably determine is required, in each case in connection with the negotiation, preparation, execution and administration of the Credit Documents and any consents, amendments, waivers or other modifications thereto and any other documents or matters requested by Company; (d) all the actual, reasonable and documented (in summary form) costs and expenses of creating, perfecting, recording, maintaining, and preserving Liens in favor of Collateral Agent, for the benefit of Secured Parties, including filing and recording fees, expenses and taxes, stamp or documentary taxes, search fees, title insurance premiums and reasonable fees, expenses and disbursements of counsel to each Agent and of counsel providing any opinions that any Agent or Requisite Lenders may request in respect of the Collateral or the Liens created pursuant to the Collateral Documents; (e) the actual, reasonable and documented costs and fees, expenses for, and disbursements of any external auditors, accountants, consultants or appraisers (not to exceed one single auditor, accountant, consultant or appraiser for the Agents

and Lenders as a whole); (f) all other actual, reasonable and documented (in summary form) costs and expenses incurred by each Agent and Lender in connection with the syndication of the Loans and Commitments and the transactions contemplated by the Credit Documents and any consents, amendments, waivers or other modifications thereto; (g) all accrued and unpaid fees and out-of-pocket expenses incurred by Gibson, Dunn & Crutcher LLP and monthly fees and expense of Houlihan Lokey on behalf of the Lenders, in each case to the extent invoices are provided on a monthly basis, and (h) after the occurrence of a Default or an Event of Default, all costs and expenses, including reasonable and documented attorneys' fees and costs of settlement, incurred by any Agent, and Lenders in enforcing or preparing for enforcement of any Obligations of or in collecting or preparing to collect any payments due from any Credit Party hereunder or under the other Credit Documents by reason of such Default or Event of Default (including in connection with any actual or prospective sale of, collection from, or other realization upon any of the Collateral or the enforcement of the Guaranty) or in connection with any actual or prospective refinancing or restructuring of the credit arrangements provided hereunder in the nature of a "work out" or pursuant to or in contemplation of any insolvency or bankruptcy cases or proceedings, including the engagement of a single restructuring advisor or consultant satisfactory to the Requisite Lenders in their sole discretion. If the Credit Parties fail to pay when due any amounts payable by them hereunder or under any Credit Document, such amount may be paid on behalf of the Credit Parties by the Administrative Agent in its discretion by charging any loan account(s) of the Credit Parties, without notice to or consent from the applicable Credit Parties, and any amounts so paid shall constitute Obligations hereunder.

10.3.    **Indemnity**.

(a)    In the event that an Indemnitee becomes involved in any capacity in any action, proceeding or investigation brought by or against any Person in connection with or arising out of any Indemnified Liabilities, each Credit Party agrees that on demand it will reimburse such Indemnitee for its fees and legal and other actual and documented (in summary form) costs and expenses (including the cost of any investigation and preparation) incurred in connection therewith, but limited to one firm of counsel for Administrative Agent and the Lenders' Indemnitees, taken as a whole and a separate firm of counsel for Collateral Agent's Indemnitees, taken as a whole (and, in the case of an actual or perceived conflict of interest where the Indemnitee affected by such conflict notifies Company of any existence of such conflict and in connection with the investigating or defending of any of the foregoing, has retained its own counsel, of another firm of counsel for such affected Indemnitee and, to the extent required, one firm or local counsel in each relevant jurisdiction (which may include a single special counsel acting in multiple jurisdictions)), subject to the proviso in the following clause (b).

(b)    In addition to the payment of fees, costs and expenses pursuant to Section 10.2, each Credit Party agrees to defend (subject to Indemnitees' selection of counsel as set forth above), indemnify, pay and hold harmless, each Agent and Lender, their Affiliates and their respective officers, partners, directors, trustees, employees and agents of each Agent and each Lender (each, an "**Indemnitee**"), from and against any and all Indemnified Liabilities; provided, no Credit Party shall have any obligation to any Indemnitee hereunder with respect to any Indemnified Liabilities to the extent such Indemnified Liabilities arise from (x) the gross negligence, willful misconduct or material breach of an obligation to fund under this Agreement of that Indemnitee, or (y) any action, proceeding or investigation that does not involve an act by

or omission of Company or any of its Affiliates and that is brought by an Indemnitee against another Indemnitee (other than any action, proceeding or investigation against any Agent, acting in its capacity as such), in each case as determined by a final non-appealable judgment of a court of competent jurisdiction.  To the extent that the undertakings to defend, indemnify, pay and hold harmless set forth in this Section 10.3 may be unenforceable in whole or in part because they are violative of any law or public policy, the applicable Credit Party shall contribute the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by Indemnitees or any of them.

(c)    To the fullest extent permitted by applicable law, no party hereto shall assert, and each party hereto hereby waives, any claim against any other party hereto and their respective Affiliates, directors, employees, attorneys or agents, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) (whether or not the claim therefor is based on contract, tort or duty imposed by any applicable legal requirement) arising out of, in connection with, as a result of, or in any way related to, this Agreement or any Credit Document or any agreement or instrument contemplated hereby or thereby or referred to herein or therein, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof or any act or omission or event occurring in connection therewith, and each party hereto hereby waives, releases and agrees not to sue upon any such claim or any such damages, whether or not accrued and whether or not known or suspected to exist in its favor; provided, however, that nothing in this Section 10.3(c) shall limit the Credit Parties' indemnity and reimbursement obligations with respect to special, indirect, consequential or punitive damages included in any third party claim with respect to which the applicable Indemnitee is entitled to indemnification under Section 10.3(a).  No Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Credit Documents or the transactions contemplated hereby or thereby.

10.4.    **Set-Off**.  In addition to any rights now or hereafter granted under applicable law and not by way of limitation of any such rights, upon the occurrence of any Event of Default each Lender and their respective Affiliates each of is hereby authorized by each Credit Party at any time or from time to time subject to the consent of Administrative Agent (such consent not to be unreasonably withheld or delayed), without notice to any Credit Party or to any other Person (other than Administrative Agent), any such notice being hereby expressly waived, to set off and to appropriate and to apply any and all deposits (general or special, time or demand, provisional or final (in whatever currency)) and any other obligations or Indebtedness at any time held or owing by such Lender to or for the credit or the account of any Credit Party against and on account of the Obligations of any Credit Party to such Lender hereunder and under the other Credit Documents, including all claims of any nature or description arising out of or connected hereto or with any other Credit Document, irrespective of whether or not (a) such Lender shall have made any demand hereunder or (b) the principal of or the interest on the Loans or any other amounts due hereunder shall have become due and payable pursuant to Section 2 and although such obligations and liabilities, or any of them,  may be contingent or unmatured; provided that in the event that any Defaulting Lender shall exercise any such right of (x) setoff, all amounts so set off shall be paid over immediately to Administrative Agent for further application in accordance with the provisions of Sections 2.14 and 2.19 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of Administrative

Agent and the Lenders and (y) the Defaulting Lender shall provide promptly to Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff.  The rights of each Lender and Affiliates under this Section 10.4 are in addition to other rights and remedies (including other rights of set off) that such Lender or its respective Affiliates may otherwise have.  Each Lender agrees to notify Administrative Agent promptly after any such setoff and application; provided that the failure to give such notice shall not affect the validity of such setoff and application.

10.5.  **Amendments and Waivers**.

(a)  Requisite Lenders' Consent.  Subject to the additional requirements of Sections 10.5(b) and 10.5(c), no amendment, modification, supplement, termination, consent or waiver of the Credit Documents (other than the Fee Letter and the Collateral Agent Fee Letter) (in each case, including any provision thereof), or consent to any departure by any Credit Party therefrom, shall in any event be effective without the written concurrence of the Requisite Lenders; provided, however, that the Administrative Agent and the Company may, without the consent of any Lender, enter into amendments or modifications to this Agreement or any of the other Credit Documents or to enter into additional Credit Documents as the Administrative Agent reasonably deems appropriate in order to implement any Benchmark Replacement or any Conforming Changes or otherwise effectuate the terms of Section 2.22(c) in accordance with the terms of Section 2.22(c).  With respect to any extension or waiver of any date or obligation under Section 2.11 that requires consent of the Requisite Lenders, such consent may be communicated by email from counsel to the Requisite Lenders and shall not require any amendment to this Agreement.

(b)  Affected Lenders' Consent.  Without the written consent of each Lender that would be directly and adversely affected thereby, no amendment, modification, supplement, termination, consent or waiver shall be effective respect to any of the Credit Document if the effect thereof would:

(i)  extend, delay or postpone the scheduled final maturity or any scheduled payment (including mandatory prepayments and any amendments, modifications, supplements, terminations, consents to or waivers thereof) of any principal, interest, fees or other amounts due hereunder or any other Credit Document in connection with any Loan or Note;

(ii)  reduce the rate of interest on any Loan (other than any waiver of any increase in the interest rate applicable to any Loan pursuant to Section 2.8 or change in Adjusted Term SOFR pursuant to the second paragraph of the definition thereof) or any fee payable hereunder or waive or postpone the time for payment of any such interest, fee or premium or any fee or premium payable under this Agreement; provided, that only the consent of the Requisite Lenders shall be necessary to amend the Default Rate in Section 2.8, to waive any prospective obligation of Company to pay interest at the Default Rate, or to restore any right of Company to continue Loans as SOFR Loans that was revoked at the direction of Requisite Lenders or automatically pursuant to any provision of this Agreement;

(iii)  reduce or forgive the principal amount of any Loan;

(iv)    amend, modify, supplement, terminate or waive any provision of this Section 10.5 or any other provision of this Agreement that expressly provides that the consent of all Lenders or any specific Lenders is required;

(v)    amend, modify, supplement, terminate or waive the definition of "**Pro Rata Share**," Section 2.14, or any other provisions in any Credit Document that would, directly or indirectly, result in payments (other than any permitted consent fee paid to all consenting Lenders) to any Lender of amounts in excess of its pro rata share of the Obligations;

(vi)    amend, modify, supplement, terminate or waive any provision, directly or indirectly, of Section 2.12, Section 3.1 or Section 8.2; or

(vii)    consent to the assignment or transfer by any Credit Party of any of its rights and obligations under any Credit Document, except as expressly provided in any Credit Document.

(c)    <u>Other Consents</u>.  No amendment, modification, supplement, termination, consent or waiver of any provision of the Credit Documents, or consent to any departure by any Credit Party therefrom, shall:

(i)    amend the definition of "**Requisite Class Lenders**" without the consent of the Lenders of each directly and adversely affected Class; <u>provided</u>, with the consent of Administrative Agent and the Requisite Lenders, additional extensions of credit pursuant hereto may be included in the determination of such "**Requisite Class Lenders**" on substantially the same basis as the Commitments and the Loans;

(ii)    increase any Commitment of any Lender over the amount thereof then in effect without the consent of such Lender; <u>provided</u>, no amendment, modification or waiver of any condition precedent, covenant, Default or Event of Default shall constitute an increase in any Commitment of any Lender;

(iii)    amend, modify, terminate or waive any provision of Section 3.2(a) with regard to any Credit Extension without the consent of all Lenders of the affected Class;

(iv)    amend, modify, or waive any provision of this Agreement or the Pledge and Security Agreement so as to alter the ratable treatment of Obligations arising under the Credit Documents or the definitions of "Obligations," or "Secured Obligations" (as such term or any similar term is defined in any relevant Collateral Document) in each case in a manner adverse to any Lender with Obligations then outstanding without the written consent of any such Lender;

(v)    amend, modify, terminate or waive any provision of Section 9 as the same directly applies to any Agent, or any other provision hereof as the same directly applies to the rights or obligations of any Agent, in each case in any manner adverse to such Agent without the consent of such Agent;

143

(vi)     amend, modify, terminate or waive the definition of "Requisite Lenders" without the consent of all Lenders;

(vii)     release all or substantially all of the Collateral from the Liens of the Collateral Documents or all or substantially all the Guarantors from the Guarantees created under the Credit Documents without the consent of all Lenders (it being agreed that a release of any Collateral for the direct or indirect purpose of utilizing such Collateral to secure any obligations owed to some, but not all, Lenders and their Affiliates, is prohibited by this clause unless with the consent of each Lender);

(viii)     (x) contractually subordinate the payment obligations under the Credit Documents with respect to the Obligations to other obligations of the Credit Parties and/or contractually subordinate any of Agents' Liens securing the Obligations and/or (y) amend, modify or waiver any covenant hereunder or under any other Credit Document the result of which would permit the granting of a *pari passu* Lien securing any obligations owed to some, but not all, Lenders and their Affiliates, unless, in the case of each of clauses (x) and (y) with the consent of each Lender; or

(ix)     amend, modify, terminate or waive any provision of Section 2.2, without the consent of all Lenders.

(d)     Execution of Amendments, etc.  Administrative Agent may, but shall have no obligation to, with the concurrence of any Lender, execute amendments, modifications, supplements, terminations, waivers or consents on behalf of such Lender.  Any waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given.  No notice to or demand on any Credit Party in any case shall entitle any Credit Party to any other or further notice or demand in similar or other circumstances.  Any amendment, modification, termination, waiver or consent effected in accordance with this Section 10.5 shall be binding upon each Lender at the time outstanding, each future Lender and, if signed by a Credit Party, on such Credit Party.

(e)     [Reserved].

(f)     Cashless Settlement.  Notwithstanding anything to the contrary contained in this Agreement, any Lender may exchange, continue, or rollover all or a portion of its Loans in connection with any refinancing, extension, loan modification, or similar transaction permitted by the terms of this Agreement pursuant to a cashless settlement mechanism approved by Company, Administrative Agent and such Lender.

10.6.  **Successors and Assigns; Participations**.

(a)     Generally.  This Agreement shall be binding upon the parties hereto and their respective successors and permitted assigns and shall inure to the benefit of the parties hereto and the successors and permitted assigns of Lenders.  No Credit Party's rights or obligations hereunder nor any interest therein may be assigned or delegated by any Credit Party without the prior written consent of all Lenders.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, Indemnitee Agent Parties under Section 9.6, Indemnitees under Section 10.3, their respective successors and assigns permitted

144

hereby and, to the extent expressly contemplated hereby, Affiliates of each of the Agents and Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    Register.  Company, Agents and Lenders shall deem and treat the Persons listed as Lenders in the Register as the holders and owners of the corresponding Commitments and Loans (including principal and stated interest) listed therein for all purposes hereof (notwithstanding anything to the contrary in this Agreement), and no assignment or transfer of any such Commitment or Loan shall be effective, in each case, unless and until recorded in the Register following Administrative Agent's acceptance of a fully executed an Assignment Agreement, together with the forms and certificates regarding tax matters and any fees payable in connection with such assignment, in each case, as provided in Section 10.6(e).  Each assignment shall be recorded in the Register promptly following acceptance by Administrative Agent of the fully executed Assignment Agreement and all other necessary documents and approvals, prompt notice thereof shall be provided to Company and a copy of such Assignment Agreement shall be maintained, as applicable.  The date of such recordation of a transfer shall be referred to herein as the **Assignment Effective Date**."  Any request, authority or consent of any Person who, at the time of making such request or giving such authority or consent, is listed in the Register as a Lender shall be conclusive and binding, absent manifest error, on any subsequent holder, assignee or transferee of the corresponding Commitments or Loans.  It is intended that the Register be maintained such that the Loans are in "registered form" for the purposes of the Internal Revenue Code.

(c)    Right to Assign.  Each Lender shall have the right at any time to sell, assign or transfer all or a portion of its rights and obligations under this Agreement, including all or a portion of its Commitment or Loans owing to it or other Obligations (provided, however, that pro rata assignments shall not be required and each assignment shall be of a uniform, and not varying, percentage of all rights and obligations under and in respect of any Loan and any related Commitments):

(i)    with respect to any sale, assignment or transfer of Loans, (A) upon the giving of notice to Administrative Agent, to any Person meeting the criteria of clause (a)(i) of the definition of "Eligible Assignee," and (B) with the consent of both (x) Administrative Agent (such consent not to be unreasonably withheld, conditioned or delayed) and (y) unless an Event of Default shall have occurred and is then continuing, Company (such consent to not be unreasonably withheld, conditioned or delayed, and such consent to be deemed given by Company unless an objection is delivered to Administrative Agent in writing within five (5) Business Days after notice of a proposed sale, assignment, transfer or assumption is delivered to Company), to any other Person meeting the criteria of clause (a)(ii) or clause (a)(iii) of the definition of "Eligible Assignee;" and

(ii)    with respect to any sale, assignment, transfer or assumption of any unfunded Commitments, with the consent of both (x) Administrative Agent (such consent not to be unreasonably withheld, conditioned or delayed) and (y) unless an Event of Default shall have occurred and is then continuing, Company (such consent to not be unreasonably withheld, conditioned or delayed), to any other Person meeting the criteria of clause (b) of the definition of "Eligible Assignee,"

145

provided, each such sale, assignment, transfer or assumption pursuant to this Section 10.6(c) (other than (c)(i)(A) or (c)(ii)) shall be in an aggregate amount of not less than $1,000,000 (or such lesser amount as may be agreed to by Company and Administrative Agent or as shall constitute the aggregate amount of the New Money Loans or Roll-Up Loans or Commitments of a particular Class of the assigning Lender).

        (d)      Mechanics.

        (i)      Assignments and assumptions of Loans and Commitments by Lenders shall be effected by manual execution and delivery to Administrative Agent of an Assignment Agreement. Assignments made pursuant to the foregoing provision shall be effective as of the Assignment Effective Date. In connection with all assignments there shall be delivered to Administrative Agent such forms, certificates or other evidence, if any, with respect to U.S. federal income tax withholding matters as the assignee under such Assignment Agreement may be required to deliver pursuant to Section 2.17(c), together with payment to Administrative Agent of a registration and processing fee of $3,500 (except that no such registration and processing fee shall be payable in the case of an assignee that is already a Lender or is an Affiliate or Related Fund of a Lender or a Person under common management with a Lender).

        (ii)      In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of Company and Administrative Agent, the applicable Pro Rata Share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to Administrative Agent and each Lender hereunder (and interest accrued thereon), and (y) acquire (and fund as appropriate) its full Pro Rata Share of all Loans. Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

        (e)      Notice of Assignment. Upon its receipt and acceptance of a duly executed and completed Assignment Agreement, any forms, certificates or other evidence required by this Agreement in connection therewith, Administrative Agent shall record the information contained in such Assignment Agreement in the Register, shall give prompt notice thereof to Company and shall maintain a copy of such Assignment Agreement.

        (f)      Representations and Warranties of Assignee. Each Lender, upon execution and delivery hereof or upon succeeding to an interest in the Commitments and/or Loans, as the case may be, represents and warrants as of the Closing Date or as of the Assignment Effective Date that (i) it is an Eligible Assignee (with respect to the applicable Loans and/or Commitments);

(ii) it has experience and expertise in the making of or investing in commitments or loans such as the applicable Commitments or Loans, as the case may be; (iii) it will make or invest in, as the case may be, its Commitments or Loans for its own account in the ordinary course and without a view to distribution of such Commitments or Loans within the meaning of the Securities Act or the Exchange Act or other federal securities laws (it being understood that, subject to the provisions of this Section 10.6, the disposition of such Commitments or Loans or any interests therein shall at all times remain within its exclusive control); (iv) it will not provide any information obtained by it in its capacity as a Lender to any Credit Party or any of its Affiliates; and (v) neither such Lender nor any of its Affiliates owns or controls any trade obligations or Indebtedness of any Credit Party (other than the Obligations) or any Capital Stock of any Credit Party.

(g)     Effect of Assignment.   Subject to the terms and conditions of this Section 10.6, as of the "Effective Date" specified in the applicable Assignment Agreement: (i) the assignee thereunder shall have the rights and obligations of a "Lender" hereunder to the extent such rights and obligations hereunder have been assigned to it pursuant to such Assignment Agreement and shall thereafter be a party hereto; and a "Lender" for all purposes hereof; (ii) the assigning Lender thereunder shall, to the extent that rights and obligations hereunder have been assigned thereby pursuant to such Assignment Agreement, relinquish its rights (other than any rights which survive the termination hereof under Section 10.8) and be released from its obligations hereunder (and, in the case of an Assignment Agreement covering all or the remaining portion of an assigning Lender's rights and obligations hereunder, such Lender shall cease to be a party hereto; provided, anything contained in any of the Credit Documents to the contrary notwithstanding, such assigning Lender shall continue to be entitled to the benefit of all indemnities hereunder as specified herein with respect to matters arising out of the prior involvement of such assigning Lender as a Lender hereunder); (iii) the Commitments shall be modified to reflect the Commitment of such assignee and any Commitment of such assigning Lender, if any; and (iv) if any such assignment occurs after the issuance of any Note hereunder, the assigning Lender shall, upon the effectiveness of such assignment or as promptly thereafter as practicable, surrender its applicable Notes to Administrative Agent for cancellation, and thereupon Company shall issue and deliver new Notes, if so requested by the assignee and/or assigning Lender, to such assignee and/or to such assigning Lender, with appropriate insertions, to reflect the new Commitments and/or outstanding Loans of the assignee and/or the assigning Lender.

(h)     Participations.

(i)     Each Lender shall have the right at any time to sell one or more participations to any Person (other than Company, any of its Subsidiaries or any of its Affiliates or any natural person) in all or any part of its Commitments, Loans or in any other Obligation. Each Lender that sells a participation pursuant to this Section 10.6(h) shall, acting solely for U.S. federal income tax purposes as a non-fiduciary agent of Company, maintain a register on which it records the name and address of each participant and the principal amounts (and stated interest) of each participant's participation interest with respect to any Loan or Commitment (each, a "**Participant Register**"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any participant or any information relating to a participant's interest in any Commitments, Loans or its other obligations under this Agreement) except to the extent that the relevant parties, acting reasonably and in good

faith, determine that such disclosure is necessary to establish that such Commitment, Loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations and Section 1.163-5(b) of the Proposed United States Treasury Regulations.  The entries in the Participant Register shall be conclusive and binding, absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of a participation with respect to any Loan or Commitment for all purposes under this Agreement, notwithstanding any notice to the contrary.  For the avoidance of doubt, Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register. The holder of any such participation, other than an Affiliate of the Lender granting such participation, shall not be entitled to require such Lender to take or omit to take any action hereunder except with respect to any amendment, modification or waiver that would (i) extend the final scheduled maturity of any Loan or Note in which such participant is participating, or reduce the rate or extend the time of payment of interest or fees thereon (except in connection with a waiver of applicability of any post-default increase in interest rates) or reduce the principal amount thereof, or increase the amount of the participant's participation over the amount thereof then in effect (it being understood that a waiver of any Default or Event of Default or of a mandatory reduction in the Commitment shall not constitute a change in the terms of such participation, and that an increase in any Commitment or Loan shall be permitted without the consent of any participant if the participant's participation is not increased as a result thereof), (ii) consent to the assignment or transfer by any Credit Party of any of its rights and obligations under this Agreement, or (iii) release all or substantially all of the Collateral under the Collateral Documents or all or substantially all of the Guarantors from the Guaranty (in each case, except as expressly provided in the Credit Documents) supporting the Loans hereunder in which such participant is participating.

(ii)    Company agrees that each participant shall be entitled to the benefits of Sections 2.15(c), 2.16 and 2.17 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (c) of this Section; provided, (x) a participant shall not be entitled to receive any greater payment under Section 2.16 or 2.17 than the applicable Lender would have been entitled to receive with respect to the participation sold to such participant, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after such participant acquired the participation and (y) a participant shall not be entitled to the benefits of Section 2.17 unless such participant agrees to comply with Section 2.17 as though it were a Lender; (it being understood that any documentation required under Section 2.17(c) and (d) shall be delivered to the participating Lender).  To the extent permitted by law, each participant also shall be entitled to the benefits of Section 10.4 as though such participant were a Lender, provided such participant agrees to be subject to Section 2.14 as though it were a Lender.

(i)    Certain Other Assignments and Participations.  In addition to any other assignment or participation permitted pursuant to this Section 10.6, any Lender may assign, pledge and/or grant a security interest in, all or any portion of its Loans, the other Obligations owed by or to such Lender, and its Notes, if any, to secure obligations of such Lender to any Person including to any Federal Reserve Bank as collateral security pursuant to Regulation A of the FRB and any

operating circular issued by such Federal Reserve Bank; provided, no Lender, as between Company and such Lender, shall be relieved of any of its obligations hereunder as a result of any such assignment and pledge, and provided further, in no event shall the applicable Federal Reserve Bank, pledgee or trustee be considered to be a "Lender" or be entitled to require the assigning Lender to take or omit to take any action hereunder.

10.7.    **Independence of Covenants**.  All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or would otherwise be within the limitations of, another covenant shall not avoid the occurrence of a Default or an Event of Default if such action is taken or condition exists.

10.8.    **Survival of Representations, Warranties and Agreements**.  All representations, warranties and agreements made herein shall survive the execution and delivery hereof and the making of any Credit Extension.  Notwithstanding anything herein or implied by law to the contrary, the agreements of each Credit Party set forth in Sections 2.15(c), 2.16, 2.17, 10.2, 10.3, 10.4, and 10.10 and the agreements of Lenders set forth in Sections 2.14, 9.3(b) and 9.6 shall survive the Payment in Full of the Obligations.

10.9.    **No Waiver; Remedies Cumulative**.  No failure or delay on the part of any Agent or any Lender in the exercise of any power, right or privilege hereunder or under any other Credit Document shall impair such power, right or privilege or be construed to be a waiver of any default or acquiescence therein, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other power, right or privilege.  The rights, powers and remedies given to each Agent and each Lender hereby are cumulative and shall be in addition to and independent of all rights, powers and remedies existing by virtue of any statute or rule of law or in any of the other Credit Documents.  Any forbearance or failure to exercise, and any delay in exercising, any right, power or remedy hereunder shall not impair any such right, power or remedy or be construed to be a waiver thereof, nor shall it preclude the further exercise of any such right, power or remedy.

10.10.    **Marshalling; Payments Set Aside**.  Neither any Agent nor any Lender shall be under any obligation to marshal any assets in favor of any Credit Party or any other Person or against or in payment of any or all of the Obligations.  To the extent that any Credit Party makes a payment or payments to Administrative Agent or Lenders (or to Administrative Agent, on behalf of Lenders), or Administrative Agent, Collateral Agent or Lenders enforce any security interests or exercise their rights of setoff, and such payment or payments or the proceeds of such enforcement or setoff or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, any other state or federal law, common law or any equitable cause, then, to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor or related thereto, shall be revived and continued in full force and effect as if such payment or payments had not been made or such enforcement or setoff had not occurred.

10.11.    **Severability**.  In case any provision in or obligation hereunder or under any Note or other Credit Document shall be invalid, illegal or unenforceable in any jurisdiction, the validity,

legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby (it being understood that the invalidity, illegality or unenforceability of a particular provision in a particular jurisdiction shall not in and of itself affect the validity, legality or enforceability of such provision in any other jurisdiction). The parties hereto shall endeavor in good faith negotiations to replace any invalid, illegal or unenforceable provisions with valid, legal and enforceable provisions the economic effect of which comes as close as reasonably possible to that of the invalid, illegal or unenforceable provisions.

10.12. **Obligations Several; Actions in Concert**. The obligations of Lenders hereunder are several and no Lender shall be responsible for the obligations or Commitment of any other Lender hereunder. Nothing contained herein or in any other Credit Document, and no action taken by Lenders pursuant hereto or thereto, shall be deemed to constitute Lenders as a partnership, an association, a Joint Venture or any other kind of entity. Anything in this Agreement or any other Credit Document to the contrary notwithstanding, each Lender hereby agrees with each other Lender that no Lender shall take any action to protect or enforce its rights arising out of this Agreement or any Note or otherwise with respect to the Obligations without first obtaining the prior written consent of Administrative Agent or Requisite Lenders (as applicable), it being the intent of Lenders that any such action to protect or enforce rights under this Agreement or any other Credit Document with respect to the Obligations shall be taken in concert and at the direction or with the consent of Administrative Agent or Requisite Lenders (as applicable).

10.13. **Headings**. Section headings herein are included herein for convenience of reference only and shall not constitute a part hereof for any other purpose or be given any substantive effect.

10.14. **APPLICABLE LAW. THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER (INCLUDING ANY CLAIMS SOUNDING IN CONTRACT LAW OR TORT LAW ARISING OUT OF THE SUBJECT MATTER HEREOF AND ANY DETERMINATIONS WITH RESPECT TO POST JUDGMENT INTEREST) SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK EXCEPT TO THE EXTENT THE LAW OF THE STATE OF NEW YORK IS SUPERSEDED BY THE BANKRUPTCY CODE .**

10.15. **CONSENT TO JURISDICTION. SUBJECT TO CLAUSE (V) OF THE FOLLOWING SENTENCE, ALL JUDICIAL PROCEEDINGS BROUGHT AGAINST ANY PARTY ARISING OUT OF OR RELATING HERETO OR ANY OTHER CREDIT DOCUMENT, OR ANY OF THE OBLIGATIONS, SHALL BE BROUGHT IN THE BANKRUPTCY COURT, AND IF THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM) JURISDICTION, IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN THE CITY AND COUNTY OF NEW YORK. BY EXECUTING AND DELIVERING THIS AGREEMENT, EACH CREDIT PARTY, FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, IRREVOCABLY (I) ACCEPTS GENERALLY AND UNCONDITIONALLY THE EXCLUSIVE (SUBJECT TO CLAUSE (V) BELOW) JURISDICTION AND VENUE OF SUCH COURTS; (II) WAIVES ANY DEFENSE OF FORUM NON CONVENIENS; (III) AGREES THAT SERVICE OF**

**ALL PROCESS IN ANY SUCH PROCEEDING IN ANY SUCH COURT MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO THE APPLICABLE CREDIT PARTY AT ITS ADDRESS PROVIDED IN ACCORDANCE WITH SECTION 10.1; (IV) AGREES THAT SERVICE AS PROVIDED IN CLAUSE (III) ABOVE IS SUFFICIENT TO CONFER PERSONAL JURISDICTION OVER THE APPLICABLE CREDIT PARTY IN ANY SUCH PROCEEDING IN ANY SUCH COURT, AND OTHERWISE CONSTITUTES EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT; AND (V) AGREES THAT AGENTS AND LENDERS RETAIN THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO BRING PROCEEDINGS AGAINST ANY CREDIT PARTY IN THE COURTS OF ANY OTHER JURISDICTION IN CONNECTION WITH THE EXERCISE OF ANY RIGHTS UNDER ANY CREDIT DOCUMENT OR AGAINST ANY COLLATERAL OR THE ENFORCEMENT OF ANY JUDGMENT, AND HEREBY SUBMITS TO THE JURISDICTION OF, AND CONSENTS TO VENUE IN, ANY SUCH COURT.**

10.16.   **WAIVER OF JURY TRIAL. EACH OF THE PARTIES HERETO HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING HEREUNDER OR UNDER ANY OF THE OTHER CREDIT DOCUMENTS OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS LOAN TRANSACTION OR THE LENDER/BORROWER RELATIONSHIP THAT IS BEING ESTABLISHED.  THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS.  EACH PARTY HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS ALREADY RELIED ON THIS WAIVER IN ENTERING INTO THIS AGREEMENT, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN ITS RELATED FUTURE DEALINGS.  EACH PARTY HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.  THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS SECTION 10.16 AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS HERETO OR ANY OF THE OTHER CREDIT DOCUMENTS OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THE LOANS MADE HEREUNDER.  IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.**

10.17.  **Confidentiality**.

(a)     Each Agent and each Lender shall keep confidential, in accordance with its customary procedures for handling confidential information and safe and sound lending practices, all non-public information regarding each Credit Party and its Subsidiaries obtained by such Agent or such Lender pursuant to the requirements hereof, it being understood and agreed by the Credit Parties that, in any event, Administrative Agent may disclose such information to the Lenders and each Agent and each Lender may make disclosures of such information (a) to Affiliates of such Lender or such Agent and to their and their respective Affiliates' respective officers, directors, members, partners, employees, legal counsel, independent auditors and other agents, experts and advisors, on a confidential basis (and to other Persons authorized by a Lender or Agent to organize, present or disseminate such information in connection with disclosures otherwise made in accordance with this Section 10.17), provided that, prior to any such disclosure, the Persons to whom such disclosure is made are informed of the confidential nature of such information and instructed to keep such information confidential; (b) as reasonably required by (x) any potential or prospective assignee, transferee or participant in connection with the contemplated assignment, transfer or participation of any Loans or any participations therein or by any direct or indirect contractual counterparties (or the professional advisors thereto) to any swap or derivative transaction relating to any Credit Party and its obligations or (y) any prospective partners or prospective financing sources of any Lender or Agent, provided, such potential or prospective assignees, transferees, participants, counterparties, advisors, prospective partners or prospective financing sources (A) are advised of, and agree to be bound by, either the provisions of this Section 10.17 or other confidentiality provisions at least as restrictive as the provisions of this Section 10.17, or (B) in the case of prospective assignees, transferees, participants, counterparties, partners or financing sources of a Lender, are informed of the confidential nature of the information, are instructed to keep such information confidential and are already bound by (and remain bound by) such Lender's customary confidentiality obligations and restrictions; (c) to any rating agency on a confidential basis when required by it; (d) to any Lender's or its Affiliates' respective current financing sources, provided, that, prior to any such disclosure, each such financing source is informed of the confidential nature of the information and instructed to keep such information confidential; (e) in connection with the exercise of any remedies hereunder or under any other Credit Document or any suit, action or proceeding relating to the Credit Documents or the enforcement of rights hereunder or thereunder; (f) disclosures made pursuant to the order of any court or administrative agency or in any pending legal or administrative proceeding, or otherwise as required by applicable law or compulsory legal process (in which case such Person agrees to inform Company promptly thereof to the extent not prohibited by law); (g) disclosures made upon the request or demand of any regulatory or quasi-regulatory authority purporting to have jurisdiction over such Person or any of its Affiliates; and (h) disclosures with the consent of the relevant Credit Party.  Notwithstanding anything to the contrary set forth herein, any Person required to maintain the confidentiality of information as provided in this Section 10.17 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such information as such Person would accord to its own confidential information.

(b)     In no event shall this Section 10.17 or any other provision of this Agreement or any of the other Credit Documents be deemed: (i) to apply to or restrict disclosure of information that has been or is made public by Company or any Guarantor or otherwise becomes generally

available to the public other than as a result of a disclosure in violation hereof, (ii) to apply to or restrict disclosure of information that was or becomes available to any Agent or Lender (or any Affiliate of any Lender) on a non-confidential basis from a person other than Company or a Guarantor, so long as such source is not known by such Agent or such Lender to be bound by obligations of confidentiality with respect to such information, and (iii) to prevent an Agent or Lender from responding to routine informational requests in accordance with the Code of Ethics for the Exchange of Credit Information promulgated by The Robert Morris Associates or other applicable industry standards relating to the exchange of credit information; provided, however, that (x) such routine informational request is not specific to Company or its Affiliates or (y) no portion of the financial statements of any of Company or its Affiliates are provided in such response. The obligations of the Agents and Lenders under this Section 10.17 shall supersede and replace the obligations of the Agents and Lenders under any confidentiality letter signed prior to the Closing Date.

(c)   Notwithstanding the foregoing, on or after the Closing Date, Administrative Agent and Lenders may, at its or their own expense (and subject to Company's approval with respect to the timing and substance thereof (such approval not to be unreasonably withheld, conditioned or delayed)) issue news releases and publish "tombstone" advertisements and other announcements relating to this transaction in newspapers, trade journals and other appropriate media (which may, with the consent of Company, include use of logos of one or more of the Credit Parties) (collectively, "**Trade Announcements**"); it being understood that, for the avoidance of doubt, no other use of the logos of Company and its Subsidiaries shall be permitted without the consent of Company.  No Lender or Credit Party shall (a) issue any Trade Announcement, (b) use or reference in advertising, publicity, or otherwise the name of any Lender or any of their respective Affiliates, partners, or employees, or (c) represent that any product or any service provided has been approved or endorsed by any Lender, or any of their respective Affiliates, except in the case of clauses (a) and (b) of this sentence, (i) disclosures required by applicable law, regulation, legal process or the rules of the Securities and Exchange Commission or other applicable regulatory authority or (ii) with the prior approval of such Lender or Credit Party, as applicable.

(d)   Notwithstanding anything to the contrary contained herein, each Credit Party agrees that neither it nor any of its Affiliates, employees, investors, agents, advisors or representatives, will now or in the future, directly use or refer to Lakestar, Soros Fund Management LLC, the "Soros" or "Quantum" name, Fortress Investment Group LLC, the "Fortress" or "Drawbridge" name, or any derivation thereof, for any press release, any public announcement or statement or in any interview or other discussion with any reporter or other member of the media, without the prior written consent of Soros Fund Management LLC or Fortress Credit Corp., as applicable, with respect to each such use or reference, except to the extent any such use or reference is required by applicable law or an order of a court of competent jurisdiction, provided, that Company shall as soon as practicable notify Lakestar or Fortress, as applicable, of such requirement except where doing so is prohibited by law, so that Lakestar or Fortress (or their respective Affiliate) may, at its expense, seek a protective order or other appropriate remedy protecting such information. Notwithstanding the foregoing, public announcements or statements, interviews or other discussions with any reporter or other member of the media shall mean only by press release or other formally released announcements and exclude any coverage by Company about Lakestar or Soros Fund Management LLC in its news-reporting capacity.

153

(e)    Notwithstanding anything to the contrary contained herein, each of Lakestar and Soros Fund Management LLC agrees that neither it nor any of its Affiliates, employees, investors, agents, advisors or representatives, will now or in the future, directly use or refer any Credit Party, the "Vice" name, or any derivation thereof, for any press release, any public announcement or statement or in any interview or other discussion with any reporter or other member of the media, without the prior written consent of Company with respect to each such use or reference, except to the extent any such use or reference is required by applicable law or an order of a court of competent jurisdiction, provided, that the Lakestar or Soros Fund Management LLC, as applicable, shall as soon as practicable notify Company of such requirement except where doing so is prohibited by law, so that Company (or its Affiliate) may, at its expense, seek a protective order or other appropriate remedy protecting such information.

10.18.  **Effectiveness; Counterparts**.  This Agreement shall become effective upon the execution of a counterpart hereof by each of the parties hereto and receipt by Company and Administrative Agent of written notification of such execution and authorization of delivery thereof.  This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.  Delivery of an executed counterpart of a signature page of this Agreement by facsimile or other electronic transmission shall be effective as delivery of a manually executed counterpart of this Agreement.

10.19.  **Entire Agreement**.  This Agreement, together with the other Credit Documents (including any such other Credit Document entered into prior to the date hereof), reflects the entire understanding of the parties with respect to the transactions contemplated hereby and shall not be contradicted or qualified by any other agreement, oral or written, made prior to the date hereof.

10.20.  **Patriot Act**.  Each Lender and Agent (for itself and not on behalf of any Lender) hereby notifies each Credit Party that pursuant to the requirements of the PATRIOT Act, it is required to obtain, verify and record information that identifies such Credit Party, which information includes the name and address of such Credit Party and other information that will allow such Lender or Agent, as applicable, to identify such Credit Party in accordance with the PATRIOT Act.

10.21.  **Electronic Execution of Agreements**.    The words "execution," "signed," "signature" and words of like import in this Agreement or any Credit Document shall in each case be deemed to include electronic signatures, signatures exchanged by electronic transmission, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act; provided, that Administrative Agent or Collateral Agent may request, and upon any such request the Credit Parties shall be obligated to provide, manually executed "wet ink" signatures to any Credit Document.

10.22.  **No Fiduciary Duty**.  Each Agent, Lender and their Affiliates (collectively, solely for purposes of this paragraph, the "**Lenders**"), may have economic interests that conflict with

those of the Credit Parties, their equity holders and/or their affiliates. Each Credit Party agrees that nothing in the Credit Documents or otherwise will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between any Lender, on the one hand, and such Credit Party, its equity holders or its affiliates, on the other. The Credit Parties acknowledge and agree that (i) the transactions contemplated by the Credit Documents (including the exercise of rights and remedies hereunder and thereunder) are arm's-length commercial transactions between the Lenders, on the one hand, and the Credit Parties, on the other, and (ii) in connection therewith and with the process leading thereto, (x) no Lender has assumed an advisory or fiduciary responsibility in favor of any Credit Party, its equity holders or its affiliates with respect to the transactions contemplated hereby (or the exercise of rights or remedies with respect thereto) or the process leading thereto (irrespective of whether any Lender has advised, is currently advising or will advise any Credit Party, its equity holders or its Affiliates on other matters) or any other obligation to any Credit Party except the obligations expressly set forth in the Credit Documents and (y) each Lender is acting solely as principal and not as the agent or fiduciary of any Credit Party, its management, stockholders, creditors or any other Person. For the avoidance of doubt, this Agreement is not intended to establish, and shall not establish, an investment advisory relationship among Lakestar or Soros Fund Management LLC, on the one hand, and any Credit Party or any of its Affiliates or its or their respective officers, directors, shareholders, partners, members, employees, agents or representatives ("**Credit Party Representatives**"), on the other hand, whereby Lakestar or Soros Fund Management LLC serves as an investment adviser to any Credit Party Representative or that would otherwise result in among Soros Fund Management LLC meeting the definition of investment adviser in Section 202(a)(11) of the U.S. Investment Advisers Act of 1940, as amended, with respect to any Credit Party Representative. Each Credit Party acknowledges and agrees that it has consulted its own legal and financial advisors to the extent it deemed appropriate and that it is responsible for making its own independent judgment with respect to such transactions and the process leading thereto. Each Credit Party agrees that it will not claim that any Lender has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to such Credit Party, in connection with such transaction or the process leading thereto.

10.23. **Usury Savings Clause**.

(a)    Notwithstanding any other provision herein, the aggregate interest rate charged or agreed to be paid with respect to any of the Obligations, including all charges or fees in connection therewith deemed in the nature of interest under applicable law shall not exceed the Highest Lawful Rate. If the rate of interest (determined without regard to the preceding sentence) under this Agreement at any time exceeds the Highest Lawful Rate, the outstanding amount of the Loans made hereunder shall bear interest at the Highest Lawful Rate until the total amount of interest due hereunder equals the amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect. In addition, if when the Loans made hereunder are Paid in Full the total interest due hereunder (taking into account the increase provided for above) is less than the total amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect, then to the extent permitted by law, Company shall pay to Administrative Agent an amount equal to the difference between the amount of interest paid and the amount of interest which would have been paid if the Highest Lawful Rate had at all times been in effect. Notwithstanding the foregoing, it is the intention of Lenders and Company to conform strictly to

any applicable usury laws.  Accordingly, if any Lender contracts for, charges, or receives any consideration which constitutes interest in excess of the Highest Lawful Rate, then any such excess shall be cancelled automatically and, if previously paid, shall at such Lender's option be applied to the outstanding amount of the Loans made hereunder or be refunded to Company.  In determining whether the interest contracted for, charged, or received by Administrative Agent or a Lender exceeds the Highest Lawful Rate, such Person may, to the extent permitted by applicable law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest, throughout the contemplated term of the Obligations hereunder.

(b)    Without limiting the generality of the foregoing, if any provision of this Agreement or of any of the other Credit Documents would obligate Company or any other Credit Party to make any payment of interest or other amount payable to any Lender in an amount or calculated at a rate which would be prohibited by applicable law or would result in receipt by such Lender of interest at a criminal rate (as such terms are construed under the *Criminal Code* (Canada)) then, notwithstanding such provisions, such amount or rate shall be deemed to have been adjusted with retroactive effect to the maximum amount or rate of interest, as the case may be, as would not be so prohibited by applicable law or so result in a receipt by such Lender of interest at a criminal rate, such adjustment to be effected, to the extent necessary, as follows: firstly by reducing the amount or rate of interest required to be paid by such Lender and thereafter, by reducing any fees, commissions, premiums and other amounts required to be paid to such Lender which would constitute "interest" for purposes of Section 347 of the *Criminal Code* (Canada).

10.24.  **Acknowledgement and Consent to Bail-In of Affected Financial Institutions**. Notwithstanding anything to the contrary in any Credit Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Lender that is an Affected Financial Institution arising under any Credit Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)    the effects of any Bail-In Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Credit Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of the applicable Resolution Authority.

10.25.  **No Additional Perfection Steps Required**.  Upon entry of the Interim Order or Final Order, as applicable, and pursuant to its terms, all Liens granted by Credit Parties in favor of the Collateral Agent, for the benefit of the Secured Parties, shall be valid, binding, enforceable and perfected first priority Liens in the Collateral, senior in priority to all other Liens (subject to the terms of the DIP Order and the Carve-Out), and the Collateral Agent shall not be required to file any financing statements, mortgages, notices of Lien or similar instruments in any jurisdiction or filing office, enter into any control agreements, or to take any other action in order to validate or perfect the Liens granted by Credit Parties to the Collateral Agent, for the benefit of the Secured Parties, pursuant to the Credit Documents or the DIP Order. Without in any way suggesting that the entry of the Interim Order is not sufficient for such purpose, each Credit Party irrevocably and unconditionally authorizes the Collateral Agent (or its agent) to file at any time and from time to time such financing statements or PPSA financing statements with respect to the Collateral naming the Collateral Agent, for the benefit of Secured Parties, as secured party and such Loan Party as debtor, as any Agent may require, and including any other information with respect to such Credit Party or otherwise required by part 5 of Article 9 of the UCC, or otherwise, as such Agent determines, together with any amendment and continuations with respect thereto, which authorization shall apply to all financing statements filed on, prior to or after the Closing Date. Each Credit Party hereby ratifies and approves all financing statements naming the Collateral Agent, for the benefit of the Secured Parties, as secured party and such Credit Party as debtor with respect to the Collateral (and any amendments with respect to such financing statements) filed by or on behalf of the Collateral Agent prior to the Closing Date and ratifies and confirms the authorization of the Collateral Agent to file such financing statements (and amendments, if any). Without in any way suggesting that the entry of the Interim Order is not sufficient for such purpose, each Credit Party shall take any other actions requested by Collateral Agent from time to time to cause the attachment, perfection and priority of, and the ability of the Collateral Agent to enforce, any Liens of the Secured Parties in any and all of the Collateral, including the filing of a financing statement, mortgage or the taking of delivery or control (including via any account control agreements) or by appropriate filings with the United States Patent and Trademark Office or United States Copyright Office, in accordance with the Laws and regulations of the United States of America and its political subdivisions, or otherwise. The foregoing grant of authority shall not relieve the Company of the obligation to perfect and maintain the perfection of the Collateral Agent's Liens on the Collateral or impose a duty on the Collateral Agent to make any of the filings described herein.

10.26.  **Orders Control**.  In the event of any inconsistency between the provisions of the DIP Order and this Agreement, the provisions of the DIP Order shall govern.

10.27.  **Parties Including the Trustees; Bankruptcy Court Proceedings**.    This Agreement, the other Credit Documents, and all Liens and other rights and privileges created hereby or pursuant hereto or to any other Credit Document shall be binding upon each Credit Party, the bankruptcy estate of each Credit Party, and any trustee, other bankruptcy estate representative or any successor-in-interest of any Credit Party in the Chapter 11 Cases or any subsequent case commenced under Chapter 7 of the Bankruptcy Code, and shall not be subject to Section 365 of

the Bankruptcy Code. The Liens created by the DIP Order, this Agreement and the other Credit Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of the Chapter 11 Cases or any other bankruptcy case of any Credit Party to a case under Chapter 7 of the Bankruptcy Code or in the event of dismissal of the Chapter 11 Cases or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that the Collateral Agent file financing statements or otherwise perfect its Liens under applicable law.

10.28. **Forbearance**.

(a)     In consideration of (i) the Credit Parties' agreements hereunder, and in reliance upon the representations, warranties, agreements and covenants set forth herein, subject to the satisfaction of each of the conditions precedent to the effectiveness hereof and (ii) the forbearance by JPMCB pursuant to the JPMCB Forbearance Agreement, from the Closing Date until earlier of (x) the DIP Maturity Date and (y) the Forbearance Termination Date (defined below) (the "**Forbearance Period**"), each of the Agents and the Lenders, in its capacity as a Pre-Petition Agent (acting on the instructions of the Pre-Petition Lenders) or a Pre-Petition Lender under the Pre-Petition Credit Agreement (each such forbearing Agent, a "**Forbearing Agent**", and each such forbearing Lender, a "**Forbearing Lender**"), hereby agrees to forbear from exercising any remedies with respect to any Default or Event of Default under the Pre-Petition Credit Agreement or under any other "Credit Document" (as defined in the Pre-Petition Credit Agreement) against any "Credit Party" (as defined in the Pre-Petition Credit Agreement) that is not a Debtor under the Chapter 11 Cases during the Forbearance Period.  For the avoidance of doubt, during the Forbearance Period, each Forbearing Lender agrees that it (individually or collectively) will not deliver any notice or instruction to any Forbearing Agent or otherwise direct any Forbearing Agent, in each case, to exercise any remedies under the Pre-Petition Credit Agreement, any other "Credit Document" (as defined in the Pre-Petition Credit Agreement) or applicable Laws against any such "Credit Party" (as defined in the Pre-Petition Credit Agreement) that is not a Debtor under the Chapter 11 Cases.

(b)     For the purposes of this Section 10.28, "**Forbearance Termination Date**" means the occurrence of any of the following events or circumstances:

(i)     the JPMCB Forbearance Agreement shall terminate or be revoked or found unenforceable at any time prior to the DIP Maturity Date;

(ii)     whether or not it is then permitted to do so under the JPM Forbearance Agreement, JPMCB shall commence the enforcement of remedies against any "Credit Party" (as defined in the Pre-Petition Credit Agreement) that is not then a Debtor in the Chapter 11 Cases, or any of such Credit Party's assets or properties under their cash management agreement with JPMCB, any other agreement, at law, at equity or otherwise; or

(iii)     with respect to any such "Credit Party" (as defined in the Pre-Petition Credit Agreement) that is not a Debtor in the Chapter 11 Cases, the commencement by or against such Credit Party of an insolvency or liquidation proceeding under the United States Bankruptcy Code or the law of such Credit Party's local jurisdiction.

[Remainder of page intentionally left blank]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first written above.

**VICE GROUP HOLDING INC.**, as Company

By: _____
Name: Hozefa Lokhandwala
Title:  Co-Chief Executive Officer

**VICE HOLDING INC.**, as a Guarantor

By: _____
Name: Hozefa Lokhandwala
Title:  Co-Chief Executive Officer

**SSGM INVESTMENTS INC.**
**VICE MEDIA CANADA INC.**
**VICE MEDIA DISTRIBUTION (CANADA) INC.**
**VICE STUDIO CANADA INC.**,
each as a Guarantor

By: _____
Name: Richard Bisson
Title:  Director

**PROJECT CHANGE LLC**, as a Guarantor

By: _____
Name: Hozefa Lokhandwala
Title:  President

**VICE FOOD LLC**, as a Guarantor

By: _____
Name: Hozefa Lokhandwala
Title:  Manager

*[Signature page to Senior Secured Super-Priority Term Loan Debtor-in-Possession Credit and Guaranty Agreement]*

**VICE MEDIA LLC**
**BOY WHO CRIED AUTHOR LLC**
**CARROT CREATIVE LLC**
**CARROT OPERATIONS LLC**
**DANA MADE LLC**
**INVERNESS COLLECTIVE LLC**
**JT LEROY HOLDING LLC**
**PLDM FILMS LLC**
**REFINERY 29 INC.**
**R29 PRIDE, LLC**
**R29 PRODUCTIONS, LLC**
**VALVI LLC**
**VICE CONTENT DEVELOPMENT, LLC**
**VICE DISTRIBUTION LLC**
**VICE IMPACT INC.**
**VICE INTERNATIONAL HOLDING, INC.**
**VICE MUSIC PUBLISHING LLC**
**VICE PAYROLL LLC**
**VICE PRODUCTIONS LLC**
**VICE PROJECT SERVICES LLC**
**VILLAIN LLC**
**VIRTUE WORLDWIDE, LLC**
**VISUR LLC**
**VTV PRODUCTIONS LLC,**
each as a Guarantor


By: _____
Name: Hozefa Lokhandwala
Title:   Chief Strategy Officer

**CLIFFORD BENSKI, INC.**
**EDITION WORLDWIDE LIMITED**
**LEVELPRINT LIMITED**
**PARADISE INDUSTRIES LIMITED**
**PULSE FILMS LIMITED**
**REFINERY 29 LIMITED**
**VICE EUROPE HOLDING LIMITED**
**VICE EUROPE PULSE HOLDING LIMITED**
**VICE UK LIMITED**
**VICE UK STUDIOS LIMITED**,
each as a Guarantor


By: _____
Name: Hozefa Lokhandwala
Title:   Director

**CHANGE INCORPORATED UK LIMITED**
**REFINERY 29 CORP.**
**VICE FRANCE TV LIMITED**
**VICE UK TV LIMITED**,
each as a Guarantor


By: _____
Name: Bruce Dixon
Title:   Director

**CHANNEL 271 PRODUCTIONS LLC**,
as a Guarantor


By: _____
Name: Jason Guberman
Title:   Vice President

*[Signature page to Senior Secured Super-Priority Term Loan Debtor-in-Possession Credit and Guaranty Agreement]*

**FORTRESS CREDIT CORP.**,
as Administrative Agent

By: _____
     Name:
     Title:

**WILMINGTON TRUST, NATIONAL ASSOCIATION**
as Collateral Agent

By: _____
Name:
Title:

**LENDERS**:

**DBDB FUNDING LLC,**
in its capacity as a Lender


By: _____
Name:
Title:


**DRAWBRIDGE SPECIAL OPPORTUNITIES
FUND LP,**
in its capacity as a Lender

By**: DRAWBRIDGE SPECIAL
OPPORTUNITIES GP LLC,**
its general partner


By: _____
Name:
Title:


**FORTRESS CREDIT OPPORTUNITIES XV
CLO LIMITED,**
in its capacity as a Lender

By**: FCOD CLO MANAGEMENT LLC,**
its collateral manager


By: _____
Name:
Title:

**FORTRESS CREDIT OPPORTUNITIES IX CLO LIMITED,**
in its capacity as a Lender

By**: FCOD CLO MANAGEMENT LLC,**
its collateral manager

By: _____
Name:
Title:

**FORTRESS CREDIT OPPORTUNITIES XI CLO LIMITED,**
in its capacity as a Lender

By**: FCOD CLO MANAGEMENT LLC,**
its collateral manager

By: _____
Name:
Title:

**FORTRESS CREDIT OPPORTUNITIES VI CLO LIMITED,**
in its capacity as a Lender

By**: FCOO CLO MANAGEMENT LLC,**
its collateral manager

By: _____
Name:
Title:

**FORTRESS CREDIT OPPORTUNITIES XIX CLO LLC,**
in its capacity as a Lender

**BY: FCOD CLO MANAGEMENT LLC,**
its collateral manager


By: _____
Name:
Title:


**FLF I HOLDINGS FINANCE L.P.,**
in its capacity as a Lender

By**: FLF I HOLDINGS FINANCE CM LLC,**
as servicer

By**: FORTRESS LENDING I HOLDINGS L.P.,**
its sole member

By**: FORTRESS LENDING ADVISORS LLC,**
its investment manager


By: _____
Name:
Title:

**FORTRESS LENDING I HOLDINGS L.P.,**
in its capacity as a Lender

By**: FORTRESS LENDING ADVISORS LLC,**
its investment manager


By: _____
Name:
Title:

**DRAWBRIDGE SPECIAL OPPORTUNITIES FUND LTD.,**
in its capacity as a Lender

By:  **DRAWBRIDGE SPECIAL OPPORTUNITIES ADVISORS LLC**, its investment manager

By: _____
Name:
Title:

**LAKESTAR FINANCE LLC**,
in its capacity as a Lender


By: _____
Name:
Title:

**MONROE CAPITAL CORPORATION,**
in its capacity as a Lender


By: _____
Name:
Title:

**MONROE CAPITAL INCOME PLUS CORPORATION,**
in its capacity as a Lender


By: _____
Name:
Title:




**MONROE CAPITAL PRIVATE CREDIT FUND III LP,**
in its capacity as a Lender

By**: MONROE CAPITAL PRIVATE CREDIT FUND III LLC,**
its general partner


By: _____
Name:
Title:


**MONROE CAPITAL PRIVATE CREDIT FUND III (UNLEVERAGED) LP,**
in its capacity as a Lender

By**: MONROE CAPITAL PRIVATE CREDIT FUND III LLC,**
its general partner


By: _____
Name:
Title:

*[Signature page to Senior Secured Super-Priority Term Loan Debtor-in-Possession Credit and Guaranty Agreement]*

**MONROE PRIVATE CREDIT FUND A LP,**
in its capacity as a Lender

By**: MONROE PRIVATE CREDIT FUND A LLC,**
its general partner

By: _____
Name:
Title:

**MONROE CAPITAL PRIVATE CREDIT FUND I LP,**
in its capacity as a Lender

By**: MONROE CAPITAL PRIVATE CREDIT FUND I LLC,**
its general partner

By: _____
Name:
Title:

**MONROE CAPITAL PRIVATE CREDIT FUND VT LP,**
in its capacity as a Lender

By**: MONROE CAPITAL PRIVATE CREDIT FUND VT LLC,**
its general partner

By: _____
Name:
Title:

*[Signature page to Senior Secured Super-Priority Term Loan Debtor-in-Possession Credit and Guaranty Agreement]*

**MONROE CAPITAL FUND MARSUPIAL (LUX) FINANCING HOLDCO LP,**
in its capacity as a Lender

By**: MONROE CAPITAL MANAGEMENT ADVISORS LLC,**
as Investment Manager


By: _____
Name:
Title:


**MONROE (NP) U.S. PRIVATE DEBT FUND LP,**
in its capacity as a Lender

By**: MONROE (NP) U.S. PRIVATE DEBT FUND GP LTD.,**
its general partner


By: _____
Name:
Title:

**MONROE CAPITAL PRIVATE CREDIT FUND III (LUX) FINANCING HOLDCO LP,**
in its capacity as a Lender

By**: MONROE CAPITAL PRIVATE CREDIT FUND III (LUX) FINANCING HOLDCO GP LLC,**
as General Partner

By**: MONROE CAPITAL MANAGEMENT ADVISORS LLC,**
as Manager


By: _____
Name:
Title:

**MONROE CAPITAL FUND SV S.A.R.L., acting in respect of its Fund III (Unleveraged Compartment),**
in its capacity as a Lender

By**: MONROE CAPITAL MANAGEMENT ADVISORS LLC,**
as Investment Manager


By: _____
Name:
Title:

**APPENDIX A**
**TO SENIOR SECURED SUPER-PRIORITY TERM LOAN DEBTOR-IN-POSSESSION**
**CREDIT AND GUARANTY AGREEMENT**

**New Money Commitments**

| Lender | Initial Term Loan Commitment | Pro Rata Share |
|---|---|---|
|  |  |  |
| **Total** | **$** | **100.00%** |

**APPENDIX B**
**TO SENIOR SECURED SUPER-PRIORITY TERM LOAN DEBTOR-IN-POSSESSION**
**CREDIT AND GUARANTY AGREEMENT**

**Notice Addresses**

VICE GROUP HOLDING INC. and each other Credit Party

    49 South 2nd Street
    Brooklyn, NY 11249
    Attention:  Maria Harris
    Email:  maria.harris@vice.com

in each case, with a copy (which copy shall not constitute notice) to:

    Shearman & Sterling LLP
    599 Lexington Avenue
    New York, NY 10022
    Attention:  Creighton Condon; Chris Forrester; Michael Steinberg
    Email:  ccondon@shearman.com; chris.forrester@shearman.com;
    michael.steinberg@shearman.com

FORTRESS CREDIT CORP,

    as Administrative Agent

    c/o Fortress Investment Group LLC
    1345 Avenue of the Americas, 46th Floor
    New York, NY, 10105
    Attn: General Counsel
    Email: gccredit@fortress.com

with a copy to:

    c/o Fortress Investment Group LLC
    1345 Avenue of the Americas, 46th Floor
    New York, NY, 10105
    Attn: Brian Stewart
    Email: bstewart@fortress.com

with a copy (which copy shall not constitute notice) to:

    Gibson Dunn & Crutcher LLP
    333 South Grand Avenue
    Los Angeles, CA 90071-3197
    Attention:  Cromwell Montgomery, Esq.
    Email:  cmontgomery@gibsondunn.com

WILMINGTON TRUST, NATIONAL ASSOCIATION,

as Collateral Agent

50 South Sixth Street, Suite 1290
Minneapolis, Minnesota 55402
Attention: J. Campbell
Email: jcampbell3@wilmingtontrust.com

with a copy to (which shall not constitute notice):

Shipman & Goodwin LLP
One Constitution Plaza
Hartford, Connecticut 06103
Attention: Marie C. Pollio, Esq.
Email: mpollio@goodwin.com

EXHIBIT A-1 TO

SENIOR SECURED SUPER-PRIORITY TERM LOAN DEBTOR-IN-POSSESSION CREDIT AND GUARANTY AGREEMENT

## FUNDING NOTICE

Reference is made to the Senior Secured Super-Priority Term Loan Debtor-In-Possession Credit and Guaranty Agreement, dated as of May [ ], 2023 (as amended, restated, replaced, supplemented or otherwise modified from time to time, the **"Credit Agreement"**; the terms defined therein and not otherwise defined herein being used herein as therein defined), by and among **VICE GROUP HOLDING INC.**, a Delaware corporation ("**Company**"), certain Subsidiaries of Company from time to time party thereto as Guarantors, the Lenders party thereto from time to time, **FORTRESS CREDIT CORP.**, as Administrative Agent, and **WILMINGTON TRUST, NATIONAL ASSOCIATION**, as Collateral Agent.

Pursuant to Section 2.1 of the Credit Agreement, Company desires that Lenders make the following Loans (this "**Credit Extension**") to Company in accordance with the applicable terms and conditions of the Credit Agreement on **[mm/dd/yy]** (the "**Credit Date**"):

1.  ☐  New Money Loans, with an Initial Interest
Period of _____ Month(s):[1]          $[___,___,___]

The undersigned Authorized Officer hereby represents, warrants and certifies on behalf of Company that:

(i)  as of the Credit Date, the representations and warranties contained in the Credit Agreement and in the other Credit Documents are true and correct in all material respects on and as of the Credit Date to the same extent as though made on and as of that date (unless any such representation and warranty is qualified as to materiality or Material Adverse Effect, in which case such representation and warranty is true and correct in all respects), except to the extent such representations or warranties specifically relate to an earlier date, in which case such representations or warranties are true and correct in all material respects on and as of such earlier date (unless any such representation and warranty is qualified as to materiality or Material Adverse Effect, in which case such representation and warranty is true and correct in all respects as of such earlier date); and

(ii)  as of the Credit Date, no event has occurred and is continuing or would result from the consummation of this Credit Extension that would constitute an Event of Default or a Default.

Company hereby irrevocably instructs you and authorizes you to make the disbursements of the Loans on the Credit Date in the manner set forth on Annex I attached hereto and incorporated herein by reference, in accordance with the terms and provisions of the Credit Agreement, to the account numbers specified thereon.

Company hereby acknowledges that Administrative Agent may make payment strictly on the basis of the account numbers furnished herein even if such account number identifies a party other than the name of the accounts listed herein. In the event the account numbers are incorrect or if any payoff amount is incorrect, the Company hereby agrees to be fully liable for any and all losses, costs and expenses arising therefrom (including, without limitation, any losses, costs or expenses arising from any of the Company's negligence or the negligence of any of the Company's agents or employees).

---

[1] May be an interest period of one, three or six months.

Date: **[mm/dd/yy]**

**VICE GROUP HOLDING INC.**

By: _____
Name:
Title:

EXHIBIT A-1-2

ANNEX I

[Attach Funds Disbursement Instructions]

EXHIBIT A-1-3

EXHIBIT A-2 TO
SENIOR SECURED SUPER-PRIORITY TERM LOAN DEBTOR-IN-POSSESSION CREDIT AND GUARANTY
AGREEMENT

## CONTINUATION NOTICE

Reference is made to the SENIOR SECURED SUPER-PRIORITY TERM LOAN DEBTOR-IN-POSSESSION CREDIT AND GUARANTY AGREEMENT, dated as of May [  ], 2023  (as amended, restated, replaced, supplemented or otherwise modified from time to time,  the **"Credit Agreement"**; the terms defined therein and not otherwise defined herein being used herein as therein defined), by and among **VICE GROUP HOLDING INC.**, a Delaware corporation ("**Company**"), certain Subsidiaries of Company from time to time party thereto as Guarantors, the Lenders party thereto from time to time, **FORTRESS CREDIT CORP.**, as Administrative Agent, and **WILMINGTON TRUST, NATIONAL ASSOCIATION**, as Collateral Agent.

Pursuant to Section 2.7 of the Credit Agreement, Company desires to continue the following Loans, each such continuation to be effective as of **[mm/dd/yy]**:

**1. New Money Term Loans:**

$[___,___,___][1]        Loans to be continued with Interest Period of ____ month(s)[2]

**2. Roll-Up Loans:**

$[___,___,___][1]        Loans to be continued with Interest Period of ____ month(s)[2]

Company hereby certifies that as of the date hereof, no event has occurred and is continuing or would result from the consummation of the continuation contemplated hereby that would constitute an Event of Default or a Default.

Date: **[mm/dd/yy]**                    **VICE GROUP HOLDING INC.**

By: _____
Name:
Title:

---

[1] May continue, upon the expiration of any Interest Period applicable to any SOFR Loan, all or any portion of such Loan equal to
    $500,000 and integral multiples of $100,000 in excess of that amount as a SOFR Loan for one or more further Interest
    Periods, of the same or different durations.
[2] May be an interest period of one, three or six months.

EXHIBIT A-2-1

EXHIBIT B TO
SENIOR SECURED SUPER-PRIORITY TERM LOAN DEBTOR-IN-POSSESSION CREDIT AND GUARANTY
AGREEMENT

## FORM OF NOTE

$[___,___,___][1]

[mm/dd/yy][2]                                                                                         New York, New York

     **FOR VALUE RECEIVED, VICE GROUP HOLDING INC.**, a Delaware corporation (**"Company"**), promises to pay **[NAME OF LENDER]** (**"Payee"**) or its registered assigns the principal amount of [●] **DOLLARS** ($[___,___,___][1]) or, if less, the aggregate principal amount of the [New Money/Roll-Up] Loans made by Lender to Payee under the Credit Agreement (as defined below) and then outstanding, pursuant to and in accordance with the terms of the Credit Agreement (as defined below).

     Company also promises to pay interest on the unpaid principal amount hereof, from the date hereof until paid in full, at the rates and at the times which shall be determined in accordance with the provisions of that certain Senior Secured Super-Priority Term Loan Debtor-In-Possession Credit and Guaranty Agreement, dated as of May [  ], 2023 (as amended, restated, replaced, supplemented or otherwise modified from time to time, the **"Credit Agreement"**; the terms defined therein and not otherwise defined herein being used herein as therein defined), by and among Company, certain Subsidiaries of Company from time to time party thereto as Guarantors, the Lenders party thereto from time to time, Fortress Credit Corp., as Administrative Agent, and Wilmington Trust, National Association, as Collateral Agent.

     This Note is one of the "Notes" referred to in the Credit Agreement and is issued pursuant to and entitled to the benefits of the Credit Agreement, to which reference is hereby made for a more complete statement of the terms and conditions under which the Loan evidenced hereby was made and is to be repaid.

     All payments of principal and interest in respect of this Note shall be made in lawful money of the United States of America in same day funds at the Principal Office of Administrative Agent or at such other place as shall be designated in writing for such purpose in accordance with the terms of the Credit Agreement.  Unless and until an Assignment Agreement effecting the assignment or transfer of the obligations evidenced hereby shall have been accepted by Administrative Agent and recorded in the Register, Company, each Agent and Lenders shall be entitled to deem and treat Payee as the owner and holder of this Note and the obligations evidenced hereby.  Payee hereby agrees, by its acceptance hereof, that before disposing of this Note or any part hereof it will make a notation hereon of all principal payments previously made hereunder and of the date to which interest hereon has been paid; provided, the failure to make a notation of any payment made on this Note shall not limit or otherwise affect the obligations of Company hereunder with respect to payments of principal of or interest on this Note.

     This Note is subject to mandatory prepayment and to prepayment at the option of Company, each as provided in the Credit Agreement.

     THIS NOTE AND THE RIGHTS AND OBLIGATIONS OF COMPANY AND PAYEE HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF THAT WOULD RESULT IN THE APPLICATION OF ANY LAW OTHER THAN THE LAW OF THE STATE OF NEW YORK.

---

[1] Lender's New Money Commitment or Roll-Up Commitment
[2] Date of Issuance

EXHIBIT B-1-1

Upon the occurrence of an Event of Default, the unpaid balance of the principal amount of this Note, together with all accrued and unpaid interest thereon, may become, or may be declared to be, due and payable in the manner, upon the conditions and with the effect provided in the Credit Agreement.

The terms of this Note are subject to amendment only in the manner provided in the Credit Agreement.

No reference herein to the Credit Agreement and no provision of this Note or the Credit Agreement shall alter or impair the obligations of Company, which are absolute and unconditional, to pay the principal of and interest on this Note at the place, at the respective times, and in the currency herein prescribed and as more fully provided in the Credit Agreement.

Company promises to pay all actual, reasonable and documented (in summary form) costs and expenses, including reasonable attorneys' fees, all as provided in the Credit Agreement, incurred in the collection and enforcement of this Note. Company and any endorsers of this Note hereby consent to renewals and extensions of time at or after the maturity hereof, without notice, and hereby waive diligence, presentment, protest, demand notice of every kind and, to the full extent permitted by law, the right to plead any statute of limitations as a defense to any demand hereunder.

[Remainder of page intentionally left blank.]

EXHIBIT B-1-2

**IN WITNESS WHEREOF**, Company has caused this Note to be duly executed and delivered by its officer thereunto duly authorized as of the date and at the place first written above.

**VICE GROUP HOLDING INC.**

By: _____
Name:
Title:

EXHIBIT B-1-3

EXHIBIT C TO
SENIOR SECURED SUPER-PRIORITY TERM LOAN DEBTOR-IN-POSSESSION CREDIT AND GUARANTY
AGREEMENT

## COMPLIANCE CERTIFICATE

**THE UNDERSIGNED HEREBY CERTIFIES, ON BEHALF OF THE COMPANY SOLELY IN [HIS][HER] CAPACITY AS [AUTHORIZED OFFICER] OF THE COMPANY AND NOT IN [HIS][HER] INDIVIDUAL CAPACITY, AS FOLLOWS:**

1.   I am the [Authorized Officer] of **VICE GROUP HOLDING INC.**, a Delaware corporation (**"Company"**).

2.   I have reviewed the terms of that certain SENIOR SECURED SUPER-PRIORITY TERM LOAN DEBTOR-IN-POSSESSION CREDIT AND GUARANTY AGREEMENT, dated as of May [  ], 2023 (as amended, restated, replaced, supplemented or otherwise modified from time to time,  the **"Credit Agreement"**; the terms defined therein and not otherwise defined herein being used herein as therein defined), by and among the Company, certain Subsidiaries of Company from time to time party thereto as Guarantors, the Lenders party thereto from time to time, Fortress Credit Corp., as Administrative Agent, and Wilmington Trust, National Association, as Collateral Agent, and I have made, or have caused to be made under my supervision, a review in reasonable detail of the transactions and condition of Company and its Subsidiaries during the accounting period covered by the attached financial statements.

3.   The examination described in paragraph 2 above did not disclose, and I have no knowledge of, the existence of any condition or event which constitutes an Event of Default or Default during or at the end of the accounting period covered by the attached financial statements or as of the date of this Certificate, except as set forth in a separate attachment, if any, to this Certificate, describing in detail the nature of the condition or event, the period during which it has existed and the action which Company has taken, is taking, or proposes to take with respect to each such condition or event.

4.   The financial statements attached hereto fairly present, in all material respects, the consolidated financial condition of Company and its Consolidated Subsidiaries as at the dates indicated and the consolidated results of their operations and their cash flows for the periods indicated in conformity with GAAP[, subject to normal year-end and audit adjustments and the absence of footnotes][1].

5.   [Set forth on Annex A attached hereto is a schedule summarizing, to the best of the Company's knowledge, any material, non-ordinary course transactions with Affiliates (including the value thereof) during the period covered by the financial statements attached hereto.][2]

The foregoing certifications, together with the financial statements delivered with this Certificate in support hereof, are made and delivered as of **[mm/dd/yy]** pursuant to Section 5.1(c) of the Credit Agreement.

**VICE GROUP HOLDING INC.**


By: _____
        Name:
        Title: [Authorized Officer]

---

[1] To be added only with respect to the delivery of quarterly financial statements pursuant to Section 5.1(b) of the Credit Agreement.

[2] To be added only with respect to the delivery of quarterly financial statements pursuant to Section 5.1(b) of the Credit Agreement.

EXHIBIT C-1

[Attach Financial Statements]

EXHIBIT C-2

[ANNEX A
TO COMPLIANCE CERTIFICATE]

EXHIBIT C-3

EXHIBIT D TO
SENIOR SECURED SUPER-PRIORITY TERM LOAN DEBTOR-IN-POSSESSION CREDIT AND GUARANTY
AGREEMENT

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (the **"Assignment"**) is dated as of the Effective Date set forth below and is entered into by and between [*Insert name of Assignor*] (the **"Assignor"**) and [*Insert name of Assignee*] (the **"Assignee"**).  Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement identified below (as it may be amended, supplemented or otherwise modified from time to time, the **"Credit Agreement"**), receipt of a copy of which is hereby acknowledged by the Assignee.  The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by Administrative Agent as contemplated below, (i) the interest in and to all of the Assignor's rights and obligations in its capacity as a Lender under the Credit Agreement and any other documents or instruments delivered pursuant thereto that represents the amount and percentage interest identified below of all of the Assignor's outstanding rights and obligations under the respective facilities identified below and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, and any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on any of the foregoing, including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned by the Assignor to the Assignee pursuant to clauses (i) and (ii) above, collectively the **"Assigned Interest"**).  Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and the Credit Agreement, without representation or warranty by the Assignor.

1.  Assignor:  _____

2.  Assignee:  _____ [which is a[n] Lender / Affiliate of a Lender / Related Fund][1]

3.  Borrower(s):  Vice Group Holding Inc., a Delaware corporation

4.  Administrative Agent:  Fortress Credit Corp., as the administrative agent under the Credit Agreement

5.  Credit Agreement:  The $[        ] Senior Secured Super-Priority Term Loan Debtor-In-Possession Credit and Guaranty Agreement, dated as of May [  ], 2023 (as amended, restated, replaced, supplemented or otherwise modified) among Borrower, the other Credit Parties from time to time party thereto, the Lenders from time to time party thereto, and Administrative Agent

6.  Assigned Interest:

---

[1] Select as applicable.

| Facility Assigned[2] | Aggregate Amount of Commitment/Loans for all Lenders | Amount of Commitment/Loans Assigned | Percentage Assigned of Commitment/Loans[3] |
|---|---|---|---|
| _____ | $_____ | $_____ | _____% |
| _____ | $_____ | $_____ | _____% |
| _____ | $_____ | $_____ | _____% |

Effective Date: _____, 20__ [TO BE INSERTED BY ADMINISTRATIVE AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.]

7.    Notice and Wire Instructions:

[NAME OF ASSIGNOR]                                    [NAME OF ASSIGNEE]

Notices:                                              Notices:

_____                               _____
_____                               _____
_____                               _____
Attention:                                           Attention:
Telecopier:                                           Telecopier:

with a copy to:                                       with a copy to:

_____                               _____
_____                               _____
_____                               _____
Attention:                                           Attention:
Telecopier:                                           Telecopier:

Wire Instructions:                                    Wire Instructions:

---

[2] Fill in the appropriate terminology for the types of facilities under the Credit Agreement that are being assigned under this Assignment (e.g., "New Money Commitment", "Roll-Up Loan", etc.)

[3] Set forth, to at least 9 decimals, as a percentage of the Commitment/Loans of all Lenders thereunder.

EXHIBIT D-2

The terms set forth in this Assignment are hereby agreed to:

ASSIGNOR
**[NAME OF ASSIGNOR]**

By:_____
Name:
Title:

ASSIGNEE
**[NAME OF ASSIGNEE]**


By:_____
Name:
Title:

[Consented to and][4] Accepted:

**FORTRESS CREDIT CORP.,**
as Administrative Agent


By:_____
Name:
Title:

[Consented to:][5]

**VICE GROUP HOLDING INC.**

By:_____
Name:
Title:

---

[4] To be added only if the consent of the Administrative Agent is required by the terms of the Credit Agreement.
[5] To be added only if the consent of the Company is required by the terms of the Credit Agreement.

EXHIBIT D-3

ANNEX 1

STANDARD TERMS AND CONDITIONS FOR ASSIGNMENT
AND ASSUMPTION AGREEMENT

1.    <u>Representations and Warranties</u>.

1.1    <u>Assignor</u>.  The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby and (iv) if it is a Defaulting Lender, it has complied with the terms of Section 10.6(d)(ii) of the Credit Agreement; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with any Credit Document (as defined below), (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Credit Agreement or any other  instrument or document delivered pursuant thereto, other than this Assignment (herein collectively the **"Credit Documents"**), or any collateral thereunder, (iii) the financial condition of Company, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Credit Document or (iv) the performance or observance by Company, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Credit Document.

1.2    <u>Assignee</u>.  The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (iii) it has received a copy of the Credit Agreement and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and to purchase the Assigned Interest on the basis of which it has made such analysis and decision, (iv) if it is a Non-US Lender, attached to the Assignment is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by the Assignee, (v) it is an Eligible Assignee (with respect to the Applicable Loans and/or Commitments); (vi) it has experience and expertise in the making of or investing in commitments or loans such as the applicable Commitments or Loans, as the case may be; (vii) it will make or invest in, as the case may be, its Commitments or Loans for its own account in the ordinary course and without a view to distribution of such Commitments or Loans within the meaning of the Securities Act or the Exchange Act or other federal securities laws (it being understood that, subject to the provisions of Section 10.6 of the Credit Agreement, the disposition of such Commitments or Loans or any interests therein shall at all times remain within its exclusive control); (viii) it will not provide any information obtained by it in its capacity as a Lender to any Credit Party or any of its Affiliates; and (ix) neither such Lender nor any of its Affiliates owns or controls any trade obligations or Indebtedness of any Credit Party (other than the Obligations) or any Capital Stock of any Credit Party; and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent, the Assignor, or any other Lender, and based on such documents and information as it shall deem appropriate at that time, continue to make its own credit decisions in taking or not taking action under the Credit Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Credit Documents are required to be performed by it as a Lender.

EXHIBIT D-4

2.      <u>Payments</u>.  Unless notice to the contrary is delivered to the Lender from Administrative Agent, payment to the Assignor by the Assignee in respect of the Assigned Interest shall include such compensation to the Assignor as may be agreed upon by the Assignor and the Assignee with respect to all unpaid interest which has accrued on the Assigned Interest to but excluding the Effective Date.  On and after the applicable Effective Date, the Assignee shall be entitled to receive all interest paid or payable with respect to the Assigned Interest, whether such interest accrued before or after the Effective Date.

3.      <u>General Provisions</u>.  This Assignment shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.  This Assignment may be executed in any number of counterparts, which together shall constitute one instrument.  Delivery of an executed counterpart of a signature page of this Assignment by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment.  THIS ASSIGNMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF THAT WOULD RESULT IN THE APPLICATION OF ANY LAW OTHER THAN THE LAW OF THE STATE OF NEW YORK.

EXHIBIT D-5

EXHIBIT E-1 TO
SENIOR SECURED SUPER-PRIORITY TERM LOAN DEBTOR-IN-POSSESSION CREDIT AND GUARANTY
AGREEMENT

### U.S. TAX COMPLIANCE CERTIFICATE

(For Foreign Lenders That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is made to the Senior Secured Super-Priority Term Loan Debtor-In-Possession Credit and Guaranty Agreement, dated as of May [  ], 2023  (as amended, restated, replaced, supplemented or otherwise modified from time to time,  the **"Credit Agreement"**; the terms defined therein and not otherwise defined herein being used herein as therein defined), by and among **VICE GROUP HOLDING INC.**, a Delaware corporation ("**Company**"), certain Subsidiaries of Company from time to time party thereto as Guarantors, the Lenders party thereto from time to time, FORTRESS CREDIT CORP., as Administrative Agent, and Wilmington Trust, National Association, as Collateral Agent.

Pursuant to the provisions of Section 2.17(c)(ii) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Internal Revenue Code, (iii) it is not a ten percent shareholder of the Company within the meaning of Section 871(h)(3)(B) of the Internal Revenue Code, (iv) it is not a controlled foreign corporation related to the Company as described in Section 881(c)(3)(C) of the Internal Revenue Code, and (v) payments in connection with the Loan(s) are not effectively connected with the undersigned's conduct of a U.S. trade or business.

The undersigned has furnished Administrative Agent and the Company with a certificate of its non-U.S. Person status on IRS Form W-8BEN or W-8BEN-E.  By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Company and Administrative Agent in writing, and (2) the undersigned shall have at all times furnished the Company and Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

**[NAME OF LENDER]**

By: _____

    Name:

    Title:

EXHIBIT E-2 TO
SENIOR SECURED SUPER-PRIORITY TERM LOAN DEBTOR-IN-POSSESSION CREDIT AND GUARANTY
AGREEMENT

## U.S. TAX COMPLIANCE CERTIFICATE

**(For Foreign Participants That Are Not Partnerships For U.S. Federal Income Tax Purposes)**

Reference is made to the Senior Secured Super-Priority Term Loan Debtor-In-Possession Credit and Guaranty Agreement, dated as of May [  ], 2023 (as amended, restated, replaced, supplemented or otherwise modified from time to time, the **"Credit Agreement"**; the terms defined therein and not otherwise defined herein being used herein as therein defined), by and among **VICE GROUP HOLDING INC.**, a Delaware corporation ("**Company**"), certain Subsidiaries of Company from time to time party thereto as Guarantors, the Lenders party thereto from time to time, FORTRESS CREDIT CORP., as Administrative Agent, and Wilmington Trust, National Association, as Collateral Agent.

Pursuant to the provisions of Section 2.17(c)(ii) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the participation in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Internal Revenue Code, (iii) it is not a ten percent shareholder of the Company within the meaning of Section 871(h)(3)(B) of the Internal Revenue Code, (iv) it is not a controlled foreign corporation related to the Company as described in Section 881(c)(3)(C) of the Internal Revenue Code, and (v) payments with respect to such participation are not effectively connected with the undersigned's conduct of a U.S. trade or business.

The undersigned has furnished its participating Lender with a certificate of its non-U.S. Person status on IRS Form W-8BEN or W-8BEN-E.  By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender in writing, and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

<b>[NAME OF LENDER]</b>

By: _____
    Name:
    Title:

EXHIBIT E-3 TO
SENIOR SECURED SUPER-PRIORITY TERM LOAN DEBTOR-IN-POSSESSION CREDIT AND GUARANTY
AGREEMENT

## U.S. TAX COMPLIANCE CERTIFICATE

(For Foreign Participants That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is made to the Senior Secured Super-Priority Term Loan Debtor-In-Possession Credit and Guaranty Agreement, dated as of May [  ], 2023 (as amended, restated, replaced, supplemented or otherwise modified from time to time,  the **"Credit Agreement"**; the terms defined therein and not otherwise defined herein being used herein as therein defined), by and among **VICE GROUP HOLDING INC.**, a Delaware corporation ("**Company**"), certain Subsidiaries of Company from time to time party thereto as Guarantors, the Lenders party thereto from time to time, Fortress Credit Corp., as Administrative Agent, and Wilmington Trust, National Association, as Collateral Agent.

Pursuant to the provisions of Section 2.17(c)(ii) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such Loan(s) (as well as any Note(s) evidencing such Loan(s)), (iii) with respect to the extension of credit pursuant to this Credit Agreement or any other Loan Document, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Internal Revenue Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of the Company within the meaning of Section 871(h)(3)(B) of the Internal Revenue Code, (v) none of its direct or indirect partners/members is a controlled foreign corporation related to the Company as described in Section 881(c)(3)(C) of the Internal Revenue Code, and (vi) payments in connection with the Loan(s) are not effectively connected with the undersigned or any of its direct or indirect partners/members' conduct of a U.S. trade or business.

The undersigned has furnished the participaing Lender with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or W-8BEN-E or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or W-8BEN-E from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption.  By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender in writing, and (2) the undersigned shall have at all times furnished the Company and Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

**[NAME OF LENDER]**

By: _____
    Name:
    Title:

EXHIBIT E-4 TO

SENIOR SECURED SUPER-PRIORITY TERM LOAN DEBTOR-IN-POSSESSION CREDIT AND GUARANTY AGREEMENT

### U.S. TAX COMPLIANCE CERTIFICATE

(For Foreign Lenders That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is made to the Senior Secured Super-Priority Term Loan Debtor-In-Possession Credit and Guaranty Agreement, dated as of May [ ], 2023 (as amended, restated, replaced, supplemented or otherwise modified from time to time, the **"Credit Agreement"**; the terms defined therein and not otherwise defined herein being used herein as therein defined), by and among **VICE GROUP HOLDING INC.**, a Delaware corporation ("**Company**"), certain Subsidiaries of Company from time to time party thereto as Guarantors, the Lenders party thereto from time to time, Fortress Credit Corp., as Administrative Agent, and Wilmington Trust, National Association, as Collateral Agent.

Pursuant to the provisions of Section 2.17(c)(ii) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such Loan(s) (as well as any Note(s) evidencing such Loan(s)), (iii) with respect to the extension of credit pursuant to this Credit Agreement or any other Loan Document, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Internal Revenue Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of the Company within the meaning of Section 871(h)(3)(B) of the Internal Revenue Code, (v) none of its direct or indirect partners/members is a controlled foreign corporation related to the Company as described in Section 881(c)(3)(C) of the Internal Revenue Code, and (vi) payments in connection with the Loan(s) are not effectively connected with the undersigned's or any of its direct or indirect partners/members' conduct of a U.S. trade or business.

The undersigned has furnished Administrative Agent and the Company with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or W-8BEN-E or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or W-8BEN-E from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Company and Administrative Agent in writing, and (2) the undersigned shall have at all times furnished the Company and Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

**[NAME OF LENDER]**

By: _____
      Name:
      Title:

EXHIBIT F TO
SENIOR SECURED SUPER-PRIORITY TERM LOAN DEBTOR-IN-POSSESSION CREDIT AND GUARANTY
AGREEMENT

**[RESERVED]**

EXHIBIT F-1

SENIOR SECURED SUPER-PRIORITY TERM LOAN DEBTOR-IN-POSSESSION CREDIT AND GUARANTY
AGREEMENT

## COUNTERPART AGREEMENT

This **COUNTERPART AGREEMENT**, dated **[mm/dd/yy]** (this **"Counterpart Agreement"**) is delivered pursuant to that certain Senior Secured Super-Priority Term Loan Debtor-In-Possession Credit and Guaranty Agreement, dated as of May [ ], 2023  (as amended, restated, replaced, supplemented or otherwise modified from time to time,  the **"Credit Agreement"**; the terms defined therein and not otherwise defined herein being used herein as therein defined), by and among **VICE GROUP HOLDING INC.**, a Delaware corporation (**"Company"**), certain Subsidiaries of Company from time to time party thereto as Guarantors, the Lenders party thereto from time to time, **FORTRESS CREDIT CORP.**, as Administrative Agent, and **WILMINGTON TRUST, NATIONAL ASSOCIATION**, as Collateral Agent.

**Section 1.**  Pursuant to Section 5.9 of the Credit Agreement, the undersigned hereby:

(a)        agrees that this Counterpart Agreement may be attached to the Credit Agreement and that by the execution and delivery hereof, the undersigned becomes a Guarantor under the Credit Agreement and agrees to be bound by all of the terms thereof;

(b)        represents and warrants that each of the representations and warranties set forth in the Credit Agreement and each other Credit Document and applicable to the undersigned is true and correct in all material respects on and as of the date hereof, both before and after giving effect to this Counterpart Agreement, to the same extent as though made on and as of such date (unless any such representation and warranty is qualified as to materiality or Material Adverse Effect, in which case such representation and warranty is true and correct in all respects), except to the extent such representations or warranties specifically relate to an earlier date, in which case such representations or warranties are true and correct in all material respects on and as of such earlier date (unless any such representation and warranty is qualified as to materiality or Material Adverse Effect, in which case such representation or warranty is true and correct in all respects as of such earlier date);

(c)        certifies that, no event has occurred or is continuing as of the date hereof, or will result from the transactions contemplated hereby on the date hereof, that would constitute an Event of Default or a Default;

(d)        agrees to, jointly and severally with the other Guarantors, irrevocably and unconditionally guaranty to Administrative Agent for the ratable benefit of the Beneficiaries the due and punctual Payment in Full of all Obligations when the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a)) in accordance with Section 7 of the Credit Agreement; and

(e)        (i) agrees that this Counterpart Agreement may be attached to the Pledge and Security Agreement, (ii) agrees to comply with all the terms and conditions of the Pledge and Security Agreement as if it were an original signatory thereto, (iii) grants to "Secured Parties" (as such term is defined in the Pledge and Security Agreement) a security interest in all of the undersigned's right, title and interest in and to all "Collateral" (as such term is defined in the Pledge and Security Agreement) of the undersigned, in each case whether now or hereafter existing or in which the undersigned now has or hereafter acquires an interest and wherever the same may be located and (iv) agrees to deliver to Collateral Agent a "Pledge Supplement" (as

such term is defined in the Pledge and Security Agreement) supplements to all schedules attached to the Pledge and Security Agreement.  All such Collateral shall be deemed to be part of the "Collateral" (as such term is defined in the Pledge and Security Agreement) and hereafter subject to each of the terms and conditions of the Pledge and Security Agreement.

**Section 2.**  The undersigned agrees from time to time, upon request of Administrative Agent, to take such additional actions and to execute and deliver such additional documents and instruments as Administrative Agent may reasonably request to effect the transactions contemplated by, and to carry out the intent of, this Counterpart Agreement.  Neither this Counterpart Agreement nor any term hereof may be changed, waived, discharged or terminated, except by an instrument in writing signed by the party (including, if applicable, any party required to evidence its consent to or acceptance of this Counterpart Agreement) against whom enforcement of such change, waiver, discharge or termination is sought.  Any notice or other communication herein required or permitted to be given shall be given in pursuant to Section 10.1 of the Credit Agreement, and all for purposes thereof, the notice address of the undersigned shall be the address as set forth on the signature page hereof.  In case any provision in or obligation under this Counterpart Agreement shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

This Counterpart Agreement may be executed in any number of counterparts, which together shall constitute one instrument.  Delivery of an executed counterpart of a signature page of this Counterpart Agreement by telecopy shall be effective as delivery of a manually executed counterpart of this Counterpart Agreement.

THIS COUNTERPART AGREEMENT SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF THAT WOULD RESULT IN THE APPLICATION OF ANY LAW OTHER THAN THE LAW OF THE STATE OF NEW YORK.

[Remainder of page intentionally left blank.]

EXHIBIT G-2

**IN WITNESS WHEREOF**, the undersigned has caused this Counterpart Agreement to be duly executed and delivered by its duly authorized officer as of the date above first written.

**[NAME OF SUBSIDIARY]**

By:_____
    Name:
    Title:

Address for Notices:

_____
_____
_____
Attention:
Telecopier

with a copy to:

_____
_____
_____
Attention:
Telecopier

ACKNOWLEDGED AND ACCEPTED,
as of the date above first written:

**FORTRESS CREDIT CORP.,**
as Administrative Agent

By:_____
    Name:
    Title:

**WILMINGTON TRUST, NATIONAL ASSOCIATION,**
as Collateral Agent

By:_____
    Name:
    Title:

EXHIBIT G-3

EXHIBIT H TO
SENIOR SECURED SUPER-PRIORITY TERM LOAN DEBTOR-IN-POSSESSION
CREDIT AND GUARANTY AGREEMENT

**[Reserved]**

EXHIBIT I TO
SENIOR SECURED SUPER-PRIORITY TERM LOAN DEBTOR-IN-POSSESSION CREDIT AND
GUARANTY AGREEMENT

**[RESERVED]**

EXHIBIT I-1

EXHIBIT J TO
SENIOR SECURED SUPER-PRIORITY TERM LOAN DEBTOR-IN-POSSESSION CREDIT AND
GUARANTY AGREEMENT

**MASTER INTERCOMPANY SUBORDINATED NOTE**

**[●], 20[●]**

ON DEMAND, FOR VALUE RECEIVED, each of the undersigned (each a "Company" and collectively, the "Companies"), HEREBY PROMISES TO PAY to each other Company (each in such capacity as a creditor hereunder, together with its successors and assigns, a "Holder," and collectively, the "Holders") the aggregate unpaid amount of all advances, indebtedness, loans, payables and other extensions of credit and obligations (individually, an "Advance" and, collectively, the "Advances") made by a Holder to such Company, or otherwise owing by such Company to a Holder, from time to time, as set forth on the books and records of such Holder. Interest may be payable on the principal amount of any Advance evidenced by this Note (as hereinafter defined) as may be agreed from time to time by the parties hereto. Some of the Advances may also be evidenced by one or more intercompany promissory notes or instruments issued prior to the date hereof (or the date that an Additional Party (as defined below) becomes a party hereto) by a Company to a Holder. This Note shall evidence all Advances, whether or not any Advances were also evidenced by a separate intercompany promissory note or instrument prior to the date hereof (or the date that an Additional Party becomes a party hereto) and shall supersede all such other separate intercompany promissory notes and instruments on the date hereof (or the date that such Additional Party becomes a party hereto), and such other separate intercompany promissory notes and instruments shall be herewith terminated as of the date hereof (or the date that such Additional Party becomes a party hereto).

    1.   Definitions. Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Credit Agreement (as hereinafter defined). For purposes of this Note, the following terms have the meanings set forth below:

        "Agent" means the Administrative Agent, together with its successors and permitted assigns.

        "Credit Agreement" means, as the same may be amended, restated, supplemented or otherwise modified from time to time, that certain Senior Secured Super-Priority Term Loan Debtor-In-Possession Credit and Guaranty Agreement, dated as of May [  ], 2023 by and among (i) Vice Group Holding Inc., a Delaware corporation, as the borrower (the "Borrower"), (ii) the guarantors from time to time party thereto as Guarantors, (iii) the Lenders party thereto from time to time, (iv) Fortress Credit Corp., as Administrative Agent and (v) Wilmington Trust, National Association, as Collateral Agent.

        "Note" means this Master Intercompany Subordinated Note as originally executed or if later amended, restated, modified or supplemented, then, as so amended, restated, modified or supplemented.

        "Note Obligation" means all principal, interest (including interest which accrues after the commencement of any case or proceeding in bankruptcy, or for the reorganization of any Company), fees, charges, expenses, attorneys' fees and any other sum chargeable to any Company under this Note or due in respect of the Advances.

    2.   Payments. This Note may be prepaid at any time in whole or in part from time to time without penalty or premium. The principal of this Note is payable in lawful money of the United States of America and in same day funds, without abatement, reduction, deduction, counterclaim recoupment, defense or setoff, to Holders at such account as Holders may designate. Each Advance made by a Holder to any Company, and all payments made on account of principal or interest thereof, shall be recorded by such Holder and, prior to any transfer thereof, on the books and records of such Holder; provided, however, that any failure to make such endorsement on such books and records shall not limit or otherwise affect the obligations of any Company hereunder.

    3.   Holder Rights. Upon demand for payment hereunder, each Holder is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any indebtedness at any time owing by

EXHIBIT J-1

such Holder to or for the credit or the account of any Company against any and all of the obligations of such Company now or hereafter existing under this Note, irrespective of whether or not such Holder shall have made any demand under this Note and although such obligations may be unmatured. Each Holder agrees promptly to notify a Company after any such set off and application; provided that the failure to give such notice shall not affect the validity of such set off and application. The rights of Holders under this Section are in addition to other rights and remedies (including, without limitation, other rights of set off) which Holders may have.

4. Subordination. Each Company covenants and agrees, and each Holder by its acceptance of this Note likewise covenants and agrees, that the payment of the principal of this Note and the other Note Obligations (including interest) is subordinated in right of payment, to the extent and in the manner provided in this Section 4, to the prior Payment in Full of all Obligations, other than contingent indemnification obligations as to which no claim has been asserted (the "Senior Obligations"), and that the subordination is for the benefit of Agent and the Secured Parties. Each of the Secured Parties and the Agent is made an express third party beneficiary and an obligee hereunder for the purposes of this Section 4. Agent may enforce the provisions of this Section 4 directly.

(b) Each Holder by its acceptance of this Note hereby (i) authorizes Agent to demand specific performance of the terms of this Section 4, whether or not any Company shall have complied with any of the provisions hereof applicable to it, at any time when any Holder shall have failed to comply with any provisions of this Section 4 which are applicable to it and (ii) irrevocably waives to the extent permitted under applicable law any defense based on the adequacy of a remedy at law, which might be asserted as a bar to such remedy of specific performance.

(c) Upon any distribution of assets of any Company in any dissolution, winding up, liquidation or reorganization (whether in bankruptcy, insolvency or receivership proceedings or upon an assignment for the benefit of creditors or otherwise):

(i) Agent and the Secured Parties shall first be entitled to receive Payment in Full of the Senior Obligations before any Holder is entitled to receive any payment on account of the Note Obligations.

(ii) Any payment or distribution of assets of any Company of any kind or character, whether in cash, property or securities, to which any Holder would be entitled except for the provisions of this subsection 4(c), shall be paid by the liquidating trustee or agent or other Person making such payment or distribution prior to the time at which the Senior Obligations have been Paid in Full (such time, the "Discharge of Senior Obligations"), directly to Agent, to the extent necessary to make Payment in Full of all Senior Obligations remaining unpaid after giving effect to any concurrent payment or distribution or provisions therefor to Agent, for itself and the Secured Parties.

(iii) In the event that notwithstanding the foregoing provisions of this subsection 4(c), any payment or distribution of assets of any Company of any kind or character, whether in cash, property or securities, shall be received by any Holder on account of this Note before all Senior Obligations are Paid in Full, such payment or distribution shall be received and held in trust for and shall be paid over to Agent, for application to the payment of the Senior Obligations until all of the Senior Obligations shall have been Paid in Full, after giving effect to any concurrent payment or distribution or provision therefor to Agent.

(d) No right of the Agent to enforce the subordination provisions herein shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of any Company or any Holder or by any act or failure to act, in good faith, by any such Holder, or by any noncompliance by any Company or any Holder with the terms of this Note, regardless of any knowledge thereof which any such Holder may have or be otherwise charged with.

(e) Notwithstanding the foregoing, so long as no Event of Default has occurred and is continuing, the parties hereto shall be entitled to pay, and to receive, regularly scheduled interest payable hereunder.

5. Waiver. Except as otherwise provided for in this Note, and to the fullest extent permitted by applicable law, each Company waives: (a) presentment, notice, demand and protest, and notice of presentment, dishonor, intent to accelerate, acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of this Note at any time held by any Holder on which any Company may in any way be liable, and hereby ratifies and confirms whatever any Holder may do in this regard; (b) all rights to notice and a hearing prior to a

EXHIBIT J-1

Holder's taking possession or control of, or to a Holder's replevy, attachment or levy upon, any property, real or personal, tangible or intangible of any Company or any bond or security which might be required by any court prior to allowing a Holder to exercise any of its remedies; and (c) the benefit of all valuation, appraisal and exemption laws. Each Company acknowledges that it has been advised by counsel with respect to this Note and the transactions evidenced hereby.  No failure or delay on the part of any Holder in the exercise of any power, right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other right, power or privilege.  All rights and remedies existing hereunder are cumulative to, and not exclusive of, any rights or remedies otherwise available.

6.    <u>Lost or Destroyed Note</u>. Upon receipt by any Company of evidence reasonably satisfactory to such Company of the loss, theft, destruction or mutilation of this Note, and in the case of any such loss, theft or destruction, upon delivery of an indemnity reasonably satisfactory to such Company or, in case of any such mutilation, upon surrender and cancellation of this Note, such Company will issue a new Note of like tenor in lieu of this Note.

7.    <u>Severability</u>. Wherever possible, each provision of this Note shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Note shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Note.

8.    <u>Amendment and Modification</u>.  Prior to the occurrence of the Discharge of Senior Obligations, the Companies and Holders agree that no change, waiver, modification or amendment of  Section 4 or this Section 8 of this Note or that would otherwise be adverse to the Lenders shall be effective without the prior written approval of Agent.

9.    <u>Costs and Expenses</u>.  Each Company agrees to pay on demand all costs and expenses of any Holder, if any, including reasonable counsel fees and reasonable and documented out-of-pocket expenses, in connection with the enforcement (whether through negotiations, legal proceedings or otherwise) of this Note.

10.  **<u>GOVERNING LAW</u>.   THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN THAT STATE.**

11.  <u>Successors and Assigns</u>.  This Note shall be binding upon each Company and its successors, and shall inure to the benefit of each Holder and its successors and permitted assigns (including Agent).

12.  <u>Acknowledgment of Security Assignment</u>. To secure the payment and performance of the Senior Obligations and without limiting any other rights and remedies of Agent and the Secured Parties set forth in the Credit Documents, the Holders that are Credit Parties (the "<u>Pledgors</u>") have, pursuant to the terms of the Credit Agreement, among other things, irrevocably granted to Agent, for itself and the Secured Parties, a Lien on and security interest in all of the Pledgors' rights, title and interest in and to this Note and any related intercompany loan documentation (including financing statements), including without limitation, the right to collect all amounts due hereunder or thereunder during the continuation of an Event of Default.  Each Company hereby consents to such Lien and grant of security interest and the irrevocable power of attorney granted by the Pledgors to Agent, for itself and the Secured Parties, pursuant to the Credit Documents, to (i) perform any act, execute any documents or otherwise to take any action with respect to the advances evidenced by this Note and (ii) demand, receive and enforce all of the Pledgors' rights, powers and remedies with respect to this Note and any related intercompany loan documentation, including without limitation, Agent's right to receive directly (or as it otherwise directs) any and all payments to be made to a Pledgor under this Note.  Each Company acknowledges that Agent and the Secured Parties are providing certain loans and other financial accommodations described in the Credit Agreement and the other Credit Documents to the Pledgors and certain of their Affiliates, in reliance in part on such grant of Lien and security interest and power of attorney and the representations, warranties and covenants made by each Company herein.

13.  <u>Joinder</u>.  From time to time after the date hereof, additional Subsidiaries of the Borrower may become parties hereto by executing a counterpart signature page to this Note (each additional Subsidiary, an "<u>Additional Party</u>").  Upon delivery of such counterpart signature page to the holder of this Note, notice of which is hereby waived by the other Companies party hereto, each Additional Party shall be as fully a party hereto as if such Additional Party

were an original signatory hereof.  Each Company expressly agrees that its obligations arising hereunder shall not be affected or diminished by the addition or release of any other Company hereunder. This Note shall be fully effective as to any Company that is or becomes a party hereto regardless of whether any other person becomes or fails to become or ceases to be a Company hereunder.

      14.  <u>Counterparts</u>.  This Note may be executed in any number of counterparts and by different parties in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same note.

**[Signature pages follow]**

      **IN WITNESS WHEREOF,** the parties hereto have caused this Note to be duly executed and delivered as of the date first written above.

                                       **[SIGNATURE BLOCKS TO BE PROVIDED]**

**ENDORSEMENT**

     For value received, each Holder hereby endorses to the order of _____, all of its right, title and interest in and to the Master Intercompany Subordinated Note of each Company, dated [●], payable to the undersigned, effective as of _____.

**[SIGNATURE BLOCKS TO BE PROVIDED]**

EXHIBIT J-1