**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| VICE GROUP HOLDING INC., et al., | Case No. 23-10738 (JPM) |
| Debtors.[1] | (Joint Administration Requested) |

### INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING AND (B) USE CASH COLLATERAL, (II) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, (IV) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession

(collectively, the "Debtors") in the above captioned chapter 11 cases (collectively, the "Chapter

11 Cases") for entry of an interim order (this "Interim Order") and a final order (the "Final Order"),

pursuant to sections 105, 361, 362, 363, 364, 503, 507, and 552 of title 11 of the United States

Code (as amended, the "Bankruptcy Code"), rules 2002, 4001, 6003, 6004, and 9014 of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1, 4001-1, 4001-2, and

9013-1 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules"):

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number,
are: Vice Group Holding Inc. (4250); Vice Impact Inc. (9603); Vice Media LLC (5144); Villain LLC (3050); Boy
Who Cried Author LLC (6199); Carrot Operations LLC (1596); Carrot Creative LLC (8652); Channel 271
Productions LLC (1637); Clifford Benski, Inc. (9387); Dana Made LLC (1065); Inverness Collective LLC (6542);
JT Leroy Holding LLC (7555); PLDM Films LLC (5217); Project Change LLC (2758); R29 Pride, LLC (7011);
R29 Productions, LLC (6344); Refinery 29 Inc. (7749); Valvi LLC (6110); Vice Content Development, LLC
(5165); Vice Distribution LLC (5515); Vice Europe Holding Limited (N/A);  Vice Europe Pulse Holding Limited
(N/A); Vice Food LLC (1693); Vice Holding Inc. (2658); Vice International Holding, Inc. (5669); Vice Music
Publishing LLC (3022); Vice Payroll LLC (6626); Vice Productions LLC (5399); Vice Project Services LLC
(6473); Virtue Worldwide, LLC (7212); Visur LLC (9336); and VTV Productions LLC (6854). The location of
the Debtors' service address for purposes of these chapter 11 cases is:  49 South 2nd Street, Brooklyn, NY 11249.

[2]   Capitalized terms used but not defined herein have the meanings given to such terms in the Motion.

(i)        authorizing Vice Group Holding Inc., in its capacity as borrower (the "DIP Borrower"), to obtain postpetition financing, and for each of the other Debtors to guarantee unconditionally (the "DIP Guarantors"), on a joint and several basis, the DIP Borrower's obligations in connection with a senior secured superpriority debtor-in-possession multi-draw term loan facility (the "DIP Facility") which consists of a multi-draw credit loan facility in an aggregate principal amount of up to $60 million, which shall be made available to the Debtors (a) in a single new money draw in the initial amount of $5 million (the "Initial New Money DIP Loans"),  in accordance with the terms and conditions set forth in the DIP Credit Agreement (as defined below) attached hereto as **Exhibit 1**, and effective upon entry of this Interim Order, and (b) in a roll-up (the "Initial Roll-Up DIP Loans") of approximately $25 million in Prepetition Senior Secured Term Loans (defined below) in accordance with the terms and conditions set forth in the DIP Credit Agreement and effective upon entry of this Interim Order, and (c) in  new money draws of the remaining principal amount of $5 million in accordance with the terms of the DIP Credit Agreement and the DIP Budget effective solely upon entry of the Final Order (such loans described in subsection (c) together with the Initial New Money DIP Loan, the "New Money DIP Loans"), and (d) in a roll-up of approximately $25 million in outstanding Prepetition Senior Secured Term Loans in accordance with the terms and conditions set forth in the DIP Credit Agreement and effective solely upon entry of the Final Order (such loans described in subsection (d) together with the Initial Roll Up DIP Loans, the "Roll-Up DIP Loans", and such New Money DIP Loans and the Roll-Up DIP Loans, the "DIP Loans");

(ii)        authorizing the Debtors to cause any non-Debtor subsidiary that is a Canadian Credit Party, a UK Credit Party, or a Jersey Credit Party (each, as defined in the DIP

Credit Agreement, and together, the "Non-Debtor Guarantors") to guarantee the Roll-Up DIP Loans;

(iii)    authorizing the Debtors to enter into that certain Senior Secured Super-Priority Term Loan Debtor-in-Possession Credit and Guaranty Agreement in substantially the form attached hereto as **Exhibit 1** (as the same may be amended, restated, supplemented, waived or otherwise modified from time to time, the "DIP Credit Agreement"), among the DIP Borrower, the DIP Guarantors, the Non-Debtor Guarantors, the lenders party thereto (collectively in such capacities, the "DIP Lenders"), and Fortress Credit Corp., as administrative agent (in such capacity, the "DIP Administrative Agent"), and Wilmington Trust, National Association, as collateral agent (in such capacity, the "DIP Collateral Agent," and together with the DIP Administrative Agent, the "DIP Agents," and the DIP Lenders and DIP Agents, collectively, the "DIP Secured Parties"); and together with this Interim Order, the Final Order, and all agreements, documents, and instruments delivered or executed in connection therewith (including the fee letters executed by the DIP Borrower in connection with the DIP Facility), and other guarantee and security documentation (collectively, the "DIP Loan Documents"), and to perform such other and further acts as may be required in connection with the DIP Loan Documents;

(iv)    authorizing the Debtors to use the proceeds of the New Money DIP Loans, the Prepetition Collateral (as defined below), and the DIP Collateral (as defined below), in accordance with the DIP Budget (as defined below) (subject to permitted variances set forth herein and in the DIP Credit Agreement) in form and substance acceptable to the Requisite Lenders under and pursuant to the DIP Credit Agreement (the "Requisite Lenders") to provide working capital for, and for other general corporate purposes of, the Debtors and their non-Debtor affiliates, including for payment of any Adequate Protection Payments (as defined below), the Carve Out (as

defined below), and reasonable and documented transaction costs, fees, and expenses incurred in connection with any transactions to be implemented through the Chapter 11 Cases;

(v)      granting adequate protection to the Prepetition Secured Parties and Cash Management Bank (as defined below) to the extent of any Diminution in Value (as defined below) of their interests in the Prepetition Collateral (as defined below);

(vi)      granting valid, enforceable, binding, non-avoidable, and fully perfected first-priority priming liens on and senior security interests in substantially all of the property, assets, and other interests in property and assets of the Debtors, whether such property is presently owned or after-acquired, and each Debtor's estate as created by section 541 of the Bankruptcy Code, of any kind or nature whatsoever, real or personal, tangible, intangible, or mixed, now existing or hereafter acquired or created, whether existing prior to or arising after the Petition Date (as defined below), subject only to the (x) Carve Out (as defined below), (y) certain senior liens permitted pursuant to the terms of the DIP Credit Agreement and (z) other valid, perfected and unavoidable senior liens, if any, existing as of the Petition Date (or perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code) (the "Prior Senior Liens"), in each case, that are senior in priority to the Prepetition Senior Liens (as defined below), on the terms and conditions set forth herein and in the DIP Loan Documents, *provided*, *however*, for the avoidance of doubt, no right, title, or interest of Wipro, LLC or any of its affiliates in any of the DIP Collateral shall constitute a Prior Senior Lien;

(vii)      granting superpriority administrative expense claims against each of the Debtors' estates to the DIP Agents and the DIP Lenders with respect to the DIP Obligations (as defined below) over any and all administrative expenses of any kind or nature subject and

subordinate only to the payment of the Carve Out on the terms and conditions set forth herein and in the DIP Loan Documents;

(viii)    subject to entry of a Final Order and to the extent set forth herein, waiving the Debtors' and the estates' right to surcharge against the DIP Collateral and the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code;

(ix)    subject to entry of a Final Order and to the extent set forth herein, for the "equities of the case" exception under Bankruptcy Code section 552(b) to not apply to such parties with respect to the proceeds, products, offspring, or profits of any of the Prepetition Collateral or the DIP Collateral, as applicable;

(x)    pursuant to Bankruptcy Rule 4001, holding an interim hearing (the "Interim Hearing") on the Motion before this Court to consider entry of this Interim Order, among other things, (1) authorizing Debtors to, on an interim basis, borrow from the DIP Lenders a principal amount of up to $5 million in Initial New Money DIP Loans and $25 million in Initial Roll-Up DIP Loans, (2) authorizing the DIP Guarantors to guarantee the DIP Obligations, (3) authorizing the Debtors to cause the Non-Debtor Guarantors to guarantee the Roll-Up Loans; (4) authorizing the Debtors' use of Prepetition Collateral (including Cash Collateral), (5) granting the adequate protection described in this Interim Order, and (6) authorizing the Debtors to execute and deliver the DIP Loan Documents to which they are party and to perform their respective obligations thereunder and such other and further acts as may be necessary or appropriate in connection therewith;

(xi)    scheduling a final hearing (the "Final Hearing") to consider the relief requested in the Motion and the entry of the Final Order, and approving the form of notice with respect to the Final Hearing; and

(xii)    granting related relief.

This Court having considered the Motion, the exhibits thereto, the *Declaration of Frank A. Pometti in Support of the Debtors' Chapter 11 Petitions and First Day Relief* [Docket No. 3] (the "First Day Declaration"), the *Declaration of Brent Herlihy in Support of the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Superpriority Claims, (III) Modifying the Automatic Stay, (IV) Granting Adequate Protection to Prepetition Secured Parties, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* [Docket No. 14] (the "DIP Declaration"), and the other evidence submitted or adduced and the arguments of counsel made at the Interim Hearing held pursuant to Bankruptcy Rule 4001(b)(2) on May 16, 2023 and this Court having heard and resolved or overruled any objections, reservations of rights, or other statements with respect to the relief requested in the Motion; and the Court having noted the appearances of all parties in interest; and it appearing that approval of the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their estates, and all parties-in-interest, and is essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets; and it appearing that the Debtors' entry into the DIP Credit Agreement and the other DIP Loan Documents is a sound and prudent exercise of the Debtors' business judgment;  and the Debtors having provided notice of the Motion as set forth in the Motion, and it appearing that no other or further notice of the Motion need be given; and after due deliberation and consideration, and for good and sufficient cause appearing therefor;

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW**:[3]

A.    <u>Petition Date</u>.  On May 15, 2023 (the "<u>Petition Date</u>"), each of the Debtors filed a voluntary petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York commencing these Chapter 11 Cases.

B.    <u>Debtors in Possession</u>.  The Debtors continue to manage and operate their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these Chapter 11 Cases.

C.    <u>Jurisdiction and Venue</u>.  The Court has jurisdiction over the Motion, these Chapter 11 Cases, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated January 31, 2012.  Venue for these Chapter 11 Cases is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This Court may enter a final order consistent with Article III of the United States Constitution.

D.    <u>Committee</u>.  As of the date hereof, no official committee of unsecured creditors has been appointed in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (any such committee, the "<u>Committee</u>").

E.    <u>Findings Regarding the DIP Facility and Use of Cash Collateral</u>.

(i)    The Debtors have an immediate need to obtain the DIP Facility and to use Cash Collateral (solely to the extent consistent with the DIP Budget (subject to permitted variances

---

[3]    Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, pursuant to Bankruptcy Rule 7052.

as set forth in this Interim Order and the DIP Loan Documents)) to, among other things, (A) permit the orderly continuation of their businesses while pursuing a sale of substantially all of their assets; (B) pay certain Adequate Protection Payments; and (C) pay the costs of administration of their estates and satisfy other working capital and general corporate purposes of the Debtors. Specifically, the proceeds of the DIP Facility will provide the Debtors with the ability to fund day-to-day operations, meet administrative obligations during the Chapter 11 Cases and preserve the value of their estates. The DIP Facility will also reassure the Company's customers and employees that the Company will have access to additional liquidity to meet its commitments during the Chapter 11 Cases. The ability of the Debtors to obtain sufficient working capital and liquidity through the incurrence of the new indebtedness for borrowed money and other financial accommodations is vital to the preservation and maintenance of the Debtors' going-concern values and successful reorganization. The Debtors will not have sufficient sources of working capital and financing to operate their businesses in the ordinary course of business throughout the Chapter 11 Cases without access to the DIP Facility and authorized use of Cash Collateral.

(ii)     The Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Lenders under the DIP Loan Documents and are unable to obtain unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense. The Debtors also are unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2), and 364(c)(3) of the Bankruptcy Code for the purposes set forth in the DIP Loan Documents without the Debtors granting to the DIP Secured Parties, subject to the Carve Out as provided for herein, the DIP Liens (as defined below) and the DIP Superpriority Claims (as defined below) under the terms and conditions set forth in this Interim Order and the DIP Loan Documents.

(iii)    The DIP Facility has been negotiated in good faith and at arm's length among the Debtors and the DIP Secured Parties, and all of the Debtors' obligations and indebtedness arising under, in respect of, or in connection with the DIP Facility and the DIP Loan Documents, including, without limitation, all loans made to and guarantees issued by the Debtors pursuant to the DIP Loan Documents and all other obligations under the DIP Loan Documents (collectively, the "DIP Obligations") shall be deemed to have been extended by the DIP Secured Parties in good faith as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code.   The DIP Obligations, the DIP Liens, and the DIP Superiority Claims shall be entitled to the full protection of Bankruptcy Code section 364(e) in the event that this Interim Order or any provision hereof is vacated, reversed, or modified on appeal or otherwise, and any liens or claims granted to, or payments made to, the DIP Agents or the DIP Lenders hereunder arising prior to the effective date of any such vacatur, reversal, or modification of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges, and benefits granted herein.

(iv)    Adequate Protection. Each of the Prepetition Secured Parties and the Cash Management Bank are entitled, pursuant to sections 105, 361, 362 and 363(e) of the Bankruptcy Code, to adequate protection of their respective interests in the Prepetition Collateral, including Cash Collateral, for any diminution in the value thereof.

(v)    Section 552(b).  In light of the DIP Secured Parties' agreement to fund the DIP Facility, and the Prepetition Secured Parties' agreement to subordinate their liens and superiority claims to the DIP Obligations and the Carve Out and to permit the use of their Cash Collateral as set forth herein, the DIP Secured Parties and the Prepetition Secured Parties are

entitled to the rights and benefits of section 552(b) of the Bankruptcy Code and, subject to and solely upon entry of the Final Order, a waiver of any "equities of the case" claims under section 552(b) of the Bankruptcy Code.

(vi)    Consent by Prepetition Term Agents.  The Prepetition Term Agents (at the direction of the Required Lenders (as defined in the Prepetition Senior Secured Credit Agreement)), on behalf and for the benefit of each of the Prepetition Secured Parties, has consented to, conditioned on the entry of this Interim Order, the Debtors' incurrence of the DIP Facility and proposed use of Cash Collateral on the terms and conditions set forth in this Interim Order, and the terms of the adequate protection provided for in this Interim Order, including that the Adequate Protection Liens and Adequate Protection Superpriority Claims (as defined below) are subject and subordinate to the Carve Out.

(vii)    Consent by Cash Management Bank.  The Cash Management Bank (as defined in the Motion) has consented to, conditioned on the entry of this Interim Order, the Debtors' incurrence of the DIP Facility and proposed use of Cash Collateral on the terms and conditions set forth in this Interim Order, and the terms of the adequate protection provided for in this Interim Order, including that the Adequate Protection Liens are subject and subordinate to the Carve Out.

(viii)    No Control.  The Prepetition Secured Parties and the DIP Secured Parties do not control the Debtors or their properties or operations, have authority to determine the manner in which any Debtors' operations are conducted, or are controlling persons or insiders of the Debtors by virtue of any of the actions taken with respect to, in connection with, related to or arising from this Interim Order, the DIP Facility, the DIP Loan Documents, the Prepetition Senior Secured Term Loans or the Prepetition Senior Secured Credit Agreement.

F.      <u>Credit Bidding</u>.  The Prepetition Secured Parties, or certain affiliates or assignees thereof, as well as the DIP Secured Parties, or certain affiliates or assignees thereof, intend to enter into a stalking horse purchase agreement for certain of the Debtors' assets (the "<u>Asset Purchase Agreement</u>").  Subject to the terms of the DIP Credit Agreement, no Debtor or Debtor's affiliate shall object to any Prepetition Secured Party's or DIP Secured Party's right to credit bid, in full or in part, the Prepetition Senior Secured Term Loans or DIP Obligations, as applicable, in each case including, without limitation, any accrued interest, fees, and expenses, in any sale, as applicable, whether such sale is effectuated through Bankruptcy Code section 363, in a chapter 11 or chapter 7 proceeding, under Bankruptcy Code section 1129, by a chapter 7 or chapter 11 trustee, or otherwise.

G.      <u>Good Cause Shown; Best Interest</u>.  Good cause has been shown for entry of this Interim Order, and entry of this Interim Order is in the best interests of the Debtors' respective estates and creditors as its implementation will, among other things, allow for the continued operation of the Debtors' existing business and enhance the Debtors' prospects for a successful reorganization.  Absent granting the relief sought by this Interim Order, the Debtors' estates will be immediately and irreparably harmed.

H.      <u>Notice</u>.  In accordance with Bankruptcy Rules 2002, 4001(b) and (c), and 9014, and the Local Rules, notice of the Interim Hearing and the emergency relief requested in the Motion has been provided by the Debtors.  Under the circumstances, the notice given by the Debtors of the Motion, the relief requested herein, and of the Interim Hearing complies with Bankruptcy Rules 2002, 4001(b) and (c), and 9014 and applicable Local Rules.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED THAT:

1.      <u>DIP Financing Approved</u>.  The Motion is granted on an interim basis as set forth herein, and the use of Cash Collateral on an interim basis is authorized, subject to the terms of this Interim Order.

2.      <u>Objections Overruled</u>.  Any objections, reservations of rights, or other statements with respect to entry of the Interim Order, to the extent not withdrawn, resolved or set forth herein, are overruled on the merits.  This Interim Order shall become effective immediately upon its entry.

3.      <u>Authorization of the DIP Facility and the DIP Loan Documents</u>.

(a)     The Debtors are hereby immediately authorized and empowered to enter into, and execute and deliver, the DIP Loan Documents, and such additional documents, instruments, certificates, and agreements as may be reasonably required or requested by the DIP Secured Parties to implement the terms or effectuate the purposes of this Interim Order and the DIP Loan Documents.  To the extent not entered into as of the date hereof, the Debtors and the DIP Secured Parties shall negotiate the DIP Loan Documents in good faith, and in all respects such DIP Loan Documents shall be consistent with the terms of the DIP Credit Agreement and otherwise acceptable to the DIP Agents and the Requisite Lenders.  Upon entry of this Interim Order and until execution and delivery of the DIP Credit Agreement and other DIP Loan Documents required or requested by the DIP Secured Parties, the Debtors and the DIP Secured Parties shall be bound by (x) the terms and conditions and other provisions set forth in the other executed DIP Loan Documents (including the fee letters executed in connection with the DIP Facility), with the same force and effect as if duly executed and delivered to the DIP Administrative Agent by the Debtors, and (y) this Interim Order and the other executed DIP Loan Documents (including the fee letters executed in connection with the DIP Facility) shall govern

and control the DIP Facility.  Upon entry of this Interim Order, the Interim Order, the DIP Credit

Agreement, and other DIP Loan Documents shall govern and control the DIP Facility.  The DIP

Agents are hereby authorized to execute and enter into its respective obligations under the DIP

Loan Documents, subject to the terms and conditions set forth therein and this Interim Order.

Upon execution and delivery thereof, the DIP Loan Documents shall constitute valid and binding

obligations of the Debtors enforceable in accordance with their terms.  To the extent there exists

any conflict among the terms and conditions of the DIP Loan Documents and this Interim Order,

the terms and conditions of this Interim Order shall govern and control.

(b)    Upon entry of this Interim Order, the DIP Borrower is hereby authorized to

borrow, and the DIP Guarantors are hereby authorized to guarantee, borrowings up to an aggregate

principal amount of $5 million of Initial New Money DIP Loans and $25 million of Initial Roll-

Up DIP Loans, subject to and in accordance with this Interim Order, without any further action by

the Debtors or any other party.

(c)    Upon entry of this Interim Order, the Debtors are hereby authorized to cause

the Non-Debtor Guarantors to guarantee $25 million of Initial Roll-Up DIP Loans, subject to and

in accordance with this Interim Order, without any further action by the Debtors or any other party.

(d)    In accordance with the terms of this Interim Order and the DIP Loan

Documents, proceeds of the DIP Loans shall be used solely for the purposes permitted under the

DIP Loan Documents and this Interim Order, and in accordance with the DIP Budget, subject to

permitted variances as set forth in this Interim Order and the DIP Loan Documents.  Attached as

**Exhibit 2** hereto and incorporated herein by reference is a budget prepared by the Debtors and

approved by the Requisite Lenders in accordance with Section 5.18 of the DIP Credit Agreement

(the "DIP Budget").

(e)        In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized, and the automatic stay imposed by section 362 of the Bankruptcy Code is hereby lifted to the extent necessary, to perform all acts and to make, execute, and deliver all instruments and documents (including, without limitation, the DIP Credit Agreement, any security and pledge agreement, and any mortgage to the extent contemplated thereby), and to pay all fees (including all amounts owed to the DIP Lenders and the DIP Agents under the DIP Loan Documents) that may be reasonably required or necessary for the Debtors' performance of their obligations under the DIP Facility, including, without limitation:

(1)        the execution, delivery, and performance of the DIP Loan Documents, including, without limitation, the DIP Credit Agreement, any security and pledge agreement, and any mortgage to the extent contemplated thereby;

(2)        the execution, delivery, and performance of one or more amendments, waivers, consents, or other modifications to and under the DIP Loan Documents (in each case in accordance with the terms of the applicable DIP Loan Documents and in such form as the Debtors, the DIP Administrative Agent, and the Requisite Lenders may agree), it being understood that no further approval of the Court shall be required for amendments, waivers, consents, or other modifications to and under the DIP Loan Documents or the DIP Obligations that do not shorten the maturity of the extensions of credit thereunder or modify the commitments or the rate of interest or other amounts payable thereunder;

(3)        the non-refundable payment to each of and/or on behalf of the DIP Secured Parties, as applicable, of the fees referred to in the DIP Loan Documents,

including (x) all fees and other amounts owed to the DIP Agents and the

DIP Lenders and (y) all reasonable and documented costs and expenses as

may be due from time to time, including, without limitation, the reasonable

and documented fees and expenses of counsel and other professionals

retained as provided for in the DIP Loan Documents and this Interim Order

(whether incurred before or after the Petition Date or in connection with the

Chapter 11 Cases (in any capacity) or the DIP Facility), including, for the

avoidance of doubt, (a) Gibson, Dunn & Crutcher LLP (as counsel) and

Houlihan Lokey, Inc. (as financial advisor), (collectively, the "DIP/First

Lien Advisors") to the DIP Lenders, the DIP Administrative Agent, and the

ad hoc group of the Prepetition Term Lenders (the "DIP/First Lien Group");

and (b) Shipman & Goodwin LLP (as counsel) to the DIP Collateral Agent

and the Prepetition Collateral Agent, and, to the extent necessary to exercise

its rights and fulfill their obligations under the DIP Loan Documents, one

counsel to each of the DIP Agents in each local jurisdiction, which such

fees and expenses shall not be subject to the approval of the Court, nor shall

any recipient of any such payment be required to file with respect thereto

any interim or final fee application with the Court, provided that any fees

and expenses of a professional shall be subject to the provisions of

Paragraph 20 of this Interim Order;

(4)     a commitment premium of 10.00% of the total aggregate amount of the New

Money DIP Loans in respect of the DIP Facility, which is deemed earned

upon entry of this Interim Order, (the "Commitment Premium"), which

Commitment Premium shall be added to the outstanding principal amount of the DIP Loans and thereafter constitute principal for all purposes and accrue interest in accordance with the DIP Loan Documents;

(5)     an exit premium of 6.00% of the total aggregate amount of the New Money DIP Loans in respect of the DIP Facility (the "Exit Premium"), which is deemed earned upon maturity, acceleration, termination, conversion, and/or repayment/prepayment in full (unless the Lenders shall acquire the Debtors' assets pursuant to a credit bid), which Exit Premium shall be added to the outstanding principal amount of the DIP Loans and thereafter constitute principal for all purposes;

(6)     the payment of interest, in cash or in kind, pursuant to the DIP Credit Agreement, and any prepayment, repayment, or payment pursuant to the DIP Credit Agreement;

(7)     the performance of all other acts required under or in connection with the DIP Loan Documents.

(f)     Upon entry of this Interim Order, such DIP Loan Documents, the DIP Obligations, and the DIP Liens shall constitute valid, binding, and non-avoidable obligations of the Debtors enforceable against each Debtor party thereto in accordance with their respective terms and the terms of this Interim Order for all purposes during the Chapter 11 Cases, any subsequently converted Case of any Debtor to a case under chapter 7 of the Bankruptcy Code or after the dismissal of any Case.  No obligation, payment, transfer, or grant of security under the DIP Credit Agreement, the other DIP Loan Documents, or this Interim Order shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable law

(including, without limitation, under sections 502(d), 548, or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, Uniform Voidable Transactions Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment, or counterclaim.  All payments or proceeds remitted to or on behalf of the DIP Agents on behalf of any DIP Secured Parties, in each case, pursuant to the DIP Loan Documents, the provisions of this Interim Order, or any subsequent order of this Court shall be received free and clear of any claim, assessment, or other liability, including, without limitation, any such claim arising out of or based on, directly or indirectly, the "equities of the case" exception of section 552(b) of the Bankruptcy Code (and, solely in the case of waivers of rights under section 552(b) of the Bankruptcy Code, subject to, and upon, the entry of the Final Order).

(g)    The DIP Guarantors hereby are authorized and directed to jointly, severally, and unconditionally guarantee, and upon entry of this Interim Order shall be deemed to have guaranteed, in full, all of the DIP Obligations of the DIP Borrower.

(h)    Notwithstanding anything to the contrary in this Interim Order, subject to entry of a Final Order, this Court reserves the right to unwind or partially unwind, after notice and hearing, the rollup of the Prepetition First Lien Obligations through the Initial Roll-Up DIP Loans, in the event that there is a timely and successful challenge to the validity, enforceability, extent, perfection or priority of the Prepetition Secured Parties' claims or liens, or a determination that the Prepetition First Lien Obligations were undersecured as of the Petition Date, and the rollup unduly advantaged the Prepetition Secured Parties or DIP Secured Parties.

4.    <u>Budget and Variance Reporting</u>.  On the final business day of every fourth calendar week following entry of this Interim Order beginning with the first full week following the Petition Date (or more frequently if determined by the Debtors), the Debtors will deliver to the Prepetition

Administrative Agent and the DIP/First Lien Advisors, and any Committee an updated Budget for the subsequent 13-week period, which shall be in form and substance satisfactory to the Requisite Lenders. The initial DIP Budget or any subsequent DIP Budget shall be deemed to constitute the "DIP Budget" for purposes of this Interim Order with the most recently delivered Budget constituting the "DIP Budget," upon (i) approval by the Requisite Lenders (which must be in writing, email being sufficient) or (ii) 5:00 p.m. (prevailing Eastern time) three (3) business days following delivery of such Budget if the Requisite Lenders have neither approved nor rejected the Budget. The Debtors will deliver to the Prepetition Administrative Agent, the DIP/First Lien Advisors, and any Committee an updated Budget for the subsequent 13-week period on the final business day of every fourth calendar week following entry of this Interim Order beginning with the fourth full week following the Petition Date. In the event the conditions for the most recently delivered Budget to constitute an "DIP Budget" are not met as set forth herein, the prior DIP Budget shall remain in full force and effect. Commencing on the first full calendar week after the Petition Date, on or before 5:00 p.m. (prevailing Eastern time) on Thursday of every other week, the Debtors shall deliver to the DIP Administrative Agent, the DIP/First Lien Advisors, and any Committee a budget variance report/reconciliation (the "DIP Budget Variance Report"), setting forth in reasonable detail actual operating receipts and operating disbursements on a rolling two-week basis (the "Budget Period") and all Budget Variances (as defined below), in each case, for items (i-iii) below, as compared to the projected amounts therefor set forth in the then applicable DIP Budget, together with a statement confirming compliance with the budget covenants set forth in Section 5.18 of the DIP Credit Agreement. The DIP Budget Variance Report shall include indications as to whether each variance therein is temporary or permanent and an explanation, in reasonable detail, of any material variance. The Debtors shall not permit the percentage variance

with respect to (i) total projected operating disbursements in each then-current DIP Budget to exceed 10% on an aggregate basis of total actual operating disbursements, (ii) total projected net investment and financing disbursements in each then-current DIP Budget to exceed 10% on an aggregate basis of total actual net investment and financing disbursements, and (iii) total projected restructuring professional fees in each then-current DIP Budget to exceed 10% on an aggregate basis of total restructuring professional fees, in each case, for measuring the variance, beginning with the week ending May 20, 2023, which would be reported by the DIP Budget Variance Report delivered May 24, 2023, tested bi-weekly on a four week rolling basis, in each case, for the Budget Period under the then-current DIP Budget (the "Budget Variances"; all references in this Interim Order and the DIP Loan Documents to "DIP Budget" shall mean the DIP Budget as it is subject to the Budget Variances).

5.    Access to Records.  The Debtors shall provide the DIP/First Lien Advisors with all reporting and other information required to be provided to the DIP Administrative Agent under the DIP Loan Documents.  In addition to, and without limiting, whatever rights of access the DIP Secured Parties have under the DIP Loan Documents, upon reasonable notice to Debtors' counsel (email being sufficient), at reasonable times during normal business hours, the Debtors shall permit representatives, agents, and employees of the DIP Secured Parties to have reasonable access to (i) inspect the Debtors' assets, and (ii) all information (including historical information and the Debtors' books and records) and personnel, including regularly scheduled meetings as mutually agreed with senior management of the Debtors and other company advisors (during normal business hours), and the DIP Secured Parties shall be provided with access to all information they shall reasonably request, excluding any information for which confidentiality is owed to third

parties, information subject to attorney client or similar privilege, or where such disclosure would not be permitted by any applicable requirements of law.

6.    <u>Debtors' Stipulations</u>.  Without prejudice to the rights of parties in interest (other than the Debtors), including any Committee, as set forth in Paragraph 13 herein, and subject to the limitations thereon contained in Paragraphs 21 and 29 herein, the Debtors are authorized to stipulate and agree that (collectively, Paragraphs 6(i) through (x) below are referred to herein as the "<u>Debtors' Stipulations</u>"):

(i)    <u>Prepetition Senior Secured Term Loans</u>.

(a)    Under that certain Amended and Restated Credit and Guaranty Agreement, dated as of November 4, 2019 (as amended, restated, or otherwise modified from time to time, the "<u>Prepetition Senior Secured Credit Agreement</u>" and, together with the other "Loan Documents" (as defined in the Prepetition Senior Secured Credit Agreement, the "<u>Prepetition Term Loan Documents</u>"), by and among Vice Group Holding Inc. (the "<u>Borrower</u>"), certain of the Debtors (the "<u>Guarantors</u>"), the lenders party thereto (collectively, the "<u>Prepetition Term Lenders</u>"), Fortress Credit Corp., as administrative agent (in such capacity, the "<u>Prepetition Administrative Agent</u>"), and Wilmington Trust, National Association, as collateral agent (in such capacity, the "<u>Prepetition Collateral Agent</u>" and, together with the Prepetition Administrative Agent, the "<u>Prepetition Term Agents</u>," and the Prepetition Term Lenders and Prepetition Term Agents, collectively, the "<u>Prepetition Secured Parties</u>"), the Prepetition Term Lenders provided loans thereunder (the "<u>Prepetition Senior Secured Term Loans</u>") in a total aggregate principal amount outstanding as of the Petition Date of $474,572,920.

(b)    As of the Petition Date, the Debtors were jointly and severally indebted to the Prepetition Secured Parties pursuant to the Prepetition Term Loan Documents, without

defense, counterclaim, or offset of any kind, in an amount equal to the aggregate principal amount of the Prepetition Senior Secured Term Loans plus accrued and unpaid interest with respect thereto and any additional fees, costs, expenses (including any attorneys', financial advisors', and other professionals' fees and expenses), reimbursement obligations, indemnification obligations, contingent obligations, and other charges of whatever nature, whether or not contingent, whenever arising, due, or owing, and all other Obligations (as defined in the Prepetition Senior Secured Credit Agreement) owing under or in connection with the Prepetition Term Loan Documents (collectively, the "Prepetition First Lien Obligations").

(ii)    First Lien Loan Collateral.    In connection with the Prepetition Senior Secured Credit Agreement, the Debtors entered into that certain Security Agreement, dated as of November 4, 2019 (as amended, supplemented or otherwise modified from time to time, the "Security Agreement"), by and between the Borrower, the other loan parties thereto, and the Prepetition Collateral Agent.    Pursuant to the Security Agreement and the other Prepetition Term Loan Documents, the Prepetition First Lien Obligations are secured by valid, binding, perfected, and enforceable first-priority security interests in and liens (the "Prepetition Senior Liens") on the "Collateral" (the "Prepetition Collateral"), pursuant to, and as such term is defined in, the Security Agreement, consisting of substantially all of the Debtors' assets, except as set forth in the Security Agreement.

(iii)    Second Lien Note. Under that certain Instrument, among Vice Europe Pulse Holding Limited ("VEPH"), the Guarantors (as defined therein), and the Sellers (as defined therein), dated as of December 8, 2021 (as amended, restated, or otherwise modified from time to time, the "Second Lien Note") the Sellers hold subordinated notes in an aggregate principal amount of approximately $20.9 million.

(iv)    Second Lien Collateral. In connection with the Second Lien Note, VEPH, the Sellers, and B & C 3, LLC (the "Second Lien Agent", together with the Sellers, the "Prepetition Second Lien Secured Parties"), entered into that certain Second Lien Share Charge, dated as of December 8, 2021 (as amended, supplemented or otherwise modified from time to time, the "Share Charge", together with the Second Lien Note, the "Second Lien Note Documents").  Pursuant to the Share Charge, the Second Lien Agent was granted security interests in and liens on certain assets of VEPH (the "Second Lien Loan Liens").

(v)    Pulse Notes Subordination Agreement. The Prepetition Administrative Agent, the Prepetition Collateral Agent, and the Second Lien Agent are parties to that certain Subordination and Intercreditor Agreement, dated as of December 8, 2021 (as amended, restated, or otherwise modified from time to time, the "Pulse Notes Subordination Agreement") to govern, among other things, the respective rights, interests, obligations, priority, and positions of the Prepetition Secured Parties and the Prepetition Second Lien Secured Parties with respect to the assets and properties of the Debtors and other obligors.  Each of the Borrower and Guarantors acknowledged and agreed to the Pulse Notes Subordination Agreement.

(vi)    Cash Collateral.  Any and all of the Debtors' cash, including the Debtors' cash and other amounts on deposit or maintained in any account or accounts by the Debtors, and any amounts generated by the collection of accounts receivable or other disposition of the Prepetition Collateral existing as of the Petition Date, and the proceeds of any of the foregoing are the Prepetition Secured Parties' cash collateral within the meaning of Bankruptcy Code section 363(a) (the "Cash Collateral").

(vii)    Bank Accounts.  The Debtors acknowledge and agree that, to the knowledge of the Debtors, as of the Petition Date, none of the Debtors has either opened or maintains any

bank accounts other than the accounts listed in the exhibit attached to any order authorizing the Debtors to continue to use the Debtors' existing cash management system.

(viii)    _Cash Management Obligations_. JPMorgan Chase Bank, N.A. (together with its affiliates, a "Cash Management Bank") is a party to that certain Facility Agreement, dated 17 October 2016, (as amended, supplemented or otherwise modified from time to time, the "Prepetition Overdraft Facility", and the obligations thereunder, the "Overdraft Obligations"; the Overdraft Obligations, together with all other obligations of the Debtors to the Cash Management Bank pursuant to the Prepetition Senior Secured Credit Agreement, the "Cash Management Obligations") with Vice Europe Holding Limited ("VEHL").    In connection with the Cash Management Obligations, and pursuant to the Security Agreement, the Cash Management Bank was granted _pari passu_ security interests in and liens (the "Cash Management Liens" and, together with the Prepetition Senior Liens, the "Prepetition Liens") on the Prepetition Collateral.

(ix)    _Validity, Perfection, and Priority of Prepetition Senior Liens and Prepetition First Lien Obligations_.  Subject to the Challenge Period (as defined herein), each of the Debtors acknowledges and agrees that, in each case as of the Petition Date:  (A) the Prepetition Senior Liens are valid, binding, enforceable, non-avoidable, and properly perfected liens on and security interests in the Prepetition Collateral; (B) the Prepetition Senior Liens are subject and subordinate only to Prior Senior Liens; (C) the Prepetition First Lien Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtors; (D) no offsets, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition Senior Liens or Prepetition First Lien Obligations exist, and no portion of the Prepetition Senior Liens or Prepetition First Lien Obligations is subject to any challenge or defense including impairment, set-off, right of recoupment, avoidance, attachment, disallowance, disgorgement, reduction,

recharacterization, recovery, subordination (whether equitable or otherwise), attack, offset, defense, counterclaims, cross-claims, or "claim" (as defined in the Bankruptcy Code), pursuant to the Bankruptcy Code or applicable nonbankruptcy law; and (E) the Debtors and their estates have no claims, objections, challenges, causes of actions, recoupments, counterclaims, cross-claims, setoff rights, and/or choses in action, including "lender liability" causes of action or avoidance claims under chapter 5 of the Bankruptcy Code, whether arising under applicable state law or federal law (including any recharacterization, subordination, avoidance, disgorgement, recovery, or other claims arising under or pursuant to sections 105, 510, or 542 through 553 of the Bankruptcy Code), against the Prepetition Administrative Agent, the Prepetition Collateral Agent, the other Prepetition Secured Parties, or any of their respective affiliates, agents, representatives, attorneys, advisors, professionals, officers, directors, and employees arising out of, based upon, or related to their loans under the Prepetition Term Loan Documents, the Prepetition First Lien Obligations, or the Prepetition Senior Liens.

(x)    _Pulse Notes Subordination Agreement_.    Pursuant to section 510 of the Bankruptcy Code, the Pulse Notes Subordination Agreement, and any other applicable intercreditor or subordination provisions contained in any of the Prepetition Term Loan Documents, the Second Lien Note, the Second Lien Share Charge, or the Prepetition Overdraft Facility, shall (i) remain in full force and effect, (ii) continue to govern the relative obligations, priorities, rights and remedies of the Prepetition Secured Parties, the Prepetition Second Lien Secured Parties, and the Cash Management Bank, and (iii) not be deemed to be amended, altered or modified by the terms of this Interim Order or the DIP Loan Documents, in each case, unless expressly set forth herein or therein.

7.    DIP Superpriority Claims.  Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims against each of the Debtors' estates (the "DIP Superpriority Claims") (without the need to file any proof of claim) with priority over any and all administrative expenses, adequate protection claims, diminution claims, and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503(b), 507(a), 507(b), 726, 1113, or 1114 of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall for the purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code and which shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, including, without limitation, subject to entry of the Final Order, any proceeds or property recovered in connection with the pursuit of claims or causes of action arising under chapter 5 of the Bankruptcy Code, if any (the "Avoidance Actions"), subject only to, and subordinated in all respects to, the payment of the Carve Out.  Except as set forth in this Interim Order or the Final Order, no other superpriority claims shall be granted or allowed in these Chapter 11 Cases.

8.    DIP Liens.  As security for the DIP Obligations, effective and perfected upon the date of this Interim Order, and without the necessity of the execution, recordation of filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements, or other similar documents, or the possession or control by the DIP Agents or any

DIP Lender of, or over, any DIP Collateral (as defined below), the following security interests and liens are hereby granted by the Debtors to the DIP Collateral Agent, for the benefit of the DIP Secured Parties (all property identified in clause (a) and (b) below being collectively referred to as the "DIP Collateral"), subject to (x) Liens permitted pursuant to the terms of the DIP Credit Agreement and (y) the Carve Out (all such liens and security interests granted to the DIP Collateral Agent, for the benefit of the DIP Secured Parties, pursuant to this Interim Order and the DIP Loan Documents, the "DIP Liens"):

(a)    First Priority Lien On Any Unencumbered Property.  Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected, non-avoidable, automatically, and properly perfected first-priority senior security interest in and lien upon all property of the Debtors, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date is not subject to Prior Senior Liens (subject to the Carve Out), including, without limitation (in each case, to the extent not subject to Prior Senior Liens), a 100% equity pledge of any first-tier foreign subsidiaries; unencumbered cash of the Debtors (whether maintained with the DIP Agents or otherwise) and any investment of such cash, accounts, inventory, goods, contract rights, instruments, documents, chattel paper, patents, trademarks, copyrights, and licenses therefor, accounts receivable, receivables and receivables records, general intangibles, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, contracts, owned real estate, real property leaseholds, fixtures, deposit accounts, commercial tort claims, securities accounts, instruments, investment property, letter-of-credit rights, supporting obligations, machinery and equipment, real property, leases (and proceeds from the disposition thereof), all of the issued and outstanding capital stock of each Debtor, other equity or ownership interests in or of any entity (including equity interests in subsidiaries of each Debtor), money,

investment property, intercompany claims, claims arising on account of transfers of value from a

Debtor to (x) another Debtor and (y) a non-Debtor affiliate incurred on or following the Petition

Date, causes of action, including causes of action arising under section 549 of the Bankruptcy

Code (but excluding all other Avoidance Actions), all products and proceeds of the foregoing and,

subject to entry of the Final Order, all proceeds and property recovered in respect of Avoidance

Actions (collectively, the "Previously Unencumbered Property"); *provided*, *further*, that, for the

avoidance of doubt and notwithstanding anything to the contrary contained herein, to the extent a

lien cannot attach to any of the foregoing pursuant to applicable law, the liens granted pursuant to

this Interim Order shall attach to the Debtors' economic rights, including, without limitation, any

and all proceeds of the foregoing.

(b)    Liens Priming the Prepetition Liens.  Pursuant to section 364(d)(1) of the

Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first-priority senior

priming security interest in and lien upon all property of the Debtors that was subject to the

Prepetition Liens (subject to the Carve Out), including, without limitation, the Prepetition

Collateral and Cash Collateral; *provided* that such liens shall be immediately junior to any Prior

Senior Liens; *provided*, *further*, that, for the avoidance of doubt and notwithstanding anything to

the contrary contained herein, to the extent a lien cannot attach to any of the foregoing pursuant to

applicable law, the liens granted pursuant to this Interim Order shall attach to the Debtors'

economic rights, including, without limitation, any and all proceeds of the foregoing.

(c)    Liens Junior to Certain Other Liens.  Pursuant to section 364(c)(3) of the

Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected junior security interest

in and lien upon all property of the Debtors, whether existing on the Petition Date or thereafter

acquired, that, on or as of the Petition Date, is not Prepetition Collateral but is subject to a Prior Senior Lien.

9.    <u>Adequate Protection for the Prepetition Secured Parties</u>.  Subject only to the Carve Out and the terms of this Interim Order, pursuant to sections 361, 363(e), and 364 of the Bankruptcy Code, and in consideration of the stipulations and consents set forth herein, as adequate protection of their interests in the Prepetition Collateral (including Cash Collateral), solely for and equal in amount to the postpetition diminution in value of such interests (each such diminution, a "<u>Diminution in Value</u>"), resulting from, among other things, the imposition of the priming DIP Liens on the Prepetition Collateral, the Carve Out, the Debtors' use of the Prepetition Collateral (including Cash Collateral), and the imposition of the automatic stay, the applicable Prepetition Term Agent, for the benefit of itself and the other Prepetition Secured Parties, is hereby granted the following (collectively, the "<u>First Lien Adequate Protection Obligations</u>"):

(a)    <u>First Lien Adequate Protection Liens</u>.  As security for and solely to the extent of any Diminution in Value, additional and replacement, valid, binding, enforceable, non-avoidable, and effective and automatically perfected postpetition security interests in and liens as of the date of this Interim Order (together, the "<u>First Lien Adequate Protection Liens</u>"), without the necessity of the execution by the Debtors (or recordation or other filing), of security agreements, control agreements, pledge agreements, financing statements, mortgages, or other similar documents, on all DIP Collateral and, solely upon entry of the Final Order, all proceeds or property recovered from Avoidance Actions.  Subject to the terms of this Interim Order, the First Lien Adequate Protection Liens shall be subordinate only to the (A) Carve Out, (B) the DIP Liens, and (C) Prior Senior Liens.  The First Lien Adequate Protection Liens shall otherwise be senior to all other security interests in, liens on, or claims against any of the DIP Collateral (including, for

the avoidance of doubt, any lien or security interest that is avoided and preserved for the benefit

of the Debtors and their estates under section 551 of the Bankruptcy Code).

(b)      Adequate Protection Superpriority Claims.  As further adequate protection,

and to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code, allowed

administrative expense claims in each of the Chapter 11 Cases ahead of and senior to any and all

other administrative expense claims in such Cases to the extent of any postpetition Diminution in

Value (the "Adequate Protection Superpriority Claims"), but junior to the Carve Out and the DIP

Superpriority Claims.  Subject to the Carve Out and the DIP Superpriority Claims in all respects,

the Adequate Protection Superpriority Claims will not be junior to any claims and shall have

priority over all administrative expense claims against each of the Debtors, now existing or

hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative

expense claims of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331,

365, 503(a), 503(b), 507(a), 507(b), 546(d), 726, 1113 and 1114 of the Bankruptcy Code.  The

Prepetition Secured Parties shall not receive or retain any payments, property or other amounts in

respect of the Adequate Protection Superpriority Claims under section 507(b) of the Bankruptcy

Code granted hereunder unless and until the DIP Obligations have been indefeasibly paid in full,

in cash, or satisfied in a manner otherwise agreed to by the Requisite Lenders, in each case as

provided in the DIP Loan Documents.

(c)      First Lien Adequate Protection Payments.  As further adequate protection,

the Debtors are authorized and directed to pay, in accordance with the terms of Paragraph 20 of

this Interim Order, all reasonable and documented fees and expenses (the "Adequate Protection

Fees"), whether incurred before or after the Petition Date or in connection with the Chapter 11

Cases (in any capacity), to the extent not duplicative of any fees and/or expenses paid pursuant to

paragraph 3(e)(3) hereof, including all reasonable and documented fees and expenses of counsel

and other professionals retained as provided for in the DIP Loan Documents and this Interim Order,

including, for the avoidance of doubt, of (i)  the DIP/First Lien Group Advisors, and (ii) to the

extent necessary to exercise and fulfill its obligations under the Prepetition Term Loan Documents,

one counsel to the Prepetition Collateral Agent and one counsel to the other Prepetition Secured

Parties (taken as a whole) in each local jurisdiction that is material to the Prepetition Secured

Parties (taken as a whole) (all payments referenced in this sentence, collectively, the "Adequate

Protection Payments").  None of the Adequate Protection Fees shall be subject to separate approval

by this Court or the U.S. Trustee Guidelines, and no recipient of any such payment shall be required

to file any interim or final fee application with respect thereto or otherwise seek the Court's

approval of any such payments.

(d)    Right to Seek Additional Adequate Protection.  This Interim Order is

without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the

Prepetition Secured Parties to request further or alternative forms of adequate protection at any

time or the rights of the Debtors or any other party to contest such request.

10.    Adequate Protection for the Cash Management Bank.  Pursuant to the terms of this

Interim Order and sections 361, 363(e), and 364 of the Bankruptcy Code, as adequate protection

of their interests in the Prepetition Collateral (including Cash Collateral), solely for and equal in

amount to the postpetition Diminution in Value, resulting from, among other things, the imposition

of the priming DIP Liens on the Prepetition Collateral, the Carve Out, the Debtors' use of the

Prepetition Collateral (including Cash Collateral), and the imposition of the automatic stay, the

Prepetition Collateral Agent, for the benefit of itself and the Cash Management Bank, is hereby

granted the following (collectively, the "Cash Management Adequate Protection Obligations" and,

together with the First Lien Adequate Protection Obligations, the "Adequate Protection Obligations"):

(a)    Cash Management Adequate Protection Liens.  As security for and solely to the extent of any Diminution in Value, additional and replacement, valid, binding, enforceable, non-avoidable, and effective and automatically perfected postpetition security interests in and liens as of the date of this Interim Order (together, the "Cash Management Adequate Protection Liens" and, together with the First Lien Adequate Protection Liens, the "Adequate Protection Liens"), without the necessity of the execution by the Debtors (or recordation or other filing), of security agreements, control agreements, pledge agreements, financing statements, mortgages, or other similar documents, on all DIP Collateral and, solely upon entry of the Final Order, all proceeds or property recovered from Avoidance Actions.  Subject to the terms of this Interim Order, the Cash Management Adequate Protection Liens shall be subordinate only to the (A) Carve Out, (B) the DIP Liens, (C) the First Lien Adequate Protection Liens, (D) the Prepetition Senior Liens, and (E) Prior Senior Liens.  The Cash Management Adequate Protection Liens shall otherwise be senior to all other security interests in, liens on, or claims against any of the DIP Collateral (including, for the avoidance of doubt, any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code).

11.    Carve Out.

(a)    Priority of Carve Out.  Subject to the terms and conditions contained in this Paragraph 11, and notwithstanding anything to the contrary elsewhere in this Interim Order, each of the DIP Liens, DIP Superpriority Claims, Prepetition Liens, Adequate Protection Liens, and Adequate Protection Superpriority Claims shall be subject and subordinate to payment of the Carve Out.  The Carve Out shall have such priority claims and liens over all assets of the Debtors,

including any DIP Collateral, Prepetition Collateral, and any funds in the escrow account into

which the DIP Loans are funded (the "DIP Loan Escrow").

(b)        Definition of Carve Out.  As used in this Interim Order, the "Carve Out"

means the sum of (i) all fees required to be paid to the Clerk of the Court and to the United States

Trustee under section 1930(a) of title 28 of the United States Code plus interest, if any, under

section 3717 of title 31 of the United States Code (without regard to the notice set forth in

(iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section

726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the

extent allowed at any time, whether by interim order, procedural order, or otherwise, and to the

extent provided for under the DIP Budget, all unpaid fees and expenses (including any success or

transaction fees earned and owed to any investment banker or professional advisor prior to the

Trigger Date) (the "Allowed Professional Fees") incurred by persons or firms retained by the

Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals")

and   the Committee pursuant   to   section   328   or   1103   of   the   Bankruptcy   Code

(the "Committee Professionals"   and,   together   with   the   Debtor   Professionals,   the

"Professional Persons") at any time before or on the first business day following delivery by the

DIP Administrative Agent (at the direction of the Requisite Lenders) of a Carve Out Trigger Notice

(as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger

Notice, (the amounts set forth in clauses (i) through (iii), the "Pre-Carve Out Trigger Notice Cap");

and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed

$1,000,000 incurred after the first business day following delivery by the DIP Administrative

Agent of the Carve Out Trigger Notice (such date, the "Trigger Date"), to the extent allowed at

any time, whether by interim order, procedural order, or otherwise, less the amount of any

prepetition retainers received by any such Professional Persons and not previously returned or applied to fees and expenses (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap" and, together with the Pre-Carve Out Trigger Notice Cap, the "Carve Out Cap").  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Administrative Agent to the Debtors, their lead restructuring counsel Togut, Segal & Segal LLP, One Penn Plaza, Suite 3335, New York, NY 10119 (Attn:  Kyle J. Ortiz and Brian F. Moore), the U.S. Trustee, and counsel to the Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default (as defined in the DIP Credit Agreement) and acceleration of the DIP Obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(c)    Carve Out Reserve.  Notwithstanding the occurrence of an Event of Default or conditions to borrowing or release of funds from the DIP Loan Escrow, on the day on which a Carve Out Trigger Notice is given by the DIP Administrative Agent to the Debtors with a copy to counsel to the Committee (the "Termination Declaration Date"), the Carve Out Trigger Notice shall (i) be deemed a draw request and notice of borrowing by the Debtors for DIP Loans under the DIP Facility (on a pro rata basis based on the then outstanding DIP Obligations) and/or request to release funds from the DIP Loan Escrow, in an amount equal to the then unpaid amounts of the Allowed Professional Fees plus reasonably estimated fees not yet allowed for the period through and including the Termination Declaration Date (any such amounts actually advanced shall constitute DIP Loans and shall be deposited in the DIP Loan Escrow), and (ii) also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor or available in the DIP Loan Escrow to fund a reserve in an amount equal to

the then unpaid amounts of the Allowed Professional Fees plus reasonably estimated fees not yet allowed for the period through and including the Termination Declaration Date. The Debtors shall deposit and hold such amounts in a segregated account in trust to pay such then-unpaid Allowed Professional Fees plus reasonably estimated fees not yet allowed for the period through and including the Termination Declaration Date (the "Pre-Carve Out Trigger Notice Reserve") prior to any and all other claims. On the Termination Declaration Date, the Carve Out Trigger Notice shall also (i) be deemed a request by the Debtors for DIP Loans under the DIP Facility (on a pro rata basis based on the then outstanding DIP Obligations) and/or request to release funds from the DIP Loan Escrow in an amount equal to the Post-Carve Out Trigger Notice Cap (any such amounts actually advanced shall constitute DIP Loans) and (ii) constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor or available in the DIP Loan Escrow, after funding the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap. The Debtors shall deposit and hold such amounts in a segregated account in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "Post-Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to any and all other claims. On the first business day after the DIP Administrative Agent gives such notice to such DIP Lenders, notwithstanding anything in the DIP Credit Agreement to the contrary, including with respect to the existence of a Default (as defined in the DIP Credit Agreement) or Event of Default, the failure of the Debtors to satisfy any or all of the conditions precedent for DIP Loans under the DIP Facility, any termination of the DIP Obligations following an Event of Default, or the occurrence of the Maturity Date (as defined in the DIP Credit Agreement), each DIP Lender with an outstanding Commitment (as defined in the DIP Credit Agreement, on a pro

rata basis based on the then outstanding Commitments) shall make available to the DIP

Administrative Agent such DIP Lender's pro rata share with respect to such borrowing in

accordance with the DIP Facility.  All funds in the Pre-Carve Out Trigger Notice Reserve shall be

used first to pay the obligations set forth in the Pre-Carve Out Trigger Notice Cap (the "Pre-Carve

Out Amounts"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until

paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced

to zero, to pay the DIP Administrative Agent for the benefit of the DIP Lenders, unless the DIP

Obligations have been indefeasibly paid in full, in cash, and all Commitments have been

terminated, in which case any such excess shall be paid to the Prepetition Secured Parties in

accordance with their rights and priorities as of the Petition Date.  All funds in the Post-Carve Out

Trigger Notice Reserve shall be used first to pay the obligations set forth in the Post-Carve Out

Trigger Notice Cap (the "Post-Carve Out Amounts"), and then, to the extent the Post-Carve Out

Trigger Notice Reserve has not been reduced to zero, to pay the DIP Administrative Agent for the

benefit of the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash,

and all Commitments have been terminated, in which case any such excess shall be paid to the

Prepetition Secured Parties in accordance with their rights and priorities as of the Petition

Date.  Notwithstanding anything to the contrary in the DIP Loan Documents, or this Interim Order,

if either of the Carve Out Reserves is not funded in full in the amounts set forth in this Paragraph

11, then any excess funds in one of the Carve Out Reserves following the payment of the Pre-

Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other

Carve Out Reserves, up to the applicable amount set forth in this Paragraph 11, prior to making

any payments to the DIP Administrative Agent or the Prepetition Secured Parties, as

applicable.  Notwithstanding anything to the contrary in the DIP Loan Documents or this Interim

Order, following delivery of a Carve Out Trigger Notice, the DIP Administrative Agent and the Prepetition Administrative Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but the DIP Collateral Agent shall have a security interest in any residual interest in the Carve Out Reserves (for its benefit and the benefit of the other DIP Secured Parties), with any excess paid to the DIP Administrative Agent for application in accordance with the DIP Loan Documents.  Further, notwithstanding anything to the contrary in this Interim Order, (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute DIP Loans or increase or reduce the DIP Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the Initial Budget, Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors.  For the avoidance of doubt and notwithstanding anything to the contrary in this Interim Order, the DIP Facility, or the Prepetition First Lien Documents, the Carve Out shall be senior to all liens and claims securing the DIP Facility, the Adequate Protection Liens, the Adequate Protection Superpriority Claims, any claims arising under section 507(b) of the Bankruptcy Code, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations, the Prepetition First Lien Obligations, and the obligations pursuant to the Asset Purchase Agreement.

(d)    <u>Payment of Allowed Professional Fees Prior to the Termination Declaration Date</u>.  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(e)    <u>No Direct Obligation to Pay Allowed Professional Fees</u>.  Except for funding

the Carve Out Reserves as provided herein, none of the DIP Agents, DIP Lenders, or the

Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or

disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any

successor cases under any chapter of the Bankruptcy Code.  Nothing in this Interim Order or

otherwise shall be construed to obligate the DIP Agents, the DIP Lenders, or the Prepetition

Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional

Person or to guarantee that the Debtors have sufficient funds to pay such compensation or

reimbursement.

(f)    <u>Payment of Carve Out on or after the Termination Declaration Date</u>.  Any

payment or reimbursement made on or after the occurrence of the Termination Declaration Date

in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a

dollar-for-dollar basis.  Any funding of the Carve Out shall be added to, and made a part of, the

DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections

granted under this Interim Order, the DIP Loan Documents, the Bankruptcy Code, and applicable

law.

12.    <u>Reservation of Rights of the DIP Agents, DIP Lenders, and Prepetition Secured

Parties</u>.  Subject in all cases to the Carve Out, notwithstanding any other provision in this Interim

Order or the DIP Loan Documents to the contrary, the entry of this Interim Order is without

prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair:

(a) any of the rights of any of the Prepetition Secured Parties to seek any other or supplemental

relief in respect of the Debtors, including the right to seek additional adequate protection at and

following the Final Hearing; provided that any such further or different adequate protection shall

at all times be subordinate and junior to the Carve Out and the claims and liens of the DIP Secured

Parties granted under this Interim Order and the DIP Loan Documents; (b) any of the rights of the

DIP Secured Parties or the Prepetition Secured Parties under the DIP Loan Documents, the

Prepetition Term Loan Documents, or the Bankruptcy Code or under non-bankruptcy law (as

applicable), including, without limitation, the right of any of the DIP Secured Parties or the

Prepetition Secured Parties to (i) request modification of the automatic stay of section 362 of the

Bankruptcy Code, (ii) request dismissal of any of the Chapter 11 Cases, conversion of any of the

Chapter 11 Cases to cases under chapter 7, or appointment of a chapter 11 trustee or examiner with

expanded powers in any of the Chapter 11 Cases, (iii) seek to propose, subject to the provisions of

section 1121 of the Bankruptcy Code, a chapter 11 plan or plans; or (c) any other rights, claims,

or privileges (whether legal, equitable, or otherwise) of any of the DIP Secured Parties or the

Prepetition Secured Parties.   The delay in or failure of the DIP Secured Parties and/or the

Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies shall not

constitute a waiver of any of the DIP Secured Parties' or the Prepetition Secured Parties' rights

and remedies.

13.    <u>Reservation of Certain Committee and Third-Party Rights and Bar of Challenges</u>
<u>and Claims</u>.  Subject to the Challenge Period (as defined herein), the stipulations, admissions,

waivers, and releases contained in this Interim Order, including the Debtors' Stipulations, shall be

binding upon the Debtors, their estates, and any of their respective successors in all circumstances

and for all purposes, and the Debtors are deemed to have irrevocably waived and relinquished all

Challenges (as defined below) as of the Petition Date.  The stipulations, admissions, and waivers

contained in this Interim Order, including the Debtors' Stipulations, shall be binding upon all other

parties in interest, including any Committee and any other person acting on behalf of the Debtors'

estates, unless and to the extent that a party in interest with proper standing granted by order of the

Court (or other court of competent jurisdiction) has timely and properly filed an adversary

proceeding or contested matter under the Bankruptcy Rules on or before June 21, 2023, at 12:00

p.m. ET, subject to further extension by (x) written agreement of the Debtors and the DIP

Administrative Agent, (y) written agreement of the Debtors, the DIP Administrative Agent, and

any Committee, or (z) an order of this Court obtained on notice and after a hearing, such time, the

"Challenge Period"); provided, however, that if, prior to the end of the Challenge Period, (1) the

Chapter 11 Cases convert to chapter 7, or (2) if a chapter 11 trustee is appointed, then, in each such

case, the Challenge Period shall be extended by the later of (A) the time remaining under the

Challenge Period plus ten (10) days or (B) such other time as ordered by the Court solely with

respect to any such trustee, commencing on the occurrence of either of the events discussed in the

foregoing clauses (x) and (y); (ii) seeking to avoid, object to, or otherwise challenge the findings

or Debtors' Stipulations regarding: (a) the validity, enforceability, extent, priority, or perfection of

the mortgages, security interests, and liens of the Prepetition Collateral Agent and the Prepetition

Secured Parties; or (b) the validity, enforceability, allowability, priority, secured status, or amount

of the Prepetition First Lien Obligations (any such claim, a "Challenge"), and (iii) in which the

Court enters a final order in favor of the plaintiff sustaining any such Challenge in any such timely

filed adversary proceeding or contested matter.  Upon the expiration of the Challenge Period

Termination Date without the filing of a Challenge (or if any such Challenge is filed and

overruled):  (a) any and all such Challenges by any party (including the Committee, any chapter

11 trustee, and/or any examiner or other estate representative appointed or elected in these Chapter

11 Cases, and any chapter 7 trustee and/or examiner or other estate representative appointed or

elected in any Successor Case) shall be deemed to be forever barred; (b) the Prepetition First Lien

Obligations shall constitute allowed claims, not subject to counterclaim, setoff, recoupment, reduction, subordination, recharacterization, defense, or avoidance for all purposes in the Debtors' Cases and any Successor Cases; (c) the Prepetition Senior Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, and perfected secured claims, not subject to recharacterization, subordination, or avoidance; and (d) all of the Debtors' stipulations and admissions contained in this Interim Order, including the Debtors' Stipulations, and all other waivers, releases, affirmations, and other stipulations as to the priority, extent, and validity as to the Prepetition Secured Parties' claims, liens, and interests contained in this Interim Order shall be of full force and effect and forever binding upon the Debtors, the Debtors' estates, and all creditors, interest holders, and other parties in interest in these Chapter 11 Cases and any Successor Cases. If any such adversary proceeding or contested matter is timely and properly filed under the Bankruptcy Rules and remains pending and the Chapter 11 Cases are converted to chapter 7, the chapter 7 trustee may continue to prosecute such adversary proceeding or contested matter on behalf of the Debtors' estates.  Furthermore, if any such adversary proceeding or contested matter is timely and properly filed under the Bankruptcy Rules, the stipulations and admissions contained in this Interim Order, including the Debtors' Stipulations, shall nonetheless remain binding and preclusive on any Committee and any other person or entity except to the extent that such stipulations and admissions were expressly challenged in such adversary proceeding or contested matter prior to the Challenge Period Termination Date.  Nothing in this Interim Order vests or confers on any person (as defined in the Bankruptcy Code), including, without limitation, any Committee appointed in the Chapter 11 Cases, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation, any challenges (including a Challenge) with respect to the Prepetition Term Loan Documents, the Prepetition Senior Liens,

and the Prepetition First Lien Obligations, and a separate order of the Court conferring such standing on any Committee or other party-in-interest shall be a prerequisite for the prosecution of a Challenge by such Committee or such other party-in-interest.

14.    DIP Termination Date.    On the DIP Termination Date (as defined below), consistent with Section 8.2 of the DIP Credit Agreement, (a) all DIP Obligations shall be immediately due and payable, all Commitments will terminate, and the Carve Out Reserves shall be immediately funded; (b) all authority to use Cash Collateral shall cease; provided, however, that during the Remedies Notice Period (as defined below), the Debtors may use Cash Collateral solely to fund the Carve Out and pay payroll and other expenses critical to the administration of the Debtors' estates strictly in accordance with the DIP Budget, subject to such variances as permitted in the DIP Credit Agreement; and (c) the DIP Secured Parties shall be otherwise entitled to exercise rights and remedies under the DIP Loan Documents in accordance with this Interim Order.

15.    Events of Default.    The occurrence of any of the following events, unless waived by the Requisite Lenders in accordance with the terms of the DIP Loan Documents, shall constitute an event of default (collectively, the "Events of Default"):  (a) the failure of the Debtors to perform, in any material respect, any of the terms, provisions, conditions, covenants, or obligations under this Interim Order, (b) the failure of the Debtors to comply with any of the Milestones (as defined below) or (c) the occurrence of an "Event of Default" under the DIP Credit Agreement, (d) the entry of an order authorizing the use of Cash Collateral of the Prepetition Secured Parties or the DIP Lenders on a non-consensual basis or financing under Bankruptcy Code section 364 that is pari passu or senior to the Prepetition Senior Secured Term Loans or the DIP Loans or the filing by the Debtors of a motion seeking such authority; (e) dismissal or conversion of the Chapter 11

Cases;  (f) any suit, indictment, or similar action by the Department of Justice or a regulatory

agency (or entry of any order granting relief from the automatic stay related to the foregoing)

against or with respect to any Debtor, the business, operations or assets of any Debtor or any

current or former employee of any Debtor, that the Requisite Lenders determines (in their sole

discretion) may be adverse in any material respect to the value of the business, operations or assets

of any Debtor; (g) termination of the Interim Order or the Final Order, as applicable (except in the

case of the Interim Order, as a result of the entry of the Final Order); and (h) the filing of a plan or

disclosure statement that has not been approved by the DIP Administrative Agent.

16.     Milestones.  The Debtors' failure to comply with those certain case milestones set

forth in Section 5.21 of the DIP Credit Agreement (collectively, the "Milestones") shall constitute

an "Event of Default" in accordance with the terms of the DIP Credit Agreement. Notwithstanding

anything in this Order or in the DIP Credit Agreement, the Milestone in Section 5.21 (d)(iv) shall

be no later than June 22, 2023.

17.     Rights and Remedies Upon Event of Default.  Immediately upon the occurrence

and during the continuation of an Event of Default, notwithstanding the provisions of section 362

of the Bankruptcy Code, without any application, motion, or notice to, hearing before, or order

from the Court, but subject to the terms of this Interim Order, subject to the Remedies Notice

Period (defined below), (a) the DIP Administrative Agent (at the direction of the Requisite

Lenders) may declare (any such declaration shall be referred to herein as a "Termination

Declaration") (i) all DIP Obligations owing under the DIP Loan Documents to be immediately due

and payable, (ii) the termination, reduction or restriction of any further commitment to extend

credit to the Debtors to the extent any such commitment remains under the DIP Facility, (iii)

termination of the DIP Facility and the DIP Loan Documents as to any future liability or obligation

of the DIP Agents and the DIP Lenders, but without affecting any of the DIP Liens or the DIP Obligations, and (iv) that  the Carve Out shall be triggered, through the delivery of the Carve Out Trigger Notice to the DIP Borrower and (b) subject to paragraph 13(b), the DIP Administrative Agent (at the direction of the Requisite Lenders) may declare a termination, reduction or restriction on the ability of the Debtors to use Cash Collateral (the date on which a Termination Declaration is delivered, the "DIP Termination Date").  The Termination Declaration shall not be effective until notice has been provided by electronic mail (or other electronic means) to counsel to the Debtors, counsel to a Committee (if appointed), and the U.S. Trustee.  The automatic stay in the Chapter 11 Cases otherwise applicable to the DIP Agents, the DIP Lenders, and the Prepetition Secured Parties is hereby modified so that five (5) business days after the DIP Termination Date (the "Remedies Notice Period"):  (a) the DIP Agents (at the direction of the Requisite Lenders) shall be entitled to exercise its rights and remedies in accordance with the DIP Loan Documents and this Interim Order to satisfy the DIP Obligations, DIP Superpriority Claims, and DIP Liens, subject to the Carve Out; and (b) subject to the foregoing clause (a), the applicable Prepetition Secured Parties and the Cash Management Bank shall be entitled to exercise their respective rights and remedies to the extent available in accordance with the applicable Prepetition Term Loan Documents and this Interim Order with respect to the Debtors' use of Cash Collateral.  During the Remedies Notice Period, the Debtors, the Committee (if appointed), and/or any party in interest shall be entitled to seek an emergency hearing within the Remedies Notice Period with the Court for the sole purpose of contesting whether an Event of Default has occurred or is continuing or for the contested use of Cash Collateral.  Except as set forth in this Paragraph 17 or otherwise ordered by the Court prior to the expiration of the Remedies Notice Period, after the Remedies Notice Period, the Debtors shall waive their right to and shall not be entitled to seek relief, including,

without limitation, under section 105 of the Bankruptcy Code, to the extent such relief would in any way impair or restrict the rights and remedies of the DIP Agents, the DIP Lenders, or the Prepetition Secured Parties under this Interim Order.  Unless the Court has determined that an Event of Default has not occurred and/or is not continuing or the Court orders otherwise, the automatic stay, as to all of the DIP Agents, DIP Lenders, and Prepetition Secured Parties (solely with respect to the use of Cash Collateral to the extent permitted hereunder) shall automatically be terminated at the end of the Remedies Notice Period without further notice or order.  Upon expiration of the Remedies Notice Period, the DIP Agents (at the direction of the Requisite Lenders) and the Prepetition Secured Parties shall be permitted to exercise all remedies set forth herein, and in the DIP Loan Documents, and as otherwise available at law without further order of or application or motion to this Court consistent with this Interim Order; provided, that the Prepetition Secured Parties and the Cash Management Bank shall be permitted to exercise remedies to the extent available solely with respect to the Debtors' use of Cash Collateral.

18.    <u>Limitation on Charging Expenses Against Collateral</u>.    No expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral (except to the extent of the Carve Out), the DIP Agents and the DIP Lenders pursuant to the Bankruptcy Code or any similar principle of law or equity, without the prior written consent of the DIP Agents and the DIP Lenders, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Agents and the DIP Lenders.

19.    <u>Use of Cash Collateral</u>.    The Debtors are hereby authorized to use all Cash Collateral of the Prepetition Secured Parties, but solely for the purposes set forth in this

Interim Order and in accordance with the DIP Budget (subject to permitted variances as set forth

in this Interim Order and the DIP Loan Documents), including, without limitation, to make

payments on account of the Adequate Protection Obligations provided for in this Interim Order,

from the date of this Interim Order through and including the date of termination of the DIP Credit

Agreement.  Except on the terms and conditions of this Interim Order, the Debtors shall be enjoined

and prohibited from at any time using the Cash Collateral.

   20. <u>Expenses and Indemnification</u>.

   (a) The Debtors are hereby authorized and directed to pay, in accordance with

this Interim Order, the principal, interest, fees, payments, expenses, and other amounts described

in the DIP Loan Documents as such amounts become due and without need to obtain further Court

approval, including, without limitation, backstop, fronting, closing, arrangement or commitment

payments (including all payments and other amounts owed to the DIP Lenders), administrative

agent's fees, collateral agent's fees, and escrow agent's fees (including all fees and other amounts

owed to the DIP Agents), the reasonable and documented fees and disbursements of counsel and

other professionals to the extent set forth in Paragraphs 3(e)(3) and 9(c) of this Interim Order,

whether or not such fees arose before or after the Petition Date, all to the extent provided in this

Interim Order or the DIP Loan Documents.  Notwithstanding the foregoing, the Debtors are

authorized and directed to pay on the Closing Date (as defined in the DIP Loan Documents) all

reasonable and documented fees, costs, and expenses, including the fees and expenses of counsel

to the DIP Lenders, the DIP Agents, the Prepetition Term Agents, and the DIP/First Lien Group,

incurred on or prior to such date without the need for any professional engaged by the DIP Lenders,

the DIP Agents, the Prepetition Term Agents, or the DIP/First Lien Group to first deliver a copy

of its invoice as provided for herein.

(b)     The Debtors shall be jointly and severally obligated to pay all fees and expenses described above, which obligations shall constitute the DIP Obligations.  The Debtors shall pay the reasonable and documented professional fees, expenses, and disbursements of professionals to the extent provided for in Paragraphs 3(e)(3) and 9(c) of this Interim Order (collectively, the "<u>Lender Professionals</u>" and, each, a "<u>Lender Professional</u>") no later than ten (10) business days (the "<u>Review Period</u>") after the receipt by counsel for the Debtors, any Committee, and the U.S. Trustee of each of the invoices therefor (the "<u>Invoiced Fees</u>") and without the necessity of filing formal fee applications or complying with the U.S. Trustee Guidelines, including such amounts arising before the Petition Date.[4]  Invoiced Fees shall be in the form of an invoice summary for professional fees and categorized expenses incurred during the pendency of the Chapter 11 Cases, and such invoice summary shall not be required to contain time entries, but shall include a general, brief description of the nature of the matters for which services were performed, and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any work product doctrine, privilege or protection, common interest doctrine privilege or protection, any other evidentiary privilege or protection recognized under applicable law, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege, work

---

[4]     For the avoidance of doubt, the fees provided for in this Interim Order must be reasonable. Although the U.S. Trustee fee guidelines do not specifically apply, professionals shall submit time and expense detail entries to the U.S. Trustee, as well as any further information or back up documentation requested by the U.S. Trustee to determine the reasonableness of the invoiced amount. Invoices for such fees and expenses provided to any party other than the U.S. Trustee shall not be required to include any information subject to the attorney-client privilege, joint defense privilege, bank examiner privilege, or any information constituting attorney work product, and time and expense detail entries and other information provided solely to the U.S. Trustee shall be returned or destroyed after the U.S. Trustee has reviewed such material and any objections to the applicable fees and expenses have been resolved upon request of the applicable professional. Furthermore, the provision of invoices, time entries or other information pursuant to the terms hereof shall in no event constitute a waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine.

product doctrine, privilege or protection, common interest doctrine privilege or protection, or any other evidentiary privilege or protection recognized under applicable law.  The Debtors, any Committee, or the U.S. Trustee may dispute the payment of any portion of the Invoiced Fees (the "Disputed Invoiced Fees") if, within the Review Period, a Debtor, any Committee that may be appointed in these Chapter 11 Cases, or the U.S. Trustee notifies the submitting party in writing setting forth the specific objections to the Disputed Invoiced Fees (to be followed by the filing with the Court, if necessary, of a motion or other pleading, with at least ten (10) days prior written notice to the submitting party of any hearing on such motion or other pleading).  For avoidance of doubt, the Debtors shall promptly pay in full all Invoiced Fees other than the Disputed Invoiced Fees.

(c)     In addition, the Debtors will indemnify the DIP Lenders, the DIP Agents, and their respective affiliates, successors, and assigns and the officers, directors, employees, agents, attorneys, advisors, controlling persons, and members of each of the foregoing (each an "Indemnified Person") and hold them harmless from and against all costs, expenses (including but not limited to reasonable and documented legal fees and expenses), and liabilities arising out of or relating to the transactions contemplated hereby and any actual or proposed use of the proceeds of any loans made under the DIP Facility; provided that no such person will be indemnified for costs, expenses, or liabilities to the extent determined by a final, non-appealable judgment of a court of competent jurisdiction to have been incurred solely by reason of the gross negligence, fraud, or willful misconduct of such person (or their related persons).  No Indemnified Person shall have any liability (whether direct or indirect, in contract, tort, or otherwise) to the Debtors or any shareholders or creditors of the Debtors for or in connection with the transactions contemplated hereby, except to the extent such liability is found in a final non-appealable judgment by a court

of competent jurisdiction to have resulted solely from such Indemnified Person's gross negligence, fraud, or willful misconduct or breach of their obligations under the DIP Facility, and in no event shall any Indemnified Person be liable on any theory of liability for any special, indirect, consequential, or punitive damages.

21.     <u>No Third-Party Rights</u>.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

22.     <u>Section 507(b) Reservation</u>.  Subject to the Carve Out, nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition Secured Parties is insufficient to compensate for any Diminution in Value of their interests in the Prepetition Collateral during the Chapter 11 Cases. Nothing contained herein shall be deemed a finding by the Court, or an acknowledgment by any of the Prepetition Secured Parties that the adequate protection granted herein does in fact adequately protect any of the Prepetition Secured Parties against any Diminution in Value of their respective interests in the Prepetition Collateral (including the Cash Collateral).

23.     <u>Insurance</u>.  Until the DIP Obligations have been indefeasibly paid in full, at all times the Debtors shall maintain casualty and loss insurance coverage for the Prepetition Collateral and the DIP Collateral on substantially the same basis as maintained prior to the Petition Date and shall name the DIP Collateral Agent as loss payee thereunder.

24.     <u>No Waiver for Failure to Seek Relief</u>.  The failure or delay of the DIP Agents or the Requisite Lenders to exercise rights and remedies under this Interim Order, the DIP Loan Documents, or applicable law, as the case may be, shall not constitute a waiver of their respective rights hereunder, thereunder, or otherwise.

25.    <u>Perfection of the DIP Liens and Adequate Protection Liens</u>.

(a)    The DIP Agents and the Prepetition Term Agents are hereby authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, depository account control agreements, notices of lien, or similar instruments in any jurisdiction in order to validate and perfect the liens and security interests granted hereunder.  Whether or not the DIP Agents or the Prepetition Term Agents shall (at the direction of the applicable required lenders) choose to file such financing statements, intellectual property filings, mortgages, notices of lien, or similar instruments, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable, and not, subject to the Challenge Period, subject to challenge, dispute, or subordination as of the date of entry of this Interim Order.  If the DIP Agents or the Prepetition Term Agents, (each, at the direction of the applicable required lenders) determines to file or execute any financing statements, agreements, notice of liens, or similar instruments, the Debtors shall cooperate and assist in any such execution and/or filings as reasonably requested by the DIP Agents or the Prepetition Term Agents (each, at the direction of the applicable required lenders), and the automatic stay shall be modified to allow such filings.

(b)    A certified copy of this Interim Order may, at the direction of the applicable Requisite Lenders, be filed with or recorded in filing or recording offices by the DIP Agents or the Prepetition Term Agents, in addition to or in lieu of such financing statements, mortgages, notices of lien, or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Interim Order for filing and recording; provided, however, that notwithstanding the date of any such filing, the date of such perfection shall be the date of this Interim Order.

(c)    Any provision of any lease or other license, contract or other agreement that requires (i) the consent or approval of one or more landlords or other parties or (ii) the payment of

any fees or obligations to any governmental entity, in order for any Debtor to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest, or the proceeds thereof, or other collateral related thereto, is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code, subject to applicable law.  Any such provision shall have no force and effect with respect to the granting of the DIP Liens and the Adequate Protection Liens on such leasehold interest or the proceeds of any assignment and/or sale thereof by any Debtor in accordance with the terms of the DIP Credit Agreement or this Interim Order, subject to applicable law.

26.    <u>Release</u>.  Subject to the rights and limitations set forth in Paragraph 13 of this Interim Order, effective upon entry of this Interim Order, each of the Debtors and the Debtors' estates, on its own behalf and on behalf of each of their predecessors, their successors, and assigns, shall, to the maximum extent permitted by applicable law, unconditionally, irrevocably, and fully forever release, remise, acquit, relinquish, irrevocably waive, and discharge each of the DIP Secured Parties and the Prepetition Secured Parties, and each of their respective affiliates, former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, assigns, and predecessors in interest, each in their capacity as such, of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened, including, without limitation, all legal and equitable theories of recovery, arising under common law, statute, or regulation or by contract, of every nature and description that exist on the date hereof with respect to or relating to the DIP

Obligations, the DIP Liens, the DIP Loan Documents, the Prepetition First Lien Obligations, the

Prepetition Senior Liens or the Prepetition Term Loan Documents, as applicable, including,

without limitation, (i) any so-called "lender liability" or equitable subordination claims or

defenses, (ii) any and all claims and causes of action arising under the Bankruptcy Code, and

(iii) any and all claims and causes of action regarding the validity, priority, extent, enforceability,

perfection, or avoidability of the liens or claims of the DIP Secured Parties and the Prepetition

Secured Parties; provided that nothing in this paragraph shall in any way limit or release the

obligations of any DIP Secured Party under the DIP Loan Documents.

27.     Credit Bidding.  The DIP Administrative Agent (at the direction of the Requisite

Lenders) and the Prepetition Administrative Agent (at the direction of the Requisite Lenders (as

defined in the Prepetition Credit Agreement)) shall have the right to credit bid (either directly or

through one or more acquisition vehicles), up to the full amount of the underlying lenders'

respective claims, including, for the avoidance of doubt, Adequate Protection Superpriority

Claims, if any, in any sale of all or any portion of the Prepetition Collateral or DIP Collateral

including, without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or

included as part of any chapter 11 plan subject to confirmation under Bankruptcy Code section

1129(b)(2)(A)(ii)-(iii).  The DIP Secured Parties shall have the absolute right to assign, sell, or

otherwise dispose of their right to credit bid in connection with any credit bid by or on behalf of

the DIP Secured Parties, as applicable, to any acquisition entity or joint venture formed in

connection with such bid.

28.     Preservation of Rights Granted Under this Interim Order.

(a)     Unless and until all DIP Obligations are indefeasibly paid in full, in cash,

and all Commitments are terminated, the Prepetition Secured Parties shall:  (i) have no right to and

shall take no action to foreclose upon, or recover in connection with, the liens granted thereto pursuant to the Prepetition Term Loan Documents or this Interim Order, or otherwise seek to exercise or enforce any rights or remedies against such DIP Collateral; and (ii) not file any further financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or otherwise take any action to perfect their security interests in the DIP Collateral, except as set forth in Paragraph 24 herein.

(b)     In the event this Interim Order or any provision hereof is vacated, reversed, or modified on appeal or otherwise, any liens or claims granted to the DIP Secured Parties or the Prepetition Secured Parties hereunder arising prior to the effective date of any such vacatur, reversal, or modification of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges, and benefits granted herein, and the Prepetition Secured Parties shall be entitled to all the rights, remedies, privileges, and benefits afforded in section 364(e) of the Bankruptcy Code.

(c)     Unless and until all DIP Obligations, Prepetition First Lien Obligations, and Adequate Protection Payments are indefeasibly paid in full, in cash, and all Commitments are terminated, the Debtors irrevocably waive the right to seek and shall not seek or consent to, directly or indirectly (i) except as permitted under the DIP Loan Documents or, if not provided for therein, with the prior written consent of the DIP Administrative Agent, the Requisite Lenders, and the Prepetition Administrative Agent, (x) any modification, stay, vacatur, or amendment of this Interim Order or (y) a priority claim for any administrative expense or unsecured claim against any of the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in sections 503(b), 507(a), or 507(b) of the Bankruptcy Code) in any of the Chapter 11 Cases, pari passu with or senior to the

DIP Superpriority Claims, the Adequate Protection Superpriority Claims, or the Prepetition First

Lien Obligations, or (z) any other order allowing use of the DIP Collateral; (ii) except as permitted

under the DIP Loan Documents (including the Carve Out), any lien on any of the DIP Collateral

or the Prepetition Collateral with priority equal or superior to the DIP Liens, the Adequate

Protection Liens or the Prepetition Senior Liens, as applicable; (iii) the use of Cash Collateral for

any purpose other than as permitted in the DIP Loan Documents and this Interim Order; (iv) except

as set forth in the DIP Loan Documents, the return of goods pursuant to section 546(h) of the

Bankruptcy Code (or other return of goods on account of any prepetition indebtedness) to any

creditor of any Debtor; (v) an order converting or dismissing any of the Chapter 11 Cases; (vi) an

order appointing a chapter 11 trustee in any of the Chapter 11 Cases; or (vii) an order appointing

an examiner with enlarged powers in any of the Chapter 11 Cases.

(d)    Notwithstanding any order dismissing any of the Chapter 11 Cases entered

at any time, (x) the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the

Adequate Protection Superpriority Claims, and the other administrative claims granted pursuant

to this Interim Order shall continue in full force and effect and shall maintain their priorities as

provided in this Interim Order until all DIP Obligations and Adequate Protection Payments are

indefeasibly paid in full in cash (and such DIP Liens, DIP Superpriority Claims, Adequate

Protection Liens, Adequate Protection Superpriority Claims, and the other administrative claims

granted pursuant to this Interim Order, shall, notwithstanding such dismissal, remain binding on

all parties in interest); and (y) to the fullest extent permitted by law the Court shall retain

jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens, and

security interests referred to in clause (x) above.

(e)      Except as expressly provided in this Interim Order or in the DIP Loan

Documents, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the

Adequate Protection Superpriority Claims, and all other rights and remedies of the DIP Agents,

the DIP Lenders and the Prepetition Secured Parties granted by the provisions of this Interim Order

and the DIP Loan Documents shall survive, and shall not be modified, impaired, or discharged by

(i) the entry of an order converting any of the Chapter 11 Cases to a case under chapter 7,

dismissing any of the Chapter 11 Cases, terminating the joint administration of these Chapter 11

Cases or by any other act or omission, (ii) the entry of an order approving the sale of any

Prepetition Collateral or DIP Collateral pursuant to section 363(b) of the Bankruptcy Code, or (iii)

the entry of an order confirming a chapter 11 plan in any of the Chapter 11 Cases and, pursuant to

section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any

remaining DIP Obligations or Adequate Protection Obligations.  The terms and provisions of this

Interim Order and the DIP Loan Documents shall continue in these Chapter 11 Cases, in any

successor cases if these Chapter 11 Cases cease to be jointly administered, or in any superseding

chapter 7 cases under the Bankruptcy Code.  The DIP Liens, the DIP Superpriority Claims, the

Adequate Protection Liens, the Adequate Protection Superpriority Claims, and all other rights and

remedies of the DIP Secured Parties, and the Prepetition Secured Parties granted by the provisions

of this Interim Order shall continue in full force and effect until the DIP Obligations and the

Adequate Protection Payments are indefeasibly paid in full, in cash (or, with respect to the DIP

Obligations, otherwise satisfied in a manner agreed to by the Requisite Lenders and the DIP

Administrative Agent).

(f)      Other than as set forth in this Interim Order, neither the DIP Liens nor the

Adequate Protection Liens shall be made subject to or pari passu with any lien or security interest

granted in any of the Chapter 11 Cases or arising after the Petition Date, and neither the DIP Liens

nor the Adequate Protection Liens shall be subject or junior to any lien or security interest that is

avoided and preserved for the benefit of the Debtors' estates under Bankruptcy Code section 551.

29.    <u>Limitation on Use of DIP Facility Proceeds, DIP Collateral, and Cash Collateral</u>.

Notwithstanding anything to the contrary set forth in this Interim Order, none of the DIP Facility,

the DIP Collateral, the Prepetition Collateral, including Cash Collateral, or the Carve Out or

proceeds thereof may be used:  (a) to investigate (including by way of examinations or discovery

proceedings), initiate, assert, prosecute, join, commence, support, or finance the initiation or

prosecution of any claim, counterclaim, action, suit, arbitration, proceeding, application, motion,

objection, defense, adversary proceeding, or other litigation of any type (i) against any of the

DIP Secured Parties or the Prepetition Secured Parties (each in their capacities as such), and each

of their respective affiliates, officers, directors, employees, agents, representatives, attorneys,

consultants, financial advisors, affiliates, assigns, or successors, with respect to any transaction,

occurrence, omission, action, or other matter (including formal discovery proceedings in

anticipation thereof), including, without limitation, any so-called "lender liability" claims and

causes of action, or seeking relief that would impair the rights and remedies of the DIP Secured

Parties or the Prepetition Secured Parties (each in their capacities as such) under the DIP Loan

Documents, the Prepetition Term Loan Documents, or this Interim Order, including, without

limitation, for the payment of any services rendered by the professionals retained by the Debtors

or any Committee appointed in these Chapter 11 Cases in connection with the assertion of or

joinder in any claim, counterclaim, action, suit, arbitration, proceeding, application, motion,

objection, defense, adversary proceeding, or other contested matter, the purpose of which is to

seek, or the result of which would be to obtain, any order, judgment, determination, declaration,

or similar relief that would impair the ability of any of the DIP Secured Parties or the Prepetition

Secured Parties to recover on the DIP Collateral or the Prepetition Collateral or seeking affirmative

relief against any of the DIP Secured Parties or the Prepetition Parties related to the DIP

Obligations or the Prepetition First Lien Obligations; (ii) invalidating, setting aside, avoiding, or

subordinating, in whole or in part, the DIP Obligations or the Prepetition First Lien Obligations,

or the DIP Agents', the DIP Lenders,' and the Prepetition Secured Parties' liens or security

interests in the DIP Collateral or Prepetition Collateral, as applicable; or (iii) for monetary,

injunctive, or other affirmative relief against the DIP Secured Parties or the Prepetition Secured

Parties, or the DIP Agents', the DIP Lenders,' the Prepetition Secured Parties' respective liens on

or security interests in the DIP Collateral or the Prepetition Collateral that would impair the ability

of any of the DIP Secured Parties or the Prepetition Secured Parties, as applicable, to assert or

enforce any lien, claim, right, or security interest or to realize or recover on the DIP Obligations

or the Prepetition First Lien Obligations, to the extent applicable; (b) for objecting to or challenging

in any way the legality, validity, priority, perfection, or enforceability of the claims, liens, or

interests (including the Prepetition Senior Liens) held by or on behalf of each of the Prepetition

Secured Parties related to the Prepetition First Lien Obligations, or by or on behalf of the DIP

Agents and the DIP Lenders related to the DIP Obligations; (c) for asserting, commencing, or

prosecuting any claims or causes of action whatsoever, including, without limitation, any

Avoidance Actions related to the DIP Obligations, the DIP Liens, the Prepetition First Lien

Obligations, or the Prepetition Senior Liens; or (d) for prosecuting an objection to, contesting in

any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or

enforceability of: (x) any of the DIP Liens or any other rights or interests of the DIP Agents or the

DIP Lenders related to the DIP Obligations or the DIP Liens, or (y) any of the Prepetition Senior

Liens or any other rights or interests of any of the Prepetition Secured Parties related to the Prepetition First Lien Obligations or the Prepetition Senior Liens, provided that no more than $50,000 of the proceeds of the DIP Facility, the DIP Collateral, or the Prepetition Collateral, including the Cash Collateral, in the aggregate, may be used by any Committee appointed in these Chapter 11 Cases, if any, solely to investigate, within the Challenge Period (as defined below), the claims, causes of action, adversary proceedings, or other litigation against the Prepetition Secured Parties solely concerning the legality, validity, priority, perfection, enforceability or extent of the claims, liens, or interests (including the Prepetition Senior Liens) held by or on behalf of each of the Prepetition Secured Parties related to the Prepetition First Lien Obligations.  Nothing contained in this Paragraph 28 shall prohibit the Debtors from responding or objecting to or complying with discovery requests of any Committee, in whatever form, made in connection with such investigation or the payment from the DIP Collateral (including Cash Collateral) of professional fees related thereto or from contesting or challenging whether a Termination Declaration has in fact occurred.

30.    <u>Conditions Precedent</u>.  Except as provided for in the Carve Out, no DIP Lender shall have any obligation to make any DIP Loan under the respective DIP Loan Documents unless all of the conditions precedent to the making of such extensions of credit under the applicable DIP Loan Documents have been satisfied in full or waived in accordance with such DIP Loan Documents.

31.    <u>Binding Effect; Successors and Assigns</u>.   The DIP Loan Documents and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in these Chapter 11 Cases, including, without limitation, the DIP Secured Parties, the Prepetition Secured Parties, any Committee appointed in these Chapter 11 Cases, and the Debtors

and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Secured Parties and the applicable Prepetition Secured Parties; provided that, except to the extent expressly set forth in this Interim Order, the Prepetition Secured Parties shall have no obligation to permit the use of Cash Collateral or to extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors.  In determining to make any loan (whether under the DIP Credit Agreement, a promissory note or otherwise) to permit the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Loan Documents, the DIP Secured Parties and the Prepetition Secured Parties shall not (i) be deemed to be in control of the operations of the Debtors, or (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders, or estates.

32.    <u>Pulse Notes Subordination Agreement</u>.  Pursuant to section 510 of the Bankruptcy Code, the Pulse Notes Subordination Agreement and any other applicable intercreditor or subordination provisions contained in any of the Prepetition Term Loan Documents or any of the Second Lien Note Documents (i) shall remain in full force and effect, and (ii) shall continue to govern the relative priorities, rights, and remedies of the Prepetition Secured Parties and the Prepetition Second Lien Secured Parties; provided that nothing in this Interim Order shall be deemed to provide liens to any Prepetition Secured Party or Prepetition Second Lien Secured Party on any assets of the Debtors except as set forth herein.

33.    <u>Limitation of Liability</u>.  Subject to entry of a Final Order, in determining to make any loan under the DIP Loan Documents, permitting the use of Cash Collateral, or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Loan Documents, the DIP Secured Parties and the Prepetition Secured Parties shall not, solely by reason thereof, be deemed in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq. as amended, or any similar federal or state statute).  Furthermore, nothing in this Interim Order or in the DIP Loan Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agents, the DIP Lenders, or any Prepetition Secured Parties of any liability for any claims arising from the prepetition or post-petition activities of any of the Debtors.

34.    <u>No Requirement to File Claim for DIP Obligations</u>.  Notwithstanding anything to the contrary contained in any prior or subsequent order of the Court, including, without limitation, any order establishing a deadline for the filing of proofs of claim or requests for payment of administrative expenses under section 503(b) of the Bankruptcy Code, neither the DIP Agents nor any DIP Lender shall be required to file any proof of claim or request for payment of administrative expenses with respect to any of the DIP Obligations, all of which shall be due and payable in accordance with the DIP Loan Documents without the necessity of filing any such proof of claim or request for payment of administrative expenses, and the failure to file any such proof of claim or request for payment of administrative expenses shall not affect the validity, priority, or enforceability of any of the DIP Loan Documents or of any indebtedness, liabilities, or obligations arising at any time thereunder or prejudice or otherwise adversely affect the DIP Agents' or any

DIP Lender's rights, remedies, powers, or privileges under any of the DIP Loan Documents, this Interim Order, or applicable law. The provisions set forth in this paragraph are intended solely for the purpose of administrative convenience and shall not affect the substantive rights of any party-in-interest or their respective successors-in-interest.

35.    No Requirement to File Claim for Prepetition First Lien Obligations. Notwithstanding anything to the contrary contained in any prior or subsequent order of the Court, including, without limitation, any order establishing a deadline for the filing of proofs of claim or requests for payment of administrative expenses under section 503(b) of the Bankruptcy Code, neither the Prepetition Term Agents nor any Prepetition Term Lender shall be required to file any proof of claim or request for payment of administrative expenses with respect to any of the Prepetition First Lien Obligations; and the failure to file any such proof of claim or request for payment of administrative expenses shall not affect the validity, priority, or enforceability of any of the Prepetition Term Loan Documents or of any indebtedness, liabilities, or obligations arising at any time thereunder or prejudice or otherwise adversely affect the Prepetition Term Agent's or any Prepetition Term Lender's rights, remedies, powers, or privileges under any of the Prepetition Term Loan Documents, this Interim Order, or applicable law.   The provisions set forth in this paragraph are intended solely for the purpose of administrative convenience and shall not affect the substantive rights of any party-in-interest or their respective successors-in-interest.

36.    Cash Management Obligations.  The Debtors are authorized to continue utilizing the products and services of the Cash Management Bank and incur obligations in connection with various cash management products and services (including, without limitation, treasury, depository, credit card, debit card, stored value cards, purchasing or procurement cards and cash management services or automated clearinghouse transfer of funds or any overdraft or similar

services) provided to the Debtors and/or any of their affiliates (for which the Debtors are otherwise liable) on a postpetition basis consistent with historical practices (the "Postpetition Cash Management Obligations") on the terms set forth in the *Interim Order (I) Authorizing the Debtors to Continue to (A) Utilize Their Existing Cash Management System, (B) Maintain Their Existing Bank Accounts, (C) Perform Intercompany Transactions, (D) Utilize and Maintain Their Existing Business Forms, and (E) Utilize Their Corporate Credit Card Programs and (II) Granting Related Relief* and any subsequent final order.

37.     Cash Management Bank Forbearance.  In accordance with that certain Consent and Forbearance Agreement by and among the Cash Management Bank, Vice Group Holding Inc., Vice Media LLC, and Vice Europe Holding Limited, dated as of May 14, 2023 (the "JPM Forbearance Agreement"), the Cash Management Bank shall not terminate any "Cash Management Agreement" (as defined in the JPM Forbearance Agreement), shall continue to provide cash management services to the Debtors' non-Debtor affiliates, and shall permit such non-Debtor affiliates of the Debtors to withdraw and transfer funds as of the Petition Date.

38.     [Reserved].

39.     Application of Proceeds of DIP Collateral.  Subject to entry of a Final Order, the DIP Obligations, at the option of the Requisite Lenders, to be exercised in their sole and absolute discretion, shall be repaid (a) first, from the DIP Collateral comprising Previously Unencumbered Property and (b) second, from all other DIP Collateral.

40.     Application of Sale Proceeds.  Subject to the entry of a Final Order, in the event of any sale or other disposition of DIP Collateral (other than pursuant to the Asset Purchase Agreement (as defined in the DIP Credit Agreement)), any cash or cash equivalents that are proceeds of such sale or other disposition shall be paid or reserved in the following order of priority

immediately upon closing of such sale or other disposition:  (a) *first*, cash or cash equivalents shall

be reserved by the Debtors for the benefit of the estate in an amount equal to the Excluded Cash

(as defined in the Asset Purchase Agreement) and the Carve Out (provided that there shall be no

duplication of expenses or liabilities to the extent provided for in both the Excluded Cash and the

Carve Out), (b) *second*, the DIP Obligations shall be indefeasibly paid in cash pursuant to the DIP

Credit Agreement, and (c) *third*, the Prepetition First Lien Obligations shall be indefeasibly paid

in cash pursuant to the Prepetition Senior Secured Credit Agreement.  Upon satisfaction of the

amounts and obligations set forth in the immediately preceding sentence, any proceeds from the

sale or other disposition of DIP Collateral shall be available to the Debtors and creditors pursuant

to the priorities set forth in the Bankruptcy Code or as otherwise provide pursuant to an order of

this Court.

41.     Equities of the Case.  Subject to entry of a Final Order, the Prepetition Secured

Parties shall each be entitled to all the rights and benefits of section 522(b) of the Bankruptcy

Code, and, subject to and solely upon entry of the Final Order, the "equities of the case" exception

under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties

with respect to proceeds, product, offspring, or profits of any of the Collateral (including the

Prepetition Collateral).

42.     Final Hearing.  The Final Hearing on the Motion shall be held on June 6, 2023, at

11:00 a.m., prevailing Eastern time.  Any objections or responses to entry of a final order on the

Motion shall be filed on or before 4:00 p.m., prevailing Eastern time, on May 30, 2023, and shall

be served on:  (a) the Debtors, Vice Group Holding Inc., 49 South 2nd Street, Brooklyn, NY

11249, Attention:  Maria Harris, Email:  maria.harris@vice.com; (b) proposed lead counsel to the

Debtors, Togut, Segal & Segal LLP, One Penn Plaza, Suite 3335, New York, NY 10119 (Attn:

Kyle J. Ortiz and Brian F. Moore); (c) proposed special counsel to the Debtors, Shearman &

Sterling LLP, 599 Lexington Avenue, New York, NY 10022 (Attn.: Fredric Sosnick) and

Shearman & Sterling LLP, 2601 Olive Street, 17th Floor, Dallas, TX 75201 (Attn.:  Ian E.

Roberts); (d) counsel to the DIP Lenders, the DIP Administrative Agent, and the DIP/First Lien

Group, Gibson, Dunn & Crutcher LLP, 200 Park Ave., New York, NY 10166, Attn:  David M.

Feldman, Esq., Michael S. Neumeister, Esq., and Matthew C. Rowe, Esq.; (e) counsel to the DIP

Agent, Collateral Agent and the Prepetition First Lien Collateral Agent, Shipman & Goodwin LLP,

One Constitution Plaza, Hartford, Connecticut 06103, Attn: Marie C. Pollio, Esq. and Latonia

Williams, Esq.; (f) counsel to William K. Harrington, the United States Trustee, U.S. Department

of Justice, Office of the United States Trustee, One Bowling Green, Rm. 534, New York, NY

10004 (Attn.: Andrea B. Schwartz, Esq. and Annie Wells, Esq.); and (g) counsel to any statutory

committee appointed in these chapter 11 cases.  In the event no objections to entry of the Final

Order on the Motion are timely received, this Court may enter such Final Order without need for

the Final Hearing.

43.    <u>Effect of this Interim Order</u>.  This Interim Order shall constitute findings of fact

and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable

immediately upon execution hereof.

44.    <u>Retention of Jurisdiction</u>.  The Court retains exclusive jurisdiction with respect to

all matters arising from or related to the implementation of this Interim Order.


 Dated: May 17, 2023                        /S/ John P. Mastando III
                                            UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit 1</u>**

**Form of DIP Credit Agreement**

## **Exhibit 2**

**Budget**